IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**UNITED STATES OF AMERICA,**

          v.

**JOSEPH JENKINS,**

         **Defendant.**

Criminal Action No.
5:11-CR-602 (GTS)

Government Response to
Motion to Suppress Evidence

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## INTRODUCTION

Defendant Joseph Jenkins stands charged by Indictment with one count of transporting child pornography in violation of Title 18, United States Code, Section 2252A(a)(1) and one count of possessing child pornography in violation of Title 18, United States Code, Section 2252A(a)(5)(B). On July 9, 2012, defendant Jenkins filed a motion[1] to suppress the electronic evidence seized from him by Canadian law enforcement officials and subsequently obtained by the United States government pursuant to the execution of a search warrant issued by Judge George H. Lowe. This response follows.

**I.  FACTS**

On May 24, 2009, at approximately 9:00 a.m., Canadian Border Services Agency Officer ("CBSA") Pedro Sousa-Diaz ("Officer Sousa-Diaz") encountered defendant Joseph Jenkins ("Jenkins") as he applied for admission into Canada at the Port of Lansdowne, Ontario, Canada from

---

[1] In the defendant's Memorandum of Law, he also requests discovery of "any materials that the United States Attorney may have, or may be able to require though acts of due diligence, which would have caused the CBSA to stop and search the Jenkins vehicle." Defendant Memorandum of Law at 8.  As the government noted in its letter filed July 6, 2012, it has fully complied with its discovery obligations.  *See* Doc. No. 24.  Further, appended as exhibits to the present response motion are "Will Say" statements from several Canadian Border Services Agency officers involved in the search of Jenkins' vehicle.

1

Wellesley Island, New York. *See* Exhibit A (Will Say Statement of CBSA Officer Tristan Garrah)[2]. Jenkins was the sole occupant of a 2003 Dodge Ram pickup truck bearing New York license plate 19322JL, which CBSA Officer Tristan Garrah later determined - through checks with the New York State Department of Motor Vehicles - was registered in his name. *Id.*

Officer Sousa-Diaz related to CBSA Officer Melany Boyd ("Officer Boyd") that he directed Jenkins to a criminal activity checkpoint because Jenkins appeared to be extremely nervous and was avoiding eye contact with Officer Sousa-Diaz. *See* Exhibits B and C (Will Say Statements of Officers Glen Hache and Melany Boyd). Officer Boyd conducted a criminal activity inquiry of Jenkins at the check point. Exhibit C. She observed that Jenkins appeared apprehensive and gave evasive answers to her questions about his reason for traveling to Canada. *Id.* Officer Boyd referred Jenkins to CBSA Officer Glen Hache ("Officer Hache") for a secondary inspection. *Id.* Officer Hache inspected Jenkins's vehicle and noticed that there were tools in the truck. Exhibit B. Officer Hache suspected that Jenkins might be entering Canada to work, so he sought assistance from CBSA Officers Jarrett Johnston ("Officer Johnston") and Garrah.

Officer Johnston noticed a Toshiba laptop bearing the serial number 78175808W in a box located in the backseat of Jenkins's vehicle. Exhibit D (Officer Johnston Will Say Statement). Officer Johnston asked Jenkins whether the laptop was new. *Id.* Jenkins stated that he had been using the laptop for over a year and that it was for personal use. *Id.* Officer Johnston opened the Toshiba computer and noticed a file shortcut on the computer desktop. *Id.* When he accessed the file, Officer Johnston observed an image of what appeared to be a male holding a young girl and a

---

[2]"Will Say Statements" are the instruments used by Canadian law enforcement agents. They are attested to by the agent and outline testimony that would be given should the agent be called to the witness stand.

video of what appeared to be two prepubescent girls performing sexually suggestive acts. *Id.* Officer Garrah located a second laptop computer, a Compaq, bearing serial number: CNF3362GPN, in Jenkins's vehicle; Officer Garrah brought the second computer into the agency's office for review. Exhibit A. Officer Hache explained to Jenkins that the officers would be reviewing the contents of the computers for child pornography and asked Jenkins whether there was any child pornography on the laptops. Exhibit B. Jenkins responded "[n]ot to my knowledge," and "I don't think so." *Id.* Officer Hache then asked Jenkins whether he had ever downloaded naked pictures of teens or children; Jenkins responded that he had not. *Id.*

