```
                          VOLUME II
UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
UNITED STATES OF AMERICA

vs.                            5:11-CR-602

JOSEPH VINCENT JENKINS,

                    Defendant.

-------------------------------------------x
```

Transcript of a Jury Trial held on February 4,

2014, at the James Hanley Federal Building, 100

South Clinton Street, Syracuse, New York, the

HONORABLE GLENN T. SUDDABY, United States District

Judge, Presiding.


A P P E A R A N C E S

```
For The Government: UNITED STATES ATTORNEY'S OFFICE
                    P.O. Box 7198
                    100 South Clinton Street
                    Syracuse, New York  13261-7198
                      BY:  TAMARA THOMSON, ESQ.
                           GWENDOLYN CARROLL, ESQ.


For Defendant:      AARON M. GOLDSMITH, ESQ.
                    Attorney at Law
                    225 Broadway
                    Suite 715
                    New York, New York  10007
```

*Jodi L. Hibbard, RPR, CSR, CRR*
*Official United States Court Reporter*
*100 South Clinton Street*
*Syracuse, New York  13261-7367*
*(315) 234-8547*

1

2                    I N D E X   O F   T E S T I M O N Y

3

4

   Witnesses              Direct     Cross      Redirect     Recross
5

6   Pedro Sousa-Dias       141        156        ——           ——

7   Melany Boyd            160        179        190          ——

8   Tristan Garrah         191        221        238          ——

9   Glen Hache             240        245        ——           ——

10  Jarret Johnston        254        264        271          ——

11  Marie-Josee Vinette    274        289        296          ——

12  Laurie Sheridan        297        ——         ——           ——

13  Jeffrey Olear          300        302        ——           ——

14  Michel Boulay          303        312        316          317

15  Paul Thompson          319        323        ——           ——

16  Kip Wohlert            327        341        352          354

17  Chad Willard           357        367        375          ——

18  Brian Braisted         377        ——         ——           ——

19

20

21

22

23

24

25

1

2                    (Open Court, Jury Out, 9:01 a.m.)

3            THE COURT:  Okay.  We're in the courtroom outside

4     the presence of the jury.  Government ready to proceed?

5            MS. THOMSON:  Yes, your Honor.

6            THE COURT:  Okay.  All set?

7            MR. GOLDSMITH:  Ready.

8            THE COURT:  Okay.

9            MR. GOLDSMITH:  Before we bring the jury out, just

10    one quick issue, your Honor.  As the government's going to

11    start its witness testimony today, just wanted to inquire as

12    to whether they're going to bring up, excuse me, Mr. Jenkins'

13    conviction in state court.

14           MS. THOMSON:  Your Honor, as we'd indicated during

15    the conference, we are not intending to introduce it.  I will

16    say that on Exhibit 2C which will be admitted through our

17    second witness today, I can show the court a copy, we --

18    there's a box that the defendant had to fill out, an

19    application for admission to Canada, this is on 2C towards

20    the bottom, we did white that box out showing that he had the

21    prior conviction that was written in there.

22           THE COURT:  Which box is it?

23           MS. THOMSON:  It would be the box towards the

24    bottom, the third box up from the bottom, it's a five-line

25    box.

1          THE COURT:  Yes.

2          MS. THOMSON:  The way the court has it and the way

3     the defendant has it presently, it's whited out.

4          THE COURT:  That's right.

5          MS. THOMSON:  The original does indicate what that

6     conviction is.  If there is testimony elicited during

7     cross-examination as we mentioned in the conference, then the

8     witness may answer, we're not eliciting it but to the extent

9     that a question's asked about it or that answer is produced

10    as a result of the type of questions that are asked, we will

11    produce the original one.

12         THE COURT:  We've talked about that, defense

13    counsel's aware, you know what the situation is, they're not

14    going to ask about it, it's been whited out on this form so

15    we'll proceed on that basis.

16         MR. GOLDSMITH:  Okay, thank you.

17         THE COURT:  All right.  Let's bring the jury in,

18    please.

19              (Jury Present, 9:04 a.m.)

20         THE COURT:  Okay.  Good morning, ladies and

21    gentlemen.  Hopefully you had a restful night, and easy trip

22    in this morning.  May not be so easy tomorrow from what I'm

23    hearing.  You can be seated.  How many of you are coming from

24    the south, south of Syracuse, anybody?  Nobody.  Okay.  The

25    reason I ask is it is supposed to be worse the further south

1     you go, all right.  We're going to monitor the situation, the

2     weather during the day, keep an eye on it, see what the most

3     recent reports are and then based on that, depending on what

4     I think we're looking at, we'll make some decisions, if it

5     looks like it's going to -- it's supposed to start after

6     11:00 tonight, which generally if it starts that early, they

7     have an opportunity to clean it up in the morning.  If that's

8     the case we're just going to proceed on a regular basis.  If

9     it looks like it's going to continue and we get into the

10    morning hours where they have more difficulty cleaning it up,

11    what we're going to do before you leave is we'll get your

12    phone numbers and I'm going to make a decision by the end of

13    the day based on the most recent information they can provide

14    us whether we'll start late or not.  I might push it till

15    10:00 or something if it looks like they're going to have a

16    hard time in the morning with the morning commute, but

17    otherwise we're going to -- we're hardy Central New Yorkers,

18    we're going to forge through it and start on time if at all

19    possible, okay?  So I know some of you were asking about it,

20    so we're going to keep an eye on the situation and we'll act

21    accordingly.  Okay?

22          All right.  We've concluded opening statements

23    yesterday before you went home, government's prepared to call

24    their first witness.

25          MS. THOMSON:  Thank you, your Honor.  The

1    government calls to the stand Pedro Sousa-Dias.

2              THE CLERK:  Good morning.  Can you please state

3    your full name for the record and spell it, please.

4              THE WITNESS:  Pedro Sousa-Dias.  P-e-d-r-o,

5    S-o-u-s-a, hyphen, D-i-a-s.

6

7              P E D R O   S O U S A - D I A S , called

8    as a witness and being duly sworn, testifies as

9    follows:

10

11        DIRECT EXAMINATION BY MS. THOMSON:

12   Q    Good morning.

13   A    Good morning.

14   Q    Could you please introduce yourself to the members of

15   the jury.

16   A    My name is Pedro Sousa-Dias.

17   Q    And if you could please keep your voice up because we

18   want to make sure that everybody can hear you.

19   A    Absolutely.

20   Q    Where do you work?

21   A    I work at the Port of Lansdowne, it's a port of entry

22   into Ontario, Canada.

23   Q    When you say port of entry, what do you mean by that?

24   A    Basically a port of entry is a designated area for

25   foreign nationals to gain access into Canada.  It could be a

Pedro Sousa-Dias - Direct                    142

1    land border such as the Port of Lansdowne, or it could be an

2    airport or even a marine port.

3    Q    Who is your employer?

4    A    My employer is the Canada Border Services Agency.

5    Q    Do you go by the initials CBSA?

6    A    Yes, we do.

7    Q    How long have you been with CBSA?

8    A    I've been with CBSA since May 7th, 2007.

9    Q    What is your current position?

10   A    My current position is border services officer.

11   Q    What does a border services officer do?

12   A    Basically, we regulate the movement of goods and people

13   into the country.

14   Q    In May of 2009, were you a border services officer?

15   A    Yes, I was.

16   Q    Were you stationed at the Port of Lansdowne?

17   A    Yes, I was.

18   Q    Have you always been stationed at the Port of

19   Lansdowne?

20   A    Yes.

21   Q    Prior to holding your position as a border services

22   officer, did you have any other prior law enforcement

23   experience?

24   A    I worked as a correctional officer between 1993 and

25   2000.

Pedro Sousa-Dias – Direct                               143

```
1              MS. THOMSON:  May I approach the witness, your

2      Honor?

3              THE COURT:  You may.

4      Q      At this time I'm handing you what's been previously

5      marked as Government's Exhibit Number 1C.  I'm going to ask

6      you if you recognize Exhibit 1C.

7      A      Yes, I do.

8      Q      What is that?

9      A      That is the Port of Lansdowne, an image of the Port of

10     Lansdowne.

11     Q      Does that photo fairly and accurately depict the Port

12     of Lansdowne as you saw it on May -- May of 2009?

13     A      Yes, it does.

14     Q      And is that how it looks today?

15     A      It looks the same, yes.

16             MS. THOMSON:  At this time, your Honor, I would

17     offer into evidence Government's Exhibit 1C.

18             THE COURT:  Any objection?

19             MR. GOLDSMITH:  Briefly, your Honor, may I have

20     voir dire?

21             THE COURT:  You want to voir dire on the

22     photograph?

23             MR. GOLDSMITH:  Sure.

24             THE COURT:  Okay, go ahead.

25             VOIR DIRE EXAMINATION BY MR. GOLDSMITH:
```

Pedro Sousa-Dias – Voir Dire                    144

1   Q      Sergeant Dias, this is an aerial photograph?

2   A      Yes, it is.

3   Q      When you testified a moment ago, this is how the port

4   of entry, that's how you view it, you want to clarify you're

5   viewing it from the ground, correct?

6   A      I'm viewing it from the ground, however, we do have

7   aerial images on the walls in the commercial building.

8   Q      And this photographic depiction is exactly in terms of

9   structures of the buildings as the port of entry was in May

10  of 2009, is that correct?

11  A      As far as I can tell, that's correct.

12  Q      And the flow of the primary and secondary inspection

13  sites is also the same as it was in 2009?

14  A      Yes, as far as I can tell it is.

15         MR. GOLDSMITH:  No further objection.

16         THE COURT:  Exhibit will be received.

17         MS. THOMSON:  Thank you, your Honor.

18

19         CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

20  Q      Since you've worked there, have you had any major

21  renovations in the time that you've worked there?

22  A      No, we have not.

23  Q      And you've been working there since 2007?

24  A      I've been working there since 2007.  I would like to

25  clarify just quickly that there, under the canopy, they have

1    added a garage to that area.

2    Q     And when was that addition?

3    A     It was I believe around 2010, if I'm not mistaken.

4    Q     Where does the Port of Lansdowne connect with the

5    United States?

6    A     It connects with the Port of Alexandria Bay, there's a

7    highway that runs from U.S. Customs Alexand -- Port of

8    Alexandria Bay to the Port of Lansdowne.

9    Q     If we could publish 1C, please.  Is that depicted in

10   Exhibit 1C?

11   A     The bridge, yes, that goes from the Port of Lansdowne

12   into Alexandria Bay.

13   Q     So the port that's noted where there are flags on the

14   part where you see the Canadian flag, is that where the

15   border is?

16   A     Yes.

17   Q     If we could go back and talk a little bit more about

18   some of your duties as a border services officer.  I believe

19   you described that there are some immigration and some custom

20   functions?

21   A     Yes, there are.

22   Q     Can you tell us about that?

23   A     Basically our duties are divided into what best be

24   described as three different areas.  We work in the office,

25   the office is divided into two counters, there's a customs

Philip Sousa-Dias - Direct                                146

1    counter and an immigration counter.  In the customs area, or

2    customs counter, we collect tax and we also do different

3    documentation in terms of goods that are being imported by

4    travelers and whatnot.  The immigration trained officers, I'm

5    not immigration trained, in their side of the counter, they

6    attempt to determine the admissibility of foreign nationals

7    into the country so they do things such as background checks,

8    criminal background checks and whatnot.  They also do

9    documentation for work purposes, work permits, school

10   permits, people want to either study or work in Canada.  That

11   would be our office duties.

12              The second area would be what we refer to as

13   the secondary area, that's the area where we do examinations

14   of vehicles and goods being brought into the country, and the

15   third area would be the primary area, and that would be the

16   primary interview lanes that lead to the booths where

17   travelers present themselves in the vehicles and are

18   interviewed by the officers.

19   Q    Do you work shifts, are there particular set hours that

20   you work?

21   A    We work shift work, yes.

22   Q    During a shift do you stay at one fixed location or do

23   you rotate?

24   A    We rotate pretty much on an hourly basis.

25   Q    I want to take you back to May 24 of 2009.  Were you

Philip Sousa-Dias - Direct

147

1    working on that day?

2    A      Yes, I was.

3    Q      Do you recall what shift you were working?

4    A      I was working day shift which ran from 730 to 1630.

5    Q      What is 1630?

6    A      It's 4:30 p.m.

7    Q      Where were you stationed?

8    A      I was stationed -- originally I was supposed to be

9    stationed with the VACIS unit but due to operational

10   requirements, I was reassigned to the traveler side.

11   Q      What does that mean, traveler's side?

12   A      Our port, there's two streams to our port, one's the

13   commercial side of things for commercial importations and

14   whatnot, business goods, and the other is the traveler, what

15   we refer to as traffic, and it's just people coming to visit,

16   visit family, on vacation and whatnot.

17   Q      When you began your shift, where did you begin it,

18   where were you stationed?

19   A      I was stationed, at 8:00 I was stationed in interview

20   lane number 5.

21   Q      What are your primary duties in a lane?

22   A      My primary duties in a lane is to make a determination,

23   basically a vehicle pulls up with individuals in it, and I

24   have to interview those individuals and make a decision that

25   I'm satisfied.  Once I'm satisfied of the purpose of their

1    travel, and of what they are bringing in, I may make a

2    decision to allow them entry to Canada or refer them for

3    further examination.

4    Q      What happens when a vehicle approaches your lane?

5    A      First thing I do when a vehicle approaches my lane is I

6    compare the license plate to the license plate that comes up

7    on our screen.  We have a -- we have cameras that capture the

8    license plate from the vehicles that pull up and

9    automatically insert them into a database and it runs,

10   compares that license plate to any other license plate that

11   may have had prior enforcement against it.

12   Q      And then once you've made the check of the license

13   plate, what's the next step?

14   A      The next step is I request the driver to hand me his

15   ID, passport in this case, and I ask the driver how many

16   people are in the vehicle.

17   Q      At approximately 8:50 a.m., can you tell us what

18   happened?

19   A      At 8:50, approximately 8:50 a.m., a Navy blue Dodge Ram

20   truck pulling a trailer, and I believe there were a couple of

21   ATVs on that trailer, pulled into my lane.  There was only

22   one occupant in that vehicle, it was the driver himself.  I

23   follow the same process I always do, I compare the license

24   plate to what I had in front of me in the monitor, I then

25   requested that the driver hand me his passport to which he

1    did.  I compare the image on the passport to the driver in

2    front of me, and scan the passport.  The name on the passport

3    was Joseph Jenkins.  I scanned the passport on our database

4    to see again if there was any prior enforcement either from

5    an immigration or customs-based prior charge, and there was

6    none.

7                I then proceeded to interview this individual.

8    I went through my set of mandatory questions, questions such

9    as whether he was leaving anything behind in Canada, whether

10   he had $10,000 in currency or monetary instruments, whether

11   he was carrying any firearms, pepper spray, mace, tasers, any

12   weapons of any sort, prohibited items in Canada.  I asked him

13   whether he had pets, plants, animal products, there's

14   concerns with cross-contamination of pests.  I asked him if

15   he had alcohol or tobacco, if he had gone into duty free,

16   there's regulations with reporting alcohol and tobacco into

17   Canada.  So I went through my mandatory questions with him.

18   I noticed that the driver was avoiding making eye contact

19   with me, he was very rigid.  He kept both hands on the

20   steering wheel, he faced, pretty much was looking straight

21   out of the windshield, straight ahead rather than turning

22   towards me and seemed to be focused primarily on the exit to

23   the port of entry which would allow him entry to Canada.

24                My past experience with seasonal residents,

25   that's how we refer to, lot of U.S. citizens own cottages in

1    Canada, particularly in and around the Thousand Islands, my

2    experience with them has been that they're very friendly,

3    they're very -- they're used to crossing the border, they

4    tend to be very talkative and you know, they're -- they face

5    you and tend to chat, if anything.  Mr. Jenkins was

6    completely the opposite of my past experiences.  As such, I

7    felt that he had a concern, the impression I was left with

8    was that he had a concern about crossing the border.  I

9    decided that I would send Mr. Jenkins into our immigration

10   department for a criminal background check.  There's certain

11   criminal charges that will make an individual inadmissible to

12   Canada, and as such, I thought that a background check was

13   due.

14          So I went and I filled out a form, it's a

15   referral form, we refer to it also as an E67, that's the

16   number on the form, and I filled out the information on this

17   form, included the number of individuals in the vehicle which

18   in this case was one, the length of stay, I then checked no

19   for all the mandatory questions that I had previously asked

20   Mr. Jenkins.  I then put his license plate, the state that

21   the license plate was from, my badge number and the time that

22   I was doing this, and on the immigration box in this form, I

23   wrote down "1 x CC," which meant one individual for criminal

24   check.

25   Q    At this time I'm going to approach the witness, your

Philip Sousa-Dias - Direct                    151

1    Honor, and I'll show you what's been previously marked as

2    Government's Exhibit 2A.  I'll ask you if you recognize

3    Exhibit 2A.

4    A    Yes, I do.

5    Q    Can you tell me what that is?

6    A    This is the referral form I handed Mr. -- or a copy of

7    the referral form I handed Mr. Jenkins.

8    Q    Is that the form that you use when you're making a

9    referral?

10   A    Yes, it is.

11   Q    Is there a title of that form, is there a way that it's

12   referred to?

13   A    It's referred as an E67, that's the number on the

14   bottom of the form, it's a government-issued form.

15   Q    That's the form that you use every time you make that

16   type of referral?

17   A    Yes, it is.

18   Q    And is that the form that you used on May 24, 2009?

19   A    Yes, it is.

20   Q    Is that your writing on the form?

21   A    Yes, it is.

22            MS. THOMSON:  At this time, your Honor, I would

23   offer into evidence Government's Exhibit 2A.

24            THE COURT:  Any objection?

25            MR. GOLDSMITH:  No objection.

Philip Sousa-Dias - Direct                                    152

1              THE COURT:  It will be received.

2              MS. THOMSON:  And if we could publish that, please.

3              The box that's highlighted, can you see on the

4    screen in front of you?

5    A    Yes, I can.

6    Q    Is this the top portion of the E67?

7    A    Yes, it is.

8    Q    At the top part, I notice that there's a box that

9    indicates length of stay, is that your handwriting, the word

10   indicates one week?

11   A    Yes, it is.

12   Q    Where did you get that information?

13   A    I asked Mr. Jenkins how long he was staying in Canada.

14   Q    Did you ask him anything else about his trip to Canada?

15   A    I asked the purpose of his trip to Canada.

16   Q    What did he indicate?

17   A    He stated that he was coming to stay at -- at a family

18   cottage for the time period of one week.

19   Q    Did he indicate where that family cottage was?

20   A    I can't recall.

21   Q    Was it in Canada?

22   A    Yes, it was.

23   Q    Is that why you perceived him to be a seasonal

24   resident?

25   A    Yes, it is.  It was -- he indicated to me at the time

Philip Sousa-Dias - Direct                    153

1    that it was a family-owned cottage.

2    Q     That he was going to?

3    A     That he was going to.

4    Q     So the questions that you asked him with regard to

5    goods declared and currency and whatnot, there's a series of

6    boxes, do the boxes reflect that when you asked him that

7    question, he didn't declare any of those items?

8    A     That's correct.

9    Q     Now at the bottom where it's indicated 1 x CC, is that

10   where you indicated that there was one person present and you

11   wished to have a criminal check?

12   A     Criminal check on that individual.

13   Q     Where it indicates no AIT, what does that refer to?

14   A     It's actually no A/T and it indicates no alcohol and

15   tobacco.

16   Q     Moving down on the form, did you note on the form the

17   license plate of the vehicle that you dealt with?

18   A     Yes, I did.

19   Q     And what is that plate number?

20   A     It's 19322JL, New York.

21   Q     And did you also indicate the time that you made the

22   referral?

23   A     Yes.

24   Q     And what time was that?

25   A     It was at 0853.

1    Q     Is the lane that you were working in referenced on the

2    form?

3    A     Yes, it is, it's lane number 5.

4    Q     Once you completed that form and made your decision

5    that he should go inside, what did you tell Mr. Jenkins?

6    A     I handed him the referral form and I just directed him

7    to park in front of the building, the office building in

8    front of immigration, and I directed him to leave the

9    vehicle, take his passport with him, the referral, the E67

10   referral document I just filled out and head towards the

11   immigration counter and present himself to an officer.

12   Q     Did you have an opportunity to see the person that had

13   come through lane 5 that you made that referral for again

14   later that day?

15   A     Yes, I did.

16   Q     And can you tell us how that came to pass?

17   A     As I've stated before, we only tend to spend an hour

18   out in the booth and then we're assigned to a different area

19   and we rotate through these posts throughout the day or

20   throughout the shift.  At 9:00, I was relieved from lane 5

21   and I was assigned to the office so I was actually in the

22   office in the customs counter, the counters are perpendicular

23   to each other, and I was in the customs counter while

24   Mr. Jenkins was sitting, while the immigration officers were

25   running database checks on him.  So I could face him.  I was

Philip Sousa-Dias - Direct                                    155

1    probably maybe 10 feet away from him at that point.

2    Q     At this time if I could approach the witness and I'm

3    handing you Government Exhibit 1D.  I'm going to ask you if

4    you recognize 1D.

5    A     Yes, I do.

6    Q     What is that?

7    A     That's the primary inspection lanes at the Port of

8    Lansdowne.

9    Q     Does that represent the booth that you were working in

10   and the lane you were working in in May 2009?

11   A     All eight lanes are in this image, I was working lane

12   number 5 which would be in the center of those eight lanes.

13             MS. THOMSON:  Your Honor, at this time the

14   government would move into evidence Government's Exhibit 1D.

15             THE COURT:  Any objection?

16             MR. GOLDSMITH:  No objection.

17             THE COURT:  It will be received.

18             MS. THOMSON:  If we could publish that, please.

19   Q     You indicated that lane 5 would be somewhat in the

20   center that's depicted as this image?

21   A     Yes.

22   Q     Officer Sousa-Dias, do you see the person that

23   presented themselves to lane 5 on May 24, 2009 at

24   approximately 8:53 a.m., do you see them in the courtroom?

25   A     Yes, I do.

Philip Sousa-Dias - Direct                           156

1    Q     And if you could please indicate where you see them and

2    describe them by an article of clothing.

3    A     He's sitting right there with the blue shirt on.

4          MS. THOMSON:  And your Honor, if the record could

5    reflect the witness identified the defendant?

6          THE COURT:  It will so reflect.

7          MS. THOMSON:  That's all I have, if I could

8    retrieve the exhibits.  Thank you.

9          THE COURT:  Mr. Goldsmith, any cross-examination?

10         MR. GOLDSMITH:  May I approach.

11         THE COURT:  You may.

12         CROSS-EXAMINATION BY MR. GOLDSMITH:

13   Q     Officer Sousa-Dias, you said you started that morning

14   at 7:30?

15   A     Yes.

16   Q     And approximately 8:50 you saw a blue Dodge Ram

17   approach carrying or towing a trailer, is that correct?

18   A     Yes, it is.

19   Q     When the Dodge truck came to your booth you said you

20   ran a plate check of the vehicle, is that correct?

21   A     Yes, it is.

22   Q     Plate check did not have any returns whatsoever as to

23   in the Canadian criminal system?

24   A     It doesn't check the Canadian criminal system.  The

25   only database attached to that plate check are a customs

157

1    database for any infractions against customs regulations and

2    immigration database.

3    Q    And there were no positive results on the plate check?

4    A    There were none.

5    Q    When you asked the driver to produce identification he

6    did so?

7    A    Yes, he did.

8    Q    And traffic that morning at that time of day, you

9    recall?

10   A    Yes, it was pretty light, we only had two lanes open.

11   Q    Lot of cars lined up behind the Dodge Ram?

12   A    Not really, no, it was -- it was early in the morning,

13   traffic is light.

14   Q    Many cars before the Dodge Ram within the last few

15   minutes?

16   A    Within the last few minutes, no, there was no line, it

17   may be two or three cars, tops.

18   Q    Now you said that you had a referral slip that you

19   prepared in order to send the driver of the vehicle to a

20   secondary inspection point, is that correct?

21   A    Yes, it is.

22   Q    And you had that slip that you had to handwrite out, is

23   that correct?

24   A    That's right.

25   Q    And those slips typically will have some information

158

1    already on them so that you can facilitate filling them out

2    easier and quicker?

3    A     I'm not sure I understand the question.

4    Q     As a vehicle approaches will you be able to fill out

5    some of the information on it already as the vehicle's

6    approaching?

7    A     No, we do not.  I do not.

8    Q     So you did not fill out any paperwork until you,

9    after -- withdrawn.  You did not fill out any of the referral

10   slip until after you had already began interviewing the

11   driver of the vehicle?

12   A     That's correct.

13   Q     You said that the -- that you filled out the referral

14   based solely upon the driver's behavior, is that correct?

15   A     Once I made a decision to refer him, I filled out the

16   referral.

17   Q     Okay.  When you made the decision to refer him, was it

18   based solely on what you described as his behavior?

19   A     Yes, it was.

20   Q     And what you described was him staring straight ahead

21   in the vehicle, correct?

22   A     That was part of it, yes.

23   Q     Holding onto the steering wheel of a vehicle, correct?

24   A     Correct, with both hands.

25   Q     All right.  So the basis that you had in referring him

Pedro Sousa-Dias - Cross                              159

1    was essentially that he was staring ahead and kept his hands

2    on the wheel, right?

3    A     Not really, there's more to it than that.

4    Q     Well, you also testified that he didn't seem as

5    "friendly" as you classified the regional -- or I'm sorry,

6    vacation residents in the area, is that correct?

7    A     That's correct.

8    Q     All right.  And that's your experience with every

9    single vacation homeowner in the area?

10   A     I couldn't -- I can't recall if it's with every single

11   but the majority of them.

12   Q     So you made a judgment based upon a generalization of

13   other drivers that you see, is that correct?

14   A     It's not a perfect science, it's -- we can only go by

15   our experience.

16   Q     All right.  And at the time when you were asking the

17   driver questions, he responded to all your questions, is that

18   correct?

19   A     Yes, he did.

20   Q     Didn't have any outbursts or refuse to answer any of

21   your questions, correct?

22   A     That's correct.

23   Q     Was otherwise compliant with your interview?

24   A     Yes, he was.

25             MR. GOLDSMITH:  No further questions.

Melany Boyd – Direct                    160

1              THE COURT:  Any redirect?

2              MS. THOMSON:  No.

3              THE COURT:  You may step down, sir, thank you.

4                   (Whereupon the witness was excused.)

5              MS. THOMSON:  At this time, your Honor, the

6      government calls to the stand Melany Boyd.

7              THE CLERK:  Good morning.  Step right up here,

8      please.  State your full name and spell it for the record.

9              THE WITNESS:  Melany Boyd, M-e-l-a-n-y, Boyd,

10     B-o-y-d.

11             THE CLERK:  Thank you, raise your right hand.

12

13             M E L A N Y   B O Y D , called as a

14     witness and being duly sworn, testifies as follows:

15             DIRECT EXAMINATION BY MS. THOMSON:

16     Q     Good morning.

17     A     Good morning.

18     Q     Could you please introduce yourself to the members of

19     the jury?

20     A     I'm Melany Boyd.

21     Q     Where do you work?

22     A     I work for Canada Border Services Agency in Ottawa,

23     Ontario.

24     Q     How long have you worked for Canada Border Services

25     Agency?

1    A      Since May of 2006.

2    Q      Does that agency also refer to itself as CBSA?

3    A      Yes, it does.

4    Q      And what positions have you held with CBSA?

5    A      I've been a border services officer and I'm currently a

6    hearings officer.

7    Q      How long have you been a hearings officer?

8    A      Since August of 2013.

9    Q      Prior to getting a position of hearing officer, what

10   position did you hold?

11   A      A border services officer.

12   Q      What does a hearing officer do?

13   A      We represent the Canada Border Services Agency when it

14   comes to immigration matters, so we would represent the

15   agency when we're seeking a removal order against someone

16   who's inadmissible to Canada.

17   Q      In May of 2009, can you tell us what position you held?

18   A      I was a border services officer.

19   Q      What are some of the duties of a border services

20   officer?

21   A      We examine both people and goods that are seeking entry

22   to Canada.

23   Q      Why do you make an examination of people and goods that

24   are seeking entrance into Canada?

25   A      For people, we determine if they have the right to

Melany Boyd – Direct                                    162

1    enter Canada and if they don't, be considered a foreign

2    national, we would determine if they're admissible to Canada,

3    and for goods we determine if the goods are permissible to

4    enter the country.

5    Q     When you're talking about people, that determination,

6    is there a name that you call that process?

7    A     Yes, it's called immigration secondary.

8    Q     And when you're talking about goods, is there a name

9    that you refer to that as?

10   A     Yes, it's customs.

11   Q     On May 24, 2009, can you please tell us where you were

12   assigned.

13   A     I was assigned to immigration secondary.

14   Q     And where?

15   A     At the Port of Lansdowne in Hill Island, Ontario.

16   Q     On that day, what shift were you working?

17   A     I was on day shift which is 7 a.m. until 7 p.m.

18   Q     At this time I'm going to show you what's been

19   previously marked as Government's Exhibit 1B.  I'm going to

20   ask you if you recognize what 1B is.

21   A     Yes, I do.

22   Q     And what is that?

23   A     It's a map of the Canadian and U.S. border.

24   Q     Are you familiar with that map?

25   A     Yes, I am.

Melany Boyd – Direct                                        163

1    Q    And does that map fairly and accurately depict the

2    items that are contained therein?

3    A    Yes.

4         MS. THOMSON:  At this time, your Honor, I would

5    offer into evidence Government's Exhibit 1B.

6         THE COURT:  Any objection?

7         MR. GOLDSMITH:  No objection.

8         THE COURT:  It will be received.

9         MS. THOMSON:  And if we could publish 1B, please.

10   Q    Would it be fair to say that this is an aerial of the

11   Port of Lansdowne?

12   A    Yes.

13   Q    And if you could with your finger touch where you could

14   see the Port of Lansdowne on this photograph, on this aerial

15   photograph, and you could touch the screen.

16   A    On the screen, so this here is the Port of Lansdowne.

17   Q    Is that function working?

18        THE CLERK:  Yes, she's doing it.

19   Q    It didn't come up right away on mine.  That's where you

20   just -- where the pink arrows are, that's the Port of

21   Lansdowne?

22   A    Yes.

23   Q    The Port of Lansdowne on the Canadian side, where does

24   it connect on the American side?

25   A    This here is the bridge, so when you cross over that

Melany Boyd - Direct                    164

1   waterway, you're entering Canada.

2   Q     From New York?

3   A     Yes, Alexandria Bay.

4         MS. THOMSON:  At this time I'm approaching the

5   witness and handing the witness Government's Exhibit 1E.

6         Do you recognize Government's Exhibit 1E?

7   A     Yes, I do.

8   Q     What is Government's Exhibit 1E?

9   A     It's the secondary area at the Port of Lansdowne.

10  Q     And is that -- does that photograph fairly and

11  accurately depict the secondary area as you are familiar with

12  it?

13  A     Yes.

14  Q     Both in 2009 and presently?

15  A     Yes.

16        MS. THOMSON:  At this time, your Honor, I would

17  offer into evidence Government's Exhibit 1E.

18        THE COURT:  Any objection?

19        MR. GOLDSMITH:  No objection.

20        THE COURT:  It will be received.

21  Q     If we could publish that, please.  Is this the area you

22  were working in on May 24, 2009?

23  A     Yes.

24  Q     Now during your shift on that day, what were your

25  particular duties?

Melany Boyd – Direct

1   A     I was assigned to immigration secondary, so I was in

2   the office and I was dealing with travelers that were

3   referred for immigration processing.

4   Q     Where are these travelers referred from?

5   A     They're referred from the primary inspection booth.

6   Q     What do you do when you're doing an interview, if you

7   could just describe that.

8   A     I would talk to the client to determine the purpose of

9   their trip to Canada, and to assess their admissibility to

10  Canada.

11  Q     At approximately 9 a.m., can you tell us where you

12  were?

13  A     Yes, I was assigned to the immigration secondary

14  office.

15  Q     Can you tell us what happened.

16  A     Yes, a male gentleman came into the office, he

17  approached the immigration counter.  He handed an American

18  passport as well as a CBSA referral slip.

19  Q     Is there a particular name for the CBSA referral slip?

20  A     Yes, it's called an E67.

21  Q     So when a person's referred from primary, they are

22  referred with an E67?

23  A     Yes.

24  Q     So once that referral comes in, what happens?

25  A     Then I would interview the client.

Melany Boyd – Direct

1    Q      What types of things do you do during the interview?

2    A      I start with a general, general questioning to

3    determine the purpose of their trip and then any questions

4    following that would ultimately determine if they're

5    admissible to Canada or not.

6    Q      I believe you indicated approximately 9 a.m. a

7    gentleman came in for this type of immigration interview; do

8    you recall that event?

9    A      Yes, I do.

10   Q      And when he came in, were you handed that E67?

11   A      Yes, I was.

12   Q      And if we could publish Exhibit 2A which has already

13   been received into evidence, you'll see the exhibit in front

14   of you on the screen.  Do you recognize that exhibit?

15   A      Yes, I do.

16   Q      What is that exhibit?

17   A      It's a CBSA referral slip, known as an E67.

18   Q      Is that the referral slip that you were handed?

19   A      Yes, it was.

20   Q      Who handed that to you?

21   A      It was Mr. Joseph Jenkins.

22   Q      Did you do an interview with Joseph Jenkins?

23   A      Yes, I did.

24   Q      Can you tell us about that interview?

25   A      I asked Mr. Jenkins what his citizenship was, he stated

Melany Boyd – Direct                    167

1    American.  I asked him where he lives, he stated Geneva,

2    New York.  I asked him how long he was going to be staying in

3    Canada, he stated one week.  I asked him the purpose of his

4    trip to Canada, he stated he was on vacation.  I asked him

5    where he was going, he stated to his parents' place.  I asked

6    him where that was, and he stated in Quebec.  I asked him

7    what his parents' status was in Canada, he stated that they

8    were seasonal residents.  I asked him what he did for a

9    living, he stated that he was self-employed.  I asked him

10   what he did, he stated that he was an electrician.  I asked

11   him if he had ever been to Canada before and he stated yes.

12   I asked him if he ever had any problems crossing the border,

13   he stated no.  I also asked him if he had ever had any

14   problems with the law before, ever been arrested, charged or

15   convicted of any criminal offenses and he stated no.  So this

16   ended my interview and I asked him to have a seat in the

17   lobby, and I went to my desk to conduct database checks.

18   Q    When you encountered Mr. Jenkins with the E67, did you

19   also obtain from him any other documentation?

20   A    Yes.  He handed me his American passport.

21   Q    At this time I'm going approach the witness and hand

22   you Exhibit 2B and ask you if you recognize Government's

23   Exhibit 2B.

24   A    Yes, I do.

25   Q    What is that?

Melany Boyd – Direct                           168

1   A     It's an American passport for Mr. Jenkins.

2   Q     Is that a copy of an American passport?

3   A     Yes, it is.

4   Q     When you were handed the passport, were you handed an

5   actual passport or a copy of it?

6   A     No, the original passport.

7   Q     Is that copy a true and accurate copy of the passport

8   that you were handed?

9   A     Yes, it is.

10         MS. THOMSON:  At this time, your Honor, I would

11  offer into evidence Government's Exhibit 2B.

12         MR. GOLDSMITH:  May I briefly voir dire?

13         THE COURT:  You may.

14         MR. GOLDSMITH:  Thank you.

15         VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

16  Q     Agent Boyd, did you make a photocopy of the passport on

17  that morning?

18  A     Yes, I did.

19  Q     And photocopy of the passport under Government

20  Exhibit 2B, is that a version of the photocopy that you made

21  that morning?

22  A     Yes.

23         MR. GOLDSMITH:  No further questions, no objection.

24         THE COURT:  It will be received.

25         CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

Melany Boyd – Direct                              169

1   Q     When you make a copy of the passport, is it to be kept,

2   is it, the copy to be kept in your files?

3   A     Yes.

4   Q     And the Government Exhibit 2B, was that from your

5   files?

6   A     Yes.

7   Q     What was the next step in your process of doing an

8   interview?

9   A     I conducted database checks.

10  Q     While you were conducting the database checks, where

11  was the defendant?

12  A     He was sitting in the lobby of the office.

13  Q     Do you see the person in this courtroom that you

14  encountered at approximately 9 a.m. on May 24, 2009, that

15  presented the passport that's depicted in Exhibit 2B?

16  A     Yes, I do.

17  Q     And if you could please identify him by his location

18  and article of clothing.

19  A     He's seated at the table to my left in a blue-collared

20  golf shirt.

21        MS. THOMSON:  If the record could reflect the

22  witness has identified the defendant Mr. Jenkins.

23        THE COURT:  It will.

24  Q     When you encountered the defendant, could you describe

25  any observations that you made about him, during your entire

Melany Boyd - Direct                                    170

1    encounter with him?

2    A     I did notice Mr. Jenkins' behavior, he appeared to be

3    nervous when I was asking him questions, he avoided eye

4    contact when I was asking him the questions, as well as he

5    was evasive when I was asking questions.  For example, he

6    would only provide the direct answer to my question, he would

7    never provide additional information.  He also was fidgeting

8    with his hands when I was conducting my interview as well, so

9    I noticed this behavior when I was speaking with Mr. Jenkins.

10   Q     When you're conducting these interviews, are you

11   attempting to make those observations, are you trying to

12   gauge what the answers are to the questions and how they're

13   being answered?

