VOLUME III

UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
UNITED STATES OF AMERICA

vs.                          5:11-CR-602

JOSEPH VINCENT JENKINS,

                    Defendant.

-------------------------------------------x

        Transcript of a Jury Trial held on February 5,

2014, at the James Hanley Federal Building, 100

South Clinton Street, Syracuse, New York, the

HONORABLE GLENN T. SUDDABY, United States District

Judge, Presiding.


            A P P E A R A N C E S

For The Government: UNITED STATES ATTORNEY'S OFFICE
                    P.O. Box 7198
                    100 South Clinton Street
                    Syracuse, New York  13261-7198
                      BY:  TAMARA THOMSON, ESQ.
                           GWEN CARROLL, ESQ.


For Defendant:      AARON M. GOLDSMITH, ESQ.
                    Attorney at Law
                    225 Broadway
                    Suite 715
                    New York, New York  10007




            *Jodi L. Hibbard, RPR, CSR, CRR*
         *Official United States Court Reporter*
              *100 South Clinton Street*
            *Syracuse, New York  13261-7367*
                 *(315) 234-8547*

1

2                    I N D E X   O F   T E S T I M O N Y

3

4    Witnesses                Direct    Cross    Redirect    Recross

5    Brian Braisted            412       497       524         --

6    Chad Willard, recalled    530       533       --          --

7    Joshua Findley            537       542       543         --

8    Christopher McClellan     545       --        --          --

9    Justin Myers              548       --        --          --

10   Michael Wojeski           552       561       --          --

11

12   Joseph Vincent Jenkins    577       608       --          --

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Open Court, Jury Out, 9:08 a.m.)

2          THE COURT:  Good morning.  We're in the courtroom

3     outside the presence of the jury.  Are you all set, your

4     witness make it back or did he stay or whatever?

5          MS. THOMSON:  He traveled back from Buffalo this

6     morning.

7          THE COURT:  Good for him.  You ready to go?  We've

8     got all our jurors so we'll go ahead and get started.

9          (Jury Present, 9:09 a.m.)

10         THE COURT:  Okay.  The record should reflect that

11    we have our complete group of hardy jurors that had no issue

12    this morning, right?  Little slippery maybe, but not bad.

13    I'm glad to see that you all got here safe.  We were on

14    direct examination and we'll continue with the government's

15    examination.  Go ahead.

16         MS. THOMSON:  Thank you, your Honor.  At this time

17    I'm going to approach the witness with what has been received

18    into evidence as Government's Exhibit 3B.

19

20         B R I A N   B R A I S T E D , recalled as

21    a witness and being previously duly sworn, testifies

22    as follows:

23         CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

24    Q    Agent Braisted, since we've had a break since the

25    beginning of your testimony I just would like to cover a few

1    things before we start looking at Exhibit 3B.  I believe

2    yesterday during your testimony you identified that you as

3    part of your examination computed hash values for the items

4    that you examined, is that correct?

5    A    Correct.

6    Q    So if I understand when you made the image of the items

7    that were in evidence, you computed the hash values of each

8    of the image and video file that you found on the Toshiba and

9    all the other electronic media, is that right?

10   A    Well, initially when I image it, I create a hash value

11   of the totality of the hard drive, the thumb drive, and the

12   totality of the image created.  So those hash values are just

13   for the overall products.  Then when I process the evidence,

14   the image file within FTK or in EnCase, those two programs

15   actually create a hash value for each individual file within

16   there.

17   Q    And so when you have that hash value, do you do a

18   comparison of the image that you created against the original

19   evidence?

20   A    Yes.

21   Q    And what was that, what did that comparison result in?

22   A    It showed that the image was a bit-for-bit copy of the

23   original evidence.

24   Q    Did you also have the opportunity with the Toshiba

25   laptop to do a hash comparison to the image that the

Brian Braisted - Direct                           414

1    Canadians made of the Toshiba?

2    A      Yes.

3    Q      And what was that hash comparison result?

4    A      Again, the hashes were identical indicating that my

5    image copy was the same as their image copy, the same as the

6    original evidence.

7    Q      Now as we were talking about the Toshiba, if we could

8    discuss the Toshiba at length.  If we could look at

9    Exhibit 3B, please.  Can you tell me if you recognize page 1

10   of 3B.

11   A      Yes, I do.

12   Q      What is that?

13   A      This is a screen shot of the desktop for the user

14   account Joe on the Toshiba laptop.

15   Q      How do you know it's the user account Joe?

16   A      When I first booted up the system, it goes through, you

17   see the Windows booting up, go through a splash screen for

18   Windows and then once the program is totally booted up you'll

19   have a blue page and you'll have a little icon for each user

20   account that's installed on the computer, and in this case

21   there was a single icon, and it was labeled underneath it Joe

22   so that was the only user account on this computer.

23   Q      So if I understand page 1, Exhibit 3B, this is what the

24   computer looked like when it's powered up?

25   A      Once you click on the user account, Joe, it opens up to

Brian Braisted - Direct                                    415

1    this desktop page.

2    Q      The items that are located on here, particularly in the

3    rows on the left-hand side, is there a word for those little

4    picture images?

5    A      They're called icons.

6    Q      How do icons get on a desktop?

7    A      Some icons are created at the time of the program, or

8    the operating system is installed.  For example, up in the

9    very top left, you see Recycle Bin, that's a

10   Windows-installed icon.  Some of the icons are installed by

11   the user, for example, New Folder 2, 2 MB, these were folders

12   that were created on the desktop at a later date.  Then there

13   are also icons that are created by programs installed on the

14   computer.

15   Q      You indicated that a user can add icons to their

16   desktop; how does that happen?

17   A      Just by moving your curser anywhere on the desktop and

18   right click and you'll get a little box opening up, give you

19   some choices and one of the choices will be to create a

20   folder.

21   Q      You mentioned there are some that are added as a result

22   of -- is it internet activity?

23   A      Internet activity.

24   Q      Right.  Can you give some examples of some icons that

25   are on here that would show internet activity?

Brian Braisted – Direct                                          416

1    A     Well, they don't really show internet activity.  I can

2    specify the icons, I pointed out Recycle Bin would be an icon

3    that's created automatically by the operating system, there's

4    several here, see if I can -- if I touch the screen I don't

5    know if it will bring it up to the jury, but up along the top

6    rows you'll see Toshiba, Toshiba offers, underneath that

7    Toshiba registration, so those are all icons that were loaded

8    in the operating system bundled with the operating system and

9    when the operating system was installed, they were

10   automatically put on this desktop.

11   Q     And if we could see page 2, please.  Looking at page 2,

12   do you see an icon that you've already described as New

13   Folder 2?

14   A     Yes, right in the center of this screen shot.

15   Q     Now is New Folder 2 an icon that was there at setup or

16   was that added by a user?

17   A     That would be added by a user.

18   Q     And did you examine the contents of New Folder 2?

19   A     Yes, I did.

20   Q     Were you able to establish when New Folder 2 was added

21   to the desktop?

22   A     As I recall New Folder 2 was created on January 19th,

23   2009.

24   Q     Is New Folder 2 visible to any user of the desktop?

25   A     Yes.

Brian Braisted - Direct

1    Q     And forensically, is that significant to you?

2    A     It is because it means that anyone who uses this

3    computer would have ready knowledge and access to that

4    folder.

5    Q     Knowledge and that it's visible?

6    A     Absolutely.

7    Q     So when you're looking at it, you can see New Folder 2?

8    A     Right.

9    Q     And if we could see page 3, please.  Looking at page 3,

10   can you tell us what that is?

11   A     Yes, if you look at the very top of the screen, this is

12   Windows Explorer view and it shows that this is the contents

13   of New Folder 2, and within New Folder 2 you'll see that

14   there's four subfolders labeled Homework, New Folder 98, Zoe,

15   and New Folder, and in addition to these folders is also 33

16   video files, they're spread throughout this page, Blue System

17   Laila, there's a number of video files in here, and when I

18   opened up Homework, New Folder 98, Zoe, and New Folder, I

19   found additional video files.  So in total within this

20   New Folder 2, there were 55 video files contained on the

21   computer.

22   Q     If we could look at the first row, over towards the

23   end, the third icon from the right, I'm looking at the screen

24   now and it indicates four files, and the two middle ones, the

25   names KP432 Bate 215 and KP432 Bate 15, are those videos that

Brian Braisted - Direct                          418

1   are contained on this desktop saved in New Folder 2?

2   A     Yes, they are.

3   Q     And the screen that we're looking at, page 3, is that

4   the screen of what you see when you click on New Folder 2?

5   A     Yes, it is.

6   Q     And if we could go to page 4, please.  Can you tell us

7   what page 4 is?

8   A     One of the folders, subfolders contained in New Folder

9   2 is a folder created by the user and named Zoe and when you

10  open up the Zoe folder, you'll see that there's 10 video

11  files all with the word Zoe in them and I viewed those files.

12  Each one of them depicts the same girl, presumably named Zoe,

13  or at least that's the name she's using on these, in these

14  videos, and four of them were categorized as child

15  pornography.

16  Q     And if we could blow it up a little bit so that you can

17  see the titles of each of these files and you can tell us

18  what the titles are?

19  A     From left to right the file titles, and these are

20  descriptive of what was found in the videos, the first one is

21  Zoe Down Top, and two are Zoe pj1 and pjs2, Zoe First Ever

22  Bate Part 1, Zoe's First Ever Bate Part 2 --

23  Q     Let me stop you for a moment.  You've reviewed these

24  video files?

25  A     Yes.

Brian Braisted – Direct                                419

1    Q     And with regard to Zoe's First Ever Bate and First Ever

2    Bate Part 2, what is depicted in the files?

3    A     It -- the girl starts out clothed and through the video

4    she takes her clothes off and then she masturbates for the

5    video.

6    Q     Is that what you understood bate to refer to?

7    A     Exactly.

8    Q     Have you seen bate shortened in that capacity before in

9    your examinations of child pornography?

10   A     It's not unusual, yes.

11   Q     If we could continue on with the icons.

12   A     There's Zoe Show, Zoe Show 2, Zoe Tit Flash, Zoe Tits

13   Arse 2, and Zoe Tits Vag.

14   Q     And if we could see page 5, please.  And if I

15   understand correctly, page 5 is what the computer looks like

16   when you turn it on?

17   A     That's the desktop, yes.

18   Q     Did you find in your examination any evidence of any

19   type of file wiping software installed?

20   A     Yes, there's a file program named CCleaner and it's

21   actually, there's a shortcut file to that right on the

22   desktop.

23   Q     And do you see that displayed in front of you?

24   A     It is down to the lower left on the screen, it would be

25   a big C and then underneath it says CCleaner.

1    Q      What happens when you click on CCleaner?

2    A      That launches the program.

3    Q      If we could see page 6, please.  Does this screen

4    depict what you see when you click on the CCleaner program?

5    A      Exactly, when the screen is opened you'll see a screen

6    like this and you'll see up here there's two tabs, Windows

7    and applications, and when I launched this program, the

8    Windows tab was already open, and underneath the Windows tab

9    there are file categories for Internet Explorer, Windows

10   Explorer, and System and for each one of those file

11   categories the user can designate by a check which files he

12   wants to be wiped from the computer, and in this case the

13   user indicated that he wanted all files created through

14   Internet Explorer, that would be temporary internet files,

15   cookies, history, recently typed URLs, URL is Uniform

16   Resource Locater, that's basically the website, when you want

17   to go to a website on the computer, you type a website into

18   your, into your -- the search bar, and last download location

19   and auto complete form history.

20          For Windows Explorer, he wanted recent

21   documents deleted, under System he wanted the empty Recycle

22   Bin, temporary files, et cetera.  So once you check those

23   blocks, if you go down to the bottom of the page you'll see

24   over to the left of that, please, it says analyze, and when

25   you click on analyze, CCleaner will search through the hard

Brian Braisted – Direct                421

1    drive for all files that fit these categories that are blue

2    checked.  And then it will give you a display within that

3    open window, it will tell you all the files that it found

4    that fit those categories, and how much space they take up on

5    the computer.  And then if you go to the very bottom right,

6    where it says run cleaner, when you click that button, then

7    the program starts to wipe all of the files that fit those

8    categories.

9    Q    Did the presence of the CCleaner have any significance

10   to you in your forensic examination?

11   A    It deleted files that would indicate certain internet

12   activity, yes.

13   Q    And if we could see page 7, please, going again to the

14   start page of the desktop, do you see an icon on that start

15   page for 2 MB?

16   A    Yes, down at the bottom, very bottom row.

17   Q    Did you view the contents of 2 MB?

18   A    Yes, I did.

19   Q    And to view the contents, do you click on that icon?

20   A    Just click on the icon and it will open up a window

21   showing you the contents of the folder.

22   Q    When you click on an icon such as 2 MB, and you do no

23   more than click on it, you open it and view it and then close

24   out of it, does that change the content of 2 MB?

25   A    No, it does not.

Brian Braisted - Direct                              422

1    Q     If we could look at page 8, please.  Can you tell me

2    what page 8 is?

3    A     Page 8 shows that within the folder 2 MB there were 21

4    subfolders, and each one has a unique name below the folder,

5    these were all user-added folders within 2 MB.

6    Q     And was 2 MB a user-added folder to the desktop?

7    A     Yes, it was.

8    Q     So within 2 MB there were also added folders?

9    A     Exactly.

10   Q     If we can just look at the first row, perhaps the first

11   couple of files.  Can you tell me just the names of the first

12   couple files in 2 MB?

13   A     They're labeled 6, ATV trip, and D Load.

14   Q     The one that's labeled ATV Trip, ATV, is that shortened

15   for all-terrain vehicle?

16   A     Yes.

17   Q     And if we could look at the second row as well, third

18   from -- second from the right.  You also see a trip ATV?

19   A     Yes, I do.

20   Q     And that was located in a folder on the 2 MB folder?

21   A     Correct.

22   Q     And if we could see page 9, please.  Do you recognize

23   page 9?

24   A     Yes, one of the subfolders to the 2 MB folder is a

25   folder labeled Estimates and when I opened the Estimates

Brian Braisted – Direct                                    423

1   folder, this is what I see.  There's a long list of files

2   within that folder, primarily text documents or spreadsheet

3   documents.

4   Q    Go ahead.

5   A    One of the documents on there, I opened up, it says

6   Ciccino's Service material quote and when I opened it, I see

7   that there's a spreadsheet and in the top of the spreadsheet

8   there's Jenkins Electric with a business address and a phone

9   number and a fax number and it looks like it's a request for

10  quote for electrical service, so it appeared to me that

11  within this folder, Mr. Jenkins was storing business records.

12  Q    Or the user of this computer was storing records?

13  A    Yes.

14  Q    And one of those records appears to be Jenkins

15  Electric.  Can you tell us what that address is?

16  A    4072 Dwyer Lane, Geneva, New York.

17  Q    And that came from the -- I'm not sure how to say it,

18  Ciccino's?

19  A    Ciccino's Services material quote.

20  Q    And that was located within the Estimates file in the

21  2 MB folder?

22  A    Yes.

23  Q    If we could see page 10, please.

24  A    This is another file that I opened within that

25  Estimates folder, the file name is RR Info, and then you open

Brian Braisted – Direct

1    it, you'll see it opens in Notepad and the top of the Notepad

2    shows RR info which I believe it's referring to Road Runner

3    info.

4    Q      Why do you think Road Runner?

5    A      Well, I'm looking underneath there and there appear to

6    be three e-mail addresses with rochester.rr.com which is the

7    Road Runner e-mail, the way that Road Runner e-mail structure

8    is.

9    Q      And so within the Notepad folder, can you tell us the

10   three e-mail addresses that you can see in Notepad?

11   A      Yes, there's a gjenkins@rochester.rr.com.  And then

12   below that, jjenkins70@ and below that, jenkinselectric@, and

13   underneath each of those e-mail addresses appear to be

14   passwords for each individual account.

15   Q      Looking at the jenkinselectric@, what's the item that

16   you describe to be as something that appeared to be a

17   password?

18   A      Joseph70.

19   Q      And if we could see page 11, please.  Can you tell us

20   what page 11 is?

21   A      Page 11, this is another file I found within the

22   Estimates folder, the file name itself is LNK, and when I

23   opened up LNK it opens up in Notepad and it has some

24   terminology in there that would indicate to me that this is

25   designed for a user to be able to access websites that have

Brian Braisted – Direct                               425

1   child pornography content.

2   Q     Why?

3   A     At the very top it reads, "Gateways Read All New

4   Added."  Underneath that, "Please remember some of our

5   gateways.  If the BBS is delete, you will find us using these

6   gateways."  And the term BBS stands for bulletin board

7   system.  Below that there is a web page, www.bbznet.com, and

8   to the far right of that there's a user and then this would

9   be a password to get into that particular board, and the user

10  password would be lollybbs.  One of the most common terms in

11  child pornography is Lolita, which refers to an underage

12  female who's sexually attractive to some males, so Lolly

13  would be an abbreviation of Lolita.

14  Q     Have you seen in the forensic examinations you've done

15  related to child pornography that term Lolly before?

16  A     Yes, I have.

17  Q     Looking at the first couple of entries where it says

18  HTTP, could you tell us some of the entries at the end?

19  A     Yes.  These are all to one website called tymisk.com

20  and then there's subfolders to that.  One of them is Lillie

21  Planet, below that would be mylollybbs and further down,

22  yourloplace, those are all terms that I would say would

23  indicate child pornography.

24  Q     If we could look at page 12, please.  Do you recognize

25  page 12?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Brian Braisted – Direct

426

1    A    Yes, I do.

2    Q    What is page 12?

3    A    Within the 2 MB folder, there's a subfolder called 6

4    and this is the contents of folder 6, and it contains 10

5    stickam videos.  A stickam is a web camera that feeds

6    directly into your computer and then can be fed into the

7    internet.  And each of these stickam videos depicts one or

8    two females engaged in sexual activity.

9    Q    Did you review each of the files that are shown?

10   A    Yes, I did.

11   Q    What are some of the names of these files?

12   A    Stickam_ Gina, stickam_ Gretchy, stickam_Nicole,

13   stickam_Rach, stickam_Sammylove, stickam_Shelb,

14   stickam_sosexy, stickam_Taylor15, stickam_tragedy, and

15   stickam_xoKatieox.

16   Q    If we could see page 13, please.  Do you recognize

17   page 13?

18   A    Yes, I do.

19   Q    What is page 13?

20   A    Page 13 is the Favorites folder for the user account

21   Joe.

22   Q    What is a Favorites folder?

23   A    A Favorites folder, it's created by the Vista operating

24   system when a user account is created, and the Favorites

25   folder is where all internet shortcuts or bookmarks for the

Brian Braisted – Direct

1    internet are stored for that particular user account.

2    Q     And would that be user directed so that the user

3    created that favorite?

4    A     Well, the Favorites itself is created by the operating

5    system, so there's a folder created as soon as a user account

6    is installed, and then if you look at the top of this page,

7    it shows there's some yellow boxes underneath the title name

8    and for example Microsoft websites, and MSN websites, those

9    would have been already stored in the operating system and

10   created automatically when this Favorites folder was created.

11   Then below that you'll see icons, those would all have been

12   user-created icons.

13   Q     So below the Windows Live items that are located there,

14   the user would have taken an action to get them there?

15   A     Exactly.

16   Q     And do each of these Favorites below the Windows Live

17   represent, if you click on them you would go to a website?

18   A     If you're connected to the internet and you clicked on

19   them, you would go to that particular website.

20   Q     Do you see one referred to anonib stickam girls?

21   A     Yes.

22   Q     Could you read the full title of that?

23   A     "Anonib stickam girls and cam whores."

24   Q     And the one under that, please.

25   A     "Anonibteensnorules."

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Brian Braisted - Direct

1   Q     And the one on -- directly under, below that.  ATV?

2   A     "ATV horsepower ratings."

3   Q     Below that?

4   A     "ATV 2007 Can-Am Outlander Max 800 HOEFIXT."

5   Q     At the very bottom, second one from the bottom, can you

6   tell us what that one is?

7   A     Yes, that one will be relevant in a few slides,

8   there's -- it's titled, "Elweb Lolita photos BBS gateways."

9   Q     If we could see page 14, please.  Can you tell us what

10  page 14 is?

11  A     Page 14 shows additional bookmarks that were located in

12  the Favorites folder.  There are some bookmarks that would be

13  suggestive to me of child pornography, there's Great Lolita

14  B, Great Lolita BBS, Great Lolita BBS with Chinese characters

15  followed by freeforum.tw.  TW would be indicative of Taiwan

16  and then additional Chinese characters.  Further down you'll

17  see jailbait, underneath that, Lolitafix, below that, Lolita

18  BBS.

19  Q     And if we could see page 15, please.  Can you tell us

20  what page 15 is?

21  A     Page 15 is what I see when I open the Joe Documents

22  folder.  In Documents is another file, it's another folder

23  that's automatically created by the Vista operating system

24  when a user account is created and that's where Microsoft

25  recommends you store personal documents.

Brian Braisted - Direct                                    429

1    Q     And did you see anything within page 15 that had

2    forensic significance to you?

3    A     Yes, down about two-thirds of the way down there's a

4    Word document that's titled Links, l-i-n-k-s.

5    Q     Did you view the Links file?

6    A     Yes, I did.

7    Q     And can you take a look at page 16, please.  Do you

8    recognize page 16?

9    A     Yes.  When I clicked on the Links file it opens up in

10   Microsoft Word and at the very top it says L Web Lobbs, which

11   is close to the bookmark which said L Web Lolita Photos

12   Gateways BBS.  And within this document further down, it

13   shows gateways to include one of the top, extremetracking.com

14   with a login of lobbsgtw, which I would take to be an

15   abbreviation for Lolita bulletin board system gateway.

16   Q     If we could see page 17, please.  Do you recognize

17   page 17?

18   A     Page 17 is the photographs of the pictures, the graphic

19   files that were contained within the Joe Pictures folder when

20   I examined the computer.

21   Q     When it indicates Joe Pictures, is Joe for the user on

22   the desktop?

23   A     User account.

24   Q     And Pictures is the folder that would open up pictures

25   that are stored in that folder?

Brian Braisted – Direct                           430

1    A      Exactly.

2    Q      What did you find when you opened up the Pictures

3    folder?

4    A      I found there were only seven pictures in there.  Each

5    one of them was received at the computer on May 23rd in the

6    evening, roughly 10:10 at night, so close to the end of the

7    evening before the computer was taken by the Canadians, and

8    each picture depicts a young girl at a beach scene, basically

9    an adolescent female at a beach.

10   Q      And if we could see the next page, please, page 18.  Do

11   you recognize page 18?

12   A      Yes, one of the files when I clicked it to enlarge,

13   that's one of the pictures contained on the hard drive.

14   Q      And were you able to determine the create date?

15   A      It was May 23rd, 2009.

16   Q      Do you know, recall a time?

17   A      It was between 10:10 and 10:15 at night.

18   Q      Were all of those pictures created around the same

19   time?

20   A      Yes, they were.

21   Q      If we could see page 20, please.  I'm sorry, I skipped.

22   Page 19.  Is page 19 what the user sees when they open up the

23   user Joe?

24   A      Exactly, this is the desktop again.

25   Q      Within the desktop, is there an icon that can direct

Brian Braisted – Direct

1    you to mail, e-mail?

2    A     There is, at the very top there is an icon, it says

3    Windows Mail, it's a shortcut icon, and when you click it, it

4    launches a Windows Mail program.

5    Q     And if we could see now page 20.  Is this what you see

6    when you launch the Windows Mail?

7    A     Yes, it is.

8    Q     Could you tell us what's contained in Exhibit 3B,

9    page 20?

10    A     What happened, Windows Mail is a program offered by

11    Vista and you can configure it to receive your e-mail

12    content, you can designate multiple e-mail addresses,

13    multiple e-mail accounts to handle your e-mails.  So this

14    page here shows the last e-mail that was accessed by the

15    computer, it was dated 5/23/2009, and went to the jjenkins70

16    e-mail address and it's addressed to Joseph, it confirms

17    receipt of a payment to My Nationwide for $99.95.

18    Q     And that's addressed to Dear Joseph?

19    A     Dear Joseph, yes.  Now I think what's important here is

20    you also see there's a Windows security box that pops up

21    indicating that a person has to have a user name and password

22    in order to receive these e-mails coming in.

23    Q     And to also go in and look at the e-mails that are

24    contained -- that are received to that e-mail address, would

25    you need a password?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Brian Braisted - Direct                    432

1    A     You would have to have a password to receive them the

2    first time.  Once they're stored on the hard drive you can

3    then look at them on your own.

4    Q     And if we could see page 21, please.  Is this what the

5    user Joe, once you click on user Joe, what the desktop looks

6    like?

7    A     Yes.

8    Q     And looking at page 21, do you see an icon that's

9    called New Camera?

10   A     Yes, on the very bottom, four rows from the left.

11   Q     Would that be a preinstalled icon or would that be one

12   that was added?

13   A     That's added by the user.

14   Q     Did you click on the New Camera?

15   A     I did.

16   Q     And when you clicked on it, can you tell us what

17   happened?

18   A     When I clicked on it, there's a number of pictures

19   contained within that folder; one of those pictures was a

20   picture of the defendant.

21   Q     And can I see page 22, please.  Was this the folder

22   that you found, or the picture of the picture depicted, was

23   that found in the New Pictures icon?

24   A     In the New Camera icon?

25   Q     New Camera icon.

1    A     Yes.

2    Q     So this picture was saved on the Toshiba laptop?

3    A     Yes.

4    Q     If we could see page 23, please.  Do you recognize

5    Exhibit 23 -- or page 23 of Exhibit 3B?

6    A     Yes, I do.

7    Q     What is that?

8    A     This is a screen shot of the registry, Windows registry

9    which maintains system settings for the computer, user

10   settings, software settings.  This particular page shows

11   information that would have been received when the operating

12   system was first installed, down near the middle of the page,

13   when the operating system was installed, the user would be

14   prompted to enter a register organization and in this case

15   the user chose not to enter any information there.  It would

16   also be prompted to enter information for a registered owner

17   and in this case the person entered the name Joe, J-o-e.

18   Q     So a user for this Toshiba laptop would have had to

19   enter the name Joe to have it become the registered owner?

20   A     Exactly.

21   Q     Can we see page 24, please.  Can you tell us what

22   page 24 is?

23   A     Page 24 is -- it's a two-part, over on the left, that

24   is the registry information for USB devices that were

25   attached to the Toshiba laptop.  You'll see the key, USB

Brian Braisted - Direct

1    store and I opened that and found that there were multiple

2    USB devices that were attached to the computer at one time.

3    Down near the very bottom, seven folders down, seven folders

4    below the USB store it says disk and then PNY Prod USB 2.0.

5    And I opened that folder below that and I found a folder

6    that's labeled 6E741E120B3A.  That would be the serial number

7    for a USB device that was attached to the Toshiba computer.

8    Q     Now when you say serial number, is there an external

9    serial number on the thumb drives that you've examined in

10   this case?

11   A     No, there's not.

12   Q     When you say serial number, where does that number come

13   from?

14   A     That serial number is hard coded into the device when

15   it's made by the manufacturer.

16   Q     So this particular serial number is not visible when

17   you look at the thumb drive?

18   A     Exactly.

19   Q     But it's registered to the computer when it's mounted

20   to the computer?

21   A     The operating system is able to see the serial number

22   that's encoded on the thumb drive.

23   Q     And so if I understand your testimony correctly on the

24   left-hand side of this exhibit, show that, the laptop that

25   the thumb drive is mounted to will store information about

Brian Braisted – Direct                                    435

1    what devices were mounted into it?

2    A      Exactly.

3    Q      And so the Toshiba laptop, did it store that this

4    particular thumb drive was mounted to it?

5    A      Yes, it did.

6    Q      Is that a thumb drive that you examined in the course

7    of this investigation?

8    A      Yes, it is.

9    Q      Do you recall which gigabyte thumb drive?

10   A      That is the -- make sure here.  That is the 4-gigabyte

11   thumb drive.

12   Q      And if he could see page 25, please.  Do you recognize

13   page 25?

14   A      25 is again the same user key, same registry key from

15   the Toshiba laptop computer and it shows that two files down,

16   there's a disk and Prod USB flash memory with a serial number

17   of 5B8506000016.

18   Q      And did you see that in any other place, that number?

19   A      Yes, that's the same serial number as the serial number

20   for the 8-gigabyte thumb drive.

21   Q      So looking at, in total, page 24 and page 25, were you

22   able to establish the two thumb drives that you examined as

23   part of this investigation were connected to the Toshiba

24   laptop?

25   A      Yes, I was.

Brian Braisted – Direct                                    436

1    Q     Did you make a CD of the image files that you located

2    of child pornography on the Toshiba laptop?

3    A     Yes, I did.

4    Q     At this time I'm showing you what's been previously

5    marked as Government's Exhibit 3C.  I'm going to ask you if

6    you recognize what Exhibit 3C is.

7    A     Yes.

8    Q     What is Exhibit 3C, please?

9    A     This is child pornography, I initialed and dated it

10   yesterday when I reviewed it.

11   Q     And are those images of child pornography?

12   A     They're graphic files, yes.

13   Q     Did you -- you initialed the CD indicating you reviewed

14   it?

15   A     Yes.

16   Q     Were those images created from your forensic

17   examination of the Toshiba laptop?

18   A     Yes.

19   Q     So that's a copy of the images that were located on the

20   Toshiba laptop?

21   A     Exactly.

22   Q     And is that the images of child pornography?

23   A     Yes, it is.

24   Q     Is that CD a true and accurate copy of the images that

25   you recovered on the Toshiba laptop?

Brian Braisted – Direct                                437

1   A      Yes, it is.

2          MS. THOMSON:  Your Honor, I would at this time move

3   into evidence Government's Exhibit 3C.

4          MR. GOLDSMITH:  Brief voir dire, your Honor?

5          THE COURT:  Go ahead.

6          VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

7   Q      Agent Braisted?

8   A      Yes, sir.

9   Q      You created the CD, correct?

10  A      I created a CD.  The official CD was then created by

11  the U.S. Attorney's office here.

12  Q      Okay.  The CD that you have in front of you, is that

13  the CD that you created or that the U.S. Attorney's office

14  created?

15  A      That the U.S. Attorney's office created.

16  Q      The CD that you created, when was the last time that

17  you saw it?

18  A      Friday.

19  Q      Was it within your roles and responsibilities to take

20  the custody of that CD within this investigation?

21  A      No, I don't believe so.

22  Q      After you created it -- withdrawn.  From last Friday to

23  the time that you created it, was it in your possession?

24  A      This one here?

25  Q      No, the one that you created.

Brian Braisted – Direct                              438

1   A      The one that I created, no, I believe I had -- it

2   remained with the U.S. Attorney's office.

3   Q      Did you have the opportunity to create -- withdrawn.

4   When was the last time you saw the CD that you created?

5   A      Would have been last Friday.

6   Q      Prior to last Friday, when was the last time you saw

7   the CD that you created?

8   A      I created it on Friday from my laptop computer with the

9   contents of the FTK report.

10  Q      All right.  And were you present when the U.S.

11  Attorney's office created the CD that is in front of you now?

12  A      I was -- no, I gave it to them in one office, they went

13  to another machine to create it.

14  Q      Did you have the opportunity to compare the CD that you

15  created with the CD that's in front of you?

16  A      Yes.

17  Q      All right.  Are they the same or substantially the same

18  condition?

19  A      Yes, they are.

20          MR. GOLDSMITH:  No objection.

21          THE COURT:  It will be received.

22          MS. THOMSON:  Your Honor, may we approach briefly.

23          THE COURT:  You may.

24              (At Side Bar.)

25          MS. THOMSON:  We had decided I would flag you when

Brian Braisted – Direct

439

1    it was time for images and the time's here.  What I intend to

2    do is to have the witness look at a binder and then see if he

3    recognizes those images and whatnot and then once they're

4    received in evidence, I'll give a binder to each member of

5    the jury.

6         THE COURT:  Oh, so it won't be on the screens?

7         MS. THOMSON:  We're not going to use screens for

8    the images.  We have to for videos, right now we'll be doing

9    images and then switch to the videos.  Before I switch to

10   video, I will need to --

11        THE COURT:  And we'll take a break at that point

12   and get the jury out of the room, shut those videos off and

13   get set so everybody knows where they're going to be standing

14   to see what's going on, be all set.

15        MR. GOLDSMITH:  Can I have a copy of the images.

16   Okay.

17             (Open Court.)

18        THE COURT:  Hold on for just a moment.

19        MS. THOMSON:  Would it be okay if I grab the

20   binders.

21             (Pause in Proceedings.)

22        MS. THOMSON:  May I approach the witness?

23        THE COURT:  You may.

24   CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

25   Q    At this time I'm showing you what's been previously

Brian Braisted – Direct                                    440

1    marked as Government Exhibit 3D, 3E, and 3F.  I'm going to

2    ask you if you recognize each of those three exhibits.

3    A      Yes, I do.

4    Q      Can you tell us what those exhibits are?

5    A      These are graphic files that I designated as child

6    pornography that were contained on the Toshiba laptop.

7    Q      Starting with Exhibit 3D, can you tell us what's on the

8    front page of Exhibit 3D?

9    A      On the front page is a file panel of where I found the

10   image.

11   Q      And what is on the reverse side?

12   A      The picture itself.

13   Q      Same question for 3E and 3F, what's on the front page?

14   A      Again, the file path, where the file was located and

15   where I found it on the Toshiba.

16          MS. THOMSON:  Your Honor, at this time the

17   government would move into evidence Exhibits 3D, 3E, and 3F.

18          THE COURT:  Any objection or voir dire?

19          MR. GOLDSMITH:  Briefly voir dire.

20          THE COURT:  Go ahead.

21          VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

22   Q      Agent Braisted, file pathway on the front indicates a

23   system volume information?

24   A      Yes, sir.

25   Q      Were these alive files on the computer?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Brian Braisted – Direct                          441

1    A     They are contained as a compressed volume within system

2    volume information.

3    Q     So in other words, were these files that were readily

4    accessible to the user?

5    A     No.

6                MS. THOMSON:  I'm going to object, that's not

7    really the scope of a voir dire.  It's certainly a subject he

8    can talk about during his cross-examination.

9                THE COURT:  During cross-examination, yes.

10               MR. GOLDSMITH:  All right.  I'll reserve for same,

11   thank you.

12               THE COURT:  Okay.  Go ahead.

13               MS. THOMSON:  Are they admitted, your Honor?

14               MR. GOLDSMITH:  No objection under the

15   circumstance.

