VOLUME IV
UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
UNITED STATES OF AMERICA

vs.                              5:11-CR-602

JOSEPH VINCENT JENKINS,

                        Defendant.

-------------------------------------------x

        Transcript of a Jury Trial held on February 6,

2014, at the James Hanley Federal Building, 100

South Clinton Street, Syracuse, New York, the

HONORABLE GLENN T. SUDDABY, United States District

Judge, Presiding.


                    A P P E A R A N C E S

For The Government: UNITED STATES ATTORNEY'S OFFICE
                    P.O. Box 7198
                    100 South Clinton Street
                    Syracuse, New York  13261-7198
                      BY:  TAMARA THOMSON, ESQ.
                           GWEN CARROLL, ESQ.


For Defendant:      AARON M. GOLDSMITH, ESQ.
                    Attorney at Law
                    225 Broadway
                    Suite 715
                    New York, New York  10007




                *Jodi L. Hibbard, RPR, CSR, CRR*
            *Official United States Court Reporter*
                  *100 South Clinton Street*
                *Syracuse, New York  13261-7367*
                       *(315) 234-8547*

656

I N D E X   O F   T E S T I M O N Y

| Witnesses | Direct | Cross | Redirect | Recross |
|-----------|--------|-------|----------|---------|
| Chad Willard recalled | 658 | -- | -- | -- |
|  | 752 | 753 | -- | -- |

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

657

1            (Open Court, Jury Out, 9:07 a.m.)

2            THE COURT:  Good morning.  Counsel, it's still your

3    intention to rest?

4            MR. GOLDSMITH:  Yes.

5            THE COURT:  Okay.  Then what we're going to do is

6    we'll bring the jury in, we'll let you rest your case before

7    the jury, and then we'll start with closing arguments.  Go

8    ahead.

9            MS. THOMSON:  We do have one very brief rebuttal

10   witness.  We have one additional witness.

11           THE COURT:  Oh, you have, you want to call a

12   rebuttal witness, okay, we can do that.  And then we'll do

13   closings.  Regarding closings, are you going to reserve time

14   for rebuttal or how do you want to --

15           MS. CARROLL:  Yes, I think so, your Honor.  Ten

16   minutes.

17           THE COURT:  Okay.  I'm not asking how much time, I

18   just want to see if you were -- okay, that's fine.  You can

19   do a rebuttal.  All right.  If everybody's ready, let's bring

20   the jury in, please.

21           (Jury Present, 9:08 a.m.)

22           THE COURT:  Good morning, ladies and gentlemen.

23   Traveling a little easier this morning?  It's good to see you

24   all here.  Hopefully you had a nice night, all rested and

25   ready to go.  Mr. Goldsmith, does the defendant wish to call

1   any more witnesses?

2            MR. GOLDSMITH:  No, your Honor.  At this time,

3   defense rests.

4            THE COURT:  Okay.  Defense has rested its case.

5   Does the government have any rebuttal witnesses?

6            MS. THOMSON:  Yes, your Honor, would the court like

7   us to call the witness at this time?

8            THE COURT:  Yes, please.

9            MS. THOMSON:  The United States calls to the stand

10  Special Agent Chad Willard.

11           THE CLERK:  You're still under oath.

12           THE COURT:  You can step right up, Special Agent,

13  I'm going to instruct you that you are still under oath.

14           THE WITNESS:  I understand that.

15           THE COURT:  Okay.

16

17           C H A D   W I L L A R D , recalled as a

18  witness and being previously duly sworn, testifies

19  as follows:

20           DIRECT EXAMINATION BY MS. THOMSON:

21  Q    Good morning.

22  A    Good morning.

23  Q    Can you tell us where you work for Homeland Security,

24  where are you physically located?

25  A    Alexandria Bay, New York, I am on the second floor of

Chad Willard – Direct

659

1     the port of entry there.

2     Q     When people come to the border from Canada into the

3     United States, are you part of that process, part of their

4     entry into the United States?

5     A     No, I am not.

6     Q     What function do you have at the border?

7     A     I'm a criminal investigator.  If one of the people

8     during their inspections found a violation of federal law, I

9     would be brought into the process, but I do not perform

10    inspections, I do the criminal investigations.

11    Q     Who performs those inspections?

12    A     Customs and Border Protection officers.

13    Q     On September 13th, 2010, did you encounter the

14    defendant Joseph Jenkins at the border?

15    A     No, I did not.

16    Q     Did you ever see him on that day?

17    A     No, I did not.

18    Q     When's the first time you ever saw the defendant?

19    A     On 10/4 of 2011 when I arrested him at his parents'

20    home where he resides.

21    Q     On September 13, 2010, had you opened your

22    investigation?

23    A     No, I hadn't.

24          MS. THOMSON:  I have no further questions.

25          MR. GOLDSMITH:  No questions, your Honor.

660

1          THE COURT:  You may step down, sir.

2               (The witness was excused.)

3          THE COURT:  Does the government have any further

4    witnesses?

5          MS. THOMSON:  No, your Honor.

6          THE COURT:  Government rests?

7          MS. THOMSON:  Yes, your Honor.

8          THE COURT:  Okay.  Ladies and gentlemen, that

9    concludes the proof in this trial, both sides have rested

10   their case.  The next step is to hear closing arguments, and

11   we're going to do that now, okay.  When you're ready,

12   Counsel.

13         MS. CARROLL:  May it please the court.

14         THE COURT:  I'm sorry?

15         MS. CARROLL:  May it please the court.

16         THE COURT:  Yes, go ahead.

17         MS. CARROLL:  At the beginning of this trial, the

18   government stood in front of you and said the proof would

19   establish beyond a reasonable doubt that on May 24th, 2009,

20   the defendant, Joseph Jenkins, transported and possessed from

21   the United States into Canada images of child pornography and

22   that he did so knowingly.  And that is exactly what the

23   evidence consistently, methodically, and for the most part

24   without any impeachment, established.

25              There are actually seven things that are really not

1    up for dispute.  Seven crucial facts that have not been

2    impeached, that the evidence has established, that witness

3    after witness has testified to.

4            The first one is that the person driving that 2003

5    blue Dodge Ram was the defendant.  Joseph Jenkins.  The

6    defendant himself acknowledged that, and you heard from five

7    CBSA officers who all said the defendant was the person

8    behind the wheel of that vehicle.

9            The second is that the defendant was the only

10   person in that vehicle, sole occupant, and the driver.

11           The third is that that vehicle moved from

12   Alexandria Bay in Jefferson County in the United States

13   across the foreign border into Canada to the port of

14   Lansdowne.  No dispute about that.  The evidence showed it,

15   the defendant acknowledged it.

16           The next thing the evidence established and that

17   has not been contradicted is that in the vehicle that the

18   defendant owned and was driving, there was a black Toshiba

19   computer, a black laptop bag containing a silver Compaq, an

20   8-gigabyte USB drive and a 4-gigabyte USB drive.  No dispute

21   about that.  You heard from Officers Johnston, Garrah, Hache,

22   Melany Boyd, that that is exactly what was contained in the

23   defendant's vehicle.  And further, the defendant himself

24   acknowledged it.  Yes, absolutely, that black Toshiba was in

25   the vehicle.  And do you remember when he said what the

1    officers said, what Tristan Garrah, what Jarret Johnston,

2    what Glen Hache said was correct, he said, yeah, they were

3    correct, except about him being nervous, but everything else,

4    everything else except about him being nervous, that was all

5    right, that was all true.  Well, each of those officers said

6    that in that defendant's 2003 Dodge Ram, there was a laptop

7    bag containing a Compaq computer and an 8-gigabyte and

8    4-gigabyte USB drive.  So that fact remains undisputed.  In

9    the car defendant owned, the defendant was driving, there

10   were those digital media items.

11          The next fact that is undisputed is that on each of

12   those digital media items, there were images and videos of

13   child pornography.  You heard from certified forensic

14   examiner Brian Braisted who examined the black Toshiba

15   computer and the 2-gigabyte and the 4-gigabyte and the

16   8-gigabyte USB drives, that he found videos and pictures of

17   child pornography on the black Toshiba, on the 8-gigabyte,

18   and the 4-gigabyte.  And that was undisputed.  In fact,

19   that's consistent with what the defendant himself

20   acknowledged.  In that jail call where the defendant says,

21   yes, the numbers are wrong, it's not actually 3800, it's more

22   like a hundred, but the defendant does not dispute the

23   presence of child pornography on the digital media found in

24   his car that he was driving over the border on May 24th,

25   2009.  And the forensics bear out the defendant's admission.

1    Brian Braisted testified that on the black Toshiba he found

2    594 pictures of child pornography.  594, in the system volume

3    information and in the thumb caches.  He also told you that

4    he found at least three videos of child pornography.

5            Now among those images and videos that Brian

6    Braisted found on the black Toshiba laptop belonging to the

7    defendant, there was a video called Vicky.  You saw a lot of

8    Vicky during this trial.  Not nearly as much as is contained

9    in the whole video clip, but you saw her through more than

10   one witness.  And you heard from Special Agent Joshua Findley

11   that Vicky is a real girl.  At the time that video was made,

12   she was 10 years old.  The video the defendant had on the

13   8-gigabyte USB drive and on the black Toshiba laptop featured

14   Vicky, at 10 years old, being abused by her father.  And you

15   heard from Joshua Findley that that was a real person, that

16   she was a minor at the time the video was taken, that he has

17   met her and that he has talked to her.  And that is the video

18   that Brian Braisted found on the defendant's computer.

19           Also on the defendant's computer, Brian Braisted

20   found something called a Green Bath series image.  You heard

21   from Special Agent Justin Myers that Green Bath is another

22   known victim.  The Green Bath has been circulated all over

23   the internet and that Green Bath, like Vicky, features a real

24   child, a girl who was between 8 and 10 years old at the time

25   that the images found on the defendant's computer were taken,

1    and that those images were taken by her father.  And Brian

2    Braisted confirmed, without impeachment, that Green Bath was

3    present on the defendant's black Toshiba laptop.

4              On the 8-gigabyte USB drive, Brian Braisted found

5    15 child pornography pictures.  15.  And there's no issue

6    there about whether they were stored in a place the defendant

7    couldn't access or if they were somehow cached because they

8    were active.  They were right there.  All you had to do to

9    find those 15 child pornography pictures was plug the USB

10   drive into a computer and double click.  Just like with the

11   Vicky video.  All you had to do was double click on the image

12   in New Folder 2 and up that video pops.  Same thing with the

13   Green Bath picture.  Same thing with the pictures found on

14   the 8-gigabyte USB drive.

15             On the 4-gigabyte USB drive, Brian Braisted

16   testified that he found 3,250 images of child pornography.

17   Sixteen of those images were sadomasochistic.  That means

18   they featured bondage.  He also found 10 video files.  Ten

19   video files readily accessible, all you had to do was plug

20   the USB drive into a computer and double click.  Brian

21   Braisted testified that among those pictures and videos was

22   the Vicky video and the Green Bath video.  The same Vicky

23   video found on the 8-gigabyte USB drive.  Earlier I said that

24   Vicky was found on the black Toshiba.  Vicky was found on the

25   8-gigabyte USB drive and on the 4-gigabyte USB drive.

1          On the black Toshiba was a video called KP Nancy.

2     And you heard from Special Agent Chris McClellan about what

3     KP Nancy is.  KP Nancy, yet another well-known, widely

4     circulated child pornography series, portraying a real girl.

5     Chris McClellan met her, confirmed that she was a minor at

6     the time the video was created, he knows her, she is real and

7     she was captured on the video that was captured on the

8     defendant's black Toshiba laptop.  The black Toshiba laptop

9     he fully acknowledged owning.  The black Toshiba laptop that

10    the forensics confirmed he used over and over on a regular

11    basis.  He used it to check e-mail, he used it to send out

12    work estimates, he used it to pay bills online, he used it to

13    get e-mail confirmations of Master Card charges, and he did

14    so as he was looking at images of child pornography.  He used

15    it as part of his integrated system of activity.  Used it for

16    something like a work estimate, watch child pornography,

17    check it for an e-mail, upload a video to the USB drives.

18    Both the forensics and the defendant's admission that there

19    were images of child pornography on that digital media

20    confirm the existence of child pornography on the black

21    Toshiba and the USB drives.

22         You heard a lot during this trial about the

23    Canadian forensic examination.  You heard that there may have

24    been some disparities or some confusion but I want you to

25    remember the testimony of Detective Constable Kip Wohlert.

1    Kip Wohlert, who did the examination in Canada.  Kip Wohlert,

2    who testified that he found 1600 images of child pornography

3    on the defendant's digital media and at that point he reached

4    a saturation point.  It wasn't that he found only 1600 images

5    and there's somehow an inconsistency between Brian Braisted

6    and Kip Wohlert.  No, it was that Kip Wohlert hit 1600 and

7    decided to stop because there were 10,000 more images.  And

8    as he testified, he didn't need to keep looking.  He had

9    reached the limit he needed to get to.  And so he stopped.

10   Brian Braisted kept looking and found more.  That isn't an

11   inconsistency, in fact it completely corroborates the U.S.

12   forensic examination.

13            So those six things are really not up for debate.

14   There is absolutely no factual dispute in the evidence before

15   you about those six facts.  There are, however, three open

16   questions.

17            First one came up during defendant's testimony.

18   Did those USB drives, the 4-gigabyte and the 8-gigabyte,

19   actually belong to the defendant?

20            The second question is, did the defendant knowingly

21   transport child pornography from the United States into

22   Canada?  And again, the emphasis there is on knowingly.  Did

23   the defendant know about the child pornography he was

24   bringing into Canada on those USB drives?

25            And the third open question is, did the defendant

1   knowingly possess the child pornography on the black Toshiba

2   laptop?

3          You will find when you examine the evidence that

4   the answer to all three questions is beyond a reasonable

5   doubt yes.  Yes, the USB drives belonged to the defendant,

6   yes, he knowingly transported child pornography into Canada,

7   and yes, he knowingly possessed child pornography on that

8   black Toshiba laptop.

9          Now in a minute I'm going to talk a little bit

10  about the law and later the court will instruct you on the

11  law.  To the extent that anything I say about the law

12  contradicts or is in conflict with what the court tells you

13  about the law, the court governs.  Listen to the court's

14  interpretation and instructions on the law.  But I'm now

15  going to walk you through the statutes and the elements of

16  the offenses that the government has to establish to you

17  beyond a reasonable doubt.

18         The law is of course a little bit dry and a little

19  bit dense but it is important for you to consider it in your

20  deliberations.  The defendant is charged in Count 1 with

21  transportation of child pornography.  That offense has four

22  elements.  Four things the government has to establish for

23  you beyond a reasonable doubt.  The first of which is that

24  the defendant knowingly transported a visual depiction.  And

25  as I said earlier, there is a dispute between the parties,

668

1    between the government and the defendant about whether the

2    defendant knowingly transported those USB drives containing

3    child pornography and knew that there was child pornography

4    on them.

5            The second element is that the visual depiction was

6    transported in or affecting interstate or foreign commerce or

7    the visual depiction was produced using materials that had

8    been transported in or affecting interstate or foreign

9    commerce.

10           That is the kind of language that makes people not

11   want to go to law school, it's the kind of language that

12   makes my daughter say she wants to be a doctor, not a lawyer,

13   but it's very simple and I'll explain to you exactly what

14   that means in just a moment.

15           The third element was that the visual depiction was

16   child pornography.

17           The fourth element is that the defendant knew of

18   the sexually explicit nature of the material and the visual

19   depiction was of an actual minor engaged in that sexually

20   explicit conduct.  Let's go to the next.

21           Element one.  A visual depiction.  The defendant is

22   charged with transporting visual depictions.  But what the

23   law requires the government to establish for you is not a

24   number of images.  We do not have to prove to you that the

25   defendant transported five videos or five pictures or five

1    images or 10 or 100 or 1000 or 3200.  What we have to

2    establish for you is the defendant transported a visual

3    depiction.  One.  That is the burden of proof that the

4    government carries.  We must establish beyond a reasonable

5    doubt a visual depiction was transported from the United

6    States into Canada.

7            You will hear from the court that an act is done

8    knowingly, in other words, the defendant knowingly

9    transported those USB drives, when it is done voluntarily and

10    intentionally and not because of an accident or mistake or

11    some other innocent reason.  I mentioned to you before that

12    one of the open questions is whether the defendant knew that

13    those USB drives were in that bag, whether those USB drives

14    actually belonged to him and that's really what that element

15    is talking about.  Let's go to the second.