CBSA Officers Hache, Garrah and Johnston also discovered the following items in Jenkins' vehicle: one (1) PNY Attaché 8GB USB thumb drive; one (1) PNY Attaché 4GB USB thumb drive; one (1) PNY Attaché 2GB USB thumb drive; six (6) compact discs; one (1) Belkin Notebook card, Serial Number: 408242909; one (1) Olympus Digital Camera and XD Image Card, Serial Number: MXD163K57106SSX30421MAD; and one (1) Motorola Cellular phone. *See* Exhibit E (Appendix C of Warrant to Search of Detective Constable Kip Wohlert, dated May 27, 2009).

Officer Garrah reviewed the PNY Attaché 8GB USB thumb drive and found a video entitled: 9yo_vicky_stripping_and_sucking_kiddy_pedo_illegal_underage_preteen. Exhibit A. Officer Garrah's Will Say Statement describes the video as follows: The video was 01:39 minute in length and depicted a young girl in a tank top and skirt with black stockings that went mid-thigh. *Id.* She appeared prepubescent and appeared to have been instructed to twirl and then undress. *Id.* In the video, the girl removes all of her clothing except for her stockings. *Id.* She appears to have no breast or hip development and no pubic hair. *Id.* She approaches the person holding the camera and performs oral sex. *Id.* Officer Garrah reasonably believed this video to be child pornography. *Id.*

3

At 9:46 a.m., Officer Garrah read Jenkins his rights to counsel and placed Jenkins under arrest for smuggling or attempting to smuggle goods into Canada.[3]  *Id.*

At approximately 9:45 a.m., Investigator Marie-Josee Vinette, an investigator with the CBSA Criminal Investigation Division, reviewed several videos stored on the PNY Attaché 8GB thumb drive at the border checkpoint and determined that they were child pornography. See Exhibit E (Will Say Statement of Investigator Marie-Josee Vinette ("Investigator Vinette")).  These child pornography video files included the file titled "9yo_vicky_stripping_and_sucking_kiddy _pedo_illegal_underage_preteen," that was reviewed by Officer Garrah, as well as a file titled **"Bd-C.avi_1"** depicting a prepubescent girl with no secondary sex characteristic development, posing for a photo shoot, with the camera occasionally focusing only on her genitalia.  Exhibits A and F.

On May 27, 2009, Detective Constable Kip Wohlert ("Const. Wohlert") of the Ontario Provincial Police's ("OPP") Child Sexual Exploitation Section searched the Toshiba Laptop, Compaq laptop, PNY Attaché 8GB thumb drive, PNY Attaché 4GB thumb drive, PNY Attaché 2GB thumb drive, Olympus Digital Camera, and Verizon Motorola cell phone pursuant to a search warrant issued by a Justice of the Peace for the Province of Ontario.  Exhibit E.  Following Constable Wohlert's discovery of additional images of child pornography on the above-listed digital media, Jenkins was charged with Importing-Distributing Child Pornography and Possession of Child Pornography in the Superior Court of Ontario.  Jenkins failed to appear for trial in Canada on those charges.  *See* Exhibit G (Warrant for Arrest issued by Hon. J.D.G. Waugh).

---

[3] In the defendant's memorandum of law, he states that "Mr. Jenkins' computer was taken from him prior to his arrest and was transported many miles and several hours away." The attached statements of the CBSA officers indicate that, to the contrary, the defendant was arrested during the course fo the search of the computer, which was conducted at the border checkpoint, the same location where the defendant was placed under arrest.

On or about October 21, 2010, Const. Wohlert provided Homeland Security Investigations ("HSI") Special Agent Matthew Meyer ("SA Meyer") with OPP and forensic reports associated with the investigation of Jenkins. Exhibit H (Affidavit of Special Agent Chad Willard). These reports included image files discovered on the seized Toshiba laptop and PNY Attaché thumb drives that were seized from Jenkins. Detective Wohlert also advised SA Meyer that a child pornography video was found in dead space on the Compaq laptop seized from Jenkins.