14   A     Yes.

15   Q     Why?

16   A     They're -- well, they're called indicators and our

17   training just gives us indicators if someone may be possibly

18   not answering truthfully or -- just gives us reason to

19   further the examination.

20   Q     As a result of your interview, what steps, if any, did

21   you take?

22   A     I had deferred the secondary examination to customs.

23   Q     Why?

24   A     Because of the observations I made, when I was

25   conducting the interview with Mr. Jenkins.

Melany Boyd - Direct                                171

1    Q      When you made those observations and decided to defer

2    him, what were you seeking to have done?

3    A      A examination of Mr. Jenkins' vehicle.

4    Q      Why his vehicle?

5    A      To determine his admissibility to Canada.  I had

6    concerns that because Mr. Jenkins did have his parents in

7    Canada, I was concerned that he possibly could stay in Canada

8    longer.  He'd also, he informed me in the interview that he

9    was self-employed so I was concerned that he could possibly

10   be staying in Canada longer than his one-week trip that he

11   had stated to me.

12   Q      When he presented himself to you to do this interview,

13   had you made any observations of his vehicle?

14   A      Yes, the office is all glass, you can see all the

15   vehicles that are parked in the secondary area so I did see

16   Mr. Jenkins' vehicle.  It was -- he was driving a pickup

17   truck so you could see in the bed of the truck there were a

18   lot of belongings as well as he was pulling a trailer and it

19   was an open trailer so I did observe a lot of belongings in

20   the trailer as well so noticing this also made me want his

21   vehicle to be examined as well.

22   Q      When you made the decision that his vehicle should be

23   examined, how did you start that process?

24   A      I made a radio call to customs secondary.

25   Q      Did anyone respond to that radio call?

1    A     Yes, it was Officer Glen Hache.

2    Q     The inspection that you were calling for, is that part

3    of your duties as well, do you do -- do you perform those

4    inspections?

5    A     Yes, I do.

6    Q     On that particular day, did you participate in the

7    inspection of his vehicle?

8    A     No.

9    Q     Why is that?

10   A     Myself and a colleague of mine, we were the only ones

11   working in immigration secondary, it was a very busy day, and

12   noticing the amount of belongings in the vehicle that I had

13   observed, I knew it was going to take longer and there were

14   other clients waiting to be examined for immigration

15   secondary, so I had deferred the secondary to customs for --

16   just for time, time restraints.

17   Q     But you yourself do perform custom functions in

18   addition to immigration functions?

19   A     Yes.

20   Q     At this time I'm approaching the witness and handing

21   the witness what's been previously marked as Government's

22   Exhibit 2C.  I'm going to ask you if you recognize

23   Exhibit 2C.

24   A     Yes, I do.

25   Q     What is Government Exhibit 2C?

Melany Boyd - Direct                                    173

1    A      It's a immigration form, it's an application for

2    admission to Canada form.

3    Q      Were you present when that form was filled out?

4    A      Yes, I was.

5    Q      What is the purpose of that form?

6    A      It's to collect standard information from someone that

7    is seeking entry to Canada.

8    Q      On that particular form, who was seeking entry on that

9    form?

10   A      It was Mr. Jenkins.

11   Q      And you were present when Mr. Jenkins was filling out

12   that form?

13   A      Yes, I was.

14          MS. THOMSON:  At this time, your Honor, the

15   Government would move into evidence Exhibit 2C.

16          THE COURT:  Any objection?

17          MR. GOLDSMITH:  Very brief voir dire, your Honor.

18          THE COURT:  Go ahead.

19          MR. GOLDSMITH:  Thank you.

20   VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

21   Q      Agent Boyd, when you said that he was in your presence

22   when he filled it out, did he fill it out at the counter in

23   front of you?

24   A      No.

25   Q      He filled it out in a waiting area?

Melany Boyd - Direct                                    174

1    A      It was in an interview room.

2    Q      All right.  Where was the interview room located

3    relative to the counter that he approached you at?

4    A      It was the other end of the office.

5    Q      All right.  And you were in the interview room with him

6    when he filled it out?

7    A      Yes.

8    Q      And you presented him with the forms?

9    A      Yes.

10   Q      You watched him fill it out?

11   A      Yes.

12   Q      You took the form from him?

13   A      Yes.

14   Q      And this form's a copy of your records?

15   A      Yes.

16          MR. GOLDSMITH:  No objection.

17          THE COURT:  Received.

18          CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

19   Q      If we could publish 2C, please.  In relation to the

20   time that you spent with him at the counter when he first

21   presented himself, when was this form filled out?

22   A      It was approximately 1620.

23   Q      Is that 4:20 p.m.?

24   A      Yes.

25   Q      I always have trouble with that.  So at 4:20 p.m., you

Melany Boyd – Direct                                   175

1   were still in the presence of the defendant?

2   A     Yes.

3   Q     Okay.  And do you know why?

4   A     Yes.  He was in custody of CBSA, he had been arrested.

5   Q     And so when you sat -- you sat with him and he filled

6   this out?

7   A     Yes.

8   Q     Where it's indicated for name it indicates Joseph

9   Jenkins, correct?

10  A     Yes.

11  Q     Is there a birth date associated on the form?

12  A     Yes, January 22nd, 1970.

13  Q     And if we could scroll down and see the bottom half of

14  the form, please.  Where it indicates accompanied by, can you

15  tell us what is written in there?

16  A     No one.

17  Q     And that would be what Mr. Jenkins filled out on this

18  form?

19  A     Yes.

20  Q     And what is indicated for purpose of trip?

21  A     Vacation.

22  Q     And destination?

23  A     Lac-des-Seize-îles (phonetic), Quebec.

24  Q     Length of stay?

25  A     Week.

Melany Boyd – Direct                                    176

1    Q      And if we could move down to the bottom of the form,

2    please.  Did defendant sign this form?

3    A      Yes, he did.

4    Q      And date it May 24, 2009?

5    A      Yes.

6    Q      Did he also indicate his vehicle information?

7    A      Yes.

8    Q      Would that be the vehicle that he -- that you observed?

9    A      Yes, it was.

10          MS. THOMSON:  One moment, your Honor.

11   Q      At this time I'm handing the witness what's been

12   previously marked as Government Exhibit 2D.  I'm going to ask

13   you if you recognize Government's Exhibit 2D.

14   A      Yes, I do.

15   Q      What is Exhibit 2D?

16   A      It's a photograph of Mr. Jenkins.

17   Q      Did you take that photograph?

18   A      Yes, I did.

19   Q      At what point did you take that photograph?

20   A      It was approximately 4:20 in the afternoon.

21   Q      Did you retain the photograph and copies of the

22   photograph in your file?

23   A      Yes, I did.

24   Q      Is this a true and accurate copy of the photograph and

25   the copies of the photograph that you maintained in your

Melany Boyd – Direct                              177

1    file?

2    A     Yes, it is.

3          MS. THOMSON:  Your Honor, at this time I would

4    offer into evidence Government's Exhibit 2D.

5          MR. GOLDSMITH:  May I actually briefly see the

6    exhibit?

7          THE COURT:  You may.

8          MS. THOMSON:  It's in your exhibit binder.

9          MR. GOLDSMITH:  The exact copy.

10         MS. THOMSON:  You want to see this one?

11         MR. GOLDSMITH:  Thank you.

12   Q     Did you maintain the original in your file?

13   A     Yes, I did.

14   Q     And is that part of your Canadian file?

15   A     Yes.

16         THE COURT:  Any objection to the offer?

17         MR. GOLDSMITH:  Just a very brief voir dire?

18         THE COURT:  Go ahead.

19   VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

20   Q     There's handwriting at the top right of the page, Agent

21   Boyd, is that your handwriting?

22   A     Yes, it is.

23   Q     And you wrote that, approximately the same time that

24   the photograph was produced?

25   A     Yes.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Melany Boyd – Direct                                      178

1    Q     And the page with the note taking in the photograph was

2    kept in your records?

3    A     Yes.

4              MR. GOLDSMITH:  No objection.

5              THE COURT:  Received.

6              MS. THOMSON:  If we could publish that, please.

7        CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

8    Q     Is that the person that you encountered on May 24,

9    2009?

10   A     Yes, it is.

11   Q     Have you seen Joseph Jenkins since the time that you

12   encountered him on May 24, 2009?

13   A     Yes.

14   Q     When was that?

15   A     It was on September 13th, 2010.

16   Q     Where was that?

17   A     It was at the Brockville Courthouse in Brockville,

18   Ontario.

19   Q     On that date was there a proceeding involving Canadian

20   charges that you've described?

21   A     Yes.

22   Q     And so you saw the defendant at that proceeding?

23   A     Yes, I did.

24   Q     Did that proceeding that you attended, did it get

25   turned over to a later date?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Melany Boyd – Direct                          179

1    A      Yes, it did.

2    Q      And do you recall the date that it was continued until?

3    A      It was October 2010.

4    Q      Did you appear in Canadian court in October of 2010?

5    A      Yes, I did.

6    Q      When you appeared, did you see the defendant at that

7    time?

8    A      No, I didn't.

9    Q      What were you appearing for?

10   A      For a trial in Canada for the Canadian charges.

11   Q      Was the defendant present for that trial?

12   A      No, he wasn't.

13   Q      Did that trial go forward?

14   A      No, it didn't.

15          MS. THOMSON:  I have no further questions for this

16   witness.

17          THE COURT:  Cross-examination, Counsel?

18          MR. GOLDSMITH:  May I inquire?

19          THE COURT:  You may.

20          MR. GOLDSMITH:  Thank you.

21          CROSS-EXAMINATION BY MR. GOLDSMITH:

22   Q      Officer Boyd, you testified that Mr. Jenkins came into

23   the office where you were with a referral slip, is that

24   correct?

25   A      Yes, it is.

1    Q     And that was at about 9:00 in the morning on May 24th

2    of 2009?

3    A     Yes.

4    Q     When he presented the referral slip to you, you began

5    to interview him, is that correct?

6    A     Yes.

7    Q     And you asked him several questions about his length of

8    stay, purpose of stay, et cetera?

9    A     Yes.

10   Q     And he provided you with answers to all those

11   questions, correct?

12   A     Yes.

13   Q     He answered all of your questions, is that correct?

14   A     Yes.

15   Q     And when he was at the counter, he did not have any

16   outburst toward you, is that correct?

17   A     That's right.

18   Q     Was -- you characterized him as compliant during the

19   interview, is that correct?

20   A     Yes.

21   Q     You testified a few moments ago that you made a

22   decision to ask for an inspection of his vehicle, do you

23   recall that?

24   A     Yes.

25   Q     And you said that you made that decision based upon

Melany Boyd – Cross

1    your view of his vehicle, is that correct?

2    A    Yes.

3    Q    Now the view of the vehicle was outside of the building

4    that you were in, correct?

5    A    Yes.

6    Q    And you testified that the building has a lot of

7    windows in it, but it was still outside of where you were,

8    correct?

9    A    Yes.

10   Q    The vehicle was approximately how many feet from where

11   you were standing?

12   A    Say approximately 15 feet.

13   Q    So it was 15 feet to where the windows were and then an

14   additional amount of feet to where the car was or where the

15   car was?

16   A    No, sorry, that's from where I was standing to the

17   vehicle.

18   Q    Okay.  And in between obviously the vehicle and you

19   there was a wall of -- all glass, is that correct?

20   A    Yes.

21   Q    Well, let me rephrase, is it all glass or does it have

22   some structure in between the windows?

23   A    Some structure.

24   Q    Does it have any blinds or shades over the windows?

25   A    No.

Melany Boyd - Cross

1  Q    All right.  So you were able, about 15 feet away from

2  behind your counter, to see the truck, is that correct?

3  A    Yes.

4  Q    And you observed the truck while you were interviewing

5  Mr. Jenkins, correct?

6  A    Yes.

7  Q    And so at the time that you're interviewing him, you're

8  taking any notes down?

9  A    No.

10  Q    Filling out any paperwork?

11  A    No.

12  Q    But you are paying attention to him and his demeanor

13  towards you, correct?

14  A    Yes.

15  Q    So then you see, I guess is it over his shoulder where

16  the truck would be?

17  A    No, it would be to my right.

18  Q    So while you're staring and paying attention to

19  Mr. Jenkins, you are also looking in a different direction

20  toward the truck, correct?

21  A    Well, what had happened was I was standing at the

22  counter waiting for the referral to be sent inside, so I saw

23  the vehicle pull into the secondary area, and I watched

24  Mr. Jenkins get out of the vehicle and come into the office,

25  but while I was conducting my interview, I was focused on

Melany Boyd – Cross

1    Mr. Jenkins.

2    Q    All right, let me stop you there.

3    A    Not on the vehicle.

4    Q    So, your testimony is that you observed the vehicle

5    prior to interviewing Mr. Jenkins?

6    A    Yes.

7    Q    So, you had the moments in time where the vehicle

8    pulled up, he got out of the vehicle and entered into the

9    building when you were observing it, correct?

10   A    Yes.

11   Q    All right.  So you had observed the vehicle prior to

12   interviewing him and having reviewed the referral slip,

13   correct?

14   A    Yes.

15   Q    So then, when he's in the building with you, that's

16   when you're paying attention to him rather than looking at

17   the vehicle?

18   A    Yes.

19   Q    Now the vehicle you recall was a blue truck, correct?

20   A    Yes.

21   Q    You recall a cab on the back?

22   A    Yes.

23   Q    And you recall a tow trailer behind it?

24   A    Yes.

25   Q    So you saw articles you testified before that were on

Melany Boyd – Cross

1    the trailer, correct?

2    A    Yes.

3    Q    All right.  And those were ATVs?

4    A    Yes.

5    Q    All-terrain vehicle, right?

6    A    Yes.

7    Q    You remember if they're three wheels or four wheels?

8    A    I don't recall.

9    Q    Do you remember color or anything about them?

10   A    No.

11   Q    You remember how many there were?

12   A    I believe there were two.

13   Q    All right.  So there were two ATVs on the back; any

14   other vehicles or other objects?

15   A    There were totes in the trailer that I had observed.

16   Q    When you say totes, why don't you describe what that

17   is?

18   A    Large plastic containers with lids on them.

19   Q    Kind of like a cooler?

20   A    Yes, that size.

21   Q    Something somebody might take out if they were camping

22   or fishing or something like that?

23   A    Yes.

24   Q    So then there was the truck and you were able to see

25   through the glass through the cab on the back of the truck,

Melany Boyd - Cross

1    right?

2    A    Like the bed, the bed of the truck, I saw.

3    Q    So you were able to see -- so the cap on the bed of the

4    truck had glass on it or windows?

5    A    No, it was open.

6    Q    All right.  And you were able to see down into what was

7    in the bed of the truck from your position 15 feet away

8    inside the building?

9    A    I couldn't see in it but I could see that it was full

10   to the top of the bed, so it appeared to be full from where I

11   was standing.

12   Q    And you were able to see any objects that were inside

13   the cab of the truck?

14   A    No, I didn't.

15   Q    The cabin, I should say?

16   A    No.

17   Q    But based upon what you saw you made a determination

18   that that looked like too much stuff for a one-week vacation?

19   A    It wasn't a determination, it was an indicator.

20   Q    Okay.  But you used that indicator of the amount of

21   stuff versus a one-week vacation to refer him for an

22   additional inspection, correct?

23   A    Yes.

24   Q    You yourself did not perform the actual inspection of

25   the vehicle?

Melany Boyd – Cross

1    A    No.

2    Q    And again, this all took -- what we've talked about

3    thus far only took place at about 9:00 in the morning, right?

4    A    Yes.

5    Q    And the interview that you did with Mr. Jenkins early

6    on took a matter of minutes?

7    A    Yes.

8    Q    At that point you referred him for an inspection of the

9    vehicle itself?

10   A    Yes.

11   Q    All right.  Then you took any identification or other

12   documentation from Mr. Jenkins?

13   A    Yes, his passport.

14   Q    Had him take a seat in the building?

15   A    Yes.

16   Q    That's all an open area lobby, correct?

17   A    Yes.

18   Q    And you said that it was very busy that morning?

19   A    Yes.

20   Q    It was only yourself and one other individual working

21   in the immigration building?

22   A    Yes.

23   Q    And you said there were other individuals that had

24   already been waiting there to have their vehicles inspected,

25   is that correct?

Melany Boyd - Cross

1    A     No, it was for immigration processing.

2    Q     Okay.  So it was -- those were other people that had

3    come in on the border that morning and had to have some

4    processing to allow their entry, right?

5    A     Yes.

6    Q     And do you recall specific issues that those

7    individuals had for immigration?

8    A     I don't recall.

9    Q     All right.  And there were several individuals though

10   that had already been waiting, correct?

11   A     Yes.

12   Q     You did say it was pretty busy because there were only

13   two of you working, right?

14   A     Yes.

15   Q     Now you also testified about the application for entry

16   that you observed Mr. Jenkins fill out?

17   A     Yes.

18   Q     And you said that you observed him fill that paperwork

19   out, correct?

20   A     Yes.

21   Q     And you said that he filled that paperwork out in the

22   afternoon?

23   A     Yes.

24   Q     Excuse me.  About 4:20 in the afternoon?

25   A     Yes.

Melany Boyd – Cross

1    Q     So after he had been sitting there for about seven

2    hours, you had him fill out an application for entry?

3    A     Yes.

4    Q     And you didn't have him fill that paperwork out when he

5    arrived at 9:00 in the morning?

6    A     No.

7    Q     You didn't have him fill that paperwork out midday at

8    all?

9    A     No.

10   Q     You waited until about 4:20 in the afternoon to have

11   him fill that paperwork out?

12   A     Yes.

13   Q     And it was also about that time that you were informed

14   that he would be taken into custody?

15   A     No, I knew Mr. Jenkins was in custody prior, but it was

16   at approximately 4:20 that I was advised that he was being

17   taken into custody into Canada so these are standard forms

18   that we fill out when someone is being taken into custody so

19   leaving the border.

20   Q     So you have -- so you have an individual that you know

21   is going to be taken into custody by Canadian authorities

22   fill out an application to be admitted into the country?

23   A     Yes.

24   Q     All right.  Now you also testified that you saw

25   Mr. Jenkins at about September 13th of 2010?

Melany Boyd – Cross                                189

1    A      Yes.

2    Q      And you said you saw him at the Brockville courthouse?

3    A      Yes.

4    Q      And there was a legal proceeding that was going to take

5    place there?

6    A      Yes.

7    Q      And you also testified that that got adjourned to

8    October of 2010, correct?

9    A      Yes.

10   Q      I believe you testified that was for a trial?

11   A      Yes.

12   Q      Okay.  And the trial, was that also supposed to take

13   place in September of 2010?

14   A      Yes.

15   Q      All right.  Did it take place on that day?

16   A      No.

17   Q      Did not -- withdrawn.  Trial did not take place when

18   Mr. Jenkins was there on September 13th of 2010?

19   A      No.

20   Q      Do you recall why?

21   A      No.

22   Q      So again, I just want to run through one more time,

23   Mr. Jenkins came in about 9:00 in the morning, is that

24   correct?

25   A      Yes.

Melany Boyd - Redirect                            190

1   Q    You observed the truck with the belongings from about

2   15 feet away before he entered the building, correct?

3   A    Yes.

4   Q    He was compliant when you asked him questions at the

5   counter, correct?

6   A    Yes.

7   Q    And you also categorized that it was very busy in your

8   building that morning?

9   A    Yes.

10            MR. GOLDSMITH:  Thank you, no further questions.

11            MS. THOMSON:  Just one followup.

12       REDIRECT EXAMINATION BY MS. THOMSON:

13  Q    When a person ordinarily presents themselves at an

14  inspection lane and they're allowed to go through, that's

15  their admission to Canada, correct?

16  A    Yes.

17  Q    So when that doesn't happen, the paperwork that you had

18  them fill out, that just notes that they applied for

19  admission to Canada?

20  A    Yes, what happens is the -- his admissibility had not

21  been determined at that point so the paperwork allows the

22  person to physically enter Canada without actually being

23  admitted to Canada because his admissibility hadn't been

24  fully assessed yet.

25            MS. THOMSON:  Understood.  Thank you.

1           THE COURT:  Okay, thank you.  Any further cross on

2   that?

3           MR. GOLDSMITH:  Nothing, your Honor.

4           THE COURT:  You may step down, thank you.

5               (The witness was excused.)

6           MS. CARROLL:  Your Honor, the government calls

7   Officer Tristan Garrah.

8           THE CLERK:  Can you state your full name, spell it

9   for the record, please.

10          THE WITNESS:  Tristan, T-r-i-s-t-a-n, Mathieu,

11  M-a-t-h-i-e-u, G-a-r-r-a-h.

12

13          T R I S T A N   M .   G A R R A H , called

14  as a witness and being duly sworn, testifies as

15  follows:

16          DIRECT EXAMINATION BY MS. CARROLL:

17  Q    Good morning, Officer Garrah.

18  A    Good morning.

19  Q    Where are you employed?

20  A    I'm employed by Canada Border Services Agency out of

21  Port of Lansdowne.

22  Q    Is Canada Border Services Agency also known as CBSA?

23  A    That's correct.

24  Q    What is your position with CBSA?

25  A    I'm a border services officer.

1    Q     What are your duties as a border services officer?

2    A     We facilitate the influx of goods and people into

3    Canada and also the catching of contraband and things of that

4    nature.

5    Q     Do you work in both primary inspection and secondary

6    inspection sites at the Port of Lansdowne?

7    A     I do.

8    Q     Could we please pull up Exhibit 1C.  Officer Garrah, do

9    you recognize what's depicted in Exhibit 1C?

10   A     Yes, it's the Port of Lansdowne.

11   Q     And could you indicate on the screen where it is that

12   the secondary inspection agency is located at the Port of

13   Lansdowne?

14   A     It's the larger building on the top of the screen

15   underneath the longer rectangular section there, that's a

16   canopy and vehicles park underneath it.

17   Q     How long have you worked for CBSA?

18   A     Since May of 2008.

19   Q     Have you received any special training in your capacity

20   as a CBSA officer?

21   A     Yes.

22   Q     What kind of training?

23   A     We get all sorts of training, we go to customs college

24   initially before you're given your full duties as officer,

25   given a badge and things like that, we're trained all the

1    time on various interdiction techniques, interview

2    techniques, search techniques for vehicles, in addition to

3    control and defensive tactics and things of that nature.

4    Q    What do you mean by interdiction techniques?

5    A    How to -- we're brought up on trends on what's

6    happening for various types of contraband, how it's smuggled

7    into the country, what other countries are seeing, what

8    different regions are seeing, and if you come across these

9    trends are indicators in the field how to, you know, take the

10   search into a more in-depth level and where things could be

11   concealed in a vehicle or device.

12   Q    Does the secondary inspection area give you the

13   opportunity to do what you called more in-depth searches?

14   A    Yes and no, it depends on the type of search.  We can

15   get into more depth in the vehicle.  In terms of electronic

16   media, we usually bring into an office, it's more private

17   setting, public doesn't have to see what's on the person's

18   private goods.  There's a desk that we can work at, things of

19   that nature.

20   Q    Were you on duty on May 24th of 2009?

21   A    Yes, I was.

22   Q    What shift were you working that day?

23   A    I was working day shift.

24   Q    What are the times for the day shift?

25   A    It's 8 a.m. to 6 p.m.

Tristan Garrah – Direct                          194

1    Q      Were you working at the Port of Lansdowne at about

2    9 a.m. on May 24th, 2009?

3    A      Yes, I was.

4    Q      Where were you stationed at that point in time?

5    A      I was in secondary duties.

6    Q      Could we pull up 1C again.  Were you inside the

7    secondary inspection area that we see on 1C or were you under

8    the outside canopy at around 9 a.m.?

9    A      I was underneath the outside canopy, there's a bench

10   there that's located right underneath the bank of windows

11   that you can see on the screen there.

12   Q      Were you asked to do a vehicle inspection at about

13   9 a.m. on May 24th?

14   A      Yes, I was.

15   Q      Was that a referral you got from a customs agent or --

16   A      It was from the immigration portion of our office.

17   Q      What was the vehicle you were asked to inspect?

18   A      It was a blue Dodge Ram, the license plate was 19322JL

19   New York.

20   Q      Were you given any specific directives about what you

21   were looking for or was it just a general inspection?

22   A      We treat everything general, in most senses, you never

23   know what you're going to find but in this case he had

24   already begun an immigration process and we knew that he was

25   self-employed, he was an electrician and he had some tools

 1    with him so there was a chance that he was working in Canada

 2    so that was part of the search at the beginning.

 3    Q    When you say he, are you referring to the driver of the

 4    vehicle?

 5    A    Yes, Joseph Jenkins.

 6    Q    Did you see the driver of the vehicle during the

 7    vehicle inspection that you were doing?

 8    A    Yes.

 9    Q    Do you see the driver of the vehicle in the courtroom

10    today?

11    A    Yes, he's seated there.

12    Q    Can you describe him using an article of clothing?

13    A    He's wearing a blue polo-style shirt.

14         MS. CARROLL:  Your Honor, may the record reflect

15    that the witness has identified the defendant?

16         THE COURT:  It will so reflect.

17    Q    How did you begin your inspection of the blue Dodge Ram

18    vehicle driven by defendant Joseph Jenkins?

19    A    I started my inspection in the driver's side area at

20    the driver's seat, begin in the center console, the dash,

21    underneath the seat, things like that.  When I finished there

22    I proceeded back to the rear passenger on the driver's side

23    so the bench seat in the back of the truck.  When I finished

24    there I went around to the back of the truck and looked

25    briefly in the bed of the truck and then at that point,

Tristan Garrah – Direct                196

1    Officer Johnston called me over to see a laptop that he had

2    found.

3    Q     Was Officer Johnston, another CBSA officer, conducting

4    the vehicle inspection?

5    A     Yes, he was.

6          MS. CARROLL:  Your Honor, permission to approach?

7          THE COURT:  You may.

8    Q     Officer Garrah, I'm handing you what's been marked for

9    identification as Government's Exhibit 3A.  Before your

10   testimony today -- I'm also going to hand you what's been

11   marked for identification as Government's Exhibit 18.  Before

12   your testimony today, have you had the opportunity to examine

13   Exhibit 3A?

14   A     Yes, I have.

15   Q     What is Exhibit 3A?

16   A     It's a Toshiba laptop that was present in the vehicle

17   we searched.

18   Q     How do you recognize it as the Toshiba laptop that was

19   in the vehicle?

20   A     I had an opportunity to compare the serial number on

21   the Toshiba to my exhibit control sheet that I filled out at

22   the time of occurrence.

23   Q     I'm going to ask you to refer to what's been marked for

24   identification as Government's Exhibit 18.

25   A     Okay.

1   Q      Do you recognize Government's Exhibit 18?

2   A      I do.

3   Q      What is it?

4   A      It's a exhibit control form.  Whenever we seize a large

5   number of goods in a case that we believe will be going to

6   prosecution or we'll have some further process attached to

7   it, we fill out this sheet that would be the exhibit to

8   basically account for all of the goods that we are taking

9   from the subject at that time.

10  Q      Did you personally fill out that sheet?

11  A      I did, yes.

12  Q      Does your signature appear on it?

13  A      It does, yes.

14  Q      Is that an accurate copy of the property control sheet

15  you filled out on May 24th, 2009?

16  A      It is, yes.

17         MS. CARROLL:  Your Honor, move to admit

18  Government's Exhibit 18.

19         THE COURT:  Any objection?

20         MR. GOLDSMITH:  Brief voir dire, your Honor?

21         THE COURT:  Go ahead.

22  VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

23  Q      Officer Garrah, that's a form that you filled out

24  yourself?

25  A      Yes, it is.

Tristan Garrah - Direct                    198

1   Q     And it's in your handwriting?

2   A     It is, yes.

3   Q     It's a photocopy that you provided to the U.S.

4   government?

5   A     I believe our Justice Department did at some point too

6   but we did as well, yes.

7   Q     When was the last time you saw that document?

8   A     It would have been roughly a week ago I suppose.

9   Q     Prior to one week ago, what was the previous time that

10  you saw that document?

11  A     It would have been at the time of occurrence so I guess

12  May 2009.

13  Q     So between May 2009 and approximately a week ago, you

14  had not seen that document?

15  A     No, it would have been filed in our warehouse.

16  Q     All right.  And you had not been holding that document

17  during the time?

18  A     No.

19          MR. GOLDSMITH:  Your Honor, object.

20          THE COURT:  Basis?

21          MR. GOLDSMITH:  Basis, foundation.

22          THE COURT:  It's overruled.  The document will be

23  received.

24          MS. CARROLL:  Could we please publish that.  And if

25  you could zoom in on, going down to number 1.

Tristan Garrah – Direct                                      199

1          CONTINUED DIRECT EXAMINATION BY MS. CARROLL:

2     Q    Officer Garrah, is this your name that appears in the

3     box just below the last name Jenkins?

4     A    Yes.

5     Q    And is this the date May 24th, 2009 that you took the

6     property into custody?

7     A    Yes.

8     Q    If you look at item number 1, could you describe what's

9     listed as item number 1?

10    A    Toshiba laptop, serial number 78175808W.

11    Q    Is that the serial number on the laptop that is

12    Government's Exhibit 3A?

13    A    It is, yes.

14    Q    And does that laptop appear to be in substantially the

15    same condition that it was when you took it into custody on

16    May 24th, 2009?

17    A    Yes, it's in the same condition.

18          MS. CARROLL:  Your Honor, move to admit

19    Government's Exhibit 3A.

20          THE COURT:  Any objection?

21          MR. GOLDSMITH:  Just a brief voir dire, your Honor.

22          THE COURT:  Go ahead.

23    VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

24    Q    Officer Garrah, when was the last time you saw the

25    laptop?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Tristan Garrah – Direct                                    200

1    A      It was yesterday prior to testimony.

2    Q      Are there any markings on the particular laptop that

3    would indicate that it's the same laptop that you took

4    possession of on May 24th, 2009?

5    A      Yes, on the underside it bears the same serial number

6    on my exhibit control sheets.

7    Q      Other than the serial number, are there any other

8    indications or markings that would show that it was the same

9    laptop?

10   A      It's the same make and model.

11   Q      Did you place the laptop into some sort of a secured

12   envelope?

13   A      At the time of seizure?

14   Q      Yes.

15   A      Yes, I did.

16   Q      And is the envelope present with the laptop?

17   A      No, it is not currently.

18   Q      Have you -- when was the last time you saw the envelope

19   that you placed the laptop into?

20   A      On the day of occurrence when it was placed in our

21   secure warehouse.

22   Q      Did you operate the laptop within the last week or so?

23   A      I've not.

24   Q      Are there any markings on it that are in addition to

25   what you recall on May of 2009?

Tristan Garrah – Direct                                    201

1    A      No, there are not.

2            MR. GOLDSMITH:  No objection.

3            THE COURT:  I'm sorry?

4            MR. GOLDSMITH:  I'm sorry, no objection.

5            THE COURT:  It will be received.

6            CONTINUED DIRECT EXAMINATION BY MS. CARROLL:

7    Q      Officer Johnston, I believe you testified that --

8    Officer Garrah, you testified that you came around to the

9    passenger side of the vehicle and observed this laptop,

10   please continue, what did you see?

11   A      Officer Johnston had called me over to view the laptop,

12   he had turned it on and I was standing behind him, he had the

13   laptop on the seat of the truck, I noticed that there was an

14   icon present on the desktop screen, the home screen.  He

15   clicked the icon and media file began to play, it was a video

16   depicting two very young girls, prepubescent, dancing around

17   in their underwear.  About halfway through the video they

18   would face away from the camera, bend over and manipulate,

19   sort of manipulate the buttocks with their hands, they were

20   not nude at this time.

21   Q      What did you do after viewing that video on the black

22   Toshiba laptop?

23   A      There were two more laptop bags in the truck, I grabbed

24   those laptop bags and we headed into the traffic office to

25   our exam room inside.

Tristan Garrah – Direct                               202

1    Q     Who is we?

2    A     Myself, Officer Johnston, and Officer Hache.

3    Q     Did you open the laptop bags you took into the traffic

4    office?

5    A     I did.  One was empty and the other contained a Compaq

6    laptop, various USB keys, a few burned CDs and other

7    electronic equipment, like a computer mouse and things of

8    that nature.

9    Q     Why did you take the laptop bags and computers into the

10   office?

11   A     As I stated earlier, it's a more private setting, the

12   general public won't see what we have playing on the laptop,

13   it can be disturbing in nature sometimes.  There's a desk

14   that we can sit at to properly manipulate a computer, power

15   sources and things like that.

16   Q     Officer Garrah, I'm handing you what's been marked for

17   identification as Government's Exhibit 4A, 5A, 6, and 7.  Do

18   you recognize those exhibits?

19   A     I do, yes.

20   Q     Prior to your testimony today, have you had the

21   opportunity to view those exhibits?

22   A     I did, yes.

23   Q     What is Exhibit 4A, 5A, and 6?

24   A     They're --

25   Q     Hold them up to the jury.

Tristan Garrah – Direct                    203

1    A      They are the three USB keys that were found alongside

2    the Compaq computer in the laptop bag.

3    Q      Do they appear to be in substantially the same

4    condition they were on May 24th, 2009?

5    A      They do, yes.

6    Q      If we could pull up Government's 18.  Are those USB

7    sticks reflected on your property custody sheet in

8    Government's 18?

9    A      Yes, they are.

10   Q      Could you explain to the jury where they're reflected

11   on that sheet?

12   A      Yes, they're items 3, 4, and 5.

13   Q      Are there gigabyte designations on your property

14   custody sheet?

15   A      Yes, 8-gigabyte, 4-gigabyte, and 2-gigabyte.

16   Q      Do the USB sticks that are in Government's Exhibits 4A,

17   5A, and 6, do those have gigabyte designations on them

18   physically?

19   A      They do, yes.

20   Q      And do those gigabyte designations correspond to what's

21   on your property sheet?

22   A      Yes, that's correct.

23          MS. CARROLL:  Your Honor, move to admit

24   Government's Exhibits 4A, 5A, and 6.

25          THE COURT:  Any objection?

Tristan Garrah – Direct                                    204

1          MR. GOLDSMITH:  Brief voir dire, your Honor?

2          THE COURT:  Go ahead.

3     VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

4     Q    Officer Garrah, when was the last time you saw these

5     objects?

6     A    Yesterday.

7     Q    Prior to yesterday, when was the last time you saw

8     these objects?

9     A    It would be the time of occurrence in May 2009.

10    Q    Between May of 2009 and yesterday, were they ever in

11    your custody or control?

12    A    No.  After I put them in the warehouse, that was the

13    end of my involvement.

14    Q    Other than the markings that are printed onto the

15    device themselves that you testified about indicating the

16    gigabytes, are there any other markings on the objects that

17    would identify themselves as the same object that you took on

18    May 24th of 2009?

19    A    They have the same branding, same model and the same

20    colors.

21    Q    Any markings that you placed there or other Customs

22    Border Service agents?

23    A    No, we did not.

24    Q    Did you place it in a sealed evidence envelope on

25    May 24th of '09?

1   A      Yes, I did.

2   Q      Is the evidence envelope that you placed the objects

3   into present?

4   A      It is not, no.

5   Q      And again, you have not seen it in the period of time

6   between May 24th of '09 and yesterday, correct?

7   A      That's correct.

8              MR. GOLDSMITH:  I object by foundation, your Honor.

9              THE COURT:  Do you want to be heard?  Why don't you

10  come on up here.

11                 (At Side Bar.)

12             THE COURT:  Okay, the nature of the objection is

13  foundation, what is it that you feel is lacking, Counsel?

14             MR. GOLDSMITH:  Chain of custody, we have no known

15  chain of custody, we have five years that the witness was not

16  the custodian, had no control, had not seen the device, the

17  items in question.

18             MS. CARROLL:  First, your Honor, chain of custody

19  is an issue of weight, not admissibility, and it's a matter

20  of authentication, but further, the defendant -- the witness

21  has testified that the make, model, color, gigabyte

22  designation, and physical appearance of the evidence all

23  appears substantially the same as it did on May 24th, 2009,

24  and that all of the make, model, and gigabyte information on

25  his property custody form is identical to the evidence he's

Tristan Garrah – Direct

206

1    looking at now.  He further testified that that evidence was

2    placed in a secure evidence storage facility.  I believe to

3    the extent that there is further chain of custody which

4    obviously there is, we will have witnesses who do that but I

5    think that that will go to authentication, not admissibility.

6              THE COURT:  That was my question, there's going to

7    be further testimony as to where it's been since 2009?

8              MS. CARROLL:  Yes.

9              THE COURT:  Okay.  Well, I'll receive it subject to

10    that testimony, connection to that testimony.  Okay?

11             MS. CARROLL:  Okay.

12             THE COURT:  So I'm assuming you want to use it with

13    this witness?

14             MS. CARROLL:  We want to use a video that was drawn

15    from the 8-gigabyte.

16             THE COURT:  Okay.  It's conditionally received

17    subject to connection with this further testimony with regard

18    to the chain of custody where it's been since 2009 until he

19    saw it again, okay?