16               THE COURT:  Okay, received.

17               MS. THOMSON:  At this time, your Honor, I will seek

18   to publish the exhibits and I'll hand each juror a binder

19   that contain the exhibits.

20               THE COURT:  And we've established with defense

21   counsel that each binder contains the same material, is that

22   right, Mr. Goldsmith?

23               MR. GOLDSMITH:  That is correct, your Honor.

24               THE COURT:  Okay.  You've had an opportunity to

25   review those?

Brian Braisted – Direct                            442

1          MR. GOLDSMITH:  I have had the opportunity to

2     review the set before me, I will take two moments to review

3     the set that the U.S. Attorney's office has presented.

4          THE COURT:  Is handing out to the jury, just so

5     that you can be satisfied they're all being given the same

6     exhibit.

7          MR. GOLDSMITH:  I appreciate the same, your Honor.

8               (Pause in Proceedings.)

9          THE COURT:  Ladies and gentlemen, I'm going to have

10    the Assistant U.S. Attorney start passing out the binders.

11    I'm going to ask you to just hold onto them until everybody

12    has them and then you'll have an opportunity to review them.

13         MR. GOLDSMITH:  Thank you, your Honor.

14         THE COURT:  Mr. Goldsmith, you've had an

15    opportunity to review each one of the binders that are being

16    handed to the members of the jury?

17         MR. GOLDSMITH:  I have had the opportunity to

18    review them, they are consistent with what was discussed at

19    side bar and the evidence being discussed currently with the

20    witness.

21         THE COURT:  Okay.  And you're satisfied that

22    they're all identical to the exhibits that have been admitted

23    as 3D, 3E and 3F?

24         MR. GOLDSMITH:  Upon my inspection, I am satisfied

25    that they are the appropriate exhibits.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Brian Braisted – Direct                                              443

1            THE COURT:  Very well.  You may publish, and ladies

2      and gentlemen of the jury, you can now review those exhibits.

3            MS. THOMSON:  Beginning with 3D, your Honor.  Just

4      so the court knows, there are other exhibits starting with 4,

5      so the jury should not look at them until they are admitted.

6      Only 3D, 3E, and 3F are admitted so if we could begin with

7      3D.

8            THE COURT:  Okay.  Everybody hear that?  We're

9      going to end with 3D.

10            MS. THOMSON:  3F.

11            THE COURT:  3F.

12            MS. THOMSON:  So what's been admitted as 3D, 3E,

13      and 3F.

14            THE COURT:  Just look at those, please, at this

15      point.

16            CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

17      Q    Agent Braisted, if we could talk about Exhibit 3D,

18      please.  Were you able to determine where Exhibit 3D was

19      located on the Toshiba laptop?

20      A    Yes, it came from system volume information.

21      Q    You did already once explain that but as it was

22      yesterday, can you just give us a reminder what the system

23      volume information is?

24      A    System volume information is the place where the

25      Windows operating system stores information that would be

Brian Braisted – Direct

444

1    used to restore the computer to a previous date.  So

2    contained within there are settings for the computer as well

3    as backups of files and folders.

4    Q    And Exhibit 3D, what does that depict?

5    A    It's a prepubescent female sitting with her knees up

6    and her legs spread, naked.

7    Q    And if you could look at Exhibit 3E, please.  Can you

8    tell me, Exhibit 3E, where this particular image was located?

9    A    3E came from system volume information as well.

10   Q    And looking at the image on the reverse side, can you

11   tell us what's depicted in this image?

12   A    It looks to be a prepubescent female bound with her

13   hands and legs tied together, her legs spread and exposing

14   her vagina.

15   Q    And if we could look at Exhibit 3F, please, where did

16   you locate 3F?

17   A    3F came from thumb cache on -- in the Windows operating

18   system.

19   Q    What is thumb cache?

20   A    Thumb cache is when you have a folder containing video,

21   picture, movie, an audio file and if you look at it in

22   thumb's view, it will create a small thumbnail icon for that

23   particular file, and that thumbnail icon is stored in thumb

24   cache.

25   Q    So for it to arrive there, what had to have happened?

Brian Braisted - Direct                                    445

1    A    The file itself would have had to have been on the

2    computer.

3    Q    And if you could look at the image on reverse and tell

4    me what's depicted in the image?

5    A    It's two prepubescent females, looks like there's an

6    object penetrating their vaginas.

7    Q    And we're done with the binders just for the moment,

8    you can set the binders down.  As we're still talking about

9    the laptop, the Toshiba laptop, did you find any other

10   evidence of child pornography on the laptop besides graphic

11   image files?

12   A    I also found video files of child pornography.

13   Q    Where did you find those video files?

14   A    In New Folder 2 and in subfolders to New Folder 2.

15   Q    Is that the folder that we looked at in Exhibit 3B?

16   A    Yes.

17   Q    And if we could have, please, page 3 of Exhibit 3B.

18   Can you tell us what page 3 is again?

19   A    Page 3 shows the video files that are contained within

20   New Folder 2.

21   Q    And those files, would they have arrived there because

22   the user saved them there?

23   A    Yes.

24   Q    I'm now handing you what's been previously marked for

25   identification purposes as Exhibit 3G and I'm going to ask

Brian Braisted - Direct

446

1    you if you recognize Exhibit 3G.

2    A    Yes, this is CD containing video files from the Toshiba

3    laptop.

4    Q    How do you recognize that CD?

5    A    I reviewed it yesterday and I initialed and dated it.

6    Q    Is that CD -- does that contain a true and accurate

7    copy of the multimedia video files that you found on the

8    Toshiba laptop?

9    A    Yes, it does.

10    Q    And you reviewed those video files to ensure that they

11    were a true and accurate copy of the ones that you recovered

12    from the Toshiba laptop?

13    A    Yes.

14         MS. THOMSON:  At this time, your Honor, we would

15    move to admit Exhibit 3G.

16         MR. GOLDSMITH:  Brief voir dire, your Honor?

17         THE COURT:  You may.

18         VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

19    Q    Agent Braisted, did you create this particular CD that

20    is in front of you?

21    A    I did not.

22    Q    U.S. Attorney's office create it?

23    A    Exactly.

24    Q    Did you, or rather, did they make a copy of one that

25    you had created?

Brian Braisted - Direct                                   447

1   A      Yes.

2   Q      Did you have the opportunity to compare the CD that you

3   created with the CD that is directly in front of you?

4   A      I did.

5   Q      Were they the same or substantially the same?

6   A      Yes, they were.

7          MR. GOLDSMITH:  No objection.

8          THE COURT:  It will be received.

9          MS. THOMSON:  Your Honor, it would be that time.

10         THE COURT:  It's your intention to show these

11  videos?

12         MS. THOMSON:  Yes.

13         THE COURT:  Ladies and gentlemen, I'm going to give

14  you a short morning break, about 5, 10 minutes, we're going

15  to get the courtroom situated so we can show the video, and

16  we'll get you right back out here.  Please don't discuss the

17  case.  You can leave those binders right on your seat or on

18  the rail, that's fine, and then we'll get you back out here.

19                   (Jury Excused, 10:02 a.m.)

20         THE COURT:  Anybody needs to use the facilities,

21  Mr. Jenkins, whoever, let's do it now, including our witness,

22  if you need to step down, that's fine.  Ron, you're going to

23  take care of these monitors, okay.  And Mr. Goldsmith, before

24  you go away, would you please consult with Mr. Jenkins and

25  see if he wants to be in a position to be able to view these.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Brian Braisted – Direct                                   448

1          MR. GOLDSMITH:  No, he does not want to see them.

2          THE COURT:  On the record.  Mr. Jenkins, you have

3    an absolute right to see all evidence that's being introduced

4    and shown to this jury.  You've had an opportunity to consult

5    with your attorney, we can have you positioned in a place

6    where you can view one of these screens as the evidence is

7    being played.  Is that something you want to do?

8          THE DEFENDANT:  Just give me a minute.

9          MR. GOLDSMITH:  Your Honor, he's decided he wants

10   to think about it for another minute or two.

11         THE COURT:  Okay that's fine, let us know after the

12   break.

13                    (Court in recess, 10:03 a.m. to 10:13 a.m.)

14                    (Open Court, Jury Out.)

15         THE COURT:  We're going to turn it towards the

16   windows, he can slide around to the side of the table,

17   exactly.  Mr. Jenkins, that screen needs to be turned so it

18   can't be seen by the gallery so you're going to have to move.

19   I know there's no one there now, but if someone comes in, it

20   has to be in a position where it can't be seen.

21         Okay, Mr. Goldsmith, you all set?

22         MR. GOLDSMITH:  Yes, I'm fine.

23         THE COURT:  Okay.  And government's counsel, ready

24   to go?

25         MS. THOMSON:  Yes.

Brian Braisted – Direct                             449

1              THE COURT:  Okay.  Please bring the jury in.

2                   (Jury Present.)

3              THE COURT:  Okay.  The record should reflect we

4     have all the ladies and gentlemen of the jury after a break

5     and we're prepared to go ahead.

6              Ms. Thomson, it's your intention to publish

7     Exhibit 3G which contains video files, is that correct?

8              MS. THOMSON:  Momentarily, your Honor.  I do have

9     the individual clips on 3H and the witness --

10             THE COURT:  Okay, go ahead.

11             CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

12    Q     Agent Braisted, I'm handing you now what's been marked

13    for identification purposes as 3H.  Do you recognize

14    Exhibit 3H?

15    A     It's another disk with video files.

16    Q     Agent Braisted, did you assist in compiling three

17    videos off of Exhibit 3G which contain all of the multimedia

18    files on the Toshiba to narrow them down to three which are

19    contained on Exhibit 3H?

20    A     Yes, I did.

21    Q     Did you review the three videos that are on 3H?

22    A     Yes.

23    Q     Are these three videos that are contained on 3H true

24    and accurate copies of what's on 3G?

25    A     Yes, they are.

Brian Braisted - Direct

450

1    Q    And also what you found on the Toshiba laptop?

2    A    Exactly.

3              MR. GOLDSMITH:  No objection.

4              MS. THOMSON:  Move to admit.  It's received?

5              THE COURT:  No objection, it will be received.

6              MS. THOMSON:  At this time, your Honor, the

7    government would move to publish what's been called clip 1 on

8    Exhibit 3H.

9              THE COURT:  Proceed.

10             MS. THOMSON:  And your Honor, for the record, this

11   clip, clip 1 is, and I discussed, informed the jury of this,

12   with counsel, it's a video of 23 minutes in length and the

13   government's playing only a portion of clip 1, only a few

14   seconds portion, and that would be at 1401 to 1409.

15             THE COURT:  Okay, Counsel, go ahead.

16             MS. THOMSON:  Computer problems.  Bear with us.

17                  (A video clip was played from Government's

18                   Exhibit No. 3H.)

19             MS. THOMSON:  If the record could reflect we have

20   played that 8-second portion of the video for the court and

21   for the jury.

22             Agent Braisted, did you review the entire video

23   that was just shown portion of?

24   A    Yes, I did.

25   Q    Is that the video of KP_Nancy 432 Bate 15?

Brian Braisted – Direct                        451

1   A     On the Toshiba it was KP_432 Bate.

2   Q     And was that the same file that was located in New

3   Folder 2?

4   A     Yes.

5   Q     Did you watch the entirety of the video?

6   A     I did.

7   Q     And can you just briefly describe what happens in the

8   video?

9   A     It starts out, the girl is clothed, as the film

10  progresses she takes her clothes off, she exposes herself,

11  she displays her genitals, I believe she masturbates later on

12  in the video.

13         MS. THOMSON:  We're at this time, your Honor, going

14  to play what's been identified as clip 2 from Exhibit 3H.

15              (A video clip was played from Government's

16              Exhibit No. 3H.)

17  Q     And for the record, the clip that was shown is of a

18  17-minute-and-39-second-long video and the clip was shown

19  from 9:55 to 10:12.  Did you review the entire video?

20  A     I did.

21  Q     Can you just give us a general idea of what's on the

22  video?

23  A     Similar to the first, it's a young girl, she starts out

24  in the video, she's fully clothed, she takes her clothes off,

25  she displays herself for the video, she ends up masturbating

Brian Braisted – Direct                                    452

1    in the video as well.

2    Q      And the name of that video, is that Sierra.avi?

3    A      Yes.

4    Q      Was that Sierra.avi also found in New Folder 2 on the

5    Toshiba laptop?

6    A      Yes, it is.

7    Q      If we could see clip 3, please.

8                    (A video clip was played from Government's

9                     Exhibit No. 3H.)

10   Q      And for the record, the portion that was played of that

11   video -- was this video in excess of three hours?

12   A      Yes, it was.

13   Q      And the portion that was played for the jury was at

14   1:54:24 to 1:54:29.  Did you watch the entire three hours?

15   A      I clicked through it so I saw segments from beginning

16   to end.

17   Q      Could you tell us briefly what you saw when you were

18   clicking through it?

19   A      Appears to be a video taken at a girl's bedroom, at

20   times there's no one in the display, at other times the girl

21   shows up dressed, she undresses, then she does things to

22   herself while naked, displaying herself to the video camera.

23   Q      Each of these three videos, are they three videos that

24   you identified as child pornography?

25   A      Yes.

1    Q      Did you do more than one examination in this case?

2    A      Yes.

3    Q      Of the media?

4    A      Yes, I did.

5    Q      Would you tell us a little bit about that?

6    A      Well, my initial examination, once I received the items

7    from the case agent, I brought them back to the lab, I

8    created images and then I processed the images and worked off

9    of those images.  When I started my exam, the first thing I

10   did was I went through the thumb drive devices.  I found no

11   evidence of child pornography on one of the thumb drives, the

12   2-gigabyte thumb drive.  The other two thumb drives had very

13   large quantity of child pornography, both pictures and videos

14   on them.  It took me probably 10 days going through there to

15   identify the child pornography and to bookmark it.  At that

16   point I started examining the Toshiba laptop and the Compaq

17   laptop computers.  My primary goal at that point was to

18   establish that those computers were used to receive or

19   otherwise transmit the information that was found on the

20   thumb drives; in other words, that the computers had those

21   images on them as well.

22   Q      Did you also do an analysis to find out if you could

23   see any other activity that was going on on the computer that

24   was connected or in close proximity to child pornography

25   presence on the computer?

Brian Braisted - Direct                          454

1    A    Yes, I did.

2    Q    At this time I'm handing you what's been marked as

3    Government's Exhibit 3I.  I'm going to ask you if you

4    recognize 3I and if we could --

5    A    Yes, I recognize it.

6    Q    Is everyone's monitor on?  Can we turn the monitors

7    back on?  We're not going to publish it yet but there will be

8    a series of documents we're publishing.

9         THE COURT:  The monitors are on.  They should be.

10   Q    Can you tell us what Exhibit 3I is?

11   A    3I is a screen shot of file activity on the Toshiba

12   laptop, and it's -- it was sorted for date and time.

13   Q    And is this a two-page document?

14   A    Yes, it is.

15   Q    What's on the second page?

16   A    The second page is an e-mail that was a file that was

17   created in close proximity to files that I looked at in the

18   first page.

19   Q    Exhibit 3I, is this information that you were able to

20   extract from the Toshiba laptop --

21   A    Yes, it is.

22   Q    -- during your examination?

23   A    Exactly.

24        MS. THOMSON:  At this time, your Honor, I would

25   move to admit Exhibit 3I.

1          THE COURT:  Mr. Goldsmith, any objection or voir

2     dire?

3          MR. GOLDSMITH:  No objection.

4          THE COURT:  It will be received.

5     Q    If we could publish page 1, please.  Can you please

6     explain what's depicted on page 1?

7     A    This is basically a snippet of a spreadsheet, the

8     left-hand column would be a file name, the middle column

9     would be a date and time that that file was created on the

10    Toshiba laptop, and the column to the right would be the file

11    path where that particular file was found, and what I did was

12    I focused on a particular period of time, in this case at

13    January 19th, 2009, beginning at 6:00 in the evening.  The

14    highlighted line shows that New Folder 2 was created to the

15    desktop at that time, and immediately following that, the

16    five files below that, 13.flv, 14, 15, 29, and 30.flv were

17    all saved to that folder.

18          Now each of those, the .flv indicates that

19    they're video files.  I looked at those video files, I found

20    that they were all video files of the same two females, ages

21    approximately 10 to 12 years of age, was not child

22    pornography, it was child erotica, they were dancing and

23    gyrating to the camera, hugging each other, that kind of

24    thing.  When I played the videos it took about 32 and a half

25    minutes to play them in their entirety from one video to

Brian Braisted – Direct

456

1   another, total up to 32 and a half minutes.  And then 33

2   minutes after the folder was created and these files were

3   created, then an e-mail, was a long string and then .eml,

4   that indicates an e-mail file was created on the laptop.

5   Q     Is that reflected in the entry that's immediately below

6   what's highlighted in yellow after 30.flv?

7   A     Exactly.

8   Q     So that denotes that an e-mail --

9   A     That's a file, that's an e-mail file, exactly.

10  Q     FLV, can you tell us if you are familiar with that

11  extension?

12  A     It's an extension, I believe these were Stickam videos

13  but it's just a multimedia file extension.

14  Q     So the entry immediately under 30.flv, that string,

15  were you able to produce what was observed at that time?

16  A     Yes, just by clicking on that file name, it launched

17  the file.

18  Q     And is that contained in page 2?

19  A     Yes, it is.

20  Q     If we could see page 2, please.  Can you tell us what

21  it is?

22  A     So page 2, this is the e-mail that was created

23  immediately following the child erotica videos, and it went

24  to the Joe Jenkins -- I'm sorry, the

25  jjenkins70@rochester.rr.com account.  The common name for

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Brian Braisted – Direct

1    that account is indicated as Joe Jenkins and it's just an

2    e-mail from Trailer Parts Super Store advertising some sales.

3    Q    The entry on the first page, does that entry show that

4    that's when this e-mail was accessed?

5    A    Exactly, it was -- when it was actually created on the

6    Toshiba was 6:33:52 p.m.

7    Q    And to be created, does that mean that this e-mail was

8    opened?

9    A    That was when it was opened on the computer, yes.

10   Q    So if I understand the totality of your testimony, the

11   new folder was created at 6 p.m., there were five videos

12   approximately 32 minutes and 21 seconds in length, and then

13   at 33 minutes, we have this e-mail being accessed and opened?

14   A    Exactly.

15   Q    At this time, your Honor, I'm handing the witness

16   what's been previously marked as Government's Exhibit 3J.

17   I'm going to ask you if you recognize Exhibit 3J.

18   A    Yes, I do.

19   Q    What is Exhibit 3J?

20   A    3J is similar to what I described in 3I.  3J shows

21   files that were created on the Toshiba laptop on

22   January 20th, 2009 between 6:57 in the morning and 7:16 in

23   the morning.

24   Q    Does this document, or exhibit contain three pages?

25   A    Yes, it does.

1    Q     Do you recognize each of the three pages?

2    A     Yes, I do.

3    Q     And did you produce these three pages from your

4    examination of the Toshiba laptop?

5    A     I did.

6            MS. THOMSON:  Your Honor, at this time I would seek

7    to admit Government Exhibit 3J.

8            THE COURT:  Any objection or voir dire?

9            MR. GOLDSMITH:  No objection.

10           THE COURT:  It will be received.

11   Q     If we could publish page 1, please.  Can you tell us

12   what page 1 shows?

13   A     Page 1, the highlighted file, if you look at the file

14   date and time, this is the beginning of the activity that I'm

15   noting and it's a file named meekrab.mpg, mpg would indicate

16   that it's a video file.  I viewed it and found that

17   meekrab.mpg contains child pornography.  The video itself is

18   roughly five and a half minutes in length.  Shortly after

19   that file was created on the computer, there's a file called

20   start.txt and when I looked at the file path that indicates

21   that that's a file that was created when the user accessed

22   the IKEA home planner program that's installed on the

23   computer.  Then 12 minutes after that, an e-mail is created

24   on the computer, long string with the extension .eml.

25   Q     If we could see page 2, please, if you could explain

Brian Braisted – Direct                              459

1   what page 2 is.

2   A    Page 2 is just a screen capture of the child

3   pornography video file that I found labeled meekrab, this was

4   taken a minute and seven seconds into the video and this

5   shows the two adolescents who were contained within the

6   video.

7   Q    And meekrab, that's on the New Folder 2?

8   A    Exactly.

9   Q    And if we could see page 3, please.

10  A    Page 3, that depicts the e-mail file that was created

11  on the Toshiba laptop at 7:16, it's from a company

12  generic.com and it's addressed to

13  jenkinselectric@rochester.rr.com.

14  Q    The entry that's noted on Exhibit 3J, page 1, is that

15  entry created when that e-mail for jjenkinselectric is

16  opened, is accessed?

17  A    Exactly.  Exactly.

18  Q    So that e-mail was opened at that time that you

19  described?

20  A    Yes.

21  Q    And that's the jjenkinselectric@rochester.rr.com?

22  A    Right.

23  Q    I'm now handing you what's previously been marked as

24  Government's Exhibit 3K and I'm going to ask you if you

25  recognize Government Exhibit 3K.

Brian Braisted – Direct

460

1    A    Yes, I do.

2    Q    Are those -- is it four pages that you're looking at?

3    A    Yes, it is.

4    Q    Those four pages, what are they?

5    A    The first page is similar to the previous ones, I'm

6    looking at file activity on Toshiba laptop on January 24th,

7    2009, at approximately 11:49 a.m.  When I looked at that, I

8    found an e-mail was created to -- on that, at that time and

9    date, it was to the jjenkins70@rochester.rr.com account.

10   Q    Are each of the pages that are depicted in Exhibit 3K

11   pages that you recovered from the Toshiba laptop?

12   A    Page 1 was from the Toshiba, page 2 is from the

13   8-gigabyte thumb drive, page 3 is from the 8-gigabyte thumb

14   drive, and page 4 is back from the Toshiba.

15   Q    Did you create each of the images that are depicted in

16   pages 1 through 4?

17   A    Yes, I did.

18        MS. THOMSON:  At this time, your Honor, I would

19   offer in evidence Government Exhibit 3K, pages 1 through 4.

20        MR. GOLDSMITH:  No objection.

21        THE COURT:  Received.

22   Q    If we could publish page 1, please.  Please tell us

23   what's depicted on page 1.

24   A    Page 1, if you look at the -- that pane there, there is

25   a file 183917, and then the file name is 02CF2392.eml and

Brian Braisted - Direct                                    461

1    that's an e-mail file that was created on the Toshiba laptop

2    on January 24th, 2009, at 11:49 a.m.  And if you look at the

3    lower pane, it shows the contents of that e-mail, and it's an

4    e-mail that was opened from the jjenkins70@rochester.rr.com

5    account, it's from a company called Idea RC Media showing

6    that jjenkins70 account is being charged $96.  There's a

7    Master Card associated with it to Joseph Jenkins.

8    Q     Were able to determine what Idea RC is?

9    A     I just did a little internet research, Idea RC appears

10   to be a company that produces advertising for small

11   businesses, kind of like the Yellow Pages, that idea.

12   Q     And if we could see page 2, please.  What's depicted on

13   page 2?

14   A     Well, page 1 showed a file that was created on the

15   Toshiba at 11:49 so I wanted to see if there was any file

16   activity on the thumb drives in close proximity to that, and

17   I found that on the same date, roughly 15 minutes after the

18   e-mail was accessed on the Toshiba, there were three video

19   files, notmycap, TayMegBrook.avi, breekelsey.avi and

20   nicolelovessteven.avi, these are all video files that were

21   saved to the 8-gigabyte thumb drive 15 minutes after the

22   e-mail was accessed.  The breekelsey.avi, I found to contain

23   child pornography.

24   Q     And if you could please display page 3.  Do you

25   recognize page 3?

Brian Braisted – Direct                                    462

1    A      Page 3 is a screen shot of one of the two adolescent

2    females that are depicted in the video breekelsey.

3    Q      Was that a video that you determined was child

4    pornography?

5    A      Exactly.

6    Q      And if we can see page 4, please, and if you could

7    explain to us what page 4 depicts.

8    A      Having found the file breekelsey.avi on the 8-gigabyte

9    thumb drive, I wanted to see if there was any evidence that

10   it was ever contained on the Toshiba laptop, so I did a word

11   search for breekelsey which is the file name, and I found

12   that there were multiple instances of that file name being

13   associated with the Toshiba laptop, to include in the middle

14   screen you see that at one time a file by that name was

15   contained in the Users/Joe/Desktop path.

16   Q      How do you know that?

17   A      Because that information was contained within drive

18   free space on the Toshiba laptop.

19   Q      But the video that you observed that the screen shot is

20   contained in, page 3, you didn't find the video on the

21   Toshiba laptop, is that correct?

22   A      The video was not there, exactly.

23   Q      You did find that on the thumb drive?

24   A      Right.

25   Q      But you found evidence of that title on the Toshiba?

Brian Braisted – Direct                              463

1    A      Exactly.

2    Q      What did that tell you?

3    A      It tells me that that file was at one time on the Joe

4    desktop and was moved to the 8-gigabyte thumb drive.

5    Q      At this time I'm showing the witness what's been

6    previously marked as Government's Exhibit 3L.  I'm going to

7    ask you if you recognize Exhibit 3L.

8    A      Yes, I do.

9    Q      What is Exhibit 3L, please?

10   A      3L is information I found associated with the computer

11   at the -- on February 22nd of 2009.

12   Q      Are there five pages associated with this exhibit?

13   A      Yes, there are.

14   Q      And those five pages, did you produce them as a result

15   of your forensic examination in this case?

16   A      Yes, I did.

17           MS. THOMSON:  At this time, your Honor, I would

18   offer into evidence Government's Exhibit 3L, pages 1 through

19   5.

20           MR. GOLDSMITH:  No objection.

21           THE COURT:  It will be received.

22   Q      Beginning with the first page of 3L, can we publish

23   that.  Can you tell us what's depicted on the first page?

24   A      Yes.  This is a listing of file activity on the Toshiba

25   laptop computer from roughly 9:14 in the morning, up until

1    11:10 in the morning.  At the very top you see 9:14, an

2    e-mail is created, and there's some user activity with a

3    Power Point viewer.  Down at 10:05 a.m. a folder named Zoe is

4    created in New Folder 2 and immediately eight video files are

5    placed into the Zoe folder, and then at 11:10 a.m. an e-mail

6    is accessed on the computer.

7    Q    Beginning with the entry that you've identified as an

8    e-mail being opened, is that depicted on page 2?

9    A    Yes, it is.

10   Q    And if we could look at page 2, please.

11   A    This shows an e-mail, it came from the e-mail address

12   imrat@yahoo.com and was addressed to

13   jjenkins70@rochester.rr.com.

14   Q    And what time do you show activity for this having been

15   accessed?

16   A    This was accessed at 9:14 in the morning.

17   Q    Now after this e-mail was accessed you indicated there

18   was other activity tied back to the New Folder 2, is that

19   correct?

20   A    Exactly, at 10:05, a folder named Zoe was created in

21   New Folder 2.

22   Q    If we could see page 3, please.  Is this the contents

23   of the folder Zoe?

24   A    Yes, it is.

25   Q    Did you view the contents of the folder Zoe including

Brian Braisted – Direct

1    each of the media files contained therein?

2    A    Yes, I did.

3    Q    And did you find evidence of child pornography?

4    A    Four of the files I attributed as child pornography.

5    Q    And if we could see page 4, please.  Do you recognize

6    page 4?

7    A    This is screen capture of the girl who's depicted in

8    all of the Zoe videos.

9    Q    And after the Zoe videos were created and stored on the

10   New Folder system, can you tell us what was the next user

11   activity for that date?

12   A    The next user activity was an e-mail.

13   Q    And can we see page 5, please.  Describe what you

14   found.

15   A    This is the e-mail that was accessed at 11:10 a.m. and

16   it's again from imrat@yahoo.com to the

17   jjenkins70@rochester.rr.com account.

18   Q    What time was that e-mail opened?

19   A    11:10 in the morning.

20   Q    And what time was that in relation to the first

21   activity that you observed on that date?

22   A    The first activity was at 9:14, roughly two hours

23   earlier.

24   Q    And what time was the Zoe page saved, Zoe multimedia

25   files?

Brian Braisted – Direct                              466

1    A    The Zoe files, the folder was created and immediately

2    file saved to it at 10:05.

3    Q    At this time I'm showing the witness what's been

4    previously marked as Government's Exhibit 3M.  Like Mary.  Do

5    you recognize Exhibit 3M?

6    A    I do.

7    Q    What is Exhibit 3M?

8    A    Exhibit 3M is three pages, the first page shows file

9    activity on the Toshiba laptop computer.  Page 2 is an e-mail

10   and page 3 is a screen shot of a video.

11   Q    Did you create each of these pages as a result of your

12   forensic examination of the Toshiba laptop and other media?

13   A    Yes, I did.

14        MS. THOMSON:  At this time, your Honor, we would

15   offer into evidence Exhibit 3M.

16        MR. GOLDSMITH:  No objection.

17        THE COURT:  It will be received.

18   Q    If we could publish the first page, please.  Can you

19   tell us what's depicted on that first page?

20   A    Yes.  The highlighted line shows an e-mail was created

21   on the Toshiba laptop at 10:19 p.m., and then two lines below

22   that, a child pornography video, sierra.avi was created at

23   10:30 p.m.

24   Q    So let's start first with the e-mail.  Do you see

25   page 2, please?

Brian Braisted – Direct                      467

1    A     Page 2 shows the e-mail that was created at 10:19 p.m.

2    and the e-mail is from the jjenkins70@rochester.rr.com

3    account, and it's addressed to an individual known as Dave

4    Montes, it appears to be an e-mail involving electrical work

5    being done and it's signed, Joe.

6    Q     If you could just read the first line of the e-mail.

7    A     "Dave, I am researching the phase converter.  I think

8    you need a digital phase converter that is safer for

9    electronics, for the lasers anyways."

10   Q     What time was this e-mail sent?

11   A     At 10:19 p.m.

12   Q     And what was the next activity you observed?

13   A     Eleven minutes later, a video file sierra.avi which

14   contains child pornography was saved to the computer.

15   Q     And I'm showing you now page 3.  Is that a still shot

16   of the video?

17   A     Yes, it is.

18   Q     And is that a video that we already observed earlier?

19   A     Exactly.

20   Q     That video coming from the New Folder 2?

21   A     Right.

22   Q     At this time I'm handing you what's been previously

23   marked for identification purposes as Government's

24   Exhibit 3N.  I'll ask you if you recognize Exhibit 3N.

25   A     Yes, I do.

Brian Braisted – Direct

1    Q     Is this a seven-page document?

2    A     It is.

3    Q     Each of the documents that are contained herein, are

4    they from your examination of the electronic media in this

5    case?

6    A     Yes, they are.

7    Q     And did you produce these documents from your

8    examination?

9    A     Yes, I did.

10          MS. THOMSON:  At this time I would offer into

11   evidence Government Exhibit 3N.

12          MR. GOLDSMITH:  No objection.

13          THE COURT:  It will be received.

14   Q     Can you tell us what you found relevant to this

15   investigation on May 22nd, 2009?

16   A     Yes.  This first screen depicts files that are

17   contained on the 4-gigabyte thumb drive.  If you look in the

18   upper left-hand box, that shows the directory structure for

19   the contents of the 4-gigabyte thumb drive.  Those yellow

20   boxes indicate that they were folders on the thumb drive and

21   down near the bottom of that box, I highlighted 052209,

22   that's the name of one of the folders, and highlighting that,

23   that opens up in the lower box, the contents of that folder,

24   so in total there were roughly 238 graphic files contained

25   within folder 052209.  They don't all fit on this screen, but

Brian Braisted – Direct

1    one of those particular pictures is elena038.jpg which I have

2    highlighted in the lower box and when I highlight that, that

3    opens up the picture itself in the upper right-hand box on

4    the screen.

5    Q    So the image that we see, and by image I mean photo?

6    A    Exactly.

7    Q    Is that Elena?

8    A    That's elena038.jpg, the full picture does not fit

9    within the box.  If I were to scroll down, that little girl,

10   she's roughly eight years old, she's totally naked and she's

11   posed in a manner to display her genitals in a lascivious

12   manner.  At the top left-hand corner of the graphic file is a

13   caption, Lolita's Art, and www.Lolitasart.com.

14   Q    You just described the image and used a term that she's

15   exposing her genitals in a lascivious manner.  Can you tell

16   us what you mean by that?

17   A    Well, that's the -- that's one of the definitions for

18   child pornography in the federal statute basically, there are

19   such things as nudity which do not become pornography but

20   when you are focusing on the genitals, when you're posing the

21   person so that their genitals are a prominent part of the

22   picture, if the person's legs are spread or in another way

23   accentuate the genitals, that would become child pornography.

24   Q    And the image of child pornography, we just see the top

25   part, is that correct, on this exhibit?

Brian Braisted – Direct

1    A    We just see the top third of the picture, yes.

2    Q    And so if I understand you correctly, 238 graphic files

3    were saved to the 4-gigabyte at 10:25 p.m.?

4    A    Right, within a minute of each other, yes.

5    Q    All right.  If you could look at page 2, please, and

6    explain to us what page 2 shows.

7    A    Well, having found the file activity on the 4-gigabyte

8    thumb drive, I wanted to see if it was associated with the

9    Toshiba laptop so I went to the Toshiba laptop and I looked

10   for what file activity was in the surrounding time so

11   May 22nd of 2009, I started 10:25 in the evening, that's when

12   the files were created on the 4-gigabyte and I went back to

13   see when file activity began on the Toshiba.

14   Q    What did you find?

15   A    I found that there was continuous file activity on the

16   Toshiba between 8:17 and 10:25 in the evening.

17   Q    Can you describe that activity?

18   A    There were over a thousand files created during that

19   period of time to include files that would indicate to me

20   that someone was accessing the internet.

21   Q    How do you get that indication?

22   A    Well, the page we're on, if you go to page 2 of the

23   exhibit.  Appear to be a little bit out of order.

24   Essentially page 2, it won't be particularly relevant other

25   than to show that the file activity began at 8:17, page 3 is

1    a little bit more relevant to us.

2    Q    Can we see page 3, please.

3    A    That's the picture that's depicted here.  Page 3, I

4    found an HTML document which would be a web page that was

5    created on the computer at 8:46 p.m. on May 22nd.  And the

6    web page itself looks like it comes from imgsrc.ru which is

7    known as Image Source, .ru, it's a Russian website that

8    shares photos.  This particular web page has a subheading

9    showing preteen and tween girls.