16            Interstate and foreign commerce.  The language was

17    dense, it sounds complicated, it's very easy.  The government

18    has to establish that transportation affected interstate or

19    foreign commerce and we can do that by proving to you that

20    the child pornography crossed a foreign border, that the

21    transportation went from the U.S. into Canada and as I said

22    earlier, that's really not -- no debate here, we know the

23    defendant had the media with him when he was in the United

24    States, we know he drove across the bridge, we know he

25    crossed the foreign border, we know he was the only person in

1     the car, we know that no one else got into the car on the

2     bridge between United States and Canada.  Beyond a reasonable

3     doubt, the government has established the effect on

4     interstate and foreign commerce because the defendant crossed

5     a foreign border.

6           The next element is that the visual depiction was

7     child pornography.  You will hear from the court a list of

8     factors that I'm going to go over in a minute on how you can

9     decide what child pornography really is because ultimately

10    it's up to you, it is up to you to determine whether the

11    pictures in that binder, those videos you saw constitute

12    child pornography.  You heard from certified forensic

13    examiner Brian Braisted who has examined 75 different cases,

14    thousands, hundreds of thousands of images that he believes

15    he found numerous, hundreds, thousands of images of child

16    pornography on the digital media.  You heard his description

17    of the videos, you saw the videos yourself, but the

18    government does carry the burden of establishing that the

19    visual depictions were child pornography.  When you're trying

20    to answer that question for yourselves, I ask you just to

21    look at the pictures.  Just think about the videos you saw.

22    There really cannot be any dispute, the visual images were

23    child pornography.

24          It's also important for you to know that in order

25    for the government to meet its burden here, we do not have to

1    establish the exact identity of the minor.  We don't have to

2    do what we did with KP Nancy, with Vicky, with the Green Bath

3    series, we do not have to tell you the name or the exact age

4    of the child depicted in the images.  In fact, for good

5    reason, we asked the witnesses not to disclose the specific

6    real names of those victims because we are trying to honor

7    their integrity to the extent that it is possible in this

8    horrible context.  It is also important for you to know that

9    we don't have to establish anything other than the person was

10   under 18 years old.  In KP Nancy, that girl is 14, that girl

11   is a minor.  And her visual depiction constitutes child

12   pornography when it is done in a sexually explicit way.

13   These are three of the factors, there are six total, that you

14   can consider when deciding whether the images and videos

15   constitute child pornography.

16           First, whether the focal point of the visual

17   depiction is the child's genitals or pubic area.

18           Second, whether the setting of the visual depiction

19   makes it appear to be sexually suggestive.  Again, think

20   about those images, and I know they're unpleasant to think

21   about and I know you looked at them very briefly, but I think

22   it is absolutely beyond a reasonable doubt the case that

23   those are pictures that are designed to be sexually

24   suggestive.  That is their very nature.  They are designed to

25   be sexually suggestive.

1          Whether the child is displayed in an unnatural pose

2     or in inappropriate attire considering the age of the child.

3     If you think about the images with the children with their

4     hands and legs bound, that question answers itself.

5          The next factor is whether the child is partially

6     or fully clothed, or nude, although nudity is not in and of

7     itself lascivious.  You heard from Brian Braisted that he

8     didn't automatically classify every image and every video as

9     child pornography.  He went through very carefully.  He

10    decided that some images such as those images you saw of the

11    girl in the bathing suit at the beach, some of those images

12    are child erotica, they are not child pornography.  He was

13    very rigorous in setting aside what is child pornography and

14    what is not child pornography.  Nudity in and of itself --

15    not enough to be child pornography.  And Brian Braisted said

16    he considered that when he was deciding which images should

17    be considered pornographic.

18         The next factor is whether the visual depictions

19    suggest sexual coyness or willingness to engage in sexual

20    activity.

21         Finally, whether the visual depiction is intended

22    to elicit sexual response in the viewer.  Again, I think the

23    answers are found in the images themselves.

24         The fourth element is whether the defendant knew

25    the material was child pornography.  The government is

1    required to establish the defendant knew the images that were

2    on the digital media were child pornography.  The defendant

3    cannot have it just be the case that it's voluntary or the

4    defendant cannot have it be the case that it's an accident or

5    a mistake or there's an innocent reason for that image to be

6    on the computer.  He must voluntarily and intentionally know

7    that those images are child pornography.  However, the

8    government does not have to prove the defendant has specific

9    knowledge about the identity of the performer.  In the same

10   way that the government doesn't have to establish to you who

11   that performer is, who the child is, exactly how old the

12   child is, the defendant, we do not have to prove that he knew

13   the exact age or the exact identity of the child.  We also

14   don't have to provide you with eyewitness testimony from

15   someone saying I saw him looking on the computer, I saw him

16   downloading images, I saw him on the internet.  I was there

17   with him when he uploaded things to the 8-gigabyte or

18   4-gigabyte USB drive.  We don't need eyewitness testimony.

19   We can use the kind of evidence we did, the testimony of

20   certified forensic examiners, timeline evidence,

21   circumstantial evidence.

22          And finally, the defendant's belief as to the

23   legality or illegality of the material is irrelevant.  It

24   does not matter if what he thought he was doing was legal.

25   We don't have to prove that he thought he was violating the

1   law.

2          On Count 1, the transportation of child pornography

3   into the United States, we allege that that transportation

4   occurred using the 8-gigabyte and the 4-gigabyte USB drives,

5   and I mentioned earlier that it is an open question whether

6   the defendant actually possessed, whether they actually

7   belonged to him, that 8-gigabyte and 4-gigabyte USB drives.

8   When you're thinking about that question, I want you to

9   consider the testimony of the Officer Glen Hache, who as a

10  routine matter asked the defendant, is this your vehicle, did

11  you pack the contents of the vehicle.  And there was no

12  ambiguity in the defendant's response, he didn't say, well, I

13  don't know, this vehicle's actually one that's used by people

14  I work with and there are all kinds of different people who

15  put things in and sometimes there are supplies that go from

16  workers, I don't know.  None of that ambiguity came into the

17  defendant's response when he talked to Officer Hache.

18          What the defendant said on May 24th, 2009, and what

19  is actually consistent with the evidence is that, yes, he

20  packed the contents of that vehicle.  The vehicle that's

21  registered to him.  The vehicle he was the sole driver of.

22  The vehicle that held media he openly acknowledged he

23  possessed, like the black Toshiba laptop.  The vehicle that

24  contained a silver Compaq computer in the same bag as the USB

25  drives.  Do you remember that part of his testimony?  The

1    defendant said, you know what, actually, yeah, that silver

2    Compaq computer, that is mine, no dispute there, the Compaq

3    that didn't have child pornography on it except for the links

4    to web pages that Brian Braisted found stored deep, deep in

5    the data of the computer, that silver Compaq, that's mine,

6    and yes, that silver Compaq was in the same bag as the USB

7    drives containing child pornography, and actually, I looked

8    through the bag before I decided to cross the border, I

9    looked through the laptop bag, found the silver Compaq, found

10   some paperwork but I just -- I didn't find the USB drives.

11   Really?  Really?  He acknowledged owning the silver Compaq,

12   he acknowledged to Glen Hache that he is the person who

13   packed the contents of the vehicle.  He acknowledged that he

14   looked through that bag, and yet somehow he wasn't aware that

15   there were two USB drives containing thousands of images of

16   child pornography in that black laptop bag.  In the car he

17   owned.  In the car he was driving.  In the car registered to

18   him.

19          You also have the evidence from the USB drives

20   themselves.  You heard from Brian Braisted that the USB

21   drives are sort of different from a computer.  On the black

22   Toshiba laptop there's a serial number on the outside, right,

23   the unique identifier, like a fingerprint.  That serial

24   number means that that black Toshiba laptop is unique, that's

25   the way you mark it as being an individualized laptop.  The

1    4-gigabyte and 8-gigabyte USB drives didn't have serial

2    numbers on the outside.  But Brian Braisted told you that

3    they do have serial numbers, they're embedded electronically

4    by the manufacturer onto the USB drives.  And Brian Braisted

5    was able to tell you that the serial numbers for the

6    8-gigabyte and 4-gigabyte USB drives show up on the

7    defendant's black Toshiba laptop.  Conclusively.  Those two

8    USB drives were plugged into the Toshiba laptop the defendant

9    acknowledged he owned, he acknowledged he used, he

10   acknowledged was his and was in the vehicle with the same

11   kind of data contained on the 8-gigabyte and 4-gigabyte USB

12   drives.  We know that those were the USB drives plugged into

13   the computer because that unique serial number shows up on

14   the black Toshiba.  Not only that, but the data on the black

15   Toshiba is consistent with that on the 8-gigabyte and

16   4-gigabyte drives.

17          Brian Braisted testified, and you'll see in

18   Exhibit 14, that he did a hash value comparison between the

19   USB drives and the black Toshiba and what that means is once

20   he had sorted out on the black Toshiba what he considered to

21   be child pornography, he did a fingerprint comparison.  A

22   hash value is like the fingerprint of a video or image.  And

23   he found 11 overlaps, 11 completely identical images on the

24   8-gigabyte, 4-gigabyte, and black Toshiba.  Exactly

25   identical.  So from the computer the defendant owned, used,

1    operated, was taking into Canada, in the box, his ownership

2    of that black Toshiba was so complete that he kept the

3    original box and the original receipts from its purchase, his

4    ownership of that black Toshiba was so, so incontrovertible

5    that the only user profile on it was a user named Joe.  The

6    defendant's own first name.  On that black Toshiba laptop

7    that contained images of child pornography, there were 11

8    overlapping images also found on the USB drives.  What are

9    the chances that that is just a coincidence?  What are the

10   chances that the defendant is just so unlucky that somehow an

11   8-gigabyte and 4-gigabyte USB drive got planted in his laptop

12   bag, an 8-gigabyte, 4-gigabyte USB drive that didn't belong

13   to him, that he had no knowledge of but that had been plugged

14   into his own computer, plugged into his computer and had data

15   transferred from the computer to the USB drives.  There's a

16   very interesting timeline for both of those drives that makes

17   it absolutely the case that the defendant knew that those USB

18   drives belonged to him.  Knew it and used them, used them to

19   store images of child pornography.

20          You'll remember testimony from Brian Braisted that

21   he went through the computer and constructed a series of

22   events based on the forensic data, the record of events in

23   the Toshiba and in the USB drives.

24          On January 24th, 2009 at 11:49 a.m., user Joe on

25   the black Toshiba the defendant owned opened an e-mail sent

1    to jjenkins70@rochester.rr.com and that e-mail was about

2    Master Card charges.  At 12:04 p.m., about 15 minutes later,

3    user Joe, the same user who opened an e-mail sent to the

4    jjenkins e-mail address, saved three child pornography videos

5    to the 8-gigabyte USB drive.  Those videos were taken from

6    the Toshiba laptop and put on the USB drive.  The USB drive

7    whose serial number shows up on the Toshiba.  It is

8    absolutely patently incredible that the defendant did not own

9    that 8-gigabyte USB drive.  Of course he owned it.  Of course

10   he owned it.  Of course he plugged it into the Toshiba, of

11   course he transferred images of child pornography from the

12   Toshiba to the 8-gigabyte USB drive.

13           On the 4-gigabyte USB drive, there is a similarly

14   damning timeline.  On May 22nd, 2009, at 8:20 p.m., the

15   forensic evidence establishes that user Joe of the black

16   Toshiba accessed the internet.  At 8:46 p.m., so about 20, 25

17   minutes later, user Joe accessed a website featuring images

18   of preteen and tween girls.  At 8:52 p.m., so a little less

19   than 10 minutes later, user Joe then accesses a website from

20   Image Source called "young girls braless and pokies" and you

21   heard from Brian Braisted that that Image Source website is a

22   known Russian website that distributes and shares images of

23   child pornography.  And finally, at 10:25 p.m., after

24   approximately two hours of internet activity, user Joe stops

25   his activity on the Toshiba and at that point in time, 238

1    images of child pornography and child erotica are transferred

2    from the black Toshiba to the 4-gigabyte USB drive.

3            They were transferred by the same person who at the

4    same time was running CCleaner on the black Toshiba laptop.

5    You heard about CCleaner.  CCleaner is wiping software that

6    is supposed to get rid of data.  So at the same time that the

7    defendant is accessing child pornography on the internet, the

8    same time that user Joe on that black Toshiba is downloading

9    images from preteen and tween websites, CCleaner is running.

10   CCleaner is getting rid of the record of that internet

11   activity and at the same time the defendant is transferring

12   the images being uploaded to the Toshiba to the 4-gigabyte

13   USB drive.  Because that's where he keeps it, right?  That's

14   where the real motherlode is.  On that 4-gigabyte USB drive,

15   3,250 images of child pornography.  Sadomasochistic images

16   and 10 videos.  It is the defendant who possessed that

17   4-gigabyte USB drive.  It is the same person who accessed his

18   e-mail, paid his Master Card bill, checked his e-mail again,

19   went to an internet website featuring child pornography and

20   uploaded images to the 8-gigabyte and 4-gigabyte USB drive.

21   These timelines don't leave room for a mysterious person to

22   come in and plant child pornography on USB drives and then

23   plant those USB drives in the defendant's laptop bag.  What

24   possible, possible credible explanation can there be for that

25   series of events other than the one that is consistent with

680

1    the evidence?  Other than the one that is consistent with the

2    defendant's guilt?

3              In the second count, the defendant is charged with

4    possession of child pornography.  Possession of child

5    pornography on the black Toshiba laptop.  There are four

6    elements, two of which will sound very familiar.  First, the

7    defendant knowingly possessed a visual depiction.  Second,

8    that the visual depiction was transported in interstate

9    commerce or was produced using materials transported in or

10   affecting interstate commerce.  Third, that the visual

11   depiction was child pornography.  Fourth, that the defendant

12   knew of the sexually explicit nature of the material and the

13   visual depiction was of an actual minor engaged in that

14   sexually explicit conduct.

15             The third and fourth elements of Count 2 are

16   identical to those of Count 1, that the visual depiction was

17   child pornography and the defendant knew it was child

18   pornography.  Count 2, unlike Count 1, alleges possession

19   rather than transportation.  And you will hear from the court

20   that to possess means to have something within your control.

21   It doesn't mean you have to hold it physically, to have

22   actual possession of it.  As long as the depiction is within

23   the defendant's control, he possesses it.

24             You heard a lot during the discussion of the black

25   Toshiba laptop with Brian Braisted about something called

1    system volume information.  SVI.  You heard from Brian

2    Braisted that he found 594 images containing child

3    pornography on the black Toshiba in the system volume

4    information of that computer and in thumb caches.  During

5    cross-examination, Brian Braisted was asked if the defendant

6    would have access to images stored in the system volume

7    information of the computer.  Brian Braisted's answer was

8    that all it would take was the click of a button to make

9    those files active.  The CCleaner might have tried to wipe

10   them out, the CCleaner might have tried to destroy their

11   presence on the Toshiba but all you have to do is restore and

12   those images become readily accessible.  I want you to think

13   about that when you're listening to the law on the

14   description of what possession requires.  As long as the

15   visual depiction is within the defendant's control.  As long

16   as the defendant can restore those files to life, as long as

17   he can click a button and bring them back as active data on

18   the black Toshiba laptop, he possesses them.

19           Beyond that, you'll see in the indictment when you

20   go back and review it in the jury room that the government

21   has alleged on or about May 24th, 2009, the defendant

22   possessed images on the Toshiba.  That language on or about,

23   the court will instruct you is intentionally approximate.

24   Because the government does not carry the burden of proving

25   to you that exactly on May 24th, 2009, the defendant

1    possessed those images.  The government has to prove at about

2    that time, around that time.  I bring that to your attention

3    because I want you to think about Exhibit 3B which contains a

4    visual description of the Toshiba laptop and a picture of the

5    Elena file, there's an Elena file on the Toshiba laptop that

6    gets moved during that transfer of the 238 images, the Elena

7    picture that is child pornography is on the Toshiba laptop

8    and then it gets moved over to one of the USB drives.  Elena

9    is child pornography, and on May 22nd, 2009, the evidence

10   conclusively establishes it was on the laptop.  Along with

11   other images of child pornography.  On or about May 24th,

12   2009.  And we've established through Brian Braisted's

13   forensic examination that on May 22nd, just two days before,

14   on or about May 24th, there was child pornography on the

15   defendant's computer.  On that black Toshiba.  So there are

16   two different ways in which those images are possessed by the

17   defendant.  First, that he could so easily have restored them

18   if he chose to do so, and second, on May 22nd he wouldn't

19   even have had to restore them, they were active, there were

20   active images of child pornography on May 22nd, 2009.