On April 1, 2011, the Toshiba laptop, Compaq laptop, PNY Attaché 8GB thumb drive, PNY Attaché 4GB thumb drive, PNY Attaché 2GB thumb drive, Olympus Digital Camera and Verizon Motorola cell phone were transferred from CBSA's custody to HSI's custody, located at 46735 US I-81 Alexandria Bay, New York 13607.

On July 6, 2011, a search warrant for the above-described property was signed by Hon. George H. Lowe. Pursuant to that warrant, HSI Computer Forensic Agent Brian Braisted examined the electronic media and located approximately 3,881 images and 109 multimedia files of suspected child pornography on the Toshiba laptop, PNY Attaché 8GB thumb drive and PNY Attaché 4GB thumb drive.

On September 12, 2011, Jenkins was charged by complaint with violations of Title 18, United States Code Sections 2252A(a)(1) and 2252A(a)(5)(B), the knowing and unlawful transportation of child pornography and possession with intent to view child pornography. On October 4, 2011, HSI Agents arrested Jenkins at his residence at 4072 Dwyer Lane, Geneva, New York 14456.

On December 21, 2011, the Grand Jury returned a two count indictment charging Jenkins with violating Title 18, United States Code Sections 2252A(a)(1) & 2252A(a)(5)(B). On July 9,

2012, Jenkins filed a motion to suppress the electronic evidence seized from Jenkins by Canadian law enforcement officials during the execution of a border checkpoint search and later obtained by the government pursuant to a search warrant issued by a United States Magistrate Judge. This response follows.

## II. THE DEFENDANT'S MOTION TO SUPPRESS SHOULD BE SUMMARILY DENIED WITHOUT A HEARING BECAUSE HE HAS FAILED TO COMPLY WITH THE LOCAL RULES AND HAS NOT ESTABLISHED THAT HIS RIGHTS HAVE BEEN VIOLATED

Rule 12.1(e) of Section XI of the Local Rules of Practice for the District Court for the Northern District of New York provides that "[i]f the government contests whether an [evidentiary] hearing should be conducted, the defendant's motion must be accompanied by an affidavit, based upon personal knowledge, setting forth facts which, if proven true, would entitle the defendant to relief." Pursuant to this Rule, the defendant has an obligation to submit an affidavit based on personal knowledge to establish that his rights were violated for purposes of a motion to suppress evidence. Further, a criminal defendant moving to suppress evidence based on an alleged Fourth Amendment violation bears the burden of production. *See*, *e.g.*, *United States v. Arboleda*, 633 F.2d 985,989 (2d Cir. 1980); *United States v. Miller*, 382 F. Supp. 2d 350, 361-62 (N.D.N.Y. 2005). A defendant moving to suppress evidence is obligated to present facts showing that his rights were violated. *See United States v. Pena*, 91 F.2d 333, 336-37 (2d Cir. 1992) ("the defendant seeking suppression bears the burden upon this issue . . . .").

As the *Millller* Court explained:

> In this district, the defendant usually satisfies this burden in one of two ways. He may file moving papers accompanied by an affidavit, based upon personal knowledge, setting forth facts which, if proven true, would entitle him to relief. Alternatively, he and the government

> may agree that he has met his burden, specify the issues requiring resolution, and request a hearing. If he fails to comply with either alternative, he does not satisfy his burden, there will be no hearing, and the evidence he seeks to suppress will be admitted at trial.

*Id.* at 361 (citations omitted). Similarly, in *United States v. Longo*, 70 F. Supp. 2d 225 (W.D.N.Y. 1999), the Court noted:

> A defendant seeking the suppression of evidence is not automatically entitled to an evidentiary hearing on the claim, but must make a preliminary showing of facts which, if proved would require the granting of relief. To meet that burden a defendant must, at a minimum, present his or her claim through an affidavit of an individual with personal knowledge of the relevant facts. Such an affidavit must contain allegations that are "definite, specific, detailed and nonconjectural."