20             MR. GOLDSMITH:  My only concern, your Honor, is if

21    they're going to attempt to show videos that are clearly

22    going to be prejudicial within the scope of the case, I

23    understand that it's subject to connection, we may have

24    difficulty if they're unable to fulfill their -- to fulfill

25    the other foundational requirements in order for the court to

Tristan Garrah – Direct                                207

1    permit the admission of the evidence at the end of trial,

2    substantially and unduly prejudice Mr. Jenkins.

3            THE COURT:  Well, counsel has told me that they

4    have witnesses who are going to testify about where this

5    particular -- these pieces of evidence were between 2009,

6    when they were taken into custody, I'm satisfied with that.

7    I'm satisfied that this witness has identified them

8    sufficiently at this point that they can be conditionally

9    received.  So I'm going to allow them to proceed the way they

10   want to proceed.

11           MR. GOLDSMITH:  Thank you, thank you, your Honor.

12                (Open Court.)

13           MS. CARROLL:  Your Honor, we're going to move for

14   the admission of Exhibits 6, 4A and 5A.

15           THE COURT:  The exhibits will be received

16   conditionally subject to further testimony regarding chain of

17   custody.  So go ahead, Counsel.

18           CONTINUED DIRECT EXAMINATION BY MS. CARROLL:

19   Q    Officer Garrah, you testified that you also brought

20   another laptop into the office besides the black Toshiba.  Do

21   you see that laptop in front of you now?

22   A    Yes, it's a silver Compaq.

23   Q    Is that Government's Exhibit 7 that's been marked for

24   identification?

25   A    Yes.

Tristan Garrah – Direct                                    208

1    Q      Does that silver Compaq have a serial number on it?

2    A      It does, yes.

3    Q      Prior to your testimony today, have you had the

4    opportunity to examine that serial number?

5    A      Yes, I did.

6    Q      Is that serial number the same as the serial number

7    reflected on the Compaq identified on Government's 18?

8    A      Yes, it's line 2.

9    Q      Does the Compaq that's listed on your property receipt

10   form and as Government's Exhibit 7, does it appear to be in

11   substantially the same condition as it was when you seized it

12   on May 24th, 2009?

13   A      Yes, it's in the same condition.

14          MS. CARROLL:  Move to admit Government's Exhibit 7,

15   your Honor.

16          MR. GOLDSMITH:  Same objection, your Honor.

17          THE COURT:  Your objection is, basis?

18          MR. GOLDSMITH:  Same objection as my previous

19   objection as to the other evidence presented that we

20   discussed at side bar moments ago.

21          THE COURT:  Lack of foundation or --

22          MR. GOLDSMITH:  Yes.

23          THE COURT:  -- chain of custody?

24          MR. GOLDSMITH:  I believe they would both go

25   together.

Tristan Garrah – Direct                                209

1           THE COURT:  Okay.  Objection's overruled, it will
2      be received.
3      Q     Officer Garrah, what did you do once you got the
4      electronic media, the Compaq and the USB sticks, to the
5      office?
6      A     I searched the Compaq laptop manually.
7      Q     What does it mean to manually search the laptop?
8      A     To physically power it on and to look through it as you
9      would any normal computer.
10     Q     What, if anything, were you searching for?
11     A     Searching for contraband media, in this case it would
12     be child pornography.
13     Q     How long did you search the silver Compaq manually?
14     A     I would say about 10 to 12 minutes.
15     Q     Did you find anything you considered to be contraband?
16     A     No, I did not.
17     Q     What did you do next?
18     A     I plugged in the 8-gigabyte USB key and began to search
19     that.
20     Q     When you say you plugged it in, what do you mean?
21     A     I inserted it into the USB drive on the Compaq.
22     Q     Why did you put the 8-gigabyte USB into the defendant's
23     laptop as opposed to into a CBSA computer?
24     A     It was in line with our training, and we were not
25     allowed to insert any foreign media, whether it be CDs, USB

Tristan Garrah – Direct                              210

1    keys or anything of that nature into our work computers for

2    security reasons, for us to operate our computers, we're

3    behind our fire walls, we're logged into all our profiles and

4    things like that so we could expose our mainframe to viruses,

5    malware, things of that nature.

6    Q     How did you go about searching the 8-gigabyte USB

7    stick?

8    A     Manually.

9    Q     What did you do?

10   A     I put it in, I opened up the drive on the Compaq and

11   began to open media files that were present on the

12   8-gigabyte.

13   Q     When you say media files, what do you mean?

14   A     They were video files on the USB key.

15   Q     How many video files did you examine?

16   A     I believe it was one initially that we found, or that I

17   found, it was titled 9-year-old Vicky kiddie pedo illegal

18   preteen, or something along those lines.

19   Q     Did you open the file that had that 9-year-old Vicky

20   preteen title?

21   A     I did, yes.

22   Q     How long did you view that video?

23   A     I viewed it until the child that was depicted in it was

24   in a state of undress.

25   Q     Did you subsequently during your search on May 24th,

Tristan Garrah – Direct                        211

1    2009 view the entirety of the video?

2    A    I did, yes, after I arrested the subject.

3    Q    Officer Garrah, I'm handing you what's been marked for

4    identification as Government's Exhibit 4G.  Do you recognize

5    4G?

6    A    I do, yes.

7    Q    What is 4G?

8    A    It's a CD-ROM that I had the opportunity to view

9    yesterday to view the file that I just mentioned.

10   Q    What is the title of the file that you viewed on

11   Government's 4G?

12   A    It is "9-year-old Vicky stripping and sucking kiddie

13   pedo illegal underage preteen."

14   Q    Was that the title of the file that you viewed on the

15   8-gigabyte USB on May 24th, 2009?

16   A    It was, yes.

17   Q    Did you have the opportunity to view that file on

18   Government's Exhibit 4G?

19   A    I did, yes.

20   Q    Was it the same as the file that you viewed on

21   May 24th, 2009?

22   A    Yes, it was the same file.

23   Q    And was the title accurately reflected in the file

24   title on Government's 4G?

25   A    Yes, it's the same title.

Tristan Garrah – Direct                     212

1    Q    Do your initials appear on Government's 4G?

2    A    They do, yes.

3    Q    And is there a date?

4    A    Yes.

5    Q    What is that date?

6    A    It's February 3rd, 2014.

7    Q    Is that the date that you viewed the file contained on

8    Government's 4G?

9    A    Yes, that's correct.

10        MS. CARROLL:  Your Honor, move to admit

11   Government's 4G, the first video.

12        MR. GOLDSMITH:  Very brief voir dire?

13        THE COURT:  Go ahead.

14   VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

15   Q    Agent Garrah, did you create the CD?

16   A    I did not create the CD.

17   Q    Do you know who created it?

18   A    I believe the U.S. government.

19   Q    You don't know exactly who?

20   A    No, I'm not privy to that.

21   Q    You had not seen this CD prior to yesterday?

22   A    That's correct.

23   Q    With the exception of your initials on it, and viewing

24   it, do you have anything to do with the creation of this CD?

25   A    No, I have nothing to do with the creation of the CD.

1          MR. GOLDSMITH:  All right.  I object based upon

2     foundation, it wasn't created by this witness.

3          THE COURT:  Doesn't have to be, Counsel.

4     Objection's overruled.

5          MR. GOLDSMITH:  Thank you.

6          THE COURT:  It will be received.

7     CONTINUED DIRECT EXAMINATION BY MS. CARROLL:

8     Q    Officer Garrah, can you describe what you saw in the

9     video file you've given the title of previously?

10    A    The video depicts a young girl who appears to be around

11    9 to 10 years of age, she is wearing like a cardigan and some

12    black stockings, she's in a bedroom, some Britney Spears

13    music is playing, there's a man filming her, you don't see

14    the man initially.  The girl is told to disrobe, she does so,

15    but she leaves her stockings on, she's then beckoned forth by

16    the man filming her and told to administer oral sex and she

17    does.

18         MS. CARROLL:  Your Honor, at this time the

19    government would like to publish two very brief segments from

20    this video to the jury.  First the segment from the zero

21    minute mark to the 12-second mark, and second, from the

22    1-minute-and-7-second mark to the 1-minute-and-14-second

23    mark.

24         THE COURT:  Okay.  Before we do that, I'm going to

25    have some questions about how we're going to display this, so

Tristan Garrah - Direct                                    214

1    ladies and gentlemen, I'm going to give you a brief break,

2    about five minutes or so, back in the jury room, stretch,

3    relax, use the facilities if you need to and then we'll get

4    you back out here, okay.  Please don't discuss the case.

5                    (Jury Excused, 10:36 a.m.)

6              THE COURT:  Okay.  We're in the courtroom outside

7    the presence of the jury.  Where are you going to display

8    this?

9              MS. CARROLL:  It's our intention to turn off all

10   the public gallery monitors and just have it go on the jury's

11   monitor and your monitor and the defendant's monitor.

12             THE COURT:  And we're all set with that?

13             COMPUTER TECHNICIAN:  Got to turn them off.

14             THE COURT:  You can turn them off?  They've been

15   powered down?

16             COMPUTER TECHNICIAN:  Not yet.

17             THE COURT:  Not yet, we're going to do that.  What

18   about counsel's table?

19             MR. GOLDSMITH:  I have no objection to it being

20   turned off at my location as long as I can move to a place

21   where I can see it.

22             THE COURT:  That's what I'm getting at, Counsel, I

23   want you to be able to see it.

24             MS. CARROLL:  If you want to join me at the podium.

25             MR. GOLDSMITH:  Well, I guess we should probably

Tristan Garrah – Direct                                215

1    move the podium.

2              THE COURT:  We should be turning that podium away

3    from the gallery then, towards the windows, at an angle

4    towards the bench even, so it can't be viewed by the gallery.

5              MR. GOLDSMITH:  Will the monitors at your computer

6    station reflect what will be played?  I also ask then under

7    the circumstances if Mr. Jenkins could also.

8              THE COURT:  Move his chair to the side so he can

9    see if that's what you want him to do.

10             THE DEFENDANT:  I don't want to see them.

11             THE COURT:  Mr. Jenkins, is that what you want to

12   do, you want to move into a position?

13             THE DEFENDANT:  I don't care to see it.

14             THE COURT:  You don't want to see it, all right,

15   fine.  So Counsel, you just position yourself up with the

16   government's attorney so that you can view this and that's

17   the way we'll handle it, okay?

18             MR. GOLDSMITH:  Okay, thank you.

19             THE COURT:  Okay.  And the monitors on both

20   attorneys' tables will not be on, correct, or all the

21   monitors back there?

22             COMPUTER TECHNICIAN:  They're all off.

23             THE COURT:  They're all off.  If you need to use

24   the facilities, go ahead, and we'll get -- please come right

25   back and we'll get this jury right back out here and publish

Tristan Garrah – Direct                                    216

 1    this, publish this exhibit.

 2                        (A recess was taken.)

 3                        (Open Court, Jury Out.)

 4              THE COURT:  Counsel, you all set?

 5              MS. CARROLL:  We're all set.

 6              THE COURT:  Everybody's ready, okay, just going to

 7    give the jury a couple more minutes and we'll get them out

 8    here.

 9              MS. CARROLL:  Okay.

10              THE COURT:  Wanted to make sure everybody had an

11    opportunity to do what they needed to do.  Okay.

12              Counsel, can I see you for a minute at the bench.

13                        (A discussion was held at side bar off the

14                         record.)

15                        (Open Court, Jury Present, 10:50 a.m.)

16              THE COURT:  Okay.  The record should reflect we

17    have the ladies and gentlemen of the jury, they look

18    refreshed and ready to proceed.  So Counsel, go ahead.

19              MS. CARROLL:  We're going to publish minute 00 to

20    second 12 of Government's Exhibit 4G, the first video file,

21    and then a clip that runs from minute 1:07 to 1:14 also from

22    Government's 4G, the first video file.

23              MR. GOLDSMITH:  Permission to move freely, your

24    Honor.

25              THE COURT:  You may, you may.  Go ahead, you may

1    proceed.

2                   (Video Clip from Government's Exhibit No. 4G

3                   played.)

4            MS. CARROLL:  We're now going to play the clip that

5    runs from minute 1:07 to minute 1:14.

6                   (Video Clip from Government's Exhibit No. 4G

7                   played.)

8    Q    Officer Garrah, if you could just describe, what

9    happens after that video clip terminates at minute 1:14?

10   A    She takes his erect penis and puts it in her mouth and

11   begins to provide oral sex.

12   Q    After viewing that video, what did you do?

13   A    We only viewed it initially until she was disrobed, at

14   that point I arrested the subject Joseph Jenkins, I read him

15   his right to duty counsel and cautioned him not to say

16   anything.  I then frisked him and placed him in the cell at

17   the Port of Lansdowne.

18   Q    What was your next step?

19   A    We notified the criminal investigations division of

20   Canada Border Services Agency, the responding agent was

21   Marie-Josee Vinette.

22   Q    And did you meet with Marie-Josee Vinette?

23   A    Yes, I spoke with her on the phone originally and then

24   she did come to the border itself.

25   Q    What did you do when she arrived at the Port of

Tristan Garrah – Direct                     218

1   Lansdowne?

2   A     I briefed her on what we had found, who the subject

3   was, his vehicle, and then I showed her the video that you

4   just watched.  We then proceeded to further view videos on

5   the 8-gigabyte USB.

6   Q     Approximately how many videos did you watch on the

7   8-gigabyte USB?

8   A     I believe it was around five to six.

9   Q     And without having to walk through each individual

10  video, what was depicted in the videos?

11  A     It was further depiction of young girls, prepubescent

12  girls in various states of undress performing sexually

13  suggestive acts and poses.

14  Q     Officer Garrah, did you take the defendant's property

15  into custody after you met with Investigator Vinette?

16  A     I did, yes, I placed it all in secure evidence bags.

17  Q     Officer Garrah, I'm handing you what's been marked for

18  identification as Government's Exhibits 8 and 9.  Do you

19  recognize Government Exhibits 8 and 9?

20  A     I do, yes.

21  Q     What is Government's 8?

22  A     It is the Olympus camera on line 8 of the exhibit

23  control.

24  Q     Pull up Exhibit 18.  And Officer Garrah, does

25  Government's Exhibit 8 appear to be in substantially the same

Tristan Garrah - Direct                    219

1    condition that it was when you described it and listed it on

2    the property seizure form in Government's 18?

3    A     It does, yes.

4    Q     And did you have the opportunity to compare the serial

5    number of that digital camera with the serial number

6    identified on your property custody form?

7    A     I did not, no.

8    Q     Could you do that now?

9    A     Yes.  I just have to find it.  Yes, it's the same

10   number.

11   Q     Is there a picture card contained in Government's

12   Exhibit 8?

13   A     There is, yes.

14   Q     Is that the picture card reflected on your evidence

15   custody form?

16   A     It is, yes.

17         MS. CARROLL:  Your Honor, move to admit

18   Government's Exhibit 8.

19         MR. GOLDSMITH:  Very brief voir dire?

20         THE COURT:  You may, go ahead.

21   VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

22   Q     Officer Garrah or Agent Garrah, when was the last time

23   you saw these two objects prior to today?

24   A     The date of occurrence in May 2009.

25   Q     Were you in charge of any of the custody or control of

Tristan Garrah – Direct                                    220

1    these two objects prior to today?

2    A    I was, yes, I placed them in the evidence bags.

3    Q    Was it your responsibility to maintain those objects

4    between May 24 of '09 and today?

5    A    It was not, no.

6              MR. GOLDSMITH:  Same objections as before at side

7    bar.

8              THE COURT:  And the same ruling, they'll be

9    conditionally admitted subject to connection with the chain

10   of custody, but based on the testimony we have at this point,

11   I'll allow you to continue.  They are received conditionally.

12             CONTINUED DIRECT EXAMINATION BY MS. CARROLL:

13   Q    Officer Garrah, Government's Exhibit 9, do you

14   recognize Government's Exhibit 9?

15   A    Yes, it's the cell phone on line 10.

16   Q    Is that line 10 of the property custody form that's

17   Government's Exhibit 18?

18   A    That's correct, yes.

19   Q    Where did you seize the camera and cell phone from?

20   A    It was in the subject's personal effects in his

21   vehicle.  The phone I believe may have been on the subject.

22   Q    And is the subject Joseph Jenkins?

23   A    That's correct, yes.

24   Q    Did the seizure of the evidence conclude your

25   involvement in the investigation?

Tristan Garrah - Cross                                     221

1    A       It did, yes.  I put it in the bags and brought it to

2    the secure warehouse to the superintendent on shift.

3                MS. CARROLL:  No further questions.

4                THE COURT:  Counsel, when you're ready,

5    cross-examination.

6                MR. GOLDSMITH:  Thank you.

7                CROSS-EXAMINATION BY MR. GOLDSMITH:

8    Q       Agent Garrah, or should I say Officer Garrah, which do

9    you prefer?

10   A       Either/or is fine.

11   Q       Agent Garrah, on May 24th of 2009, you were asked to

12   perform the inspection of the blue Dodge truck and trailer,

13   is that correct?

14   A       That's correct, yes.

15   Q       And now you testified earlier that you performed an

16   inspection of the cab of the truck, is that it?

17   A       Primarily just the driver's side, but yes.

18   Q       So you inspected the driver's side of the cab and then

19   did you proceed to the trailer portion of the cab?

20   A       I did not, no.

21   Q       Did you inspect the rear seat of the cab?

22   A       On the driver's side, yes.

23   Q       So there were other individuals that were performing

24   the search with you, is that correct?

25   A       That's correct, Hache and Johnston.

Tristan Garrah – Cross                                        222

1   Q      So there were three individuals that were performing

2   the search of the truck, is that correct?

3   A      That's correct, yes.

4   Q      And you all did that contemporaneously?

5   A      As in together?

6   Q      I'll rephrase.  You all did that at the same time

7   together?

8   A      Yes, that's correct.

9   Q      Based upon your inspection of the vehicle, you did not

10  see anything that was out of the ordinary?

11  A      Not until Officer Johnston called me over to view the

12  laptop.

13  Q      Just focusing on the portion of the inspection that you

14  performed.

15  A      Okay.  Generally we would refer during our protocols

16  that when we're searching together, it's all of our

17  inspection.

18  Q      Okay.  Based upon what you personally saw, you didn't

19  see anything out of the ordinary?

20  A      I did not.

21  Q      Other than the laptop that Officer Johnston brought to

22  your attention, are you aware if Officer Hache saw anything

23  out of the ordinary or concerning?

24  A      I'm not aware of what Officer Hache found.

25  Q      Other than the laptop that was presented to your

Tristan Garrah - Cross                            223

1    attention by Officer Johnston, was there any other items out

2    of the vehicle and trailer that were brought to your

3    attention immediately?

4    A    By Officer Johnston?

5    Q    Yes.

6    A    No.

7    Q    So the laptop that was found, was that initially --

8    withdrawn.

9              Did you initially question the driver,

10   Mr. Jenkins, as to the laptop?

11   A    No, I had very little contact with officer -- or sorry,

12   Mr. Jenkins until I arrested him.

13   Q    Okay.  When you say very little interaction with him,

14   what interaction did you have with him prior to placing him

15   under arrest?

16   A    When we were called by the immigration officer for the

17   deferred secondary exam, I would have spoken to him briefly

18   in passing as I left the office to go to his vehicle.

19   Q    You don't recall the sum and substance of that

20   conversation?

21   A    No.

22   Q    So you took the keys from him?

23   A    I don't believe I took the keys, no.

24   Q    Took the keys from another officer?

25   A    Another officer would have had the keys.

Tristan Garrah - Cross                                    224

1    Q     So at that point you are given your instructions to go

2    inspect the vehicle, is that correct?

3    A     Yes.

4    Q     Are you given the instructions to inspect the vehicle

5    with the two other officers, Officers Johnston and Hache, or

6    are you given those instructions separately?

7    A     We do it all together, we were all scheduled for

8    secondary examination.

9    Q     Now are you all, prior to the inspection of this

10   vehicle you were conducting inspections of other vehicles?

11   A     I believe it was the first inspection of the morning.

12   Q     All right.  So the three of you all walked out to the

13   truck together?

14   A     That's correct.

15   Q     All right.  And at that point you decide which portion

16   of the vehicle you guys are each going to inspect, is that

17   it?

18   A     Yes.

19   Q     So you walked to the vehicle, you each do your

20   inspections and it's at that point where Officer Johnston

21   presents you with the laptop that he found?

22   A     Yes.

23   Q     And this is outside the presence of Mr. Jenkins?

24   A     I believe he may have been sitting outside.

25   Q     Sitting inside the building?

Tristan Garrah - Cross                                         225

1    A    He may have been sitting outside, there's a bench right

2    on the front porch.

3    Q    And the bench where he was -- where you believe he may

4    have been sitting, was that a matter of a few feet away or

5    was it far away?

6    A    20, 25 feet.

7    Q    Now the 25-foot distance between the bench and where

8    the vehicle was parked, is the bench directly against the

9    wall of the building where the windows are?

10   A    It is, yes.

11   Q    All right.  So there's -- so there's the windows where

12   the bench is and then about another 25 feet to where the

13   vehicle was parked?

14   A    Right.

15   Q    Okay.  And the vehicle was parked in some sort of a

16   parking spot or space?

17   A    Yes, underneath the canopy.

18   Q    All right.  And you said it was 25 feet or

19   approximately more or less, something like that?

20   A    Approximately, yes.

21   Q    All right.  So at that point, when you're inspecting

22   the vehicle, were there any conversations with Mr. Jenkins

23   during the physical inspection?

24   A    I had no conversations.

25   Q    Officer Johnston have any conversations?

Tristan Garrah – Cross

1   A      Don't recall.

2   Q      Officer Hache have any conversations?

3   A      Don't recall.

4   Q      Do you recall Mr. Jenkins making any statements during

5   that time?

6   A      Not to myself, no.

7   Q      Do you recall if he made any statements or conversation

8   to anyone present during that time?

9   A      I don't recall.

10  Q      So now you've been presented with the laptop and that

11  was the Compaq laptop, correct?

12  A      I was presented the Toshiba.

13  Q      I'm sorry, Toshiba.  And once it's presented to you,

14  that's when you made the determination to turn it on?

15  A      I did not turn it on, Officer Johnston did.

16  Q      Okay.  You were present when Officer Johnston turned on

17  the laptop?

18  A      I was on the other side of the vehicle at the time.

19  Q      Okay.  Do you recall noting that Officer Johnston had

20  turned on a laptop?

21  A      When he called me over to look at the laptop, it was

22  already turned on.

23  Q      All right.

24  A      I don't know if he turned it on or if it was already

25  on.

Tristan Garrah – Cross                                    227

1    Q      Did you see Officer Johnston turn the laptop on?

2    A      I know that he opened it.

3    Q      You saw him open it up, when you say open, do you mean

4    that he opened the viewing monitor away from the keyboard?

5    A      Right, he unfolded it.

6    Q      And you don't recall seeing him push any buttons to

7    operate the machine?

8    A      I don't recall, no.

9    Q      You don't recall him plugging the machine in?

10   A      I don't believe so.

11   Q      All right.  You don't recall him removing the laptop

12   from any storage items?

13   A      It was in a cardboard box I believe.

14   Q      Do you recall whether the cardboard box was located

15   within the vehicle?

16   A      It would be the rear passenger area.

17   Q      You saw Officer Johnston remove it from the box?

18   A      Yes.

19   Q      At this point you saw Officer Johnston remove it from

20   the box from the back seat and then unfold it so that it

21   could be viewed, correct?

22   A      Correct.

23   Q      At some point afterwards Officer Johnston calls your

24   attention over to view the contents with him, is that

25   correct?

1    A    Yes.

2    Q    You're not aware of what he may have viewed or not

3    viewed prior to your coming over to him?

4    A    That's correct.

5    Q    He didn't make any commentary to you prior to asking

6    you to come over to view it?

7    A    Well, he had opened up a video and paused it and showed

8    me and then showed me where it had come from.

9    Q    You said that he opened up a video?

10    A    Yes.

11    Q    Did you watch him open up whatever files on the

12    computer in order to access that video?

13    A    He told me that he'd begun to watch it and then he

14    closed it and opened it up again from the same icon on the

15    desktop.

16    Q    But again, you didn't actually watch him perform any

17    functions to open that video or file up, correct?

18    A    I did watch him do it the time that he showed me the

19    video.

20    Q    Okay.  Did he make any commentary to you about

21    requesting your assistance to view something prior to that

22    point?

23    A    I believe as soon as he had found the video, that was

24    the time that he called us over to look at it.

25    Q    And is it your custom and practice in inspecting

Tristan Garrah - Cross                                    229

1    computers to do so in the presence of more than one officer?

2    A      Yes.

3    Q      That's what you're trained to do, correct?

4    A      Yes, it's not abnormal in any sense.

5    Q      And you're trained to do that to ensure the accuracy of

6    what's being opened and viewed on the computers?

7    A      It would really just be a second person involved for

8    the opinion at the time what you're looking at.

9    Q      So to make sure that something may be proper or

10   inappropriate, correct?

11   A      Yes.

12   Q      And you've also received training on how to open and

13   receive certain items that are being inspected in vehicles,

14   correct?

15   A      Yes.

16   Q      And I've heard you discuss the training about --

17   withdrawn.

18              You received some training about indications

19   of what to look for in vehicles as to what might be inspected

20   for further review, correct?

21   A      Yes.

22   Q      And the fact that the -- that a laptop was inside a

23   cardboard box is an indication that something might be afoul?

24   A      I would not say so.

25   Q      And the cardboard box that the laptop was in, did that

Tristan Garrah – Cross                                    230

1    have any markings on it?

2    A      I do not recall.

3    Q      You don't recall what the cardboard box looked like?

4    A      No.

5    Q      Was that the only item that Officer Johnston pulled out

6    of the truck and asked for your assistance to view at that

7    time?

8    A      Yes.

9    Q      So from that moment you're outside next to the vehicle,

10   correct?

11   A      Yes.

12   Q      And Officer Johnston opens up a file on the computer,

13   correct?

14   A      That's correct.

15   Q      It's on the hard drive?

16   A      I don't know where the file was located, it was just an

17   icon on the home screen that he clicked on.

18   Q      You're not aware if Officer Johnston inserted any media

19   files into the computer prior to turning it on and showing

20   you the file?

21   A      I don't believe he did.

22   Q      Well, you don't believe or you don't know?

23   A      I'm not -- can't be certain.

24   Q      You didn't see him plug in any flash drives?

25   A      No, I did not see him plug in anything.

Tristan Garrah – Cross                                                231

1    Q      Just by way of clarity, you understand flash drive?

2    A      USB key.

3    Q      USB key or thumb drive or otherwise, okay.  You didn't

4    see him insert any CDs or DVRs into the machine?

5    A      I did not witness that, no.

6    Q      All right.  So at this point you viewed a portion of

7    the file, is that correct?

8    A      Correct.

9    Q      You called it to the attention of Officer Hache at that

10   time?

11   A      I did not call for Officer Hache.

12   Q      All right.  And at that point, you viewed a brief

13   amount of the file, correct?

14   A      Correct.

15   Q      All right.  I believe you testified that you viewed

16   only up to the point where the subject started to get

17   undressed, is that correct?

18   A      That's a different file.

19   Q      Okay.  So in this particular file you viewed it for a

20   few moments until you determined what you believed that it

21   may be improper, is that correct?

22   A      We believed it to be indication that further review of

23   the computer and any other media devices would be required

24   due to the nature of the content.

25   Q      So based upon that, you wanted to look at what else was

Tristan Garrah – Cross                                    232

1    on the computer?

2    A      That's correct.

3    Q      At that point you brought it into the building?

4    A      We did, yes.

5    Q      You brought other objects with you into the building to

6    review?

7    A      I brought two laptop bags into the building.

8    Q      And the two laptop bags, they were situated next to the

9    cardboard box?

10   A      I believe they were on the floor of the cab in the rear

11   passenger area.

12   Q      All right.  And the contents of those two laptop bags

13   was a second laptop and three flash drives, is that correct?

14   A      Yes, and the CDs listed on the exhibit control form.

15   Q      Okay.  And at that point you testified that you plugged

16   the machine in -- withdrawn.  Did you plug the machine in

17   when you brought it inside?

18   A      I don't recall.  If it needed power, I would have

19   plugged it in.

20   Q      When you were viewing the -- were viewing the files on

21   the Toshiba computer inside, do you recall reviewing files on

22   the hard -- on the hard drive or -- withdrawn.  Do you recall

23   reviewing files from the desktop?

24   A      I reviewed the Compaq when I brought it inside.

25   Q      All right.  So you reviewed the Compaq inside.  Did you

1    find any files that were of concern to you at that time?

2    A      In the Compaq I found no files.

3    Q      All right.  And your review of the Compaq was that

4    you -- well, withdrawn.  Walk us through what you did to

5    investigate the Compaq.

6    A      Opened up the device and just looked through things,

7    recently viewed places, My Pictures, My Videos, things of

8    that nature.

9    Q      When you say recently viewed places, was that on an

10   internet application?

11   A      No, you open up My Computer and it will be a tab there.

12   Q      Okay.  So you took a look at the desktop to see if

13   there were any icons that you needed to investigate?

14   A      Yes, I would have.

15   Q      And then you looked at a few of the different files

16   before you made a determination that there was nothing

17   suspect on it?

18   A      On the Compaq, yes.

19   Q      And that was done by yourself or in the presence of

20   other officers?

21   A      Within the office was myself, Officer Johnston, the

22   shift superintendent and I believe Officer Hache.

23   Q      After you reviewed the Compaq you then started to

24   review the Toshiba more?

25   A      Officer Johnston was reviewing the Toshiba.  After I

Tristan Garrah - Cross                                   234

1    reviewed the Compaq I began to immediately review the

2    8-gigabyte USB key.

3    Q      So essentially when you brought the computers in, you

4    split up who was going to look at which computer?

5    A      There was two desks, and yes.

6    Q      All right.  After reviewing the Compaq, you then

7    proceeded to inspect the contents of the flash drives?

8    A      The 8-gigabyte, yes.

9    Q      Did you look at the 4-gigabyte or the 2-gigabyte at all

10   that day?

11   A      After, with Investigator Vinette.

12   Q      All right.  But your determination to place Mr. Jenkins

13   under arrest was only based upon the file that you

14   purportedly viewed on the desktop of the Toshiba and on the

15   file that you reviewed from the 8-gigabyte flash drive?

16   A      The file that we viewed on the Toshiba was not the

17   grounds for arrest, that was just what we would refer to as

18   an indication or an indicator that further review would be

19   needed.  The grounds for arrest were solely brought from the

20   Vicky file that was shown earlier.

21   Q      So in other words, the file that you initially viewed

22   with Officer Johnston outside the vehicle was only used as a

23   basis to look further at the articles that were there?

24   A      We use -- it was indication for us for further review,

25   yes.

Tristan Garrah - Cross

235

1    Q    And the arrest was only based upon the file that was on

2    the 8-gigabyte flash drive that you viewed, correct?

3    A    That's correct.

4    Q    And prior to placing him under arrest, you only viewed

5    that one file on the 8-gigabyte?

6    A    Yes.

7    Q    And then once he was placed under arrest, in the

8    presence of the investigator you continued to view

9    approximately five to six other videos you testified?

10   A    That's correct.

11   Q    All right.  Have you been, as part of your training

12   within the CBSA, given any training on computer forensics

13   whatsoever?

14   A    No.

15   Q    Have you been -- do you have any certificates or

16   education in computer sciences?

17   A    No.

18   Q    Are you aware of anything that may be created by

19   turning on a computer and looking at files?

20   A    No, I'm not.

21   Q    Are you aware of any changes to those files that may be

22   created by turning the computer on and viewing those files?

23   A    No.

24   Q    Now you also discussed that there was a camera and card

25   and a cell phone that were taken at the time?

Tristan Garrah - Cross

236

1    A      Yes.

2    Q      All right.  Did you investigate at the time the

3    contents of the camera or the photograph card in the camera?

4    A      I did not, no.

5    Q      So you did not conduct any -- you didn't try to turn

6    the camera on?

7    A      I didn't myself, no.

8    Q      Are you aware if any officers tried to turn the camera

9    on that morning?

10   A      I'm not aware, no.

11   Q      Anybody try to -- withdrawn.  Was the cell phone

12   already on?

13   A      I don't recall.

14   Q      You don't recall investigating the cell phone at all?

15   A      I did not.

16   Q      Describing the truck that you investigated was a blue

17   Dodge truck, is that correct?

18   A      That's correct, yes.

19   Q      Was a pickup truck?

20   A      Yes.

21   Q      And it had a cab, within the cabin that you inspected,

22   there was a cap on the flatbed?

23   A      On the bed of the truck, yes, I believe so.

24   Q      Could you describe the cap on the flatbed of the truck?

25   A      I don't recall the color.

Tristan Garrah - Cross                               237

1    Q      All right.  Did it have any windows in it?

2    A      I don't recall.

3           MR. GOLDSMITH:  One moment, your Honor.

4                (Pause in Proceedings.)

5    Q      Just very briefly, Officer Garrah, did you have any

6    other contact with this material between May 24th of 2009 and

7    within the last week?

8    A      Sorry, which material are you referring to?

9    Q      The two laptops and the flash drives and the camera.

10   A      I had no other contact, no.

11   Q      Did you have any contact with Mr. Jenkins between

12   May 24 of 2009 and today?

13   A      I was in his presence at two court dates or one court

14   date, I apologize, in Canada.

15   Q      Was that in September of 2009 -- I'm sorry, September

16   of 2010?

17   A      Yes, that was the court date.

18   Q      The purpose of that was for a trial?

19   A      Yes, for the trial stemming from the occurrence in

20   Canada.

21   Q      Did the trial go forward that day?

22   A      The subject, or Mr. Jenkins made a motion for charter

23   infringement I believe and trial did not proceed that day, we

24   ran out of time.

25           MR. GOLDSMITH:  Right.  No further questions.

Tristan Garrah – Redirect                              238

1        THE COURT:  Any further direct, Counsel?

2        MS. CARROLL:  Yes.

3        THE COURT:  Okay, go ahead.

4     REDIRECT EXAMINATION BY MS. CARROLL:

5    Q     Officer Garrah, after the defendant made a charter

6    motion, was a new trial date set?

7    A     Yes, I believe in October of that year.

8    Q     Were you present for that trial date in October of

9    2010?

10   A     Yes, I was.

11   Q     Was the defendant present at that time?

12   A     No, he did not show up.

13   Q     Did the trial commence in October of 2010?

14   A     Inasmuch as it could.  A bench warrant was issued.

15   Q     Officer Garrah, is it standard protocol when you're

16   doing a search of a laptop for you to begin by clicking on

17   icons that appear on the laptop screen?

18   A     Yes, you can do that, as long as you notate what you're

19   doing, that was our training at the time.

20   Q     Are you trained about altering data on the laptops or

21   digital media you're searching?

22   A     We're not trained on the specifics of it, no.

23   Q     When you were reviewing the defendant's laptop and the

24   8-gigabyte USB, did you create any video files?

25   A     No, I created no files and didn't delete anything or

Tristan Garrah – Redirect                              239

1    anything of that nature.

2    Q     Did you do anything to alter any of the videos you

3    viewed on the defendant's 8-gigabyte USB drive?

4    A     No, I did not alter anything.

5    Q     Did you do anything to create or alter any images on

6    the defendant's Compaq computer or 8-gigabyte USB drive?

7    A     No, I did not.

8    Q     Did you see Officer Johnston create any video files

9    during the search of the Toshiba laptop?

10   A     No, I did not.

11           MS. CARROLL:  No further questions.

12           THE COURT:  Any recross, Counsel?

13           MR. GOLDSMITH:  None, your Honor.

14           THE COURT:  You may step down, thank you.

15               (The witness was excused.)

16           THE COURT:  Please call your next witness.

17           MS. CARROLL:  Your Honor, the government calls

18   Officer Glen Hache.

19           THE CLERK:  Good morning, sir.  Can you state your

20   full name, spell it for the record.

21           THE WITNESS:  Glen Hache, G-l-e-n, last name

22   H-a-c-h-e.

23

24           G L E N   H A C H E , called as a witness

25   and being duly sworn, testifies as follows:

Glen Hache – Direct                    240

1          DIRECT EXAMINATION BY MS. CARROLL:

2     Q    Good morning, Officer Hache.

3     A    Good morning.

4     Q    Where do you work?

5     A    Canada Border Services Agency, Port of Lansdowne,

6     Ontario, opposite of Alexandria Bay, New York.

7     Q    How long have you worked there?

8     A    Since October 2005.

9     Q    What are your job duties?

10    A    Primary inspection, secondary examination of vehicles,

11    commercial traffic stream, examining goods coming into Canada

12    as well as people.

13    Q    Were you on duty on May 24th, 2009?

14    A    Yes, I was.

15    Q    Where were you stationed on that day?

16    A    The whole shift was between 7:30 and 4:30, and between

17    8 and 9 a.m., I was stationed secondary examinations, traffic

18    stream.

19    Q    Were you referred a vehicle examination on that

20    morning?

21    A    Yes, I was.

22    Q    Whose vehicle were you asked to examine?

23    A    It was a dark blue Dodge Ram pickup truck pulling a

24    trailer, a couple of ATVs, single male occupant Joseph

25    Jenkins right over there, the defendant.

Glen Hache - Direct                                    241

1    Q     And how do you know that the defendant was the driver

2    of the vehicle?