10   Q    And that's noted right in the title?

11   A    It's on the title of the web page, exactly.

12   Q    What significance did that have to you in your

13   investigation?

14   A    Well, preteen and tween girls would suggest to me that

15   it's child pornography or child erotica, Image Source is well

16   known as -- it's a legitimate site in the sense that it

17   shares graphic files of all sorts of topics, you can go there

18   and you can find pictures of sporting events, nature scenes,

19   et cetera, but it's also been used quite a bit by child

20   pornographers to maintain databases of child pornography

21   content.

22   Q    Is that what you've seen in other investigations as

23   well?

24   A    Yes.

25   Q    And page 4, if you could describe what's on page 4 and

1    its relevance to this investigation.

2    A     Page 4 is another HTML document so in other words,

3    another web page that was contained on the computer and was

4    created at 8:44 on May 22nd, 2009.  This is another web page

5    from imgsrc.ru and the caption for that web page is "young

6    girls braless and pokies".

7    Q     And page 5, please.

8    A     Page 5 is a graphic file that was created on the laptop

9    computer at 8:52 p.m.  It's -- it was not child pornography,

10   it was a child erotica picture contained on the computer.

11   Q     And where was that contained?

12   A     On the Toshiba laptop.

13   Q     And if you could look at page 6, please.  What did you

14   find that's depicted on page 6 that's of significance to this

15   investigation?

16   A     Page 6, I searched for the file title elena038 and I

17   found here on the top of the screen that at one time that

18   picture that I showed you initially, the little girl with the

19   Lolita's Art, that file name was contained in a path

20   Users/Joe/Pictures/052209 which would be the folder and then

21   elena038.  There you go right there.  The file that I found

22   on the 4-gigabyte thumb drive, I found that file name and

23   folder name as well on the Toshiba laptop, and at one time it

24   had been contained within the Joe Pictures folder.

25   Q     And the last page?

Brian Braisted – Direct                                          473

1    A      The final page just shows the final activity for the

2    laptop computer on May 22nd, it ceases activity at 10:25 p.m.

3    which is in close proximity to when those files were created

4    on the 4-gigabyte thumb drive.  If you look also at the files

5    above there, you'll see a lot of files with the file name

6    long string of Zs and file extension of .zzz.  Those are all

7    files that had been wiped and they're indicative of action by

8    this CCleaner program.

9    Q      And so that would be wiped on the Toshiba?

10   A      Exactly.

11   Q      But then you see those files show up at 10:25 p.m. on

12   the 4-gigabyte thumb drive?

13   A      That's the time the files were saved to the 4-gigabyte,

14   right.

15   Q      During your examination of the media in this case, were

16   you able to examine to see if there was any evidence of

17   accessing websites indicative of child pornography?

18   A      Yes.

19   Q      How did you do that?

20   A      Using EnCase, I searched for the -- on the hard drives

21   for the Toshiba and the Compaq computer for internet

22   artifacts, that would be cookies, bookmarks, index, .gat

23   files and other items that would be associated with internet

24   activity.

25   Q      What did you find?

Brian Braisted – Direct

1    A    I found search terms and things of that nature, URLs

2    that were indicative of child pornography.

3    Q    Do you recall what those were?

4    A    There was I believe a Lola sex, things along the nature

5    of Lolita, jailbait, things of that nature.

6    Q    As part of your examination of the two laptops that you

7    were asked to examine, did you review them for any markings

8    indicating where they were manufactured?

9    A    Yes, I did.

10   Q    Start with the Toshiba which is just, for the record,

11   Government Exhibit Number 3A.  What did you observe?

12   A    On the back of the Toshiba laptop there's a

13   manufacturer plate and it shows Made in China.

14   Q    Any other components to the Toshiba laptop that you

15   looked at for markings?

16   A    I removed the hard drive and hard drive has a separate

17   manufacturer marking.

18   Q    And do you recall where that was manufactured?

19   A    I do.  The hard drive was made in The Philippines.

20   Q    Where is that stamp that indicates its place of

21   manufacturer?

22   A    This is the hard drive that comes out of the laptop,

23   and it's stamped right on the face of the hard drive.

24   Q    And how about for the laptop itself?

25   A    It's right on the back of the hard -- back of the

Brian Braisted – Direct

1    computer.

2    Q    And I have the same question for the Compaq.

3         THE COURT:  Which is exhibit number?

4         MS. THOMSON:  I'm sorry.  Exhibit?

5         THE WITNESS:  Exhibit 7, sir.

6         THE COURT:  Thank you.

7    Q    Are you able to determine that?

8    A    The laptop, it was also produced in China.

9    Q    Thank you.  As part of your investigation, did you do a

10   forensic examination of the 8-gigabyte thumb drive that's

11   already been received into evidence and you've already

12   viewed?

13   A    Yes, I did.

14   Q    I'm now handing you what's packaged together as

15   Government's Exhibit 4A, 5A, and 6 and I'd like you to look

16   at Exhibit 4A, the 8-gigabyte thumb drive.  Is that the thumb

17   drive that you examined?

18   A    Yes, it is.

19   Q    How did you begin your examination of the thumb drive,

20   if you could explain that process.

21   A    The first thing I did with the thumb drive was I

22   connected to a write block which was then connected to my

23   forensic machine and I created an image of the thumb drive.

24   Q    Now you previously gave testimony with regard to the

25   write block of the Toshiba laptop; did you do the same

Brian Braisted – Direct

1   process with the 8-gigabyte?

2   A    Yes, I did.

3   Q    For the same purpose?

4   A    Exactly.

5   Q    And just briefly, what's that purpose?

6   A    The purpose is to ensure that I don't make any changes

7   to the files that are contained within the original evidence.

8   Q    What software did you use to do your examination?

9   A    I did, I used FTK and I believe I used EnCase as well

10  for these.

11  Q    What was the result of your examination with regard to

12  evidence of child pornography on the 8-gigabyte thumb drive?

13  A    The 8-gigabyte I found I believe 15 child pornography

14  graphic files, and 96 movie files.

15  Q    I'm now handing you what's been previously marked for

16  identification purposes as Government's Exhibit 4B.  Do you

17  recognize Exhibit 4B?

18  A    Yes, I do.

19  Q    What is Exhibit 4B?

20  A    These are graphic files.

21  Q    Where did those graphic files come from?

22  A    I believe this is the one from the 8-gigabyte thumb

23  drive.

24  Q    Did you have an opportunity to review Exhibit 4B?

25  A    Yes, I did.

Brian Braisted – Direct                          477

1    Q     And did you view it to ensure that the graphic files

2    that you obtained from the 8-gigabyte thumb drive are

3    contained on Exhibit 4B?

4    A     Yes.

5    Q     On Exhibit 4B did you also add the graphic files that

6    were found from the 4-gigabyte thumb drive?

7    A     Yes.

8    Q     Was that because the examination of those two were

9    imaged and placed in the same location?

10   A     They were all in the same FTK case, yes.

11   Q     So Exhibit 4B does contain all of the graphic files

12   that you obtained from the 4 and the 8-gigabyte thumb drive?

13   A     Correct.

14   Q     And is that a copy of what you obtained from the thumb

15   drives?

16   A     Right.

17   Q     And is that copy an accurate and -- true and accurate

18   copy of the originals as you saw them on the thumb drives?

19   A     Yes, it is.

20            MS. THOMSON:  At this time, your Honor, I would

21   move into evidence Exhibit 4B.

22            MR. GOLDSMITH:  Brief voir dire?

23            THE COURT:  Go ahead.

24            VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

25   Q     Agent Braisted, does that contain all of the files that

Brian Braisted – Direct

478

1    you copied or some?

2    A    Well, it contains all the files that I bookmarked as

3    child pornography.

4    Q    Okay.  Let me rephrase, all the image files?

5    A    The graphic files, yes, sir.

6    Q    Did you make that particular copy you're holding in

7    your hand?

8    A    I did not.

9    Q    Did you have the opportunity to compare the disk that

10   you produced to the disk that you're holding in your hand?

11   A    Yes, sir.

12   Q    And are they the same or substantially the same?

13   A    Yes, they are.

14            MR. GOLDSMITH:  No objection.

15            THE COURT:  It will be received.

16            CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

17   Q    At this time I'm handing you what's been previously

18   marked for identification purposes as Exhibit 4C.  I'm going

19   to ask you if you recognize Exhibit 4C.

20   A    I do.

21   Q    What is Exhibit 4C?

22   A    This is video files from the thumb drives.

23   Q    From both thumb drives?

24   A    Yes.

25   Q    And the thumb drives that we're talking about are the

Brian Braisted – Direct

479

```
 1    ones that are before you in Government Exhibit 4A, 5, and 6?
 2    A     Yes.
 3    Q     Did you place your initials on that exhibit, 4C?
 4    A     I did, yes.
 5    Q     Did you review that exhibit?
 6    A     Yes.
 7    Q     And does that exhibit contain all of the multimedia
 8    files that you recovered from the 8-gigabyte thumb drive and
 9    4-gigabyte thumb drive?
10    A     The ones that I identified as child pornography,
11    exactly, yes.
12    Q     And are those true and accurate copies of the videos
13    that you obtained from those thumb drives?
14    A     Yes, they are.
15          MS. THOMSON:  At this time, I would move into
16    evidence Exhibit 4C.
17          THE COURT:  Any objection?  Voir dire?
18          MR. GOLDSMITH:  Brief voir dire, your Honor.
19    VOIR DIRE EXAMINATION BY MR. GOLDSMITH:
20    Q     Agent Braisted, did you create the CD that you're
21    holding in your hand?
22    A     I did not.
23    Q     Did you have the opportunity to compare the CD that you
24    created with your forensic software to the CDs that you're
25    holding in your hand?
```

Brian Braisted – Direct                          480

1    A      Yes.

2    Q      Was it the same or substantially similar?

3    A      Yes.

4           MR. GOLDSMITH:  No objection.

5           THE COURT:  It will be received.

6           CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

7    Q      At this time I'm handing the witness what's previously

8    been marked as Exhibits 4D, 4E, and 4F.  Do you recognize

9    Exhibit 4D, 4E, and 4F?

10   A      Yes, I do.

11   Q      What are Exhibits 4D through 4F?

12   A      These are three graphic files that were found on the

13   8-gigabyte thumb drive.

14   Q      And are each of those exhibits double-sided pages?

15   A      Yes, they are.

16   Q      On the front page is the file path noted for where the

17   image was located?

18   A      Exactly.

19   Q      And on the reverse side is it the image itself?

20   A      Yes.

21   Q      And are those images that were found in your

22   investigation and contained on Exhibit 4B?

23   A      Yes.

24   Q      And 4B also being the disk that you created of the

25   image files?

Brian Braisted - Direct                    481

1   A     Yes.

2           MS. THOMSON:  At this time, your Honor, I would

3   offer into evidence Exhibits 4D through 4F.

4           THE COURT:  Any objection?

5           MR. GOLDSMITH:  No objection.

6           THE COURT:  It will be received.

7   Q    These are contained within the jury binders so if the

8   jury could open up their binder to tab 4D.  Agent Braisted,

9   starting with the first side of 4D, can you tell us what was

10  on the first page, front side?

11  A     This is the file path where the -- this particular file

12  was located, it was on the 8-gigabyte drive and the file name

13  is -- not asterisk, !1.jpg.

14  Q     And on the reverse side?

15  A     This is the picture that constitutes the !1.jpg.

16  Q     Was that an image of child pornography?

17  A     Yes, it is.

18  Q     And if we could turn to Exhibit 4E, please.  And can

19  you tell us what's on the first page, front page of 4E?

20  A     This is a file path showing that the graphic file

21  depicted here came from the 8-gigabyte drive and it was a

22  jpeg_753664[38].jpg.

23  Q     And on reverse side?

24  A     That is the picture that reflects that file name.

25  Q     Can you just briefly describe that picture?

Brian Braisted – Direct                                    482

1    A    It's a little girl seven or eight years of age, laying

2    down resting on a teddy bear, her genitals exposed.

3    Q    And if you could look at 4F, please.  Can you tell us

4    what the file path was for 4F?

5    A    4F is another graphic file that came from the

6    8-gigabyte drive and the file name is jpeg_ 8699904[467].jpg.

7    Q    And the image on the reverse side of the page?

8    A    It's an adolescent girl with her legs spread, she's

9    naked and she's exposing her genitals.

10   Q    On this image do you also see notation on the bottom

11   right corner, and if so, could you describe it, please.

12   A    Yes, it's a stamp for the file indicating it's from

13   www.bdcompany.com or.net and BD Company is a purveyor of

14   child pornography.

15   Q    Have you seen that in other investigations?

16   A    Yes, I have.

17   Q    You can put the jury binders.  I believe you indicated

18   that you created a CD or participated in the creation of a CD

19   of the multimedia files with regard to the 8-gigabyte and the

20   4-gigabyte thumb drives?

21   A    Correct.

22        MS. THOMSON:  Your Honor, at this point we would be

23   doing more videos, I don't know if the court wanted to take a

24   break while we turn things off?

25        THE COURT:  Okay, ladies and gentlemen, we're going

Brian Braisted – Direct                    483

1    to take just a brief break to set up the videos, and please

2    do not discuss the case, we'll get you back out here.

3                     (Jury Excused, 11:07 a.m.)

4            THE COURT:  We'll just make sure they're off, and

5    again, have Mr. Jenkins' monitor turned, and position

6    themselves so they can view the videos, the rest of them will

7    be seen by counsel and the jury only.  You let me know when

8    you're all set.  Is it all cued up?  You got it, know where

9    it is this time?

10           COMPUTER TECHNICIAN:  It crashed before.

11           THE COURT:  Did it?  Okay.  All right.  Let's bring

12   the jury in, please.  Ms. Thomson, we're playing a portion of

13   4C, is that right?

14           MS. THOMSON:  Yes, and that was contained also on

15   4G.

16           THE COURT:  Okay.

17                     (Jury Present, 11:12 a.m.)

18           THE COURT:  Okay, the record should reflect we have

19   the ladies and gentlemen of the jury, government's going to

20   publish part of the video from Exhibit 4C.  Go ahead.

21           MS. THOMSON:  Thank you, your Honor.

22   Q    Did you have the opportunity to view clips that were

23   taken from the videos you found on the 8-gigabyte thumb

24   drive?

25   A    Yes, I was.

Brian Braisted – Direct                    484

1    Q     Beginning with the first clip, is this a video that was

2    identified by title as 9YO Vicky?

3    A     Yes.

4          MS. THOMSON:  And for the record that is a video,

5    one minute and 39 seconds in length and we'll be playing a

6    short clip which is contained at 00 to 12 seconds and 1

7    minute and 7 seconds to 1 minute and 14 seconds.

8          THE COURT:  Okay.

9                (A video clip from Government's Exhibit No. 4C

10                was played.)

11   Q     As the video continues on, can you tell us what's

12   depicted in the video?

13   A     She becomes totally naked eventually.

14   Q     And if we could play the second clip.

15                (A video clip from Government's Exhibit No. 4C

16                was played.)

17   Q     How does the video continue?

18   A     She performs fellatio on the man.

19   Q     This video is -- has a file title Vicky, have you seen

20   that file title before?

21   A     I have, yes.

22   Q     In the course of doing your examinations?

23   A     Exactly.

24   Q     And if we could see the third clip, and for the record,

25   that would be the clip identified as sasha_S3, video, 4

Brian Braisted – Direct                485

1    minutes and 59 seconds in length, we will be playing the clip

2    at 4:42 to 4:46.

3                         (A video clip from Government's Exhibit No. 4C

4                          was played.)

5    Q    And can you tell us, did you watch the entire video of

6    sasha_S3?

7    A    Yes, I did.

8    Q    What's depicted on that video?

9    A    It's a young girl and she's totally naked and

10   displaying her genitals in a lascivious manner.

11   Q    And this clip four, which will be our third video,

12   titled 0036, length of the video 8 minutes and 14 seconds and

13   we're only showing one second, and that's contained at 3:08.

14                        (A video clip from Government's Exhibit No. 4C

15                         was played.)

16   Q    Did you watch this entire video?

17   A    I did.

18   Q    What's contained in this video?

19   A    It's two adolescents engaging in sex with each other

20   and there's an adult male having sex with them as well.

21   Q    Is there -- adolescents, male, female?

22   A    I believe one male and one female as I recall.

23   Q    Throughout the video, are they engaged in sex acts

24   throughout the entire video?

25   A    Yeah, for the preponderance of the video, yes.

Brian Braisted – Direct                    486

1    Q      What are the total number of videos that you recovered

2    during your examination on the 8-gigabyte thumb drive?

3    A      96 videos that I classified as child pornography.

4    Q      Now if we can talk about the 4-gigabyte thumb drive

5    that is Government Exhibit 5A.  Did you do an examination of

6    that 4-gigabyte thumb drive?

7    A      Yes, I did.

8    Q      And do you have that exhibit in front of you, 5A, the

9    thumb drive?

10   A      Yes, I do.

11   Q      How did you begin your examination of this thumb drive?

12   A      I connected it to my write block and then connected the

13   write block to my forensic machine and I created a

14   bit-for-bit copy, an image file of the 4-gigabyte contents.

15   Q      What software did you use to do your analysis?

16   A      I used FTK and EnCase.

17   Q      Can you please tell us what the results of your

18   analysis was as it relates to child pornography found on the

19   4-gigabyte thumb drive?

20   A      The preponderance of the contents of the 4-gigabyte

21   thumb drive were child pornography graphic files.  I found

22   3,250 that I bookmarked as child pornography, an additional

23   16 that I bookmarked in a separate category as bondage

24   graphic files but again depicting child pornography and I

25   found I believe 10 video files also on the 4-gigabyte thumb

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Brian Braisted - Direct                                    487

1    drive.

2    Q     At this time I'm handing you what's been previously

3    marked as Government's Exhibits 5B, 5C, and 5D and I'm going

4    to ask you if you recognize these exhibits.

5    A     I do recognize them, yes.

6    Q     What are they?

7    A     They are graphic files that were contained on the

8    4-gigabyte thumb drive.

9    Q     Beginning with Exhibit 5B, does that contain a front

10   page that has the file path and the image on the reverse?

11   A     Yes, it does.

12   Q     And the same for Exhibit 5C and 5D?

13   A     Yes.

14         MS. THOMSON:  At this time, your Honor, I would

15   move to admit Exhibits 5B, 5C, and 5D.

16         THE COURT:  Any objection?

17         MR. GOLDSMITH:  No objection.

18         THE COURT:  It will be received.

19   Q     And if the jury could pick up your juror binder and

20   beginning with the tab that's marked 5B.  Starting with 5B,

21   can you tell us what's on the front page of the exhibit?

22   A     The front page shows the file path coming from the

23   4-gigabyte thumb drive, it was in a folder labeled 0215 and

24   the file name itself is 110.jpg.

25   Q     And the image on the reverse side.  Could you describe

Brian Braisted – Direct                                              488

1    that image?

2    A      It's an adolescent female with her knees up, she's

3    naked and displaying her genitals.  On the top left there's a

4    caption, Lolly edition.

5    Q      Have you seen that Lolly edition in prior child

6    pornography investigations?

7    A      Yes, I have.

8    Q      And 5C, can you tell us what the file path for the

9    image that's contained on the reverse side?

10   A      5C came from the 4-gigabyte thumb drive, it was in New

11   Folder 54, and the file name is 1172797076831.jpg.

12   Q      And can you tell us about the image on the reverse

13   side?

14   A      It's a young girl approximately 10 years of age and

15   she's being penetrated by an adult male.

16   Q      And 5D, please, can you tell us the file path for 5D?

17   A      5D came from the 4-gigabyte thumb drive, it was in a

18   folder structure labeled 032309 and the file name is

19   1239846239242.jpg.

20   Q      And the image on the reverse?

21   A      Image on the reverse is adolescent female, she's naked

22   with her legs spread and she's tied up by the legs and also

23   apparently by the neck.

24   Q      Each of those images you classified as images of child

25   pornography?

Brian Braisted – Direct                                       489

1    A     Yes, I did.

2    Q     If I could just retrieve.  And you indicated that you

3    prepared a disk with the multimedia files together of the

4    8-gigabyte and the 4-gigabyte multimedia files that you

5    recovered?

6    A     Exactly.

7    Q     And that's been previously identified by you?

8    A     Yes.

9    Q     So we are again ready to play clips.

10          THE COURT:  And it's 4C --

11          MS. THOMSON:  Yes.

12          THE COURT:  -- that you're ready to play.

13              (A video clip from Government's Exhibit No. 4C

14               was played.)

15   Q     And for the record, what's been played is file title

16   1.avi, length of the video is 1 minute, 16 seconds and we

17   played at zero to 04 seconds.  Did you have the opportunity

18   to view the entire file?

19   A     I did.

20   Q     And can you give a description of what happens in the

21   entire video?

22   A     There's a male and a female, they're engaging in sex,

23   the girl is probably 10 or 11 years of age, the boy might be

24   anywhere from 16 to 18 years of age.

25   Q     And on -- did you have opportunity to view a second

Brian Braisted – Direct

490

1    clip also that you took of multimedia file?

2    A      Yes.

3    Q      And is that clip with regard to the Vicky file?

4    A      (Witness gesturing affirmatively.)

5    Q      Did you observe the Vicky file that you've already

6    shown today on both the 8-gigabyte and the 4-gigabyte thumb

7    drive?

8    A      Yes, I did.

9    Q      Is it the same video in content?

10   A      It is.

11   Q      And if we could just show briefly the first couple

12   seconds.

13                  (A video clip from Government's Exhibit No. 4C

14                   was played.)

15   Q      So that video was on both?

16   A      Right.

17   Q      The total videos that you found on the 4-gigabyte thumb

18   drive?

19   A      Ten, I believe.

20   Q      In addition to finding evidence of child pornography,

21   did you find any other evidence of forensic significance to

22   you on the 4-gigabyte thumb drive?

23   A      Yes, I did.

24   Q      What did you find?

25   A      The 4-gigabyte thumb drive had thousands and thousands

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Brian Braisted - Direct                                491

1    of files, primarily graphic files or video files.  There was

2    a single text document on that 4-gigabyte thumb drive and I

3    opened it up to see what the text was and it appeared to be a

4    message from someone asking for a password to access a child

5    pornography website.

6    Q    I'm now handing you what's been previously marked as

7    Government's Exhibit 5F and 5G.  I'm going to ask you if you

8    recognize Exhibit 5F and 5G.

9    A    Yes, I do.

10   Q    Can you tell me what Exhibit 5F and 5G are?

11   A    5F is a screen shot from my FTK program showing a

12   folder and a file within that folder on the 4-gigabyte thumb

13   drive and the contents of the file is a person requesting for

14   an access to a child pornography site.  5G is a screen shot

15   of a web page that was saved to the Joe Desktop and it

16   appears to be associated as the same web page for which the

17   4-gigabyte text file is requesting access.

18   Q    Did you create Exhibits 5F and 5G from your examination

19   of the media in this case?

20   A    Yes, I did.

21   Q    In particular the 4-gigabyte thumb drive?

22   A    Yes.

23        MS. THOMSON:  At this time, your Honor, I would

24   offer into evidence Government's Exhibits 5F and 5G.

25        THE COURT:  Counsel?

Brian Braisted - Direct                          492

1          MR. GOLDSMITH:  No objection.

2          THE COURT:  It will be received.

3    Q    What was the significance of your finding 5F and 5G?

4    A    Well, 5F is a text document and it's got at the top

5    caption Lolita House XXX, it's dated 09/05/12, but I believe

6    that's the European translation so really May 9th of 2012 --

7    I'm sorry, 12 -- oh, I'm sorry, it's May 12th of 2009, and

8    then it indicates letitbit.net which is a website and it's

9    asking for, "Can somebody post correct PW for me?  Doesn't

10   work.  Thanks in advance."  Then below that it shows "Sasha

11   Girl 12 year old movie."  Below that, two lines below that

12   there's pass and then there's a code which appears to be a

13   password.  Below that, a line that says, "Pass only works on

14   Russian PCs.  Look at the H tat follows the E."  And then

15   below that there's a number of lines and it looks like the

16   password, when you go about 12 to 15 characters in, the

17   letters are in Cyrillic which is the Russian alphabet,

18   wouldn't be -- you wouldn't be able to do that on an American

19   keyboard.  So apparently the user was trying to find out how

20   to access that particular web page.

21   Q    And on 5G?

22   A    This is a web page that was saved to the Joe Desktop,

23   and down in the bottom of the page to the left it shows a

24   picture of a young girl, it's not child pornography, the girl

25   is an adolescent but she's wearing a bra and it looks like

1    she's taking her clothes off, it's captioned Lolita House and

2    to the right of that, you'll see there is the word pass and

3    then a long string of characters which match the password

4    that the person was asking for on the text document on the

5    4-gigabyte thumb drive.

6    Q    What significance did that have to you as it relates to

7    this investigation?

8    A    Well, it suggested to me that the person was trying to

9    access this website and wasn't able to do so because his

10   password wasn't working so he sent a message out to the

11   community trying to find out what the proper password would

12   be.

13   Q    As part of your examination in this case, did you also

14   examine other media that was handed over to you from Agent

15   Chad Willard?

16   A    I did.

17   Q    Did that include the Compaq laptop that's in front of

18   you?

19   A    Yes.

20   Q    And that would be Exhibit?

21   A    7.

22   Q    As it relates to this investigation, what findings did

23   you make, if any, on the Compaq laptop?

24   A    I didn't find any child pornography on the Compaq

25   laptop, I found CCleaner, and in residual artifacts, I found

Brian Braisted – Direct

494

```
 1    some terms that suggested child pornography but no actual

 2    files.

 3    Q     Did you also conduct an examination of the 2-gigabyte

 4    thumb drive that was handed over to you by Special Agent Chad

 5    Willard?

 6    A     Yes, I did.

 7    Q     And that I believe is Exhibit?

 8    A     6.

 9    Q     6.  What, if any, findings did you make with regard to

10    that thumb drive?

11    A     There was no child pornography on that thumb drive.

12    Q     And did you look at Government Exhibit Number 8, the

13    camera?

14    A     I did.

15    Q     And what findings, if any, did you make with regard to

16    the camera?

17    A     No child pornography.

18    Q     And did you also attempt an examination of a Motorola

19    cell phone, Government Exhibit Number 9?

20    A     I did.

21    Q     What were the results of that examination?

22    A     I wasn't able to examine it, I wasn't -- either my

23    software wasn't working or the cell phone didn't work.

24    Q     We've talked a little bit about -- it's been a little

25    while, about hash values; did you do any hash comparisons
```

Brian Braisted - Direct                            495

1   between the 8-gigabyte thumb drive and the 4-gigabyte thumb

2   drive?

3   A     Yes, I did.

4   Q     At this time I'm handing you Government Exhibit 14.

5   I'm going to ask you if you recognize Government Exhibit 14.

6   A     Yes, I do.

7   Q     What is Government Exhibit 14?

8   A     Government Exhibit 14 is two pages, they're two

9   separate spreadsheets containing files from the Toshiba

10  laptop and files from the 4-gigabyte and 8-gigabyte thumb

11  drive.  What I did was I did an MD5 hash for each individual

12  file on the Toshiba laptop for files that are identified as

13  child pornography, and then I did a hash value for all of the

14  files that are contained on the 4-gigabyte and the 8-gigabyte

15  and I matched the hash values to see if in any situations

16  files that were contained on the 4-gigabyte and 8-gigabyte

17  were also contained on the Toshiba.

18  Q     What did you find?

19  A     I found 11 matches for files that were contained on

20  both the thumb drives and the Toshiba laptop.

21  Q     And Government Exhibit 14, is that a document that you

22  produced as part of your examination?

23  A     Yes, it is.

24  Q     And does that reflect the hash values that you

25  determined and compared for the 4 and the 8-gigabyte on one

Brian Braisted – Direct

1    page and the Toshiba on the other page?

2    A     Yes, it does.

3           MS. THOMSON:  Your Honor, at this time I would

4    offer into evidence Government Exhibit 14.

5           THE COURT:  Counsel?

6           MR. GOLDSMITH:  No objection.

7           THE COURT:  It will be received.

8    Q     And if we could publish Exhibit 14, please.  What's

9    shown on that first page?

10   A     These are file names, file paths, create dates and MD5

11   hash values for 11 files.

12   Q     And on the second page?

13   A     That would be the same information file name, file

14   path, create date, and MD 5 hash for files that were

15   contained on the Toshiba laptop.

16   Q     At this time I'm handing you what's been previously

17   received into evidence as Government's Exhibit 5B.  It is

18   contained in the jury binder, feel free to review it if you

19   wish.  Exhibit 5B, did you find that file path on your hash

20   comparisons?

21   A     Yes, I did.

22   Q     So what does that tell you?

23   A     That it was on both the 4-gigabyte thumb drive and the

24   Toshiba laptop computer.

25   Q     In summary, during this investigation, about,

Brian Braisted - Direct

497

1    approximately how many images of child pornography did you

2    find in total between the Toshiba laptop, the 8-gigabyte

3    thumb drive and the 4-gigabyte thumb drive?

4    A     Are you talking graphic files?

5    Q     Graphic.

6    A     Roughly 4,000 graphic files.

7    Q     And about how many video files?

8    A     About 116.

9    Q     And earlier in your testimony when you showed us the

10   user activity that was going on on that Toshiba laptop as it

11   related to images and videos of child pornography, all of

12   that activity that you showed us in Exhibits 3I, 3J, 3K, 3L,

13   3M, and 3N, was that activity performed by the user with

14   profile named Joe?

15   A     Exactly.

16            MS. THOMSON:  One moment, your Honor.

17            THE COURT:  Okay.

18            MS. THOMSON:  That may be all.  Just want to check

19   with counsel.

20                  (Pause in Proceedings.)

21            MS. THOMSON:  That's all, your Honor.

22            MR. GOLDSMITH:  May I inquire?

23            THE COURT:  You may.

24        CROSS-EXAMINATION BY MR. GOLDSMITH:

25   Q     Special Agent Braisted, throughout your forensic

Brian Braisted - Cross                                498

1    evaluation of the laptops and the flash drives in this

2    particular case, there were several determinations that were

3    made as to whether something qualified or not as child

4    pornography.  Did you make that determination or did someone

5    else?

6    A      I made that determination.

7    Q      As part of your training within the -- within your

8    experience working with Homeland Security, you've received

9    training and education on the determination of child

10   pornography?

11   A      I use case law and I use my experience.

12   Q      So have you had any training related to determining

13   child pornography?

14   A      I've had training on the law, the case law.  During

15   those training sessions they don't display child pornography

16   and say, this is child pornography or this is not child

17   pornography.

18   Q      So they leave it to your discretion?

19   A      Yes.

20   Q      And all of the examples that you provided and testified

21   about earlier today were based upon your discretion, correct?

22   A      Right.  Correct.

23   Q      Now you've discussed creating the forensic image hard

24   drive.  Did you create one image, forensic image hard drive,

25   for all of the media that you've discussed?

Brian Braisted - Cross

499

1    A      I put -- I put all the images on one hard drive, yes.

2    Q      Now, you recall testifying yesterday that upon your

3    receipt of the materials, you had also reviewed some of the

4    Canadian forensic reports, is that correct?

5    A      Not at that time.  I think later on I did review them,

6    yes.

7    Q      Do you recall when you reviewed the Canadian forensic

8    reports?

9    A      Not specifically, no.

10   Q      Now you actually -- well, withdrawn.  Do you recall if

11   it was closer in time to when you commenced your

12   investigation or further in time?

13   A      It would have been further in time.  Basically I got

14   the evidence from the case agent, Agent Willard, on the 7th I

15   came right back to the lab, I didn't receive anything more

16   from him.  Well, I'm not sure that I received anything more

17   from him until I contacted him a month later to tell him that

18   my initial exam was complete and ready for him.

19   Q      All right.  Now, you, you conduct one specific study or

20   did you perform a series of studies on the materials?

21   A      I did an initial examination on all of the evidence

22   that was submitted to me, and based on that initial

23   examination I prepared a document saying this is my findings

24   and I submitted that to the case agent.  The following year I

25   was contacted and they requested that I go into further depth

Brian Braisted - Cross

1  to try to find out file activity in close proximity to the

2  child pornography images that I had identified.

3  Q      That was prompted to you by the case agent?

4  A      Yes.

5  Q      Subsequent to that review, were there other reviews

6  that you did?

7  A      As it -- as this case starts to go to trial, other

8  questions will arise and I'll continue to do additional

9  research on the hard drives.

10  Q      Do you recall approximately when your subsequent

11  examinations were?

12  A      I believe March of 2012.

13  Q      All right.  You discussed on a couple of occasions

14  during your testimony the restore point or the system volume

15  information?

16  A      Yes.

17  Q      Is that something that is readily accessible to the

18  user?

19  A      The restore point is readily accessible.  The contents

20  of the system volume information would not be readily

21  accessible.

22  Q      And in your experience with the materials and the media

23  that you examined in this particular case, were the materials

24  that were found within the system volume information

25  accessible to the user?

Brian Braisted - Cross                                    501

1    A    The only way to be accessible would be if a person went

2    and tried to do a restore.  Upon doing a restore, those files

3    would be recreated on the system.

4    Q    And you -- and did you note any attempts to restore?

5    A    No.

6    Q    So it would be fair to say that based upon your

7    examination of the evidence, anything that was found within

8    the system volume information was not accessible to the user

9    on or about May 24th of 2009?

10   A    Not accessible short of going to the restore, right.

11   Q    You also discussed the thumb cache.  Were the materials

12   that were located in the thumb cache of the computers

13   accessible to the user?

14   A    You would use -- need to use software to actually look

15   at the thumb cache.

16   Q    All right.  And your examination of the two laptops,

17   did you find presence of a software that would be necessary

18   to view a thumb cache?

19   A    No.

20   Q    So based upon your evaluation of the two laptops, is it

21   correct to say that anything that was found within the thumb

22   cache would not be accessible to the users on or about

23   April -- I'm sorry, May 24th, 2009?

24   A    Correct, it wouldn't be readily available.

25   Q    Now, you also talked about the CCleaner software.  The

Brian Braisted – Cross

502

1    CCleaner software is software that is used to remove files

2    from the computer, correct?

3    A    It doesn't remove the files, what it does is it wipes

4    the contents of the files so the files are still there.

5    Q    So the files then sort of -- the existence of the, the

6    file is there but anything that was a part of it is not?

7    A    Exactly.

8    Q    And within your experience as a computer forensics

9    expert, are there legitimate purposes for having file wiping

10   software?