21          And finally, the defendant is not alleged to have

22   possessed only picture as opposed to videos, he is alleged to

23   have possessed videos as well as pictures.  And you heard

24   from Brian Braisted that the videos were not buried in the

25   system volume information, the videos were not thumb caches,

1   the videos were one click on the desktop away from the

2   defendant's possession.  All he had to do was double click on

3   New Folder 2 and three video files containing child

4   pornography would suddenly be viewed.  They weren't buried,

5   they weren't wiped, they never disappeared, they were sitting

6   right there on the desktop, they were sitting right there on

7   the desktop able to be accessed by Officer Johnston, able to

8   be accessed by the defendant.  Those videos show he possessed

9   child pornography on May 24th, 2009 because he hadn't

10  bothered getting rid of them, he hadn't bothered transferring

11  those videos to a USB drive, they were sitting right there in

12  New Folder 2.

13          The second element in the possession charge is that

14  the visual depiction was transported in or affecting

15  interstate or foreign commerce, or was produced using

16  materials that had been transported in or affecting

17  interstate commerce.  I'm sure this testimony seemed a little

18  strange at the time, you know, why do we care where the

19  laptop was manufactured.  This is why we care, this is why

20  the government put that evidence before you, because the

21  Toshiba laptop, the shell of it was manufactured in China,

22  and the hard drive was manufactured in the Philippines, and

23  that means the child pornography was possessed on something

24  that was in or affecting interstate commerce.  We had to

25  bring the black Toshiba into the United States, it wasn't

1       made in New York, it wasn't made in Jefferson County, it had

2       to cross a foreign border to get here and that's material

3       that the defendant possessed using the laptop.

4               I said there was another question that was open,

5       and that was whether the defendant knowingly possessed the

6       child pornography and transported the child pornography on

7       the USB drives on the laptop.  Again, I want to refer you to

8       the timeline because the timeline provides conclusive proof

9       of the defendant's knowledge.  His knowing possession, his

10      knowing transportation.  The fact that he knew that there was

11      child pornography on all three items, the fact that he knew

12      it, he knew it when he uploaded the images and he knew it

13      when he transported it and he knew it when he possessed it

14      because the activity on that computer and the activity on the

15      USB drives doesn't leave it open for question who's actually

16      doing it, who's actually uploading the images, who's actually

17      saving them.

18              January 19th, 2009, at 6 p.m. user Joe creates New

19      Folder 2 on the desktop.  Four seconds later, user Joe saves

20      five video files of girls age 12 to 14 dancing in their

21      underwear to New Folder 2.  Those videos in total have a

22      viewing time of 32 minutes and 21 seconds.  At 6:33 p.m. just

23      slightly over 32 minutes and 31 seconds, user Joe opens an

24      e-mail sent to a password-protected e-mail account in the

25      name of jjenkins70@rochester.rr.com.  An e-mail account the

1    defendant acknowledged was his.  So at 6 p.m. New Folder 2 is
2    created, then 32 minutes' worth of videos are uploaded to New
3    Folder 2 and then 33 minutes later, just after the viewing
4    time of those videos, user Joe opens Joseph Jenkins' e-mail
5    account.  Really?  A subcontractor, an employee, one of the 2
6    or 10 or 14 or 20 people who always use this computer?  One
7    of them created New Folder 2, one of them uploaded 32 minutes
8    worth of child pornography and child erotica, one of them
9    then opened Joseph Jenkins' e-mail using a secure password?
10   That explanation strains credulity to the breaking point.

11          This evidence shows that it is the defendant using
12   that computer, it is the defendant uploading those images, it
13   is the defendant watching them, saving them, creating them,
14   and possessing them.  It is the defendant doing it, and he is
15   doing it as part of a daily routine.  He is doing it just
16   after he checks his e-mail.

17          January 20th, next day, 2009.  6:57 a.m., so early
18   morning, user Joe accesses a child pornography video called
19   meekrab.  At 7:04 a.m., user Joe accesses the IKEA home
20   planner on the computer.  Now what's interesting about this
21   is that the child pornography video is just under six minutes
22   in length and just under six minutes pass in between the time
23   that that video is accessed and user Joe accesses the IKEA
24   home planning application on the computer.  At 7:16 a.m., so
25   just over 10 minutes later, user Joe opens an e-mail sent to

1     a password-protected account in the name of Joseph Jenkins,

2     an account Joseph Jenkins said he uses, in an account he said

3     is his.  Of course it's the defendant.  Of course it's the

4     defendant opening the video, watching the video and then

5     doing what he always does.  It's part of his routine.  He's

6     doing it at 6 p.m., he's doing it at 6 a.m., he's checking

7     his e-mail, he's using the IKEA home planner, because it's

8     his collection.  He is monitoring his collection.  He's

9     treating it the way people treat stamp collections, it is

10    part of a daily, ordinary course of events for him.  It is

11    the fabric of his life to possess this child pornography.  He

12    does it the same way you check your bank account, he does it

13    the same way you book airline reservations, it's just part of

14    what he does on the internet.  It's just part of what he uses

15    his computer for.

16              On February 22nd, 2009, same kind of thing.  At

17    9:14 a.m., user Joe opens an e-mail sent to the Joseph

18    Jenkins e-mail account.  9:41, user Joe uses Power Point.

19    10:05 a.m., so about 25 minutes later, user Joe creates the

20    Zoe folder, and four videos of child pornography are

21    transferred to that folder.  There are eight files total.

22    Child erotica, child pornography, with a 43-minute viewing

23    time.  And just like always, after that viewing time lapses,

24    user Joe opens an e-mail sent to

25    josephjenkins70@rochester.rr.com.  Because that's what he

687

1    does.  Right?  This is his activity, this is his pattern.

2    This is his crime.  This is what he does.  He uses it, he

3    looks at it, and it becomes part of a routine.  So much a

4    part of his routine that he literally cannot leave his child

5    pornography at home to go on a week-long vacation in Canada.

6    So much a part of the daily events of his life he has to pack

7    it in a Toshiba box and bring it with him to go into Canada,

8    he can't leave it alone, clearly he can't leave it alone.  He

9    looks at videos, he checks an e-mail, he uploads videos, he

10   checks his e-mail.

11        You're also going to hear from the court there is a

12   distinct form of evidence called evidence of flight.

13   Evidence that can establish the defendant's consciousness of

14   his guilt.  You will hear that if proved, the flight of a

15   defendant after he knows he has been accused of a crime may

16   tend to prove the defendant believed he was guilty.  When

17   we're thinking about the defendant's knowledge, whether he

18   really knew about the child pornography, whether the USB

19   drives really belonged to him, I want you to think about what

20   you heard about that Canadian bench warrant because

21   originally, the defendant is charged in Canada.  He's charged

22   in Canada, he's brought to trial, and there's a delay because

23   he asks for a stay in the prosecution, he says that he wants

24   more time.  And so the court says, okay, we'll give you more

25   time, come back October 18th, 2010.  But the defendant

1   doesn't come back on October 18th, 2010.  Witnesses are

2   there, they're ready to go, they're lined up, the trial's

3   going to start, and the defendant is nowhere to be found.

4   The court issues a warrant for the defendant because he fails

5   to appear for his own trial, and you heard all kinds of

6   excuses about that failure.  Got the time wrong or his lawyer

7   didn't tell him or his lawyer told him not to come or the

8   American lawyer didn't tell him or the lawyers didn't

9   communicate, or the Canadian investigators messed it up or

10   the Canadian prosecutor had it wrong or the court wasn't

11   clear, but the defendant didn't show up.  He didn't show up

12   for his own trial.

13        Do you remember his testimony that his lawyer told

14   him he didn't have to come to his own trial?  Really?  The

15   lawyer who wrote him a letter saying you missed your trial,

16   they paged you three times, where were you?  The defendant

17   did not appear because he knew he was guilty and he did not

18   want to stand trial for it.  The defendant knew he was going

19   to be standing trial for an offense he was guilty of in the

20   same way he knew he possessed that child pornography, in the

21   same way he knew that he transported it into Canada from the

22   United States, in the way he knows today that that child

23   pornography belonged to him, that it was on the USB drives,

24   that it was on the laptop, that he knew exactly what kind of

25   material was on that digital media.  The way he knew it then,

1   the way he knew when he didn't show up for court in Canada,

2   and the way he knows it today.

3          The court will tell you that the defendant's

4   failure to appear in court can be construed as consciousness

5   of his own guilt.  He didn't show up because he did not want

6   to face the consequences.  When you're thinking about the

7   defendant's knowledge, about whether he actually knew what he

8   was doing, whether he actually understood what the images

9   were, I want you to think about the defendant's demeanor and

10  responses, I want you to think about the defendant himself,

11  when the defendant was confronted by Officer Hache with the

12  question, is there child pornography on your computer, do you

13  have anything like that?  He paused.  Think about that.  He's

14  being told that he has some of the most offensive material in

15  Western Civilization on his computer and he pauses, he thinks

16  about it.  And then he says -- not, how dare you, that's

17  disgusting, I'm shocked, no, of course not.  What he says is,

18  pause, not to my knowledge.  That's an awfully carefully

19  calibrated answer, isn't it?  Not to my knowledge.  And then

20  Officer Hache follows up and says, well, have you ever

21  uploaded anything like that, have you ever had anything like

22  that?  And he says, I don't think so.  I don't think so.

23  Not, no, are you crazy?  Not, no, how on earth could you

24  accuse me of that?  He's not shocked, he's not angry.  Do you

25  remember during cross-examination how officer after officer

1    was asked, did defendant have any outbursts?  He remained

2    calm, right, he didn't have any outbursts, he didn't get

3    angry.  Exactly, he didn't get angry.  He was being accused

4    of a horrific, disgusting offense and he didn't get angry.

5    What he got was scared, what he got was nervous, he turned

6    red, he sweated, he curled up into a little ball.  He did not

7    express outrage.  Because how could he be outraged?  He knew

8    the truth of the question, he knew the truth of the

9    accusation.  Outrage and surprise would have had no place

10   with the defendant.  Because of course he knew about the

11   child pornography.  Of course he wasn't shocked.  Two days

12   earlier he uploaded it to one of the USB drives, it wasn't a

13   surprise to him.  It wasn't a surprise at all.

14           I also want you to think about what each and every

15   officer told you about their observations of the defendant's

16   demeanor.  The defendant starts out nervous when he gets to

17   the point of entry and he gets more and more nervous the

18   closer the Canadian officers get to that digital media.  The

19   closer they get, the worse it gets for him.  When he first

20   shows up at the point of entry, he's all right, you know,

21   he's gripping the steering wheel and staring straight ahead

22   and not making eye contact and being evasive but he's not

23   sweating yet.  But what he's doing is bad enough for Pedro

24   Sousa-Dias to notice it.  And then for Melany Boyd to notice

25   it, for Melany Boyd to notice that he's not making eye

1    contact.  He's not really answering her questions directly,

2    he's not looking at her and he's fidgeting with his hands,

3    right, he's nervous.  And then when Officer Hache asks him

4    the question about the child pornography, that's when he

5    really falls apart.  That's when the nervousness really

6    reaches its peak because by then he's not just fidgeting,

7    he's not just avoiding eye contact, he's turning bright red,

8    he is curling up into a little ball.  He's curling up in a

9    little ball because he's afraid because he knows exactly what

10   they're going to find on that computer, he knows what they're

11   going to find on the USB drives.  He knows because he's the

12   person who put it there.  And you can consider all of those

13   observations that the officers made about the defendant's

14   demeanor when you consider his state of mind.  When you

15   consider whether he had knowledge.

16        You can also consider the defendant's demeanor on

17   that witness stand.  You can consider how forthright he

18   seemed.  How direct his answers were.  How credible his

19   testimony was.  You can and should consider his demeanor

20   during his testimony yesterday.  Do you remember when the

21   defendant said, I always tell the truth, lady?  Let's figure

22   out if the defendant always tells the truth.  If the

23   defendant is right when he says he always tells the truth,

24   lady.

25        The defendant said that he had deli meat and cheese

1    in his cooler and so he thought he might get pulled over, and

2    it might get seized.  Because of that, he was a little

3    anxious because of that but then on cross-examination, no, he

4    wasn't nervous at all, he was never nervous, the officers

5    were wrong about that.  So that's inconsistent.

6              The defendant testified that the officers who

7    testified about that search were right about everything, they

8    got everything right, really no dispute with what they said.

9    Except there is a dispute about the fact that he was nervous.

10   He wasn't nervous.  He wasn't nervous at all.  So that's

11   another inconsistency.

12             The defendant testified that he always left his

13   truck at home when he went on vacation.  Right, he leaves his

14   truck there, freely accessible to the handy men and house

15   sitters and potential child pornography planters who might be

16   getting into the Dodge Ram to plant USB sticks in the laptop

17   bag containing his laptop.  He always leaves that truck

18   there, but the defendant was driving his truck on May 24th,

19   2009.  He was driving his truck to go on vacation.  So that's

20   inconsistent.

21             The defendant also testified that at no point

22   before or during the search of his vehicle and property was

23   he asked any questions about child pornography but you heard

24   from Officer Hache that he asked the defendant explicitly

25   about child pornography, he asked him that question directly

1    and the defendant earlier said that the officers were right

2    about everything that happened during the search.  So how can

3    they both be right about everything during the search but not

4    right that he was asked about child pornography?

5           The defendant said that the black Toshiba laptop

6    was used by a lot of people.  The people used it for work,

7    that various people would come in and do things on it, use

8    programs, but then under cross-examination he said that he

9    was the person who owned that computer, he was the person who

10   used it, and his direct testimony bears that out, right?

11   He's the user so exclusively that it's his e-mail account

12   being accessed on that account.  Not another e-mail account,

13   his e-mail account.  He uses it so exclusively he's the

14   person who has the receipt for the computer, he is the person

15   who has the original case for that computer.

16          You also heard from the defendant that he wasn't

17   nervous at all during the examination.  That he never gets

18   nervous.  That he's not afraid of anything.  I want you to

19   think about how credible the statement the defendant never

20   gets nervous and that he's not afraid of anything is when you

21   think about his demeanor during his testimony in this court.

22   Really?  The defendant never gets nervous.  He's not afraid

23   of anything.  Then why did he backtrack?  Then why did he

24   change directions when it looked like the wall was coming

25   down, why did he change his answers?  Why did he avoid eye

1    contact?  Why did he seem to fidget in the witness stand?  He

2    never gets nervous.  The defendant was nervous yesterday when

3    he was testifying for the same reason he was nervous on

4    May 24th, 2009.  He was nervous because he knows he is

5    guilty.  And the evidence has established that beyond a

6    reasonable doubt.

7                 THE COURT:  Counsel, when you're ready, please.

8                 MR. GOLDSMITH:  Please the court.  "Not to my

9    knowledge."  We talked about it at the beginning of the

10   trial, spoken a lot about it today, we're going to continue

11   to talk about it, because as the government just argued for

12   several minutes to you about all of the overwhelming evidence

13   or the elements of their case, they admitted that what is in

14   dispute in this courtroom is the knowledge and the intent of

15   Mr. Jenkins.  So when he provided that answer on May 24th of

16   2009 and he provided the answer yesterday in court on the

17   witness stand, "not to my knowledge," that's what this is

18   really about, isn't it?  Did he know that the child

19   pornography was there?  Did he know that it had been on those

20   flash drives?

21                So there are several witnesses that were called at

22   this trial.  Now, Mr. Jenkins himself told you that generally

23   speaking, the three officers who performed the inspection of

24   his truck seemed to be accurate.  The government brought a

25   couple of other officers.  Officer Sousa-Dias and Officer

1    Boyd discuss the events leading up to that inspection.  The

2    government, with all of those witnesses, chooses to focus on

3    Mr. Jenkins seemed nervous.  Mr. Jenkins seemed nervous.  The

4    government brought up Officer Boyd's testimony of Mr. Jenkins

5    being nervous.  Officer Boyd, who you will recall was at a

6    counter that she testified was about 15 feet away from the

7    windows, that all of the other officers who performed the

8    inspection testified Mr. Jenkins' truck was about another 10

9    or more feet beyond that.  That all of the other officers

10   testified there was a cap on the truck.  That Officer Boyd

11   said, no, she could see right back into the bed of the truck.

12           So you want to talk about nervous, you want to talk

13   about is it that one witness that you want to rely upon, but

14   no, other witnesses said that he seemed nervous, the

15   government seems to think he seemed nervous on the stand.

16   But the government really is concerned about why wasn't he

17   nervous enough.  Why wasn't he so upset?  Why didn't he

18   scream and jump and holler when they told him at the border

19   that they thought that there was child pornography on the

20   computer?