*Id.* at 248 (citations omitted). "'[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.' *United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005) (internal quotation marks omitted)." *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 157, 165 (2d Cir. 2008).

In this case, the government has not agreed that the defendant has met his burden entitling him to the requested relief nor consented to a hearing. As a result, it was incumbent on the defendant to file an affidavit based on personal knowledge to satisfy his burden of production. He has not done so. Thus, he has presented no evidence to the Court that any Constitutional violations occurred to entitle him to the relief he seeks. In order to raise such a factual issue, the defendant must, at a minimum, present his claim through the affidavit of an individual with personal knowledge of the relevant facts. *See United States v. Gillette*, 383 F.2d 843, 848-49 (2d Cir. 1967) (holding that the

affirmation of a defendant's attorney, who has no personal knowledge of the facts at issue, is insufficient to form a basis for a suppression hearing). The government submits that the memorandum of law submitted by defense counsel, who has no direct personal knowledge of the facts at issue, is legally insufficient to justify a hearing. Under these circumstances, it is clear that the defendant's motion to suppress the evidence in this case should be summarily denied without a hearing. *See*, *e.g.*, *United States v. Ventura*, 1998 WL 186737 (S.D.N.Y. 1998) (summarily denying motion to suppress that was supported only by an attorney's conclusory affidavit).

In this case, the defendant has failed to articulate facts meriting a hearing on the suppression issue. But, as discussed below, even if all of the facts as identified in the defendant's memorandum of law are accepted as true, there is still no basis for a hearing.

### III. THE FOURTH AMENDMENT AND THE EXCLUSIONARY RULE DO NOT APPLY TO THE LAW ENFORCEMENT ACTIVITIES OF FOREIGN COUNTRIES

The defendant asserts that his Fourth Amendment rights were violated by the search and seizure of the electronic media in his possession by Canadian Border Services Agency officers during the inspection conducted at the Canadian border checkpoint. Defendant Memorandum of Law at 4-7. The defendant argues that his rights were violated because the scope of the Canadian search exceeded a permissible border search as discussed in United States precedent. *Id.* at 6. As articulated below, the government does not concede that even if the defendant did have Fourth Amendment protections against the actions of Canadian law enforcement on Canadian soil, those rights would have been violated. However, as established precedent makes clear, in most circumstances the Fourth Amendment is inapplicable to searches conducted in foreign countries by foreign law enforcement officials.

In *United States v. Busic*, 592 F.2d 13, 23 (2d Cir. 1978), the Second Circuit upheld a search of a bag belonging to a United States citizen that had been searched by French authorities who subsequently turned the property over to Federal Bureau of Investigation agents in the United States, finding that "the Fourth Amendment and its exclusionary rule do not apply to the law enforcement activities of foreign authorities acting in their own country." (*citing Mapp v. Ohio*, 367 U.S. 643 (1961); *United States ex rel. Lujan v. Gengler*, 510 F.2d 62 (2d Cir.), *cert. denied*, 421 U.S. 1001 (1975); *United States v. Toscanino*, 500 F.2d 267 (2d Cir.), *reh. en banc denied*, 504 F.2d 1380 (2d Cir. 1974)); *see also United States v. Maturo*, 982 F.2d 57, 60 (2d Cir. 1992) (". . . we note that wiretap evidence may be admissible when foreign officials, acting on their own to enforce foreign law, properly follow their own law in obtaining the evidence even where the subject of the foreign search is an American citizen.") (internal citations omitted); *United States v. Janis*, 428 U.S. 433, 455-56 n.31 (1976) ("It is well-established, of course, that the exclusionary rule, as a deterrent sanction, is not applicable where a private party or a foreign government commits the offending act.").

As in *Busic*, Jenkins was not subject to the protections of the Fourth Amendment during the searches conducted by Canadian law enforcement officials. Therefore, any violations of his rights pursuant to that amendment do not provide a basis for exclusion of the evidence obtained and then transferred to the custody of United States law enforcement officers.