3    A     He's the only person in the car.  I approached the

4    vehicle as it pulled into secondary, it was referred over the

5    radio by Officer Pedro Sousa-Dias from the primary inspection

6    line and I just approached the vehicle, looked at the

7    referral slip which is a yellow E67 referral slip, stated his

8    declaration to the officer in the booth, his U.S. --

9    presented U.S. passport with that name on it, and it was

10   marked for immigration secondary so I instructed him to go

11   inside the traffic office and door number 1, turn left, talk

12   to immigration officer.

13   Q     How did you begin the vehicle inspection?

14   A     I began the vehicle inspection, he was -- Joseph

15   Jenkins was at the immigration counter talking to BSO Melany

16   Boyd, and once she was finished with her preliminary

17   interview, some of the things that he said, being

18   self-employed and electrician, I decided to talk to him a

19   little bit there and I instructed, told him I was going to

20   verify his declaration for compliance verification, asked for

21   the keys to his vehicle.  I asked him if he owned the

22   vehicle, he said yes.  Did he pack it himself?  He said yes.

23   Was he aware of all the contents, and he said yes.  That's

24   how we started the -- then went outside, so did he, stood

25   sort of on the sidewalk there and I started searching the

Glen Hache – Direct                                    242

1    car.

2    Q     Are those standard questions, whether he owned the

3    vehicle, whether he packed the vehicle?

4    A     Those are other questions we ask everyone before we

5    throw ourselves into searching a vehicle, everyone gets asked

6    those questions.

7    Q     Did you have any assistance in the vehicle inspection?

8    A     Yeah, it was top of the hour so like closer to 9:00 so

9    Officer Garrah and Officer Johnston were also standing

10   outside, they were scheduled secondary between 9 and 10 so

11   they offered to help.  And as soon as I saw the truck the

12   first time, I said, you know what, there's a lot of stuff in

13   here, so sure, I'll accept the help, and they helped out.

14   Q     What was your first step in examining the vehicle?

15   A     Which is the same thing I always do, start at the

16   driver's side.  Front seat driver's side, rear, rear driver's

17   side, while Officer Garrah I believe was in the back of the

18   truck, and Officer Johnston started the trailer, the trailer,

19   examined the goods there.

20   Q     Was anything discovered during the inspection of the

21   vehicle?

22   A     Yeah, a few minutes in, like less than 10 minutes into

23   the examination, Officer Johnston turned on a laptop that he

24   saw in a box on the passenger side, rear passenger side and

25   sort of made a reference to a media file that he saw, couple

Glen Hache - Direct

243

1   of girls, appeared to be 11, 12, 13 years old, title that

2   said Sexy Girl 95, was like, you know, these girls are, you

3   know, little tank tops, wearing little shorts, they're sort

4   of posing, looking like there's a web cam that they're

5   looking at, they're pausing, look like they're following

6   instructions.  There's no -- there's no sound to it, so they

7   were -- they seemed like they were trying to be seductive for

8   the camera.  So that's when Johnston decided, okay, you know

9   what, we're going to take this inside the office, we're not

10  going to do this outside, we're going to have to do a

11  progressive examination of the laptop.

12  Q     What did you do once the progressive examination in the

13  office had begun?

14  A     Well, Johnston and Garrah were in the office, I was --

15  they were in the closed office, I was outside like in the

16  main office, there was obviously other people there.  And the

17  defendant came into the office and looked at me, made eye

18  contact and like, you know, why are they taking my laptop in,

19  so I went outside with him, and I explained to him, you know,

20  because he asked why are you taking my laptop in, the

21  examination of electronic media, laptop, cell phones,

22  anything like that is subject to the examination, it's the

23  same as examining the contents of the vehicle, luggage, so

24  on, so forth.  He just, you know, I told him, I explained to

25  him, I told him quickly what we saw, what I observed with

Glen Hache - Direct                                244

1    that media file and that was a concern to us so we were going

2    to do a progressive examination.  He sort of looked away and

3    I said, do you have, like basically we're looking for

4    prohibited images, child pornography, anything like that on

5    your laptop?  He looked away and he said, not to my

6    knowledge, I don't think so.  I looked at him, I said, well,

7    rephrase it then for you, because that was alarming to me

8    that he would answer that way.  So I repeated --

9              MR. GOLDSMITH:  Objection.

10   A    Sort of rephrase --

11             THE COURT:  You have an objection, Counsel?

12             MR. GOLDSMITH:  Yes, objection.  The qualification

13   of alarm.

14             THE COURT:  No, I'll take the testimony, it's

15   overruled, go ahead.

16   A    All right.  Rephrased the question, I mean it was

17   pretty direct, you know, I'm not going to sugarcoat anything,

18   I said, listen, have you ever downloaded images of nude

19   children, 12, 13, 14, teenagers?  I don't think so.  Just red

20   in the face, looked like he wanted to curl up in a ball.  I

21   said, okay, well, that's what we're doing, and the rest of

22   the conversation was just sort of, you know, him saying, I'm

23   just going to my parents' cottage and cross all the time,

24   never had to go through this, you know, said, well -- asked

25   me how long it was going to take, I said, as long as it

Glen Hache - Cross                                    245

1    takes, I don't know, we'll see.

2    Q    When you say it looked like the defendant wanted to

3    curl up into a ball, what do you mean?

4    A    Because he was almost halfway there just because, I

5    know he's a little bit shorter than I am but he was just sort

6    of like doing this, and hands in his pocket and he was

7    looking away, I mean, that's just an observation.

8              MS. CARROLL:  No further questions.

9              THE COURT:  Cross-examination.

10             MR. GOLDSMITH:  Thank you.

11             CROSS-EXAMINATION BY MR. GOLDSMITH:

12   Q    Officer Hache, you said that you approached the truck

13   as it pulled up, is that correct?

14   A    Yes.

15   Q    And as it pulled up, it was -- withdrawn.  You wait for

16   it to come to a complete stop and then you wait for the

17   driver to come out, is that correct?

18   A    Yes.

19   Q    All right.  At that point you asked for the keys?

20   A    No.

21   Q    All right.  Directed the driver inside?

22   A    Yeah.

23   Q    And then you waited for direction from Officer Boyd to

24   start inspecting the truck, is that correct?

25   A    No, I just waited for her to talk to him.

Glen Hache - Cross

1   Q    So you waited for her to talk for a few minutes and
2   then you began the inspection?
3   A    That's right.
4   Q    So Officer Boyd didn't have the discretion to tell you
5   to inspect the truck or not?
6   A    She can, but she didn't.
7   Q    She didn't?
8   A    No.
9   Q    Okay.  At that point you had inspected the truck with
10  two other officers, correct?
11  A    Afterwards, yes.
12  Q    Now so initially, did you perform any inspection on
13  your own?
14  A    No, we just started together, I went to the driver's
15  side and they were standing there right before I could begin.
16  As I opened the door they offered so -- and that's -- they
17  started the same time pretty much.
18  Q    So let me back you up.  So Officer Johnston and Garrah
19  were with you as you approached the truck?
20  A    At which time that I approached?
21  Q    When you initially approached the truck.
22  A    No, they were in the office.
23  Q    Okay.  Then you went back to the office?
24  A    Yeah.
25  Q    And then the point where you've been notified you

Glen Hache - Cross

247

```
 1    needed to inspect the truck, then all three of you came out

 2    together?

 3    A     No, I went out, they were already outside, I went out

 4    afterwards and then I went and started searching the truck

 5    and they offered and then they started searching with me.

 6    Q     All right.  And you searched the driver's side?

 7    A     Yes.

 8    Q     And you recall Officer Garrah searching the rear of the

 9    vehicle?

10    A     Officer Garrah -- yeah, it's a pickup truck so he was

11    doing -- it was a covered cab so he was going inside the cab

12    looking at all the stuff that was in there and Johnston

13    was -- started the trailer.

14    Q     Now Officer Johnston recovered a laptop initially, is

15    that correct?

16    A     Yes.

17    Q     Did he recover that from the trailer?

18    A     No.

19    Q     So the time he recovered the laptop, he recovered it

20    from somewhere else in the truck, is that correct?

21    A     Yes.

22    Q     And at a point, do you recall where he recovered it

23    from?

24    A     Yes, the back seat, passenger's side in a box.

25    Q     All right.  And so when he recovered the laptop from
```

Glen Hache - Cross

248

```
 1    the back seat, did he just immediately, do you recall him
 2    immediately opening it up to view what the contents were?
 3    A     No.
 4    Q     Do you recall him pulling out other items from the back
 5    seat to inspect?
 6    A     Yeah, he inspected a few things while I was finishing
 7    up.  When he saw the laptop in the box I guess he had
 8    expressed some concern that it looked, appeared to be new, he
 9    went over and talked to the defendant there and then came
10    back to the truck and then opened up the laptop.
11    Q     And you were still investigating -- withdrawn.  You
12    were still inspecting the driver's side of the vehicle?
13    A     Yes, there were a few bags in there, just, you know --
14    Q     Officer Garrah still in the back?
15    A     Yes, finishing up.
16    Q     And at that point Officer Johnston then approached
17    Mr. Jenkins?
18    A     Yes, when he discovered the laptop in the box he had a
19    short conversation with Mr. Jenkins and then came back to the
20    truck.
21    Q     Were you present for the conversation between Officer
22    Johnston and Jenkins?
23    A     No, it happened about 10, 15 feet away on the sidewalk
24    but I wasn't listening.
25    Q     Then Officer Johnston returned to the truck with the
```

Glen Hache – Cross

249

1     laptop, is that correct?

2     A      No.

3     Q      So he -- I'm sorry.  He left the truck to go speak with

4     Mr. Jenkins?

5     A      He went to speak to him, yes, and then came back.

6     Q      He didn't have the laptop with him when he went over to

7     speak --

8     A      I don't recall if he had the laptop in his hands.

9     Q      Then he came back to the truck and that's when you saw

10    him open up to start to review the contents?

11    A      Yes.

12    Q      At that point you were still conducting your search of

13    the driver's side?

14    A      Yep.

15    Q      And then Officer Johnston made a remark about something

16    that he had found in a file on the laptop, is that correct?

17    A      Yep.

18    Q      At that point, you and the other officers decided to

19    inspect the laptop inside, is that correct?

20    A      Yes, we weren't going to -- well, Officer Johnston and

21    Garrah, at that time Officer Garrah came over to the front

22    passenger side and there were, there was another laptop

23    there, laptop bag and some thumb drives and at the time that

24    he was -- Officer Johnston was showing me quickly that media

25    file, they decided to go inside the office for privacy

Glen Hache - Cross

250

1    because this outside secondary exposed to other people

2    possibly coming in and parking their vehicles and seeing

3    this.

4    Q    So all three of you went inside at that point, correct?

5    A    We went inside the office, yes.

6    Q    And Mr. Jenkins was on a bench outside?

7    A    Yes, yes, he was.

8    Q    It's at that point where you testified that he

9    addressed you, some concern about why they were looking at

10   his laptop?

11   A    Yeah.  When Officer Johnston and Garrah went inside the

12   office and then they went inside the superintendent's office

13   with some media equipment there, couple of laptops, that's

14   when the defendant Joseph Jenkins opened the door of the

15   traffic office and made eye contact with me because I was

16   behind the counter.  I was -- I didn't actually immediately

17   go into the superintendent's office, I stayed in the traffic

18   office.

19   Q    All right.  And that's when he engaged you?

20   A    Yeah, I mean that's when I went and I took the

21   conversation outside.  And I explained to him exactly what we

22   were looking for and what we're doing.

23   Q    And when you explained to him what was going on, that's

24   when you asked him a question about child pornography?

25   A    Yeah.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Glen Hache - Cross

251

1    Q     And he wasn't under arrest at that point, correct?

2    A     No.

3    Q     But you asked him, and he gave you a response, not to

4    my knowledge, correct?

5    A     That's right.

6    Q     It wasn't a long drawn-out pause before that or

7    anything, he just responded in normal conversation, correct?

8    A     No, there was a pause.

9    Q     It wasn't him looking around trying to appear as though

10   he's figuring out what to say?

11   A     I would say about three seconds to me is a pause enough

12   that he's trying to figure out what to say.

13   Q     Okay, so three seconds, one-one-thousand,

14   two-one-thousand, three-one-thousand, not to my knowledge,

15   okay?

16   A     Something, something to that effect.

17   Q     Asked him again, he said I don't think so, right?

18   A     That's right.

19   Q     At that point then you proceeded back into the office

20   area to conduct further inspection, correct?

21   A     I proceeded inside -- well, after short conversation

22   with him outside, I went back inside the office, yes.

23   Q     All right.  Now do you recall Officer Johnston --

24   withdrawn.  You recall the location inside the truck where

25   the -- where Officer Johnston pulled the laptop out of?

Glen Hache - Cross                                        252

1    A      Yes, it was the -- as I stated, the rear passenger

2    side.

3    Q      Do you recall if it was in any kind of containers?

4    A      As I stated, inside a box.

5    Q      What kind of a box?

6    A      At the time it looked like a laptop box, like if you

7    buy a laptop at the store, it comes in a box, markings on it.

8    I didn't take note of every little marking on the box but --

9    Q      Sure, but it looked to you like it was the box the

10   laptop probably came in when it got purchased?

11   A      Yes.

12   Q      No other questions of Mr. Jenkins when you were outside

13   inspecting the vehicle?

14   A      No.

15   Q      You didn't see -- well, you weren't there for Officer

16   Johnston's conversation with him?

17   A      No, I just -- yeah, I didn't overhear the conversation,

18   that's all.

19            MR. GOLDSMITH:  Okay.  One moment, your Honor.

20            THE COURT:  Okay.

21   Q      Officer Hache, had you received any specialized

22   training as a CBSA agent in computer forensics?

23   A      No.

24   Q      Have you received any training regards to computer

25   sciences at all?

253

1    A      No.

2    Q      Had you received any training in regards to evidence

3    collection?

4    A      No, just the basic training as an officer, what we're

5    to do if we arrest someone.

6    Q      And would you categorize it as pretty busy that

7    morning?

8    A      No.

9    Q      Pretty light?

10   A      Light, yeah.

11          MR. GOLDSMITH:  Okay, no further questions.

12          THE COURT:  Any redirect?

13          MS. CARROLL:  No redirect, your Honor.

14          THE COURT:  Thank you, sir, you may step down.

15          THE WITNESS:  You're welcome.

16              (The witness was excused.)

17          MS. CARROLL:  Your Honor, the government calls

18   Officer Jarret Johnston.

19          THE COURT:  Everybody okay?  Let me know.

20          THE CLERK:  Good morning, sir, can you state your

21   full name and spell it for the record, please.

22          THE WITNESS:  Jarret Johnston, J-a-r-r-e-t,

23   Johnston, J-o-h-n-s-t-o-n.

24

25          J A R R E T   J O H N S T O N , called as

Jarret Johnston – Direct                    254

1    a witness and being duly sworn, testifies as

2    follows:

3            DIRECT EXAMINATION BY MS. CARROLL:

4    Q    Good morning, Mr. Johnston.

5    A    Good morning.

6    Q    Where are you currently employed?

7    A    I'm employed in Lindsay, Ontario for two different law

8    practices as well as Legal Aid Ontario.

9    Q    Are you a lawyer?

10   A    I am.

11   Q    When were you admitted to the bar?

12   A    June of 2013.

13   Q    And that's the Canadian bar?

14   A    The Ontario Bar Association, correct.

15   Q    Congratulations.

16   A    Thank you.

17   Q    Where were you working in May of 2009?

18   A    I was working for Canada Border Services Agency at the

19   Port of Lansdowne.

20   Q    What was your position there?

21   A    I was a border services officer.

22   Q    What were your responsibilities as a border services

23   officer?

24   A    To process travelers and examine goods for any

25   contraband, prohibited material.

Jarret Johnston - Direct                                    255

1   Q     In May of 2009, how long had you been working as a

2   border services officer?

3   A     I started there as a student in May of 2006, I was

4   hired as indefinite full-time employee in March of 2008 and

5   continued my employment until then.

6   Q     Were you on duty on May 24th, 2009?

7   A     I was.

8   Q     Where were you positioned on the morning of May 24th,

9   2009?

10  A     I was scheduled to the traffic office at the Port of

11  Lansdowne on 7:30 a.m. to 4:30 p.m. shift.

12  Q     Were you asked to participate in a vehicle inspection

13  during that shift?

14  A     I was.

15  Q     About what time were you asked to help out with the

16  vehicle inspection?

17  A     Approximately 9 a.m.

18  Q     Who was participating with you in the vehicle

19  inspection?

20  A     Officer Hache and Officer Garrah.

21  Q     What car were you asked to look at?

22  A     I was asked to examine a 2003 Dodge Ram pickup truck,

23  Dodge Ram 1500, blue in color.

24  Q     Who was the driver of that vehicle?

25  A     Joseph Jenkins.

Jarret Johnston – Direct                                    256

1   Q     Do you see the driver here in court today?

2   A     I do.

3   Q     Could you identify him using an article of clothing?

4   A     Sorry, an article of clothing on the day in question or

5   article of clothing in the courtroom today?

6   Q     Courtroom today.

7   A     He's wearing short sleeve, appears to be a collared

8   golf shirt attire, type shirt, blue in color, with a little

9   insignia on the chest.

10          MS. CARROLL:  Your Honor, may the record reflect

11  that the witness has identified the defendant?

12          THE COURT:  It will.

13  Q     Mr. Johnston, what did you do as part of your

14  obligations to inspect the vehicle, the 2003 Dodge Ram?

15  A     When I first approached the vehicle, I did a cursory

16  examination of the trailer, there was a utility trailer

17  attached to the blue pickup truck that contained two ATVs.  I

18  did a cursory examination of the trailer at that time and

19  then proceeded to begin searching the rear passenger side of

20  the pickup truck.

21  Q     What, if anything, did you find in the rear passenger

22  side of the pickup truck?

23  A     I first located laptop, a black Toshiba laptop that was

24  in a cardboard package, it appeared to be the original

25  packaging of the laptop.

Jarret Johnston – Direct

257

1  Q    Mr. Johnston, I'm handing you Government's Exhibit 3A.
2  Do you recognize 3A?
3  A    I do.
4  Q    What is it?
5  A    It's a black Toshiba laptop.
6  Q    Is it the laptop you searched on May 24th, 2009?
7  A    Yes, it is.
8  Q    What did you do after finding the laptop in the
9  passenger's side of the truck?
10 A    I approached Mr. Jenkins who was standing on the
11 sidewalk of our traffic building which would be about 10 to
12 15 feet approximately in front of the vehicle that we were
13 searching.  I asked who owned the laptop, Mr. Jenkins
14 indicated that he owned the laptop, Mr. Jenkins also
15 indicated that he had owned it for over a year.  I then asked
16 him why he carried the laptop in cardboard packaging and he
17 indicated that it was because he didn't possess a carrying
18 case for the laptop.
19 Q    What, if any, observations did you make about
20 Mr. Jenkins' demeanor while you were asking him about the
21 laptop?
22 A    When I asked him who owned the laptop I noticed signs
23 of nervousness, indicators of nervous, I noticed perspiration
24 on his forehead and I noticed he was evasive with his eye
25 contact which means basically he was looking at the ground

Jarret Johnston - Direct                                    258

1    when I was asking him the questions.  Due to those

2    indicators, I decided to return to the rear passenger side of

3    the truck and further examine the laptop.

4    Q    How did you go about further examining the laptop?

5    A    When I returned to the passenger, rear passenger side

6    of the vehicle, I placed the laptop on the back seat, I

7    opened it, I pressed the power button and turned the laptop

8    on.  When the laptop turned on, the desktop appeared.  I did

9    a brief cursory examination of the desktop of the laptop and

10   noticed a desktop icon that appeared to be a young female in

11   the nude.

12   Q    When you say desktop icon, what does that mean?

13   A    Little picture on the screen of the laptop and if you

14   click on them, it leads to a file.  So I clicked on the icon

15   of the, what appeared to be a young nude female, it led me to

16   a media folder with other files in it, and I clicked on

17   another file which was a video file.  When the video opened,

18   it was a video of what appeared to be two young females of

19   children's age, prepubescent, performing sexual suggestive

20   acts in front of a camera.

21   Q    What did you do after witnessing that?

22   A    I immediately closed the laptop and informed Officers

23   Hache and Garrah that I'd be taking the laptop into the

24   superintendent's office in the traffic building to continue

25   my examination.

Jarret Johnston – Direct                    259

1    Q     Why did you continue your examination in the office

2    traffic building?

3    A     For two reasons.  The first reason being that our

4    secondary designated area for searching vehicles is open to

5    other travelers coming and going and so I didn't want to do a

6    further examination with searching for prohibited material

7    and someone might walk by and see it.  Second reason being we

8    use a program called I See What You See to search for

9    contraband on laptops and it is located in the

10   superintendent's office.

11   Q     What is I See What You See?

12   A     It's a CD-ROM program disk we use for searching

13   electronic devices.  It creates a write block that preserves

14   the integrity of the laptop so there can't be any alterations

15   once we use the program.

16   Q     What does that mean, preserves the integrity of the

17   laptop?

18   A     Anything that's currently stored, the data currently

19   stored on it when we insert the CD is preserved and there

20   can't be any modifications, add-ons or changes to that data

21   at the time.

22   Q     Why do you use that software when you're doing a laptop

23   examination?

24   A     To search in a rapid form for any images that are

25   stored on the cache of the laptop, the storage unit of the

Jarret Johnston – Direct                                      260

1    laptop.  It allows us to observe any photos that have been

2    viewed using that device in, I wouldn't say a quick manner,

3    but certainly sometimes if there's thousands of images, it

4    allows us to observe them in a more expedited manner.

5    Q    Did you use I See What You See, that software during

6    your examination of the black Toshiba laptop?

7    A    I did.

8    Q    I'm handing you what's been marked for identification

9    as Government's Exhibit 3B, page 22; do you recognize what

10   I've just handed you, 3B, page 22?

11   A    Yes, I do.

12   Q    What is 3B, page 22?

13   A    It's a photograph of Joseph Jenkins and a young female

14   child sitting to his right on a couch in a residence

15   somewhere.

16   Q    How do you recognize that photograph?

17   A    I recognize the photograph from doing my observations

18   using I See What You See in the superintendent's office.

19   Q    Was that photograph located on the black Toshiba that

20   you were searching?

21   A    Yes, it was.

22   Q    Does it appear to be in substantially the same

23   condition as the image was when you saw it on May 24th, 2009?

24   A    Yes.

25               MS. CARROLL:  Your Honor, move to admit page 22 of

Jarret Johnston – Direct                    261

1    Government's 3B.

2              THE COURT:  Any objection?

3              MR. GOLDSMITH:  I just want to be clear, are we

4    moving only for page 22 or the entire exhibit?

5              MS. CARROLL:  Only page 22.

6              MR. GOLDSMITH:  Brief voir dire.

7              THE COURT:  Go ahead.

8              VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

9    Q    Officer Johnston, when was the last time you saw this

10   particular photograph prior to today?

11   A    May 20 –– yesterday.

12   Q    Prior to yesterday?

13   A    Prior to yesterday was May 24th, 2009.

14   Q    Were you the agent or officer in charge of the custody

15   and control of this object between May 24th of '09 and

16   yesterday?

17   A    No, I was not.

18             MR. GOLDSMITH:  Same objection as before, your

19   Honor.

20             THE COURT:  Okay.  It will be received, go ahead.

21             CONTINUED DIRECT EXAMINATION BY MS. CARROLL:

22   Q    Publish page 22.  Officer Johnston, was this photograph

23   discovered by you during your use of the I See What You See

24   software?

25   A    It was.

Jarret Johnston – Direct                                      262

1   Q      What is the I See What You See software designed to

2   find on a computer?

3   A      Any image that's been stored on the cache of the

4   laptop, so whether it be saved on a hard drive, whether it be

5   viewed on some other form, any image that's been viewed on

6   that electronic device.

7   Q      Was Government's 3B, page 22 the only image that I See

8   What You See found on the defendant's black Toshiba?

9   A      No, it was not.

10  Q      Were other images located during your search of the

11  black Toshiba?

12  A      Yes, they were.

13  Q      Without describing all of them specifically, what was

14  the nature of the images you saw on the black Toshiba?

15  A      Mainly videos and images of young females performing

16  sexually suggestive acts and behavior in the nude.

17  Q      As a result of your search of the black Toshiba, did

18  you have a conversation with Investigator Marie–Josee

19  Vinette?

20  A      I did.

21  Q      When did that conversation take place?

22  A      Investigator Vinette arrived at the Port of Lansdowne

23  approximately 1:40 p.m. that day.  At the time she arrived I

24  was in the process of searching using I See What You See, it

25  was at that time that Officer Garrah and myself debriefed

Jarret Johnston – Direct                                      263

1    Investigator Vinette on what was occurring in the incident up

2    to that point.

3    Q     During your briefing of Investigator Vinette did you

4    view a video that had the name Vicky in the title?

5    A     Yes, I did.

6    Q     What did you see in the video that had the name Vicky

7    in the title?

8    A     It was a video of a young girl with brown hair, pale

9    skin, appeared to be prepubescent, no hip development, no

10   pubic hair, no breast development, she undressed in the

11   bedroom and then approached the adult male and began

12   performing oral sex.

13   Q     Did you take any other steps in your investigation on

14   May 24th, 2009?

15   A     I did.

16   Q     What was the next step you took?

17   A     The next step we took after viewing the video was

18   Superintendent Cook advised myself and Officer Hache to

19   further examine the vehicle in the secondary area.

20   Q     What did you find during your further examination of

21   the vehicle?

22   A     I found a Verizon Motorola cell phone in the console of

23   that vehicle and Officer Garrah -- or sorry, Officer Hache

24   found an Olympus digital camera.

25   Q     Were those items taken into custody?

Jarret Johnston – Cross                           264

1    A      They were.

2    Q      Did you give those items to Officer Garrah?

3    A      I did.

4    Q      Did that conclude your involvement in the

5    investigation?

6    A      Yes, it did.

7           MS. CARROLL:  No further questions.

8           THE COURT:  Cross-examination.

9           MR. GOLDSMITH:  Thank you, your Honor.

10          CROSS-EXAMINATION BY MR. GOLDSMITH:

11   Q      Officer Johnston, on that morning you approached the

12   vehicle with Officers Hache and Garrah, correct?

13   A      That's correct.

14   Q      And you took the assignment of looking first toward the

15   trailer of the vehicle and then walking forward, correct?

16   A      That's correct.

17   Q      Nothing out of the ordinary in the trailer of the

18   vehicle, correct?

19   A      Nothing I observed during my cursory review.

20   Q      You then moved to the cab of the truck, said you found

21   a laptop inside of a cardboard box, correct?

22   A      That's correct.

23   Q      At that point you pulled the laptop out of the box?

24   A      Yes, I did.

25   Q      As you opened it up, or unfolded in order to view the

1    contents?

2    A      Not at that time.

3    Q      Did you turn it on?

4    A      Not at that time.

5    Q      You notified Officers Garrah and Hache that you had

6    found a laptop, is that correct?

7    A      That's correct.  What time are you directing?

8    Q      Shortly after you picked it up out of the back seat.

9    A      Right, when I first found the laptop, though, I walked

10   up to Mr. Jenkins and asked him who owned the laptop.

11   Q      Right.

12   A      That was prior to the questions you're asking me.

13   Q      You asked him who owned it, correct?

14   A      Correct.

15   Q      He responded.  He responded he did?

16   A      That's correct.

17   Q      And you asked him if he had packed it in the vehicle,

18   correct?

19   A      That's not correct.

20   Q      All right.  What else did you ask him?

21   A      I asked him who owned it, he indicated that he did, he

22   indicated that he'd owned it for over a year.  My second

23   question was why is it still in its original packing, his

24   answer was that he didn't possess a carrying case.  Those

25   were the only questions I asked Mr. Jenkins.

Jarret Johnston - Cross                                      266

1    Q    Okay.  And you didn't ask him if any other people used

2    it, right?

3    A    I did not ask him that question.

4    Q    You didn't ask him if he bought it new or used,

5    correct?

6    A    That's correct.

7    Q    You didn't ask him if he used it for work or for

8    personal purposes, correct?

9    A    That's correct.

10   Q    So no responses to -- well, withdrawn.  No questions

11   along the lines of how it was used and by whom, right?

12   A    That's correct.

13   Q    At that point you returned to the vehicle, was it

14   powered on?

15   A    At that time I turned the power on.

16   Q    You hit the power button?

17   A    That's correct.

18   Q    And it turned on itself?

19   A    That's correct.

20   Q    Did you have to plug it in at all?

21   A    No.

22   Q    So you're outside by the truck, it's powered on, and

23   you started to examine files that were on the desktop,

24   correct?

25   A    File, single, yes.

1   Q     Based upon that one file, you decided to take it inside

2   to the offices, correct?

3   A     If you're referring to the video file that I observed,

4   correct.

5   Q     Yeah.  When you brought it into the office, that's when

6   you started to install the I See What You See program on it?

7   A     No, that's not correct.  I continued a manual search at

8   that time.

9   Q     So at that point you started to look through the files

10  of the computer for other images that were contained on it or

11  other media files, correct?

12  A     That's correct.

13  Q     And you were investigating the contents of the computer

14  for about how long before you turned on the I See What You

15  See program?

16  A     I manually searched it for approximately 15 to 20

17  minutes that time when I first entered the superintendent's

18  office, it was at that time that I was interrupted when

19  Officer Garrah made the arrest for possession of child

20  pornography.  I reattended the laptop following the arrest,

21  frisk, handcuff, and placing of Mr. Jenkins in the cell, and

22  I searched it for a further approximate hour, twenty minutes

23  being manual, and then inserted the I See What You See CD,

24  searched it for further approximate 40 minutes until

25  Officer -- Investigator, sorry, Vinette arrived.

Jarret Johnston - Cross                    268

1    Q     Okay.  So all in all, you manually investigated for

2    about 40 minutes prior to turning on the I See What You See

3    software, correct?

4    A     That's correct.

5    Q     All right.  And during that 40 minutes, you were able

6    to investigate a number of files that were on the computer,

7    correct?

8    A     That's correct.

9    Q     Photographs and videos?

10   A     Correct.

11   Q     As well as looking into other programs on the computer,

12   noting what, what information was on the computer, is that

13   correct?

14   A     That's not correct.

15   Q     All right.  You simply stuck to what the media files

16   were?

17   A     Various files, yes.

18   Q     All right.  Other than the media files, what other

19   files did you look at?

20   A     I looked at files known as -- that he had entitled FLV

21   files, not sure what the FLV stands for but they were named

22   under FLV files, mostly various files within the media for

23   the document.

24   Q     You didn't ask him what FLV meant, correct?

25   A     No, I did not.

1    Q     Now you testified earlier about a photograph of

2    Mr. Jenkins with, looks like a fairly young girl sitting next

3    to him, is that correct?

4    A     That's correct.

5    Q     That's a file you found on the computer?

6    A     Using I See What You See, correct.

7    Q     And you didn't ever question Mr. Jenkins as to who the

8    girl was in the photograph?

9    A     I did not.

10   Q     Have no idea the relation between Mr. Jenkins and that

11   girl?

12   A     I found that specific picture in a folder named "My New

13   Camera Pictures" on the laptop.

14   Q     Okay.  But no questions about who the girl was and his

15   relation?

16   A     No, that's correct.

17   Q     Now you did say that you were interrupted briefly for

18   the arrest procedures?

19   A     That's correct.

20   Q     So then you came back out to witness the frisking,

21   reading of certain rights and placing him into the cell, is

22   that correct?

23   A     I observed that, correct.

24   Q     You didn't actually participate in it, though?

25   A     No, that's correct.

Jarret Johnston - Cross                                    270

1    Q      Then you went back to manually reviewing the contents

2    of the computer, correct?

3    A      That's correct.

4    Q      Plug any flash drives into the computer?

5    A      I did not.

6    Q      You just reviewed what was on the hard drive?

7    A      That's correct.

8    Q      Do you recall if you had to plug the computer in during

9    that time?

10   A      I don't recall.

11   Q      As part of your training as a CBSA agent, have you

12   received any computer forensics training?

13   A      No.

14   Q      Did you receive any training or education in computer

15   sciences prior to the inspection of Mr. Jenkins' laptop?

16   A      No, I did not.

17   Q      Have any idea how or why or any means possible that

18   your inspection may have changed any qualities of the files

19   on the computer prior to installing the I See What You See

20   software?

21   A      I'm not aware of any.

22   Q      And when you used the I See What You See software, is

23   that something you have to manually install onto the computer

24   device?

25   A      I wouldn't say install but we insert a CD into the

1    CD-ROM of the electronic device.

2    Q    So you insert the CD on and then I assume there's a

3    prompt and you have to start running the program?

4    A    That's correct.

5    Q    Is that something that stays on the computer forever?

6    A    I'm not aware of the logistics of how the program

7    works.

8    Q    You've been instructed on how to use it, though?

9    A    Yes.

10   Q    And so when you start the program, it proceeds to do

11   searches on its own, is that it?

12   A    It has a prompt so you have to start the program

13   running but once it starts running, it automatically brings

14   the pictures that are stored on the hard drive to view it.

15   Q    And again, that was only after about 40 minutes of

16   manual search?

17   A    That's correct.

18        MR. GOLDSMITH:  No further questions.

19        THE COURT:  Go ahead.

20        REDIRECT EXAMINATION BY MS. CARROLL:

21   Q    Mr. Johnston, during your search of the black Toshiba,

22   did you create any video files?

23   A    No, I did not.

24   Q    Did you download any child pornography to the

25   defendant's computer?

Jarret Johnston - Redirect                    272

1    A      No, I did not.

2    Q      Did you upload any child pornography from the CD-ROM or

3    internet or memory sticks to defendant's computer?

4    A      No, I did not.

5    Q      Did you alter or create any video or image files during

6    your search of the defendant's black Toshiba?

7    A      No, I did not.

8           MS. CARROLL:  Thank you.

9           THE COURT:  Any further cross on that,

10   Mr. Goldsmith?

11          MR. GOLDSMITH:  None, your Honor.  None, your

12   Honor.

13          THE COURT:  Okay, thank you.  Thank you, sir, you

14   may step down.

15              (The witness was excused.)

16          THE COURT:  Anybody hungry?  No response.  Okay,

17   it's 11:59, all right.  So what I think we're going to do

18   instead of starting another witness, we're going to take our

19   lunch break.  One hour, please be back in the jury room to

20   start at 1:00.  Please don't discuss the case.  If anybody

21   approaches you, tries to discuss this case with you, I need

22   to know about it immediately.  I did see some reporters in

23   here this morning, please do not read, listen, or view

24   anything dealing with anything at all about this case in any

25   media, put it aside, turn it off, do not listen or watch.

Jarret Johnston - Redirect                          273

1    Okay.  Have a good lunch hour and we'll see you at 1:00.

2                    (Jury Excused, 11:59 a.m.)

3              THE COURT:  Okay, enjoy your lunch break, please be

4    back here ready to start at 1:00.

5              MR. GOLDSMITH:  Thank you.

6              THE COURT:  Thank you.

7              THE CLERK:  Court's in recess.

8                    (Luncheon recess, 11:59 a.m. to 1:00 p.m.)

9                    (Open Court, Jury Out.)

10             THE COURT:  We all set?

11             MS. CARROLL:  We are.

12             THE COURT:  Defense counsel good to go,

13   government's ready?

14             MS. CARROLL:  Yes, your Honor.

15             THE COURT:  Okay.  Bring the jury in, please.

16                    (Jury Present, 1:00 p.m.)

17             THE COURT:  Okay.  The record should reflect we

18   have the ladies and gentlemen of the jury, hopefully you had

19   a great lunch, refreshed, nourished, ready to go.  We have

20   defendant, defense counsel.  Government, please call your

21   next witness.

22             MS. CARROLL:  Your Honor, the government calls

23   Marie-Josee Vinette.

24             THE CLERK:  Good morning -- or afternoon.  Can you

25   state your full name and spell it for the record.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Marie-Josee Vinette - Direct                    274

1        THE WITNESS:  It's M-a-r-i-e, hyphen, J-o-s-e-e,

2    Vinette, V-i-n-e-t-t-e.

3

4           M A R I E - J O S E E   V I N E T T E ,

5    called as a witness and being duly sworn, testifies

6    as follows:

7        DIRECT EXAMINATION BY MS. CARROLL:

8    Q    Good afternoon, Investigator Vinette.

9    A    Good afternoon.

10   Q    Where do you work?

11   A    I work for the Canada Border Services Agency located in

12   Ottawa.

13   Q    What is your position there?

14   A    I work as a criminal investigator.

15   Q    How long have you been a criminal investigator with the

16   Canada Border Services Agency?

17   A    Since September 2004.

18   Q    What are your duties as a criminal investigator?

19   A    I respond to the port of entries whenever there's an

20   incident that occurs that requires more than just a civil

21   sanction, then they'll call in an investigator to review the

22   case.

23   Q    How do you participate in the prosecution process in

24   Canada?

25   A    I, um, take all of the evidence and the notes they will

1    say and I present a Crown brief to the Crown prosecutor.

2    Q    Are you ever called upon to testify?

3    A    I am.

4    Q    Were you on duty on May 24th, 2009?

5    A    I was on standby duty.

6    Q    What is standby duty?

7    A    Criminal investigators work -- are day workers,

8    however, our ports are open 24 hours a day; therefore,

9    there's an investigator that rotates through with a pager at

10   that time, so that if something does occur, that you're

11   available to respond at any time.