11   A    Sure, you could use it for legitimate purposes.

12   Q    And typically file wiping software is used to delete

13   information that is received from the internet, right?

14   A    Not exclusively, but a large part of that, yes.

15   Q    You touched upon in some of your testimony the word

16   cookies.  What's a cookie?

17   A    A cookie is a small text file that is left on your

18   computer when you visit an internet site.

19   Q    Is that something that the user inputs into the

20   computer?

21   A    No.

22   Q    Is that something that is automatically received from

23   points on the internet?

24   A    Yes.

25   Q    And as part of those cookies, does that help or --

Brian Braisted - Cross                                    503

1    withdrawn.  As part of those cookies, do they essentially

2    provide the computer with information in redirecting the

3    internet to certain sites where the user may find similar to

4    other sites they visited?

5    A     No, the cookie is basically put on the computer by the

6    server, by the outside presence and it's so that the next

7    time that the computer user goes to that site, the cookie

8    will identify that site as having been previously visited.

9    So it's really not for the benefit of the computer user so

10   much as for the website that it's visiting.

11   Q     And so in your testimony what you're saying is that if

12   there's the presence of some of those cookies, then really

13   that's done for the benefit of whatever websites are out

14   there?

15   A     Right.

16   Q     And that helps those websites be able to more easily

17   access or be accessed by users?

18   A     No, it's keeping track of it.  My analogy of a cookie

19   is if you go to a supermarket nowdays and they have customer

20   appreciation benefits and you sign up, you get a little key

21   tag and so every time you go to the store, you give them your

22   key tag and they swipe it.  What they're doing is they're

23   taking information that you provide to them and now they're

24   seeing your user preferences, the things you buy, that kind

25   of thing, and they're storing that data and now they're

Brian Braisted - Cross                                    504

1    oriented, orient their services to what's going to benefit

2    you.  That's what a cookie does for the server is it

3    basically identifies the computer that visited.

4    Q    Okay.  Are these cookies -- are these things that can

5    help slow your computer down?

6    A    Cookie won't slow your computer down, no.

7    Q    But there are typically other software that may be

8    installed by the internet from websites that are viewed that

9    can slow your computer down?

10   A    A virus can slow your computer down, yes.

11   Q    And typically within those, as we've been discussing

12   these file wiping software, that's legitimately used to help

13   speed up the processing of the computer, correct?

14   A    I wouldn't say that it's got anything to do with the

15   speed of the computer, I would say more that it's got to do

16   with the volume, in other words, you have a hard drive that

17   is receiving a lot of files to it, those files are taking up

18   space.  If those files are considered to be extraneous by the

19   user, you might want to get rid of those files.

20   Q    So essentially it's used to help the user better

21   perform on the laptop?

22   A    Right.

23   Q    You talked about at one point icons on the computer.

24   You stated that typically these can be created in three ways,

25   is that correct?

Brian Braisted - Cross                                505

1    A      At least three ways, yes.

2    Q      What are those three ways?

3    A      They can be installed by the system when the system

4    first installs the operating system, icons can be placed on

5    the computer.  They can be added when you add a program, as

6    you install the program it will ask you if you want to put a

7    shortcut icon on the desktop.  And if you say yes, then it

8    will put an icon on the desktop.  The user can also generate

9    desktop icons if it's a folder, he can just right-click and

10   place a new folder on the desktop.  You can click and drag

11   from another source and put it on the desktop.

12   Q      Sometimes when you're downloading information from the

13   internet, that can automatically prompt an icon on the

14   desktop, correct?

15   A      I don't -- not that I'm aware, what are you talking --

16   Q      A shortcut?

17   A      It's not going to automatically do it, it's going to

18   ask you whether you want to put it there.

19   Q      Typically when there's applications or information

20   being downloaded from the internet, there will be a prompt on

21   the computer, right?

22   A      If you're installing a program, it will prompt you and

23   ask you if you want to have a shortcut, yes.

24   Q      And typically when we see these prompts, as you said,

25   it will ask you, manufacturers and software engineers will

Brian Braisted – Cross                                                506

1    typically put in or premark those prompts, correct?

2    A     It's got to be coded obviously, yes.

3    Q     You discussed at some points the folder on the Toshiba

4    laptop entitled New Folder 2?

5    A     Yes.

6    Q     Do you recall testifying that it could be visible to

7    anyone?

8    A     Yes.

9    Q     When you said that it could be visible to anyone, by

10   simply opening up the computer or turning it on, the contents

11   of that folder is visible to anyone?

12   A     The folder itself, the icon of the folder is on the

13   desktop.  The only way to see the contents of the folder

14   would be to open that folder either by clicking the icon or

15   going into the Windows Explorer and opening the folder.

16   Q     So there was no password protection to access the

17   content of New Folder 2?

18   A     No, it's not password protected.

19   Q     On the topic of passwords, at one point you noted that

20   there was a prompt on the e-mail of the Toshiba, is that

21   correct?

22   A     Right.

23   Q     And you recall testifying about a pop-up icon that was

24   on the computer for the screen capture that you created?

25   A     Right.

Brian Braisted - Cross                                    507

1    Q      And that was asking for user name and a password?

2    A      Right.

3    Q      Do you recall the prompt box underneath the user name

4    and password?

5    A      Yes.

6    Q      And you recall that that prompt box asked the user to

7    remember my credentials?

8    A      Right.

9    Q      Okay.  And that means that it's the computer saying,

10   remember the information so that the next time you don't have

11   to put it in, right?

12   A      Right.

13   Q      And if the individual did not uncheck that box while

14   they were putting their credentials in, it means that there

15   was no security to prohibit other individuals from accessing

16   the e-mail in that, for instance?

17   A      Well, because CCleaner removed all of the auto fill-in

18   information so there would be no information for the computer

19   to fill in automatically.

20   Q      So as part of the file wiping software, CCleaner would

21   also remove passwords and user names?

22   A      In this case, it was checked to remove all those, the

23   auto fill information.

24   Q      You also recall testifying about a particular screen

25   capture that you had created as part of your exam, which is a

Brian Braisted - Cross

1    text file listing user names and passwords?

2    A    Yes.

3    Q    And that text file of user names and passwords was

4    attributable to several e-mail accounts?

5    A    Correct.

6    Q    And at least one of those e-mail accounts that had

7    attributable user names and passwords was the jjenkins e-mail

8    account?

9    A    Yes.

10   Q    That was the Road Runner account that you discussed

11   earlier?

12   A    I think they were all Road Runner, but yes.

13   Q    And that text file was accessible on the computer?

14   A    Yes.

15   Q    And if someone were aware of that text file, that

16   essentially would provide them with all of the credentials to

17   access those particular e-mail accounts, correct?

18   A    Correct.

19   Q    That was the RR info text document, correct?

20   A    Correct, yes.

21   Q    There was at some point a number of photographs that

22   you described which were -- appeared to be girls on a beach?

23   A    Yes.

24   Q    You described I think a series of about five or six or

25   seven images?

Brian Braisted - Cross                                    509

1    A    Seven pictures.

2    Q    And did you classify those images as pornographic?

3    A    No, I did not.

4    Q    There was also a photograph image of Mr. Jenkins with a

5    younger girl, do you recall testifying about that?

6    A    Yes.

7    Q    Did you classify that as pornographic?

8    A    No.

9    Q    Did you have any information whatsoever about the

10   identity of the girl in that photograph?

11   A    None whatsoever.

12   Q    Any information of where that photograph was taken?

13   A    No.

14   Q    Any information when it was taken?

15   A    I could find the create date, but no, I didn't record

16   that.

17   Q    You discussed on several occasions the user name of

18   Joe.  Did you find other user names on the computer?

19   A    No.

20   Q    So there was only one user name available on the

21   Toshiba laptop?

22   A    Correct.

23   Q    And the user name is -- Well, withdrawn.  Why don't you

24   describe what a user name is generically as it relates to a

25   computer.

Brian Braisted - Cross                                    510

1    A     A Windows computer can have multiple user accounts.

2    When you first set up the program and even at a later date,

3    you can create a specific user account for an individual.  In

4    this case, there was only one user account, it was labeled

5    Joe.  Some computers, for example home computers, people

6    might want to have a user account for the adults and a user

7    account for the children, and then the children can go into

8    their user account and there might be specific controls as to

9    where they can go on to the internet, would not be -- would

10   not carry over to the user account for the adults.

11   Q     Okay.  So essentially for the Toshiba laptop, is it

12   fair to say then that anyone who turned on that computer was

13   going to be routed through the Joe user name?

14   A     Yes.

15   Q     And that's because there were no other options on the

16   Toshiba laptop?

17   A     Exactly.

18   Q     So the Joe user name in and of itself does not provide

19   you with any information as to who the actual user is?

20   A     Correct.

21   Q     On the topic of any evidence of who the actual users

22   are, does the forensic software that you used, whether it be

23   the FTK or the EnCase, provide you with any evidence of who

24   the actual user was of any of the e-mail accounts that were

25   accessed in your study?

Brian Braisted - Cross                                          511

1    A     No.

2    Q     Does the presence of the informational text file

3    including the user names and the passwords for all of the

4    e-mails suggest to you that anyone who opened the computer

5    would be capable of accessing e-mail if they knew of that

6    document's existence?

7    A     If they found that document, yes, that password would

8    work for anyone.

9    Q     Within particular e-mail programs, is it possible to

10   change the settings to allow for the computer to periodically

11   check e-mail for you, whether you're actively selecting check

12   e-mail or not?

13   A     Well, no.  The way e-mail works, all of these are

14   roadrunner.com accounts so when a person sends an e-mail to,

15   there are three accounts, gjenkins, jenkinselectric, and

16   jjenkins70.  When a person sends an e-mail to any of those

17   three accounts, it will be routed to the Road Runner server,

18   the e-mail server, and it will stay right on that server, so

19   someone accessing say the jjenkins70 e-mail account, he can

20   do it one of two ways.  He can go to the internet and he can

21   go to roadrunner.com, then he can enter his password -- or

22   his e-mail address and the password and that will give him

23   the e-mails.  But those will only be visible to him on the

24   server, they don't bring it down into his computer.  In this

25   case he was using a program called Windows Mail, and Windows

Brian Braisted - Cross                    512

1    Mail allows you to configure multiple user, or multiple

2    e-mail accounts and you give them the user account name and

3    the password and then at that point whenever you go on the

4    internet and you put in the security code, your user name and

5    password, it will actually bring those e-mails from the

6    server that's located presumably in Rochester to your hard

7    drive.  So that's the only reason I could see the e-mails

8    with the actual date stamp, full e-mail located on the hard

9    drive.

10   Q    And if the e-mail application had been left open while

11   the computer's running, will it continue to refresh on its

12   own?

13   A    It could if you have that Windows Mail program open and

14   running and you've put in the user name and password, that

15   could happen.

16   Q    Did you find any evidence of the laptop being

17   completely turned off within the last 24 hours prior to

18   May 24th of 2009?

19   A    No.

20   Q    Would the FTK or the EnCase software be able to

21   delineate if it had actually been turned off completely?

22   A    If I looked specifically, yes, I didn't see any of that

23   indication.

24   Q    So from your study it appears, though, that the Toshiba

25   laptop was probably left on, generally?

Brian Braisted - Cross                                        513

1    A      It was probably in sleep mode.

2    Q      Sleep mode means it's still on, correct?

3    A      Right.

4    Q      It's just sort of reserving power?

5    A      It's reserving power, there's no file activity going

6    on.

7    Q      You did testify briefly about Exhibit 3I, and you noted

8    five files ending in the -- ending in the term flv?

9    A      Yes.

10   Q      You referred to those as erotica.  Is that

11   distinguishable from pornographic material?

12   A      Yes, it is.

13   Q      So that's not pornographic material then?

14   A      No.

15   Q      The one program that you referred to in some of your

16   testimony, breekelsey, do you recall that?

17   A      It was a file name, yes.

18   Q      And you recall that you performed a word search on the

19   Toshiba for it?

20   A      Right.

21   Q      At the time that you performed your evaluation, did it

22   appear as though the breekelsey file was present and

23   accessible on the Toshiba?

24   A      No, it was not.

25   Q      Do you have an evidence notebook up there?

Brian Braisted - Cross                           514

1   A      I do not have a binder, no, sir.

2   Q      Do you have the binder?

3   A      I do not, no.

4   Q      No.

5          MR. GOLDSMITH:  May I approach?

6          THE COURT:  You may.

7   Q      Special Agent Braisted, I've opened up a evidence

8   binder to Exhibit 3L for you, 3L as in Larry.

9   A      Okay.

10  Q      This is a series of screen captures that you discussed

11  earlier, in what was a comparison of time?

12  A      Right.

13  Q      Is that correct?

14  A      Yes.

15  Q      In other words you were comparing the time of certain

16  files being put onto the system versus other activity?

17  A      Exactly.

18  Q      On page 1 of Exhibit 3L, there are essentially three

19  columns, correct?

20  A      Right.

21  Q      The left column is -- appears to be file names, right?

22  A      Correct.

23  Q      Middle column appears to be date and time stamps?

24  A      Yes.

25  Q      And the right column would be pathway?

Brian Braisted - Cross                                   515

1    A     Right.

2    Q     And the date and time stamps in the middle column,

3    those reflect when the file was accessed?

4    A     No, they were files created.

5    Q     And there was several files that you discussed having

6    been created at approximately 10:00 in the morning or shortly

7    after it; do you recall that?

8    A     Yes, uh-huh.

9    Q     And that -- and the date in which those were created

10   was February 22nd of 2009?

11   A     Correct.

12   Q     If you look at page 5 of 3L, this was an e-mail that

13   you had discussed being accessed shortly after, is that

14   correct?

15   A     Correct.

16   Q     And within the e-mail itself, there is a like a pop-up

17   box, is it fair to say?

18   A     Yeah.

19   Q     And that's -- is that something that's created by your

20   forensic equipment?

21   A     No, what that is is, you see the e-mail, the major

22   portion of it has -- well, when you look at an e-mail on your

23   screen, you'll see the data on your screen, behind that data

24   is what's called source code, and so when you right-click, it

25   will give you a pop-up and you can show source code and

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Brian Braisted - Cross                                    516

1    that's the box I have in here.  This is source code for that

2    particular e-mail.

3    Q    Okay.  So in the source code for the e-mail, it has the

4    title, return path, and then next to it is an e-mail address,

5    correct?

6    A    Exactly, yep.

7    Q    And underneath that it says received and then it has a

8    series of what appears to be maybe some e-mail servers?

9    A    There, yeah, IP addresses, basically that's the routing

10   that the e-mail took to get from the person who sent it, Ron

11   Travis, to get to the server at Road Runner, rr.com.

12   Q    Okay.  And it -- then there's the e-mail address of

13   jjenkins70@rochester.rr.com?

14   A    Exactly.

15   Q    And then beneath that is the date and time stamp?

16   A    Right.

17   Q    And that date and time stamp is February 22nd of 2009,

18   the same day, correct?

19   A    Exactly.

20   Q    And that lists a time of 14:31:05, right?

21   A    Right.

22   Q    And that time is in military time, correct?

23   A    It's Greenwich mean time, yes.

24   Q    As part of your evaluations, you looked at the last

25   time many of these files that you testified about had been

Brian Braisted - Cross                                    517

1  accessed, is that correct?

2  A     Yes.

3  Q     And as a great deal of the evidence that you discussed,

4  you were talking about files being accessed in or about days

5  or hours preceding May 24th of 2009, correct?

6  A     Correct.

7  Q     As part of your study of these materials, had you

8  reviewed the Canadian forensic reports?

9  A     I -- the written reports, yes.

10  Q     Okay.  Did you use that, the Canadian forensic reports

11  in any way to assist you with your studies?

12  A     No.

13  Q     Did you use those reports in any way to double check

14  the accuracy of your reports?

15  A     No.

16  Q     But you did review them?

17  A     I looked at them, yes.

18  Q     So essentially you reviewed them for no purpose?

19  A     I didn't have a need to look at them frankly, I stand

20  by my report.

21  Q     All right.  Do you recall any portions of the Canadian

22  forensic report detailing the finding that none of the --

23  none of the files had been accessed from the thumb drives

24  after May 16th of 2009?

25  A     I don't recall that, no.

Brian Braisted - Cross                                       518

1    Q     Now you testified that you had found approximately

2    4,000 image files on the two flash drives?

3    A     I don't think quite that many, I think that includes

4    the Toshiba laptop, I think there were 3250 graphic files on

5    the 4-gigabyte and then about 15 on the 8-gigabyte thumb

6    drive.

7    Q     So all told, between those devices, you found close to

8    4,000 graphic images?

9    A     Yes.

10   Q     And those were only -- withdrawn.  And those images

11   were images that you determined to be pornographic?

12   A     Right.

13   Q     Do you recall the Canadian forensic report finding in

14   the -- finding a number in the hundreds?

15   A     No, I don't recall that.

16          MS. THOMSON:  Your Honor, I'm going to object to

17   this line of questioning.  Number one, that examiner that

18   made the determinations was here and that was the proper

19   person to ask those questions to.

20          THE COURT:  No, it's fair cross-examination, he's

21   testified that he looked at the report so he's asking him

22   what he recalls about the Canadian report.  It's permissible.

23   Go ahead.

24          MR. GOLDSMITH:  Thank you.

25   Q     Do you recall the Canadian forensic report concluding

Brian Braisted - Cross                           519

1    that there was no evidence of the files found on the two

2    flash drives having passed through the Toshiba laptop?

3    A     I don't recall that, no.

4           THE COURT:  Counsel, I'm going to ask you to

5    approach for a minute.

6                    (At Side Bar.)

7           THE COURT:  One of the things I am going to insist

8    on is that you have a good faith basis for these questions,

9    that they're coming from the Canadian report and not things

10   that you're just asking him does he remember.

11          MR. GOLDSMITH:  No, your Honor, I have obtained the

12   forensic report and I'm referring to notes that I made on a

13   portion of them, I do not anticipate many more if any

14   questions --

15          THE COURT:  Okay.

16          MR. GOLDSMITH:  -- based on this.

17          THE COURT:  So you're saying you have a Canadian

18   report saying there was only hundreds of images as opposed to

19   thousands?

20          MR. GOLDSMITH:  Yes, based upon my review.

21          THE COURT:  Counsel, you want to be heard?

22          MS. THOMSON:  Number one, it's not correct, and

23   number two, the witness who would have been the appropriate

24   witness to talk to about that also testified that on the one

25   form of media, he located 1600, and then, if the court

Brian Braisted - Cross

1    recalls, he indicated there's a saturation point, so if he's

2    going to ask these questions --

3              THE COURT:  These are misleading questions.

4              MR. GOLDSMITH:  I don't find them to be misleading.

5              THE COURT:  You don't, I do.  Quite frankly, you

6    know, just because you're reading the report and interpreting

7    it some way, you know, there was testimony in this courtroom

8    from the Canadian expert who said, you know, I looked at

9    this, I hit a saturation point and I stopped and if you're

10   using this number and saying that the Canadian said this is

11   the number that we found, that's not accurate.

12             MR. GOLDSMITH:  No, your Honor, that is the number

13   that was put in their report.

14             THE COURT:  But again, Counsel, that is not

15   accurate with regard to the way you're asking these questions

16   and asking this witness to say, you know, assuming that the

17   Canadian report says there was only this many.  That's not an

18   accurate good faith question.

19             MR. GOLDSMITH:  Your Honor, I, I do not want the

20   court to think that I am intentionally misleading the jury or

21   in any way attempting to run afoul of the court.  If the

22   court wishes, I will withdraw those questions.

23             THE COURT:  I'm going to ask you again, is there a

24   good faith basis for these questions based on the Canadian

25   report that says that there was only a certain number of

Brian Braisted - Cross

521

1    images found.

2         MR. GOLDSMITH:  Your Honor, I would not ask them if

3    I did not have a good faith basis.

4         THE COURT:  Okay, well, then I want to see the

5    report where it says that there was only a certain number of

6    images found.

7         MR. GOLDSMITH:  Okay.

8              (Pause in Proceedings.)

9         MR. GOLDSMITH:  Your Honor, he's talking about

10   numbers of five images, five images, and I do recall that

11   there was a -- that there was something I read from

12   Mr. Wohlert, I think maybe in an affidavit or a warrant

13   earlier discussing the number of 500 or so.

14        MS. THOMSON:  It's loud.

15        MR. GOLDSMITH:  I'm sorry.  Continue to look

16   through the rest of the report.

17        MS. THOMSON:  Your Honor, so the court understands,

18   the classification he's asking about is contained within Kip

19   Wohlert's report because if the court recalls, he testified

20   that he receives data from Harrington, from just the imaging

21   process and he classifies that data, so the report that's

22   being referenced there is not even the report that the

23   Canadian testified to, this report is the classification, Kip

24   Wohlert classified them into categories 1 through 6, and made

25   those determinations, being one category.

Brian Braisted - Cross                                    522

1          MR. GOLDSMITH:  The charts.

2          MS. THOMSON:  That's the classification.

3          MR. GOLDSMITH:  Yeah.  We have no child

4     pornography, we have adult pornography, we have --

5          MS. THOMSON:  Do you know which piece of media

6     you're referring to?

7          MR. GOLDSMITH:  The C4P was the -- these were the

8     flash drives.

9          MS. THOMSON:  Okay.  The flash drives are line 66,

10    22, the PNY is -- 4-gigabyte is in the Canadian report

11    classified as 6622B1, and the 8-gigabyte is 6622B2 so which

12    one are you looking at?

13         THE COURT:  And was there a determination of number

14    of photographs for those by the Canadian?

15         MS. THOMSON:  The Canadians indicated on the

16    4-gigabyte, 1,644 to date, and 13 movie clips.

17         THE COURT:  To date meaning they went so far and

18    stopped?

19         MS. THOMSON:  He stopped.

20         THE COURT:  Which he testified to.

21         MR. GOLDSMITH:  Okay.

22         THE COURT:  So again, those questions are

23    misleading.

24         MR. GOLDSMITH:  I apologize, your Honor, I'm

25    reviewing these files, paperwork that I've been presented

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Brian Braisted - Cross

523

1    looking at numbers, and I will then, in this case upon the

2    showing from the government an explanation of the original

3    files that they have, I will withdraw those questions.

4              THE COURT:  Well, I think maybe a good way to

5    handle this is, you can try and clean it up on redirect.  I'm

6    going to ask you to be cautious about the questions you're

7    asking, okay, because they've been misleading, and I'll allow

8    you to get into it on redirect and clean it up and if I feel

9    it's necessary, I'll hear you about a curative instruction

10   with regard to this issue because the way the questions were

11   asked, you're suggesting that the reports from Canada only

12   had, you know, a limited number of photographs and that's

13   really not accurate.  Okay.

14             MR. GOLDSMITH:  I apologize, your Honor, I do not

15   want the court to feel that I'm being misleading with my

16   examination.

17             THE COURT:  Well, I understand based on your

18   explanation of how it could have happened so we're going to

19   clean it up.

20             MR. GOLDSMITH:  Thank you.

21             THE COURT:  Okay.

22                  (Open Court.)

23   Q    I should be very brief with a couple of questions left.

24   Special Agent Braisted, do you have any software capable

25   within your experience as a forensic examiner that would

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Brian Braisted - Cross                              524

1    indicate to you who the exact user is of a device prior to

2    your receipt of it?

3    A    No.

4    Q    Is there any way to determine based upon your

5    examination who exactly accessed the e-mail accounts that

6    you've discussed in your testimony?

7    A    No.

8    Q    Do you have anything in your -- withdrawn.  Do you have

9    any tools that would be able to accurately decipher for you

10   the individuals who were able to access the materials on the

11   thumb drives that you've testified about?

12   A    No.

13          MR. GOLDSMITH:  No further questions.

14          THE COURT:  Okay, Counsel, redirect?

15          MS. THOMSON:  Yes, your Honor.

16   REDIRECT EXAMINATION BY MS. THOMSON:

17   Q    When the cross-examination began, you were asked some

18   questions about that system volume information; do you recall

19   those questions?

20   A    Yes.

21   Q    And you indicated that's not accessible, it would not

22   be accessible to the user?

23   A    Right.

24   Q    Even if it's not accessible to the user at that time,

25   does it show that at some time, that images were accessible

Brian Braisted - Redirect                                     525

1   and on that Toshiba?

2   A      Absolutely.

3   Q      I want to show you Exhibit 3N, please, I'll approach

4   handing the exhibit binder, 3N.  N like Nancy.  Looking at

5   Exhibit 3N, if you could just briefly tell us what 3N, what

6   Exhibit 3N is?

7   A      3N shows contents of the 4-gigabyte thumb drive,

8   specifically the contents of the folder 052209, and it's

9   highlighting a file named elena038.jpg.

10  Q      And does that indicate the date and location where that

11  file was at, at some point resided?

12  A      It shows that it was created on the 4-gigabyte thumb

13  drive on May 22nd of 2009 at 10:25 p.m.

14  Q      And did you find evidence of that particular image on

15  the Toshiba?

16  A      I found the file name and the folder name in a panel on

17  the Toshiba, yes.

18  Q      And then that file was on the 4-gigabyte thumb drive?

19  A      Exactly.

20  Q      What determination did you make about it both having

21  evidence on the Toshiba and having presence on the 4-gigabyte

22  as noted on 5/22/09 at 10:25 p.m.?

23  A      Well, it indicates to me that it was on the Toshiba

24  laptop and then it was moved over to the 4-gigabyte thumb

25  drive.

Brian Braisted – Redirect

1    Q    Was that on May 22nd, 2009?

2    A    At 10:25, exactly.

3    Q    You were also asked about Exhibit 3I, so if you could

4    turn to Exhibit 3I, please.  And I believe if I recall your

5    testimony, Exhibit 3I, the first page, that shows the date

6    that New Folder 2 was created and saved to the desktop user

7    Joe, is that correct?

8    A    Correct.

9    Q    And then immediately thereafter, can you tell us, was

10   it those five videos, the 13, 14, 15, 29, and 30.flv that

11   were immediately also saved to that New Folder 2?

12   A    Exactly.

13   Q    And those were files as you mentioned on

14   cross-examination that were child erotica?

15   A    Correct.

16   Q    And so when you say child erotica, could you just

17   describe that in relation to child pornography?

18   A    Child erotica would be depicting children, minor under

19   the age of 18 displaying themselves but it doesn't reach the

20   level of child pornography.  So the person is clothed or is

21   not gratuitously displaying their genitalia.

22   Q    And after -- did you watch all the videos together?

23   A    Yes, I did.

24   Q    And together what's their total length?

25   A    I believe they were just short of 33 minutes in length.

Brian Braisted – Redirect                        527

1    Q     And at 33 minutes after the New Folder 2 is saved to

2    the user, what happened?

3    A     An e-mail was created on the hard drive.

4    Q     And by created, does that mean that e-mail was accessed

5    by the user?

6    A     Exactly.

7    Q     And that e-mail was addressed to Joe Jenkins?

8    A     Yes.

9    Q     So about 33 minutes after New Folder 2 was created,

10   that e-mail is accessed?

11   A     Correct.

12   Q     And in between there are five child erotica videos

13   totaling almost 33 minutes in length that are saved at that

14   time?

15   A     Correct.

16   Q     You were asked some questions about whether or not you

17   reviewed the Canadian classification report with regard to

18   the items examined in this case?

19   A     Yes.

20   Q     Are you aware if that Canadian report also noted the

21   presence of child pornography on the media examined?

22   A     I believe it did note some child pornography, yes.

23   Q     With regard to that 4-gigabyte thumb drive, you were

24   asked some questions on cross-examination; are you aware if

25   the Canadians also found child pornography on the thumb

Brian Braisted – Redirect                                    528

1    drive?

2    A      I really don't remember specifically, I think that it

3    was, they did find child pornography on the thumb drive, yes.

4             MS. THOMSON:  One moment, your Honor.  That's all,

5    your Honor.

6             THE COURT:  Okay.  Any recross?  Or -- yes.

7             MR. GOLDSMITH:  One moment, your Honor.

8                 (A discussion was held off the record between

9                  Mr. Goldsmith and the defendant.)

10            MR. GOLDSMITH:  No, I have no further questions.

11            THE COURT:  You may step down.

12            THE WITNESS:  Thank you, Judge.

13            THE COURT:  All right.  Safe travels home.

14            THE WITNESS:  I appreciate it.

15                (The witness was excused.)

16            THE COURT:  Okay, ladies and gentlemen, it's 12:24,

17   I wanted to make sure that we completed that witness before

18   we took our lunch break.  We will take our lunch break now,

19   I'm going to ask you to be back in the jury room at 1:30, so

20   we can continue with proceedings.  Please don't discuss the

21   case with anybody, don't read, listen, or view anything

22   related to the case.  If anybody approaches you, tries to

23   talk to you about this case, I need to know about it

24   immediately.  Enjoy your lunch.

25                (Jury Excused, 12:24 p.m.)

529

1           THE COURT:  Okay.  We're outside the presence of

2     the jury.  Government, how many more witnesses do you

3     anticipate?

4           MS. THOMSON:  Four very brief witnesses.

5           THE COURT:  Four witnesses.  Okay.  And what we'll

6     do is I'll have my clerks put the jury charge, proposed jury

7     charge and verdict sheet on your tables over the lunch hour,

8     we'll finish those witnesses and you said they're all brief?

9           MS. THOMSON:  Very.

10          THE COURT:  Okay.  Well, we'll finish up that

11    testimony and what I -- depending on what time it is, I'm

12    thinking I may excuse this jury for the day and let them get

13    home because the snow has continued to come, and give them a

14    lengthy period of time to make it home, but we'll see what

15    time it is.  And then we'll stay here and do our jury charge

16    conference, and again, depending on what time it is, I'll

17    allow you to sum up in the morning instead of this afternoon.

18    As we go forward, just seeing what's going on, depending upon

19    what defense counsel decides to do, okay.

20          MR. GOLDSMITH:  Thank you.

21          THE COURT:  All right.  Enjoy your lunch.

22          THE CLERK:  Court's in recess.

23               (Luncheon recess, 12:25 p.m. to 1:33 p.m.)

24               (Open Court, Jury Out.)

25          THE COURT:  Okay.  We're in the courtroom outside

1      the presence of the jury, government prepared to call their

2      next witness?

3              MS. THOMSON:  Yes, your Honor.

4              THE COURT:  Okay.  Mr. Goldsmith, you're all set?

5              MR. GOLDSMITH:  Yes.

6              THE COURT:  Okay.  Please bring the jury in.

7                  (Jury Present, 1:34 p.m.)

8              THE COURT:  Okay.  The record should reflect we

9      have all the ladies and gentlemen of the jury, hopefully

10     enjoyed your lunch, and we're prepared to hear the

11     government's next witness.

12             MS. CARROLL:  Your Honor, at this time the

13     government would seek permission to recall Special Agent Chad

14     Willard to admit an exhibit that we realize we omitted during

15     his testimony originally.

16             THE COURT:  Okay, come on up.  Special Agent

17     Willard, you're still under oath, okay?

18             THE WITNESS:  Understand.

19

20          C H A D   W I L L A R D , recalled as a

21     witness and being previously duly sworn, testifies

22     as follows:

23         DIRECT EXAMINATION BY MS. CARROLL:

24     Q    Special Agent Willard, you testified previously that

25     you retrieved a number of items of physical evidence from

Chad Willard - Direct                                    531

1    Detective Constable Kip Wohlert; was that your testimony

2    earlier?

3    A      Yes, it was.

4    Q      Special Agent Willard, I'm handing you what's been

5    marked for identification as Government's Exhibit 13.  Do you

6    recognize Government's 13?

7    A      Yes, I do.

8    Q      What is it?

9    A      Ontario Provincial Police property report that was

10   provided to me at the time that I met Kip Wohlert at the Port

11   of Lansdowne, Ontario, Canada.

12   Q      How are you able to recognize that?

13   A      By the items listed in the property sheet as well as my

14   name and signature written at the bottom.

15   Q      And are you the person who affixed your name and

16   signature to that form?

17   A      Yes.

18   Q      And is the date listed on that form accurate as to the

19   date that you signed the form?

20   A      Yes, April 1st, 2011.

21         MS. CARROLL:  Your Honor, permission to admit

22   Government's Exhibit 13?

23              THE COURT:  Any objection?

24              MR. GOLDSMITH:  Brief voir dire.

25              THE COURT:  Go ahead.

Chad Willard – Direct                    532

1          VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

2    Q    Special Agent Willard, the signature at the bottom of

3    the page is your signature?

4    A    Yes, sir.

5    Q    And do you recall when you signed it?

6    A    April 1st, 2011.

7    Q    Was this document in your possession since April 1st of

8    2011?

9    A    A copy of this document, the original went back to the

10   Ontario Provincial Police.

11            MR. GOLDSMITH:  No further questions, no objection.

12            THE COURT:  It will be received.

13         CONTINUED DIRECT EXAMINATION BY MS. CARROLL:

14   Q    Special Agent Willard, at the date you -- can you go

15   ahead and publish 13.  The items of physical evidence

16   reflected on 13, could you read those, please?

17   A    Looks like line item 1 is Toshiba laptop; line item 2,

18   Compaq laptop; line item 3, Olympus camera and cards; line

19   item 4 is Verizon cell phone; and line item 5 are three jump

20   drives.

21   Q    Are those the same items that are reflected on the

22   Homeland Security custody receipt that was previously

23   admitted as Government's Exhibit 12?

24   A    Yes, they are.

25   Q    And have you had the opportunity to compare the serial

Chad Willard – Direct                    533

1   numbers on this property receipt form to those on the items

2   listed on Government's Exhibit 12, your property receipt?

3   A      Yes, I have.

4   Q      Do they correspond?

5   A      Yes, they do.

6   Q      What is the date that you signed this evidence out?

7   A      April 1st, 2011.

8   Q      Who did you receive the evidence from?

9   A      Kip Wohlert, detective sergeant with the Ontario

10  Provincial Police.

11  Q      Where was that evidence transfer conducted?

12  A      The Lansdowne, Ontario port of entry, Canada.

13  Q      What did you do after taking custody of the evidence?

14  A      I brought it into the United States into the Thousand

15  Islands Alexandria Bay port of entry and locked it in a

16  DHS-approved vault safe in our office.

17           MS. CARROLL:  No further questions.

18           THE COURT:  Any cross?

19           MR. GOLDSMITH:  Sure.

20           CROSS-EXAMINATION BY MR. GOLDSMITH:

21  Q      Special Agent Willard, on Exhibit 12, that is the

22  voucher that you created, correct?

23  A      Correct.

24  Q      It does not include a notation for the memory card

25  associated with the camera, correct?