21           Well, in part of your job in assessing credibility

22   of the witnesses, assessing the weight of the evidence in

23   this trial, you're going to look at everything and you're

24   going to make your determination as a jury.  This concern by

25   the government of why didn't he react stronger at the border,

1      think about it.  Think about a saying that's at least 400

2      years old or 300 years old, from Shakespeare.  "The lady doth

3      protest too much."  In life, somebody jumps up and down and

4      hollers and screams that they had nothing to do with it,

5      people tend to look at that person more suspiciously because

6      that is something that seems over the top, incredible.  The

7      same level of incredulity that the government wants you to

8      think you should assign because Mr. Jenkins didn't jump up

9      and down and holler.  Because he didn't scream protestations.

10     What did he do?  He said not to my knowledge.  They asked him

11     if he had done it, he said I don't think so.  Plain, simple,

12     straightforward responses.

13          There was a lot of testimony from those officers,

14     the CBSA officers from that day in May of 2009.  Talked about

15     the inspection that they performed of the vehicle, they

16     talked about the inspection that they performed on the

17     computer.  And there was some testimony about brief

18     conversations with Mr. Jenkins.  Nobody asked him who the

19     users were, and nobody asked him about passwords.  Nobody

20     asked him about the accessibility of the computer.

21          The government has argued extensively that they

22     have been able to prove by the evidence that they provided

23     that Mr. Jenkins was using the computer.  Their own expert

24     testified yesterday this forensic software, everything that

25     he uses, the equipment that he uses, his training, his

1    experience, none of that can prove who was using the

2    computers.  None of that can prove who was using an e-mail at

3    a time and accessing an e-mail.  All he can show is activity

4    on the machine.

5            Now on the subject of Special Agent Braisted, he

6    was careful to discuss with you the necessity for a write

7    block, testified about it several times.  The machine that,

8    when he's examining or studying a piece of evidence, that

9    piece of evidence, the computer, or flash drives get plugged

10   into that device, and that device then gets plugged into his

11   equipment.  Very important, very necessary because he says

12   that machine and that machine alone, make sure that whatever

13   contents of the devices being studied does not in any way get

14   altered by turning on and accessing the computer or the flash

15   drives.  Compare that to the testimony of the CBSA officers

16   when they were conducting their inspections of the machines

17   at the border check.  They didn't plug it into a write block.

18   They talked about software, remember, Special Agent Braisted

19   said, no, this is not software, this is a machine, when they

20   looked at files and accessed files on this computer.

21           Clearly everything that I argue, that the

22   government argues, are not controlling in your minds.  What's

23   controlling is your recollection of this evidence.  But I

24   want you to think about the testimony, think about repeatedly

25   Special Agent Braisted's acknowledgment that his studies

1    cannot confirm who's accessing and who's using the devices.

2    Then I want you to think about what the government is

3    presenting to you for several minutes.  User Joe, user Joe.

4    User Joe.  User Joe.  Because user Joe is the computer

5    profile user Joe.  User Joe is not Joe Jenkins, because user

6    Joe, a computer showed activity, but Special Agent Braisted's

7    study couldn't prove, none of the CBSA agents' testimony can

8    prove, none of the testimony and evidence in this trial can

9    prove that Joe Jenkins was on the computer when that activity

10   was going.  None of the evidence can prove that Joe Jenkins

11   was accessing the e-mail.

12           What are the two strongest indicators of that fact?

13   The government's own evidence.  Exhibit 3B, page 20.  In the

14   middle of the screen there's a prompt, pop up, it's asking

15   for the credentials, the user name and the password to get on

16   e-mail.  What's that box underneath?  The box underneath is

17   something that every one of us who's ever used a computer and

18   accessed e-mail has seen the last several years, it's the

19   prompt by the software that says, do you want me to remember

20   your password?  Do you want me to make life easier, so that

21   you don't have to punch in a user name and password every

22   time you want to log into this e-mail account?  And it's

23   checked.  It's checked.

24           Now Special Agent Braisted testified that the user

25   name and the password weren't showing, he said it could have

1    been because file wiping software was used and it would have

2    wiped out a user name and a password.  But it's there and

3    once that user name and password get plugged in, unless the

4    person unchecks that box, whoever turns that computer on,

5    whoever accesses that e-mail, goes right into that e-mail

6    account.  There's no security, there's no protection there.

7    It makes life easier but it also makes life more vulnerable

8    in that anyone can access what's on that computer or any of

9    our computers if the password is on there.

10            But even if that wasn't checked, even if the

11   password hadn't been saved onto the computer into the

12   software program for the e-mail, what's the other evidence

13   that we saw at this trial that anyone could have accessed the

14   e-mail?  Exhibit 3B, page 10.  It's a text document titled RR

15   info.  Special Agent Braisted was able to pull up, and

16   Special Agent Braisted testified and as it shows, are the

17   user names and the passwords for the e-mail accounts that

18   were on that computer.  So if someone was aware of the text

19   file, and the user name and the password prompt shows up for

20   e-mail, and they didn't remember, all they had to do was to

21   look right back up at RR info, and they'd have all the user

22   names and the passwords readily available.

23            Oh, by the way, also recall that there was no

24   password protection on the computer itself so when you turned

25   it on, it immediately went on.  You didn't have to type in a

password and a user to be able to access the programs of the
computer itself.  So this computer, based on the evidence
that you saw at trial and the testimony that you heard from
Special Agent Braisted, had no security whatsoever, was
completely accessible to anyone who had physical access to it
to use, physical access, which Joe Jenkins testified when he
took the stand yesterday.  When he described his electrical
business, and he described the people who worked with and for
him, and he described for you the fact that he has a home
office, the fact that the people who worked with and for him
were given the access codes to get into his house so that
they could do work when he wasn't there.  The people who
also, once they got into that house, had access to the
computer.  The physical access.  Once they got to the Toshiba
laptop, well, the user names and the passwords were really
just a formality.

At the beginning of the trial, I asked you to
scrutinize the witnesses, scrutinize the evidence, scrutinize
every aspect of this case, look through, consider the
credibility of the CBSA agents, not just credibility but
their capacity, did they have the opportunity to see and to
understand everything that they testified about.  Consider
the progress of what happened that day, consider the aspects
of what they testified about for him being nervous, for him
preceding, all right.  Now they said he was nervous, but

1      every one of them also said that he was compliant.  The

2      inspection officers talked about Mr. Jenkins sitting or

3      standing outside while they were inspecting his truck.

4      Again, the government thinks that he probably should have

5      been jumping around, that that would have been a better

6      indication that he was surprised by what was happening.  But

7      why would he be surprised what was happening when he

8      testified that he'd been over the border numerous times and

9      he'd been searched a number of times, his car, his vehicle

10     had been searched a number of times?  Think about the

11     credibility and the capacity, what could every witness do,

12     see, had the ability to tell you.  This is almost five years

13     ago, and it's been through a number of hands.

14             There was several documents of evidence brought out

15     by several Canadian witnesses and by American witnesses about

16     chain of custody.  Where this evidence is supposed to go step

17     by step by step by step.  Who had it, what was their purpose,

18     step by step.  One witness wasn't here.  Sergeant Detective

19     Harrington, from the Ontario Police -- I'm sorry, Ontario

20     Province Police wasn't here.  Unfortunately he's ill, he

21     performed Canadian forensics searches and studies just like

22     Special Agent Braisted did here in the United States.  He

23     wasn't here to testify about what he did.  If you think that

24     that is something that should be scrutinized and should be

25     evaluated as far as the evidence goes, you should do that.

1          Think about the credibility of Special Agent
2     Braisted.  His capacity.  As an expert.  He performs studies,
3     he undergoes training and education, routinely, as part of
4     his duties.  As a law enforcement officer.  But not just any
5     kind of a law enforcement officer, someone who specializes in
6     computers and how they work.  Even he, with all of his
7     training, his expertise, his equipment to be able to perform
8     the studies, couldn't give you an answer as to one of those
9     three things that the government acknowledged were in
10    dispute.  He couldn't tell you for certain who those users
11    were.  And when we're talking about users, we're talking
12    about knowledge, which is an element of both of the crimes in
13    this case.  Knowingly possessing pornography.  Knowingly
14    transporting child pornography.  Something that was never
15    established.

16         The subject matter of this case has been
17    uncomfortable.  I asked you in opening arguments and I'm
18    reminding you again, it's uncomfortable.  But it's not -- the
19    facts and the circumstance of the case, once we move past the
20    uncomfortableness and you analyze the witnesses, and the
21    testimony herein, that's where you'll be able to make your
22    determinations.

23         There was another witness that you heard from, Joe
24    Jenkins.  The defendant in this case.  Scrutinize and you'll
25    make all the same tests and analysis of him as you will every

703

other witness that you saw here at trial.  Remember what he
testified about.  Compare it with what everyone else is
saying.  When you're making your determinations if the
government has proved all of the elements, if it proved that
he had knowledge, recall that he testified about the
accessibility of his computer.  Recall that he testified
about the number of people that had access, recall that he
testified that the Compaq computer was essentially a mobile
office for him, that there was always a computer in the
truck.  Recall that he testified that the Toshiba laptop was
put in the box with the receipt because he had purchased it
before and wanted to bring it back to the store where he
purchased it to see if it could be returned or serviced.
Recall that he had that knowledge of being searched before.
And as part of your deliberations, as part of your analysis
of whether Joe Jenkins knowingly possessed and trafficked
child pornography, does it add up?  Does it add up that
someone who knew that they had illegal merchandise, and who
knew that they were going to be putting themselves in a
position to possibly be searched would bring it?

There was also a phone call that was played for
you, phone call from Mr. Jenkins to his mother.  A phone call
where he's arguing about numbers and forensics, where he's
arguing about the evidence.  That phone call was played for
you because the government felt that it shows that he knew

1    what was on the machines.  You heard him testify.  That phone

2    call was not about what he knew was on the machines, that

3    phone call was him discussing the results of a prior test and

4    what he believed the prior results showed against what more

5    current results showed.  It was not about what he knew about

6    these machines.

7            So I want you to go back, and I want you to think

8    again.  Would someone who knew that he had child pornography

9    on a computer, would someone who knew that there was child

10   pornography on two of three flash drives, three flash drives

11   that by the way, Joe Jenkins denied having knowledge of at

12   all when he was on the stand yesterday, would someone who had

13   the knowledge that they possessed those materials driving a

14   truck into a border where he had been stopped and searched on

15   several occasions before, would he bring that to a place

16   where he thought he might get searched, or it might get

17   found?

18           The government wants to make arguments about how he

19   should have acted if he was really nervous and upset.  How

20   should he have acted if he knew that he had something

21   illegal?

22           Ladies and gentlemen of the jury, we thank you for

23   your time and attention, and it is my belief when you go back

24   into the jury room, and you discuss and you weigh the

25   evidence and the testimony that's been presented in this

1    case, you will find that the government did not prove all the

2    elements beyond a reasonable doubt, and you'll find

3    Mr. Jenkins not guilty.  Thank you.

4           THE COURT:  Any rebuttal?  Yes, okay, go ahead.

5           MS. CARROLL:  Ladies and gentlemen, I just want to

6    make sure it's clear, defendant is charged in Count 1 with

7    transportation of child pornography on the black Toshiba

8    laptop.  That includes the KP Nancy video that was in New

9    Folder 2, that was readily accessible to the defendant that

10   was there on the Toshiba laptop desktop.  It could have been

11   seen easily as soon as you opened the computer and opened New

12   Folder 2 that contained the KP Nancy video that was on the

13   black Toshiba laptop, it's the black Toshiba laptop the

14   defendant is alleged to have transported child pornography

15   into Canada containing.

16           In Count 2 the defendant is charged with possession

17   of child pornography on the 8-gigabyte and 4-gigabyte USB

18   drives.  The 8-gigabyte and 4-gigabyte USB drives, 4-gigabyte

19   contained 3,250 images of child pornography, the 8-gigabyte

20   that contained videos and images of child pornography.  It is

21   those items of digital media defendant is alleged to have

22   knowingly possessed child pornography on.

23           The defendant has offered a lot of different

24   explanations for how there was child pornography on his

25   computer on May 24th, 2009, how that pornography was found on

706

the 8-gigabyte and 4-gigabyte USB drives.  When you consider
the credibility of those explanations, I want you to remember
that those explanations were testified to by the same
defendant who said that Chad Willard, Chad Willard was
present during his harassment at the border, that Chad
Willard was the person who ransacked his vehicle and detained
him for an extended period of time trying to find a cell
phone that they were not able to find.

You heard from Chad Willard this morning, he wasn't
there, he wasn't one of the people there.  He was not there
during the search of the defendant's vehicle.  He was not
there when the defendant was supposedly detained for this
extended period of time.

It's that kind of flat contradiction that makes the
defendant's statements about his possession of child
pornography, about the many people who might be responsible
for it, the many people other than him so difficult to
accept.  The explanation that the defendant had
subcontractors who worked for him, sometimes as many as 10
people, all of whom would have had access to his computer.
There might be two other people, two partners or two former
partners who had access to the people.  The garage was
unlocked so really it could have been anyone.  It could have
been a house sitter, there was someone who checked on the
house when he was out of town, maybe it was that person.

1          But when the defendant testified in Canadian court,

2     he testified about the hardship it posed on him not to be

3     able to use the internet, he was saying the delay in the

4     trial had created a great deal of difficulty for him because

5     he was the only person at his company who was able to use the

6     computer, and so because he was not allowed to use the

7     internet, he had to hire somebody.  He had to hire somebody

8     to do all the things that supposedly these 8 or 10 or 50 or

9     100 other people could have been doing during May 2009.  The

10    defendant's testimony in Canadian court was that he was the

11    only person responsible for the computer and it was a burden

12    to him because after he got arrested in Canada, after he was

13    brought to trial in Canada he had to hire somebody to do the

14    internet stuff, he had to hire somebody to use the computer.

15    It's a complete contradiction of his testimony in court

16    today.  In Canada, he testified that he was the only one who

17    ever had access to the computer and it was a real burden for

18    him not to be able to access the computer.

19          But then in court yesterday, and during the

20    argument today, you heard that actually there were two dozen

21    people who accessed that computer.  Let's think about those

22    two dozen people.  Those two dozen people were not mentioned

23    by the defendant when Glen Hache asked him if he had child

24    pornography on his computer.  Those two dozen people, that

25    infinite number of people who had access to the garage who

1   could have put the child pornography on, he didn't name one

2   of them when Marie-Josee Vinette told him that they had found

3   child pornography on the 8-gigabyte USB drive.  The first

4   time he talked about those people, the first time he

5   mentioned that there was someone else who might have had

6   access to the computer was in court today.  And yesterday.

7   That's the first time.  And it's the first time because it's

8   not true.  It's not true that there were eight other people

9   or ten other people or house sitter who put child pornography

10   on the defendant's computer.  That explanation is exactly as

11   incredible as it sounds.  And it is flat contradicted by the

12   defendant's own previous statement in Canadian court.

13   Because there were no other people who had access to that

14   computer.  There were no other users, the defendant didn't

15   even give us a name.  Don't you think that if you thought you

16   were being accused of having child pornography on your

17   digital media, the first thing you would do if you knew that

18   other people had access, the first thing you would do is say,

19   you know what, actually John works for me, John was on my

20   computer last night.  He didn't do that on May 24th, 2009

21   with Marie-Josee Vinette, he didn't do it in Canadian court

22   in 2010.  He didn't give you a name yesterday in court when

23   he testified.  These numerous people, all of whom could have

24   framed him in an elaborate conspiracy to have him possess and

25   transport child pornography, not one of them has a name.  Not

1    one.  Because it's not a real explanation.  It's not a

2    genuine credible explanation for the evidence.  The evidence

3    that shows that at 6 in the morning, at 10 a.m., at 11 p.m.,

4    someone, user Joe, is putting child pornography on the

5    defendant's computer.  Who is it who works for the defendant

6    at 11 p.m., in an electrician company?  Who is it at 11 p.m.

7    who is accessing e-mail and then looking at child

8    pornography?  The explanation makes no sense.  It simply does

9    not hold water but it is consistent with one thing.  It's

10   consistent with the fact that when the defendant is about to

11   be held accountable for something, when the defendant is on

12   the hook for something, he looks for somebody else to blame.

13   When the defendant failed to show up for court, when a bench

14   warrant was issued for him, it was everybody else's fault but

15   his.  It was his Canadian lawyer's fault, it was his U.S.

16   lawyer's fault, his lawyer told him not to come, his lawyer

17   failed to tell him when to come, the investigation had been

18   so bungled there wasn't any point in coming, he hadn't gotten

19   full disclosure from the Canadian prosecutor, and finally,

20   finally, it's just the Canadians generally, the Canadians

21   messed it all up and that's why I didn't show up for my trial

22   in Canada.  Not because I'm guilty, but because the Canadians

23   messed it up.