**IV.   CANADIAN LAW ENFORCEMENT OFFICIALS' SEARCH OF JENKINS' PERSONAL PROPERTY SHOULD NOT BE SUPPRESSED BECAUSE IT DOES IT NOT SHOCK THE CONSCIENCE AND WAS NOT THE PRODUCT OF A COOPERATIVE INVESTIGATION WITH UNITED STATES LAW ENFORCEMENT AGENTS**

The Second Circuit "has recognized two circumstances where evidence obtained in a foreign jurisdiction may be excluded. First, where the conduct of foreign officials in acquiring the evidence is 'so extreme that they shock the judicial conscience' a federal court in the exercise of its supervisory powers can require exclusion of the evidence so seized. Second, where cooperation with foreign law enforcement officials may implicate constitutional restrictions, evidence obtained by foreign officials may be excluded. Within the second category for excluding evidence, constitutional requirements may attach in two situations: (1) where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials; or (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials." *Maturo*, 982 F.2d at 60-61 (internal citations omitted). Neither circumstance is present here and so suppression is unwarranted.

### A.    The Canadian Search of the Computer at a Border Checkpoint Was Lawful

Nothing about the search of the digital media conducted by Canadian law enforcement officials "shocks the conscience."[4] In fact, had the search been conducted within the territory of the United States, it would have been lawful. Under the "border search" exception to the warrant requirement, routine border stops and searches of persons, luggage, personal effects, and vehicles may be conducted without probable cause or reasonable suspicion. *See United State v. Montoya de*

---

[4]Serious questions have been raised regarding whether the "shocks the conscience" exception has survived limitations placed by the Supreme Court on a court's exercise of supervisory power to exclude evidence. *See United States v. Mount*, 757 F.2d 1315, 1320-24 (D.C. Cir. 1995) (Bork, J., concurring) (doubting ability of court to exclude evidence of illegal foreign searches, and rejecting "shocks the conscience" as appropriate test); *United States v. Mitro*, 880 F.2d 1480, 1484 (1st Cir. 1989) (noting debate on ability of court to exclude evidence seized by foreign officials even in circumstances which shock the conscience).

*Hernandez*, 473 U.S. 531, 537 (1985) (government has "plenary authority" to conduct warrantless routine searches to regulate "collection of duties and to prevent the introduction of contraband"); *United States v. Ickes*, 393 F.3d 501, 506-7 (4th Cir. 2005) (customs officials may search laptop computer and disks transported across border); *United States v. Irving*, 452 F.3d 110, 123-24 (2d Cir. 2006) (no reasonable suspicion needed for search of personal effects at a border). Here, the Canadian authorities actually exceeded the requirements for a lawful search under the Fourth Amendment because they had reasonable suspicion to search Jenkins's personal belongings. The initial searches conducted by the agents at the border checkpoint were based on the suspicious behavior of Jenkins, his failure to adequately explain his travel plans and his apprehensive demeanor. *See* Exhibits A, B, C, and D. During the course of the border search, Canadian authorities discovered images of child pornography on the defendant's computer. *Id.* After the defendant had been placed under arrest, Constable Wohlert sought and obtained a warrant to conduct a further forensic examination of the digital media seized from the defendant. Exhibits A and E. The initial search was a lawful border search and the subsequent search of the digital media was conducted pursuant to a search warrant. Far from shocking the conscience, the search conducted by Canadian law enforcement exceeded the requirements imposed on law enforcement agents in the United States by the Fourth Amendment.