12   Q    Did you receive any duty calls on May 24th, 2009?

13   A    I did, that morning I did.

14   Q    Where did you receive a duty call from?

15   A    I received a call from the Port of Lansdowne.

16   Q    And what did you do in response to that call?

17   A    I attended to the Port of Lansdowne.

18   Q    About what time did you arrive?

19   A    1340.

20   Q    What did you do once you got there?

21   A    I spoke to all the officers that had been involved in

22   the case up until the time I got there.

23   Q    Who did you speak to?

24   A    I spoke with Pedro Sousa-Dias, Melany Boyd, Glen Hache,

25   Jarret Johnston, and Tristan Garrah.

1   Q    As a result of those conversations, what did you do?

2   A    Well, I was advised that the subject had been arrested

3   for possession of child pornography, therefore I asked to

4   view the video for which he had been arrested.

5   Q    I'm handing you Government's Exhibit 4A.  Do you

6   recognize that exhibit?

7   A    I do.

8   Q    What is it?

9   A    Well, it's the three USB drives.  The one I viewed was

10  the one that had 8 gigabytes.

11  Q    Do you recognize that 8-gigabyte USB?

12  A    I do.

13  Q    Does it appear to be in the same condition it was in

14  when you viewed videos on it on May 24th, 2009?

15  A    Yes.

16  Q    How many videos did you view on the 8-gigabyte USB

17  stick?

18  A    Six.

19  Q    How did you select the videos that you were going to

20  view?

21  A    They were just in a thumbnail and the first one was the

22  one for which he had been arrested and I just continued to

23  sample a few more to ensure that we met our threshold.

24  Q    Could you describe the video that led to the

25  defendant's arrest?

1    A       I'll refer to it as the 9-year-old Vicky, it was of a

2    young prepubescent girl, she was wearing, at the beginning of

3    the video she was wearing a tank top with a skirt and black

4    stockings.  As she's being filmed, it appears she's being

5    instructed to twirl and then to undress, she undresses except

6    for the black stockings.  She has no development, no breast

7    development, no hip development, no pubic hair, and she

8    approaches whoever's filming her and proceeds to perform oral

9    sex.

10   Q       I'm handing you Government's Exhibit 4G.  Do you

11   recognize 4G?

12   A       I do.

13   Q       What is it?

14   A       It's the video that I viewed yesterday.

15   Q       Do your initials appear on Government's 4G?

16   A       On the right-hand corner they do.

17   Q       Did you make those initials on 4G?

18   A       I did.

19   Q       Is there a date?

20   A       February 3rd, 2014.

21   Q       Did you view the contents of the video on 4G on the

22   date that's listed on that disk?

23   A       Yes.

24   Q       What was the video you viewed on 4G?

25   A       The 9-year-old Vicky video that I had seen on the day

Marie-Josee Vinette - Direct

278

1    of the arrest.

2    Q    Was that video the same video that you watched on

3    May 24th, 2009?

4    A    It was.

5    Q    You said that you watched other videos; what was the

6    second video you saw on the 8-gigabyte USB drive?

7    A    It was a video, there was a text marking on it that

8    said Sun Dolls, it was of a young girl in a shower, she had

9    no pubic hair but she had some budding of the breasts.

10   Q    What was the next video you saw?

11   A    There was a text marking LS Magazine, female appeared

12   to be under 18 but she did have some development.

13   Q    And the next video?

14   A    The next three videos referred to as BD.  The first one

15   was two young females, one had no development, the other one

16   had some development, and the one with no development was

17   film -- was taking pictures of the other female.

18           The fifth video was, I referred to it as

19   9-year-old Marina, it was a prepubescent girl in a state of

20   undress who was posing, and the sixth video was also a BD

21   video, and it was a young prepubescent girl, she had no

22   development, and she's also posing and at times the video was

23   focusing specifically on her genitalia.

24   Q    When you say BD or LS Magazine, are you referring to

25   file names?

Marie-Josee Vinette - Direct                279

1    A    I'm referring to a marking, a text marking on the video

2    itself, not the file.

3    Q    How did you go about accessing the videos when you were

4    viewing them?

5    A    Just by clicking on the thumbnail.

6    Q    After you finished viewing the videos, what did you do?

7    A    I just scrolled down through, through the other

8    thumbnails and noticed they were -- they appeared to be all

9    of the same range as what I had just seen, and I stopped

10   viewing.

11   Q    What do you mean by range that you had just seen?

12   A    Well, it all seemed like teenagers or prepubescent

13   girls.

14   Q    What action did you take after you finished reviewing

15   the images and videos?

16   A    I went to speak with Mr. Jenkins.

17   Q    Where did that conversation take place?

18   A    In an interview room, a small interview room.

19   Q    Was that at the border services office, Port of

20   Lansdowne?

21   A    Yes, it was.

22   Q    About what time did you go speak to the defendant?

23   A    I can't recall specifically.  I viewed the video around

24   3:00 so shortly thereafter, within the hour, I would guess.

25   Q    What happened when you went to talk to the --

Marie-Josee Vinette - Direct                    280

1    A     Identified myself to Mr. Jenkins, I asked him if he

2    knew what child pornography was, he stated that he did, and I

3    advised him that we had found child pornography on some of

4    his media device that was found in his truck.  And you know,

5    I explained the process, that he would be taken to a local

6    jail and appearing before a justice of the peace in the

7    morning.

8    Q     How did the defendant respond?

9    A     He didn't.  He remained silent.  He seemed to be

10   pondering what it is I had just told him and he appeared

11   somewhat flushed and he asked me if he could call his mother

12   or his father, so I placed the call and allowed him to speak

13   to his mother.

14   Q     Did that conclude your interview with the defendant?

15   A     It did.

16   Q     Did you have any other interactions or conversations

17   with him on May 24th?

18   A     No.  Not that I recall.

19   Q     When was the next time you saw the defendant?

20   A     On September 13th.  No, actually he appeared for a bail

21   hearing the next day, saw him in court that day.

22   Q     After the bail hearing, when was the next time you saw

23   him?

24   A     On September 13th, 2010.

25   Q     Where did you see the defendant then?

Marie-Josee Vinette - Direct                     281

1    A      In the Brockville courthouse, he was scheduled for a

2    trial.

3    Q      Why were you at the Brockville courthouse?

4    A      In order to testify.

5    Q      Did the trial proceed on September 13th?

6    A      No, it did not.

7    Q      Why not?

8    A      Mr. Jenkins' defense lawyer had brought forward a

9    motion for unreasonable delay so that motion was heard by the

10   judge that day.

11   Q      Did you see the defendant any point after

12   September 13th, 2010?

13   A      No, I did not.

14   Q      Did you make any other further appearances at the

15   Brockville courthouse in connection with this case?

16   A      On October 18th, 2010, the date of the trial --

17   actually I went on September 17th when Judge Waugh rendered

18   his decision and he placed it to trial for October 18th, 2010

19   which I attended.

20   Q      Was the defendant present at the courthouse on

21   October 18th, 2010?

22   A      No, he was not.

23   Q      Did the trial proceed as it was scheduled to do so?

24   A      No.

25   Q      What happened?

Marie-Josee Vinette – Direct                              282

1    A     The judge rendered his reasoning for dismissing the

2    motion and then issued a bench warrant.

3    Q     I'm handing you what's been marked as Government's

4    Exhibit 16.  Could you identify what Government's Exhibit 16

5    is?

6    A     It's a warrant for arrest, a bench warrant.

7    Q     And is that a fair and accurate copy of the bench

8    warrant that was issued on that day?

9    A     It is.

10          MS. CARROLL:  Your Honor, move to admit

11   Government's Exhibit 16.

12          THE COURT:  Any objection?

13          MR. GOLDSMITH:  Brief voir dire, your Honor?

14          THE COURT:  Go ahead.

15          VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

16   Q     Investigator Vinette, you describe this document as a

17   bench warrant, is that correct?

18   A     Correct.

19   Q     Is this prior -- withdrawn.  Prior to today, when was

20   the last time you saw it?

21   A     I don't recall.

22   Q     Did you author this document at all?

23   A     No.

24   Q     Were you there when it was issued by any court?

25   A     Yes.

Marie-Josee Vinette - Direct                     283

1   Q     Is it your job to be the custodian of this document as

2   part of your roles and responsibilities?

3   A     No, it's not.

4   Q     And again, you say you have no idea or you don't recall

5   when the last time was you saw this document?

6   A     I don't recall if I saw the document.  I know the

7   document was issued on that day in court.

8   Q     Is there any markings on it -- withdrawn.  Did you see

9   this document when it was issued that day in court?

10  A     No.

11  Q     Is there any markings on the document that would

12  indicate to you that it is a -- that it is an official

13  document that's kept in the ordinary course of business of

14  the courts?

15  A     Can you repeat the question.

16  Q     Is there any markings on the document that would

17  indicate to you that this is an official document that is

18  kept in the ordinary course of business within the court

19  system?

20  A     No, I'm unfamiliar, the CBSA does not deal with the ...

21          MR. GOLDSMITH:  I object to the admission, your

22  Honor.

23          THE COURT:  Sustained.

24          MS. CARROLL:  Your Honor, may I ask some additional

25  foundational questions?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Marie-Josee Vinette – Direct                          284

1          THE COURT:  Go ahead.

2          CONTINUED DIRECT EXAMINATION BY MS. CARROLL:

3     Q    Investigator Vinette, if you remove that document from

4     the plastic sleeve it's contained in, is there a raised seal

5     on that document?

6     A    There is.

7     Q    Are you able to read any text that appears on the

8     raised seal?

9     A    Ontario Court of Justice.  (Speaking French). It's in

10    French.

11    Q    Is there red text that appears on top of the raised

12    seal?

13    A    Yes.

14    Q    What does the red text say?

15    A    "Certified to be a true and correct copy of the

16    original."

17    Q    Is that -- go ahead.

18    A    Sorry.  Clerk of the Court, Ontario Court of Justice.

19    Q    Is there a signature on the red text?

20    A    There is.

21    Q    Is there a date attached to that signature?

22    A    There is.

23    Q    What is the date attached to the signature?

24    A    January 29th, 2014.

25    Q    And is there a serial number at the top of the document

Marie-Josee Vinette - Direct                    285

1   under the language modified form?

2   A      There's a case file number.

3   Q      Have you ever seen bench warrants, or warrants issued

4   by a court?

5   A      Yes.

6   Q      Does this appear to be in the same format of the

7   warrants that you've seen previously?

8   A      Yes.

9   Q      Does it appear to contain the same language and the

10  same contents of the warrants you previously viewed?

11  A      It does.

12          MS. CARROLL:  Your Honor, we would submit this as a

13  self-authenticating public record.

14          THE COURT:  Why don't you -- why don't you come on

15  up here with defense counsel, retrieve the document, I'd like

16  to see it, please.

17                  (At Side Bar.)

18          THE COURT:  So your submission now is that it's

19  self authenticating based on the raised seal and it's a

20  certified copy of a court document?

21          MS. CARROLL:  That's correct, your Honor.

22          THE COURT:  You want to be heard?  You want to see

23  it?

24          MR. GOLDSMITH:  I have my copy, it doesn't have the

25  raised seal on it, is there -- have any information, it's

1  only dated a few days ago, who got it, who brought it down,

2  how it came down here?

3          MS. THOMSON:  That really wouldn't go towards

4  admissibility, but certainly --

5          THE COURT:  It wouldn't, but go ahead, go ahead and

6  answer the question if you can.

7          MS. THOMSON:  We do have a witness that retrieved

8  it.

9          THE COURT:  Okay, but when was it retrieved and who

10 brought it down?

11         MS. CARROLL:  It was retrieved the day that it was

12 dated, it was retrieved on January 29th of this year.

13         THE COURT:  Okay.

14         MS. CARROLL:  And it was retrieved by Investigator

15 Kip Wohlert.

16         THE COURT:  With what agency?

17         MS. CARROLL:  He's with Ontario Provincial Police.

18         THE COURT:  You expect him to testify?

19         MS. CARROLL:  We do.

20         THE COURT:  Okay.  Well, any other further

21 objection?  I mean based on the submission as a

22 self-authenticating document.

23         MR. GOLDSMITH:  Based on self-authenticating, no.

24         THE COURT:  Okay.

25         MR. GOLDSMITH:  But I mean, it's -- I don't know, I

Marie-Josee Vinette - Direct                                287

1    think if Mr. Wohlert's going to come in, it might be a

2    cleaner record if he testifies he brought it down.

3         MS. CARROLL:  I think the government would be happy

4    to have it admitted subject to further testimony by

5    Investigator Wohlert.

6         THE COURT:  I don't know that it's necessary, quite

7    honestly, because if you had offered it as a

8    self-authenticating document without laying out the record

9    about the raised seal and certified copy, my ruling probably

10   would have been different, but now that you've done that, I'm

11   going to admit the document at this time and then if you want

12   to have the investigator talk about it when he comes in, he

13   can do that.

14        MR. GOLDSMITH:  Okay, thank you.

15        THE COURT:  All right.  Thank you.

16             (Open Court.)

17        THE COURT:  I guess you don't like my music, either

18   that or you don't want to dance in public.

19        The document's going to be received, you may

20   continue your examination, go ahead.

21   Q    Investigator Vinette, could you please read to the

22   jury -- you can go ahead and publish 19 -- the caption that

23   begins, "This warrant is issued for the arrest of," at the

24   top of the document here.

25   A    "This warrant is issued for the arrest of Joseph

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

1    Vincent Jenkins."

2              MR. GOLDSMITH:  Objection, your Honor, document

3    speaks for itself.

4              THE COURT:  No, she can use it with the witness,

5    it's in evidence.  Go ahead.

6    A     Date of birth, 22 January 1970.

7    Q     And beginning with, "Whereas the accused," can you read

8    that paragraph?

9    A     "Whereas the accused has been charged that he, on or

10   about the 24th of May, 2009, at the customs port of entry of

11   Lansdowne in the said region."

12   Q     And what are the numbered and lettered sections that

13   appear on the lines below that text?

14   A     Section 163.1, subsection 3 of the Criminal Code of

15   Canada, Section 163.1, subsection 4 of the Criminal Code of

16   Canada, Section 160 times 2 of the Customs Act, and Section

17   160.1 of the Customs Act.

18   Q     If you know, what do those provisions govern, what kind

19   of offenses are outlined there?  Do they relate to the

20   possession of child pornography?

21   A     Possession under the Criminal Code, Customs Act,

22   failure to report possession and smuggling.

23   Q     And if you could look at the paragraph that begins,

24   "And whereas," and the checked paragraph at the bottom, could

25   you read that, please?

Marie-Josee Vinette - Cross                    289

1    A    "Subsection J, failed to attend court on October 18th,

2    2010 at 10 a.m. in courtroom number 3 at 41 Courthouse

3    Square, Brockville, Ontario, case 6V7N3 for his trial."

4    Q    And what is the date that appears at the bottom of the

5    document, handwritten?

6    A    The 18th day of October, 2010.

7    Q    Was that the day that you were at the Brockville

8    Courthouse to testify against the defendant?

9    A    It was.

10   Q    And was that testimony going to relate to your

11   investigation into possession the defendant was found to have

12   at the Port of Lansdowne?

13   A    It was.

14          MS. CARROLL:  No further questions.

15          THE COURT:  Cross-examination.

16   CROSS-EXAMINATION BY MR. GOLDSMITH:

17   Q    Officer Vinette, or is it Vinette?

18   A    Vinette.

19   Q    Vinette.  On May 24th of '09, you responded to a call

20   to the port of entry at Lansdowne, correct?

21   A    Correct.

22   Q    And at that time you spoke with several of the officers

23   that had conducted an inspection of a vehicle, correct?

24   A    Correct.

25   Q    As part of your investigation, you also reviewed

Marie-Josee Vinette - Cross                               290

1    certain evidence -- withdrawn.  Reviewed certain files within

2    an 8-gigabyte hard drive, correct?

3    A     USB stick, yes.

4    Q     Flash drive, I'm sorry.  And you only confined your

5    search or your review to that 8-gigabyte flash drive,

6    correct?

7    A     Correct.

8    Q     You didn't review anything on the desktop, correct?

9    A     No, I did not.

10   Q     Didn't search the laptop itself, correct?

11   A     No, I did not.

12   Q     You're aware there was a second laptop?

13   A     Correct.

14   Q     All right.  You didn't look into any of the contents of

15   the hard drive of the second laptop, correct?

16   A     I did not.

17   Q     Didn't review any of the contents of two additional

18   flash drives that had been recovered that morning, correct?

19   A     Correct.

20   Q     Only confined to one 8-gigabyte flash drive, correct?

21   A     That's correct.

22   Q     Now you said that at one point, after reviewing a

23   couple of -- withdrawn.  After reviewing about five or six

24   videos, you then approached Mr. Jenkins, is that correct?

25   A     That's right.

Marie-Josee Vinette - Cross                    291

1    Q    At that point, you notified him he was going to be

2    under arrest?

3    A    He was already under arrest, I read him a secondary

4    warning.

5    Q    And when you -- by that secondary warning, you advised

6    him of his right to have an attorney?

7    A    Secondary warning is when somebody's already been

8    arrested, if he comes into contact with any other officers,

9    it's just to remind him of his right to remain silent, that

10   he doesn't have to speak if he doesn't wish to make any

11   statements.

12   Q    And when you issued that secondary warning to him about

13   his right to remain silent, he didn't make any comments to

14   you about the case itself, correct?

15   A    No.

16   Q    And you informed him that he was under arrest for

17   possession of child pornography, correct?

18   A    Correct.

19   Q    You informed him that you found child pornography or

20   what you believed to be child pornography on the flash drive,

21   correct?

22   A    I stated on the media device.

23   Q    Okay.  And in response to that, you testified earlier

24   that he appeared to be pondering what you told him, right, so

25   he didn't have any sort of an outburst?

Marie-Josee Vinette - Cross                                    292

1    A      No, he did not.

2    Q      He didn't ask to have a lawyer present with him once

3    you stated that?

4    A      No, he did not.

5    Q      He seemed to really be thinking about what you told

6    him?

7    A      Correct.

8    Q      At that point you later said he asked to call his

9    mother, right?

10   A      His mother or his father.

11   Q      And you were aware at the time based upon the

12   investigation that his destination was at his parents'

13   cottage?

14   A      Yes, I was.

15   Q      He made no other comments to you at all, correct?

16   A      No.

17   Q      You said that you had also followed up with the court

18   appearance the following day, is that it?

19   A      Correct.

20   Q      That was a bail hearing?

21   A      It was.

22   Q      Was he issued bail?

23   A      The next day he was.  Or --

24   Q      Sorry?

25   A      If I remember correctly it was $10,000 bail so they're

Marie-Josee Vinette - Cross                    293

1   not released, person under custody isn't released until the

2   money arrives.

3   Q      Are you aware if he was released?

4   A      Not on that day.

5   Q      Eventually?

6   A      Yes, yes.

7   Q      As part of your duties, did you have any other contact

8   with the CBSA officers that had conducted the initial search

9   of the vehicle, laptop and flash drives?

10  A      No.

11  Q      Did you have contact with any other law enforcement

12  personnel?

13  A      Yes.

14  Q      Did you have contact with the United States law

15  enforcement personnel?

16  A      No.

17  Q      On May 25th of 2009, you didn't have any contact with

18  law enforcement personnel in the United States?

19  A      Not that I recall.

20  Q      You didn't have any contact with any law enforcement

21  personnel in Canada?

22  A      On the 25th?

23  Q      25th of 2009.

24  A      No.

25  Q      Once the arrest had taken place, did you take

Marie-Josee Vinette - Cross

```
1    possession of any of the physical evidence?

2    A    They were locked into the Queen's warehouse, located at

3    the Port of Lansdowne.

4    Q    Did you perform that locking activity or no?

5    A    I went with the goods into the lockup.

6    Q    So you witnessed it but you didn't actually perform it?

7    A    No.

8              THE COURT:  No, you didn't actually perform it, or

9    no, you didn't witness it, which is it?  I want the record to

10   be clear, what did you do?

11             THE WITNESS:  I -- the items were itemized and

12   myself and Tristan with the superintendent on duty, I don't

13   recall who that was, went upstairs to the Queen's warehouse

14   because the superintendent on duty is the one who has access

15   to that room.

16   Q    Okay.  So Mr. Jenkins was already under arrest at the

17   time you arrived, is that correct?

18   A    Yes, that's correct.

19   Q    And as part of your investigative duties, did you have

20   to contact or seek further guidance from any other law

21   enforcement personnel within Canada?

22   A    I did advise the Ontario Provincial Police.

23   Q    Did you have to seek any information from any

24   particular investigative units at the time?

25   A    I'm sorry, could you repeat the question?
```

Marie-Josee Vinette - Cross                                              295

1   Q      Sure.  Did you have to seek any guidance from any

2   additional investigative departments or units on May 24th of

3   2009?

4   A      I spoke with Sergeant Terry Paton from the Ontario

5   Provincial Police.  As far as guidance, I mean we work in

6   conjunction with one another, so we discussed the case and

7   what would be the next steps.

8   Q      That didn't change the course of action that you were

9   going to take that day in any way?

10  A      No.

11  Q      Again, you weren't present for the actual removal of

12  the articles from the truck, correct?

13  A      No.

14  Q      As part of your education and training within the

15  Ontario Province Police, have you been given any computer

16  forensics training?

17  A      No, I have not.

18  Q      Have you received any training regarding computer

19  sciences?

20  A      No.

21  Q      Are you aware of the I See What You See program?

22  A      I've never used it.  That's the port that would deal

23  with that.  I'm aware that it's out at the ports.

24  Q      Are you aware if the program had been installed or

25  running at the time that you were reviewing the files on the

Marie-Josee Vinette - Redirect

1   laptop computer -- I'm sorry, withdrawn.  On the 8-gigabyte

2   hard drive?

3   A     It was not.

4   Q     And you're aware it was not running at the time that

5   you were reviewing the materials?

6   A     Correct.

7   Q     Are you aware of any effects that your review of the

8   files or any other officer's review of the files at the Port

9   of Lansdowne that day may have had on the files themselves?

10  A     No.

11            MR. GOLDSMITH:  No further questions.

12            THE COURT:  Any redirect?

13        REDIRECT EXAMINATION BY MS. CARROLL:

14  Q     Investigator Vinette, during your review of the

15  8-gigabyte hard drive, did you create any videos containing

16  child pornography?

17  A     No, I did not.

18  Q     Did you create any image files containing child

19  pornography?

20  A     No, I did not.

21  Q     Did you create any files of any kind other than those

22  you were reviewing?

23  A     No, I did not.

24  Q     And you didn't create the files you were viewing,

25  right?

Laurie Sheridan - Direct                              297

1    A      No.

2    Q      You were just viewing them on the 8-gigabyte hard

3    drive?

4    A      Correct.

5               MS. CARROLL:  That's all.

6               THE COURT:  Anything further based upon that

7    redirect?

8               MR. GOLDSMITH:  No, your Honor.

9               THE COURT:  You may step down.  Thank you.

10                  (The witness was excused.)

11              THE COURT:  Next witness, please.

12              MS. CARROLL:  Your Honor, the government calls

13   Laurie Sheridan.

14              THE CLERK:  State your full name and spell it for

15   the record, please.

16              THE WITNESS:  Laurie, L-a-u-r-i-e, Sheridan,

17   S-h-e-r-i-d-a-n.

18

19              L A U R I E   S H E R I D A N , called as

20   a witness and being duly sworn, testifies as

21   follows:

22

23         DIRECT EXAMINATION BY MS. CARROLL:

24   Q      Good afternoon, Ms. Sheridan.

25   A      Hello.

Laurie Sheridan – Direct                    298

1    Q       Where do you work?

2    A       I work for New York State Department of Motor Vehicles.

3    Q       How long have you worked for the Department of Motor

4    Vehicles?

5    A       Almost 25 years.

6    Q       What's your position with the Department of Motor

7    Vehicles?

8    A       I'm a supervisor.

9    Q       Are you familiar with the process by which abstracts of

10   vehicle registration are maintained?

11   A       Yes.

12   Q       Are those records created and maintained in the regular

13   course of the Department of Motor Vehicles business?

14   A       Yes, they are.

15   Q       I'm handing you what's been marked for identification

16   as Government's Exhibit 11.  What is that record?

17   A       It's an abstract of a registration record.

18   Q       And does it have any insignia on it to indicate to you

19   that it was produced by the Department of Motor Vehicles?

20   A       It was, it has the state insignia and also signed by

21   the Commissioner.

22   Q       So is that an accurate copy of the record it contains?

23   A       It is.

24           MS. CARROLL:  Your Honor, move to admit

25   Government's Exhibit 11.

Laurie Sheridan – Direct                                299

1          THE COURT:  Counsel, any objection?

2          MR. GOLDSMITH:  No objection.

3          THE COURT:  It will be received.

4    Q    Ms. Sheridan, could you describe for the jury what this

5    record reflects; what information is contained here?

6    A    It's the abstract of, you know, just like you would get

7    if you were to register your car, it gives you the name of

8    the registrant, the plate number, year, make, vehicle number.

9    Q    What is the make and model of the vehicle identified on

10   this record?

11   A    It's a 2003 Dodge pickup truck.

12   Q    And what color is that Dodge pickup truck?

13   A    Blue.

14   Q    To whom is that vehicle registered?

15   A    Joseph V. Jenkins.

16   Q    What is indicated on this record about the license

17   plate of that blue Dodge pickup?

18   A    It did have a previous plate on it, would you like that

19   plate number?

20   Q    Yes, what was the plate number?

21   A    Okay, it was 19322JL, and then those same plates were

22   replaced with plate number 78367MA.

23   Q    So in 2009, what would the plate on this vehicle have

24   been?

25   A    It would have been the 19322JL.

Jeffrey Olear - Direct                          300

1          MS. CARROLL:  No further questions.

2          MR. GOLDSMITH:  No questions.

3          THE COURT:  Thank you.  You may step down.

4              (The witness was excused.)

5          THE COURT:  Next witness, please.

6          MS. THOMSON:  Government calls Jeff Olear.

7          THE CLERK:  Good afternoon.  Can you please state

8    your full name, spell it for the record.

9          THE WITNESS:  Jeffrey Olear, J-e-f-f-r-e-y,

10   O-l-e-a-r.

11

12          J E F F R E Y   O L E A R , called as a

13   witness and being duly sworn, testifies as follows:

14          DIRECT EXAMINATION BY MS. THOMSON:

15   Q    Good afternoon.

16   A    Good afternoon.

17   Q    Could you please introduce yourself to the members of

18   the jury.

19   A    Yes.  My name is Jeff Olear, I'm VP of supply chain for

20   a company called PNY Technologies in Parsippany, New Jersey.

21   Q    What does PNY Technologies, what type of company is it?

22   A    We manufacture and distribute electronics computer

23   accessories to the retail market in the United States,

24   Canada, and North America and our world headquarters is in

25   Parsippany, New Jersey.

Jeffrey Olear - Direct                                301

1   Q     Does that include thumb drives?

2   A     Yes, it does.

3   Q     At this time -- your Honor, if I may approach the

4   witness and show him what's been previously marked as

5   Government's Exhibit 4A, 5A, and 6.  Just have you take a

6   look at what's contained in the exhibit that I've just

7   identified and can you tell me if you recognize what's inside

8   that bag?

9   A     Yes, I do.  These are PNY USB drives, also known as

10  thumb drives.

11  Q     Would that be thumb drives that PNY manufactured?

12  A     Yes.

13  Q     You indicated Parsippany, New Jersey I believe is where

14  you're located?

15  A     That's correct.

16  Q     Where does PNY manufacture its thumb drives?

17  A     Everything for U.S. and North American distribution is

18  manufactured and distributed out of our Parsippany,

19  New Jersey facility.

20  Q     Are there any -- are any of those items manufactured

21  elsewhere?

22  A     Not these, no.

23  Q     So those would have been manufactured in New Jersey?

24  A     Yes.

25  Q     Do you have any manufacturing plants or locations in

Jeffrey Olear - Cross                    302

1    the state of New York?

2    A     No, we do not.

3    Q     How long have you been with the company?

4    A     Nineteen years.

5    Q     Have you ever had a location in New York?

6    A     No.

7           MS. THOMSON:  I have no further questions.

8           THE COURT:  Any cross-examination?

9           MR. GOLDSMITH:  Very brief.

10          CROSS-EXAMINATION BY MR. GOLDSMITH:

11   Q     Mr. Olear, take a look at 4A, 5A, and 6 if you have

12   them in front of you.  Those objects, they appear in

13   substantially the same condition as those objects might leave

14   the PNY manufacturing facility?

15   A     Yes.

16   Q     Any way to look at them to see if they're damaged from

17   the outside?

18   A     They don't appear to be.

19   Q     Any way to determine just by viewing them who or how

20   many people may have used them?

21   A     Not that I can tell, no.

22          MR. GOLDSMITH:  No further questions.

23          THE COURT:  Anything else?

24          MS. THOMSON:  No, your Honor.

25          THE COURT:  Thank you, sir, you may step down.

Michel Boulay - Direct                                303

1              (The witness was excused.)

2              MS. THOMSON:  If I can retrieve the exhibit.  The

3     government calls its next witness, Kip Wohlert.

4              We're going to switch.  We'll call Michel Boulay.

5              THE CLERK:  State your full name and spell it for

6     the record.

7              THE WITNESS:  First name Michel, M-i-c-h-e-l, last

8     name Boulay, B like Bob, o-u-l-a-y.

9

10             M I C H E L   B O U L A Y , called as a

11    witness and being duly sworn, testifies as follows:

12             DIRECT EXAMINATION BY MS. CARROLL:

13    Q     Good afternoon, Mr. Boulay.

14    A     Good afternoon.

15    Q     Where do you work?

16    A     I work for the Ontario Provincial Police, it's a large

17    police service in Ontario, Canada.

18    Q     How long have you worked there?

19    A     I've been a police officer for 25 years.

20    Q     What is your job title?

21    A     I'm a detective sergeant right now with the electronic

22    crime section.

23    Q     How long have you been assigned to the electronic crime

24    section?

25    A     Thirteen years.

Michel Boulay – Direct                     304

1  Q     What are your duties as a detective sergeant with the

2  electronic crime section?

3  A     Duties, I'm a team leader so beside the administrative

4  duties of a team leader, I also have to make sure in terms of

5  evidence about the security, the continuity and integrity of

6  evidence.  I perform forensic examinations of the digital

7  evidence, that includes the acquisition, the imaging of the

8  evidence, also doing forensic analysis, and then I also

9  prepare forensic reports based on any examinations, and the

10 forensic reports are for disclosure and also for court

11 presentation.

12 Q     I'm handing you Government's Exhibit 13A.  Do you

13 recognize Government's 13A?

14 A     Yes, I do.

15 Q     What is it?

16 A     It's a property report.  When investigators bring

17 evidence to the electronic crime section, we prepare a

18 property report, that lists the property, and then I see my

19 signature as being the person that received it.

20 Q     What is the date that appears on the signature line for

21 you having received the evidence?

22 A     The date is the 18th of June, 2009.

23 Q     Is that an accurate copy of the property custody report

24 you prepared?

25 A     Yes, it is.

Michel Boulay - Direct

305

1    Q    And do you prepare that report as a regular part of

2    your duties with the Ontario Provincial Police?

3    A    Yes.

4         MS. CARROLL:  Your Honor, move to admit

5    Government's Exhibit 13A.

6         THE COURT:  Any objection?

7         MR. GOLDSMITH:  Brief voir dire.

8         THE COURT:  Go ahead.

9         VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

10   Q    Agent Boulay?

11   A    Yes.

12   Q    You said you received the document on -- or at least

13   that you signed it on June 18, 2009?

14   A    That's correct, yes.

15   Q    Did you possess the document prior to June 18th, 2009?

16   A    Well, the document was brought by another officer with

17   the evidence so I'm not sure when they brought the document

18   but I received the evidence on the 18th of June.

19   Q    Would you have any knowledge as to the status of the

20   evidence prior to June 18 of 2009?

21   A    No.

22   Q    But the document itself, that is your handwriting and

23   your signature at the bottom?

24   A    It's my signature, it's not my handwriting, it's

25   probably handwriting of whoever prepared it.

1    Q      So where it indicates June 18 of '09, that is your

2    handwriting?

3    A      That line is my handwriting, all the way across

4    including my signature and then my designation, my rank,

5    badge number and then the fact that it's the E-crime section.

6    Q      Is this a copy that is true and accurate?

7    A      Yes, it is.

8    Q      It is not the original though?

9    A      No, the original, because it's so old, what we do after

10   a period of time is we scan the original and then we destroy

11   the original.

12   Q      All right.  So do you have any idea when the original

13   was destroyed?

14   A      This is 2009 so probably last year because our

15   government policy in Ontario, it's two years plus current

16   year you retain the original.  So this is 2009, you would

17   have 2010, 2011, and then any time in 2012 or after, you can

18   dispose of it.

19   Q      Did you ... once you received the items that are

20   included on this list, did you keep them in a particular area

21   associated with a method for safekeeping of evidence?

22   A      Well, I was the intake officer, at the time I was

23   receiving the evidence I would have been in my office and

24   then you can see there's certain numbers, we haven't covered

25   yet but any evidence coming to the electronic crime section,

Michel Boulay - Direct                                              307

1    we have evidence bar codes, bar codes just like a grocery

2    store, they're affixed to each piece of evidence and once

3    that's done, the evidence is moved to our vault and then the

4    evidence -- the bar codes are scanned, and then the shelf and

5    the vault where the evidence is placed is also scanned so

6    this way we have an idea at all times of where the evidence

7    is as well as who handled the evidence.

8    Q    And as far as you're aware from the review of this

9    document, you only received two laptop computers, three flash

10   drives, a camera with a digital card and a cell phone,

11   correct?

12   A    That's correct, yes.

13           MR. GOLDSMITH:  All right.  No further questions.

14   No objection to the document.

15           THE COURT:  Document will be received.

16           CONTINUED DIRECT EXAMINATION BY MS. CARROLL:

17   Q    Detective Sergeant Boulay, I'm handing you Government's

18   Exhibits 4A, 5A, 6, 8, 3A, and 7.

19   A    Okay.

20   Q    Have you --

21           THE CLERK:  Say that again, please, I'm sorry.

22           MS. CARROLL:  8, 4A, 5A, 6, 3A, 7.

23   Q    Have you had an opportunity to previously review those

24   exhibits?

25   A    Yes, I did this morning.

Michel Boulay - Direct

308

1    Q    Do those exhibits contain electronic media that's

2    reflected on the property custody sheet that's Exhibit 13A?

3    A    Yes, they do, and they still have the original bar

4    codes from our section.

5    Q    Could you explain to the jury about the bar codes?

6    A    The bar codes are just -- it's a piece of, a sticker

7    that we put on each piece of evidence and has a number of

8    lines just like a bar code again, grocery store when the

9    grocery store, they scan the items for at the cash register,

10   we have the same thing, the number and all the information we

11   need is on the bar code.  And then instead of writing it

12   manually, we just have a scanner so I would put -- once I

13   have the description entered of this piece of evidence, I

14   would scan that number, go in the vault and then each shelf

15   in the vault also has the bar code and I would scan it and

16   then it goes in our system that that piece of evidence is on

17   a certain shelf in our vault.

18   Q    Were you responsible for assigning the bar codes to the

19   evidence?

20   A    I put the bar codes myself, I scanned them and I put

21   the evidence in the vault.

22   Q    Are those bar code numbers reflected in the column on

23   the right side of Exhibit 13A, should be on your screen?

24   A    Yes, they are.

25   Q    And do those correspond to each of the items of media

Michel Boulay - Direct                    309

1    that are reflected in the exhibits before you?

2    A     Yes, they do, and I would have written those numbers

3    myself as I processed the evidence.

4    Q     And based on your comparison of your property custody

5    sheet and the bar codes that appear on those government

6    exhibits, do they correspond?

7    A     Yes, they do.

8    Q     What happens once the evidence is assigned a bar code?

9    A     Then I enter the information about the description of

10   the evidence, where it was seized from, the original

11   location, and then I put the bar code number, I'll scan it

12   and I move it from my office to the vault, it's just in the

13   same -- in the same section, the same office, section of

14   where we are, and then I scan it inside the vault and then

15   put it on the shelf.

16   Q     If you look at the lower half of the Exhibit 13A, your

17   property custody form, could you read the text that's dated

18   June 18th, '09, and just the line across there, what does

19   that say?

20   A     Okay.  It says number 1, 2, 3, 4, and 5.  And that

21   corresponds with the numbers, the evidence were listed on

22   this property report as line number 1, line number 2, line

23   number 3, so at that point when I receive it, we don't have

24   the bar codes yet, so I'm telling the officer that I'm

25   receiving these five lines, these exhibits on those five

Michel Boulay - Direct                    310

1    lines, I sign for them, as a receipt, and then I sign and

2    then put my badge number in the next line and the fact it's

3    from the E-crime section, and as I processed them after,

4    that's when I put our bar code evidence number next to it.

5    Q    Is that bar code assigned once the digital media is

6    taken to the forensic laboratory, is that the stage?

7    A    It's assigned at the time I receive it, so they're just

8    numerical sequence so the next piece of evidence that comes

9    would have the next number in line and then I just use them

10   one after another.