Chad Willard - Cross                                    534

1   A      Correct.

2   Q      Did you have the memory card that was associated with

3   the camera at the time that you took possession and created

4   Exhibit Number 12?

5   A      Yes, and it's still in the camera today.

6   Q      Were there any notations anywhere in Exhibit Number 12

7   or elsewhere created by your office that indicate possession

8   of the memory card in the camera?

9   A      No, it's included in the camera, inside.

10  Q      Were you able to review the serial number at any point

11  from the card that was enclosed in the camera?

12  A      No, I didn't review serial number from the Olympus

13  digital camera.

14          MR. GOLDSMITH:  No further questions.

15          MS. CARROLL:  No redirect, your Honor.

16          THE COURT:  You may step down.  Thank you.

17              (The witness was excused.)

18          MS. THOMSON:  Your Honor, could we approach.

19          THE COURT:  You may.

20              (At Side Bar.)

21          MS. THOMSON:  I don't know if the court had an

22  opportunity to view, AUSA Ed Broton just entered the

23  courtroom, he handed me the following piece of paper that I

24  wanted to bring to the court's attention.  It relates to the

25  next witness who is scheduled to testify and that is Josh

1   Findley.  The court may recall we had intended, noticed Roy

2   Shepherd to be a witness to be testifying.  Roy Shepherd had

3   a medical emergency, couldn't be here and if you recall we

4   were able to get Josh Findley to come and testify in his

5   place because they were both involved in the investigation.

6   As soon as we realized that we were going to be doing a

7   substitution of witnesses, we did a *Giglio* request and did

8   come back positive one incidence and that incidence is

9   Officer Findley alleged -- it was alleged alcohol use by him

10   during office hours.  I don't believe it would go to his

11   credibility at this point, I did want to disclose it, let the

12   court know so that the court can make that ruling in that

13   regard but we're disclosing it.  I don't believe it's the

14   type of evidence that the court should admit for

15   cross-examination.

16            THE COURT:  Counsel?

17            MR. GOLDSMITH:  I --

18            THE COURT:  You haven't seen this, haven't had a

19   chance to digest it or anything.

20            MR. GOLDSMITH:  Not at all.

21            THE COURT:  Why don't you go ahead, do you have a

22   copy of it?

23            MS. THOMSON:  I was handed -- it was Mr. Broton's

24   impression we had already passed this witness so he didn't

25   realize, we just received it.

1                    (Mr. Goldsmith reviewing document.)

2              MR. GOLDSMITH:  Do we have any information as to

3       when this happened?  Because the note said it was a violation

4       of probationary activity which might indicate that it was

5       when he was first starting out.

6              MS. THOMSON:  That's what I would believe to be,

7       he's been an agent for at least I believe eight years.

8              MR. GOLDSMITH:  Then in light of the circumstances,

9       your Honor, I don't think it's relevant to the testimony.

10             THE COURT:  Not to credibility, unless there's

11      something else in the direct examination that comes,

12      something that there's some issue that it may become relevant

13      and I'll hear you.

14             MR. GOLDSMITH:  I'll reserve the opportunity if it

15      comes up in testimony.

16             THE COURT:  If there's anything that, you know, as

17      you're listening to the direct and preparing to do a

18      cross-examination, if you have some application where you

19      think it may become relevant, you let me know.

20             MR. GOLDSMITH:  Thank you.

21             MS. THOMSON:  Thank you.

22                  (Open Court.)

23             MS. THOMSON:  The government calls to the stand

24      Special Agent Joshua Findley.

25             THE CLERK:  Good afternoon.  Step up here.  State

Joshua Findley - Direct                                        537

1    your full name, spell it for the record, please.

2                THE WITNESS:  Josh Findley, F-i-n-d-l-e-y.  Joshua.

3

4                J O S H U A   F I N D L E Y , called as a

5    witness and being duly sworn, testifies as follows:

6                DIRECT EXAMINATION BY MS. THOMSON:

7    Q     Good afternoon.

8    A     Good afternoon.

9    Q     Could you please introduce yourself to the members of

10   the jury?

11   A     My name's Josh Findley, I'm a special agent for the

12   Department of Homeland Security and I'm stationed in

13   Portland, Oregon.

14   Q     Did you have to travel to Syracuse from Portland?

15   A     I did yesterday.

16   Q     Did your luggage arrive?

17   A     My luggage did not make it and so I'm still in my same

18   clothes from yesterday so I apologize for my appearance.

19   Q     How long have you been a special agent in Portland?

20   A     I've been a special agent for a total of about 18 years

21   now and about 14 of it in Portland.

22   Q     What do you do as a special agent?

23   A     As special agent, I investigate federal felony crimes.

24   I spent about eight years of that time investigating sex

25   crimes.

Joshua Findley - Direct                                    538

1   Q      Does that include child exploitation cases?

2   A      Yes.

3   Q      And child pornography cases?

4   A      Yes.

5   Q      Are you familiar with a video series called Vicky?

6   A      Yes, I am.

7   Q      And do you know what I mean by video series?

8   A      Yeah.  We refer to child pornography series, and when

9   we get a case and we have images of child pornography, they

10  are submitted to the National Center for Missing and

11  Exploited Children and the way they catalog that is by

12  victim.  And so we refer to each victim in all the videos or

13  photographs that victim is in as a series of child

14  pornography.  And so when you say the Vicky series, it's a

15  series of images and videos that all relate to one victim,

16  even though they happened over different periods of time.

17  Q      And is there a place that keeps track of all of the

18  images and videos that are distributed or found to have been

19  distributed, possessed, received, of series?

20  A      Yeah, and so the National Center for Missing and

21  Exploited Children is the agency that most law enforcement

22  agencies, both federal and local agencies when they get

23  images of child pornography, they submit those images to the

24  National Center for Missing and Exploited Children.  The

25  National Center doesn't actually keep and maintain those

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

1     images, but what they do keep and maintain is what's called a

2     hash value which is like a digital fingerprint that each

3     photograph has a unique, or video has a unique fingerprint so

4     to speak.  And so they'll catalog those fingerprints and so

5     when an agency submits videos or images, then the National

6     Center for Missing and Exploited Children can tell you what

7     victim, if that victim is known or if it's an unknown victim

8     and so that's the way we catalog our victims in these cases.

9     Q     Does law enforcement together with using the resources

10    of the National Center for Missing and Exploited Children try

11    to locate the victims that are portrayed in the child

12    pornographic image and videos that are recovered?

13    A     Yes.  Our agency as well as other agencies, when we

14    find unknown victims or when we find images or videos that we

15    haven't ever seen before, you know, we embark on efforts to

16    try to identify who that child is by looking at maybe clues

17    in the background, listening to voices, the languages that

18    are used, you know, we've even gone so far as to try to read

19    bar codes of bags of chips to see if we can tell where it was

20    sold, all in furtherance of just identifying children that

21    are in a bad situation so we can get them out of it.

22    Q     Were you involved in the investigation involving Vicky?

23    A     Yes, I was.

24    Q     Have you seen video files of Vicky in other

25    investigations?

Joshua Findley – Direct                              540

1    A      Yes, I've seen it in probably hundreds of

2    investigations.

3    Q      As part of your involvement in that investigation, did

4    you meet the young girl who is portrayed in the video?

5    A      I did.

6    Q      Is her real name Vicky?

7    A      No, it's not.

8    Q      And don't identify her by name, please.  How did it

9    come to pass that you met her?

10   A      It was one of those things like I explained earlier

11   that there was a detective in Toronto who had tried to

12   identify who she was because it had been a child pornography

13   series that he had seen a lot of and he developed clues that

14   she was in the northwest United States and requested our

15   office's assistance in finding her.  We were actually able to

16   end up tracking her down through some different

17   circumstances, but she had reported sexual abuse by her

18   father and based on that report, then we were able to match

19   her up with the series and these images that we were looking

20   to identify the child.  Based on that, I interviewed her and

21   was able to confirm that it was her in these videos.

22   Q      How old was she when you met her?

23   A      She was 17 when I met her.

24   Q      Did you review prior to your testimony today video

25   files that held the title 9YO Vicky stripping and sucking,

Joshua Findley - Direct                    541

1    and then continues, did you review those video files?

2    A    Yes, ma'am.

3    Q    Did you review them in the office of the United States

4    Attorney's office?

5    A    Yes, ma'am.

6    Q    And after reviewing them, were you able to see videos

7    that you identified as the investigation you were involved

8    with, the Vicky investigation?

9    A    Yes, ma'am, it was her.

10   Q    At this time I'm handing the witness Government's

11   Exhibit 4C and 4G and I'm going to ask you if you recognize

12   4C and 4G.

13   A    I do.

14   Q    Are those the disks that you reviewed in the United

15   States Attorney's office?

16   A    They are.

17   Q    On those disks, were you able to see a video of Vicky?

18   A    Yes.

19   Q    On each of those disks?

20   A    Yes, ma'am.

21   Q    And is that the same child you investigated with regard

22   to the images and videos of her having been involved in your

23   investigation?

24   A    Yes, ma'am, I recognize those videos as being produced

25   in eastern Washington.

Joshua Findley - Cross                                          542

1    Q      And if we could see a clip.  We're going to show a clip
2    but it's the first portion that does not -- it contains the
3    image fully clothed.
4                      (A video clip from Government's Exhibit No. 4C
5                       was played.)
6    Q      Is that Vicky?
7    A      That is, that is her, and all the videos on both CDs
8    were the same video.
9    Q      And you met her when she was 17?
10   A      Yes.
11   Q      Were you able to view that video and see that that's
12   the same girl that you met?
13   A      Yes, absolutely.
14          MS. THOMSON:  I have no further questions.
15          CROSS-EXAMINATION BY MR. GOLDSMITH:
16   Q      Agent Findley, you were able to actually meet the
17   subject of that video?
18   A      Yes, sir.
19   Q      Personally?
20   A      Yes, sir.
21   Q      And as part of your investigation, you were able to
22   determine that that was in fact the same individual that was
23   depicted in the movie?
24   A      Yes, sir.
25   Q      And you used that by additional investigative

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Joshua Findley - Redirect                    543

1    techniques other than simply interviewing the subject?

2    A     Yes, sir.

3    Q     So in other words the identification was corroborated

4    by other evidence?

5    A     Yes, sir.

6    Q     And you said you met her when she was 17 years old, is

7    that correct?

8    A     Yes, sir.

9    Q     And at the time were you able to establish her age

10   relative to when the video was produced?

11   A     Yes, she was 10 and 11 when the videos were produced.

12         MR. GOLDSMITH:  No further questions.

13         THE COURT:  Anything further?

14         MS. THOMSON:  Yes, your Honor.

15   REDIRECT EXAMINATION BY MS. THOMSON:

16   Q     There were more than one video of Vicky?

17   A     There were about 13 videos in total that were created.

18   Since that time they've been distributed over the internet

19   and they've been broken up into thousands of different videos

20   and images and still shots just by different individuals who

21   have collected these and taken parts out.

22   Q     So when you indicated that you were able to view the

23   video and identify that video as the same girl that you met

24   when she was 17, had you had the opportunity to review all

25   the videos --

Joshua Findley - Redirect                          544

1    A      I believe --

2    Q      -- in your possession at that time?

3    A      Oh, yes, ma'am.

4    Q      And that would be more than the one that you saw today?

5    A      Yes, ma'am.

6           THE COURT:  Anything further?

7           MR. GOLDSMITH:  No.

8           THE COURT:  Counsel?  Thank you, sir.

9           THE WITNESS:  Thank you.

10          THE COURT:  You may step down.  Good luck getting

11   back to Portland.

12          THE WITNESS:  Thank you, hopefully I'll have my

13   luggage in time.

14          THE COURT:  Maybe you can catch it on the way back.

15              (The witness was excused.)

16          MS. THOMSON:  Government calls to the stand Special

17   Agent Chris McClellan.

18          THE CLERK:  Good afternoon.  State your full name

19   and spell it for the record, please.

20          THE WITNESS:  Christopher McClellan,

21   M-c-C-l-e-l-l-a-n.

22

23          C H R I S T O P H E R   M c C L E L L A N,

24   called as a witness and being duly sworn, testifies

25   as follows:

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Christopher McClellan - Direct                    545

1          <u>DIRECT EXAMINATION BY MS. THOMSON</u>:

2     Q     Can you please introduce yourself to the members of the

3     jury?

4     A     Yes, my name's Christopher McClellan, I'm a special

5     agent with Homeland Security, Homeland Security

6     Investigations.

7     Q     How long have you been a special agent with Homeland

8     Security Investigations?

9     A     I've been a special agent since 2005.

10    Q     What are some of your duties as a special agent?

11    A     Some of my duties as special agent, I do more of a

12    complex criminal investigations, I had done, worked in

13    narcotics unit where -- doing international narcotics

14    smuggling, money smuggling, in and out of the country.  I

15    worked smaller resident agents office which we basically

16    handled anything that came our way, money, drugs, child

17    exploitation, pretty much everything that our agency covers.

18    Q     Do you also do cases involving child pornography?

19    A     Yes, I do.

20    Q     Did you become involved in a case regarding a KP Nancy?

21    A     Yes, I did.

22    Q     How did you become involved in that case?

23    A     I became involved in that case in August of 2010.  We

24    have our -- one of our offices, HSI office in Los Angeles,

25    California had contacted my office in New York and basically

1    they had an undercover operation in which they received --

2    they were on a board where there was suspected child

3    pornography being traded and they had undercover e-mail

4    persona account set up, they were chatting with suspected

5    people trading child pornography and they had received

6    numerous videos of child pornography to their undercover

7    account.  As part of their investigation, they started to

8    realize that one of the girls, one of the victims in the

9    video they were able to trace back to the New York area which

10   was the area that I was working.

11   Q     What part of New York?

12   A     The victim they believed came back to Westchester

13   County, New York, actually town of Mount Kisco, New York.

14   Q     And so as a result of that location being narrowed

15   down, what did you do, how did you become involved?

16   A     I became involved, basically they were able to trace

17   back an IP address which is basically the internet address

18   being used by certain e-mail accounts, using that IP address

19   they were able to locate an e-mail address that had some of

20   the markings, the girl, the victim in the video had an

21   embedded image in the video KP432, using that embedded image

22   they were able to do searches on the internet for any other

23   websites, e-mail addresses that came back with KP432.  They

24   actually found a MySpace account which they sent me the

25   information on and I subpoenaed MySpace and Yahoo e-mail

Christopher McClellan - Direct                     547

1    address, both MySpace and her Yahoo account had pictures

2    which looked identical to the girl in the video, so I took

3    those images of the video and girl from the MySpace accounts,

4    I made screen shots of those videos, I went to local area,

5    the school where the -- where I believed that the victim

6    lived and I identified, I was able to identify her by showing

7    the pictures to the school resource officer who positively

8    identified the girl as a student in the school.

9    Q    Was that around August of 2010?

10   A    Yes, it was.

11   Q    Did you have the opportunity to meet the person that

12   was depicted in the KP Nancy video?

13   A    Yes, I did.

14   Q    How old was she when you met her?

15   A    When I met her in August of 2010 she was 15 years old.

16   Q    And were you able to determine when the video of her,

17   how old she was when it was created?

18   A    She said she made the video approximately six months

19   earlier so that would have put her at age 14.

20   Q    We're going to show you a very brief clip from

21   Exhibit 3H that would be clip 1, if we could just hold it.

22   Do you recognize the clip that's shown before you?

23   A    Yes, I do.

24   Q    And who, without using the name, who is depicted in

25   this image?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Christopher McClellan - Direct                    548

1    A      The girl depicted in this image is what -- her series

2    became known as KP Nancy.

3    Q      When you met her she was 15?

4    A      Yes.

5              MS. THOMSON:  I have nothing further.

6              MR. GOLDSMITH:  No questions.

7              THE COURT:  Thank you, sir.

8              THE WITNESS:  Thank you.

9              THE COURT:  You may step down.

10                 (The witness was excused.)

11             MS. THOMSON:  United States calls its next witness

12   and that is Justin Myers.

13             THE CLERK:  Good afternoon, step up here.  Please

14   state your full name, spell it for the record, please.

15             THE WITNESS:  Justin Myers, and it's J-u-s-t-i-n,

16   M-y-e-r-s.

17

18             J U S T I N   M Y E R S , called as a

19   witness and being duly sworn, testifies as follows:

20             DIRECT EXAMINATION BY MS. THOMSON:

21   Q      Good afternoon.  Could you please introduce yourself to

22   the members of the jury.

23   A      Sure.  Justin Myers, Homeland Security Investigations,

24   I'm a special agent, been there for about 10 years.

25   Q      What do you do with Homeland Security Investigation?

Justin Myers - Direct                                        549

1    A    I work criminal investigations, specifically I worked

2    child exploitation investigations for approximately six

3    years.

4    Q    Did you become involved in an investigation with regard

5    to an image series by the name of Green Bath?

6    A    Yes.

7    Q    And when I say an image series Green Bath, do you

8    understand what that means?

9    A    Yes, I do.

10   Q    And what is that?

11   A    A series is used to describe a sequence of images,

12   videos, that belong to a particular victim.

13   Q    How did you become involved in the series Green Bath?

14   A    During 2008, I was conducting a child exploitation

15   investigation involving the distribution of child pornography

16   through interstate commerce.  During the investigation I

17   executed a search warrant at a residence, which revealed the

18   presence of production of child pornography.  Upon further

19   investigation, I was able to identify the victim of that

20   child pornography as a prepubescent female who was living at

21   the residence where the search warrant was conducted and thus

22   was able to submit those -- that evidence and which became

23   part of the Green Bath series.

24   Q    When you say submit that evidence, who did you submit

25   it to?

Justin Myers - Direct                                    550

1    A    To NCMEC.

2    Q    Is that the National Center for Missing and Exploited

3    Children?

4    A    Yes.

5    Q    And then does the National Center for Missing and

6    Exploited Children keep track of any image or video file that

7    comes up hash matching to Green Bath?

8    A    Yes.

9    Q    I'm handing you at this time what's previously been

10   marked as Government's Exhibit 3C and 4B and I'm going to ask

11   you if you recognize what these are.

12   A    Yes, I do.

13   Q    Did you have the opportunity prior to your testimony to

14   go to the United States Attorney's office and review graphic

15   files contained on those exhibits?

16   A    Yes, I did.

17   Q    And when you reviewed them, did you see images that

18   correspond to the Green Bath series?

19   A    Yes, I did.

20   Q    Images that are contained in Government's Exhibit 3C

21   and 4B, is that of the victim that you met pursuant to your

22   investigation on Green Bath?

23   A    Yes.

24   Q    How old was the victim when you met her?

25   A    Eleven years old.

Justin Myers - Direct                                            551

1    Q     And were you able to determine how old she was when the

2    images were taken of her?

3    A     Yes, between the ages of 8 and 10.

4    Q     I'm now handing you what's been previously marked as

5    Government's Exhibit Number D and I'm going to ask you --

6    that would be 3D, and the jury is free to open up their

7    binders to 3D if they wish.  Do you recognize Exhibit 3D?

8    A     Yes.

9    Q     And what is depicted in Exhibit 3D, without using a

10   real name?

11   A     It's the victim from Green Bath series.

12   Q     That's the child that you met?

13   A     Yes.

14   Q     And she was 11 when you met her?

15   A     Yes.

16             MS. THOMSON:  I have no other questions.

17             MR. GOLDSMITH:  No questions.

18             THE COURT:  No cross, okay.  Thank you, sir, you

19   may step down.

20             THE WITNESS:  Thank you, your Honor.

21                 (The witness was excused.)

22             MS. THOMSON:  At this time, your Honor, the

23   government calls to the stand Mike Wojeski.

24             THE CLERK:  Good afternoon, sir.  Can you state

25   your full name and spell it for the record, please.

Michael Wojeski - Direct

552

1    THE WITNESS:  Michael J. Wojeski, W-o-j-e-s-k-i.

2

3    M I C H A E L   J .   W O J E S K I ,

4    called as a witness and being duly sworn, testifies

5    as follows:

6    <u>DIRECT EXAMINATION BY MS. THOMSON</u>:

7    Q    Good afternoon.  Could you please introduce yourself to

8    the members of the jury.

9    A    I'm Corporal Michael J. Wojeski from the Cayuga County

10   Sheriff's Department.

11   Q    How long have you worked for the Cayuga County

12   Sheriff's Department?

13   A    Fourteen years.

14   Q    What do you do?

15   A    I am a shift supervisor and phone system administrator

16   for the entire facility.

17   Q    And is that the Cayuga County Jail?

18   A    Correct.

19   Q    In the 14 years that you've been with the Cayuga County

20   Sheriff's Department, can you tell us some of the positions

21   you've held?

22   A    I started as a regular corrections officer line staff,

23   and then approximately three years ago I took the test and

24   was promoted to corporal shift supervisor, so I now run the

25   jail for my shift which is 2 to 10 in the evenings.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

1    Q     Corporal Wojeski, you also mentioned that, some

2    responsibilities as it relates to phones, could you tell --

3    A     Correct.

4    Q     -- tell us about that?

5    A     I'm the phone system administrator, every outgoing

6    inmate phone call in the facility has to be run through the

7    digital system, Global Tel is the company's name.  I do all

8    the maintenance on the computers, not the actual repair but

9    software updates and if someone's getting calls that they do

10   not want, I can go to the system and block it so that no

11   phone calls may be made to that number anymore.

12   Q     If there were a repair that were needed for the phone

13   system, would you be notified?

14   A     Yes, I'd be notified and then I would contact the

15   actual repair person to come in.

16   Q     How long have you held that position, the phone

17   administrator?

18   A     Approximately five years.

19   Q     In 2009 you were the phone administrator?

20   A     Yeah.

21   Q     Do inmates at Cayuga County Jail have access to

22   telephones?

23   A     Yes.

24   Q     How do they have access, can you describe it?

25   A     There's -- depending on the housing units they're in,

Michael Wojeski - Direct                           554

1    there's anywhere from one pay phone to four pay phones in

2    each housing unit, and they have access when they are not in

3    lock downs, lock downs during shift change or emergencies

4    where they have to go to their cells.  And normal operations,

5    they're out and walking around, and at any time if there's a

6    phone open, they may walk over, pick it up and make an

7    outgoing call.

8    Q    Does the facility have a mechanism to record the

9    telephone calls that are made --

10   A    Yes.

11   Q    -- by the inmates?

12   A    Yes.

13   Q    Can you describe that mechanism?

14   A    It's a digital system, every phone call goes through

15   the digital system and it records their personal

16   identification number, the phone that they're calling from,

17   the phone number that they are calling, the date and time of

18   the call, and an audio recording if the call is completed and

19   the outside partner -- or outside party, excuse me, accepts

20   the charges.

21   Q    In October of 2011, was that system in place?

22   A    Yes.

23   Q    Are you familiar with how the system works?

24   A    Yes.

25   Q    Could you just explain how your system works?

Michael Wojeski - Direct                    555

1    A     The -- when an inmate wants to make a call, he goes to

2    the phone, like I said, he picks up the phone, enters his

3    personal identification number, it has a couple prompts

4    before that connects, it will send a digital to the receiving

5    party to tell them that they have a phone call, the inmate's

6    name, the location, and it will give them prompts to accept

7    the charges, deny the charges, block the number, add money to

8    the prepay account, and they must accept, deny, or do one of

9    the prompts.

10   Q     Where does that inmate pin number come from?

11   A     Every inmate when they enter the facility is given a

12   pin number.  The pin number is used for the telephone,

13   commissary, so they can order food, hygiene products, and

14   it's so that our system can keep track of who's who because

15   some names are so close that we need a number and a name to

16   separate who's who.

17   Q     Using the name and number system, that's how you

18   separate inmate calls?

19   A     Correct.

20   Q     And did you receive training on that phone system by

21   the manufacturer of the phone system?

22   A     Yes.

23   Q     When a call is made by an inmate, how is that paid for?

24   A     The called party would have to set up a prepaid

25   account, usually with a credit card, the first phone call

Michael Wojeski – Direct                                      556

1   out, it will instruct the called party on how to set up the

2   account and mainly use credit card, and they will set up an

3   account with their deposit of, I believe it's now 25 or $50

4   and then as it gets down, the system will prompt them to add

5   more money if they would like.

6   Q    And that adding more money, is that done over the

7   phone?

8   A    Correct.

9   Q    Is that pin number assigned to the inmate on arrival to

10  the facility?

11  A    Yes.

12  Q    When an inmate makes a phone call, is the recipient

13  advised that they're receiving a phone call from a

14  correctional facility?

15  A    Yes.

16  Q    Is there a standard recording at the beginning of every

17  inmate call?

18  A    Yes.

19  Q    And can you just give us the nature of that, the

20  standard reporting?

21  A    Global Tel Inc., you have a collect call from, blank,

22  name, an inmate at Cayuga County Jail, and then it goes into,

23  to accept the charges, press 5, I believe it is, and then to

24  deny, to add money.

25  Q    Is there an admonishment that the call is being

Michael Wojeski - Direct                          557

1    recorded?

2    A      In the beginning of every phone call.

3    Q      And are the inmates advised that their calls are being

4    recorded?

5    A      Yes.

6    Q      Now when an inmate call is made, that call's recorded?

7    A      Yes.

8    Q      And how does the system keep track of those recorded

9    calls, how are they stored?

10   A      They're stored on hard drives in a secure room for a

11   duration of time.

12   Q      And is that stored digitally?

13   A      Yes.

14   Q      At some point can you tell us if an inmate by the name

15   of Joseph Jenkins entered your facility?

16   A      Yes, he did.

17   Q      Have you reviewed the inmate records for Joseph

18   Jenkins?

19   A      Yes, I did.

20   Q      And have you provided the U.S. Attorney's office with

21   jail -- inmate calls made from the pin number of Joseph

22   Jenkins?

23   A      Yes, I did.

24   Q      Can you describe how you did that?

25   A      I went into the computer system which I have keys to

Michael Wojeski - Direct                          558

1    the locked room, I ran the name and the identification number

2    through the report, it shows me every phone call he made,

3    whether people accepted it, whether they denied him, if he

4    made a phone call and before it finished he hung up, it will

5    still record and let me know that he's tried, and I run the

6    report and I just download it onto a disk which I forward on

7    to the requesting agency.

8    Q    At this time I'm showing you for identification

9    purposes only Exhibit 10C and I'm going to ask you if you

10   recognize Exhibit 10C.

11   A    Yes.

12   Q    What is that?

13   A    That is the disk with the records from Mr. Jenkins that

14   I made.

15   Q    And what did you do with that disk, did you provide it

16   to someone?

17   A    Yes.

18   Q    Who did you provide that to?

19   A    To Mr. Willard.

20   Q    Did you make any alterations to the recordings or are

21   the recordings that are contained on the disk exactly as you

22   recorded them?

23   A    They are exactly as I recorded them.

24   Q    I'm now showing the witness what's been previously

25   marked as Exhibit 10A and I'm going to ask you if you

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Michael Wojeski – Direct                               559

1    recognize 10A.

2    A     Yes.

3    Q     What is Exhibit 10A?

4    A     That is another copy of the phone records.

5    Q     Did you have an opportunity to listen to and review

6    Exhibit 10A?

7    A     Yes.

8    Q     As well as Exhibit 10C?

9    A     Yes.

10   Q     10A, is that a single phone call from the multiple

11   phone calls that you recorded in 10C?

12   A     Yes.

13   Q     And you reviewed yourself Exhibit 10A?

14   A     Yes.

15         MS. THOMSON:  At this time, your Honor, I would

16   move into evidence Exhibit 10A.

17         THE COURT:  Any objection?

18         MR. GOLDSMITH:  Just brief voir dire, if I may,

19   your Honor.

20         THE COURT:  You may.

21         VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

22   Q     Sergeant Wojeski, you actually downloaded the material

23   from the computer system onto the disks?

24   A     Correct.

25   Q     And you provided these disks directly to the U.S.

Michael Wojeski - Direct                        560

1    Attorney's office, is that correct?

2    A     I sent the disks to Mr. Willard.

3    Q     Okay.  And the disks as they -- as you're holding them

4    in your hand today, are they the exact disk that you

5    produced?

6    A     Yes.

7          MR. GOLDSMITH:  No further questions, no objection.

8          THE COURT:  Received.

9          CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

10   Q     Exhibit 10C, what time period did you save, in terms of

11   dates if you could look at Exhibit 10C and tell us what dates

12   you preserved.

13   A     This was 10/6/2011 to 4/20/2012.

14   Q     And then Exhibit 10A, again having had the opportunity

15   to review it, is that a call that was made from your facility

16   on March 6, 2012?

17   A     Yes.

18   Q     And that call was recorded?

19   A     Yes.

20   Q     The contents of that recording, are they on

21   Exhibit 10A?

22   A     Yes.

23         MS. THOMSON:  Your Honor, at this time I would seek

24   to publish Exhibit 10A.

25         THE COURT:  Go ahead.

Michael Wojeski – Cross                        561

1              (A telephone call from Government Exhibit No.

2              10A was played.)

3    Q     Agent Wojeski, did you also make a CD of calls from the

4    time period April 25th, 2012 to August 8, 2012?

5    A     Yes.

6    Q     Are those contained on Exhibit 10D?

7    A     Yes.

8    Q     Each of the instances where you provided a CD of calls,

9    was the system in operating order at the time that you

10   recorded it?

11   A     Yes.

12            MS. THOMSON:  I have no further questions.

13            THE COURT:  Any cross?

14            MR. GOLDSMITH:  Briefly.

15   CROSS-EXAMINATION BY MR. GOLDSMITH:

16   Q     Corporal Wojeski, there was just a phone conversation

17   was played in the courtroom, correct?

18   A     Yes.

19   Q     And that was a conversation that you had recorded at

20   the request of the United States government, correct?

21   A     Yes.

22   Q     And that was a conversation that you had copied from a

23   system and provided to them, right?

24   A     Yes.

25   Q     Is that the entirety of the conversation?

Michael Wojeski - Cross                    562

1    A    I don't believe so.

2    Q    Do you happen to recall if there was -- what the other

3    subject matter of that conversation was?

4    A    No, I do not recall.

5              MR. GOLDSMITH:  No further questions.

6              MS. THOMSON:  Nothing further.

7              THE COURT:  Anything further?  You may step down,

8    sir, thank you.  Travel safe.

9                  (The witness was excused.)

10             THE COURT:  Have another witness?

11             MS. CARROLL:  We don't, your Honor.  The only thing

12   left for the government is to move into evidence what was

13   admitted subject to connection.

14             THE COURT:  Okay.

15             MS. CARROLL:  That consists of Exhibit 13, 13A,

16   and -- and the physical evidence, your Honor, so Exhibits 3A,

17   4A, 5A, 6, 7, 8, and 9, all of the additional --

18             THE COURT:  All that were offered and received

19   subject to connection with regard to the chain of custody?

20             MS. CARROLL:  Yes, your Honor.

21             MR. GOLDSMITH:  May I approach?

22             THE COURT:  You may.  Come on up.

23                  (At Side Bar.)

24             MR. GOLDSMITH:  Your Honor, I object, can I

25   continue to object on chain of custody?  While there were a

563

1    number of witnesses regarding the chain of custody in this

2    case that did provide certain vouchers related to it, we did

3    not hear from Detective Sergeant Harrington who was the

4    forensic expert and had possession of them, at least the

5    physical evidence materials for some period of time during

6    the Canadian investigation is not present.  Accordingly,

7    while I do certainly understand the chain of custody

8    arguments are viewed in light of the preponderance standard

9    and light most favorable to the government, I do think there

10   was a significant gap that was not appropriately established

11   and therefore would continue my objection and feel that the

12   evidence should not be deemed properly admissible.

13            THE COURT:  Who wants to be heard?

14            MS. CARROLL:  I can be heard.  Your Honor, we

15   actually have a completely accurately documented chain of

16   custody with no missing links.  Harrington does not appear on

17   the chain of custody forms because he was not the evidence

18   custodian.  It was signed into the forensic lab by Michel

19   Boulay, who assigned the numbers to it and it stayed in the

20   custody, during that part of the chain of custody it was only

21   logged out of the forensic lab to be stored by Paul Thompson

22   in another secure facility.  Harrington actually could not

23   provide evidence on the chain of custody because he doesn't

24   appear in it.

25            THE COURT:  So what was Harrington's role with

564

1      regard to the evidence?

2              MS. CARROLL:  He performed the imaging.

3              THE COURT:  Okay.

4              MR. GOLDSMITH:  He was the Canadian forensic.

5              THE COURT:  You're saying it never left the lab, it

6      was never signed out, it was always in the custody of the

7      lab.

8              MS. CARROLL:  Exactly.

9              THE COURT:  Okay.  Yeah, I'm going to overrule the

10     objection, I feel that there's sufficient factual basis to

11     establish, legally establish chain of custody that's

12     acceptable to this court to receive all the items that have

13     been received subject to connection into evidence so they

14     will be received into evidence.  Now of course the chain of

15     custody arguments that you'd like to make or choose to make

16     to this jury are still something that you can do, that's a

17     fact question for this jury as well.  You can make those

18     arguments but I find that it's legally sufficient so it will

19     be received.

20             MR. GOLDSMITH:  Thank you.

21             THE COURT:  Okay.  Anything else?  You're going to

22     rest?

23             MS. CARROLL:  Yes.

24             THE COURT:  I'll have you rest in front of the

25     jury, I'll excuse the jury, I'll let you talk to your client

565

1   and decide what he wants to do.  Depending on what he does or

2   does not want to do, we'll make a record and then I'll bring

3   the jury back and allow you to do what you want to do.

4           MR. GOLDSMITH:  Right, thank you.

5           THE COURT:  As far as either resting or putting him

6   on, whatever you're going to do, okay.

7                   (Open Court.)

8           THE COURT:  Okay.  With those evidentiary issues

9   out of the way, and I'm going to ask that the attorneys

10  confirm with my courtroom deputy all the evidence that's been

11  received, subject to that, what does the government wish to

12  do?

13          MS. THOMSON:  At this time, your Honor, the

14  government rests.

15          THE COURT:  Okay, the government rests.  All right.

16  Ladies and gentlemen, the government's concluded their case.

17  I want them to verify some evidence issues, that everything

18  has been received so I'm going to give you a short break and

19  I'm going to get you right back out here and we'll hear from

20  defense counsel as to what they choose to do or not to do,

21  completely up to them as you've already heard, and we'll act

22  accordingly from there as to what we're going to do for the

23  rest of the day, okay.  So take a break, and please do not

24  discuss the case.

25                  (Jury Excused, 2:20 p.m.)