24            The Canadians didn't mess up the investigation that

25   took place on May 24th, 2009.  The Canadians did not make it

1    so the defendant failed to appear for court.  The Canadians,

2    the U.S. lawyers, the U.S. prosecutor, that stupid

3    prosecutor, none of those people, not the handymen in the

4    garage, not the subcontractors, not the partners, not the

5    prosecutors, not the investigators, not the lawyers, none of

6    those people are responsible for the defendant's possession

7    and transportation of child pornography.  The defendant is

8    responsible.  The defendant is guilty beyond a reasonable

9    doubt of those offenses.  And it is no one's fault but his

10   own.

11             THE COURT:  Okay, ladies and gentlemen, that

12   concludes the closing arguments of counsel.  The next step is

13   for me to read the law to you.  I'm going give you a brief

14   break before we do that so you can use the facilities,

15   stretch, be about 10 minutes.  Okay.  Even though all the

16   proof is in, summations have been completed, very important

17   part of the case has not been given to you, so please do not

18   discuss this case yet, don't form any opinions.  Take a short

19   break and then I'm going to read you the law.  Thank you.

20             (Jury Excused, 10:34 a.m.)

21             THE COURT:  Okay, we'll take about a 10-minute

22   break but before we do that, the revised jury instructions

23   and the jury verdict forms were placed on your tables this

24   morning.  They weren't?  They should have been.  Just take a

25   quick look, there's some revisions that we agreed to make,

711

1    and I'll ask you during the break to take a quick review of

2    those, and if there's any issues, let me know before we

3    start.  Okay.

4                    (Court in recess, 10:35 a.m. to 10:46 a.m.)

5            THE COURT:  All right, we're in the courtroom

6    without the jury, are we all set, had an opportunity to look

7    at everything?

8            MR. GOLDSMITH:  Yeah, your Honor, I've had the

9    opportunity to review the revised charges and I've noted the

10   corrections that we've discussed from the charge conference.

11           THE COURT:  They've all been made.  Government,

12   same thing, you're all set?

13           MS. CARROLL:  Yes, your Honor.

14           THE COURT:  Okay.  Very well.  Bring the jury in

15   when they're ready, please.

16                    (Jury Present.)

17           THE COURT:  Okay.  Jury's had a brief break, we're

18   ready to do the charge on the law in this case.  Now, I don't

19   want anybody getting nervous about the length of the

20   instructions.  A copy of what I'm going to read to you is

21   going to be sent in for you, so that if there's any questions

22   about what my instructions were, you'll have them there in

23   front of you.  And one of the first things you'll notice in

24   the jury instructions is that there's a table of contents, so

25   that if you want to get right to a particular section of the

1    law, you know, somebody has a question, hopefully you can

2    find it easily, go right to that section and you can find the

3    area that you're talking about, should that become necessary.

4           Okay.  So, first thing we're going to do is we're

5    going to talk about the roles of the court and the jury.

6           Now that you've heard all the evidence and the

7    arguments of counsel, it is my duty to instruct you on the

8    applicable law on this case.  Your duty as jurors is to

9    determine the facts of this case on the basis of the admitted

10   evidence.  Once you have determined the facts, you must

11   follow the law as I state it and apply the law to the facts

12   as you find them.

13          You are not to consider one instruction alone as

14   stating the law, but you are to consider the instructions as

15   a whole.  If an attorney has stated the legal principle

16   different from any that I state to you in my instructions, it

17   is my instructions that you must follow.  You should not

18   concern yourself with the wisdom of any rule of law.  You are

19   bound to accept and apply the law as I give it to you,

20   whether or not you agree with it.

21          In deciding the facts and applying the law of this

22   case, you must not be swayed by feelings of bias, prejudice,

23   or sympathy toward any party.  The government and the

24   defendant, as well as the general public, expect you to

25   carefully and impartially consider all the evidence in this

1   case, follow the law as stated by the court, and reach a

2   decision regardless of the consequences.

3           Nothing I say in these instructions is to be taken

4   as any indication that I have any opinion about the facts of

5   the case or what that opinion may be.  It is not my function

6   to determine the facts, that is your function.

7           Role of the attorneys.  The function of the

8   attorneys is to call your attention to those facts that are

9   most helpful to their side of the case.  What the attorneys

10   say, however, is not binding on you, and in the final

11   analysis, your own recollection and interpretation of the

12   evidence controls your decision.

13           Let me further elaborate on the role of attorneys.

14   Our courts operate under an adversary system in which we hope

15   that the truth will emerge through the competing

16   presentations of adverse parties.  It is the role of the

17   attorneys to press as hard as they can for their respective

18   positions.  In fulfilling that role, they have not only the

19   right but the obligation to make objections to the

20   introduction of evidence they feel is improper.

21           The application of rules of evidence is not always

22   clear, and the attorneys often disagree.  It has been my job

23   as the judge to resolve these disputes.  It is important for

24   you to realize, however, that my rulings on evidentiary

25   matters have nothing to do with the ultimate merits of the

1     case and are not to be considered as points scored for one

2     side or the other.

3            Similarly, one cannot help becoming involved with

4     the personalities and styles of the attorneys.  However, it

5     is important for you as jurors to recognize that this is not

6     a contest between attorneys.  You are to decide this case

7     solely based on the evidence.  Remember, statements and

8     characterizations of the evidence by the attorneys are not

9     evidence.  Insofar as you find their opening and/or closing

10    arguments helpful, take advantage of them; but keep in mind

11    that it is your memory and your evaluation of the evidence in

12    the case that counts.

13           In addition, you must not infer from anything I've

14    said during this trial that I hold any views for or against

15    either the government or the defendant, and in any event, any

16    opinion I might have is irrelevant to your decision.

17           The government as a party.  You are to perform the

18    duty of finding the facts without bias or prejudice as to any

19    party.  You are to perform your final duty in an attitude of

20    complete fairness and impartiality.  The case is important to

21    the government because the enforcement of criminal laws is a

22    matter of prime concern to the community.  It is equally

23    important to the defendant, who is charged with a serious

24    crime.

25           The fact that the prosecution is brought in the

1    name of the United States of America entitles the government

2    to no greater consideration than that afforded to any other

3    party to a litigation.  By the same token, it is entitled to

4    no less consideration.  All parties, whether the government

5    or individuals, stand as equals at the bar of justice.

6            The question before you can never be, will the

7    government win or lose the case.  The government always wins

8    when justice is done, regardless of whether the verdict is

9    guilty or not guilty.

10           Nature of evidence.  Testimony and exhibits.  As I

11   stated earlier, your duty is to determine the facts based on

12   the evidence that has been admitted in this case.  The term

13   evidence includes the sworn testimony of witnesses, both on

14   direct examination and cross-examination, and the exhibits

15   received into evidence regardless of who may have produced

16   them.

17           Regarding the first form of evidence, that is sworn

18   testimony, arguments and statements of attorneys, questions

19   to witnesses, and material excluded by my rulings, are not

20   evidence.  For example, at times during the trial, a lawyer

21   on cross-examination may have incorporated into a question a

22   statement that assumed certain facts to be true and asked the

23   witness if the statement was true.  If the witness denied the

24   truth of the statement, and if there is no evidence in the

25   record providing that the assumed fact is true, then you may

1    not consider the fact to be true simply because it was

2    contained in a lawyer's question.  Similarly, at times during

3    the trial, I sustained objections to questions and either

4    prevented a witness from answering or ordered an answer

5    stricken from the record.  You may not draw inferences from

6    unanswered questions and you may not consider any responses

7    that I ordered stricken from the record.

8          Regarding the second form of evidence, that is

9    exhibits, exhibits that have been marked for identification

10   but not received may not be considered by you as evidence.

11   Only those exhibits received may be considered as evidence.

12   You should consider the evidence in the light of your own

13   common sense and experience and you may draw reasonable

14   inferences from the evidence.  However, you are to base your

15   verdict only on the evidence received in the case.  Anything

16   you may have seen or heard about this case outside the

17   courtroom is not evidence and must be entirely disregarded.

18   Stated right from the beginning, jury selection, everything,

19   the only thing, and everything you'll need is going to be

20   received in this courtroom, okay.  And that's the only thing

21   you consider.

22         Direct and circumstantial evidence.  As I explained

23   to you during my preliminary instructions to you at the start

24   of trial, the law recognizes two types of evidence -- direct

25   and circumstantial.  Now that the trial is over, more

1      elaborate instruction on that subject is appropriate.  Direct

2      evidence is evidence that proves a disputed fact directly.

3      For example, when a witness testifies to what he or she saw,

4      heard, or observed, that is called direct evidence.

5            Circumstantial evidence is evidence that tends to

6      prove a disputed fact by proof of other facts.  I will give

7      you an example other than that snow example that I gave you

8      during my preliminary instructions.  Suppose that when you

9      came into the courthouse today, the sun was shining and it

10     was a nice day, but the courtroom blinds were drawn and you

11     could not look outside.  Then later, as you were sitting

12     here, someone walked in with a dripping, wet umbrella and

13     soon after, somebody else walked in with a dripping wet

14     raincoat.  Now, on our assumed facts, you cannot look outside

15     the courtroom and you cannot see whether it's raining so you

16     have no direct evidence of that fact, but on the combination

17     of the facts about the umbrella, and the raincoat, it would

18     be reasonable for you to infer that it had begun to rain

19     based on that circumstantial evidence that you observed.

20           That is all there is to circumstantial evidence.

21     Using your reason and experience, you infer from established

22     facts the existence or the nonexistence of some other fact.

23     Please note, however, that it is not a matter of speculation

24     or guess.  It is a matter of logical inference.

25           The law makes no distinction between direct and

1    circumstantial evidence.  Circumstantial evidence is of no

2    less value than direct evidence, and you may consider either

3    or both and you may give them such weight as you conclude is

4    warranted.  And I emphasize, as I've said in my instructions,

5    common sense.  It's critical and important in your evaluation

6    of evidence.

7           The indictment is not evidence.  As I explained to

8    you during my preliminary instructions, the defendant has

9    been charged with a crime about which I will further instruct

10   you shortly.  The instrument through which he has been

11   charged is called the indictment.  The indictment is not

12   evidence.  Rather, it is merely an accusation describing the

13   charge made against the defendant.  As a result, it may not

14   be considered by you as any evidence of guilt of the

15   defendant.

16          Potential punishment is not evidence.  Similarly,

17   the question of possible punishment of the defendant should

18   be of no concern to you and should not in any sense enter

19   into or influence your deliberations.  The duty of imposing

20   sentence rests exclusively upon the court.  Your function is

21   to weigh the evidence in the case and to determine whether or

22   not the defendant is guilty beyond a reasonable doubt solely

23   upon the basis of such evidence.  Under your oath as jurors,

24   you cannot allow consideration of the punishment which may be

25   imposed upon the defendant if he is convicted to influence

1    your verdict in any way or in any sense let it enter into

2    your deliberations.  Okay.  Strictly prohibited.

3                    Evaluation of evidence.  Verdict based on

4    evidence, not sympathy.  Under your oath as jurors, you are

5    not to be swayed by sympathy.  You are to be guided by the

6    evidence in this case.  The crucial hard core question that

7    you must ask yourself as you sift through the evidence is

8    this.  Has the government proven the guilt of the defendant

9    beyond a reasonable doubt.

10                   It is for you alone to decide whether the

11   government has proven that the defendant is guilty of the

12   crime charged solely on the basis of the evidence and subject

13   to the law as I charge you.  It must be clear to you that

14   once you let fear or prejudice or bias or sympathy interfere

15   with your thinking, there is a risk that you will not arrive

16   at a true and just verdict.

17                   If you have a reasonable doubt as to the guilt

18   of the defendant, then you should not hesitate for any reason

19   to render a verdict of not guilty.  But on the other hand, if

20   you should find that the government has met its burden of

21   proving the guilt of the defendant beyond a reasonable doubt,

22   then you should not hesitate because of sympathy or any other

23   reason to render a verdict of guilty.

24                   Improper considerations.  Race, religion,

25   national origin, sex, or age.  Your verdict must be based

1   solely upon the evidence developed at trial or the lack of

2   evidence.

3              It would be improper for you to consider in

4   reaching your decision as to whether the government sustained

5   its burden of proof any personal feelings you may have about

6   the defendant's race, religion, national origin, sex, or age.

7   All persons are entitled to the presumption of innocence and

8   the government has the burden of proof as I will discuss in a

9   moment.

10             It would be equally improper for you to allow

11  any feelings you might have about the nature of the crime

12  charged to interfere with your decision-making process.  To

13  repeat, your verdict must be based exclusively upon the

14  evidence or the lack of evidence in the case.

15             Quality, not quantity of evidence.  The fact

16  that one party has introduced more evidence than the other

17  does not mean that you should find the facts in favor of the

18  side offering the more evidence.  It is the quality of the

19  evidence that governs, not the quantity.  As a matter of

20  fact, the defendant in a criminal case is under no obligation

21  to present any evidence.

22             Credibility of witnesses.  You have heard

23  the -- you have had the opportunity, excuse me, to observe

24  all of the witnesses.  It is now your job to decide how

25  believable each witness was in his or her testimony.  You are

1    the sole judges of the credibility of each witness and of the

2    importance of his or her testimony.

3              In evaluating a witness' testimony, you should

4    use all the tests for truthfulness that you would use in

5    determining matters of importance to you in your everyday

6    life.  You should consider any bias or hostility the witness

7    may have shown for or against any party, as well as the

8    interest, excuse me, as well as the interest the witness may

9    have in the outcome of the case.  You should consider the

10   following:  First, the opportunity the witness had to see,

11   hear, and know the things about which he or she testified;

12   two, the accuracy of the witness' memory; three, his or her

13   candor or lack of candor; four, the reasonableness and

14   possibility -- probability, excuse me, of the witness'

15   testimony; and five, the testimony's consistency or lack of

16   consistency; and six, its corroboration or lack of

17   corroboration with other credible testimony.

18             In other words, what you must try to do in

19   deciding credibility is to size up the witness in the light

20   of his or her demeanor, the explanations given, and all the

21   other evidence in the case.  Always remember that you should

22   use your common sense, your good judgment, and your own life

23   experience.

24             The existence or nonexistence of a fact is not

25   determined by the number of witnesses called.  Again, your

1    concern is not the quantity, but the quality of the evidence.

2              Testimony of law enforcement witnesses.  You

3    have heard the testimony of law enforcement officials.  The

4    fact that a witness may be employed by the government as a

5    law enforcement official does not mean that his or her

6    testimony is necessarily deserving of any more or any less

7    consideration or greater or lesser weight than that of an

8    ordinary witness.

9              At the same time, it is legitimate for defense

10   counsel to try to attack the credibility of law enforcement

11   witnesses on the grounds that his or her testimony may be

12   colored by personal or professional interest in the outcome

13   of the case.

14             It is your decision, after reviewing all the

15   evidence, whether to accept the testimony of law enforcement

16   witnesses and to give that testimony whatever weight, if any,

17   you find it deserves.

18             Pretrial statements of the defendant.  There

19   has been evidence that the defendant made certain statements

20   to, or overheard by, law enforcement authorities.

21             Evidence of these statements was properly

22   admitted in this case and may be properly considered by you.

23   You are to give the evidence of such statements such weight

24   as you feel it deserves in light of all of the evidence.

25             Whether you approve or disapprove of the use

1    of these statements, the use of these statements may not

2    enter your deliberations.  Let me reread that so it's clear.

3    Whether you approve or disapprove of the use of these

4    statements may not enter your deliberations.  I instruct you

5    that the defendant's rights were not violated during the

6    making of these statements and the government's use of this

7    evidence is entirely lawful.

8                    Testimony of the defendant.  In a criminal

9    case, the defendant cannot be required to testify but if he

10   does choose to testify, he is of course permitted to take the

11   witness stand on his own behalf.  In this case defendant

12   decided to testify.  You should examine and evaluate his

13   testimony just as you would the testimony of any witness with

14   an interest in the outcome of the case.

15                   Use of evidence obtained.  During the trial,

16   you have heard testimony about evidence obtained by law

17   enforcement officers through searches.  You are instructed

18   that the evidence obtained from these searches was properly

19   admitted into this case, and may be properly considered by

20   you.  Such searches were entirely appropriate law enforcement

21   actions.  Whether you approve or disapprove of how the

22   evidence was obtained should not enter into your

23   deliberations, because I instruct you that the government's

24   use of the evidence is entirely lawful.

25                   In addition, the government has offered

1    evidence in the form of a recording of a telephone call

2    between the defendant and other people.  You are instructed

3    that this recording was lawfully obtained and the government

4    is entitled to use the recording in this case.