The defendant contends that *United States v. Cotterman*, 637 F.3d 1068 (9th Cir. 2011), may prove significant to the lawfulness of the search in the present case. In *Cotterman*, the defendant and his wife crossed into the United States from Mexico at a port of entry in Arizona. *Id.* at 1071. United States Customs and Border Patrol agents received a Treasury Enforcement Communication System field alert indicating that agents should be on the lookout for child pornography because of

the defendant's criminal record. *Id.* Cotterman was taken aside for secondary inspection of the laptop computers and digital cameras in his vehicle. *Id.* An initial search did not reveal any child pornography. *Id.* A subsequent search at the border checkpoint also did not disclose the presence of child pornography on any of the electronic devices. *Id.* Finally, agents advised the Cottermans that although they were free to leave, two of the laptops and one of the digital cameras would be retained by Border Patrol agents and sent to Tucson for further forensic examination. *Id.* at 1072. Tuscon was 170 miles from the border checkpoint where the Cottermans had entered the United States. *Id.* During the forensic examination of one of the laptops, the examiner discovered hundreds of images of child pornography depicting Cotterman molesting a prepubescent female. *Id.* at 1073. In determining that the evidence had been lawfully seized, the Ninth Circuit held that "[i]n this case, the property presented for the privilege of entry was sufficiently complex to permit its relocation to the lab in Tucson—a location where the Government could conduct an adequate search to ensure the property was safe for entry. Its relocation was by no means so offensive as to render the Government's conduct unreasonable." *Id.* at 1081-1082.

      On March 19, 2012, the Ninth Circuit issued an order for a rehearing of the case *en banc*. No decision has yet been issued from that rehearing. *See United States v. Cotterman*, 673 F.3d 1206 (9th Cir. Mar 19, 2012). The defendant in the present case argues that the as-yet undecided *Cotterman* rehearing "bears mentioning" because the "facts of the case at bar are far worse than those faced by defendant Cotterman." There are a number of problems with this argument. First, *Cotterman* has not yet been decided, and so cannot provide a precedent which this Court could rely on even as persuasive authority. The *Cotterman* rehearing decision may well uphold the Ninth Circuit's decision finding that the search was lawful. Second, even if the Ninth Circuit were to

reverse its decision upholding the search, that precedent would not be binding on this Court. Third, the facts of *Cotterman* are so readily distinguishable from those in the present case that a decision holding the search to be unlawful could not be considered to be even persuasive authority.

*Cotterman* is distinguishable from the present case in three ways: (1) *Cotterman* deals with a search conducted by United States Border Patrol agents, not agents of a foreign government whose law enforcement activities do not fall within the purview of the Fourth Amendment; (2) the law enforcement agents in *Cotterman* did not obtain a search warrant for the laptop computer before transporting it 170 miles away from a border; the Canadian officers in the present case sought and obtained a search warrant for the forensic examination of the digital media; (3) in *Cotterman*, the Customs and Border Patrol agents failed to find any child pornography on the electronic media in either the initial or the secondary inspection before the computer was transported to Tucson for forensic examination. In the present case, CBSA Officer Johnston observed child pornography on the laptop computer during his initial inspection of the computer conducted at the border checkpoint. *Cotterman*'s facts are so dissimilar from those of the present case that any opinion in *Cotterman* can be considered tangential at best.

    **B.**    **The Search Performed by Canadian Authorities Was Not the Result of a Joint Investigation with the United States**

"[W]here cooperation with foreign law enforcement officials may implicate constitutional restrictions, evidence obtained by foreign officials may be excluded. Within the second category for excluding evidence, constitutional requirements may attach in two situations: (1) where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials; or (2) where the cooperation between the United States and foreign law

enforcement agencies is designed to evade constitutional requirements applicable to American officials." *Maturo*, 982 F.2d at 60-61 (internal citations omitted).  As the affidavit of HSI Special Agent Chad Willard makes clear, neither of these situations applies in this case.  In *United States v. Paternina-Vergara*, the Second Circuit observed that "[t]he investigation of crime increasingly requires the cooperation of foreign and United States law enforcement officials, but there is no reason to think that Congress expected that such cooperation would constitute the foreign officials as agents of the United States." 749 F.2d 993, 998.  *See also United States v. Molina–Chacon*, 627 F.Supp. 1253, 1260 (E.D.N.Y.1986) (holding that a foreign search prompted by information from U.S. officials does not trigger Fourth Amendment requirements), *aff'd sub nom.*, *United States v. DiTommaso*, 817 F.2d 201 (2d Cir.1987).