11   Q    You testified earlier that one of your functions with

12   the Ontario Provincial Police is that you work with the

13   imaging and examination of digital media?

14   A    That's correct.

15   Q    Are you familiar with the process by which digital

16   media is imaged and examined by OPP or Ontario Provincial

17   Police?

18   A    Yes, I am.

19   Q    How are you familiar with that process?

20   A    From training, I have been in that section for 13 years

21   so I have formal training in computer and then I also in

22   forensic examination of digital evidence, I have a number of

23   certifications from classes I've attended, certification

24   exams that I've passed.  I also have some formal

25   certification in -- as computer forensic examiner.

Michel Boulay - Direct                    311

1    Q      Did you personally image and examine Government's

2    Exhibits 3A, 4A, 5A, 6, and 7?

3    A      These ones, no, another officer from our section did

4    the imaging.

5    Q      Does your section use a uniform set of policies and

6    procedures for imaging and examination?

7    A      Yes, we do.

8    Q      How are digital media items imaged?

9    A      What we do is, we never work off of the original piece

10   of evidence, any time you connect to a device, whether it's a

11   hard drive or other digital evidence, you end up changing

12   dates and time, information on the piece of evidence so what

13   we do is we use a device, it's called a write blocker, it

14   prevents us from writing to that device, and then we put that

15   between our equipment and the device that we're -- and by

16   device, again, I mean either a hard drive or it could be a

17   thumb drive, could be anything that's in a digital format.

18   So between our equipment, that device, we have a blocker, it

19   prevents us from writing to the original evidence.  And then

20   we make an exact copy.  In the digital world everything is in

21   a binary format, it's either 0 or 1, so we copy every 0 and

22   every 1 from the hard drive to another location, that becomes

23   our image, and then we work off of the image after, so we

24   never actually work off or touch the original evidence except

25   when it's time to image it to make a copy of it.

Michel Boulay - Direct                              312

1   Q     Why don't you work off the original evidence to do an

2   examination?

3   A     So you don't end up changing any of the information.

4   At that point we could give that piece of evidence to

5   somebody else, to another agency, another examiner and that

6   person would come up with the same result that we have.

7   Q     Does the imaging process itself change or in any way

8   alter or create data on the digital media devices?

9   A     No, not if it's done properly.

10  Q     Would any examination have been done of the digital

11  media that you checked into the property custody form or

12  would the examination have been done on the image?

13  A     The examination would have been done on the image.

14  Q     Is that the standard practice of the OPP?

15  A     It is the practice, yes, not just the OPP, of the

16  forensic world.

17        MS. CARROLL:  No further questions.

18        THE COURT:  Go ahead, Counsel.

19        MR. GOLDSMITH:  Thank you.

20        CROSS-EXAMINATION BY MR. GOLDSMITH:

21  Q     Officer Boulay, on June 18th of 2009, you received the

22  items that were listed on the voucher form, correct?

23  A     That's correct, yes.

24  Q     Do you recall who you received those items from?

25  A     Detective Constable Kip Wohlert of the child sexual

Michel Boulay – Cross                                   313

1    exploitation section.

2    Q     And you were the intake officer that day, correct?

3    A     At that time, I was, yes.

4    Q     At the time that you received -- well, withdrawn.  Did

5    you have any contact with those items prior to June 18th of

6    2009?

7    A     I don't recall.  All I know is based on the property

8    report, that it was entered in our system and signed on the

9    18th of June.

10   Q     So, and again, based upon the report, would you have

11   had any contacts with those items prior to June 18th of

12   2000 --

13   A     No.

14   Q     Now you noted that there were several items in there;

15   do you recall if there were the bricks or the chargers for

16   those laptops included?

17   A     If they're not there, they would not have been

18   included, no.

19   Q     That would have been listed separately?

20   A     Yes, or at least as an attachment as part, they would

21   have listed the laptop and a charger or they would have been

22   put separately.

23   Q     Did you attempt to turn the laptops on when it was in

24   your presence?

25   A     No.

Michel Boulay - Cross                                    314

1    Q     Do you recall ever having attempted to turn the laptops

2    on?

3    A     No, I recall not attempting.

4    Q     Now you made a statement a few moments ago about the

5    use of getting images of the original equipment so you're not

6    working on the originals, correct?

7    A     It's a copy, it's not just the images, we copy the

8    entire content of the hard drive or the digital evidence to

9    another device.

10   Q     You call it a mirror image?

11   A     We can call it a mirror, it's not really mirror because

12   mirror would be the opposite but it's an exact copy.

13   Q     Are you familiar with any other terms that is used

14   other than just a copy?

15   A     Forensic copy, or ...

16   Q     Okay.  And you said that you and other forensic

17   investigators make that copy so that the original is not

18   altered, correct?

19   A     That's correct, yes.

20   Q     And you specifically testified that when you are

21   attempting to access those files, it can change the dates and

22   times that are recorded of that file, correct?

23   A     On the original one?

24   Q     Yes.

25   A     If you didn't have a write blocker device, yes.

Michel Boulay – Cross

315

1    Q     And a write blocking device, is that a program that

2    will specifically be used so that nothing could be added or

3    deleted onto the original?

4    A     It's not a program, it's an actual physical device that

5    prevents communication to the original device.

6    Q     Okay.  Why don't you explain a little bit more then how

7    the write block works?

8    A     The write block, once you connect to an operating -- if

9    you use a Windows-based operating system which most people

10   use Microsoft Windows, any time you connect to a device, that

11   operating system will write to the device, it will change

12   dates and time.  Each file on a computer device, on a hard

13   drive or -- will have certain dates, certain times.  Any time

14   you access that file, you change the date, you change the

15   time.  So for us to keep it in the same state as it was at

16   the time it's seized from an accused or suspect, then you use

17   this physical box, it's a box that sits between that, we'll

18   take a hard drive, for example, between a hard drive and our

19   storage device.  And then what that box will do, it tricks

20   the device, it tricks the operating system as saying, okay,

21   when you communicate with me with that hard drive, it's not

22   really going to the hard drive, it's only going to that

23   device.  And those devices are tested of course once we get

24   them to make sure that they function.  The manufacturer will

25   say that they won't -- they won't write to whichever device

Michel Boulay - Cross                    316

1    you're connected to, so we do test to make sure that it's a

2    fact, it's a statement, and then we use them after.

3    Q    And but for the use of one of those write block pieces

4    of equipment, then if you went in and you accessed a file,

5    then the computer operating software would automatically

6    change some of the dates and times coded onto that file?

7    A    If you didn't use a write blocker?

8    Q    Yes.

9    A    Yes.

10   Q    Okay.

11   A    Now once we have -- once we work off of the image, then

12   it doesn't matter how many times you access it, you don't

13   change any dates or times after.

14   Q    Right, but when you're working with the original, if

15   you don't have the write block software engaged, I'm sorry,

16   the write block equipment engaged, then it could change the

17   dates and times encoded onto the files?

18   A    Certain files, yes.

19   Q    And it's not, as you stated it's not a piece of

20   software that you upload into the original?

21   A    No, it's an actual physical device.

22            MR. GOLDSMITH:  Thank you, no further questions.

23            THE COURT:  Redirect.

24            REDIRECT EXAMINATION BY MS. CARROLL:

25   Q    Detective Sergeant Boulay, if a user opens a video file

1   without using write block software or write block hardware,

2   will anything other than the date accessed be altered if the

3   user takes no further steps beyond opening the file?

4   A    Well, you definitely have the last access time would be

5   changed, but no, if you don't change the size of the file,

6   nothing else would be changed.

7   Q    So the video itself would remain unaltered just by

8   opening it?

9   A    That's right, you can view it as many times as you

10  want, it's not going to change the video or the picture.

11  Q    Is the same thing true for images that are not videos?

12  A    Yes.

13          MS. CARROLL:  No further questions.

14          MR. GOLDSMITH:  One question.  I mean one.

15          RECROSS-EXAMINATION BY MR. GOLDSMITH:

16  Q    Officer Boulay, if you access that file without the use

17  of the write block equipment, will it accumulate to cache?

18  A    Accumulate to cache.

19  Q    Will there be a notation in the cache of the computer

20  that it had been accessed?

21  A    Probably not likely today because there's so much

22  memory, the RAM memory, the Random Access Memory in your

23  computer would basically buffer, wouldn't have to, it

24  wouldn't get cached on the actual computer on the hard drive.

25  Q    Same in 2009?

Michel Boulay - Recross                          318

1    A     2009 is still fairly recent computers, we're talking

2    like a long time ago when there was so little RAM in the

3    computer, lots of stuff have to be cached to hard drive

4    because there wasn't enough RAM to contain the entire file,

5    but now you have so much RAM in the computer that you don't

6    need to cache information anymore.

7    Q     And other than the -- other than the intake on that

8    particular day, do you recall if you ran any forensic testing

9    on this equipment?

10   A     No, not at that time, another person did.

11             MR. GOLDSMITH:  Thank you.

12             THE COURT:  And the RAM is what?

13             THE WITNESS:  Random Access Memory.

14             THE COURT:  Random Access Memory, okay.

15             THE WITNESS:  It's the memory, your Honor, that

16   goes from the Central Processing, the CPU of the computer and

17   then anything from your hard drive gets cached to the RAM

18   first and then from the RAM to the CPU and back.

19             THE COURT:  Okay.  Thank you.  Any follow-up?

20             MS. CARROLL:  No, your Honor.

21             THE COURT:  I just wanted that explained.  Thank

22   you, you may step down.

23                   (The witness was excused.)

24             MS. CARROLL:  Your Honor, the government calls Paul

25   Thompson.

Paul Thompson - Direct                               319

1          THE COURT:  Okay.

2          THE CLERK:  Good afternoon.  Please state your full

3     name and spell it for the record.

4          THE WITNESS:  Paul Gerard Thompson,

5     T-h-o-m-p-s-o-n.

6

7          P A U L   T H O M P S O N , called as a

8     witness and being duly sworn, testifies as follows:

9          <u>DIRECT EXAMINATION BY MS. CARROLL:</u>

10    Q     Good afternoon, Mr. Thompson.

11    A     Good afternoon.

12    Q     Where are you employed?

13    A     With the Ontario Provincial Police.

14    Q     How long have you been with the Ontario Provincial

15    Police?

16    A     Since June of 1996.

17    Q     What is your job title?

18    A     Detective sergeant.

19    Q     What are your duties as detective sergeant?

20    A     I'm one of a team that is in the child sexual

21    exploitation unit.  Our mandate is to investigate child

22    sexual abuse offenses including child pornography and child

23    luring offenses.

24    Q     How long have you been with the child exploitation

25    unit?

Paul Thompson - Direct

320

1    A    I first started there in 1999.

2    Q    Is one of your responsibilities with the child

3    exploitation unit to maintain custody of evidence?

4    A    Yes, it is.

5    Q    Could we go ahead and publish 13A.  I'm handing you

6    Government's Exhibit 13A.  Do you recognize it?

7    A    Yes, I do.

8    Q    What is it?

9    A    This is a property report, it's official property

10   document, established by the Ontario Provincial Police to

11   record any property that comes into the custody of our police

12   department.

13   Q    Does this document reflect whether property ever came

14   into custody and was signed in by you?

15   A    I received -- when it first came into my custody was

16   the date indicated on the left side of the document beside my

17   signature, the 19th of April, 2010.

18   Q    Where was that property transferred from to come to

19   you?

20   A    Our offices are situated in OPP general headquarters

21   building in Ontario, it's in the same office building as the

22   forensic unit.  They're situated on the fourth floor and our

23   storage room is also on the fourth floor which is literally

24   down the hall a couple hundred feet, storage area.

25   Q    Prior to your testimony today, have you had the

Paul Thompson - Direct                    321

1    opportunity to review the physical property that's reflected

2    on that custody sheet?

3    A      Yes, last evening I attended the offices here to review

4    some of these bags of evidence.

5    Q      I'm handing you Government's Exhibit 8.  Does

6    Government's Exhibit 8 appear on the property custody form?

7    A      Yes.

8    Q      What is Government's Exhibit 8 on the property custody

9    form?

10   A      Easiest identifier is the pink label from our

11   electronic crimes section with the number 6620, 006620 which

12   indicates number 3 on the list, Olympus camera and card.

13   Q      Handing you Government's Exhibits 4A, 5A, and 6.  Are

14   those reflected on the property custody receipt that you

15   signed for?

16   A      Yes, they are.

17   Q      And what are 4A, 5A, and 6?

18   A      They're referred to on here as jump drives, I call them

19   thumb drives but three thumb drives are contained in the bag

20   with the label.  006622.

21   Q      I'm handing you Government's Exhibit 3A, very heavy

22   laptop.  Does Government's Exhibit 3A appear anywhere on your

23   property custody sheet?

24   A      It's number 1 indicated, Toshiba laptop, bearing OPP

25   label 006618.  Consistent with the document.

Paul Thompson – Direct

322

1    Q     And finally, handing you Government's 7, does

2    Government's 7 show up anywhere on that property sheet?

3    A     Yes, it does, Compaq laptop, and it's bearing OPP label

4    006619 which is consistent with the document.

5    Q     If you look at the top of 13A, that property receipt

6    form, there appears to be a cell phone reflected on that

7    form, is that right?

8    A     Correct.  Indicated item number 4, a Verizon cell

9    phone, bearing OPP label, indicated on here 006621 which

10   wasn't part of the previous four exhibits.

11   Q     If you look down at the bottom half of the form to

12   where you signed the property custody receipt, did you take

13   custody of the Verizon cell phone?

14   A     No.

15   Q     Why didn't you take custody of the Verizon cell phone?

16   A     It wasn't with the exhibits, which isn't uncommon.  The

17   procedure for conducting forensic examination on laptops and

18   thumb drives, they go to a separate area of the OPP forensic

19   lab.  Handheld devices such as cell phones go to another

20   area, generally taking longer to examine, it's not always

21   that they come back with these, exhibits come back to our

22   custody, generally because they're not finished with the

23   process of the actual device.

24   Q     What do you do with the property once you take it into

25   custody?

Paul Thompson - Direct                              323

1    A      I take it, I verify that all the items that I'm signing

2    for are physically there, I confirm who the officer in charge

3    of the case is, and I place it on a shelving unit within our

4    vault indicating that particular police officer.

5    Q      How is the vault secured?

6    A      Vault secured by locking and electronic swipe card.

7    It's programmed through our general security.

8    Q      Is that vault also located within a secured building?

9    A      Absolutely, yes, it is.

10   Q      How is the building itself secured?

11   A      It's our general headquarters building, only police

12   personnel is allowed behind the secured doors at the front of

13   the building.  This particular area is also on a secure

14   floor, the fourth floor, you need electronic credentials or

15   swipe card to access the main fourth floor of that building.

16   You need further credentials to get in our particular vault,

17   with electronic swipe card.

18              MS. CARROLL:  No further questions.

19              THE COURT:  Any cross?

20              MR. GOLDSMITH:  Yes, your Honor, thank you.

21        CROSS-EXAMINATION BY MR. GOLDSMITH:

22   Q      Mr. Thompson -- I'm sorry, Officer Thompson, you

23   receive the items on April 19th of 2010, is that correct?

24   A      Yes, sir.

25   Q      As the markation next to the dates says quitclaim;

Paul Thompson - Cross

324

1    could you describe what that means?

2    A     Yeah, quitclaim is normally in a situation when perhaps

3    a complainant or victim no longer wants custody of it.  This

4    was brought to my attention last night, quitclaim, it should

5    have been marked off as receipt, I'm in receipt of the item

6    and it was marked off quitclaim, in error by myself.

7    Q     Okay.  And does that document reflect who you received

8    the items from?

9    A     Not in this occasion, no.

10   Q     Now you stated that you were working in the Olean --

11   pronounce the name, Oleana (phonetic), is that the correct?

12   A     I think you mean Orillia, sir.

13   Q     Orillia headquarters of the OPP.  And that is a place

14   where a lot of the investigatory forensic work is performed?

15   A     For the OPP, yes, sir.

16   Q     Did you perform any forensic investigation on these

17   items after you received it?

18   A     No.

19   Q     Now do you have any knowledge as to where it had been

20   prior to the April 19th day that you received it?

21   A     Specifically, no.  Generally, it's the OPP forensic

22   lab, yes.

23   Q     All right, but you have no specific knowledge?

24   A     No, sir.

25   Q     And within the OPP headquarters, how many different

Paul Thompson - Cross                    325

1    officers are there like yourself, within the -- within your

2    particular division?

3    A      In the child sexual exploitation unit, there's 11

4    detective constables, two detective sergeants, and one

5    detective inspector.

6    Q      Is it within your roles and responsibilities for all of

7    you to take and receive evidence as indicated on Exhibit 13A?

8    A      If I can explain just a bit of procedure, what happens

9    in this particular case, a number of exhibits, the storage

10   facility in the forensic lab is small so they have a number

11   of exhibits that are moved over at once so it wouldn't be one

12   particular case that's moved over at that particular date and

13   time, sometimes 100 to 200 exhibits could come over simply

14   because it's a storage issue.

15   Q      Okay.  So then likely at the time that you received

16   these particular items, you may have been receiving up to

17   hundreds more of similar kinds of items?

18   A      It's possible, sir, yes.

19   Q      Okay.  And you probably then are engaged in hundreds of

20   investigations at any given time?

21   A      Well, when it comes to a particular property when they

22   transfer in property over to our office, come over in two or

23   three trollies at a time, make sure they're separated and I

24   sign and verify that the items listed on a particular report

25   such as the property report, they're all there and I simply

Paul Thompson – Cross                                        326

1    put it on the officer's shelf, just try to keep it very

2    organized when I do this.  That wouldn't be an uncommon time,

3    I do that six times a year so to speak.

4    Q     So on this particular day of April 19th of 2010, do you

5    recall performing any activity other than accepting these

6    particular items and placing them in the vault?

7    A     No, I don't, sir.

8    Q     Do you have any knowledge of any activities that you

9    performed related to those particular items after April 19th

10   of 2010?

11   A     I didn't touch them at all, sir.

12             MR. GOLDSMITH:  No further questions.

13             MS. CARROLL:  No redirect, your Honor.

14             THE COURT:  Thank you, you may step down.

15             THE WITNESS:  Thank you.

16                  (The witness was excused.)

17             THE COURT:  Everybody okay?  All right.  We're

18   going to do at least one more witness and then we'll give you

19   a break, go ahead.

20             MS. THOMSON:  The government calls to the stand

21   Detective Constable Kip Wohlert.

22             THE CLERK:  Good afternoon.  Please state your full

23   name and spell it for the record.

24             THE WITNESS:  Kip Wohlert, W-o-h-l-e-r-t, first

25   name Kip, K-i-p.

Kip Wohlert - Direct

1

2          K I P   W O H L E R T , called as a

3   witness and being duly sworn, testifies as follows:

4          DIRECT EXAMINATION BY MS. THOMSON:

5   Q     Good afternoon.

6   A     Good afternoon.

7   Q     Would you please introduce yourself to the members of

8   the jury.

9   A     Ladies and gentlemen, my name is Kip Wohlert.  I am a

10  detective constable with the Ontario Provincial Police in

11  Ontario, Canada.

12  Q     How long have you been with provincial police?

13  A     I'm in my 26th year of service.

14  Q     Can you please tell us about your position.

15  A     My position is with the child sexual exploitation unit,

16  it is housed in our general headquarters in Orillia in

17  Canada.  My specific duties are online luring, I do the

18  undercover online investigations.  Our unit is set up with a

19  number of investigators which investigate any internet-based

20  child exploitation, the possession, distribution,

21  manufacturing of images of child pornography and also of

22  luring.

23  Q     Is there a particular unit that you are involved with,

24  is it Project P; do you know what Project P is?

25  A     Project P is one of our original names of our unit, the

Kip Wohlert - Direct                                    328

1   unit now is called the child sexual exploitation unit, we

2   still go by our original name of Project P, the P standing

3   for pornography.

4   Q     Was it called Project P in 2009?

5   A     In 2009, we were called the child pornography section,

6   it's changed over the years.  When we have a new

7   commissioner, chief of police they sometimes like to change

8   the names on us.

9   Q     I want to direct your attention to May 29, 2009.  Did

10  you become involved in an investigation with a subject by the

11  name of Joseph Jenkins?

12  A     Yes, I did.

13  Q     How did you become involved in that investigation?

14  A     At approximately 4 p.m. on that date, I received

15  information that a person was being detained at the border

16  crossing, Thousand Islands, at Lansdowne.  I contacted the

17  border crossing and spoke with the Investigator MJ Vinette,

18  she provided information that was located on the computer

19  which formed grounds for me to start a criminal

20  investigation.  Based on that, I contacted the local uniform

21  police of jurisdiction and explained to them the grounds for

22  an arrest and criminal investigation.  Those officers came

23  and transported Mr. Jenkins to the Brockville detachment

24  which was the area for lockup.  I then created a, what is

25  called a show cause brief in Canada, it's a bail hearing, and

Kip Wohlert - Direct

329

1    information laying out the charges of possession and

2    importation of images of child pornography.

3    Q    Once you received that phone call, can you tell the

4    jury what you did?

5    A    I followed up by contacting the members of Canada

6    customs that had intercepted Mr. Jenkins, and based on the

7    information that they provided me, I had reasonable grounds

8    to believe that an offense had been committed.  I organized

9    the arrest and the bail hearing brief, I then started writing

10   a search warrant.  The items that were seized were placed

11   into a -- called the Queen's warehouse which is a locked

12   facility.  I formed up a search warrant which I took to a

13   justice on the 27th of May at 1:20 p.m. I presented my search

14   warrant to Justice -- I apologize to her because I'm going to

15   slaughter her name, Aubray Spring -- Springjinger (phonetic),

16   words to that effect, she reviewed the grounds for my search

17   warrant and at 2:50 p.m. authorized the search warrant.

18            On the 28th of May, I drove from my office to

19   the border crossing and attended to Superintendent Brady.  At

20   2:12 p.m. on that date, the superintendent took me to the

21   warehouse, the vault where I proceeded to take the exhibits

22   that were seized.  Those exhibits were removed from that

23   vault, secured by myself, and returned to our office in

24   Toronto.  Those exhibits remained in my custody until the

25   17th of June where I attended at our headquarters in Orillia,

1   our electronic crime section has an intake, those exhibits

2   were turned over to the intake.  On the 17th of June, the

3   electronic tracking system was not functional so they were

4   secured there.  I was advised on the 18th that the electronic

5   tracking system was operable and those items were logged into

6   the vault and then placed in cue for forensic examination.

7   Q     If I could approach the witness, show you Exhibit 13B.

8   Ask you if you recognize Exhibit 13B.

9   A     This exhibit on the top right-hand -- top left-hand

10  corner is the Ontario Provincial Police, that is a property

11  report that we use when logging in exhibits.  It has the file

12  number, which was assigned to this case, it lists out the

13  items that were seized from the Port of Lansdowne, year, it

14  states the date property received on here.  I will apologize,

15  it states the 24th of May which was actually the date of the

16  offense, not the date that I acquired the materials which was

17  on the 28th as part of my search warrant.  It's signed by

18  myself.  In the boxes below, it states different times of

19  when the items were received and moved.  Here on the 18th of

20  June, exhibit signed by Michel Boulay, detective sergeant,

21  E-crime, was moved on the 19th of April, 2010, by Detective

22  Sergeant Paul Thompson, and then item was removed from

23  E-crimes on the 31st of March, 2011 by myself.

24         MS. THOMSON:  At this time, your Honor, I would

25  offer into evidence Exhibit 13B.

Kip Wohlert - Direct                                    331

1          THE COURT:  Any objection to the document?

2          MR. GOLDSMITH:  No objection.

3          THE COURT:  It will be received.

4          MS. THOMSON:  If we could publish that, please.

5   Q     Looking at this form, where you had indicated there was

6   a date that you had noted incorrectly, was that the bottom

7   right-hand corner?

8   A     That is the bottom right-hand corner, it says the 24th

9   of May, and again, the items were seized as part of my search

10  warrant on the 28th, the 24th being the date of the offense.

11  It was just an oversight by myself.

12  Q     If we could go back up, please.  Right next to that

13  line where the date is, are those your initials?  You don't

14  need to highlight.

15  A     Right beside the CSES is our unit name, then there is

16  my signature, D/C is for Detective Constable and then 7253,

17  if you interpret my scratching, that is my badge number

18  assigned to me.

19  Q     At this time I'm going to approach the witness, your

20  Honor.  If you could take a look at exhibit -- Government

21  Exhibit 3A.  Is that the exhibit that you noted on Government

22  Exhibit 13B?

23  A     This is a Toshiba laptop as stated on line number 1,

24  Toshiba laptop, and you can see the numbers 006618, which

25  identifies as per the property report.

Kip Wohlert – Direct                                          332

1    Q      And so that's the item that you retrieved?

2    A      That is, yes.

3    Q      And I'm showing you now Government's Exhibit Number 8.

4    Ask you, is that the exhibit you also retrieved relative to

5    this investigation?

6    A      On line number 3, the Olympus camera and card,

7    Exhibit 006620.  Which corresponds with that Olympus camera.

8    Q      I'm now handing you Government's Exhibit 4A, 5A, and 6,

9    and can you tell me if those are the thumb drives that you

10   retrieved from CBSA?

11   A      Three jump drives, Exhibit number 006622, corresponds

12   line number 5, yes, that is correct.

13   Q      And Government Exhibit Number 7, could you also verify

14   that's the item that you retrieved and noted on Government

15   Exhibit 13B?

16   A      Line number 2, Compaq laptop, Exhibit Number 006619

17   which corresponds with one Compaq Presario.

18   Q      As part of this investigation, you retrieved these

19   items from the CBSA officers who initiated the investigation?

20   A      That is correct.

21   Q      And that's what you noted on the top half of

22   Exhibit 13B?

23   A      Yes.

24          THE COURT:  The jury's going to have a hard time

25   hearing you if you're standing up talking so close.

1          MS. THOMSON:  I'm done.

2          THE COURT:  Okay.

3    Q    I'll leave that there.  Once you retrieved those items

4    from CBSA, the items that are in front of you and you've just

5    given testimony about, where did you take them after you

6    retrieved them?

7    A    When these items were obtained from the vault, they

8    were secured in my vehicle, I have a lockbox.  Our unit

9    covers the entire province of Ontario other than some of the

10   larger municipal policing that had their own units so we

11   travel a great distance.  From our office to the border

12   crossing is approximately four hours' drive, so we travel all

13   over so we have a locked secure box in our vehicles for

14   exhibits.  These were obtained from the vault, returned to

15   our office, at that time they were in the city of Toronto,

16   they were secured until I was able to bring them up to

17   headquarters Orillia to our electronic crime section.

18   Q    So then once -- then you turned them into the

19   electronic crime unit, crime section?

20   A    Yes.  Once it's turned in, it is secured into their

21   vaults and then those exhibits along with all the other

22   exhibits that they're analyzing go into cue and then as the

23   cases proceed, then comes down to this case, then they're

24   retrieved and their forensic examination is done at that

25   time.

Kip Wohlert - Direct

334

1    Q     Now after you logged that evidence into the vaults, did

2    you have occasion to have further involvement with this case?

3    A     Once the exhibits are lodged into our electronic crime

4    section and then at certain points they are removed and

5    forensically examined, the data that is retrieved from that

6    forensic examination is then provided to me.  I then take

7    that data and place it into a software program that we have,

8    it's the initials at that time in 2009 C for P which is for

9    pictures, C for M which is for movies.  This software assists

10   us in categorizing the images that are located.  These images

11   are then viewed and then placed into one of six different

12   categories.  These categories are number 1, child

13   pornography; number 2 is child nudity; number 3 is child,

14   other; number 4 is adult pornography; number 5 is obscenity;

15   and number 6 is other.  In that software, there are

16   categories 7, 8, and 9, which are blank.  I use category 7

17   sometimes for a court presentation, if I have a large number

18   of images, those aren't available to show all the images at

19   court, so I'll take a sampling of an entire collection and

20   show maybe between 50 and 100 images.  Category 8, I've used

21   for an investigative file, if there's something that catches

22   my eye that's saying I need to look further into this image,

23   I'll place it into that category; and category 9 I use

24   sometimes if there are maps on the computer just in case that

25   corresponds with something else that I locate on the

Kip Wohlert - Direct                    335

1    computer.

2    Q     I'm going to take you several steps back, okay.  When

3    you began this investigation, after you retrieved the

4    evidence, were you given an image of that evidence, were you

5    provided with an image copy of that evidence?

6    A     What I received from the electronic crime section is an

7    image copy of the hard drive or other exhibit, that comes to

8    me in a folder, and I use that folder, the data from there,

9    it goes into the software that we categorize.

10   Q     Would that include an image for the Toshiba laptop,

11   Compaq laptop, and the thumb drives?

12   A     That is correct.

13   Q     And so do you do some type of work off of that image?

14   A     Off of the image side that's provided to me, that's

15   where all the images or movie clips are and then that goes

16   into the software which allows us to categorize and it's just

17   a large folder with everything in there and then from there I

18   just piece and place things into whichever category is

19   appropriate.

20   Q     To perform your job in presenting cases under Canadian

21   law, do you then take and review items off of that image copy

22   and categorize them according to Canadian law of whether or

23   not they meet the definition of Canadian law for child

24   pornography?

25   A     Yes, category 1 is for child pornography, we have a

Kip Wohlert - Direct

1    criminal code which states out what the definition of

2    pornography -- child pornography is in Canada.  When the

3    image data is put into the software, images have what is

4    known as a hash value, it's like electronic serial number to

5    that image.  No two images can have the same hash value, so

6    it's kind of like the DNA of that image.  So using a -- those

7    hash values, this program can pre-categorize some images that

8    have been previously categorized in other investigations.  So

9    on completion of categorizing all of the images, I would then

10   go back into category 1 because that's the only category

11   which is a criminal offense, and review the images to see

12   that I'm comfortable with what images are placed in there.

13   Q    With regard to your involvement in this case, were you

14   consulted as a computer forensic expert?

15   A    I am not a forensic expert, I am a police investigator,

16   so I get this information, this data, from the forensics

17   units, I have training on viewing images and categorizing it

18   as per the Canadian law, and then within our unit, we have a

19   working methodology that when you view images, especially

20   when you get into the teens because of the development of the

21   teen body, puberty is about benchmark so prepubescent is

22   classified as child pornography in Canada.  When we get into

23   the pubescent, the puberty stages of development, that is

24   usually given credit to the accused that it's classified as

25   an adult, unless it's a known person that we know is under

Kip Wohlert - Direct                                    337

1    the age of 18, but if you look at a female, specifically

2    females that are into the mid-teens and that, to say with the

3    development of the body, there's certain things we look at

4    whether or not that is, so if there is a question, then it is

5    classed as an adult, that's how we do it in Canada.

6    Q    As your involvement in this case went forward, did you

7    become involved in a trial of the matter of Joseph Jenkins?

8    A    Yes.

9    Q    Were you called to come to court for a trial of Joseph

10   Jenkins?

11   A    Yes.

12   Q    Was that in September of 2010?

13   A    That is correct.

14   Q    Did you appear for that trial in September 2010?

15   A    I appeared for the trial in September 13th, 2010.

16   Q    At that trial was a motion made by defense?

17   A    Defense counsel brought forward a charter application

18   that the accused charter was breached, the trial was heard

19   and at that time the presiding judge deemed that there were

20   no breaches incurred.

21   Q    And then was a subsequent trial date set for October of

22   2010?

23   A    That is correct.

24   Q    Did you attend that trial?

25   A    I attended at that time as well.

Kip Wohlert - Direct                                    338

1    Q    Was the defendant present for that trial?

2    A    At that time, the accused before the court did not

3    appear.

4    Q    Did the court issue a bench warrant as a result of his

5    failure to appear?

6    A    As I attended on that date, procedure in Canada is to

7    call the name three times on the PA system, there was no

8    response.  Defense counsel could not offer any reason why the

9    accused was not before the court, and the judge then issued a

10   bench warrant for Mr. Jenkins.

11   Q    I'm going to approach and hand you Government's

12   Exhibit Number 16, ask you if you recognize Government

13   Exhibit Number 16.

14   A    What I have before me is on the top, a warrant for the

15   arrest [bench warrant] in the name of Joseph Vincent Jenkins,

16   22nd of January 1970 is his date of the birth, town of

17   Geneva, state of New York.  The offense on the 24th of May,

18   2009, port of entry, Lansdowne, the offense is listed of

19   possession, importation under the Criminal Code and two

20   Custom Act charges as well.  And listed here, failed to

21   attend court on October the 18th, 2010 at 10 a.m. in

22   courtroom number 3 at 41 Courthouse Square, Brockville,

23   Ontario for his trial, dated the 18th of October, 2010 at the

24   city of Brockville, and it is signed by Justice Waugh.

25   Justice Waugh was the judge that was hearing this matter and

Kip Wohlert - Direct

1    I was in attendance at this time.

2    Q    The item that's in your hand, did you retrieve that

3    from the court?

4    A    I requested from the court to have a certified copy,

5    this has been stamped and signed as a certified copy of the

6    bench warrant.  The original bench warrant which I observed

7    yesterday had the attachment is a copy here and I retrieved

8    this and brought it to court.

9              THE COURT:  Brought it to this court?

10             THE WITNESS:  This court, yes, your Honor, this

11   court.

12   Q    After that October 2010 trial date, did you then notify

13   American authorities of the fact that a bench warrant had

14   been issued for Joseph Jenkins?

15   A    Once the bench warrant was issued, I contacted Homeland

16   Security to inform them that a citizen in their area was

17   arrested and charged with the offenses of possession of child

18   pornography, this is who this person is, this is where he

19   resides and of any interest for, again, the criminal offense

20   of -- any offense against a child is quite serious, and so I

21   notified them if they were interested in obtaining any

22   further information or anything from my case that they could

23   review.

24   Q    I want to direct your attention now to March 31 of

25   2011.  On that date, did you retrieve evidence relative to

Kip Wohlert - Direct                          340

1    this case?

2    A       On that date, I retrieved the exhibits before me here,

3    from our vault, and then I attended our electronic crime

4    section to obtain the cell phone which is also here.  In our

5    electronic crime section, there are two units, there's the

6    mobile device unit that reviews like cell phones and iPads

7    and things like that, and then the crime section which deals

8    with the storage devices and laptops and computers.  So

9    exhibits are in two separate areas within the vault.  So when

10   this stuff was retrieved, it was in our vaults, and then I

11   went back to get the cell phone which was still at the

12   electronic crime section of the vault.

13   Q       Once you retrieved those items, what did you do?

14   A       They were secured in my vehicle until I could meet with

15   Special Agent Chad ... Willard and hand them over to him.

16   Had to pause there for his last name.

17   Q       What day did you turn them over to him?

18   A       That was on the 1st of April, the next day.

19   Q       And on April 1, 2011, did you turn over to Agent Chad

20   Willard a Toshiba laptop, Compaq laptop, an Olympus camera

21   and card, Verizon cell phone, and three thumb drives?

22   A       Yes, I did.

23   Q       Is that the evidence in front of you?

24   A       The evidence in front of me.

25           MS. THOMSON:  I have no further questions.

Kip Wohlert – Cross                                    341

1          THE COURT:  Any cross?

2          MR. GOLDSMITH:  Yes.

3          CROSS-EXAMINATION BY MR. GOLDSMITH:

4     Q    Officer Wohlert, I'll give you a minute to drink.

5     A    Thank you.

6     Q    What was your role in the investigation?

7     A    My role in this -- my role in this investigation is as

8     an investigator to view what images were located, to see if

9     they fit within the Criminal Code definition and then form

10    together the brief to bring this matter to court to be heard.

11    Q    So essentially you evaluated the evidence once it had

12    been imaged, is that correct?

13    A    That is correct.

14    Q    So you yourself did not perform any of the forensic

15    imaging?

16    A    I am not a forensic person, I am not super technology

17    inclined.  I have a scope of investigation.

18    Q    All right.  You don't know who exactly performed the

19    imaging?

20    A    The imaging was performed by Detective Sergeant Mike

21    Harrington.

22    Q    When did you learn that Detective Sergeant Harrington

23    had performed the imaging?

24    A    I received the data back in September 2009 and as a

25    result of the work by Detective Sergeant Mike Harrington.

Kip Wohlert - Cross                                    342

1    Q      And you took that imaging to then perform your duties

2    in relation to evaluating it, correct?

3    A      That is correct.

4    Q      Now, you asked -- answered some questions a few moments

5    ago about proceedings in September of 2010 in which you were

6    called, is that correct?

7    A      That is correct.

8    Q      All right.  And you testified about a defense motion at

9    that time, is that correct?

10   A      That is correct.

11   Q      And at that time, had your office provided disclosure

12   of its findings to the defense counsel?

13   A      That is correct.

14   Q      Wasn't that the basis of defense counsel's motion at

15   that time?

16   A      The motion that was brought, the charter argument that

17   was brought is the time that it took for that disclosure to

18   be brought to courts and then disclosed to defense lawyer.

19   Q      Essentially it was that it took too long to do, is that

20   the reason for everybody being in court that day?

21   A      The court matter was to hear that, and the judge made a

22   decision that there was no such breach.

23   Q      Now, you testified that you had been notified of

24   Mr. Jenkins' arrest, April 24th, 2009, is that correct?

25   A      Sorry?

Kip Wohlert - Cross                                    343

1    Q     I'm sorry, May 24th, 2009.

2    A     Yes, that is correct.

3    Q     And it was part of your job to draw up paperwork as

4    part of the arrest process and the bail hearing, is that

5    correct?