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

1          THE COURT:  Okay.  If counsel just wants to verify

2    with my courtroom deputy that all the exhibits that you

3    offered and believe are received into evidence are indeed

4    listed as received into the record, we'll accomplish that

5    task, and then Mr. Goldsmith, I'll hear from you and your

6    client as to what you'd like to do.

7          MR. GOLDSMITH:  Thank you.

8          THE COURT:  Okay.

9              (Court in recess.)

10             (Open Court, Jury Out.)

11         THE COURT:  Mr. Goldsmith?

12         MR. GOLDSMITH:  I have, excuse me, I've conferred

13   with Mr. Jenkins several times over the last couple of days,

14   and certainly during the course of today's testimony,

15   proceedings and at this time he has confirmed his desire to

16   testify.

17         THE COURT:  Okay.

18         MR. GOLDSMITH:  Before we get into that, would the

19   court prefer that I make legal applications pursuant to

20   Rule 29?

21         THE COURT:  You can do that now.

22         MR. GOLDSMITH:  Okay.  At this point, your Honor, I

23   make two arguments.  First, that the government has failed to

24   meet its burden, even in light most favorable to the

25   government as the standard is for Rule 29 applications.  The

1    evidence in this case, while it provides sufficient facts for

2    the jury to evaluate the presence of child pornography on the

3    one laptop computer and on the three -- I'm sorry, two of the

4    three flash drives, it did not in any way sufficiently

5    establish the mens rea categories and the elements of these

6    cases.  In other words, the evidence did not establish that

7    Mr. Jenkins knowingly and intentionally possessed those

8    materials.  In fact, the testimony of Special Agent Braisted

9    earlier today clearly established that there is no particular

10   device nor evidence nor conclusion that he could have made

11   based upon the evidence itself as to who the actual users

12   were logging in.  He also provided evidence of the security

13   levels, or rather, lack of security levels on the Toshiba

14   computer, the fact that there was a file, a text file

15   indicating all of the user names and passwords for all of the

16   e-mails.  That evidence does not -- withdrawn -- is not

17   sufficient to prove beyond a reasonable doubt to any

18   reasonable juror who the user was, and whether further down

19   that user actually was the defendant Joseph Jenkins.  So

20   under those circumstances I believe that the evidence is

21   insufficient to prove all of the necessary elements beyond a

22   reasonable doubt.

23           The second aspect of my motion for the case to be

24   dismissed at this point is in light of the evidence or the

25   testimony that Kip Wohlert provided yesterday.  It is a

568

1    reapplication of prior arguments by Mr. Jenkins that the

2    jurisdiction, the procedures are not proper in this case

3    under the U.S.-Canadian extradition treaty.  Article 17 of

4    that treaty, and I'm happy to provide the court a copy if it

5    hasn't reviewed it already, dictates that it is up to

6    executive authority of the Canadian and in this case the

7    United States government to discuss and authorize the

8    transfer of a case.  Detective Wohlert testified yesterday,

9    I'm sorry, Sergeant Detective Wohlert testified yesterday

10   that it was his discretion and his decision alone when he

11   made the phone calls to United States authorities in his

12   attempts to follow up or have the United States authorities

13   follow up in its pursuit of Mr. Jenkins after the bench

14   warrant had been issued in Canada.  For those reasons,

15   respectfully request that the court dismiss the indictment in

16   this matter.

17            THE COURT:  Thank you, Counsel.

18            MS. CARROLL:  Your Honor, first, as defense counsel

19   acknowledged, Rule 29 motions are to be construed in light

20   most favorable to the government and it is the government's

21   position they have met and sustained the burden of proof well

22   exceeding the requirements of a Rule 29 threshold.  The issue

23   that defense counsel raised was the government's failure to

24   establish sufficient proof to sustain the knowingly and

25   intentionally element of both Counts 1 and 2.

1      First of all, on the issue of the defendant's

2  ownership of the laptop computer and the USB drives, we heard

3  testimony that the defendant explicitly acknowledged his

4  ownership of the Toshiba laptop to Officer Johnston.

5  Further, a photograph of the defendant was found on the

6  Toshiba laptop, and the defendant at no point disclaimed

7  ownership of the USB drives, the 8-gigabyte and the

8  4-gigabyte that are identified in Counts 1 and 2.

9      Beyond that, we heard testimony from certified

10  forensic examiner Braisted about an interwoven fabric of

11  activity on the Toshiba laptop and the 8-gigabyte and

12  4-gigabyte USB drives reflecting the identity of the user and

13  owner and operator of those laptops.  All of the internet

14  activity, all of the file creation activity that Agent

15  Braisted described were done by a user with the profile name

16  Joe.  The defendant's first name is Joseph.  The only user

17  profile on that computer was Joe.

18      Beyond that, Agent Braisted testified that the

19  user, who was accessing internet sites associated with child

20  pornography, the user who created New Folder 2, the user who

21  transferred child pornography into New Folder 2, the user who

22  put an 8-gigabyte and a 4-gigabyte USB drive into that

23  Toshiba laptop, the user who transferred images of child

24  pornography to the 8-gigabyte and 4-gigabyte USB drive was

25  also accessing internet accounts that were password

1    protected, and Agent Braisted testified the cleaning software

2    on that computer would have been -- there was no saving of

3    the credentials that would have allowed access to the e-mail.

4         Beyond that, the user who was accessing child

5    pornography, saving child pornography, did things like pay

6    Mr. Jenkins' Master Card bill, access e-mails from the

7    Jenkins Electronics Company.  We heard testimony that Joseph

8    Jenkins told multiple officers he operated an electronics

9    company.  He responded to e-mails, he signed e-mails with the

10   name Joe, he accessed things like travel websites and paid an

11   insurance bill, all activity interspliced with the accessing

12   and saving of child pornography.  Agent Braisted's testimony

13   on that point was more than sufficient to establish that the

14   defendant knowingly and intentionally possessed that child

15   pornography found on the USB drives and the Toshiba.

16        Finally, beyond that, there's the testimony

17   concerning the defendant's demeanor when he was confronted

18   with the fact that child pornography was found on the Toshiba

19   laptop and USB drives.  The defendant at no point expressed

20   shock or outrage, he never disclaimed ownership, his

21   responses were, not to my knowledge is there child

22   pornography on the digital media, and I don't think I've ever

23   downloaded child pornography and saved it onto my laptop.

24   Those responses in and of themselves are enough for the

25   government to meet the threshold requirements under Rule 29

571

1    motion as to the scienter elements of Counts 1 and 2.

2         THE COURT:  Okay, Counsel, do you want to be heard

3    on the second part of counsel's argument?  He's requesting

4    once again the dismissal of the indictment based on

5    extradition treaty between United States and Canada.

6         MS. CARROLL:  Your Honor, to the extent the court

7    has ruled on this issue numerous times, the government simply

8    asks the court to refer to its previous decisions and orders.

9    This was a motion that was renewed at the commencement of

10   trial, the court again denied the motion referring to its

11   previous decision.

12        THE COURT:  But he's specifically referencing the

13   testimony of a witness at the trial now and is making a

14   reapplication based on that testimony.

15        MS. CARROLL:  Your Honor, the basis of counsel's

16   argument, my understanding, is the extradition treaty in

17   Canada.  The extradition treaty in Canada holds no legal

18   weight and cannot provide a basis for the dismissal of the

19   indictment under United States laws.  The defendant's failure

20   to appear in Canadian court would not necessarily revoke the

21   extradition treaty but it is evidence of his consciousness of

22   guilt.  The extradition treaty holds no force and sway over

23   the indictment under which the defendant stands charged here.

24        THE COURT:  Okay.  Thank you, Counsel.  The court's

25   going to deny defendant's motion and find that there is

1    sufficient evidence, particularly given the standard that

2    needs to be looked -- evidence needs to be looked at in the

3    view most favorable to the government, therefore the Rule 29

4    is denied.

5              With regard to the renewed motion regarding the

6    extradition treaty between United States and Canada, the

7    court will rule the way it has previously, irregardless of

8    the testimony we heard during the trial, the court finds that

9    that has no bearing on the prior rulings that I've made with

10   regard to this case.  The fact that the defendant is residing

11   in the United States, he was arrested in the United States,

12   this case was brought and indicted here in the United States,

13   the extradition treaty between the United States and Canada

14   has no bearing with regard to this indictment and the pending

15   charges that are now before this jury.  Okay.  You've

16   indicated you'd like to put a case on?

17             MR. GOLDSMITH:  Yes, your Honor.  Mr. Jenkins will

18   be testifying as I noted earlier.  To those ends, there's one

19   issue that I think should be addressed by the court.  Earlier

20   today during the testimony of Special Agent Braisted, after a

21   lengthy side bar, examination of the Canadian forensics

22   report based upon defense counsel's beginning of a line of

23   questioning on it, the court made a ruling that we would not

24   be able to pursue questions in cross-examination of Special

25   Agent Braisted based upon Canadian forensic report.

1          THE COURT:  That's not accurate, Counsel.  That was

2     not the court's ruling.

3          MR. GOLDSMITH:  All right.

4          THE COURT:  The court in no way precluded you from

5     examining Special Agent Braisted with the Canadian report.

6     What I precluded you from doing was asking misleading

7     questions and misstating what was in that report.  I never

8     precluded you and would not preclude you from asking

9     questions about the Canadian report.  All I did was explain

10    that you had to have a good faith basis for asking the

11    questions, the questions have to be factually correct when

12    you're referring to a report and they weren't.  And that was

13    the nature of my ruling.  You indicated that you would

14    withdraw that line of questions, I told you it wouldn't be

15    necessary at this point, I said we'll allow the government to

16    clean it up on redirect.  And that was my ruling.  In no way

17    did I ever preclude you from asking questions from that

18    report to Special Agent Braisted.

19         MR. GOLDSMITH:  Your Honor, correct, I apologize

20    for the imprecise nature of my formulating statement, but it

21    really is not the point of my commentary now.  The reason I

22    raise the issue is because the court wanted a good faith

23    basis, and at the time was questioning the results of those

24    tests given the nature of the test performed related to

25    Mr. -- Special Agent Braisted.  In light of the fact that the

1   government has introduced a telephone call in which

2   Mr. Jenkins is recorded discussing a number, or when I say

3   number, a number value of files related to those two findings

4   made by the government, I believe that Mr. Jenkins may take

5   the opportunity to try and explain what was his mindset in

6   discussing those numbers or discussing the conversation that

7   was brought into the record by the government.  And I want to

8   ensure that if Mr. Jenkins is to mention and discuss his

9   mindset in discussing or what was engaged in that

10   conversation, that the court would not find it preclusive in

11   nature.

12           THE COURT:  It's not really clear to me what you're

13   asking.

14           MR. GOLDSMITH:  In other words, I want to make sure

15   that if Mr. Jenkins discusses his mindset as to what he is

16   discussing in that phone call, in the recorded phone call,

17   that the court will permit him to discuss it.

18           THE COURT:  You want to be heard?

19           MS. THOMSON:  Your Honor, if I understand the

20   argument, it's that when he's indicating amounts, he's using

21   the Canadian report as a basis.  If the defendant does

22   testify that way, then it would be the government's

23   opportunity during cross-examination to bring out the fact

24   that there was child pornography and in some instances more

25   child pornography was categorized in Canada than it was in

1    the United States.  At all times the government, besides

2    explaining the nature of the case, the way that the case came

3    to us, we've been specific not to elicit how many images from

4    Canada because he's not charged under Canadian law.  The

5    categorization of child pornography is different in the

6    United States as it is in Canada so it could lead to juror

7    confusion but if this is the road the defendant goes down and

8    the court allows that road, then the United States will ask

9    him questions with regard to that.

10              THE COURT:  There's no reason for me to preclude

11   anything, and let me make the record clear.  With regard to

12   Special Agent Braisted, the court, over the government's

13   objection, allowed you to ask him questions about the

14   Canadian report because he had testified that he had reviewed

15   that report at some point in time during his examination and

16   the work that he'd done on this case, in viewing the

17   different electronic media that he was assigned to do.  And

18   certainly, as I ruled, that area was appropriate

19   cross-examination.  The only thing I indicated to counsel

20   that wasn't appropriate was to misstate or mischaracterize

21   the report in questions during cross-examination to Special

22   Agent Braisted.  You have an obligation to have a good faith

23   basis for your question and not to insinuate, as the court

24   believed you were inappropriately, information that was not

25   contained in the report.

1           So if Mr. Jenkins wants to talk about his state of

2    mind with regard to his conversation or the things that he

3    said during a phone conversation, that's between you and your

4    client.  He's free to testify as he will, and of course he's

5    subject to cross-examination based on whatever direct

6    testimony he gives.

7           MR. GOLDSMITH:  Very well, your Honor.  Thank you.

8           THE COURT:  Okay.

9           MS. THOMSON:  Your Honor, would you entertain the

10   parties have an opportunity to go to the bathroom, just

11   quick?

12          THE COURT:  Go ahead, we'll take a brief break, get

13   this jury out here.  I want to keep moving because of the

14   weather situation.

15               (Pause in Proceedings.)

16          THE COURT:  Okay, we have counsel back, we're going

17   to proceed.  Mr. Goldsmith, you've indicated Mr. Jenkins

18   wishes to testify, is that right?

19          MR. GOLDSMITH:  Yes, that is.

20          THE COURT:  Mr. Jenkins, is that right, you want to

21   exercise your right to testify?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Okay, we're going to have you come up

24   and get in the witness seat now before the jury comes in the

25   room.  Okay, Counsel, you ready to proceed?

Joseph Jenkins – Direct                577

1          MR. GOLDSMITH:  Ready.

2          THE COURT:  Okay?

3          MS. THOMSON:  Yes, thanks.

4          THE COURT:  Please bring the jury in.

5               (Jury Present, 2:43 p.m.)

6          THE COURT:  Okay.  The record should reflect we

7  have the ladies and gentlemen of the jury after a recess, and

8  the government has rested its case.

9          Mr. Goldsmith, you've indicated that defendant

10  intends to put a case on, correct?

11          MR. GOLDSMITH:  That's correct, your Honor.

12          THE COURT:  And you're calling your first witness?

13          MR. GOLDSMITH:  Yes, at this time defense would

14  call Joseph Jenkins to the stand.

15          THE CLERK:  Good afternoon.  Can you state your

16  full name, spell it for the record, please.

17          THE DEFENDANT:  Joseph Jenkins, J-o-s-e-p-h,

18  J-e-n-k-i-n-s.

19

20          J O S E P H   J E N K I N S , called as a

21  witness and being duly sworn, testifies as follows:

22          MR. GOLDSMITH:  May I inquire?

23          THE COURT:  When you're ready.

24          MR. GOLDSMITH:  Thank you.

25          DIRECT EXAMINATION BY MR. GOLDSMITH:

Joseph Jenkins - Direct                              578

1    Q    Mr. Jenkins, where do you live?

2    A    Geneva, New York.

3    Q    And prior to your arrest, what did you do for a living?

4    A    I'm a self-employed electrician.

5    Q    Why don't you describe your practice a little bit.

6    A    Um, I started the business about 1991, um, I received

7    some training, maybe, I don't know, 600 hours locally, and

8    um, I picked up some work.  I used to -- I started out by

9    myself, I subcontracted a lot of work up, Eastman Kodak, it

10   was busy at the time, you know, people still used film, I

11   worked up there for probably four, five years, on and off,

12   and then that started to kind of slow down.  So, um, we began

13   picking up jobs around the Geneva area, you know, anywheres

14   between Rochester and Syracuse and even down as far as

15   Elmira, just the general area.  I had, took on a couple

16   partners for a while, and we did larger jobs like --

17   Q    Let me stop you, what is a larger job?

18   A    I'd call it -- well, like medium commercial work, um,

19   banks and restaurants, we did a ton of restaurants, few

20   banks, we've done Boy Scout camps -- actually I did that on

21   my own, but I had partners and we just took on a lot of, you

22   know, like small, medium commercial work, that the three of

23   us could do.  We --

24   Q    Let me stop you for a moment.  Did you have the

25   occasion to use computers for your work?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Joseph Jenkins - Direct                                579

1    A      Yes.  Of course all invoicing and things like that are

2    done on the computer, we -- I picked up a generator

3    franchise, probably about 10 years ago, selling service,

4    generators, residential, commercial.  We order -- use the

5    computers for diagnosing the boards in the generators.

6    Q      How do you use the computer to diagnose a problem with

7    the generator?

8    A      Um, there were CDs that we had, there were some CDs,

9    there were some programs, that's what one computer was always

10   in the vehicle for.  And it ran an older operating system, I

11   bought -- there were some computers I bought off eBay at one

12   point in time.

13   Q      Let me stop you.  When you said there was one computer

14   in your vehicle, describe a little bit more detail what you

15   mean by that.

16   A      There was a -- there was a computer in the briefcase,

17   wireless, couple of different wireless cards with it, and we

18   could -- well, you know, different applications, we could --

19   there's programs to run for generators, you can plug them

20   into the computer or, um -- well, there's just, there's just

21   CDs, you pick a generator, pick a CD, plug it in, you can

22   program the boards and diagnose them, find out what's wrong

23   with them, things like that.  You could order generators, get

24   online, order parts for them, find out what's wrong with

25   them, could order parts for them.  There was one, I used to

Joseph Jenkins - Direct                              580

1    buy old computers because basically what we do is when we
2    hire people, they're required to have basic hand tools and
3    transportation.  If there's anything that you run above that
4    like computers, power tools, ladders, have to provide that
5    for them.
6    Q     You said -- you just mentioned that you hired people.
7    Approximately, or to the best of your ability, how many
8    people were working with or for you for your company?
9    A     I probably had up to 10.  I like to use subcontractors.
10   So I can get them on and off, employed some part-time people
11   because work is kind of up and down, it could be very busy
12   one week and, you know, there could be nothing going on
13   another week or we could have six solid months of work and
14   then a month of nothing, and so I try to, you know, employ
15   different people and I have -- there's maybe 10 different
16   contractors in our area who are all very good friends and we
17   trade labor back and forth, might be somebody we could use
18   for a particular job, and we'll trade, you know, one person
19   work out better for certain types of jobs than others.  We do
20   mainly 70 percent commercial and about 30 percent
21   residential.  So like to use certain people for certain
22   things, but for service work you would use the more
23   intelligent people because you have to troubleshoot, whether
24   it's residential, commercial or generators, things like that,
25   and we used my truck for service work because it had most of

Joseph Jenkins - Direct                                  581

1   the tools in it.

2   Q     In 2009, approximately how many people worked with your

3   company?

4   A     That was about the time me and my two partners kind of

5   started to split up, I probably had about three of my own at

6   that time.

7   Q     Okay.  So there's three people in addition to you?

8   A     Yes.

9   Q     Could you describe the setting of -- withdrawn.  Other

10  than the computer that was in the truck, were there any other

11  computers that you used for that work?

12  A     I have an office set up in my basement, there's

13  probably four desks down there, um, it's accessible through

14  the garage.  Um, when we split up I moved pretty much

15  everything back to my house.  We had kind of a co-op, just a

16  building that we used to store things, me and my partners and

17  then we split up, moved most the stuff back to my house

18  because 2008, 2009 was around the time of recession and

19  things slowed down, and we were mainly doing service work for

20  a while.  And I take a lot of vacations and things so we

21  leave -- I try to leave my truck, my truck home.  If it were

22  an airport, I'll take a second -- usually a second vehicle at

23  my house, I'll drive that to the airport, leave my truck

24  there.  And anybody that's covering for me doing service

25  work, there's an access code to get in the garage, opens the

Joseph Jenkins - Direct                              582

1  door, and then have access to the basement, I would lock the

2  house separate.

3  Q     Let me stop you.  You just testified there was an

4  access code to enter the basement where the office was,

5  correct?

6  A     It opens the garage door, then you can walk through the

7  garage, go down into the basement.

8  Q     Did any of the individuals that you worked with know

9  the access code?

10 A     Yes.  There were -- well, quite a few people, we have

11 friends and family that check on the house, there were

12 probably two or three guys that I used that would, if I

13 wasn't there or they were doing something else, have to go

14 there and pick up materials or some sort of special tool,

15 they could go in there.

16 Q     Could you describe how your business would function or

17 operate if you were not at your home?

18 A     I would have -- mainly there were two very good guys

19 that were smart that worked for me that I could have do

20 service work.  We -- well, we're in Syracuse now, there's

21 Waterloo Premium Outlets, there's a bunch of stores down

22 there, I don't know if anybody's familiar with them, it's a

23 big strip mall and there's service companies that, um, do

24 maintenance at the stores.  There's all kinds of different

25 service companies so if there's a problem in the store,

Joseph Jenkins - Direct                    583

1   lights, anything else, cash register stops working, they call

2   these service companies and then service company would call

3   somebody like me to actually go to the store and do work.  So

4   they would send us.  This is going on like, you know,

5   probably got six or eight calls a week, to go to those

6   stores.  They'll call us, maybe two or three lights are out,

7   two or three lights are out, then they'll send us a work

8   order, either fax or e-mail, and you print that out, and the

9   prices is already negotiated with these companies, you just

10  get a form and you print it out or you pick it up at the fax

11  machine and then you go to the store, they have to sign it,

12  and that's pretty much it, then we send them in and get paid

13  once the work's completed.

14  Q    So again, could you describe how your business would

15  operate if you were away on vacation?

16  A    Oh, okay, we got off that.  I would just -- I would

17  have a couple guys I could call, I could call one of my

18  former partners, we're still friends even though we split up.

19  Like I said, I use part-time guys, some of them work nights,

20  some of them work mornings, I mix and match to get the

21  employees I need to get things done.

22              So if I didn't need my truck, I would leave

23  that there for people to use, and they would have access to

24  the garage and the basement.  Somebody would have to check

25  the e-mail or the fax machine, maybe at least once a day

Joseph Jenkins - Direct                          584

1      because these work orders come in from the malls or whatever,

2      they would -- they pretty much want them done right away,

3      they have to be done in two, three days.

4                  So at one point in time, sometimes I take long

5      vacations, once during winter, once during summer, go to

6      Florida for a month in the winter and I would go to Canada

7      for -- it's hard sometimes to get away in the summer, but I

8      try to get up there between two weeks and a month in the

9      summer, and basically somebody else would have to take --

10     most of the calls came to me on my cell phone, if I got a

11     call, like call somebody else or text them or whatever to go

12     do the work, they could get access to the vehicle, whatever

13     else they needed there.

14     Q    So if you're on vacation, could you describe for the

15     jury how your e-mails and faxes would get checked?

16     A    A lot of times I would bring -- normally I bring a

17     laptop with me.  I can pick up an e-mail that way.  Or if I

18     receive a phone call, normally have to coordinate the jobs,

19     I'll have to call somebody else and say, well, you know, go

20     to the house, get this, do that, or they could use their own

21     vehicle, it doesn't take much, you know, to fix lights or

22     whatever, you can take hand tools.  If it was a generator

23     service call, they'd have to go get -- I mean they're

24     basically like car motors, with electronics on them, so there

25     were a lot of parts that we stocked for those, and they would

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Joseph Jenkins - Direct                              585

1    have to go to the house and get those.  We get -- when I'm in

2    Florida, the generator service business was -- it's pretty

3    big especially in the wintertime, things get cold out, they

4    don't want to start, you get error codes on them, they

5    exercise once a week and, you know, you get little old ladies

6    that -- they're depending on these things, we have a lot of

7    power outages out in the rural areas and if they don't hear

8    the thing start at the same time, they get right on the

9    phone, call us, we have to go see what it is.

10   Q    Could you describe a circumstance, if any, where other

11   of the individuals who were working for you could have

12   accessed your fax and e-mail on a time where you were not on

13   vacation?

14   A    Pretty much any time.

15   Q    What do you mean by any time?  Please explain.

16   A    I mean there's a code in the garage and I'm not there.

17   Q    And how about --

18   A    There's friends and family, that code's been the same

19   for 10 years, we haven't changed it.

20   Q    Could you describe the access to your computer?

21   A    The -- the Compaq computer was always, there were a few

22   computers I had similar to that, smaller ones, Toshiba

23   computer I bought for mainly doing estimates.  We get, with

24   computers now estimates, bids, I should say bids, I do a lot

25   of bids, when you get calls for these commercial jobs, used

Joseph Jenkins - Direct

586

 1   to be they just used blueprints, you know, old-fashioned

 2   blueprints, big things, but now they save the money and they

 3   put the plans on CDs, .pdf files, so basically you stick that

 4   in the computer and you've got to go through and select what

 5   you want to print and then just print out whatever sections

 6   you want, do the estimates or you can just look at them on

 7   the screen, and basically that -- there were a few desktop

 8   computers.  Toshiba laptop computer was mainly in the

 9   basement, at my desk, it's just smaller, you know, it's

10   easier to handle and if I wanted to -- you know, if it's nice

11   out I could take it out on the back porch, summertime, you

12   know, work on it there, work on stuff.  I don't work every

13   single day, I don't go out and do physical work, but I like

14   to stay busy.  I actually like to do the physical work, I

15   don't like the paperwork, and sometimes I delegate people to

16   do the paperwork.  We have -- I get in the truck, there's

17   always a camera, if we do estimates, mainly residential

18   estimates, I can send other people to do -- they go and like

19   if it's an electrical service on a house, pretty much

20   standard price for that, they can go with a camera, you know,

21   talk to the homeowner, take pictures and then we would know

22   what materials we needed, just by looking at the picture,

23   picture's worth a thousand words when it comes to a job, you

24   don't have to remember, you can open up the camera and take a

25   picture of it.

1    Q    Mr. Jenkins, let me focus you on, again, how the other

2    individuals who worked with or for you could access your

3    computers.

4    A    They were not password protected, they were just in --

5    they were in the office, if I wasn't there, like I said, it's

6    pretty much open 24 hours a day if I wasn't there, if I was

7    home I'd know somebody came in, but the files are -- there

8    was -- nothing was password protected.  They never had a

9    problem until 2009, the e-mail was not password protected,

10   there were three different e-mail accounts.  I mean I'd have

11   to type in -- the computers basically, we left the e-mail

12   program open all day long, and it would check for e-mail

13   every three or four minutes, it was set on automatic, and you

14   know, of course if an e-mail came in, it would make a noise

15   or some indication would be there and then we'd look at the

16   e-mail.  But there was wireless access in the house, wifi,

17   then there's three computers that are hard wired.  I probably

18   had three computers down in the basement for different

19   things.  One for doing estimates, I kept some old computers

20   that worked on like Windows XP because we have an old

21   accounting program with 3 or 400 customers' names in it and I

22   wouldn't get it to work past Windows XP so we just -- I just

23   kept that.

24   Q    So let me stop you.  The computer itself, when you

25   stated earlier was not password protected, do you mean that

Joseph Jenkins - Direct                                    588

1    anyone could access the computer itself?

2    A    Yes, there was no restriction whatsoever.

3    Q    And when you were discussing e-mail, could you describe

4    whether there was any security measures on the e-mails that

5    you had?

6    A    No.

7    Q    Why don't you describe or elaborate a little bit more

8    than no.

9    A    I mean basically you just turn on the computer, click

10   on the e-mail icon, and you can -- you could send e-mail.

11   All my -- all my computers were set up with the e-mail

12   accounts.  Other -- there was the Compaq one, one of the ones

13   in the trucks, computer in the basement -- well, whenever I

14   get them, like the computers that I bought a couple off eBay,

15   just older XP ones that -- keep them in the truck that I

16   really don't care about, employees can take them home if they

17   want.  Once in a while somebody take one home if they're

18   working on a job, something like that, that's fine, they can

19   do that.  The batteries, the ones that I buy and keep in the

20   trucks, the batteries aren't that good, we have power,

21   power -- I have a power inverter in my truck, one in the

22   front seat and one in the back that can power the computers.

23   I mean they're pretty much accessible at any time.

24   Q    Let me draw you to shortly before May 24th of 2009.

25   Could you describe what was happening at that time in your

Joseph Jenkins - Direct                                    589

1    life.

2    A     I don't remember specific jobs.  I haven't had access

3    to these computers since this happened.  I don't really

4    remember, I know we lost some data.  All I remember was I was

5    supposed to take the trip to Canada, I was supposed to leave

6    on a Friday, and we picked up a job, three swimming pools in

7    a suburb of Rochester, was probably about an hour from the

8    house, I needed -- have a large trencher that just broke and

9    I stayed home for three days working on it, put us behind on

10   the pool jobs.  People come in with -- people buy these

11   swimming pools and the guys just come in, throw them in their

12   yard and they're just sitting there until somebody comes,

13   hooks them up, people are anxious to get them going so

14   they're usually all over us to get them done, and so we just

15   had a job that we did that, pushed it back Friday and

16   Saturday, worked long days Friday and Saturday to get -- it

17   was -- I think it was three pools, I remember, to get done,

18   and then Saturday night, I basically just cleaned out the

19   truck and threw some clothes in it and I left.  I think I got

20   up at 4:00 in the morning, I don't -- I think I left

21   somewheres around 6, 5:30, 6, to go to Canada.

22               I just remember the swimming pool job before

23   we left.  It was, it was -- it was in a nice suburb, I

24   remember the job, people just started peeling off hundred

25   dollar bills and paying us cash, that's the only way --

Joseph Jenkins - Direct                                                590

1    that's why I remember that.

2    Q    A moment ago you testified that you just grabbed some

3    clothes and threw it in the truck.  Did you put anything else

4    in the truck other than clothing?

5    A    I grabbed the Toshiba computer out of the basement.  I

6    had bought it the previous summer in Canada, at the time it

7    was working slow, we thought it had a virus, had a couple

8    other guys look at it, and we figured it was either -- I

9    think figured it was kind of a combination virus and maybe it

10   needed some more memory, something like that, so I was going

11   to drop it by, put it in the original box, had the original

12   paperwork, the original receipt.  And Canada's kind of

13   different, it's not like around here, on Sunday everything's

14   closed in Canada, there's no stores open, there's nothing

15   going on, people don't travel, everything's closed on Sunday

16   in Canada.  So I couldn't have dropped it off on Sunday, so I

17   was just gonna try and maybe do something on the way back,

18   just swing by the store, it was in Ottawa, had to go through

19   Ottawa on my way to my parents' place.

20   Q    So at this point you're driving toward the border.  Why

21   don't you describe what happened next.

22   A    It was about -- I looked right at the clock, there's a

23   duty free store before the border, and once in a while my

24   parents want me to pick up a bottle of vodka or something

25   like that so I called them, I looked right at the clock, it

Joseph Jenkins - Direct                                    591

1    was 9 -- 8:50, ten minutes to 9 when I passed the duty -- I

2    called them just before I got to duty free store, do you want

3    anything, they said no so I blow by it, went straight to the

4    border.

5              I noticed that there was little to no activity

6    there.  I'd been to Canada probably 40 something times, my

7    parents have always had a place up there ever since I was a

8    kid.  I've always gone at least once a year.  And I've had my

9    car searched probably four, five times going up there, there

10   wasn't anything in there that I was aware of.  My mother

11   wanted some deli meat and cheese, stuff like that, I had that

12   in the cooler, she said they'd probably take it from me if

13   they saw it, I wasn't really worried about that.

14             And I pulled up to the -- I think I was the

15   only one there, it wasn't actually -- I think one of the

16   officers up here testified, said there were only two lanes

17   open or something, there was like nobody there when I pulled

18   up there.  And -- but then I figured I was going to get

19   searched because probably, you know, lot of guys standing

20   around, nothing to do.  So sure enough when I got up there, I

21   got up to the booth, the one officer that was up here, I

22   don't recognize him but he said he was there, he'd already

23   had an inspection ticket in his hand, I figured I was going

24   to get pulled over, but I didn't really care.  And he just

25   asked me questions, writing stuff down on the ticket.  I

Joseph Jenkins – Direct

1    recognized that it was –– I'd seen them before, you know, he

2    wasn't making notes, he was writing out the ticket, so he

3    said, he just asked me a few basic questions and he said, all

4    right, go in there, go inside the building so I did.  Excuse

5    me, thank you.

6              I pulled up, you kind of pull up diagonally, I

7    think it was under a roof, and I didn't really do anything,

8    just grabbed my passport, jumped out of the car.  I don't

9    remember if I left the keys in them or took them with me, but

10   the one officer that was up here, Hache, he was –– he was

11   standing up on a platform, and he was putting on a pair of

12   gloves and just walking towards me, he just asked me for the

13   keys to the vehicle and I either handed them to him or I said

14   they're in there, I don't remember if I locked it or not.

15   And he just went right to work on the vehicle, and I went

16   inside the building.

17             And I encountered that –– the one lady who was

18   up here, I think her name was Boyd, is that right?  I think

19   it was.  At the counter, she asked me couple of basic

20   questions, and she just said have a seat, you know, I know

21   they were trying to make a big deal I was nervous, this and

22   that, that wasn't true, you hear cops lie to make a case,

23   that's pretty much all that was.

24             MS. THOMSON:  Objection, your Honor.

25             THE COURT:  Yeah, that will be sustained and it

1    will be stricken.  Please conduct this examination with a

2    question and an answer.

3              MR. GOLDSMITH:  I will, thank you, your Honor.

4    Q    So when you proceeded in to the counter, Mr. Jenkins, I

5    believe you had testified that you were not nervous at the

6    time?

7    A    Absolutely not.  I'd been to Canada --

8    Q    What happened after you proceeded to the counter in the

9    building?

10   A    I, like I said, I was just asked a few questions and

11   she said, you know, take a seat, and --

12   Q    What happened after that?

13   A    This was probably about five minutes to 9 at this point

14   in time.  I -- I sat down for 15 or 20 minutes, I didn't -- I

15   don't know if I could see outside or not, but I -- I probably

16   just had like four, five cups of coffee, just wanted to get

17   up and walk around.  So I went outside on the platform,

18   outside the door, and they were, you know, all three of them

19   are crawling through the truck, you know, going through

20   everything.  And I stood out there for maybe 10 minutes, and

21   they were just finishing up.

22   Q    When you say they, who is they?

23   A    The three guys that were here.  Pretty much happened

24   like they described it.  The one guy, Hache, he went through

25   the driver's side, both doors in the cab on the driver's

594

1    side, and he had gone through.  Well, when I was -- I cleaned

2    out the truck the night before, I took all -- lot of garbage

3    out of the back, the back seat just kind of collects garbage,

4    tools and material and --

5    Q    All right, well, let me stop you.  You had said a

6    moment ago that they were about finished with the inspection?