5                    You must, therefore, regardless of your

6    personal opinions, give this evidence full consideration

7    along with all the evidence in the case in determining

8    whether the government has proven the defendant's guilt

9    beyond a reasonable doubt.

10                   Expert testimony.  You have also heard

11   testimony from what we call an expert witness.  An expert is

12   allowed to express his opinion on those matters about which

13   he has special knowledge and training.  Expert testimony is

14   presented to you on the theory that someone who is

15   experienced in the field can assist you in understanding the

16   evidence or in reaching an independent decision on the facts.

17                   In weighing the expert's testimony, you may

18   consider the expert's qualifications, his opinions, his

19   reasons for testifying as well as all the other

20   considerations that ordinarily apply when you're deciding

21   whether or not to believe a witness -- a witness' testimony.

22   You may give the expert testimony whatever weight, if any,

23   you find it deserves in light of all the evidence in this

24   case.  You should not, however, accept this testimony merely

25   because he is an expert.  Nor should you substitute it for

1    your own reason, judgment, and common sense.  The

2    determination of facts in this case rests solely with you.

3                    Transcript of audio recording.  With regard to

4    the audio recording that I mentioned earlier, a certain

5    typewritten transcript was provided to you.  This transcript,

6    which purports to identify the speakers engaged in an oral

7    conversation was provided to you for the limited and

8    secondary purpose of aiding you in following the content of

9    the conversation, as you listened to the audio recording and

10   aiding you in identifying the speakers.

11                   However, you are specifically instructed that

12   whether the transcript correctly or incorrectly reflect the

13   content of the conversation or the identity of the speakers

14   is entirely for you to determine based upon your own

15   evaluation of testimony you have heard concerning the

16   preparation of the transcript, and from your own examination

17   of the transcript in relation to your hearing of the audio

18   recording itself.  If you noticed a difference between what

19   you heard on the recording and what you read in the

20   transcript, you must rely on what you heard, not what you

21   read.  Similarly, if you could not hear or understand certain

22   parts of the recording, you must ignore the transcript as far

23   as that part, as far as those parts are concerned.

24                   Particular investigative techniques not

25   required.  In the questions and arguments of defense counsel

1       in this case, you have heard reference to the fact that

2       certain investigative techniques may not have been used by

3       law enforcement authorities.  However, there is no legal

4       requirement the government prove its case through any

5       particular means.  Law enforcement authorities have no legal

6       duty to employ in the course of an investigation all of the

7       many tools at their disposal, and the failure to use any

8       particular technique or techniques does not tend to show that

9       a defendant is not guilty of a crime with which he is

10      charged.  Thus, you are not to concern yourself with why law

11      enforcement authorities used the techniques they did, or why

12      they did not use other techniques.  Rather, your concern is

13      to determine whether or not, based on the evidence or lack of

14      evidence, the guilt of the defendant has been proven beyond a

15      reasonable doubt.

16                  Variance in dates immaterial.  Please note

17      that it does not matter if the indictment charges that a

18      specific act occurred on or about a certain date and that the

19      evidence indicates that, in fact, it was on another date.

20      The law requires only a substantial similarity between the

21      dates alleged in the indictment and the date established by

22      testimony or exhibits.

23                  Okay, let's talk about the burden of proof.

24      Now, before discussing the alleged crime charged here, I want

25      to remind you that the indictment here is a mere accusation.

1    It is not evidence and you are to draw no inference of guilt

2    from the mere fact the defendant has been charged.  As a

3    result, in reaching your determination of whether the

4    government has proved the defendant guilty beyond a

5    reasonable doubt, you may consider only the evidence

6    introduced or the lack of evidence.

7            The defendant has no burden of proof

8    whatsoever in this case.  He is under no obligation to

9    produce any witnesses.  He is presumed to be innocent and the

10   presumption of innocence continues through the trial and

11   during your deliberations.  The presumption of innocence is

12   overcome when and only when the government establishes the

13   guilt of the defendant by proving each element of the offense

14   you are considering beyond a reasonable doubt.

15           Now what do I mean by beyond a reasonable

16   doubt?  It is not some vague or speculative doubt.  As the

17   phrase implies, a reasonable doubt is a doubt that is based

18   upon reason, a reason that appears in the evidence or the

19   lack of evidence.  The government is not required to prove a

20   defendant guilty beyond every conceivable or every possible

21   doubt.  Nor is the government required to prove a defendant

22   guilty to an absolute mathematical certainty, because of

23   course in human affairs, that is usually impossible.  But you

24   should review all the evidence as you remember it, sift out

25   what you believe, discuss it, analyze it, compare your views

728

1    of the evidence with that of your fellow jurors, and if that

2    process produces in your mind some belief or conviction that

3    you would be willing to accept without further hesitation,

4    then you may say that you have been convinced beyond a

5    reasonable doubt.

6             On the other hand, if going through that same

7    process in your mind, your mind is wavering, or it is so

8    uncertain that you would hesitate before acting if it were an

9    important matter of your own, then you have not been

10   convinced beyond a reasonable doubt.

11            We're now going to go into the substantive

12   law.  The indictment in this case contains two counts.  Each

13   count is a separate offense or crime.  Each count must

14   therefore be considered separately by you, and must -- and

15   you must return a separate verdict on each count.

16            Count 1 of the indictment charges defendant in

17   this case with transportation of child pornography, in

18   violation of Title 18, United States Code, Sections

19   2252A(a)(1), and 2256(8)(A).  Specifically, Count 1 of the

20   indictment reads as follows:  "On or about May 24th, 2009, in

21   the Northern District of New York, Joseph Jenkins, the

22   defendant herein, did knowingly and unlawfully transport

23   child pornography using a means and facility of interstate

24   and foreign commerce and in and affecting interstate and

25   foreign commerce by any means, including by computer, in that

1    the defendant made entry into Canada at the Port of Lansdowne

2    Ontario, from Wellesley Island, New York, in Jefferson

3    County, transporting in a vehicle a Toshiba laptop computer,

4    serial number 78175808W, that contained one or more graphic

5    image files and multimedia files containing images of a minor

6    and minors engaged in sexually explicit conduct."

7                  Count 2 of the indictment charges the

8    defendant in this case with the possession of child

9    pornography in violation of Title 18, United States Code,

10   Sections 2252A(a)(5)(B) and 2256(8)(A).  Specifically, Count

11   2 of the indictment reads as follows:  "On or about May 24th,

12   2009, in the Northern District of New York, Joseph Jenkins,

13   the defendant herein, did knowingly possess material that

14   contained one or more images of child pornography, that had

15   been transported using a means and facility of interstate and

16   foreign commerce, and in and affecting such commerce by any

17   means, including by computer, and that was produced using

18   materials that had been shipped and transported in and

19   affecting such commerce by any means, including by computer,

20   that is:  A PNY Attache 8GB -- 8-gigabyte USB thumb drive

21   that contained one or more graphic image files and multimedia

22   files containing images of a minor and minors engaged in

23   sexually explicit conduct; and two, a PNY Attache 4GB thumb

24   drive that contained one or more graphic image files and

25   multimedia files containing images of a minor and minors

1   engaged in sexually explicit conduct obtained by use of the

2   internet."

3              Having read the two counts of the indictment

4   to you, I will now discuss in more detail the elements of

5   those two counts which the government must prove beyond a

6   reasonable doubt.

7              Count 1.  Transportation of child pornography.

8   Title 18, United States Code, Section 2252A and then

9   subdivision (a)(1) provides as follows:  "Any person who...

10  knowingly mails, or transports or ships using any means or

11  facility of interstate or foreign commerce or in or affecting

12  interstate or foreign commerce by any means, including by

13  computer, any child pornography ... [shall be guilty of a

14  crime]."

15             As a result, in order to satisfy its burden of

16  proof with regard to Count 1, the government must establish

17  each of the following four elements beyond a reasonable

18  doubt:

19             One, that the defendant knowingly transported

20  a visual depiction as that term will be defined;

21             Two, that the visual depiction was transported

22  using any means or facility of interstate or foreign commerce

23  or in or affecting interstate or foreign commerce by any

24  means, including by computer;

25             Three, that the visual depiction was child

1    pornography, as that term will be defined; and

2              Four, that the defendant knew of the sexually

3    explicit nature of the material and that the visual depiction

4    was of an actual minor engaged in that sexually explicit

5    conduct.

6              Having briefly described these four elements,

7    I will now discuss them with you in more detail.

8              First element.  The first element that the

9    government must prove beyond a reasonable doubt is that the

10   defendant knowingly transported a visual depiction.

11             A visual depiction includes any photograph,

12   film, video, or picture, including undeveloped film and

13   videotape, and data stored on a computer disk or by

14   electronic means which is capable of conversion into a visual

15   image.

16             An act is done knowingly when it is done

17   voluntarily and intentionally, not because of accident,

18   mistake, or other innocent reason.  It is not necessary for

19   the government to show the defendant personally transported

20   or shipped the depiction.  It is sufficient if the government

21   proves that the defendant knowingly caused the interstate

22   shipment to take place.

23             Second, the second element that the government

24   must prove beyond a reasonable doubt is that the visual

25   depiction was transported using any means or facility of

1    interstate or foreign commerce or in or affecting interstate

2    or foreign commerce by any means, including by computer.

3    This means that the government may establish this element by

4    proving that the visual depiction crossed between one state

5    and another or between the United States and a foreign

6    country.

7                    Third.  The third element the government must

8    prove beyond a reasonable doubt is that the visual depiction

9    was child pornography.

10                    Child pornography means any visual depiction

11   the production of which involved the use of a minor engaging

12   in sexually explicit conduct, as I will explain that term to

13   you, and which portrays that minor engaged in that conduct.

14                    The visual depiction must be of a real person

15   under the age of 18 engaging in sexually explicit conduct.

16   The government does not have to prove the identity of the

17   minor, or the exact age of the minor.  You may consider all

18   the evidence, including your viewing of the depiction, in

19   determining whether the depiction portrayed an actual person

20   under the age of 18 engaging in sexually explicit conduct.

21                    The term sexually explicit conduct means any

22   actual or simulated sexual intercourse, including genital to

23   genital, oral to genital, anal to genital, or oral to anal,

24   whether between persons of the same or opposite sex;

25   bestiality, masturbation, sadistic or masochistic abuse; or

1   lascivious exhibition of the genitals or pubic area of any

2   person.

3            The term lascivious exhibition means a

4   depiction that displays or brings to view to attract notice

5   to the genitals or the pubic area of children in order to

6   excite lustfulness or sexual stimulation in the viewer.  Not

7   every exposure of the genitals or the pubic area constitutes

8   a lascivious exhibition.  In deciding whether the government

9   has proved a visual depiction constitutes a lascivious

10  exhibition, you must consider the following questions:

11           One, whether the focal point of the visual

12  depiction is on the child's genitals or pubic area, or

13  whether there is some other focal area;

14           Two, whether the setting of the visual

15  depiction makes it appear to be sexually suggestive, for

16  example, in a place or pose generally associated with sexual

17  activity;

18           Three, whether the child is displayed in an

19  unnatural pose or in inappropriate attire considering the age

20  of the child;

21           Four, whether the child is fully or partially

22  clothed or nude, although nudity is not in and of itself

23  lascivious;

24           Five, whether the visual depiction suggests

25  sexual coyness or a willingness to engage in sexual activity;

1              And six, whether the visual depiction is

2      intended or designed to elicit a sexual response in the

3      viewer.

4              It is not required that a particular visual

5      depiction involve all of these factors to be a lascivious

6      exhibition.  The importance you give to any one of the

7      factors is up to you to decide.

8              The fourth element.  The fourth element that

9      the government must prove beyond a reasonable doubt is the

10     defendant knew that the material he possessed was child

11     pornography.

12             As I stated before, an act is done knowingly

13     when it is done voluntarily and intentionally and not because

14     of accident, mistake, or for some other reason.

15             In this case, the term knowingly refers to an

16     awareness of the sexually explicit nature of the material and

17     to the knowledge that the visual depictions were in fact of

18     actual minors engaged in that sexually explicit conduct.

19             The government must show the defendant had

20     knowledge of the general nature of the contents of the

21     material.  The defendant need not have any specific knowledge

22     as to the identity or actual age of the underage performer.

23     The defendant must have knowledge or awareness that the

24     material contained a visual depiction of a minor engaging in

25     sexually explicit conduct.  Such knowledge may be shown by

1    direct or circumstantial evidence, or both.  Eyewitness

2    testimony of defendant's viewing of the material is not

3    necessary to prove his awareness of its contents.  The

4    circumstances may warrant an inference that he was aware of

5    what the material depicts.  Furthermore, the defendant's

6    belief as to the legality or illegality of the material is

7    irrelevant.

8               Finally, a few additional words are

9    appropriate regarding consciousness of guilt from flight.

10   You have heard evidence that the defendant fled after he

11   learned that he was going to be prosecuted in Canada for the

12   same conduct giving rise to the charges for which he is now

13   on trial.  If proved, the flight of defendant after he knows

14   he has been accused of a crime may tend to prove that the

15   defendant believed that he was guilty.  It may be weighed by

16   you in this connection together with all the other evidence.

17              However, flight may not always reflect

18   feelings of guilt.  Moreover, feelings of guilt, which are

19   present -- which are present in many innocent people, do not

20   necessarily reflect actual guilt.

21              You are specifically cautioned that evidence

22   of flight of a defendant may not be used by you as a

23   substitute of proof of guilt.  Flight does not create a

24   presumption of guilt.

25              Whether or not evidence of flight does show

1   the defendant believed that he was guilty and the

2   significance, if any, to be given to defendant's feelings on

3   this matter are for you to determine.  Okay.  You are the

4   judges of the facts, it's always your determination that

5   controls.

6               Count 2.  Possession of child pornography.

7   Excuse me a second.  Title 18, United States Code, Section

8   2252A(a)(5)(B) provides as follows, in pertinent part:  "Any

9   person who...knowingly possesses,...any book, magazine,

10  periodical, film, videotape, computer disk, or any other

11  material that contains an image of child pornography that has

12  been mailed, or shipped or transported using any means or

13  facility of interstate or foreign commerce or in or affecting

14  interstate or foreign commerce by any means, including by

15  computer, or that was produced using materials that had been

16  mailed, or shipped or transported in or affecting interstate

17  or foreign commerce by any means, including by

18  computer...[shall be guilty of a crime]."

19              As a result, in order to satisfy its burden of

20  proof with regard to Count 2, the government must establish

21  each of the following four elements beyond a reasonable

22  doubt:

23              First, that the defendant knowingly possessed

24  a visual depiction as I have defined that term.

25              Two, that the visual depiction has been

1    transported using any means or facility of interstate or

2    foreign commerce or in or affecting interstate or foreign

3    commerce by any means including by computer or that the

4    visual depiction was produced using materials that had been

5    shipped or transported in or affecting interstate or foreign

6    commerce by any means, including by computer;

7            And that the visual depiction was child

8    pornography, as I have defined that term; and

9            Four, that the defendant knew of the sexually

10   explicit nature of the material and that the visual depiction

11   was of an actual minor engaged in that sexually explicit

12   conduct.

13           Having briefly described these four elements,

14   I will now discuss them in more detail.

15           First, the first element that the government

16   must prove beyond a reasonable doubt is that the defendant

17   knowingly possessed a visual depiction.  As I previously

18   instructed you, a visual depiction includes any photograph,

19   film, video, or picture, including undeveloped film and

20   videotape, data stored on a computer disk or by electronic

21   means which is capable of conversion into a visual image.

22           To possess something means to have it within a

23   person's control.  That does not necessarily mean that the

24   person must hold it physically, that it is -- that is, have

25   actual possession of it.  As long as the visual depiction is

1      within the defendant's control, he possesses it.  If you find
2      the defendant either had actual possession of the depiction
3      or that he had the power and the intention to exercise
4      control over it, even though it was not in his physical
5      possession, you may find that the government has proven
6      possession.

7                    The law also recognizes that possession may be
8      sole or joint.  If one person alone possesses it, that is
9      sole possession.  However, it is possible that more than one
10     person may have the power and intention to exercise control
11     over the visual depiction.  This is called joint possession.
12     If you find the defendant had such power and intention, then
13     he possessed the depiction even if he possessed it jointly
14     with another person.

15                    The government must prove that the defendant
16     possessed the depiction knowingly.  An act is done knowingly
17     when it is done voluntarily and intentionally, and not
18     because of accident, mistake, or for some other innocent
19     reason.

20                    Second element.  Please note that the second
21     element of Count 2 is different from the second element of
22     Count 1 in that it contains the additional language "or that
23     the visual depiction had been produced using materials that
24     had been shipped or transported in or affecting interstate or
25     foreign commerce by any means, including by computer."