There is no evidence in this case either that Canadian officials were acting as agents of the United States government or that cooperation was intended to evade constitutional requirements applicable to domestic law enforcement entities.  First, there was no contact between Canadian law enforcement officials before Jenkins rendered the involvement of the United States necessary by failing to appear for his scheduled court appearance in Canada.  Exhibit H at ¶¶ 3-5.  It was only once it became clear that Jenkins did not intend to comply with due process of law in Canada that Canadian law enforcement officials made contact with United States law enforcement.  *Id.* at ¶ 4.  Second, none of the investigative steps performed by the Canadians were done at the behest or even with the knowledge of United States law enforcement agents.  Third, even if there were any basis to support the contention that the search of Jenkins' property was performed as part of cooperative investigative effort, as *Paternina-Vergara* makes clear, cooperation between law enforcement officials from different sovereign powers does not render a search subject to constitutional

14

requirements. It is only once that cooperation is used with the express purpose of evading constitutional requirements that the Fourth Amendment becomes applicable. There is nothing in the evidence before the Court to suggest that there was any intention of the part of either Canadian or United States law enforcement agents to evade U.S. constitutional requirements by performing the investigation in Canada. Fourth, the search was not, in fact, unlawful, even if the Fourth Amendment protections would have applied to the defendant. As discussed above, the search performed by the CBSA officers was a lawful border search and the subsequent examination of the electronic devices seized from the defendant by Constable Wohlert was performed pursuant to a search warrant. The searches performed by Canadian authorities are lawful even under the most rigorous Fourth Amendment scrutiny.

V. **THE DEFENDANT'S STATEMENTS MADE DURING THE COURSE OF A LAWFUL CANADIAN BORDER INSPECTION SHOULD NOT BE SUPPRESSED**

In the Defendant's Memorandum of Law, he seeks suppression of any statements made by the defendant during the course of the search performed by CBSA officers at the border checkpoint because the *Miranda* warnings were not administered. First, the defendant has failed to submit an affidavit in support of his request for suppression of his statements which, as described in section II *supra*, means that he has failed to make the requisite showing meriting a hearing. Second, the Fifth Amendment protections of *Miranda v. Arizona*, 384 U.S. 436 (1966), do not, for the reasons described in section III *supra*, apply to investigations conducted by foreign law enforcement officials. Third, as the Defendant acknowledges in his Memorandum, Canadian officials *did* administer "secondary warnings which are the Canadian equivalent of the *Miranda* warnings used in the United States." Defendant Memorandum of Law at 8. Fourth, even if the protections of

*Miranda* were applicable to the Canadian investigation, routine border questioning, such as the questioning to which the defendant was subject, are not considered "interrogation" for the purposes of *Miranda* and therefore, do not require *Miranda* warnings. *See United States v. Kiam*, 432 F.3d 524, 529-31 (3d Cir. 2006) (*Miranda* warnings not required for immigration questioning even if criminal conduct is suspected because the questions are relevant to the admissibility of the individual into the country); *United States v. Gupta*, 183 F.3d 615, 617-18 (*Miranda* warnings not required during routine border questioning); *United States v. Hudson*, 210 F.3d 1184, 1191-92 (10th Cir. 2000) (*Miranda* warnings not required though Border Patrol agent had probable cause to arrest suspects because agent asked only routine border stop questions). For all of these reasons, the defendant's motion for suppression of the his statements to Canadian officials is baseless and should be denied.

## VI.   CONCLUSION

The defendant is not entitled to a hearing because he has failed to provide the Court with evidence demonstrating facts that, if true, would merit relief. Further, the search conducted by Canadian law enforcement officials was not governed by the protections of the Fourth Amendment, and even if it had been, the defendant's Fourth Amendment rights were not violated. Therefore, the government respectfully requests that the defendant's motion to suppress the evidence and his statements be **DENIED** without a hearing.

Dated: July 23, 2012                                           Respectfully submitted,

                                                                     RICHARD S. HARTUNIAN
                                                                      United States Attorney

                                     By:    */s/ Gwendolyn E. Carroll*
                                                Assistant United States Attorney
                                                Bar Roll No. 515777