6    A     Because the province is large and we drive all over,

7    sometimes it's not physically able to be -- from where I

8    resided to the border crossing is approximately four hours

9    drive, to drive down for a court hearing, drive back and

10   drive down for the proceeding, court hearing sometimes is

11   not -- we rely on other officers to assist us.

12   Q     Okay, but you did testify it was part of your

13   responsibilities to draw up that paperwork?

14   A     Yes, and I created those briefs.

15   Q     Okay.  You also testified that within the following

16   couple of days you traveled down to Lansdowne to receive the

17   evidence, is that correct?

18   A     That is correct.

19   Q     All right.  And at the time that you received the

20   evidence at Lansdowne, you placed them in a secure box in

21   your vehicle and drove it back to Toronto?

22   A     That is correct.

23   Q     And are you based out of Toronto or are you based out

24   of headquarters?

25   A     In 2009, our office was in Toronto.  Since then we have

Kip Wohlert - Cross                                        344

1      moved up to headquarters.  The building that we were in at

2      that time is now a parking lot.

3      Q      When you retrieved the items, you brought them back to

4      Toronto for safekeeping, is that correct?

5      A      That is correct.

6      Q      And you transferred them to the forensics unit?

7      A      I transferred them to the forensics unit, yes.

8      Q      Do you recall when you transferred them to the

9      forensics unit?

10     A      On the 17th of June I brought the exhibits to the

11     forensic unit, at that time they were lodged in that unit.

12     Q      You said the 17th of June?

13     A      17th of June they were physically brought up, on the

14     sheet it states the 18th of June, that's when the electronic

15     tracking device actually logged them into the system.

16     Q      All right.  So one would hand write into the voucher

17     forms when the electronic tracking devices kick in?

18     A      No, those -- that was written on there, there's a

19     tracking system that's placed on the bar codes and stuff and

20     the numbers that's placed into electronic tracking system.

21     That wasn't available on the 17th, it was placed in the next

22     day and then that was handwritten in on that form.

23     Q      Okay.  So in other words, even though you brought it up

24     on the 17th, had to be listed as being received on the 18th?

25     A      That's what's on the form is listed on the 18th.  I'm

Kip Wohlert - Cross

345

1    saying that it was brought up, secured in their offices and

2    then logged in with the device.

3    Q     But there's no record of that one-day lapse?

4    A     In my notes I have that written and that is my

5    recollection from what had occurred.

6    Q     But not on the voucher form, correct?

7    A     On the property form it is stated the 18th of June.

8    Q     Now, between the 18th of June of 2009 and March 31st of

9    2011, were you in possession of any of the materials that

10   were vouchered?

11   A     Between those dates?

12   Q     Yes.

13   A     The exhibits themselves I was not, no.

14   Q     You were in possession of the image, is that correct?

15   A     The image that was forensically obtained is what I

16   worked off of, yes.

17   Q     You recall when you received that image?

18   A     2nd of September, 2009.

19   Q     Do you recall who you received it from?

20   A     Detective Sergeant Mike Harrington.

21   Q     March 31st of 2011, you obtained the original items

22   that were secured at headquarters, correct?

23   A     That is correct.

24   Q     And on the voucher form were you supposed to list out

25   every number corresponding to the items that you took?

Kip Wohlert – Cross                                    346

1    A      On the form, there is one exhibit number that is the

2    cell phone that was obtained from electronic crime section,

3    the other exhibits were in our vault and I obtained those off

4    of my shelf.

5    Q      Okay.  So the physical items then traveled from the

6    electronic crimes unit into your particular unit, is that

7    correct?

8    A      That is correct.

9    Q      All right.  And that's not reflect -- that travel was

10   not reflected on Exhibit 13B that you testified, the voucher

11   form that you testified about a few minutes ago?

12   A      May I see that form?

13   Q      Sure.

14          MR. GOLDSMITH:  May I approach.

15          THE COURT:  You may.

16   A      So again your question, please, sir.

17   Q      The travel of the laptops and the flash drives, camera

18   and camera image card from the electronic unit to your

19   particular unit is not reflected on that voucher?

20   A      It states here on the 19th of April 2010 that it was

21   removed from the electronic crime section by Detective

22   Sergeant Paul Thompson and he moved that into our vaults and

23   placed on my shelf.

24   Q      And then that would then reveal that the one remaining

25   unit was the cell phone?

1   A     The cell phone remained in the electronic crime

2   section.

3   Q     And that's why on that form you only list the one

4   serial number?

5   A     That is correct.

6              MR. GOLDSMITH:  May I approach?

7              THE COURT:  You may.

8   Q     Now as part of the process or investigating this

9   particular matter in Canada, were you charged with

10  maintaining these particular items until the case was closed?

11  A     The items remain in police custody as part of a court

12  order.

13  Q     Well, within your roles and responsibilities were you

14  charged with the responsibility of oversight to ensure that

15  the items were safe kept until the close of the case?

16  A     That is correct.

17  Q     And as you testified to a few moments ago, you then

18  brought the items to a member of United States law

19  enforcement, is that correct?

20  A     That is correct.

21  Q     At this point you took the items, you placed them in

22  the safe box in your vehicle and drove them to the U.S.

23  border, is that correct?

24  A     That is correct.

25  Q     Is that where you met with the U.S. law enforcement

Kip Wohlert - Cross                                      348

1    agencies?

2    A      I apologize, I don't recall exactly where we met.

3    Q      Okay.  But you then did hand them directly to U.S. law

4    enforcement?

5    A      That is correct.

6    Q      And that event was precipitated by your phone call to

7    U.S. law enforcement after the issuance of the bench warrant

8    in Canada, correct?

9    A      Correct.

10   Q      Approximately how long between that phone call by you

11   until the day where you delivered those items to U.S. law

12   enforcement?

13   A      I don't recall that, that time frame.

14   Q      In addition to the physical evidence of the laptops and

15   the flash drives, et cetera, did you provide any paperwork to

16   U.S. law enforcement officials?

17   A      I don't recall but I believe that there has been some

18   paperwork that was associated with the investigation that was

19   also turned over.

20   Q      Okay.  At that time in March 31st of 2011, excuse me,

21   did you provide a copy of any of your findings from your

22   investigation?

23   A      I would have provided the charts that -- the software

24   that I used to categorize the images.

25   Q      And did you provide -- withdrawn.  When you said that

1    there are charts, so does that constitute a final report of

2    your findings?

3    A     The reports and charts that we have that the software

4    creates as we use it to categorize the line where all those

5    images fall.  Within those charts there were still

6    approximately 10,000 images that were not categorized.

7    Q     Okay.  Within -- withdrawn.  If you recall it, do you

8    recall approximately how many images were classified by the

9    software as category 1?

10   A     There were a number of exhibits and in different

11   exhibits there were different numbers, the exact ones I can't

12   recall.  I can say that on one of the flash drives there was

13   in excess of 1600 images located.  On some of the other items

14   there were one or -- I remember 13 on one specific item,

15   which one it falls into, I'd have to refer to my charts.

16   Q     That were specifically categorized as category 1?

17   A     What I categorize as pertaining to Canadian law, that's

18   how it fell into category 1.  The other categories are

19   noncriminal so category 1 is all that we determined.

20   Q     And again that's -- that was based upon your particular

21   evaluation, correct?

22   A     The evaluation as per Canadian law and the training and

23   expertise that I have within our unit.

24   Q     Based upon the imaging that had been done by Detective

25   Sergeant Harrington, correct?

Kip Wohlert - Cross                                350

1    A       That is correct.

2    Q       Detective Sergeant Harrington produced a report related

3    to his imaging?

4    A       Detective Sergeant Harrington would produce a forensic

5    report on what he had completed.  That's not something that I

6    can read and understand, it's a lot of technical stuff.  I

7    receive the images and I do what my job specifies.

8    Q       You testified earlier that you are not a forensic

9    expert, is that correct?

10   A       That is correct.

11   Q       Within your role and responsibility at the Ontario

12   Province Police, have you received any special training

13   regarding computers?

14   A       We have computer training, yes.  Forensic based, no.

15   Q       So even as an investigator charged with evaluating

16   items removed from computers, you have not been given any

17   specific computer training?

18   A       Not in regards to forensic examination, no, I have not.

19   Q       So, if forensic -- withdrawn.  One moment.

20              Just a couple more questions, Officer Wohlert.

21   Are you aware of any other items in addition to those listed

22   on the voucher that you signed off on that were taken from

23   Mr. Jenkins at the time of his stop and arrest?

24   A       There are some other items and they remain in the

25   vaults of our general headquarters as per the court order.

Kip Wohlert - Cross                                    351

1    Q     Those other items still are there today?

2    A     The items are there, yes.

3    Q     Okay.  To your knowledge, was there ever a file

4    forensic report produced by your office?

5    A     If you can specify my office as in the categorization

6    imaging that I would do or are you saying forensic as in

7    from --

8    Q     By your specific office.

9    A     There is still just over 10,000 images that have not

10   been categorized.  They have not been categorized because

11   they're ones that have to be individually viewed to determine

12   where they fall in the categories.  Sometimes it is just

13   physically impossible to go through all images and in this

14   particular case, we were at a saturation point of --

15   Q     Let me stop you, all right.  A specific answer to my

16   question is, was there ever a final report that was generated

17   by your office?

18   A     There is not a final report of a completed

19   categorization.

20   Q     Okay.  Was there ever a final report generated by the

21   forensics department of the Ontario Province Police?

22   A     That is a question I'm not in a position to answer.  I

23   don't know.

24   Q     Okay.  Since you handled the materials on March 31 of

25   2011, have you seen the materials prior to today?

Kip Wohlert - Redirect                                    352

1    A     I have not.

2          MR. GOLDSMITH:  No further questions.

3          REDIRECT EXAMINATION BY MS. THOMSON:

4    Q     You were asked a bunch of questions about a person by

5    the name of Mike Harrington.  What unit did he work in

6    Ontario Provincial Police in May of 2009?

7    A     In May of 2009, Detective Sergeant Mike Harrington

8    worked as a forensic investigator with electronic crime

9    section.

10   Q     Would that be the same section as Michel Boulay?

11   A     Same section as Detective Sergeant Boulay.

12   Q     Is he presently working?

13   A     Sergeant Harrington?

14   Q     Sergeant Harrington, yes.

15   A     Sergeant Harrington is not working right now.

16   Q     What is his status with regard to work, is he -- is he

17   out for any particular reason?

18   A     Sergeant Harrington is on long-term sick leave right

19   now.

20   Q     When you turned those items over, you were asked

21   about -- turned the items that were shown to you over, did

22   you turn them over to Agent Chad Willard?

23   A     That is correct.

24   Q     And you were asked about the images that you did

25   include and whether you had come up with a final report, you

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Kip Wohlert – Redirect                                      353

1    indicated you had found I believe in excess of 1600 images?

2    A     On this specific jump drive I did.

3    Q     But you did not continue your investigation because you

4    indicated you had reached a point of saturation.  What do you

5    mean by that?

6    A     In Canada, there is -- in this particular one we had in

7    excess of 1600 images.  Continuing through the 10,000

8    outstanding images, if there was another 500 or another

9    thousand images, the point's been made, it's a large

10   collection of child pornography, whether it's 1600, whether

11   it's 2,000, it's still a large collection of child

12   pornography.

13   Q     And you were also just asked about whether all the

14   items were contained on Exhibit 13B that you were previously

15   shown, did you also receive, OPP that is, receive CDs

16   relative to this investigation?

17   A     There were six CDs also seized, those were reviewed by

18   me and there was nothing illegal contained on those CDs.

19   Q     So did you keep them in OPP custody?

20   A     Those items and all items seized when we execute any

21   search warrants, we're required by law to make a report to

22   the signing justice to say this is what we've seized, he then

23   signs an order saying that those items will remain in police

24   custody until completion of all court proceedings.

25   Q     I have the same question with regard to Belkin wireless

Kip Wohlert - Recross                    354

1    notebook card, was that given to you as part of this

2    investigation?

3    A     That is correct.

4    Q     And was that turned over to Chad Willard?

5    A     No, that remains in my custody.

6    Q     Why wasn't it turned over to Chad Willard?

7    A     There is nothing illegal on that device, there's no

8    evidentiary value to it.

9              MS. THOMSON:  I have nothing further.

10             THE COURT:  Any further cross?

11             MR. GOLDSMITH:  Briefly.

12             RECROSS-EXAMINATION BY MR. GOLDSMITH:

13   Q     You said Sergeant Harrington, Detective Sergeant

14   Harrington is on long-term sick leave, is that correct?

15   A     That is correct.

16   Q     You have the ability to contact him?

17   A     I personally do not, no.

18   Q     Does your office, meaning the OPP, have the ability to

19   contact him?

20   A     I would imagine that they would, yes.

21   Q     Now you just testified on redirect about your

22   obligations to maintain the items that were seized until the

23   end of all proceedings in the case in Canada, is that

24   correct?

25   A     That is correct.

Kip Wohlert - Recross                                    355

1  Q    Now you testified earlier on cross-examination that you

2  had, as well as on direct, that you had contacted United

3  States law enforcement when the bench warrant was issued by a

4  judge in Canada, is that correct?

5  A    That is correct.

6  Q    So upon the issuance of the bench warrant, that was the

7  close of all proceedings?

8  A    That is not correct.

9  Q    All right.  So then if you are obligated to maintain

10  the evidence until the close of all proceedings, were you

11  directed by the supervisors to transfer the evidence to

12  United States law enforcement?

13  A    I was not directed by any of my supervisors, no.

14  Q    Were you directed by any members of the Crown's

15  prosecution?

16  A    I was not directed by anyone from Crown prosecution.

17  Q    To your knowledge is there still an open case?

18  A    There is an outstanding bench warrant for Mr. Jenkins'

19  arrest to return to complete the Canadian trial.

20       MR. GOLDSMITH:  No further questions.

21       MS. THOMSON:  Just one quick follow-up.

22  FURTHER REDIRECT EXAMINATION BY MS. THOMSON:

23  Q    With regard to Mr. Harrington, is he expected to return

24  to work?

25  A    I am unaware of that, I know that he's on long-term

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

356

1    sick.

2              MS. THOMSON:  That's it.

3              THE COURT:  Anything else?

4              MR. GOLDSMITH:  Nothing.

5              THE COURT:  Okay, thank you, sir, you may step

6    down.

7              THE WITNESS:  Thank you, your Honor.

8                  (The witness was excused.)

9              THE COURT:  Okay, ladies and gentlemen of the jury,

10   we're going to take a break, an afternoon break of about 10

11   minutes, try and get you back out here about 3:10, it's

12   almost 3:00 now.  Go ahead, stretch out, and please don't

13   discuss the case, we'll see you in a few minutes.

14                  (Jury Excused, 2:57 p.m.)

15             THE COURT:  Okay, we'll stand in recess for about

16   10 minutes.

17                 (Court in recess, 2:57 p.m. to 3:24 p.m.)

18                 (Open Court, Jury Out.)

19             THE COURT:  Let's bring in the jury.

20   Mr. Goldsmith, you're ready, sir?

21             MR. GOLDSMITH:  Yes.

22             THE COURT:  Okay.  We're going to get started.

23                 (Jury Present.)

24             THE COURT:  Okay, the record should reflect we have

25   the ladies and gentlemen of the jury after a nice long break,

Chad Willard – Direct                                    357

1    double than what I told you at the time, so hopefully that

2    got you good and refreshed for the rest of the afternoon, and

3    we're going to continue with the government's case.  Go

4    ahead.

5            MS. THOMSON:  Thank you, your Honor.  The United

6    States calls to the stand Special Agent Chad Willard.

7            THE CLERK:  Good afternoon.  Can you state your

8    full name for the record, please.

9            THE WITNESS:  Chad Jeremy Willard.

10

11           C H A D   J .   W I L L A R D , called as

12   a witness and being duly sworn, testifies as

13   follows:

14           <u>DIRECT EXAMINATION BY MS. THOMSON:</u>

15   Q    Good afternoon.

16   A    Good afternoon.

17   Q    Could you please introduce yourself to the members of

18   the jury.

19   A    My name's Chad Willard, I'm a special agent with

20   Homeland Security Investigations in Alexandria Bay, New York.

21   Q    How long have you been a special agent?

22   A    Since August 6, 2006.

23   Q    And always with Homeland Security?

24   A    Yes, correct.

25   Q    Could you describe briefly some of your duties and

Chad Willard – Direct

358

1    responsibilities?

2    A    I investigate crimes against the United States

3    government that have to do with immigration and customs

4    enforcement mostly and the laws related to immigration and

5    customs.

6    Q    Is there a particular area that you spend a lot of your

7    time on?

8    A    Yes, I've primarily focused on child exploitation

9    investigations over the last two and a half, three years.

10   Q    Child exploitation, would that include crimes involving

11   child pornography?

12   A    That would.

13   Q    Did you become involved in an investigation regarding

14   Joseph Jenkins?

15   A    Yes, I did.

16   Q    How did you become involved in that investigation?

17   A    I received a call from Special Agent Matt Myers

18   notifying me that an incident had happened up in Canada and

19   that there was a gentleman who didn't return to face justice

20   in Canada and that there's potential for us to bring him to

21   justice in the United States.

22   Q    Was an investigation opened?

23   A    It was.  My investigation was opened in March of 2011.

24   Q    Were you the agent in charge of that investigation?

25   A    Yes, I was the lead case agent.

Chad Willard – Direct                    359

1    Q      As part of your investigation, did you seek to obtain

2    physical evidence from Canada?

3    A      Yes, I did.

4    Q      What evidence did you seek to obtain?

5    A      There was a Toshiba laptop, Compaq laptop, several

6    thumb drives, three, and there was Motorola cell phone, and

7    a -- help me here.  I forget what the last item was.

8    Q      Were those items that were identified to you in the

9    course of learning about the investigation that may be

10   involved in incidents of child pornography?

11   A      Yes.

12   Q      At this time I'm going to approach the witness and hand

13   the witness Government's Exhibit Number 12.  I'm going to ask

14   you if you recognize Exhibit Number 12, please.

15   A      I do recognize Exhibit 12.

16   Q      What is Exhibit 12?

17   A      Exhibit 12 is our custody receipt and seized property

18   in evidence form, we call it a Form 6051S for seized

19   property, it is line items 3 through 7 which are the

20   8-gigabyte Attache thumb drive, 4-gigabyte Attache thumb

21   drive, 2-gigabyte Attache thumb drive, Olympus camera, and

22   Verizon Motorola cell phone.  In addition, line item 1 on the

23   second page is a Toshiba laptop and line item 2 on the third

24   page is a Compaq laptop.

25   Q      Are those items that came into the custody of the

Chad Willard – Direct                    360

1    Department of Homeland Security?

2    A      Yes, on -- they were seized by the Department of

3    Homeland Security on April 1st, 2011.

4    Q      Did you receive them on behalf of the Department of

5    Homeland Security?

6    A      Yes, I did.

7    Q      Who did you receive them from?

8    A      Kip -- Detective Sergeant Kip Wohlert of the Ontario

9    Provincial Police.

10   Q      At this time I'm going to hand you a bunch of

11   government exhibits.  If you could start with the first

12   government exhibit and my question for you, if you could

13   identify the government exhibit, identify if that's noted on

14   Government Exhibit Number 12.

15   A      So I will go through line item 1 through 7.  Line item

16   1 is the Toshiba laptop, and this is the Toshiba laptop that

17   I received from Kip Wohlert at the Port of Lansdowne on

18   April 1st, 2011 and this is the bag I created with it with my

19   handwriting on it.

20   Q      Have you reviewed that item?

21   A      Yes.

22   Q      Is that the same item that you recovered from Kip

23   Wohlert?

24   A      It is the exact item, yes.

25   Q      And if you could continue with each item.

Chad Willard – Direct                              361

1           THE COURT:  Exhibit numbers as you go, please, for

2    the record.

3    Q     Can you -- if you could tell us what the exhibit number

4    is.

5    A     Sure.

6           THE COURT:  The Toshiba laptop, what's the exhibit

7    number?

8           THE WITNESS:  That is Exhibit 3A.

9           THE COURT:  Okay.

10   A     And now I'm on my line item number 2 which is

11   Government Exhibit 7, and it is the Compaq laptop, and this

12   is the Compaq laptop that I received from Kip Wohlert on

13   April 1st, 2011 at the Port of Lansdowne, Ontario.  Line item

14   3 is the 8-gigabyte thumb drive, Government Exhibit 4 --

15   let's just do all the jump drives at once, 4A, 5A, and 6, 6

16   is going to be the 2-gigabyte thumb drive, this is the

17   2-gigabyte thumb drive I received from Kip Wohlert and the 8

18   and the 4 on April 1st, 2011 in Lansdowne, Ontario.

19   Q     And those particular exhibits are contained in the bag

20   that has which government exhibits noted on them?

21   A     4A, 5A, and 6.  And Government Exhibit 8 is a Olympus

22   digital camera, and this is the camera and the bag that I

23   created on April 1st, 2011, when I received that from Kip

24   Wohlert.  And this is the Verizon Motorola cell phone,

25   Exhibit Number -- bag is missing for, camera.  Yes, this is

Chad Willard – Direct                              362

1   the bag, my handwriting, and that's Government

2   Exhibit Number 9.

3            THE COURT:  And that is again the phone?

4            THE WITNESS:  This is the Motorola cell phone that

5   I received from Kip Wohlert, OPP, April 1st, 2011, Lansdowne,

6   Ontario.

7   Q    Did you create the receipt reflecting that you had

8   received these items?

9   A    Yes, I did.

10            MS. THOMSON:  At this time, your Honor, the

11   government would move into evidence Government

12   Exhibit Number 12.

13            THE COURT:  That's the form, any objection?

14            MR. GOLDSMITH:  Brief voir dire, your Honor?

15            THE COURT:  Go ahead.

16   VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

17   Q    Special Agent Willard, you filled out this form

18   yourself?

19   A    Yes, I did.

20   Q    You filled it out on April 1st, 2010 -- I'm sorry,

21   2011?

22   A    2011, correct.

23   Q    And the items that are noted both -- on all three pages

24   have corresponding serial numbers to labels placed on the

25   bags, on the evidence bags of those items, is that correct?

Chad Willard – Direct                                363

1   A     No, the serial numbers that are listed above the

2   description would be the actual serial numbers for the device

3   like the serial number on the Toshiba, the serial number on

4   the Compaq, and you can see like the thumb drives which do

5   not contain serial numbers don't have any serial number

6   listed.

7   Q     And within your roles and responsibilities as a special

8   agent and case agent on this matter, have you held custody of

9   the original voucher in this particular matter?

10  A     This original document?

11  Q     Yes.

12  A     Yes, I have.

13        MR. GOLDSMITH:  No further questions.  No

14  objection.

15        THE COURT:  It will be received.

16        CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

17  Q     If we could publish Exhibit 12, please.  Is this your

18  custody receipt showing that you received those items of

19  evidence that you've just given testimony on?

20  A     Yes, it is.

21  Q     Once you had the evidence in your possession, did you

22  take any other steps with regard to furthering an

23  investigation involving Joseph Jenkins?

24  A     Yes, I did, I wrote a search warrant for the items that

25  I received from Kip Wohlert.

Chad Willard – Direct                                    364

1    Q    What was the purpose of that search warrant?

2    A    To be able to forensically examine the computers and

3    other digital media received from Kip Wohlert.

4    Q    And just to go back a moment, Exhibit Number 12, is

5    that a three-page exhibit?

6    A    Yes, it is.

7    Q    If we could just briefly show page 2 and page 3.

8    Page 2, does that reflect the Toshiba laptop?

9    A    Yes, it does.

10   Q    And if we could see page 3, does that reflect the

11   Compaq laptop?

12   A    Yes, it does.

13   Q    So that custody receipt is for all of the evidence that

14   you received?

15   A    That is correct.

16   Q    Now I think where I just cut myself off on was the

17   search warrant I believe you indicated you sought?

18   A    Yes.

19   Q    Okay.  Tell us what steps you took in your

20   investigation.

21   A    I drafted a search warrant and submitted it to United

22   States Attorney's office who maybe refined it a bit and then

23   I took it before federal magistrate on July 6, 2011, in this

24   building.

25   Q    And did that give you authorization to search all of

Chad Willard – Direct

1    the electronic media that is in front of you?

2    A    It was signed by the federal magistrate and authorized,

3    correct.

4    Q    Once that search warrant was signed, authorizing a

5    search of those items, did you take the items, did you keep

6    them into Homeland Security custody?

7    A    Yes.  They went to Computer Forensic Agent Brian

8    Braisted for examination along with the copy of the search

9    warrant.

10   Q    At that point then was all of the evidence turned over

11   to Brian Braisted?

12   A    Yes, it was.

13   Q    And he's also employed by the Department of Homeland

14   Security?

15   A    Yes, he is.

16   Q    Did there come a point when you had an opportunity to

17   be face to face with the defendant, Joseph Jenkins?

18   A    Yes, on October 4th of 2011, myself and colleagues

19   executed an arrest warrant with the defendant.

20   Q    As part of that arrest warrant, did you take him into

21   custody?

22   A    Yes, I did.

23   Q    When you took him into custody, did you have an

24   opportunity to speak with Joseph Jenkins?

25   A    Yes, I did.

Chad Willard – Direct                                366

1    Q      And tell us where you spoke with him.

2    A      A tiny bit in his home as we secured him and then

3    mostly in transporting him from Geneva, New York to this

4    building for his initial appearance in court.

5    Q      During that process that you've described, the total

6    time that you were with Joseph Jenkins, did you have the

7    opportunity to hear his voice?

8    A      Yes, I did.

9    Q      And are you familiar with the sound of his voice?

10   A      Yes, I am.

11   Q      Are you familiar with it because you've heard it

12   before?

13   A      I'm familiar with it, yeah, because I spoke with him on

14   the way and he had questions for us and, you know, he had

15   40-some-minute drive in the car and words were exchanged,

16   yes.

17   Q      I'm now approaching the witness and handing the witness

18   Government Exhibit 10A for identification purpose only.  Do

19   you recognize Government Exhibit 10A?

20   A      Yes, I do.

21   Q      What is that?

22   A      This is a disk that we created for -- it contains calls

23   from the Cayuga County Jail of the defendant, his calls out

24   of the jail.

25   Q      Did you listen to that audio?

Chad Willard – Direct                                    367

1    A      Yes, I have.

2    Q      And when you listened to that audio, were you able to

3    recognize the voice on the audio?

4    A      Yeah, I recognize it to be the defendant, Joseph

5    Jenkins.

6    Q      In the course of listening to that audio, was there

7    also -- did the voice identify itself in terms of a name, did

8    you hear a name?

9    A      Yeah, there's a prerecording that goes along with it,

10   and you have a call from, and you say your name, he says

11   Joseph Jenkins on the tape.  Most of the time.  Not all the

12   time, sometimes he just says Joe, sometimes towards the end

13   he just says nothing but I think in all these calls he

14   probably uses his full name or at least Joe.

15          MS. THOMSON:  I have nothing further for this

16   witness and if I could just have a moment to collect the

17   things.

18          THE COURT:  You may.

19          MR. GOLDSMITH:  May I inquire?

20          THE COURT:  You may.

21          MR. GOLDSMITH:  Thank you.

22          CROSS-EXAMINATION BY MR. GOLDSMITH:

23   Q      Special Agent Willard, you testified that approximately

24   March of 2011, you took over the investigation of

25   Mr. Jenkins, is that correct?

Chad Willard - Cross

368

1    A      I learned of the -- I opened an investigation into

2    Mr. Jenkins.

3    Q      So there was no formal investigation by the U.S. prior

4    to that?

5    A      No, there was not.

6    Q      But the United States government had been made aware by

7    Canadian authorities?

8    A      Yeah, they had been made aware of -- by Canadian

9    authorities but without original evidence, there's not a lot

10   to do with an investigation.

11   Q      Then as part of the -- well, let me put it this way,

12   the file would have been started by Homeland Security prior

13   to your opening the investigation?

14   A      No, the first investigation into Mr. Jenkins was opened

15   on March 7th, 2011 by myself.

16   Q      But there were records indicating that Homeland

17   Security had been made aware by Canadian authorities,

18   correct?

19   A      I am aware that an attache office in Ottawa was

20   notified of his arrest, but no formal investigation had

21   opened by my office in the United States.

22   Q      Okay.  And as part of your responsibilities and review

23   of all pertinent records in Homeland Security, you're aware

24   as you stated that the Homeland Security attache in Ottawa

25   had been notified by Canadian law enforcement, correct?

Chad Willard – Cross                                    369

1    A      Notified of the arrest, yep.

2    Q      Notified by Investigator Vinette as we heard testimony

3    from earlier today, correct?

4    A      I'm speaking to a time that predates my existence in

5    the RAC Syracuse AOR, I started here in January of 2010 and

6    that would have been in January 2009 so I don't know who

7    notified our attache, I couldn't say if it was OPP or CBSA.

8    Q      But there are records in Homeland Security's possession

9    that would indicate that?

10   A      Yeah, there was one record that I am aware of that the

11   attache in Ottawa sent down to Syracuse, it's called a

12   collateral request, and it's a request to open an

13   investigation but that investigation was never opened in the

14   Syracuse office because lack of original evidence means a

15   lack of a case, in Northern District New York.

16   Q      That document would have indicated the source of which

17   law enforcement agent notified the Homeland Security attache

18   in Ottawa, correct?

19   A      It's been awhile since I read it, but I would bet that,

20   yeah, that's in the report.

21   Q      If you were to take a look at some of those reports it

22   might refresh your recollection?

23   A      Sure.

24          MR. GOLDSMITH:  May I approach.

25          THE COURT:  You may.  Is it marked?

Chad Willard – Cross

370

```
 1          MR. GOLDSMITH:  It's not.

 2          THE COURT:  For identification, why don't you do

 3   that first.

 4   Q    Let the record reflect I'm handing to Special Agent

 5   Willard what's been marked as Defense Exhibit 1 for

 6   identification only.  Take a look at the, just the first

 7   sentence of the narrative of the report.

 8   A    Yes.

 9          THE COURT:  Well, first of all, do you recognize

10   what it is?

11          THE WITNESS:  I do recognize what it is.

12          THE COURT:  What is that?

13          THE WITNESS:  Report of investigation from the

14   Department of Homeland Security.

15   Q    Okay.

16          THE COURT:  Go ahead, Counselor.

17   Q    Does that refresh your recollection as to the agent who

18   contacted the Homeland Security attache in Ottawa?

19   A    Yeah, it does say as you said, Marie-Josee Vinette

20   notified HSA attache Ottawa.

21   Q    You received the evidence from Detective Sergeant Kip

22   Wohlert on April 1st of 2011, is that correct?

23   A    That is correct.

24   Q    It was not on March 31st, 2011, correct?

25   A    No, it was April 1st, 2011.
```

Chad Willard - Cross                                    371

1   Q     Once you received those materials, you kept them within

2   a Homeland Security vault, is that correct?

3   A     That is correct.  It's a government, Homeland Security

4   approved drawer vault, it's not a huge room or anything like

5   that, it's a huge safe essentially in our office.

6   Q     Based upon information that you had at the time, you

7   drafted a -- withdrawn.

8                    After April 1st of 2011, that's when you began

9   your investigation, correct?

10  A     That is correct.

11  Q     And you based your investigation on terms that were

12  provided to you by Detective Sergeant Kip Wohlert, correct?

13  A     Correct.

14  Q     And you based your investigation on documents in

15  addition to the hard evidence being two laptops, the three

16  flash drives, the camera, and the cell phone that were

17  provided, correct?

18  A     Correct.

19  Q     In fact prior to the -- withdraw it.  You took that

20  evidence, or that information and you used it to apply for a

21  search warrant in the United States, correct?

22  A     Correct.

23  Q     And you apply for that search warrant in July of 2011,

24  correct?

25  A     Yes.

Chad Willard - Cross

372

1    Q    It was executed by a magistrate in this particular

2    court, is that correct?

3    A    That is correct.

4    Q    All right.  So in the intervening time of April 1st to

5    July of 2011, the specific evidence of the two laptops, the

6    three flash drives, cell phone, and camera were maintained in

7    the Homeland Security vault, correct?

8    A    That is correct.

9    Q    At that time, did you also execute an arrest warrant?

10   A    No, we didn't execute the arrest warrant until October

11   of 2011.

12   Q    And between July of 2011 to October of 2011 when you

13   executed the search warrant, you transfer possession of the

14   two laptops, three thumb drives, and other evidence to an

15   Agent Brian Braisted, is that correct?

16   A    That is correct.

17   Q    After you transferred that hard evidence to

18   Mr. Braisted, how long approximately until you received that

19   evidence back from him?

20   A    It was not until, I would say two weeks ago that we

21   decided to move the evidence back from Buffalo, keep it in

22   the Syracuse office in preparation for this trial.

23   Q    Now you testified a few moments ago about an audio

24   recording CD?

25   A    Yes.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Chad Willard - Cross

373

1    Q    And you testified specifically about the -- about the

2    content of those CDs being recordings of phone calls of

3    Mr. Jenkins, is that correct?

4    A    I did.

5    Q    As part of your training practice as a special agent,

6    have you received any training related to voice recognition?

7    A    No, I have not.

8    Q    Have you been qualified in this or any court of being a

9    voice analyst or voice specialist?

10   A    No.

11   Q    And you did state that only on some of the calls is

12   there some sort of a recognition of who the caller is, is

13   that correct?

14   A    Most of the calls, yes.

15   Q    Not all?

16   A    Not all.

17   Q    Now, in Exhibit 12 which was the voucher of the

18   evidence that you took from Detective Kip -- Sergeant

19   Detective Kip Wohlert, you included a camera in there; that

20   camera also have a picture card in it or a memory card?

21   A    It does.

22   Q    Was the memory card of the camera subject to any

23   forensic evaluation under your investigation?

24   A    CFA Braisted looked at the camera, not myself.

25   Q    You had originally been -- withdrawn.  Are you aware of

Chad Willard - Cross

374

1    whether your office had originally been informed of the

2    Canadian proceedings prior to the transfer of evidence to you

3    on April 1st of 2011?

4    A      If my office had been informed of?  I'm --

5    Q      The Canadian proceedings.

6    A      Of the Canadian proceedings?

7    Q      Yes.

8    A      Not my office, no.

9    Q      Have you -- are you aware as to whether Detective

10   Sergeant Kip Wohlert had notified agents of your office prior

11   to April 1st of 2011 of the ongoing court proceedings in

12   Canada?

13   A      I can't say for sure when exactly a dialogue began

14   between Detective Wohlert and the people in the Buffalo area

15   responsible for my agency.

16   Q      Were you informed ever by other agents -- withdrawn.

17   Do you recall being informed by other agents of your office

18   of phone calls or contacts from Detective Sergeant Wohlert

19   dating back to October of 2010?

20   A      I -- that's the exact time period I believe that I was

21   contacted from Special Agent Matt Myers of the SAC Buffalo

22   which is special agent in charge Buffalo office for my agency

23   that Joseph Jenkins existed and this was kind of what

24   happened and they were looking into it at that time, or began

25   looking into it at that time.

Chad Willard - Cross

1   Q    So between October of 2010 and April 1st of 2011, you

2   personally took no action in regards to this case?

3   A    No, no, no evidence, I took no action.

4   Q    Are you personally aware of any action that was taken

5   by your office between October of 2010 and April 1st of 2011?

6   A    I think there was some e-mails that went back and forth

7   requesting the original evidence or at least a copy of the

8   original evidence to see what we were looking at here, but

9   there was no success until the April 1st, 2011 date when I

10   met Kip Wohlert at the Lansdowne Ontario port of entry.

11        MR. GOLDSMITH:  One moment.

12            (Pause in Proceedings.)

13   Q    One other question.  The execution of the arrest

14   warrant, was that the first time you met Mr. Jenkins?

15   A    Yes, it was.

16   Q    First time you had any interaction with him whatsoever?

17   A    That is correct.

18   Q    You never had any interaction with him at the U.S.

19   border?

20   A    That is correct.

21        MR. GOLDSMITH:  No further questions.

22        MS. THOMSON:  Just briefly.

23   REDIRECT EXAMINATION BY MS. THOMSON:

24   Q    I believe you were asked a question in regard to

25   whether there was attache notification made to HSI; do you

Chad Willard - Redirect

376

1    recall being asked that question?

2    A    Yes, I do.

3    Q    Is that routine to be notified when an American citizen

4    is arrested abroad?

5    A    Yeah, it's pretty routine.  I wouldn't say it happens

6    every time, but a lot of times it does, yes.

7    Q    Is that separate from HSI opening an investigation?

8    A    Yeah, it's a courtesy between law enforcement partners,

9    it's done to, you know, notify in case, you know, anybody

10   down here is looking for that person because they're MIA and

11   their family's worried about them, and then in addition to

12   that, you know, we would think about, you know, the case and

13   if it was something that we would be interested in following

14   through with, maybe open an investigation or seek more

15   information about what actually took place.

16   Q    And you were asked about a report number, too, that was

17   prepared.  Does that report reflect that there was attache

18   notification?

19   A    Yes, it did.

20   Q    And does it also reflect that there were Canadian

21   charges that had been put forward?

22   A    I believe it did.  I didn't read the whole -- just

23   focused on the first line.