7    A    Yeah, um --

8    Q    What happened at that point?

9    A    Well, I'd already noticed, what I was gonna say is when

10   I was cleaning out the truck the night before, it was late at

11   night, you know, because we worked late, the Compaq computer

12   was in the back seat and I think I just took it out and I

13   didn't really -- I don't remember if I looked in the bag or

14   not, but I just took it out and put it on the floor in the

15   front seat, it was up there with a cooler, little small

16   cooler with some stuff my mother wanted.  I remember Hache

17   pulled it up, he was leaning over from the driver's side,

18   opened it up on the passenger seat, opened it up, looks

19   through it, put it back, he had gone through that and the

20   side, the one -- one guy was going through, he was crawling

21   around the back going through under the cab.  The one, the

22   one guy had said he was a lawyer, I don't remember his name,

23   he had gone through like a trailer with two ATVs on it, the

24   ATVs had boxes on them, he went through the boxes and he -- I

25   think he started going through the back right passenger's

Joseph Jenkins - Direct                                          595

1    seat and that was when he found the Toshiba computer.

2    Q     Is that Officer Johnston?

3    A     I don't remember, I think he said he was a lawyer, I

4    think that was him, he's a lawyer now or something.

5    Q     So at that point what happened after he seemed to take

6    over the Toshiba laptop?

7    A     He came up to me, I was on the platform, he started

8    questioning me about it, is it new, is it staying in Canada,

9    I said, well, I purchased it in Canada last year, I was

10   having some problems with it, I was gonna take it back to the

11   store, see if they could, you know, make a recommendation in

12   the store what was going on with it, and I'm not really sure

13   why but he asked me like really dumb questions for like two,

14   three minutes about the computer.  He seemed to be obsessed

15   with it, I don't know why.

16   Q     What kinds of questions?

17   A     Um, tell you the truth, I don't even remember.  They

18   went on for like two or three minutes and I'm thinking like I

19   didn't really know why he was asking me all these questions.

20   I really don't remember, I -- it was five years ago, so -- he

21   just, he had some interest in it, when I bought it it was,

22   five years ago laptops were expensive, so --

23   Q     Do you recall being asked questions by any of those

24   officers about child pornography?

25   A     No, um, I mean not -- not before, or during the search,

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Joseph Jenkins - Direct                                    596

1    no.

2    Q     Okay.  So what happened next?

3    A     I don't know, he was fixated on that computer so I went

4    back and I guess he went back to turn it on, he asked me a

5    bunch of questions about it.  I was -- I was getting little

6    irritated because they been crawling through the car for

7    probably half hour, 40 minutes, and I don't know if anybody's

8    been through a border search or not, you know, just watch

9    your stuff get tossed, three guys, and it's -- gets a little

10   annoying after awhile.  So, and there was a lot of stuff in

11   there because it was the work truck, and there was stuff in

12   and out of the back seats and, you know, things like that.

13   So he went back and turned on -- he must have turned it on or

14   something, I couldn't see -- the windows in the truck are

15   kind of tinted, couldn't probably see what he was doing but

16   he was -- the door was open and he was in there for maybe 10

17   minutes.

18   Q     So what happened next?

19   A     I think he called -- he called another officer over,

20   maybe it was Hache, one of the other ones, and the two of

21   them looked at it for another five or ten minutes, I really

22   don't know, I lost track.  Then he just -- Hache, the guy, he

23   had already gone through the computer in the front seat, he

24   opened up the passenger's door and grabbed that whole laptop

25   bag and just, they took both computers inside.

Joseph Jenkins - Direct                                    597

1    Q      What happened after that?

2    A      Not -- I can't remember.  They -- he said he said

3    something to me when they were taking the computers, I really

4    don't remember.  I think I may have questioned them like what

5    the heck are you doing or something like that.  They didn't

6    say anything, they just walked by me.

7    Q      How long had all this been going on?

8    A      It was probably at least 9:30, 9:40, probably 9:30,

9    9:40 when they took the computers inside, somewheres around

10   there.

11   Q      Okay.  And what happened after they took the computers

12   inside?

13   A      Nothing for quite awhile.  I just sat, sat, I either

14   stood outside, sat on a bench inside, and just waited.

15   Actually I think he did come out, yeah, Hache came out, and

16   he started asking me -- yeah, he did ask me, he came out and

17   he said, you know, um, he basically asked me those questions

18   I think he testified to, have you ever -- I don't remember

19   what they were, and I said no, not to my knowledge, no, I

20   don't think so.  There was no delay, no hesitation, I just

21   said it, I didn't curl up in a ball and start crying, that

22   was a bunch of garbage.  That was, I mean I didn't -- I had

23   no knowledge of anything like that at the time on the

24   computer.  Like I said, it was just, you know, making a

25   story.

Joseph Jenkins - Direct                    598

1    Q    Did there come a time when you were arrested that day?

2    A    Yes.  Maybe 20 minutes or so after that.  I went up to

3    him, I was like, what are you guys doing, how much longer are

4    you going to be, and that's when they directed them to arrest

5    me.

6    Q    What happened after you were arrested?

7    A    Nothing.  They wouldn't tell me anything.  They really

8    didn't say anything, they didn't tell me what they found or

9    where they found it or anything like that.  Um, I was trying

10   to question them, what he found, where he found it, and I

11   just didn't get any answers.  After that pretty much,

12   everything pretty much happened like they said it did, except

13   for the part, I wasn't nervous, I had my hands on the wheel

14   and I was looking forward, that was just ridiculous, all that

15   stuff, you know, I didn't curl up in a ball when he asked me

16   about the computer, that was just ridiculous.  That didn't

17   happen.

18   Q    So what happened after you were arrested?

19   A    I really don't remember the specifics, like I said,

20   pretty much what they said happened, couldn't really ...

21   Q    Did there come a time where you were released from

22   custody?

23   A    Yeah.  It was -- I think it was 24th, I called my

24   parents.  Well, that, that was the thing, I was there all day

25   without a phone call, I was anxious to call my parents,

Joseph Jenkins - Direct                                    599

1    they're older and -- 70s, and I had called them ten minutes

2    to 9, said you can probably expect me about 1 and they

3    wouldn't let me use the phone.  So around 4:00 I started

4    getting little irritated with them, I was like, I got to use

5    the phone, you know, my parents are -- it's a twisted

6    mountain road getting up where they are, it's a terrible

7    drive but it's a beautiful spot where they are.  And we've

8    actually, my aunt had a friend going up to visit her one

9    time, we own a few cottages on the lake up there, and she

10   actually went off the road and died, went down a ravine and

11   so when people travel up there, my parents get -- they get

12   kind of anxious and I know they're expecting me 1, 2:00 and I

13   just wanted to call them and tell them, I'm okay, I'm not

14   there but I'm okay, and you know, I just wanted to tell them

15   what happened so I was just anxious to use the phone to tell

16   them, you know, don't come looking for me or anything, so ...

17   Q    Again, was there a time where you were released from

18   custody?

19   A    Yeah, sorry.  Yes, they came down day or two later,

20   they -- they borrowed some cash money from a friend up there,

21   came down and got me out a day or two later.

22   Q    So you posted bail?

23   A    I posted $10,000 cash bail.

24   Q    All right.  And what happened after you were bailed

25   out?

Joseph Jenkins - Direct                        600

1    A     Right before I was bailed out, there was, there was

2    another inmate in the holding room with me, gave me a

3    lawyer's name, Edgley, and I don't remember if I called him

4    or my parents called him, but we retained him, he got a

5    consignment on the bail, some sort of bail consignment, big

6    leverage to get paid.  So we retained him and then -- this

7    was all in Brockville, which is maybe 45 minutes from the

8    border crossing, and then they escorted me back to the border

9    and I met my parents there and we picked up my vehicle and I

10   think I signed some paperwork, they gave me my passport back

11   and we headed back to the American border.

12   Q     So let me fast forward to the fall of 2010.

13   A     Well, there was the -- there was an incident I want to

14   mention.  On my way through the border on the way back, I was

15   immediately detained by U.S. Customs and Border Patrol.  They

16   interrogated me for an hour about what happened in Canada and

17   they proceeded to search my vehicle.  I don't know if they

18   made me empty my pockets or not, but they held me up for an

19   hour.  I was supposed to -- my parents were somewheres in the

20   area there, and I was supposed to meet them, I don't know if

21   it was maybe Watertown on the way back, I was supposed to

22   meet them someplace for dinner and I was just late, I never

23   showed up.

24   Q     Okay.  So again, let me fast forward to the fall of

25   2010.  Were there legal proceedings in Canada?

Joseph Jenkins - Direct                                601

1    A    Yes.  We had -- we had received some disclosure, there

2    were several court appearances, no disclosure was made so

3    maybe March 3rd, 2010, received part of a Canadian forensic

4    report.

5    Q    Let me stop you.  Let's -- you recall that there was --

6    several witnesses testified about being in court proceedings

7    with you in the fall of 2010, here at trial?

8    A    Yes.

9    Q    And what were the purposes of those proceedings?

10   A    The purpose of the proceedings were we never received

11   disclosure.  I'd hired another attorney in Geneva on the way

12   back and he was supposed to deal with the Canadian attorney,

13   and we never received a disclosure.  We had several meetings

14   with the Geneva attorney, and we never found out what was on

15   the computer or even why they arrested me really.

16   Q    Let me stop you.  Was there a trial scheduled in

17   October of 2010?

18   A    Yes.

19   Q    Did you appear for the trial?

20   A    I did but the -- I was trying to get to that.  The

21   Canadian lawyer brought up charter motion because we never

22   received the disclosure, there was some 15- or 17-month

23   delay.  They scheduled the trial in February and I had

24   planned on -- I had the week of the 30 -- was it the 13th,

25   September, I had that scheduled for trial but they --

1    Canadians never made disclosure in time so the trial couldn't

2    go through.  My attorney applied for a stay on proceedings

3    and I guess at the time anything over eight and a half months

4    for delay for a trial was considered worthy of a stay, and

5    ten months was ridiculous so he thought we had a good chance

6    of a stay on September 13th, so he asked me to appear, he

7    sent me a notice to appear and I appeared.

8    Q    All right.  And were you aware of proceedings that were

9    going to take place in October of 2010?

10   A    We had discussed it with the attorney, he didn't make

11   it mandatory that I appear.  We -- as far as I knew, I was

12   actually looking for another attorney at the time.

13   Q    So let me stop you.  So you heard testimony at trial

14   from other witnesses about your not appearing in October of

15   2010?

16   A    Yes.

17   Q    Okay.  So is that why you didn't appear?

18   A    Well, my -- the attorney I hired, he didn't seem to

19   know what to do with the case, and at the beginning he said,

20   you know, if things go bad and they issue a warrant for your

21   arrest, he said, that -- this is just a complicated case.

22   The lawyer gave me some advice right from the very beginning,

23   he said -- which I didn't like, he said, you could just not

24   return to Canada if you want to just not deal with the

25   charge.

Joseph Jenkins - Direct                                    603

1    Q    Let me stop you.  After the October date which you were

2    not there, did you attempt to return to Canada for the case?

3    A    No, because I wanted to find another attorney and we

4    couldn't find another attorney while we had this attorney,

5    this attorney from Brockville.  I just figured I'd wait, he

6    was gonna be done October 18th so sometime after that I was

7    going to try to hire an attorney from Ottawa, a better

8    attorney.

9    Q    After the October period of 2010, what happened next in

10   this case?

11   A    Really nothing.  When we received -- well, really

12   nothing.  I hired two attorneys to deal with it, and we

13   didn't have disclosure on the trial date, and really nothing

14   happened after that.

15   Q    When, if ever, was your next encounter with law

16   enforcement?

17   A    Well, on September 13th when I returned I had an

18   encounter.  I was detained at the U.S. border and searched

19   for two hours, which that was just harassed over a cell

20   phone.  And when Special Agent Willard was up here, I'd asked

21   Mr. Goldsmith to try to get at is, Mr. Willard was the one

22   that harassed me for over two hours on a cell phone --

23             MS. THOMSON:  Objection.

24   Q    Let me back up.

25             THE COURT:  Objection will be sustained.  I'm going

Joseph Jenkins - Direct

604

1   to ask again, this is a narrative.

2          MR. GOLDSMITH:  I will try, your Honor.

3          THE COURT:  There should be a question and an

4   answer.

5   A    Well, there's some points that need to be made here for

6   the record.

7   Q    Mr. Jenkins, let me bring you back because we were just

8   discussing the appearance in Canada.  Did you willfully

9   refuse to go to Canada to evade prosecution?

10  A    Absolutely not, there just wasn't a case, the lawyer

11  hadn't prepared a case.  A defense I guess.

12  Q    Did there come a time when you were arrested in the

13  United States?

14  A    Yes.  I heard nothing, I heard nothing further from the

15  Canadian attorney, he just said I had a bench warrant in

16  Canada, and I shouldn't be bothered anymore.  That was the

17  last I heard from him.  I got a notice to appear on

18  September 17th and I never heard any more from him.  I was

19  actually working on the 18th, we scheduled work after that,

20  and I mean I showed up for the trial but the Canadians

21  screwed up the investigation, just wasn't ready for trial,

22  so --

23  Q    Mr. Jenkins, let me bring you forward.  There was a

24  photograph that was admitted in testimony of this case, a

25  photograph of you with a girl?

Joseph Jenkins - Direct                                    605

1    A    My niece.

2    Q    Okay.  So that's your niece?

3    A    Yes.

4    Q    There was also testimony about wiping software.  Could

5    you describe what knowledge you had, if any, regarding wiping

6    software on the Toshiba?

7    A    Wiping software.  It was, it was CCleaner, it was a --

8    I think it's, I think C's an abbreviation for crap, crap

9    cleaner, just cleans the -- so your computer works faster,

10   just cleans up anything that builds up.

11   Q    Did you install that into the computer?

12   A    Probably, when I first -- yeah, I mean it's handy, it's

13   just --

14   Q    Why?

15   A    Just to -- it gets rid of that adware and things like

16   that.

17   Q    Is that the reason why you installed it?

18   A    Yeah, I mean there was no -- you know, any other

19   reason.

20   Q    Mr. Jenkins, there was a phone call that was recently

21   played in court.  Remember hearing the phone call?

22   A    Yes.

23   Q    Do you happen to remember that phone call other than

24   just listening to it?

25   A    I did, they edited the phone call.

Joseph Jenkins - Direct                              606

1    Q      What was the phone call about?

2    A      The attorney I had at the time came in with the

3    Canadian forensic computer exam, I hadn't seen it since my

4    Geneva attorney showed it to me on March, somewheres around

5    March 2010.  It had indicated basically that there's no child

6    pornography on the computers, and it's, a small amount was

7    found on the thumb drives and the thumb drives were half

8    erased.  The only thing they found -- they wouldn't let me

9    bring the paperwork up here with me, but there was no child

10   pornography found, any live files on the computer but there

11   was under deleted or something you couldn't see,

12   inaccessible, I think.  Canadians provided full disclosure on

13   the proceeding, there were five, they classified five items

14   as child pornography on the -- just in some unallocated space

15   deleted, something.

16   Q      Is that why you were referring to different numbers?

17   A      Yes, he -- he put the paperwork down in front of me and

18   kind of spread it out, there were charts and different things

19   on it, and he said, look, here's -- we can defend you on

20   this, there's only, you know, maybe --

21   Q      Not discussing the conversation between you and your

22   attorney.

23   A      Well, that's how -- that's how this came up.

24   Q      I just, just, please, with respect to the phone call,

25   was it your belief at the time that the numbers that you

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Joseph Jenkins – Direct                                607

1    discussed on the phone -- withdrawn.  Did you have a belief

2    at the time about the conversations you were having with your

3    mother?

4    A    Yes, I was getting into that.  The attorney just put

5    down the paperwork in front of me and he said, look, there's

6    only a hundred things here, we can build up a defense for

7    this, this is just an accident.

8    Q    Just to what you understood, without what other people

9    are telling you or not telling you, is that what you

10   understood?

11   A    That's what he told -- I didn't really look at them, he

12   just put them down in front of me and I just glanced at them

13   quick, he said, look, there's maybe a hundred things here

14   that, I mean, that's just a mistake on here, I can defend you

15   on this.  He was just -- I don't even know why he --

16   Q    I want to bring you back to the -- to May 24th of 2009.

17   Did you make any statements to Canadian law enforcement?

18   A    About?

19   Q    Well, there's been testimony about questions that

20   they've asked you.  Did you make any statements to Canadian

21   law enforcement?

22   A    Just "Not to my knowledge" or "I don't think so," there

23   was no -- there was no visible child pornography on either

24   computer at the time.

25   Q    Your statement, though, what were your statements

Joseph Jenkins - Cross                                    608

1    again, just your statements?

2    A     "Not to my knowledge" and "I don't think so."

3              MR. GOLDSMITH:  I have nothing further.

4              MS. THOMSON:  I didn't know if the court was going

5    to break.

6              THE COURT:  I'm sorry?

7              MS. THOMSON:  I didn't know if the court was going

8    to break, I saw you look at your watch.

9              THE COURT:  No, we're going to stop at 4 today,

10   they tell us they want us to close at 4 so we might as well

11   start your cross-examination.  We've got 20 minutes.

12             CROSS-EXAMINATION BY MS. THOMSON:

13   Q     Mr. Jenkins, let's see if there's a couple things that

14   we can agree on.  Let's start with May 24, 2009.  Did you

15   enter primary lane number 5 crossing from the United States

16   into Canada?

17   A     Yes, I don't know what lane it was, but yes.

18   Q     You came from Alex Bay in Jefferson County and you

19   crossed into Canada?

20   A     Yes.

21   Q     And when you crossed into Canada, were you driving your

22   truck?

23   A     Yes.

24   Q     Nobody else's truck?

25   A     No, it was mine.

Joseph Jenkins – Cross                                        609

1    Q      And inside that truck, did you have two laptop

2    computers?

3    A      Yes.

4    Q      Handing you Government's Exhibit Number 7 and

5    Government's Exhibit Number 3A, are these the two laptops

6    that you had in your truck when you crossed into Canada from

7    the United States?

8    A      This is the first time I've seen these.

9    Q      Take all the time you need.

10   A      I believe they are, yes.

11   Q      On that day you were alone, weren't you?

12   A      I'm sorry?

13   Q      You were driving the truck?

14   A      Yes.

15   Q      No one else in the car?

16   A      No.

17   Q      You also had in the truck three thumb drives, isn't

18   that correct?

19   A      No.

20   Q      No?

21   A      I did not see those.

22   Q      These were not in the truck.  Have you ever seen these

23   before?  Why don't you take a real good look at those.

24   A      I don't think so.  I don't think so.

25   Q      So is it your testimony that when you crossed into

Joseph Jenkins - Cross                    610

1   Canada on May 24, 2009, those items were not in your truck?

2   A     I didn't put them there, no.

3   Q     That's not the question.  Were they in your truck?

4   A     No.

5   Q     So if they were found in your truck, you have no

6   knowledge of them being in your truck?

7   A     They weren't found in front of me and I have no

8   knowledge of them being there.

9   Q     You've never seen those thumb drives before?

10  A     Never.

11  Q     The Toshiba laptop, how did you have it stored?

12  A     I believe I testified to that, it was in the -- it was

13  in the original box, the original paperwork.

14  Q     And that's your Toshiba laptop?

15  A     Yes.

16  Q     The Compaq computer, you had that in a bag?

17  A     It was in -- it was in a laptop bag, that one, that one

18  always stayed in the truck.

19  Q     So the Compaq laptop was in a bag in your truck?

20  A     Yes.

21  Q     And the three thumb drives that were found in the bag

22  in your truck, you have no knowledge of?

23  A     I have no knowledge of them.  I opened up -- when I

24  moved the -- I was cleaning out the truck, I moved the

25  computer to the front seat, I believe I opened up the bag and

Joseph Jenkins - Cross                    611

1    I just made sure the computer and the charger were in there,

2    I just looked in there and saw the computer and the charger,

3    I didn't see anything else.  There might have been some

4    paperwork, I usually have a -- a service kit made up with

5    invoices or maybe some necessary paperwork, there might have

6    been some papers in there with it that somebody could use if

7    they had to do service work, they could just grab that bag,

8    had pens, papers, business cards, anything like that would

9    have been in there.

10   Q    Did you look in the bag at the time that you prepared

11   to go for Canada -- to Canada?

12   A    The Toshiba bag, I just unzipped it and just looked in

13   there and I saw the computer and the charger.

14   Q    And that --

15   A    I didn't go through the bag, any compartments or

16   anything.

17   Q    The bag that we're talking about was the one containing

18   the Compaq laptop, because the Toshiba was in a box, right?

19   A    Yeah, I think I still have the bag, I don't think they

20   took the bag.  There was two bags in the truck actually,

21   laptop bags.

22   Q    But you did not have the Toshiba in the actual laptop

23   bag?

24   A    No it was a cardboard box.

25   Q    It was in a cardboard box.  And that cardboard box is a

Joseph Jenkins - Cross                              612

1  cardboard box that when you, as you got it, when the computer
2  was new?
3  A    Yes, it didn't have like the Styrofoam packaging in it
4  or anything like that, but it was probably -- probably had
5  the plastic bag in it or something like that, it was just
6  sitting in the box.  I may have thrown some files in there
7  with it or something like that.
8  Q    You have indicated you traveled from the United States
9  to Canada numerous times before, correct?
10 A    Oh, yes, probably at least 40 times.
11 Q    If I understand your testimony, your mom had informed
12 you that there was some deli meat and that that might get
13 taken in the car?
14 A    Yeah, she always has some special requests, they're
15 kind of -- they're kind of out in the woods up there, so if I
16 come up there, she usually asks me for things from the store.
17 Q    I believe you indicated you really weren't nervous
18 about the deli meat, is that right?
19 A    Absolutely not.
20 Q    In fact what you were nervous about is the fact that
21 you were bringing two laptops and thumb drives into Canada
22 full of child pornography, isn't that what you were nervous
23 about?
24 A    No.
25         MR. GOLDSMITH:  Objection.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Joseph Jenkins - Cross                          613

```
1          THE COURT:  It's overruled.
2    Q    You heard testimony you appeared to be nervous, is that
3    correct?
4    A    I appeared to be, that's what they said.
5    Q    Perspiring?
6    A    No.
7    Q    Giving short evasive answers?
8    A    No.  I don't get nervous, I don't -- I'm not really
9    afraid of anything, tell you the truth.
10   Q    So you agree with -- if I understand your testimony on
11   direct, you agree with the majority of the Canadian
12   testimony --
13   A    I agree with their statements.
14   Q    Sir, if you could let me finish my question.  So you
15   agree with the majority of the Canadians' testimony, you just
16   disagree with each of the officers that indicated that you
17   were nervous, evasive, that you had a tight grip on the
18   steering wheel, that you appeared not to make eye contact,
19   each officer that testified to that fact, that's what you
20   disagree with?
21   A    Yes, I do.
22   Q    You are an electrician?
23   A    Yes.
24   Q    And I believe you indicated on direct testimony that as
25   part of your job being an electrician, there are times when
```

Joseph Jenkins - Cross                           614

1   you produce invoices?

2   A     Yes.  They can be either handwritten -- um, lot of

3   customers like to pay you right when you're done or they can

4   just write down on a piece of paper and bill them later.

5   Q     If we could see Exhibit 3B, page 9, please.  Do you see

6   Exhibit 3B, page 9 wherein there's a Jenkins Electric header

7   and a quote on materials?

8   A     Yes.

9   Q     Do you also provide quotes?

10  A     Um, that's the -- that's the type of quote I would send

11  to a electrical distributor, if I'm bidding a job, or if I'm

12  just pricing materials to see where it's the cheapest place,

13  I would send out something like that, I would fill in -- oh,

14  whatever I wanted and they would price it and send it back to

15  me.

16  Q     That's your address, 4072 Dwyer Lane in Geneva?

17  A     Yes.

18  Q     And did you create that quote?

19  A     Probably, yes.

20  Q     Do you recognize the name for, is it Ciccino's, am I

21  saying that correctly?

22  A     Yes, that was a restaurant job, that was a restaurant

23  that we did the electrical, it was a new building, we did the

24  electrical work.

25  Q     That was one of your customers?

Joseph Jenkins - Cross                                    615

1    A     Yes.

2    Q     And you provided a quote to your customer?

3    A     No, that's just the material I would use for the job.

4    It's basically a blank form, I can either print it out or I

5    can type it in there and print it out and I would send that

6    to an electrical supplier and get the prices so I can do a

7    bid.

8    Q     And that form was found on your computer, correct?

9    A     Yes, that was mine.

10   Q     If we could see page 22, please.  And this also, you

11   were asked about a photograph on direct, that's you?

12   A     Yes, that was taken at our place in Canada.

13   Q     And that picture you stored on your computer?

14   A     I don't know if -- I don't know if somebody took the

15   picture or -- I don't really know how it came about.

16   Probably, I probably did.

17   Q     You probably stored that picture on your computer?

18   A     Yeah, I guess one of my parents could have done it, but

19   I probably did it.

20   Q     Do you have e-mail accounts?

21   A     Yes, three.

22   Q     Would that be jjenkins@rochester.rr.com?

23   A     Yes, I -- we had an option to set up three accounts,

24   one was for my parents, one was for me, and one was for the

25   business.

Joseph Jenkins - Cross

1   Q    The one that you set up for your parents, is that

2   gjenkins?

3   A    Yes.

4   Q    And did you set up one for Jenkins

5   Electric@rochester.rr.com?

6   A    Yes.

7   Q    Now that particular e-mail, did you set the password as

8   joseph70?

9   A    I don't know passwords, they were saved in the

10  computer.

11  Q    Is 70 your birth year?

12  A    Yes.

13  Q    So the gjenkins account would be something that you

14  would have set up for your father?

15  A    Yes.  Parents.

16  Q    Are you familiar with the word Lolita?

17  A    No.

18  Q    You've never heard that word before?

19  A    I couldn't give you the definition of it, no.

20  Q    You ever seen that before?

21  A    No.

22  Q    Do you know what it means?

23  A    No, I just said I couldn't give you the definition of

24  it.

25  Q    So the fact that there are sites called Great Lolita,

Joseph Jenkins - Cross                          617

1    Lolita BBS, Lolly, Lolita BBS, multiple times marked as a

2    favorite on your computer, you have no knowledge of that?

3    That's a yes-or-no question, do you know whether or not you

4    had marked as a favorite on your computer items including

5    Great Lolita, Lolita BBS?

6    A     No, they looked out of place there.

7    Q     They looked out of place, did you see them yourself?

8    A     I only saw what you put on the screen, I haven't -- I

9    haven't turned these computers on in five years.  They

10   looked -- that was in with -- that was in with just work and

11   eBay stuff, it looked out of place to me.

12   Q     Well, this is your computer, right?

13   A     Right.

14   Q     And so you would use your computer for work?

15   A     Yes.

16   Q     Right, and then how about if you took a trip with your

17   ATVs, would you save pictures or save any remnants of your

18   ATV trips?

19   A     Absolutely, they were on there.

20   Q     So these items being mixed in with work items and other

21   personal items, not really out of place, are they, they're

22   right where they belong on your computer?

23   A     No, they didn't look like they belong there.

24   Q     Did you have an insurance policy through Nationwide?

25   A     Probably.

Joseph Jenkins - Cross                                            618

1    Q      And did you pay for your insurance policy online?

2    A      Probably.

3    Q      If we could see Exhibit 3B, page 20, please.  Do you

4    see Exhibit 3B, page 20 where it indicates, "Dear Joseph:

5    Thank you for making your payment using MyNationwide," is

6    that your insurance company?

7    A      It must have been at the time, switched quite a bit, I

8    price them out every year and switch them.  I'm sure it was,

9    yes, I probably did.

10   Q      Do you also use IKEA home planner, is that something

11   you use?

12   A      No, a customer actually sent the program to me, they

13   wanted an estimate for a kitchen, they bought some cabinets

14   or something.  Had something to do with a customer, I don't

15   normally use it.  It was just for one job I think somebody

16   sent it to me.

17   Q      And if they sent it to you, then that would be on your

18   computer?

19   A      Yes.

20   Q      Again, your Toshiba laptop?

21   A      Yes.

22   Q      Now you testified a little bit about some proceedings

23   that you had in Canada.  Do you remember that testimony, that

24   you had a proceeding specifically in September,

25   September 13th of 2010, do you recall that?

1    A    Yes.

2    Q    And on September 13, 2010, you brought a motion before

3    the court on behalf of -- your attorney brought a motion on

4    your behalf complaining about unreasonable delay and the case

5    going forward, is that true?

6    A    Yes.

7    Q    They call that a charter motion?

8    A    Charter motion.

9    Q    Because you were asserting there was an unreasonable

10   period of delay for your trial to happen?

11   A    Right.

12   Q    And on that same date, did you ask for the trial not to

13   go forward?

14   A    No, I -- the attorney told me to show up and he was

15   going to do a motion and he just said show up and you might

16   be there for the day and go home.  That's what I did, I

17   really wasn't too aware of what was going on at the time.  He

18   just told me to show up and say a few things and go home.

19   Q    Were you also aware that on that date there were

20   witnesses that were there prepared to attend the trial of the

21   matter?

22   A    I did, I did, they were the same ones that were here.

23   Q    And that trial didn't go forward?

24   A    No.

25   Q    Now on that date, September 13, 2009 [sic], do you

Joseph Jenkins - Cross                                    620

1   recall being in the courtroom and seeing Detective Constable

2   Kip Wohlert, do you recall him?

3   A     No.  I didn't until, according to the court transcripts

4   and I saw his name on there, but I couldn't have identified

5   him.

6   Q     Let me ask you this.  Do you recall that you were

7   observed with a cell phone on September 13, 2010 and you were

8   made aware that you were seen with that cell phone on that

9   date?

10  A     Yes.

11  Q     And having that cell phone violated your conditions of

12  release in Canada, isn't that correct?

13  A     No, it didn't.

14  Q     Okay, so you were permitted to have a cell phone that

15  had internet access?

16  A     It didn't have internet, it was a flip phone.

17  Q     Do you recall being told that you were observed with

18  that cell phone and that they wanted to ask you some

19  questions about that cell phone, perhaps to check to see if

20  it had internet access?

21  A     No, my attorney -- my attorney called me into a room

22  and he said, they're making a big deal about your having a

23  cell phone, just get rid of it, is what he told me.

24  Q     Your attorney told you to get rid of the phone?

25  A     Yes.

Joseph Jenkins - Cross                                621

1   Q      Is this the same attorney who told you not to show up

2   for a trial in October --

3   A      Yes.

4   Q      -- of 2013 [sic], advised you to break the law?

5   A      Yes.

6   Q      Your attorney advised you that on that occasion, not to

7   go to your own trial?

8   A      Yes, that's why I was looking for a new attorney.

9   Q      And your attorney told you to destroy that telephone?

10  A      I didn't destroy it.

11  Q      What'd you do with it?

12  A      I'm not sure, showed up at home, but -- few days later.

13  Q      When you were testifying on direct examination, you

14  complained about the fact that you were stopped at the

15  border, I believe you called it for two hours and subjected

16  to a search; do you recall that testimony?

17  A      I was.  I was, I found it offensive.

18  Q      Do you recall that what they were searching for was

19  that cellular telephone?

20  A      I remember they didn't find it.

21  Q      That's because you destroyed it?

22  A      No, I didn't, I still have it today, I didn't destroy

23  it.

24  Q      Okay.  Well, let's be simple here.  When you were

25  stopped, you did not have the cell phone that you had earlier

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Joseph Jenkins - Cross                                    622

1   that day?

2   A    They didn't find a cell phone.

3   Q    They didn't find it.  Now on September 13, you knew

4   that they were interested in the fact that you had your cell

5   phone because it was their position that that was in

6   violation of your release conditions?

7   A    They were afraid it might have internet access but it

8   didn't, I don't use internet on a phone.  It wasn't a big

9   deal, they were trying to make a big deal about it.

10  Q    It wasn't a big deal to you, but if there actually had

11  been internet access on that phone and if they had been able

12  to see that phone to verify that it did, might you have been

13  in violation of your release conditions?

14  A    I guess.

15  Q    And isn't that why you didn't return for your trial

16  date in October along with the fact that you --

17  A    It wasn't over a cell phone, no.

18  Q    And didn't you also not return for your trial date

19  because you knew you were guilty of these charges?

20  A    No, I had work to do.  I was called and -- my attorney

21  called me in August and he said, the trial's not going to go

22  through, the Canadians haven't provided the disclosure and he

23  basically told me the case was over.  And then a few weeks

24  later he said, I need you to show up on September 13th.  He

25  didn't really say why, but --

Joseph Jenkins - Cross                               623

1    Q      How about October 18th?  Your attorney advised you to

2    show up on October 18th, right?

3    A      He did not, because all of our correspondence went

4    through the attorney in Geneva.  I have new attorney

5    paperwork to confirm that he sent me a notice to show up on

6    the 13th of September and he was really expecting a stay in

7    the proceedings because -- just gone too long, it was more

8    than over twice the amount of time it should have been for me

9    to have a trial and they still didn't have -- apparently they

10   still didn't have the forensic report done.

11   Q      Let's address that because you indicate it was more

12   than twice the time to have a trial, that motion was actually

13   denied, right, so the court found that there was nothing

14   improper about the time that it took to bring your case

15   before the court?

16   A      Well, I --

17   Q      Yes or no, sir, was it denied?

18   A      It was denied.

19   Q      And after it was denied, even though you'd been

20   complaining about the length of the delay, you in fact

21   yourself asked for an adjournment?

22   A      No, I did not.

23   Q      You didn't ask for an adjournment on October 18th?

24   A      No.

25   Q      You didn't make numerous attempts to try to get an

Joseph Jenkins - Cross                          624

1   adjournment?

2   A     Well, I don't remember what was going on, he just told

3   me that -- he told me to show up on September 13th and that

4   was it.  We had work scheduled on October 18th, I was

5   actually -- we were actually doing some work for an attorney

6   from Syracuse, a real estate attorney had couple houses on

7   Seneca Lake and we were putting backup generators in, that's

8   what I remember.  I remember when I got -- I think the

9   attorney called me on October 18th and said that they denied

10  your stay and issued a warrant for your arrest.

11  Q     Sir, I'm approaching and handing you what's been now

12  marked as Government's Exhibit Number 19, I'm going to ask

13  you if you recognize this letter.  Do you recognize that

14  letter?

15  A     Yes, looks like mine.

16  Q     Was that letter actually --

17  A     That's from my attorney.

18  Q     Who's on the letterhead?

19  A     It's Steven J. Edgley, it's addressed to me.

20  Q     The attorney you've been referring to, and I'm going to

21  retrieve the item from you, the attorney that you've been

22  referring to is Steven J. Edgley, the attorney you've been

23  talking about who was your barrister and solicitor

24  representing you in Canada?