1                This means that instead of establishing this

2       element by proving beyond a reasonable doubt that the visual

3       depiction had been transported using any means or facility of

4       interstate or foreign commerce or in or affecting interstate

5       or foreign commerce by any means, the government may also

6       establish this element by proving, beyond a reasonable doubt,

7       that the visual depiction had been produced using materials

8       that had been shipped or transported in or affecting

9       interstate or foreign commerce by any means.

10               Third and fourth elements.  I have previously

11      instructed you on the third and fourth elements.  Please rely

12      on my instructions concerning those elements with regard to

13      this count as well, they are the same.

14               Before I proceed to a discussion of the venue

15      requirement, I'd like to add a few words about the knowledge

16      requirement contained in the first and fourth elements of

17      Count 1, and the first and fourth elements of Count 2.  In

18      determining whether defendant acted knowingly, you may

19      consider whether defendant deliberately closed his eyes to

20      what would otherwise have been obvious to him.  If you find

21      beyond a reasonable doubt that defendant acted with or that

22      his ignorance was solely and entirely the result of a

23      conscious purpose to avoid learning the truth of the facts

24      referenced in those elements, then this knowledge requirement

25      may be satisfied.  However, guilty knowledge may not be

740

1    established by demonstrating that the defendant was merely

2    negligent, foolish, or mistaken.  It is entirely up to you

3    whether you find the defendant deliberately closed his eyes

4    and any inferences to be drawn from the evidence on that

5    issue.  Okay.

6                    Venue requirement for both counts.  In

7    addition to the elements of Count 1 and 2, you must consider

8    whether any act in furtherance of the crime occurred within

9    the Northern District of New York.  You are instructed that

10   the Northern District of New York includes, among other

11   places, Syracuse, Binghamton, Oswego, Watertown, Plattsburgh,

12   Albany, Utica, New York.  It also includes the counties and

13   land running along the St. Lawrence River including the

14   Jeffer -- including Jefferson County.  In this regard, the

15   government need not prove that the crime itself was committed

16   in this district or that defendant himself was present here.

17   It is sufficient to satisfy this element if any act in

18   furtherance of the crime occurred within this district.

19   Okay.  And I told you right from the beginning of jury

20   selection when I welcomed you to District Court in the

21   Northern District of New York, Northern District is a huge

22   area, 32 of the 62 counties of the state.  I've given you a

23   brief description of the geographical area, runs along the

24   U.S.-Canadian border, over to Albany, Utica, down to

25   Binghamton, so that's what you need to decide to satisfy this

1       element if any act in furtherance of the crime occurred

2       within this district.

3                    I should note that on this issue, the

4       government need not prove venue beyond a reasonable doubt,

5       but only by a preponderance of the evidence, which is a lower

6       standard than proof beyond a reasonable doubt.  A

7       preponderance of the evidence means that the government must

8       prove that it is more likely than not that any act in

9       furtherance of the charge you are considering occurred in the

10      Northern District of New York.  Thus, with respect to

11      Counts 1 and 2, the government has satisfied its venue

12      obligation if you conclude that it is more likely than not

13      that any act in furtherance of the conduct charged occurred

14      within this district.  The Northern District of New York.

15                   If you find that the government has failed to

16      prove that any act in furtherance of the crime, excuse me,

17      occurred within this district, then you must acquit the

18      defendant of the charge.

19                   Finally, please note that depending on the

20      verdict you reach, there may be a brief additional proceeding

21      after you have returned with your verdict.

22                   In conclusion, I have now outlined the rules

23      of law applicable to this case and the process by which you

24      should weigh the evidence and determine the facts.  In a few

25      minutes you will retire to the jury room for your

1    deliberations.  Your first order of business in the jury room

2    will be to elect a foreperson.  The foreperson's

3    responsibility is to ensure that deliberations proceed in an

4    orderly manner.  This does not mean that the foreperson's

5    vote is entitled to any greater weight than the vote of any

6    other juror.

7              When you are in the jury room, listen to each

8    other and discuss the evidence and issues.  You will have at

9    your disposal all of the exhibits.  It is the duty of each of

10   you as jurors to consult with each other.  You must

11   deliberate with a view to reaching an agreement but only if

12   you can do so without violating your individual judgment and

13   conscience.  Your job as jurors is to reach a fair conclusion

14   from the law and the evidence.  The defendant, the

15   government, and the court are relying on you to give full and

16   conscientious consideration to the issues and the evidence

17   before you.

18              In order to return a verdict, it is necessary

19   that each juror agree.  Your verdict must be unanimous.

20              As you know, I have permitted you to take

21   notes during the trial.  As I explained during my preliminary

22   instructions to you, those notes are simply an aid to your

23   memory.  Because the notes may be inaccurate or incomplete,

24   they may not be given any greater weight or influence than

25   the recollections of other jurors about the facts or the

1    conclusions drawn from the facts in determining the outcome

2    of this case.  You may base your determination of the facts

3    and ultimately your verdict on the court record, rather than

4    on any juror's notes.

5              Having said that, if in the course of your

6    deliberations, your recollection of any part of the testimony

7    should fail, or if you find yourself in doubt concerning my

8    instructions, it is your privilege to return to the courtroom

9    to have the testimony read to you or my instructions further

10   explained.  Please remember that it is not always easy to

11   locate what portion of the testimony you might want, so be as

12   specific as you possibly can in requesting the portion or

13   portions of testimony that you may want.  In addition, I

14   caution you that the reading back of testimony may take some

15   time and effort.  You should therefore make a conscientious

16   effort to resolve any questions as to the testimony through

17   your collective recollections in your deliberation process.

18   Talk to each other, discuss.

19             Should you desire to communicate with the

20   court during your deliberations, please put your message or

21   question in writing.  The foreperson should sign the note and

22   pass it to the marshal who will bring it to my attention.  I

23   will then respond either in writing or orally by having you

24   returned to the courtroom.  However, do not tell me or anyone

25   else how the jury stands on the issue of the defendant's

1    guilt until after a unanimous verdict is reached.  In other

2    words, no indication of where you are or if there's been a

3    vote taken or anything like that.  Don't want to know

4    anything about that.  All we need to know is what your

5    question is and put it in writing and it doesn't have to be

6    the foreperson, if the foreperson's writing is not great,

7    whoever has the best writing so we can make sure we can read

8    it.  The foreperson is required to sign it, put the date on

9    it, time, and send it out.

10          During your deliberations, do not hesitate to

11   reexamine your views and change your mind.  Do not, however,

12   surrender your honest convictions because of the opinion of a

13   fellow juror or for the purpose of returning a verdict.

14   Remember, you are not partisans.  You are the judges.  Judges

15   of the facts.  Your duty is to seek the truth from the

16   evidence presented to you while holding the government to its

17   burden of proof.

18          Once you have reached a unanimous verdict,

19   your foreperson should fill in the verdict form, date it and

20   sign it and inform the Marshal that a verdict has been

21   reached.

22          A verdict form has been prepared for you and I

23   will now review it with you.  One page, very simple,

24   straightforward.  It's got the caption of the case, says

25   verdict form.  First question, as to Count 1, transportation

1    of child pornography, how do you unanimously find the

2    defendant, guilty or not guilty?

3              Number 2, as to Count 2, possession of child

4    pornography, how do you unanimously find the defendant,

5    guilty or not guilty?

6              And then just foreperson, please sign in the

7    space provided below and notify the marshal that you have

8    reached a verdict.  It has a place for you, foreperson to

9    sign and for it to be dated.  And that completes my

10   instructions.

11             Are there any questions from anybody?  And

12   again, I remind you, we'll send this all in to you so you can

13   have it as reference material.  Not telling you you have to

14   reread it but it's there if you need it.  Okay.  Lori, can

15   you swear in the marshals, please.  We need two.  Actually

16   three, right?  Our alternates, you will be taken back

17   upstairs to the jury assembly room and you'll be kept there

18   unless and until we need you at some point in the

19   deliberations, and you'll be kept apprised of what's going

20   on, if there are notes and those sort of things, be brought

21   back to the courtroom at some point if we need you or when

22   there's a verdict.  Okay.

23             COURT SECURITY OFFICER:  He'll be here momentarily.

24             THE COURT:  Welcome back.  State your name for the

25   record.

1          COURT SECURITY OFFICER:  John Conroy.

2          COURT SECURITY OFFICER:  John Estabrook.

3               (The court security officers were duly sworn.)

4          THE COURT:  Okay.  Ladies and gentlemen, you may

5     retire to deliberate, alternates will be taken to the jury

6     assembly room, and the evidence, all the admitted evidence is

7     available for you and will be brought in to you, okay.  Go

8     ahead.

9               (Jury excused for deliberations, 11:39 a.m.)

10         THE COURT:  Okay.  We're in the courtroom without

11    the jury.  Are there any requests or objections with regard

12    to the court's charge, from the government?

13         MS. THOMSON:  No, your Honor.

14         MR. GOLDSMITH:  I did want to clarify, I don't

15    think the transcript was admitted, was it, of the phone call?

16         MS. CARROLL:  It wasn't.

17         MS. THOMSON:  It wasn't admitted but it was shown.

18         MR. GOLDSMITH:  I just say that as a matter of

19    clarity, it's not an objection to it because I don't think it

20    bears any weight and the court was careful in its instruction

21    that the jury's recollection of the phone call itself

22    controls.

23         THE COURT:  That instruction is given because the

24    visual aid that was provided by the government when they were

25    listening to the tape recording, there was a video, video

747

1    transcript displayed on the screen, which had the photo of

2    the defendant and a blank for the other person and went back

3    and forth so it's important for them to understand that that

4    does not control, it's their impression and hearing of the

5    video, or of the audio recording, excuse me, the audio

6    recording that controls, and that was the purpose of that

7    instruction.  Anything else?

8         MR. GOLDSMITH:  Nothing.  Just housekeeping, do

9    you -- I'm assuming you permit them to deliberate during

10   lunch?

11        THE COURT:  Yeah, their lunch is brought to them,

12   they've already ordered their lunch, it will be brought, if

13   it's not there already, it will be there shortly, and they

14   continue to deliberate, eat their lunch, it's up to them to

15   decide if they want to break or keep deliberating while

16   they're eating.  So that's the way we handle that.

17        If you're going to be out of the courtroom, away

18   from this floor, I'm going to ask you to leave a cell number

19   with my courtroom deputy, Lori, so we can get you if there

20   are any notes so we can get everybody back assembled here in

21   the courtroom as quickly as possible to address any notes

22   that are sent from the jury.  Okay.

23        Other than that, the court thanks you for your

24   courtesies and the way you tried the case, I think we moved

25   through it expeditiously and appreciate the courtesies of

748

1    counsel.

2              MS. CARROLL:  Your Honor, there's really only one

3    other matter for the record and that is the defendant is

4    going to make an initial appearance on the perjury complaint

5    in five minutes in front of Magistrate Dancks.

6              THE COURT:  Yeah, that shouldn't interfere in any

7    way.  If we get a note, we'll wait for him, that's not an

8    issue.

9              MS. CARROLL:  Okay.

10             THE COURT:  Thank you.

11             THE CLERK:  Court's in recess.

12                  (Court in recess for jury deliberations,

13                   11:42 a.m. to 1:30 p.m.)

14                  (Open Court, Jury Out, 1:30 p.m.)

15             THE COURT:  Okay, we're in the courtroom without

16   the jury.  The jury sent out a note that they have a verdict

17   so we're going to bring the jury in, we're going to take the

18   verdict, and then once we've taken the verdict, we'll go

19   right into the next phase, if necessary.  Okay.

20             MR. GOLDSMITH:  Okay.

21                  (Jury Present, 1:31 p.m.)

22             THE COURT:  The record should reflect that we have

23   the ladies and gentlemen of the jury, defendant and defense

24   counsel and government attorneys.  It is the court's

25   understanding that a verdict has been reached.  I'm going to

1    ask the foreperson to please stand and my courtroom deputy

2    will take that verdict.

3            THE CLERK:  In the case of the United States of

4    America versus Joseph Vincent Jenkins, case number

5    5:11-CR-602, question 1 as to Count 1, transportation of

6    child pornography, how do you unanimously find the defendant?

7            THE FOREPERSON:  Guilty.

8            THE CLERK:  Number 2, as to Count 2, possession of

9    child pornography, how do you unanimously find the defendant?

10           THE FOREPERSON:  Guilty.

11           THE CLERK:  Thank you.

12           THE COURT:  Okay.  Would either party like this

13   jury polled?

14           MR. GOLDSMITH:  Defense requests a polling, your

15   Honor.

16           THE COURT:  Very well.  We'll do that.

17           THE CLERK:  Now I'm going to ask each of you

18   individually if the verdict as I just received from the

19   foreperson is your individual verdict.  With regard to the

20   guilty verdict on Counts 1 and 2 of the indictment, Juror

21   Number 1, is that your verdict?

22           JUROR NO. 1:  Yes.

23           THE CLERK:  Juror Number 2?

24           JUROR NO. 2:  Yes.

25           THE CLERK:  Juror Number 3?

1          JUROR NO. 3:  Yes.

2          THE CLERK:  Juror Number 4?

3          JUROR NO. 4:  Yes.

4          THE CLERK:  Juror Number 5?

5          JUROR NO. 5:  Yes.

6          THE CLERK:  Juror Number 6?

7          JUROR NO. 6:  Yes.

8          THE CLERK:  Juror Number 7?

9          JUROR NO. 7:  Yes.

10          THE CLERK:  Juror Number 8?

11          JUROR NO. 8:  Yes.

12          THE CLERK:  Juror Number 9?

13          JUROR NO. 9:  Yes.

14          THE CLERK:  Juror Number 10?

15          JUROR NO. 10:  Yes.

16          THE CLERK:  Juror Number 11?

17          JUROR NO. 11:  Yes.

18          THE CLERK:  Juror Number 12?

19          JUROR NO. 12:  Yes.

20          THE CLERK:  Thank you.

21          THE COURT:  Okay, ladies and gentlemen.  Under

22   normal circumstances, that would conclude your jury service,

23   but in this particular case, the government has brought

24   forfeiture allegations with regards to certain pieces of

25   property of the defendant.  Now you have found the defendant

1   guilty of transportation of child pornography as charged in

2   Count 1 of the indictment and possession of child pornography

3   as charged in Count 2 of the indictment.  You will now need

4   to consider a further question regarding property that the

5   indictment alleges is subject to forfeiture by the defendant

6   to the government.

7        Forfeiture means the defendant would lose any

8   ownership or interest he has or claims to have in the

9   specified property as a part of the penalty for engaging in

10  criminal activity.

11       After the parties have presented any additional

12  evidence on this subject, I will instruct you further on the

13  law with respect to forfeiture.  In considering whether the

14  property is subject to forfeiture, you should consider the

15  evidence you have already heard and any additional evidence

16  presented by the parties.  You should evaluate that evidence

17  and its credibility and then I will explain to you, as I did

18  earlier, some legal instructions.  Okay.

19       Ms. Carroll, with regard to the government, does

20  the government wish to adduce any more evidence with regard

21  to this forfeiture hearing?

22       MS. CARROLL:  Your Honor, as the court knows, it's

23  the government's position that hearsay is appropriate during

24  this phase of the trial since this is technically part of the

25  sentencing proceeding; however, the government will call

Chad Willard - Direct                                752

1    Special Agent Willard to provide a synopsis of the evidence

2    on the forfeiture allegations.

3                 THE COURT:  Okay.  Please come on up.  As this is a

4    separate hearing, Lori, I'm going to ask you to swear him in,

5    please.

6                 THE CLERK:  Can you state your full name and spell

7    it for the record, please.

8                 THE WITNESS:  Chad Willard, W-i-l-l-a-r-d.

9                 THE CLERK:  Thank you.

10

11              C H A D   W I L L A R D , recalled as a

12   witness and being previously duly sworn, testifies

13   as follows:

14                THE COURT:  Go ahead.

15              DIRECT EXAMINATION BY MS. CARROLL:

16   Q    Special Agent Willard, were you present in the

17   courtroom during the testimony of certified forensic examiner

18   Brian Braisted?

19   A    Yes, I was.

20   Q    And did you hear the contents of his testimony

21   regarding his examination of a black Toshiba laptop,

22   8-gigabyte USB drive and 4-gigabyte USB drive?

23   A    Yes, I did.

24   Q    What did Special Agent Braisted testify about the child

25   pornography found on the black Toshiba laptop?

Chad Willard - Cross                    753

1    A    That he had found three videos, 594 images of child

2    pornography and six enhancement images of child pornography.

3    Q    What was Special Agent Braisted's testimony about child

4    pornography on the 8-gigabyte?

5    A    That he found 15 images of child pornography and 96

6    videos of child pornography.