24   Q    I'm now handing you what's been marked for

25   identification purposes as Defendant's Exhibit D1.  Does that

Brian Braisted – Direct

1    refresh your recollection as to whether or not it is noted

2    that there were Canadian charges at that time?

3    A     Yes.

4    Q     And does it note if there were?

5    A     Yes, CBSA arrested Jenkins for nonreport, evading

6    compliance, and smuggling child pornography under Section

7    1211, 53C and 159 of the Customs Act.

8              MS. THOMSON:  Thank you.  I have nothing further.

9              MR. GOLDSMITH:  Nothing further.

10             THE COURT:  You may step down, sir, thank you.

11                  (The witness was excused.)

12             MS. THOMSON:  At this time, the government calls to

13   the stand Forensic Analyst Brian Braisted.

14             THE CLERK:  Good afternoon.  State your full name

15   and spell it for the record.

16             THE WITNESS:  Brian Braisted, B-r-i-a-n,

17   B-r-a-i-s-t-e-d.

18

19             B R I A N   B R A I S T E D , called as a

20   witness and being duly sworn, testifies as follows:

21             DIRECT EXAMINATION BY MS. THOMSON:

22   Q     Good afternoon.

23   A     Good afternoon.

24   Q     Could you please introduce yourself to the members of

25   the jury.

Brian Braisted – Direct                            378

1   A     My name is Brian Braisted, I'm a special agent with

2   Homeland Security Investigations in Buffalo, New York.

3   Q     How long have you been with Homeland Security

4   Investigations?

5   A     Since their creation in 2003.

6   Q     How long in Buffalo?

7   A     I arrived in Buffalo in 2004.

8   Q     And you indicated since their creation; what predated

9   that?

10  A     I started with Immigration and Naturalization Service

11  and then in 2003 they created the Department of Homeland

12  Security, they took all the special agents from Immigration

13  and Naturalization Service and special agents from Customs

14  and they threw us all together and we're now Homeland

15  Security Investigations.

16  Q     Your present position is a special agent?

17  A     Yes.

18  Q     Can you tell us some other positions you've held within

19  your agency?

20  A     I started off as an immigration inspector in 1992, I

21  moved -- I was in Pittsburgh, Pennsylvania, then I moved to

22  the Boston office, and in 1995 I became a special agent

23  there.  I was there for about five years and I went to U.S.

24  embassy in Rome, Italy, I was a special agent there for

25  Immigration and Naturalization Service until I returned to

Brian Braisted – Direct

379

1    the U.S. and was assigned to the Buffalo office in 2004.

2    Q      What is your present assignment?

3    A      I am currently working in a immigration benefit fraud

4    group in HSI Buffalo.

5    Q      Within that group, do you have a particular title?

6    A      I'm a special agent there.

7    Q      Are you a computer forensic agent as well?

8    A      Yes, I am.

9    Q      What do computer forensic agents do?

10   A      We examine digital media, looking for evidence

11   contained on the digital media.

12   Q      What is computer forensics?

13   A      It's the examination of digital media in a way that can

14   be replicated at a later date.

15   Q      How long have you performed forensic analyses of

16   various media, of electronic data?

17   A      For about six and a half years now.

18   Q      What training have you had in order to do that

19   position?

20   A      In 2007, they were looking for a computer forensics

21   agent from my office so I volunteered and was selected and I

22   went down to the Federal Law Enforcement Training Center in

23   Glynco, Georgia and I received my initial training there,

24   six-week period.

25   Q      Can you tell us about that training, please?

Brian Braisted – Direct                                    380

1    A      The training, it began with A-Plus certification which

2    is basically a computer technician training, it showed that I

3    was qualified in basic computer hardware, replacing hardware,

4    removing hardware, sharp shooting little bit on the computer,

5    also a little bit of networking contained within the

6    computer.

7    Q      From your time at Glynco forward, did you receive any

8    other type of training, and if so, could you tell us what

9    that was?

10   A      Sure.  Like I said, my initial training was in 2007.

11   Subsequent to that, every year I get about two weeks of

12   additional training, it varies in what the course is.  The

13   first year, 2008, I went down to Washington, D.C. and I was

14   trained by AccessData which is a company that makes forensic

15   software.  That was two weeks of training and then subsequent

16   to that I received my certification, AccessData certified

17   examiner.  In 2010 and 2012 I received training through the

18   cyber crimes unit down in Washington, two weeks at a time for

19   advanced computer evidence recovery training.  In 2011 I went

20   to training with the International Association of Computer

21   Investigative Specialists, I attended basic computer forensic

22   examiner training there, and subsequent to that I earned a

23   certificate, computer forensic certified examiner

24   certificate.

25   Q      And I believe you've indicated that you've earned some

1    certifications.  Are there any other certifications that you

2    haven't just spoken to?

3    A      My A-Plus certification, my CFCE certification from

4    IACIS, IACIS which is AccessData certified examiner training.

5    Q      You gave a couple of acronyms prior to that last one.

6    Can you explain what they are and what type of certification

7    that that is?

8    A      CFCE, it's Certified Forensic Computer Examiner, and

9    it's issued by the International Association of Computer

10   Investigative Specialists, it's an organization, an

11   international organization that specializes in computer

12   forensics.  So to obtain that certification, I went through a

13   one-year process of taking some at-home exams, I submitted

14   those exams to a mentor who did peer review.  He critiqued my

15   analysis, returned it to me for corrections, we went back and

16   forth.  Following the four at-home examinations and I did one

17   final examination which was evaluated and ultimately I

18   received my certification.

19   Q      And that certification includes a computer forensic

20   certified examiner?

21   A      Yes.

22   Q      What is the first certificate that you received in

23   computer forensics?

24   A      That was my A-Plus certification.

25   Q      You did mention briefly I believe AccessData?

1    A     Yes.

2    Q     Can you tell us what AccessData makes as it relates to

3    types of tools that you use?

4    A     AccessData makes FTK which is forensic software, it's

5    one of the leading forensic products on the market today,

6    they prepare the software and they also provide training on

7    that software.

8    Q     You've been certified to use that software?

9    A     I have.

10   Q     Is that the software that's used in computer forensics?

11   A     It's one of the two or three primary tools, yes.

12   Q     Are there any other types of programs that are used?

13   A     Another one would be EnCase which is made by a

14   competitor.  Each one will tell you that theirs is the best

15   but working side by side, they both do a pretty good job.

16   Q     Have you received training in EnCase?

17   A     I have, yes.

18   Q     Is that something that you've used?

19   A     Yes, it is.

20   Q     Do you periodically take continuing education type

21   courses?

22   A     I do.  I take webinars and other things that are

23   available online.

24   Q     How often?

25   A     Whenever they're available.  Most recent was, there was

Brian Braisted – Direct

383

1    a couple of classes by Guidance Software which produces

2    EnCase in December and January of this year.

3    Q    Can you tell us about how many forensic examinations

4    you've performed?

5    A    Roughly 100 exams to date.

6    Q    And within that 100, does that mean you've performed a

7    hundred exams on a hundred pieces of electronic media?

8    A    No, each case is different.  Some cases, a few cases

9    might only consist of one laptop, many of the cases consist

10   of multiple items.  For example, this case was two laptops,

11   three thumb drives, a digital camera and a cell phone.  Some

12   cases are as many as 20 or 25 computers, additional hard

13   drives, hundreds of DVDs so all of that total into -- would

14   be one exam.

15   Q    With regard to those 100 exams that you've performed,

16   can you tell us what type of crimes they involved?

17   A    Child pornography, human trafficking, alien smuggling,

18   document fraud, financial crimes, international property

19   right violations.

20   Q    And if you could say among that hundred, what

21   percentage, if you can say, deal -- dealt with child

22   pornography?

23   A    Roughly 75 percent.

24   Q    Have you ever testified in federal court before as an

25   expert in computer forensics?

Brian Braisted – Direct                          384

1    A      Yes, I have.

2    Q      And can you tell us how many times?

3    A      Once last year for a trial in Buffalo, New York and

4    several times for suppression hearings in Buffalo and

5    Rochester.

6    Q      Were you accepted as an expert in that trial?

7    A      Yes, I was.

8           MS. THOMSON:  At this time, your Honor, offer

9    Special Agent Brian Braisted as an expert in the area of

10   computer forensics.

11          THE COURT:  Any objection, any voir dire?

12          MR. GOLDSMITH:  Brief voir dire?

13          THE COURT:  Go ahead.

14          VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

15   Q      Special Agent Braisted, the multiple suppression

16   hearings that you testified about, those in state or federal

17   court?

18   A      All federal court.

19   Q      And so far only one trial or multiple trials?

20   A      Just one trial.

21          MR. GOLDSMITH:  I have no objection to his

22   qualification as an expert.

23          THE COURT:  Okay.  He'll be received as an expert.

24   You may continue your examination.

25          MS. THOMSON:  Thank you, your Honor.

Brian Braisted – Direct                              385

1          CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

2     Q     Now I believe you indicated about 75 percent of the

3     hundred investigations you've done involve child pornography,

4     is that right?

5     A     Yes.

6     Q     Did you perform an examination of electronic media as

7     it relates to an investigation of Joseph Jenkins?

8     A     I did.

9     Q     And how did that come to pass?

10    A     First I was contacted by Special Agent Willard who was

11    the case agent for the case, he works out of the Alexandria

12    Bay and Syracuse offices.  They don't have a computer

13    forensics agent so the Buffalo office provides support to

14    them and Agent Willard asked me if I'd be available to

15    conduct an examination of some items he had in a case.

16    Q     And once he asked you if you were available, what did

17    you indicate?

18    A     I said, yeah, sure I could do that.

19    Q     And what was the next step?

20    A     Then we coordinated to get the evidence.  I believe he

21    received the search warrant on the 6th of July and so we

22    coordinated to meet on July 7th to basically pass the

23    evidence.  I was going out to Central New York to conduct a

24    search warrant and so he met me halfway basically and gave me

25    the evidence.

Brian Braisted – Direct

386

1    Q     At this time I'm approaching the witness and handing

2    him what's been received into evidence as Government's

3    Exhibit Number 12.  Do you recognize Exhibit Number 12?

4    A     Yes, I do.

5    Q     And that is the three-page document?

6    A     Yes, it is.

7    Q     On Exhibit 12, does it indicate that you received the

8    evidence from Agent Chad Willard?

9    A     Yes, it does.

10   Q     And did you make any notation that you received it?

11   A     Yes, I signed for them and I dated it, initially I

12   dated it 7/6/11 and then I crossed it out and dated it 7/7/11

13   and I initialed above to show that I made the correction.

14   Q     Was that an error writing 7/6/11?

15   A     Yeah, it was about 6:00 in the morning on the 7th, I'd

16   been up very early to get out to Honeoye to do the search

17   warrant so I just had -- I just screwed up on my date

18   basically.

19   Q     So you received it on?

20   A     On the 7th.

21   Q     At this time I'm going to hand you a series of exhibits

22   and I'm going to ask you, sir, if these exhibits are the

23   exhibits that are reflected in Government Exhibit Number 12,

24   and if you could, please, just so we make a record, if you

25   could when you're talking about an exhibit, identify it by

Brian Braisted – Direct                    387

1    the yellow government exhibit sticker number and tell us if

2    that is reflected on Exhibit Number 12 and if that was the

3    item that you received from Special Agent Chad Willard.

4    A     The first one says Exhibit 9, and it's a cell phone,

5    and it's line item 007 contained on the chain of custody

6    form.

7              THE COURT:  And you received that when?

8              THE WITNESS:  That was received on July 7th.

9              THE COURT:  It's reflected on the --

10             THE WITNESS:  Exact --

11             THE COURT:  -- on the exhibit somewhere.  Where?

12             THE WITNESS:  On the exhibit.

13             THE COURT:  Or just on the sheet?

14             THE WITNESS:  It's just on the sheet, sir.

15             THE COURT:  Okay.  Thank you.  Go ahead.

16   A     The next one is an Olympus camera, it's marked as

17   Government Exhibit 8, and on here, I received it on July 7th

18   as line item 006.  The third is Government Exhibits 4A, 5A,

19   and 6, they're three thumb drives, and they're annotated as

20   line items 3, 4, and 5 that I received on July 7th.

21   Government Exhibit 7 is a Compaq computer, and I signed for

22   it as line item 002 on July 7th of 2011.  And finally,

23   Government Exhibit 3A is line item 001, a Toshiba laptop

24   computer that I received on July 7th of 2011.

25   Q     So the items in front of you, those are the items that

Brian Braisted – Direct                              388

1    you received from Agent Chad Willard?

2    A     Yes.

3    Q     And they're noted properly on the exhibit that you've

4    just gone over?

5    A     They are.

6    Q     I believe you indicated that you completed a search,

7    you received those items after a search warrant had been

8    sought?

9    A     Yes.

10   Q     And did that search warrant authorize you reviewing

11   those items?

12   A     Yes, it did.

13   Q     So once you had the search warrant and once you had the

14   items, what did you do?

15   A     I returned to the Buffalo computer forensics lab and I

16   began my analysis of the items.

17   Q     How did that analysis begin?

18   A     My first step is to make an exact copy of each of the

19   pieces of digital media so that means I create an image,

20   what's called an image file for each of the items, the thumb

21   drives, the laptop, the hard drives contained within the

22   laptops.

23   Q     How do you create that image?

24   A     What I do is I take the piece of media, be it a thumb

25   drive or hard drive, and I connect it to something called a

Brian Braisted – Direct

389

1    write block, it's a little black box that I have, and then I

2    connect that little black box to my computer, and what that

3    does is it allows me to look at all of the contents of the

4    media, the thumb drives or the hard drives and the write

5    block stops any changes being made to those items so

6    basically isolates the hard drive or the thumb drives from

7    any other user activity, and then once I do, once I'm

8    connected to my computer through this write block, I use a

9    program called FTK imager which makes an exact bit-for-bit

10   copy of all of the data that's contained on the hard

11   drives -- or the thumb drives, it copies it to an evidence

12   file that I have connected to my computer.

13   Q    When you indicate it makes a bit-by-bit copy, are there

14   values that are determined in that bit-by-bit copy?

15   A    Yes, one of the things that the program will do is it

16   will run a hash algorithm and what a hash algorithm is is a

17   computation which will assess all of the contents in the

18   media, be it the hard drive or the thumb drive and it would

19   assign to that a hash value, and in this case I used two

20   different hash algorithms, one called an MD5 hash and the

21   other one is shaw 1 hash.  The MD5 hash computes hash value,

22   it's 32 characters in length, and it precisely defines the

23   contents of that particular device, be it a hard drive or a

24   thumb drive.  It's kind of like a fingerprint for a digital

25   media.

Brian Braisted – Direct

1    Q     What is done with that hash value?

2    A     Well, I've hashed the original media, then I do the

3    same hash analysis of the created images.  And then I compare

4    the hash values for the created images with the hash values

5    for the original evidence, and if there's any deviation at

6    all on the image from what was contained on the hard drive or

7    the thumb drive, then that hash value will be different, but

8    in this case I compared them and found them to be identical

9    indicating to me that the images were exact bit-for-bit

10   copies of the original evidence.

11   Q     When you made this image, did you save it to a piece of

12   media?

13   A     Yes, I took a sterilized hard drive that had no other

14   contents on it and I saved it to that hard drive.

15   Q     At this time I'm approaching the witness and handing

16   him Government Exhibit Number 15.  I'll ask you if you

17   recognize Exhibit Number 15.

18   A     Yes, Exhibit 15 is the hard drive that contains the

19   images of the thumb drives and the laptop hard drives.

20   Q     When you make that image, do you go back to the

21   original media at all or do you work off of the image?

22   A     No, once I've created the image I remove the original

23   evidence from the write block and I seal it up and I put it

24   into evidence.

25   Q     So when you were doing your forensic examination, is it

Brian Braisted – Direct                           391

1    fair to say that you work off of what's contained in

2    Government Exhibit 15 which is the saved image that you

3    created?

4    A      Exclusively off of that, yes.

5    Q      Why is that?

6    A      Because I don't want to touch the original evidence

7    anymore, I want to make sure that it does not get compromised

8    so I put it away, never use it again.  I've already got an

9    exact copy on my images, I don't need this anymore.

10   Q      When you create an image of original evidence like you

11   did here, is there any change that's made to that original

12   evidence?

13   A      No.

14   Q      Did you create an image of both the Toshiba and the

15   Compaq laptop?

16   A      Yes, I did.

17   Q      And did you write block it before you created the image

18   or was that part of the process?

19   A      You write block them all, yes.

20   Q      And did you also create the image of the three thumb

21   drives?

22   A      I did.

23   Q      And all of those items are contained on Exhibit 15?

24   A      Yes.

25          MS. THOMSON:  I would move into evidence

Brian Braisted – Direct                    392

1    Exhibit 15.

2            THE COURT:  Any objection, any voir dire?

3            MR. GOLDSMITH:  Brief voir dire.

4            VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

5    Q    Special Agent Braisted, are there any markings on the

6    outside of Government Exhibit 18, or I'm sorry, 15 that would

7    indicate the source of your using it in your capacity as a

8    forensic analyst?

9    A    Markings, I put a label on there saying Jenkins working

10   copy EO1 files exam product, just handwritten, is that what

11   you're indicating?

12   Q    Yes.

13   A    Yes.

14   Q    And is that item kept with you throughout the scope of

15   your investigation?

16   A    Yes, it stays in the lab which is a secured facility.

17   Q    Where is the lab?

18   A    It's in Buffalo, New York.

19   Q    Is that where you perform your activities?

20   A    Yes.

21   Q    Is there -- withdrawn.  When was the last time prior to

22   today that you saw Exhibit 15?

23   A    Well, yesterday I drove it out, Monday morning I drove

24   it out to Batavia, handed it off to an agent to bring out to

25   here.

Brian Braisted – Direct                                    393

1    Q    Okay.  So from Buffalo on Monday, meaning yesterday?

2    A    Yes.

3    Q    You drove that particular item to an agent in Batavia?

4    A    Right.

5    Q    Is there anything about the item as it stands here

6    today that appears to be different from when you dropped it

7    off to that agent in Batavia?

8    A    No, I don't, I had actually sealed it with evidence

9    tape, I don't even think the evidence tape has been tampered

10   with.  I sealed this on Monday morning when I got it ready to

11   drive it out of the lab.

12   Q    And prior to your transporting it yesterday morning,

13   it's been in your offices within an evidence vault since your

14   possession of it?

15   A    It's been in my custody constantly, yes.

16        MR. GOLDSMITH:  No further questions, no objection.

17        THE COURT:  It will be received.

18   CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

19   Q    I believe you already indicated how you create the

20   image of the laptop computers; how do you image the thumb

21   drives?

22   A    The same way, I use a write block.  The write block is

23   a little bit different than the write block I use for the

24   laptop computers because the connector is different but I use

25   a write block that's got a USB port and the USB port is the

Brian Braisted – Direct

394

1   little shape that a thumb drive has when you plug it into a

2   computer, it's the same shape I have on my write block for

3   thumb drives.

4   Q     When you're write blocking the thumb drives and when

5   you did in this case, does that make it so there are no

6   changes, alterations, modifications?

7   A     Exactly.

8   Q     Do you also then make a bit-by-bit image of thumb

9   drives?

10  A     I do.

11  Q     And again, why do you do that?

12  A     Well, because I want to be able to work off the copy as

13  opposed to working off of the original.

14  Q     Prior to your forensic examination on the items that

15  are in front of you, the two laptops and the three thumb

16  drives, that's what we'll be talking about, so prior to your

17  examination of those particular items, are you aware if the

18  items were examined by Canadian authorities?

19  A     Yes, I was told they were examined in Canada as well.

20  Q     Can you tell us, please, what impact if any will a

21  prior forensic examination have on a future examination?

22  A     None whatsoever.

23  Q     Did the prior Canadian forensic examination have any

24  impact on your examination?

25  A     No, it didn't.

Brian Braisted – Direct                    395

1    Q      How do you know?

2    A      Well, because I did an independent exam, I did an exam

3    from soup to nuts without regard to what they had done.

4    Q      You earlier talked about a hash algorithm; did you use

5    a hash algorithm for the image that you created?

6    A      Each of the devices I imaged, I had a hash algorithm

7    for each one of those, yes.

8    Q      And does that algorithm give you hash values for the

9    item that you image?

10   A      Yes.

11   Q      Did you do a hash algorithm of the original evidence?

12   A      Yes.

13   Q      Once you had those hash values, what did you do?

14   A      I compared them one to the other to determine and

15   verify that I had true images, true copies.

16   Q      Did you review the Canadian hash algorithms for the

17   Toshiba and the Compaq?

18   A      Yes.

19   Q      Were you provided those?

20   A      Yes.

21   Q      And what was the result of that comparison?

22   A      They were a match for what I had created as well.

23   Q      After you imaged the items that we're going to be

24   talking about, again, the two laptops and the three thumb

25   drives, what was the next step?  Did you analyze what you

Brian Braisted – Direct

396

1    imaged?

2    A      Exactly.  What I then do is I process the created

3    images using special forensic software FTK and EnCase.

4    Q      Can you describe that process?

5    A      Well, basically I put the evidence, the original

6    evidence away, I'm now working off of a hard drive that

7    contains the images and I have, on my forensic machine I have

8    EnCase and FTK installed so I begin processing the images

9    using those pieces of software and, for example, FTK will

10   open up the image and will begin looking at each individual

11   file and categorize that file as to what kind of content it

12   is, whether it's a document, a graphic file being a picture,

13   a movie file, a spread sheet, and it will, once processed, it

14   will put those in containers for me and so I can look at them

15   in a systematic manner.

16   Q      When you looked at the image that you made, did you

17   also look to see what the BIOS information is and was?

18   A      The BIOS actually comes off of the two laptops, and

19   yes, I checked the BIOS information as well.

20   Q      What is BIOS information?

21   A      BIOS is the basic input/output system on a computer.

22   When you turn a computer off, basically it goes dead except

23   for a little tiny piece of software that's located on the

24   motherboard and that's the BIOS and when you turn the

25   computer on again, the motherboard looks at this BIOS and the

Brian Braisted – Direct                                   397

1    BIOS tells it, okay, go to the mouse, and go to the keyboard

2    and then go to a hard drive, and once the computer knows

3    where to go to on the hard drive, it starts booting up the

4    operating system, in this case the Windows operating system.

5    So the BIOS is just the very preliminary piece of software

6    just to get the computer started and pointing in the right

7    direction.

8    Q    Were you able to confirm date and time information by

9    reviewing the BIOS information?

10   A    Yes, the BIOS has a date and time clock, a system clock

11   and I looked in the BIOS and saw that the date was correct,

12   was a valid date for the date that I checked, and the time

13   was about 10 minutes ahead of the actual local time.

14   Q    When conducting your examination, do you like to

15   determine whether that BIOS information is correct, so that

16   you can report what's on the media as the date that's on the

17   media?

18          MR. GOLDSMITH:  Objection, form.

19          THE COURT:  Why don't you rephrase it.

20   Q    What do you look at the BIOS information for?

21   A    I like to know if the system clock is accurate so I can

22   then say the file create dates, modified dates and last

23   accessed dates actually reflect a true date.

24   Q    And in this case, your finding was it was off by about

25   10 minutes?

Brian Braisted – Direct

1    A      For the Toshiba I said.

2    Q      Starting with the Toshiba laptop, how did you analyze

3    the image that you created off of the hard drive?

4    A      I processed it in FTK and EnCase and then I looked

5    through there for evidence of the charges that were alleged

6    on the search warrant.

7    Q      What were those charges?

8    A      It related to child pornography, possession,

9    distribution, transportation, receipt, and production.

10   Q      So when you were doing your analysis, were you looking

11   for evidence of child pornography?

12   A      Yes, I was.

13   Q      Did you find any evidence of child pornography on the

14   Toshiba laptop?

15   A      Yes, I did.

16   Q      What did you find?

17   A      I found about 594 graphic files, picture files of child

18   pornography, and I believe I identified initially three

19   multimedia video files of child pornography.

20   Q      When you indicate you initially identified three, did

21   you do more than one examination?

22   A      Yes, I did.

23   Q      And on -- after having done more than one examination,

24   did you identify other multimedia files as child pornography?

25   A      Yes, I did.

1    Q     And some -- let's start, please, if we could with the

2    images of child pornography.  Do we use interchangeably image

3    and picture?

4    A     Graphic file or picture would probably be best.

5    Q     Can you tell us where you found those graphic files?

6    A     They were two basic locations, one was in system volume

7    information and one was in thumb cache.

8    Q     Can you describe for us what both of those are.

9    A     The system volume information on the Windows operating

10   system.  Windows is a pretty sophisticated operating system

11   and what it will do while you're using the computer is

12   periodically it will take a snapshot of the computer and that

13   snapshot captures the computer settings, files and folders

14   that are contained on that computer, and then it saves all of

15   that data into the system volume information folder in what's

16   called a restore point.  So you're using the computer for

17   months and months and months and at some point maybe your

18   computer starts to act badly.  There's some kind of a

19   conflict between the operating system and something that's

20   been installed on the computer.  What you can do is you can

21   go into your control panel on your computer and there's a

22   button in there for restore to an earlier date and if you

23   select that restore to an earlier date, it will show you a

24   calendar on the computer of all the restore points that were

25   captured by the snapshots of the operating system, and you

Brian Braisted – Direct                    400

1    click on one of those restore points and the Windows

2    operating system will pull all the data out of system volume

3    information and it will restore your computer back to the

4    configuration it was, that it was at that particular date,

5    and the idea is that if you somehow picked something up, not

6    necessarily a virus but just a downloaded program that's not

7    operating properly with the Windows operating system, by

8    going to one of these previous dates when things were working

9    right, you're going to alleviate your problems.

10   Q     I believe you indicated that you found images, graphic

11   files in another location besides the system volume

12   information?

13   A     Yes.

14   Q     Can you explain that as well?

15   A     There were also pictures in thumb cache and what thumb

16   cache is in Windows Vista operating system, if you have a

17   folder that contains pictures or movies or audio files and

18   you look at your folder in the thumbnail view, that will make

19   a little tiny picture of each one of those files within your

20   folder.  And so let's say you have a folder with a hundred

21   pictures and the pictures are just made by your digital

22   camera, six-digit identifier, really doesn't help you when

23   you're looking for a particular picture.  So the thumbnail

24   view will create a tiny little thumbnail picture of what that

25   file contains.  Now rather than looking at a file name,

1   you're looking for that particular picture.  Thumb cache,

2   that's where all these little tiny pictures are stored, is

3   the thumb cache.

4   Q    I'm now handing you what's previously been marked as

5   Government's Exhibit 3B and I've taken it out of the sleeve.

6   For the record it does contain 25 pages.  You take a look at

7   Exhibit 3B, those pages, and tell me if you recognize what

8   they are.

9   A    Yes, I do.

10  Q    What's in Exhibit 3B?

11  A    Exhibit 3B, these are screen captures I made of the

12  subject's Toshiba laptop computer.

13  Q    What's a screen capture?

14  A    A screen capture is a digital picture of what was on

15  the screen on the laptop.

16  Q    Is that a computer-generated document?

17  A    Yes, it is.

18  Q    Did you create these 25 pages from a computer-generated

19  document?

20  A    Yes, I did.

21  Q    These were printed from the computer?

22  A    Exactly.

23  Q    And this is information that was stored by the

24  computer?

25  A    Yes.

Brian Braisted – Direct                          402

1    Q      How did you create Exhibit 3B, pages 1 through 25?

2    A      Well, I wanted to see what exactly the Toshiba laptop

3    computer would look like in use but I don't want to actually

4    use the original hard drive, so what I did was I took a clean

5    laptop hard drive and I took the image of the Toshiba laptop

6    and I used a piece of software to restore the image over onto

7    this clean laptop hard drive, and I removed the laptop from

8    evidence, I opened it up and I removed the original hard

9    drive, I replaced it with this restored hard drive and I

10   turned the computer on.  And when I turned the computer on,

11   these are the pictures that appeared on the computer.

12   Q      And do pages 1 through 25 fairly and accurately depict

13   the screens as you saw them on the Toshiba?

14   A      Yes, they do.

15          MS. THOMSON:  At this time, your Honor, I would

16   move to admit Government Exhibit 3B, pages 1 through 25.

17          THE COURT:  Any objection or voir dire?

18          MR. GOLDSMITH:  Brief voir dire if I may, your

19   Honor?

20          THE COURT:  You may.

21          VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

22   Q      Special Agent Braisted, is there any qualities or

23   coding on the hard drive that was used to create the screen

24   caps that would indicate if the files had been changed in any

25   way since May 24th of 2009?

Brian Braisted – Direct

403

1   A      I'm -- one more time, please.

2   Q      Sure.  Is there anything within the hard drive that was

3   used to create the screen caps, any information that would

4   indicate if any of the files had been changed on that hard

5   drive from May 24th of 2009 to the date when you examined it?

6   A      Yeah, there were no indications of any files being

7   created or changed in any way subsequent to the 24th.

8   Q      And there was -- and that would be reported during the

9   imaging process, or at a different point?

10  A      Well, as I said, the hard drive that I put into the

11  Toshiba laptop was based off of a restored image.  That

12  restored image is a bit-for-bit copy of the original hard

13  drive, so all the file dates, everything is as reported in

14  the original, the FTK report, and looking through the FTK

15  report there were no files created after the 24th.

16  Q      And so essentially this was -- there was no indication

17  of any changes from the point that you made your image copy,

18  correct?

19  A      Exactly, yes.

20  Q      All right.  But it could not report to you whether or

21  not there were any changes provided prior to your making the

22  imaged copy, in other words there's no indications that you

23  have as to any changes or whether there were changes prior to

24  when you made your image copy?

25  A      Well, I can compare my -- the hash value for my image

Brian Braisted – Direct

404

1    copy to the hash values that the Canadians obtained I believe

2    in August of 2009, so there were no changes from those.

3    Q    So you did, as part of your process, do a comparison of

4    your hash values to that of the Canadians?

5    A    Not initially but very recently they provided their

6    hash values and I then compared them to mine.

7    Q    And that was done, your comparison was done prior to

8    the creation of these screen caps?

9    A    No, no, these screen caps were done probably in October

10   of this year, of 2013.

11   Q    And when approximately did you perform this comparison

12   of the hash values between your study and the Canadian study?

13   A    Well, the Canadian -- for the images we're talking now?

14   Q    Yes.

15   A    That would have been last week I believe I received

16   those hash values.

17   Q    How did you perform your comparison between your hash

18   values and the Canadians'?

19   A    It's a 32-character-long value, so I just looked at my

20   value, compared it to their value.

21   Q    Did you do that manually or with computer software?

22   A    No, to look at the hash value itself, it's just looking

23   at it manually.

24             MR. GOLDSMITH:  No objection.

25             THE COURT:  It will be received.  Counsel, would

1    you please approach the bench.  Please feel free to stand up

2    and stretch if you'd like.

3                        (A discussion was held off the record at side

4                        bar.)

5             THE COURT:  Is this a good place to break as far as

6    you're concerned?

7             MS. THOMSON:  Sure.

8             THE COURT:  Okay.  Here's the situation.  I was

9    going to try and finish up this witness, keep you a little

10   longer so that we could finish up this witness before the end

11   of the day, because we're about at break time, but I'm being

12   informed both by the Assistant United States Attorney and the

13   defense counsel, I'm going to make my jury happy because

14   they're going to get to go home but I'm not going to make you

15   happy.  It's going to be an extensive period of time, we're

16   talking at least another hour, hour and a half, so I can't

17   keep you or court personnel here.  So we're going to break

18   for the day now, let you go home, we're going to come back in

19   the morning.  I apologize, I tried but it's just not going to

20   work.

21            And here's what we're going to do.  As of right

22   now, the reports that we're getting, is in the Syracuse area

23   6 to 10, and I think you're all in the Syracuse area or

24   north, is that right, show of hands, is that correct?

25   Everybody is Syracuse or north, correct?  All right.  And

1    people that are north are damn tough because you deal with it

2    all the time.  Depending how far north you are, Pulaski I

3    heard, I remember that.  So here's what we're going to do, as

4    of right now, the snow is supposed to hit around midnight

5    tonight, get started, okay, are the reports.  There's no

6    indication how long it's going to last that I've heard, so

7    unless it snows all night which for 6 to 10, that's not

8    really possible, unless it's in dribs and drabs, they should

9    have it cleaned up in the morning and you should be able to

10   get here.  So I was thinking about starting at 10 but I don't

11   think we need to do that.  I'm going to say 9:00 in the jury

12   room.  And lookit, I don't want anybody getting hurt.  If the

13   roads are bad, Lori's got all your numbers or you can call

14   in, she will give you a number, and let us know what's going

15   on, if you're having a problem.  I don't want you in any type

16   of -- putting yourself in any sort of dangerous situation if

17   the roads are not passable, okay.  But as of right now,

18   unless you hear something different from us, we will contact

19   you if there's something that's really changing in the

20   forecast.  And what we're looking at for the morning hours,

21   we're going to try and start at 9:00, okay.  I ask you to get

22   here, try and be here at 9:00, and if anything changes, we'll

23   call you, okay.  Or you can call and check in if you're

24   concerned about what the roads look like, coming from

25   wherever you're coming from, okay, just call us and let us

1    know.  And if we have to wait a little bit for some of you to

2    get here, we can do that, all right.  Obviously we don't like

3    to do that, but if it's a dangerous situation, we will do it.

4    Okay.  No problem.  Safety, number one.  All right?

5            Second issue.  As I indicated earlier today, I did

6    notice at least one reporter in here, again, please, please,

7    please, understand under your oath, do not read, listen, or

8    view anything to do with this case.  If you check the

9    computer for news or whatever you do, you know, notice that

10   there's something about it, shut it off, put it away, don't

11   view it, don't listen to it, okay.  Don't want you influenced

12   by somebody else's view of what's going on in this courtroom.

13   It's your view that matters and counts, okay.  Don't discuss

14   the case with anybody.  If anybody approaches you, tries to

15   talk to you about this case, I need to know about it

16   immediately.  All right.  I don't think you'll have any

17   trouble getting home, so have a good night, safe travels in

18   the morning, and we'll see you then, okay.

19                    (Jury Excused, 4:38 p.m.)

20           THE COURT:  Okay.  We'll pick it up with direct

21   examination in the morning.  Unless there's anything else

22   before we break, we'll see you tomorrow morning.

23   Approximately how many more witnesses?

24           MS. CARROLL:  Your Honor, we only have four more

25   witnesses and they are all very brief.  They're witnesses who

1    identified the children in the images.  And we have the

2    corporal from the jail who will authenticate the jail call.

3    So we were wondering about the possibility of a charging

4    conference.

5              THE COURT:  Yeah, well, that's why I'm asking.  I'm

6    trying to find out, so sounds like you're going to be done in

7    the morning.

8              MS. CARROLL:  I believe so.

9              THE COURT:  Okay.  And you don't have to tell me a

10   thing about what you're going to do or not going to do, but

11   if that's the case, we should look at doing a charge

12   conference, sounds like we might have to do it before then.

13   You know what we'll do, depending on where we are, if we're

14   getting close to lunch, that's perfect, there's not an

15   extensive amount of charges in this case, it's pretty

16   straightforward, we have two counts, and I think we can

17   expedite this, we can get done pretty quickly a charge.

18   We'll try and have a proposed charge prepared for you to give

19   to you in the morning so you can take a look at it, on breaks

20   or whenever you get a chance, and then we'll just look for a

21   time to do a charge conference.  If we have to keep the jury

22   available to come back for closings, we'll do that.

23             But I think if things work out the right way,

24   saying that our witness here is going to be an hour and a

25   half to two hours, you do the calculation, going to be pretty

409

1    close to lunchtime, so this could work out fine, even if I

2    have to send the jury to lunch a little early, we'll do our

3    charge conference, have a lunch break, we'll sum up, if

4    that's the way it's working out, and then we can go from

5    there.  Okay?  Just so everybody's prepared, so you should be

6    prepared, sounds like barring whatever defense decides to do

7    or not do, that we're going to be doing summations tomorrow.

8    Okay?  Anything else?

9              MS. CARROLL:  That's it.

10             THE COURT:  Counsel?

11             MR. GOLDSMITH:  Nothing.

12             THE COURT:  All good?  Okay, we'll see you in the

13   morning.  Hopefully at 9:00.

14             THE CLERK:  Court's in recess.

15                  (Court Adjourned, 4:40 p.m.)

16

17

18

19

20

21

22

23

24

25

1                  CERTIFICATE OF OFFICIAL REPORTER

2

3              I, JODI L. HIBBARD, RPR, CRR, CSR, Federal Official

4     Realtime Court Reporter, in and for the United States

5     District Court for the Northern District of New York, DO

6     HEREBY CERTIFY that pursuant to Section 753, Title 28, United

7     States Code, that the foregoing is a true and correct

8     transcript of the stenographically reported proceedings held

9     in the above-entitled matter and that the transcript page

10    format is in conformance with the regulations of the Judicial

11    Conference of the United States.

12

13                  Dated this 23rd day of May, 2014.

14

15

16                  /S/ JODI L. HIBBARD
                    _____
17                  JODI L. HIBBARD, RPR, CRR, CSR
                    Official U.S. Court Reporter
18

19

20

21

22

23

24

25

                    JODI L. HIBBARD, RPR, CRR, CSR
                            (315) 234-8547