25  A     I didn't hear the last --

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Joseph Jenkins - Cross                                    625

1   Q      Was he your attorney in Canada?

2   A      Yes.

3   Q      And did he write you a letter on October 20, 2010,

4   indicating, "Dear Sir," addressed to you, "I am writing to

5   confirm that I attended court in Brockville on your behalf on

6   October 18, 2010.  This was the date scheduled for

7   continuation of your trial.  Your name was paged both inside

8   and outside the courtroom three times and you were not in

9   attendance."  Goes on to say, "You had instructed me to

10  request an adjournment of the trial so that you could

11  consider your options.  I made the request.  However, it was

12  denied."

13               Do you recall getting that letter?

14  A      Yes, it came over -- excuse me.

15  Q      Did you receive the letter, sir, was this something

16  that you received?

17  A      Yes, I did.

18  Q      But is it your testimony today that you were not trying

19  to get the case continued?

20  A      I don't remember how we left it, I had two attorneys I

21  hired to work on and they told me to show up on the 13th, I

22  showed up on the 13th, they never told me to show up after

23  that.

24  Q      Well, let's clarify that because I believe earlier you

25  indicated they told you not to show up; do you remember

1    saying that, that your attorney told you not to show up?

2    A    I don't know what was going on, the Canadians had

3    things so screwed up, I really didn't know.  I hired two

4    attorneys to work on it, I was sent a notice to appear on the

5    13th, they schedule the trial six months in advance, it was

6    blocked off on my calendar, I showed up on the 13th.

7    Q    I'm asking you, were you instructed by your lawyer

8    Steven Edgley not to appear on October 18, 2010, as you

9    testified earlier?

10   A    Not to appear?

11   Q    Right.  Did your attorney tell you not to appear?

12   A    I wasn't told to appear, I thought he was going to

13   appear on my behalf.  I was not told to show up on the 18th.

14   He didn't -- on the 13th he said it's mandatory, I need your

15   appearance and I didn't receive any such letter on the 18th.

16   Q    We played a call in this courtroom today and I believe

17   on the call it's between you and your mother; did you

18   recognize the voices on the call?

19   A    Yes.

20   Q    That's you?

21   A    Yes.

22   Q    That's your mother?

23   A    Yes.

24   Q    And on the call, if we could play that, please.

25              (Telephone call played.)

Joseph Jenkins - Cross                                    627

1   Q      Now earlier in your testimony, it was suggested that we

2   might not have heard everything.  Do you recall that?

3   A      You left out the part about the lawyer, the lawyer'd

4   just been there.

5   Q      Why don't we play what's after that.

6                    (Telephone call played.)

7   Q      Was that also you?

8   A      Yes.

9   Q      And you indicate on here that you've been telling

10  people all along and nobody chooses to believe you, so when

11  you've told people about this, no one believed you that it

12  wasn't -- nobody believes you?

13  A      I was going off the Canadian forensic report.  I hadn't

14  seen -- Jeff Parry put it in front of me and then disappeared

15  and I was trying to get ahold of it.  He put it in front of

16  me and I just saw that, um, like I said, they only found -- I

17  think they found something like five classified images as

18  child pornography, that were deleted on the computer

19  somewheres.

20  Q      When you say nobody believed you, does that include

21  your father?

22  A      I don't remember what the "believe me" part was, but my

23  parents were at that bail hearing and it was exactly what I

24  said it was, you running your mouth that there were 3800

25  pictures on there and that's not what the forensic report

Joseph Jenkins - Cross                                    628

1    said from Canada.

2    Q    When you say "you", are you referring to me?

3    A    I believe it was you, yes.

4    Q    So when you're saying, talking about a prosecutor

5    talking about these images, you weren't referring to the

6    Canadian process, you were referring to the American process?

7    A    I was referring to the Canadian -- well, the Canadian

8    report's a bit different from what yours was.  Quite night

9    and day different.

10   Q    Why don't we talk about that because you've mentioned

11   the Canadian report.  You've mentioned that it's different,

12   right?

13   A    It's very different.

14   Q    And are there some areas where the Canadians identified

15   more child pornography than the Americans did?

16   A    Not that I'm aware of.

17   Q    Not that you're aware of?  With regard to the

18   4-gigabyte thumb drive, do you recall that?

19   A    I honestly didn't pay much attention to the thumb

20   drives, I was only interested in what's on the computer, I

21   don't know anything about the thumb drives.

22   Q    Well, that was asked on the examination of Agent

23   Braisted, do you recall that, and you're indicating that

24   these reports are wildly different, isn't that your

25   testimony?

Joseph Jenkins - Cross                                    629

1    A     Yes, they are.

2    Q     Are you aware and were you present in the courtroom

3    when Officer Wohlert indicated that he found 1,644 images of

4    suspected child pornography but that he stopped because he

5    hit a saturation point; do you recall that testimony?

6    A     Yes, I recall from Canada, too.

7    Q     Isn't it true, sir, that one of the reasons why the

8    numbers are different is because they stopped looking, they

9    had found enough images of child pornography?

10   A     They failed to complete the investigation.

11   Q     And that's the motion that you brought before the

12   Canadian authorities and they denied it?

13   A     Yeah, apparently they did.

14   Q     By they, I mean the court system considered your

15   motion, considered the arguments and denied them?

16   A     Well --

17   Q     Yes or no, sir, are you aware of whether the court

18   denied the motion?

19   A     Yes, I just read about it recently, but yes, they did.

20   Q     Compaq computer, is that your computer?

21   A     Yes.

22   Q     Are you aware, sir, that part of the Canadian report

23   found a video of child pornography on the Compaq computer?

24   A     Yes, there was one in deleted space.

25   Q     That's where they found it?

Joseph Jenkins - Cross

1    A     Yes.

2    Q     And when the Americans did the imaging, they didn't

3    count that video, right?

4    A     I don't know, it was my understanding it was returned

5    and it wasn't working.

6    Q     Well, sir, you have indicated that these reports are

7    different somehow; isn't it true that one of the differences

8    on the Compaq computer, they identified a video of child

9    pornography?

10   A     Apparently, that's what they said, that's what they

11   said, if they did, they did.

12   Q     In each of the other media that was analyzed, both

13   reports indicate the presence of child pornography, isn't

14   that correct?

15   A     Which ones, the Canadian?

16   Q     In all the other remaining media, the Canadian report

17   and the American report, aside from the 2-gigabyte thumb

18   drive, there's no testimony on that from either country,

19   there was child pornography found on both, on the 8-gigabyte

20   thumb drive, 4-gigabyte thumb drive, the Toshiba laptop, and

21   the Compaq laptop?

22   A     Again, I -- the thumb drives, I can't really comment

23   on.

24   Q     You can't really comment on it because of the presence

25   of child pornography on there?

Joseph Jenkins - Cross                           631

1    A     I don't know anything about the thumb drives.  They
2    found adult pornography on the computers from the Canadian
3    report, you didn't include that.
4    Q     Is that not included, sir, because it's actually not
5    child pornography, is that right?
6    A     It would have been helpful, somebody looking for adult
7    pornography might not always be interested in child
8    pornography.
9    Q     So you find fault with the American report that only
10   categorized the images and videos of child pornography?
11   A     Just that you've pulled out child pornography, yes.
12   Q     They pulled out child pornography?
13   A     Well, the Canadians had to do -- the Canadians, their
14   process is different, they have to make full disclosure, so
15   they have to report everything that's on there which
16   includes, you know, personal pictures and everything else.
17   Q     Isn't that true because part of their process includes
18   classification, do you recall that testimony, that they
19   actually take all of the images as part of their process and
20   classify them, they classify them to category 1 and so on?
21   A     Yes.
22   Q     That their process --
23   A     That Wohlert testified to that, at the September 13th,
24   2010 hearing.
25   Q     And do you also recall that part of his testimony was

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Joseph Jenkins - Cross                    632

1    that in that classification process where there are videos or

2    images of a child who has attained puberty, they will

3    classify that as adult pornography; do you recall that?

4    A     Yes, I believe you just said that.

5    Q     Now, you indicated on direct examination that you have

6    people that work for you, right?

7    A     Yes.

8    Q     And these people, they have access to your e-mail?

9    A     Yes.

10   Q     They have -- did they have access to your Toshiba

11   laptop?

12   A     Yes, that was in the basement.

13   Q     Was that --

14   A     At one of the desks.

15   Q     Was that part of a function of work, is that you had

16   people that worked for you so as part of working for you,

17   they would have access to your computers?

18   A     Yes, it was, I testified to that.  There's a few people

19   that have access to the garage and they can access the

20   basement.

21   Q     Okay.  And while we're talking about testimony, do you

22   recall in September of 2010, appearing in the Brockville

23   Courthouse in Brockville, Ontario?

24   A     Yes.

25   Q     And do you recall as part of the motion that you made

Joseph Jenkins - Cross

633

1   complaining of delay, that one of your bases of that

2   complaint was how the delay had impacted you; do you recall

3   giving testimony about that?

4   A     Yes.

5   Q     And do you recall when you gave testimony with regard

6   to that you indicated that there were two people, two other

7   employees that worked with you?

8   A     Yes, that -- like I was explaining before, there's -- I

9   take guys on when I need them, I don't really employ anybody

10  full -- well, there are a couple of guys, one guy I keep on

11  full time and then there's two others, I alternate, but they

12  do have access to -- three people have full access.

13  Q     Do you recall giving testimony that it was very

14  difficult for you to keep functioning in your work because

15  you had to hire somebody to do the computer work because you

16  would normally do it yourself?

17  A     Right.

18  Q     You recall giving that testimony?

19  A     Yes.

20  Q     And so when you were asked about invoicing, accounting

21  programs, and purchasing items and purchasing items on the

22  internet, you indicated that that was a function that you

23  performed?

24  A     Yes.

25  Q     And you indicated as part of your complaint of the case

1    not going as fast as you wanted it to go in Canada, that you

2    actually had to hire somebody because ordinarily, no one

3    would have that type of access to your computer to perform

4    those functions for you?

5    A    No, that's not true.

6    Q    All right.  Do you recall being asked -- do you recall

7    being asked, and this is the Matter of Her Majesty The Queen

8    and Joseph Jenkins, Ontario Court of Justice, and I'm

9    referring to page 65.

10         MR. GOLDSMITH:  Just a moment, your Honor.

11   Q    Do you recall being asked this question, "And so, not

12   being able to use, I'm sorry, possess or have any access to

13   the computer or the internet, has that caused any problems

14   for you in your work?"  And do you recall giving the

15   following answer:  "Yeah, it's been very difficult.  I've had

16   to get somebody else to do what I would normally do, I've had

17   to pay someone to do what I normally do myself."  Do you

18   recall that?

19   A    Yes.

20   Q    And that was your answer?

21   A    Yes.

22   Q    Was that under oath?

23   A    Yes.

24   Q    Same oath you took today?

25   A    I believe so, yes.

Joseph Jenkins - Cross                                    635

1    Q    And were you asked the question, "You've had to pay

2    somebody else to do that type of work for you?"  And giving

3    the answer, "Yeah."  Yes?

4    A    Just switching jobs, it wasn't a big deal.

5    Q    So, when you gave this testimony, it was your position

6    then that parties that would be working for you, you

7    identified two, they would not be accessing the internet on

8    your behalf, they would not be accessing your computer to

9    perform the functions of Jenkins Electric, isn't that true?

10   A    No, I mean, like I said, there's people in and out, my

11   house is like a shop, there's people in and out, they go

12   there for materials, they go there and check the e-mail.  If

13   there's one guy that wants something to do, I say go check

14   the house, check the fax machine, see if there's a work order

15   there, we get work orders on --

16   Q    So sir, is it your testimony that you actually don't

17   have to hire anybody else to do that type of work?

18   A    I -- I don't remember what I was -- in Canada.  We mix

19   and match, it's people's nature, they don't like to do

20   physical work, I like to do physical work, I like to go out

21   and climb around, you know, ceilings and dig ditches, other

22   people don't like to do that so I try and delegate it.  If

23   somebody -- if somebody wants to do paperwork, if it's a

24   basic estimate, you know, they could do it.  I'd rather go

25   out and work, I don't want to do paperwork.

Joseph Jenkins - Cross                                    636

1    Q    I guess what I'm asking seems also mixed and matched.

2    Do you have to hire someone else to do your invoicing,

3    programming, and all the functions that you indicated

4    September of 2010 when you cannot do it yourself?

5    A    No, I don't have to hire anybody, I just have to --

6    rather than pay them to go out and work, I pay them to work

7    in the office, I don't remember really, what that testimony

8    was about, but --

9    Q    Well, do you remember if you told the truth or not?

10   A    I always tell the truth, lady, I don't lie.

11   Q    So which is it today?

12        MR. GOLDSMITH:  Objection.

13   A    I'm not lying, I didn't -- nothing to hide I've

14   disclosed all my paperwork from Canada, attorneys' letters,

15   transcripts.  I'm not hiding anything, I'm up here

16   testifying, what am I --

17   Q    And during your testimony didn't you indicate that it

18   was Agent Chad Willard who on September 13, 2010 subjected

19   you to a two-hour delay and search that you were quite

20   animated about; wasn't that your testimony today?

21   A    Yeah, I remember him.

22   Q    You remember Agent Chad Willard on September 13, 2010

23   stopped you at the border?

24   A    Yes.

25   Q    And was that the time that they were looking for the

Joseph Jenkins - Cross                          637

1    phone?

2    A    He wasn't -- he didn't stop me, somebody else stopped

3    me.

4    Q    But he was present?

5    A    I believe he was working the counter, yes.

6    Q    And at all times they had indicated exactly what they

7    were looking for, right, they were looking for this cell

8    phone?

9    A    Yes.

10   Q    When you were approached in Canada, and you -- when you

11   were asked if you downloaded child pornography, do you recall

12   that you indicated, not to my knowledge?

13   A    Yes, that was a true answer.

14   Q    So the first time that anyone tells you and suggests to

15   you that what they're looking at on your computer, your

16   devices, is child pornography, and you're asked about it,

17   your response was, not to my knowledge?

18   A    Yes, it was.

19   Q    You didn't say no, child pornography, are you kidding

20   me?  No, nothing like that?

21   A    I just said -- you just asked me, have you -- whatever

22   you said, said no, not to my knowledge.  I mean what -- I

23   didn't really think there was a more appropriate answer.

24   Q    Do you recall sitting down with Marie-Josee Vinette,

25   the female investigator, do you recall sitting down with her

Joseph Jenkins - Cross                               638

1    and her asking you if you knew what child pornography was?

2    A    I don't remember that, no.

3    Q    Do you recall her telling you that she found child

4    pornography on media devices in your truck and your reply

5    was, you asked to speak to your parents?

6    A    No, I don't remember that.

7    Q    Well, how about this.  Did you tell any of these

8    Canadians, listen, there are other people that have access to

9    my computers, I don't know, I don't know anything about it

10   but there are lots of other people?  Did you provide names of

11   these other people?

12   A    No, I was under arrest, why would I talk?

13   Q    So what you did is you asked to call, telephone your

14   parents?

15   A    They were expecting me, I asked to use the phone, yeah,

16   I didn't want them coming out looking for me late at night.

17   Q    Do you recall the officers who did the search of your

18   car before you were placed under arrest talking to you about

19   child pornography, saying, hey, listen, we're seeing

20   something here on the computer, do you remember that?

21   A    They never said they saw child pornography on the

22   computer.

23   Q    Do you remember they talked to you about what was

24   contained on your computer?

25   A    No.

Joseph Jenkins - Cross                           639

1    Q    Do you remember being asked have you had child
2    pornography on your computer before you were placed under
3    arrest?
4    A    I'm sorry, repeat that.
5    Q    Do you remember being asked if you had child
6    pornography on your computer before you were placed under
7    arrest?
8    A    Yes, I stated not to my knowledge or no, they -- I
9    can't remember what they said, if you've ever downloaded or
10   viewed it, whatever they said, I said no.
11   Q    And at that time, did you say, there are other people
12   that have access to my computer, it's not mine, I don't know
13   anything about this, or did you express any alarm, concern,
14   let them know where it came from or who had access to your
15   computer?
16   A    No, I wouldn't have acted like that, no.
17   Q    You just indicated, not to my knowledge?
18   A    That's what I said, there wasn't -- not to my
19   knowledge, I wouldn't think anybody would do that.
20   Q    Do you recall -- do you recall when you were in the
21   Cayuga County Jail also having conversations with your
22   father?
23   A    I called him a couple times a week, got to be more
24   specific.
25   Q    How about May 7th, 2012, do you recall talking to your

Joseph Jenkins - Cross                                    640

1    father?

2    A     Not any specific conversation.

3    Q     Do you recall talking to your father and your father

4    telling you you shouldn't have had that crap on your

5    computer?

6    A     I -- no, I don't.

7    Q     And if we were to play that call for you, would you

8    recognize your father's voice?

9    A     Yeah.

10   Q     This would be off of Exhibit 10D.

11                    (A telephone call on Government Exhibit

12                     No. 10D was played.)

13   A     That was probably some argument over an attorney, I was

14   getting, you know, these people, they just, they throw you in

15   jail and you don't have any access to anything, and it's very

16   frustrating, lose everything you have, you get bullied and --

17   like to go over some of that correspondence with you --

18   Q     Sir, I don't recall that question being before you.  Is

19   that your dad's voice on that call?

20   A     Yes, we --

21              MS. THOMSON:  I have nothing further.

22              THE COURT:  Counsel, any redirect?

23              MR. GOLDSMITH:  No, your Honor, I have no redirect.

24              THE COURT:  Okay.  Ladies and gentlemen, I'm going

25   to excuse you for the day.  I'm going to instruct you please

641

1    don't talk about it with anybody, if anybody approaches you,

2    tries to talk to you about this case, I need to know about it

3    immediately.  Do not read, listen, view anything to do with

4    this case, and please be in the jury room to get started at

5    9:00, we'll see you then, okay.  Have a good night, travel

6    safe, please.  I think it's supposed to be okay tomorrow.

7                    (Jury Excused, 4:18 p.m.)

8              THE COURT:  Okay.  You may step down, sir.  The

9    record should reflect that the jury's left the room and the

10   defendant is leaving the stand with the jury not being

11   present in the courtroom.  Can you give us an indication,

12   Mr. Goldsmith, if you're going to call any other witnesses?

13             MR. GOLDSMITH:  No other witnesses.

14             THE COURT:  Defense is going to rest?

15             MR. GOLDSMITH:  Defense will rest.

16             THE COURT:  Okay.  I will have you rest in front of

17   the jury in the morning.  Have either of you had an

18   opportunity to review the charge?  You've had an opportunity,

19   it's been with you.

20             MR. GOLDSMITH:  I've had some opportunity to

21   review, yes.

22             THE COURT:  Okay.  So why don't we take a brief

23   break in case anybody needs to use the facilities, and I want

24   to try and do a charge conference before we break for the

25   day, so that we're prepared for tomorrow morning, defense

642

1    will rest, we'll do our closing arguments, and I will charge

2    the jury at the conclusion of the closing arguments.  Okay.

3    So about five, ten minutes.

4              MR. GOLDSMITH:  Thank you.

5              THE COURT:  All right.

6              THE CLERK:  Court's in recess.

7                   (Court in recess, 4:20 p.m. to 4:28 p.m..)

8                 (Open Court.)

9              THE COURT:  All right.  The record should reflect

10   we're in the courtroom without the jury, the jury's been

11   excused for the day and we're going to do a charge conference

12   with regard to the jury instructions to be given in this

13   case.

14             Counsel, what I'd like to do is, I'll go through it

15   by section, and you just indicate to me whether you have any

16   requests or objections to particular charges in the sections

17   as we go through.  I'll start with the government and then,

18   Mr. Goldsmith, I'll go to you on behalf of defendant, and I

19   find that's probably the most efficient way to go through and

20   if there's a section where you say, well, Judge, I object to

21   this or I like that, we'll deal with it as we go through,

22   okay.  So I'm going to use the table of contents and then

23   I'll flip to the section if there's a particular objection or

24   a request.

25             Starting with the introduction section which

1    describes the roles of the court and the jury, the role of

2    the attorneys, and the government as a party, are there any

3    requests or objections to that section by the government?

4              MS. CARROLL:  No requests or objections.

5              THE COURT:  Okay.  Mr. Goldsmith?

6              MR. GOLDSMITH:  No requests nor objections.

7              THE COURT:  Okay.  Let's go to the nature of the

8    evidence.  It includes subsections, testimony and exhibits,

9    direct and circumstantial evidence, indictment is not

10   evidence, potential punishment is not evidence.  For the

11   government, any requests or objections?

12             MS. CARROLL:  No requests, no objections.

13             THE COURT:  Mr. Goldsmith?

14             MR. GOLDSMITH:  No requests nor objections.

15             THE COURT:  Okay.  Let's go to evaluation of

16   evidence.  It's a larger section and I'll go through the

17   subsections.  Verdict based on evidence, not sympathy,

18   improper considerations, race, religion, national origin, sex

19   or age, quality not quantity of evidence, credibility of

20   witnesses, testimony of law enforcement witnesses, pretrial

21   statements of the defendant, testimony of the defendant, use

22   of evidence obtained, expert testimony, transcript of audio

23   recording, particular investigative techniques not required,

24   and variance in dates immaterial.  For the government, any

25   requests or objections in that section?

644

1              MS. CARROLL:  None, your Honor.

2              THE COURT:  Mr. Goldsmith?

3              MR. GOLDSMITH:  No objection, however, we would

4     request a missing witness charge as to Detective Sergeant

5     Michael Harrington out of the Ontario Province Police.  This

6     is the individual who was the Canadian forensic expert who

7     performed the forensic studies on the computer that had been

8     referred to in testimony by special agent, Detective Agent

9     Braisted and by Mr. Jenkins today.  I believe he qualifies,

10    he was under the control -- or withdrawn.  I believe he

11    qualifies that there was not equal opportunity by the parties

12    to reach out and call him as a witness in that all of the

13    Canadian witnesses defendant did not have the opportunity to

14    subpoena and the government chose not to call him.  I think

15    that his testimony would have been relevant as to his

16    findings in that forensic evaluation and I believe that it

17    could be properly inferred that some of the evidence that he

18    could have discussed as part of his findings could have been

19    deemed to be favorable to defense.

20             MS. CARROLL:  Your Honor, in order to warrant

21    missing witness instruction, the defendant has to make out

22    the burden that the government is the cause of the witness'

23    absence; the government did something to make the witness

24    unavailable.  As this court knows, that witness is in fact

25    not within the subpoena power of this court or the United

645

1    States government and so it was by grace alone that the

2    Canadians agreed to appear, grace and MLATs.  The government

3    has no ability to compel Detective Harrington's testimony or

4    presence in this courtroom.

5            Beyond that, the government did nothing to make it

6    impossible for Detective Harrington to appear.  Detective

7    Harrington, as the testimony in the trial established, is on

8    long-term disability leave and is not currently working and

9    is not actually on duty and available to even Canadian

10   prosecutors at this point.  He's out on disability leave and

11   is unavailable for that reason, not because of anything the

12   government did or caused to be done.

13           THE COURT:  Okay, that request will be denied.

14   Let's go to the section burden of proof.  Any requests or

15   objections by the government?

16           MS. CARROLL:  None, your Honor.

17           THE COURT:  Mr. Goldsmith?

18           MR. GOLDSMITH:  None.

19           THE COURT:  We're going to go to section 5 which is

20   the substantive law, it has subsections of Count 1,

21   transportation of child pornography which includes

22   instructions on first, second, third, and fourth element,

23   then it goes on to subsection B, Count 2, possession of child

24   pornography and it gives first, second, third elements, and

25   then venue requirement for both counts, and it ends with the

646

1    forfeiture allegation instruction.  Any requests or

2    objections from the government?

3              MS. CARROLL:  One request, your Honor.  On

4    subsection 5B, actually 5, 5B, C, subsequent --

5              THE COURT:  You're looking at subsection 5C, venue

6    requirement for both counts.

7              MS. CARROLL:  Yes.

8              THE COURT:  On page 30.

9              MS. CARROLL:  Yes.  In the paragraph that begins,

10   "You are instructed that the Northern District of New York

11   includes, among other places, Syracuse, Binghamton, Oswego,

12   Watertown, Plattsburgh, Albany, and Utica, New York.  It also

13   includes the counties and land running along St. Lawrence

14   River.  The government would just request the inclusion of

15   the language, it also includes the counties and land running

16   along St. Lawrence River, including Jefferson County, period.

17             THE COURT:  Jefferson County.  Okay.  Anything

18   else?

19             MS. CARROLL:  That's it, your Honor.

20             THE COURT:  Mr. Goldsmith, any requests or

21   objections?  And I'll ask you that first and then I'll ask

22   you if you want to be heard on the government's request.

23             MR. GOLDSMITH:  I do have a request under Section

24   5A.  Section 5A, page 25, it's under the fourth element,

25   knowledge.  There is an instruction that allows for evidence

647

1    of flight to be inferred for consciousness of guilt.  I

2    don't -- obviously there was testimony in this trial about

3    the defendant's flight from Canada, but not flight from

4    authorities in the United States.  I think that could be

5    confusing for the jurors to try and weigh whether that was

6    appropriately admissible toward consciousness of guilt

7    because, again, we had all this testimony about him not

8    returning to Canada, but there was nothing discussed about

9    him attempting to flee at any point the United States, in

10   fact a lull, I just think it's going to confuse them and I

11   request it be stricken.

12        THE COURT:  I'm not following your argument.

13   Consciousness of guilt charge is with regard to him not

14   returning to Canada for his trial, so, and that testimony is

15   clearly in the record, I don't think you dispute that.

16        MR. GOLDSMITH:  No, I'm not disputing that.  I just

17   think that between the different -- between the discussions

18   held about him failing to appear in Canada, but there's no

19   evidence in the United States, typically this instruction is

20   used when the defendant attempts to flee from prosecution of

21   the indicted offense in the jurisdiction and I think it's

22   going to be confusing on the part of the jurors.

23        THE COURT:  You want to be heard?

24        MS. CARROLL:  Yes, your Honor.  It's actually not

25   the case that it has to be the same set of charges from which

648

1    the defendant flees that gives rise to the consciousness of

2    guilt instruction.  An example would be if an officer is

3    about to arrest someone for burglary and they run from the

4    officer and that person is ultimately indicted on larceny and

5    not burglary but it's the same operative set of facts, a

6    consciousness of guilt instruction would still be warranted.

7    What we're talking about here is flight based on the same

8    operative set of facts.  Whether the prosecutorial authority

9    is Canadian or United States makes no difference, we're

10   talking about a defendant fleeing a jurisdiction because he

11   was conscious of his guilt of the conduct of which he was

12   accused.  And the same operative set of facts form the basis

13   for the Canadian charges as form the basis for the U.S.

14   charges.

15              THE COURT:  And the only thing we're saying with

16   the instruction is that the jury can consider that if they

17   find facts which they deem credible that establish that fact

18   and how they should consider it should they find such facts.

19   So yeah, I don't see that it would be confusing.  I think

20   it's clear from the record, it's whether the jury chooses to

21   accept or reject that testimony as being credible.  The

22   defendant has testified and given his reasons for not showing

23   up in Canada, which the jury can choose to accept or reject

24   and also, you know, obviously the government has the right

25   and I believe based on the evidence to make the argument that

649

1    the reason he didn't return was because of a consciousness of

2    guilt and fear of prosecution.

3            So I think it's appropriate, I don't think it's

4    confusion -- confusing, I'm going to deny the request and

5    it's going to be charged.  Anything else, requests or

6    objections?  And then if you'd like to address the

7    government's request that Jefferson County be included in the

8    venue.

9            MR. GOLDSMITH:  Well, I'll just say I have no

10   objection to the inclusion of Jefferson County.

11           THE COURT:  And I'll tell you I'm inclined to do

12   it, I think it's appropriate.  That's what the indictment

13   alleges and certainly to point out to the ladies and

14   gentlemen of the jury in that venue area, that Jefferson

15   County is part of the Northern District of New York is

16   completely appropriate, so we're going to add that.

17           MR. GOLDSMITH:  All right.  Further in the section

18   under subsection D of the forfeiture allegation.

19           THE COURT:  Yes, sir.

20           MR. GOLDSMITH:  The first paragraph on page 31 says

21   if you found defendant guilty of the offense, I think it

22   should be, of the offense charged in Count 1 and/or the

23   offense charged in Count 2 of the indictment, you will need

24   to consider a further question.  In the pretrial conference,

25   we had discussed whether there was going to be a bifurcated

650 of 246

1    hearing as to the forfeiture counts.  I had indicated to the

2    court that it is my experience that a forfeiture hearing is

3    something that I would request under the circumstances, and

4    it's also something that in my experience I've experienced in

5    prior trials where forfeiture is an allegation.  Based upon

6    the language, and also based upon the proposed verdict form

7    being inclusive of both, the substantive as well as the

8    forfeiture counts, is it the court's intention to hold a

9    separate forfeiture hearing or to have the jury deliberate at

10   the time for everything together?

11            THE COURT:  It was my intention to have them

12   deliberate together, my recollection of the pretrial was

13   that's what you requested.  You did not?

14            MR. GOLDSMITH:  No, I said it was usually my

15   practice, that in my experience that we had actually

16   litigated it fully.

17            THE COURT:  Hold on a second.  Okay.  Go ahead, I'm

18   sorry to interrupt.

19            MR. GOLDSMITH:  No, I'm --

20            THE COURT:  You're done?

21            MR. GOLDSMITH:  I'm done as far as that particular

22   request.

23            THE COURT:  Government want to be heard?

24            MS. CARROLL:  Really it's of no significance one

25   way or the other to the government.  I suppose, you know, for

1    the sake of the jury, it might be nice for them to be able to

2    reach both the forfeiture allegation and the substantive

3    counts during the same deliberative process, but I'm happy to

4    defer to the defendant's request.  It would be the

5    government's intention simply to refer the jury to the

6    evidence they heard at trial and not to put on any additional

7    witnesses or testimony of any kind.

8             THE COURT:  So that would be the nature of your --

9    of a hearing, you would just request to make a statement or

10   an argument to the jury?

11            MS. CARROLL:  Yeah, we would just offer, basically

12   give a proffer to the jury.

13            MR. GOLDSMITH:  If that's the nature of their

14   hearing, then that's their decision to conduct the hearing if

15   we get there, so --

16            THE COURT:  Okay.  But what you're saying is on

17   behalf of your client, you prefer to have --

18            MR. GOLDSMITH:  I would prefer that it be

19   bifurcated and accordingly that the verdict form --

20            THE COURT:  Be changed.  Separate and changed and

21   move this instruction and unless and until they find him

22   guilty of Count 1 or Count 2 --

23            MR. GOLDSMITH:  I think so, yeah.  Or I also, I

24   mean I think that the court can charge the forfeiture as long

25   as it's -- as long as there's definitive language after the

652

1    comma where it says, where it has the conditional language,

2    if you have found the defendant guilty of either of those

3    offenses, then perhaps substituting some language instead of

4    you will need to consider, how about you will be asked to go

5    back and consider or separately consider, something of that

6    nature so that the court doesn't have to then issue a

7    separate forfeiture instruction prior to the forfeiture

8    hearing.

9                     (A discussion was held off the record between

10                    The Court and the law clerk.)

11          THE COURT:  Well, Mr. Goldsmith, if you're

12   requesting that it be bifurcated on Mr. Jenkins' behalf, we

13   can certainly do that.  We won't include this language, and

14   you know, we can hold a separate hearing when and if there is

15   a guilty verdict on either of the first two counts and that's

16   what we'll do.

17          MR. GOLDSMITH:  Thank you.

18          THE COURT:  The government has the burden, I would

19   say, I'm not a hundred percent convinced of what you need to

20   do in that hearing but I'm sure you can establish what you

21   need to do as far as your burden goes regarding the

22   forfeiture and we'll deal with it in that manner.  Okay.

23          MR. GOLDSMITH:  Okay, thank you.  And will the

24   court be segregating the verdict form?

25          THE COURT:  Yes.

653

1              MR. GOLDSMITH:  Thank you.  And then finally on

2    page 32, same section under forfeiture, the large paragraph

3    in the second, or the bottom half refers to controlled

4    substances.  Middle sentence, includes but is not limited to

5    property that was used or intended to be used to purchase,

6    manufacture, transport, store, conceal, or protect controlled

7    substances --

8              THE COURT:  Yeah, that's --

9              MR. GOLDSMITH:  -- used in the offense.

10             THE COURT:  That shouldn't be in there, obviously.

11             MS. CARROLL:  No objection, your Honor, if you want

12   to change it to contraband, I think that would do the trick.

13             THE COURT:  That's what we'll do.  Anything else?

14             MR. GOLDSMITH:  Nothing further.

15             THE COURT:  Okay.  There's only I believe one

16   section left and that's the conclusion.  Any requests or

17   objections in that legal instruction for the government?

18             MS. CARROLL:  None, your Honor.

19             MR. GOLDSMITH:  None, your Honor.

20             THE COURT:  Very well.  The appropriate revisions

21   will be made and you'll be provided with a new copy of the

22   charge with these changes will be placed on your counsel

23   table in the morning.  Okay?

24             MS. CARROLL:  Thank you, your Honor.

25             THE COURT:  Anything further for the government?

654

1          MS. CARROLL:  Nothing.

2          THE COURT:  Mr. Goldsmith?

3          MR. GOLDSMITH:  Nothing.

4          THE COURT:  Okay, we'll see you in the morning,

5    9:00.

6          THE CLERK:  Court's in recess.

7               (Court Adjourned, 4:47 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  CERTIFICATE OF OFFICIAL REPORTER

2

3            I, JODI L. HIBBARD, RPR, CRR, CSR, Federal Official

4    Realtime Court Reporter, in and for the United States

5    District Court for the Northern District of New York, DO

6    HEREBY CERTIFY that pursuant to Section 753, Title 28, United

7    States Code, that the foregoing is a true and correct

8    transcript of the stenographically reported proceedings held

9    in the above-entitled matter and that the transcript page

10   format is in conformance with the regulations of the Judicial

11   Conference of the United States.

12

13                  Dated this _____day of _____.

14

15

16                       /S/ JODI L. HIBBARD_____

17                       JODI L. HIBBARD, RPR, CRR, CSR
                         Official U.S. Court Reporter
18

19

20

21

22

23

24

25