7    Q    What was Special Agent Braisted's testimony regarding

8    the child pornography on the 4-gigabyte USB drive?

9    A    That he found 10 videos of child pornography, 3,250

10   images of child pornography, and 16 enhancement images of

11   child pornography.

12          MS. CARROLL:  No further questions.

13          THE COURT:  Cross-examination?

14          CROSS-EXAMINATION BY MR. GOLDSMITH:

15   Q    Special Agent Willard, you did not conduct the forensic

16   exam, correct?

17   A    Correct.

18   Q    And your only knowledge of the forensic examination is

19   based upon -- withdrawn.  Your testimony during this

20   forfeiture hearing is based only upon the testimony that you

21   heard of Special Agent Braisted, correct?

22   A    Correct.

23   Q    It is of no personal knowledge that you have, correct?

24   A    Correct.

25          MR. GOLDSMITH:  No further questions.

1          THE COURT:  Anything further?

2          MS. CARROLL:  No, your Honor, the government can

3     just deliver a couple of sentences in argument.

4          THE COURT:  You may step down.

5               (The witness was excused.)

6          THE COURT:  Does the government intend to call any

7     other witnesses?

8          MS. CARROLL:  No, your Honor, the government does

9     not.

10          THE COURT:  Go ahead.

11          MS. CARROLL:  As you'll hear in the jury

12     instructions on the forfeiture, the property that is alleged

13     in the forfeiture allegation is alleged to have been used to

14     facilitate each of the counts in the indictment.  First, that

15     the black Toshiba laptop facilitated the transportation and

16     in the second count that the two USB drives facilitated the

17     possession of the child pornography.  You heard the testimony

18     from Special Agent Braisted that was then summarized by

19     Special Agent Willard, those were the digital media on which

20     the child pornography was contained, the digital media on

21     which they were possessed and transported.

22          THE COURT:  Government rests?

23          MS. CARROLL:  Yes, your Honor.

24          THE COURT:  Counsel?

25          MR. GOLDSMITH:  Defense rests.

1          THE COURT:  Okay.  Very well.  Ladies and

2     gentlemen, I'm going to give you some further jury

3     instructions on forfeiture.

4          You have found the defendant guilty of the offenses

5     charged in Counts 1 and 2 of the indictment.  You are now

6     asked to render a verdict concerning property that the

7     indictment alleges is subject to forfeiture by the defendant

8     to the government.  In this context, forfeiture means the

9     giving up of ownership or interest in the property as a

10    penalty for committing a violation of a certain federal law.

11         In this indictment, the government alleges that

12    three items of defendant's personal property are subject to

13    criminal forfeiture pursuant to Title 18, United States Code,

14    Section 2253.  Specifically, the indictment forfeiture

15    allegation reads as follows:  "The allegations contained in

16    Counts 1 and 2 of this indictment are hereby realleged and

17    incorporated by reference for the purposes of alleging

18    forfeiture pursuant to Title 18, United States Code, Section

19    2253.  Pursuant to Title 18, United States Code, Section

20    2253, upon conviction of an offense in violation of Title 18,

21    United States Code, Section 2252A, the defendant, Joseph

22    Jenkins, shall forfeit to the United States of America:

23         First, any visual depiction described in Title 18,

24    United States Code, Sections 2251, 2251A, 2252, or 2252A, and

25    any book, magazine, periodical, film, videotape, and other

1    matter which contains any such visual depiction, which was

2    produced, transported, mailed, shipped, or received in

3    violation of Title 18, United States Code, Section -- Chapter

4    110;

5              Any property, real or personal, constituting or

6    traceable to gross profits or other proceeds contained from

7    such offenses;

8              And lastly, any property, real or personal, used or

9    intended to be used or to commit or to promote the commission

10   of such offenses and any property traceable to such

11   property."

12             The property to be forfeited includes, but is not

13   limited to, the following:  A, Toshiba laptop, serial number

14   78175808W; B, PNY Attache 8-gigabyte USB thumb drive; and C,

15   PNY Attache 4-gigabyte USB thumb drive.

16             If any of the property described above as a result

17   of any act or commission -- or omission, excuse me, of the

18   defendant cannot be located upon the exercise of due

19   diligence, and has been transferred or sold to or deposited

20   with a third party, has been placed beyond the jurisdiction

21   of the court, has been substantially diminished in value, or

22   has been commingled with other property which cannot be

23   divided without difficulty, the United States of America

24   shall be entitled to forfeiture of substitute property

25   pursuant to Title 21, United States Code, Section 853(p), as

1    incorporated by Title 18, United States Code, Section

2    2253(b), and Title 28 United States Code, Section 2471(c);"

3              Having read the forfeiture allegation in the

4    indictment, I will now discuss in more detail the elements of

5    this forfeiture allegation, which the government must prove

6    by a preponderance of the evidence.

7              Title 18, United States Code, Section 2253(a)(3)

8    provides as follows:  "A person who is convicted of an

9    offense under this chapter involving a visual depiction

10   described in Section 2251, 2251A, 2252, 2252A, or 2260 of

11   this chapter or who is convicted of an offense under Section

12   2252B of this chapter, or who is convicted of an offense

13   under Chapter 109A, shall forfeit to the United States such

14   person's interest in... any property, real or personal, used

15   or intended to be used to commit or to promote the commission

16   of such offense or any property traceable to such property."

17             I instruct you that you are bound by your previous

18   finding that the defendant is guilty of the offenses charged

19   in Counts 1 and 2 of the indictment.  As a result, in order

20   to satisfy its burden of proof with regard to the forfeiture

21   allegation, the government must establish each of the

22   following two elements by a preponderance of the evidence:

23             First, the defendant has an interest in personal

24   property specified by the government;

25             And second, the specified property was used by the

758

1    defendant or intended to be used by the defendant to commit

2    or to promote the commission of the offense charged in

3    Counts 1 and 2 of the indictment.

4         With regard to the first element, you should not

5    concern yourself or consider whether any person may own or

6    have an interest in the property in question.  I will resolve

7    any such claims.  Similarly, you are not to consider what

8    might happen to the property if it's forfeited.  Nor are you

9    to consider whether the property is currently available.

10        With regard to the second element, property that

11   was used or was intended to be used to commit or to promote

12   the commission of an offense means property that makes the

13   commission of the offense easier or which is used to assist

14   in the commission of the offense.  This includes, but is not

15   limited to, property that is used or intended to be used to

16   purchase, manufacture, transport, store, conceal, or protect

17   the contraband used in the offense, or the persons committing

18   the offense.  Property that was used or was intended to be

19   used to commit or facilitate the offense, excuse me, is

20   subject to forfeiture even if only a portion of it was so

21   used, or if it was also used for other purposes.

22        Please remember that the government's burden of

23   proof with regard to this forfeiture allegation is not beyond

24   a reasonable doubt but merely proof by a preponderance of the

25   evidence.  To prove something by a preponderance of the

759

1    evidence means to prove that it is more likely true than not

2    true.  For example, if you put the credible evidence that is

3    favorable to the government and the credible evidence that is

4    favorable to defendant on opposite sides of the scale, the

5    scale would have to tip somewhat on the government's side in

6    order for you to find the property is subject to forfeiture.

7    However, if the scale tips in favor of the defendant or if

8    the credible evidence appears to be equally balanced or if

9    you cannot say on which side the credible evidence is

10   weightier, then you must find that the property is not

11   subject to forfeiture.

12          In making this determination, you should consider

13   all the evidence presented on the subject during this

14   proceeding and during the trial, regardless of who offered

15   it.  In addition, all of my previous instructions apply to

16   this special verdict and you should evaluate the evidence and

17   its credibility according to the instructions I gave you

18   earlier.

19          Finally, a few words are appropriate regarding the

20   special verdict form that has been prepared for your use.

21   With respect to each item of property in question, the

22   special verdict form asks you to determine whether the item

23   is subject to forfeiture to the government.  You may answer

24   by writing the words yes or no or writing a checkmark in the

25   space provided next to the words yes or no.  You must reach a

1    unanimous verdict as to each question on the special verdict

2    form.  Once you have reached a unanimous verdict, your

3    foreperson should fill in the special verdict form, date it,

4    sign it, and inform the Marshal that a verdict has been

5    reached.

6             And I will now review with you that special verdict

7    form.  It has the caption of the case, it has three

8    questions.  The first question:  As to the government's

9    forfeiture allegation in the indictment, has the government

10   proved by a preponderance of the evidence that the Toshiba

11   laptop, serial number 78175808W, was used or intended to be

12   used to commit or to promote the commission of the offenses

13   charged in the indictment, yes or no?

14            Question 2:  Has the government proved by a

15   preponderance of the evidence that the PNY Attache 8-gigabyte

16   USB thumb drive was used or intended to be used to commit or

17   to promote the commission of the offenses charged in the

18   indictment, yes or no?

19            And third:  Has the government proved by a

20   preponderance of the evidence that the PNY Attache 4-gigabyte

21   USB thumb drive was used or intended to be used to commit or

22   to promote the commission of the offenses charged in the

23   indictment, yes or no?

24            And like before, it has a line for the foreperson

25   to sign and date the verdict form.

1          Are there any questions from any of the ladies and

2     gentlemen of the jury about what you're to do with regard to

3     this section of deliberations with regard to forfeiture?

4     Okay.  Well, then I'm going to ask you to retire to the jury

5     room and deliberate with regard to this special verdict.

6                    (Jury excused for deliberations, 1:50 p.m.)

7          THE COURT:  Okay, the jury has left to deliberate

8     on the special verdict form.  Any requests or objections from

9     the government with regard to the instructions on the

10    forfeiture allegation?

11              MS. CARROLL:  No, your Honor.

12              THE COURT:  Mr. Goldsmith?

13              MR. GOLDSMITH:  None.

14              THE COURT:  Okay.  Thank you.  I'd say stay close

15    by.

16                    (Court in recess.)

17                    (Open Court, Jury Out, 1:58 p.m.)

18              THE COURT:  Okay, we're in the courtroom without

19    the jury, court's received a note indicating that the jury

20    has a verdict on the forfeiture allegation, so we're going to

21    bring them in and we're going to take the verdict.

22                    (Jury present, 1:58 p.m.)

23              THE COURT:  Okay.  I've received a note indicating

24    that the jury has reached a verdict with regard to the

25    forfeiture allegations.  Again, I'm going to ask the

1    foreperson to stand and my courtroom deputy will take that

2    verdict.

3            THE CLERK:  Again in case number 5:11-CR-602,

4    United States of America versus Joseph Vincent Jenkins,

5    question 1, as to the government's forfeiture allegation in

6    the indictment, has the government proved by a preponderance

7    of the evidence that the Toshiba laptop, serial number

8    78175808W, was used or intended to be used to commit or to

9    promote the commission of the offenses charged in the

10   indictment; yes or no?

11           THE FOREPERSON:  Yes.

12           THE CLERK:  Number 2, has the government proved by

13   a preponderance of the evidence that the PNY Attache 8GB USB

14   thumb drive was used or intended to be used to commit or to

15   promote the commission of the offenses charged in the

16   indictment; yes or no?

17           THE FOREPERSON:  Yes.

18           THE CLERK:  Number 3, has the government proved by

19   a preponderance of the evidence that the PNY Attache 4GB USB

20   thumb drive was used or intended to be used to commit or to

21   promote the commission of the offenses charged in the

22   indictment; yes or no?

23           THE FOREPERSON:  Yes.

24           THE CLERK:  Thank you.

25           THE COURT:  Okay, ladies and gentlemen, that's

1    going to conclude your jury service.  On behalf of the

2    attorneys and the litigants in this case, I thank you for

3    your time and attention.  It was obvious that you were

4    attentive, you traveled here in difficult weather, you were a

5    great group, you made sure you were here on time, and it's

6    much appreciated by the court and the parties.  I always

7    excuse juries personally from the jury room so I'm going to

8    ask you to retire back to the jury room, give me a couple

9    minutes, I have some legal things I need to discuss with

10   these attorneys, I'll be able to excuse you personally, thank

11   you for your service.  Go ahead.  Excuse me, before we do

12   that, and I should have asked, would either party like this

13   jury polled as with regard to the special verdict?

14            MR. GOLDSMITH:  Defense requests a polling, thank

15   you, your Honor.

16            THE COURT:  Okay, I apologize for not asking.  Go

17   ahead.

18            THE CLERK:  Same as last time, just going to ask

19   each of you if your verdict is the same as the foreperson

20   reported.  With regard to questions 1, 2, and 3 answering

21   yes, was that your verdict, Juror Number 1?

22            JUROR NO. 1:  Yes.

23            THE CLERK:  Juror Number 2?

24            JUROR NO. 2:  Yes.

25            THE CLERK:  Juror Number 3?

1          JUROR NO. 3:  Yes.

2          THE CLERK:  Juror Number 4?

3          JUROR NO. 4:  Yes.

4          THE CLERK:  Juror Number 5?

5          JUROR NO. 5:  Yes.

6          THE CLERK:  Juror Number 6?

7          JUROR NO. 6:  Yes.

8          THE CLERK:  Juror Number 7?

9          JUROR NO. 7:  Yes.

10         THE CLERK:  Juror Number 8?

11         JUROR NO. 8:  Yes.

12         THE CLERK:  Juror Number 9?

13         JUROR NO. 9:  Yes.

14         THE CLERK:  Juror Number 10?

15         JUROR NO. 10:  Yes.

16         THE CLERK:  Juror Number 11?

17         JUROR NO. 11:  Yes.

18         THE CLERK:  And Juror Number 12?

19         JUROR NO. 12:  Yes.

20         THE CLERK:  Thank you.

21         THE COURT:  Okay, now you can retire to the jury

22    room and I'll be in to excuse you.  Thank you.

23              (Jury Excused.)

24         THE COURT:  Okay.  My courtroom deputy is going to

25    return all original exhibits to counsel who presented them,

1     it's your responsibility to provide the Court of Appeals with

2     any exhibits that may be required.

3           I'm going to direct the probation department to

4     prepare and submit a presentence report and I'm going to

5     schedule sentencing for June 17th, 2014 at 10 a.m.  Counsel,

6     the clerk will electronically file the Northern District

7     Uniform Presentence Order.  Once the presentence report is

8     prepared, any objections to the report must be submitted in

9     writing to probation within 14 days of receipt of the report.

10          Now, appellate statute rules, Rule 29(c) motion for

11    judgment of acquittal after a discharge of a jury must be

12    filed within 14 days after the jury is discharged or within

13    such further time as the court may fix during the 14-day

14    period.

15          Rule 33, motion for new trial, motion for a new

16    trial based on the ground of newly discovered evidence may be

17    made only before or within two years after the final judgment

18    but if an appeal is pending, the court may grant the motion

19    only on remand of the case.

20          Motion for new trial based on any other grounds

21    shall be made within 14 days after the verdict or finding of

22    guilt or within such further time as the court may fix during

23    14-day period.

24          Appellate Rule 4B, appeals in criminal cases.

25    Notice of appeal must be filed within 14 days after the entry

1    of the judgment.

2            Rule 46(c) release from custody pending sentence

3    and notice of appeal eligibility for release pending sentence

4    or pending notice of appeal or exploration of time allowed,

5    and finally, notice of appeal shall be in accordance with 18

6    U.S.C. Section 3143.  The burden of establishing the

7    defendant will not flee or pose a danger to any other person

8    or to community rests with the defendant.

9            Okay.  That concludes the court's admonishments.

10   Anything further from the government?

11           MS. THOMSON:  No, your Honor.

12           THE COURT:  Mr. Goldsmith?

13           MR. GOLDSMITH:  Sir, just in terms of the

14   sentencing, your Honor, it's about four months out.  Is that

15   typical with the time frames of probation department up here?

16           THE COURT:  Yes.

17           MR. GOLDSMITH:  All right.  Nothing further.

18           THE COURT:  Okay.  Thank you very much.  Take care,

19   travel safe.

20           THE CLERK:  Court is adjourned.

21               (Court Adjourned, 2:03 p.m.)

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, JODI L. HIBBARD, RPR, CRR, CSR, Federal Official

4      Realtime Court Reporter, in and for the United States

5      District Court for the Northern District of New York, DO

6      HEREBY CERTIFY that pursuant to Section 753, Title 28, United

7      States Code, that the foregoing is a true and correct

8      transcript of the stenographically reported proceedings held

9      in the above-entitled matter and that the transcript page

10     format is in conformance with the regulations of the Judicial

11     Conference of the United States.

12

13                    Dated this _____day of _____.

14

15

16                         /S/ JODI L. HIBBARD

17                         JODI L. HIBBARD, RPR, CRR, CSR
                           Official U.S. Court Reporter
18

19

20

21

22

23

24

25