UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     -v-                                                CASE NO.: 11-CR-602 (GTS)

JOSEPH JENKINS,

                 Defendant.

# SUPPLEMENTAL SENTENCING MEMORANDUM
# REGARDING RESTITUTION

DATED:    October 10, 2014        Respectfully submitted,
               Syracuse, New York

                                                               LISA A. PEEBLES
                                                               Federal Public Defender
                                                               Office of the Federal Public Defender
                                                               4 Clinton Square, 3rd Floor
                                                               Syracuse, New York 13202
                                                               (315) 701-0080

**PRELIMINARY STATEMENT**

This Supplemental Sentencing Memorandum is submitted in response to the restitution requests set forth in the government's supplemental sentencing memorandum on restitution, Dkt. No. 183. The government seeks no less than a $3,000 restitution award for each of the following four victims, respectively: (1) the victim depicted in the Vicky series ("Vicky"); (2) the victim depicted in the Jan_Feb series ("L.S."); (3) the victim depicted in the Cindy series ("Cindy"); and (4) the victim depicted in the Angela series ("Angela"). According to the government, in a case, as here, where the defendant's conduct is at or near the lowest end of the culpability spectrum with respect to each restitution victim, the requested amount of $3,000 for each victim represents a "reasonable floor" that is not "trivial, token, or nominal." Dkt. No. 183 at 9. While defense counsel agrees that Jenkins should be made to pay restitution to each of the four victims at the floor of what is deemed non-trivial, the parties disagree over what amount defines the floor. In the circumstances of this case, this Court should order Jenkins to pay as little as $50, but no more $500, to each victim, for a total of no more than $2,000 in restitution.

**BACKGROUND**

The government's supplemental sentencing memorandum adequately summarizes the background and legal considerations surrounding the application of 18 U.S.C. § 2259 as it applies to downloaders of child pornography. Dkt. No. 183 at 2-5. As explained by the Supreme Court in *Paroline v. United States*:

> [W]here it can be shown both that a defendant possessed a victim's images and that a victim has outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses.

134 S.Ct. 1710, 1727 (2014).

1

In achieving this goal, the *Paroline* Court mandated the following two-step method. First, a sentencing court must determine the total amount of losses caused solely by the continued trafficking in the victim's images. *Id*. at 1728. This amount excludes (or disaggregates) losses that cannot be proximately caused by the group, *e.g.*, injuries that may occur during trips to the therapist, *id*., as well as any amount caused by the victim's initial abuser(s) and image disseminator(s), *id.* at 1722. Second, a district court must determine the amount of the total losses caused by the group of traffickers that is attributable to the particular defendant. *Id*. at 1728. In doing so, a sentencing court must consider the following factors to achieve an award that is neither too severe nor too trivial:

    (1)    The number of past criminal defendants found to have contributed to the victim's general losses;

    (2)    Reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses;

    (3)    Any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted);

    (4)    Whether the defendant reproduced or distributed images of the victim;

    (5)    Whether the defendant had any connection to the initial production of the images;

    (6)    How many images of the victim the defendant possessed;

    (7)    And other facts relevant to the defendant's relative causal role.

*Id*. at 1727-28.

**ARGUMENT**

**I.     THIS COURT SHOULD REJECT THE GOVERNMENT'S METHODOLGIES FOR CALCULATING RESTITUTION BECAUSE THEY FAIL TO COMPLY WITH *PAROLINE*.**

As noted above, the government seeks a restitution award in the amount of at least $3,000 for each of the four victims of Jenkins's child pornography offenses. This figure is based in large measure on two separate calculations. First, taking the case involving Vicky, which is the most paradigmatic of the four, the government attempts to discern a modified mean from the prior 502 restitution awards. This is accomplished by removing the highest and lowest restitution awards entered from the top and bottom 10 percent, respectively, of all 502 cases and then calculating the mean of the remaining 80 percent of cases. In the second calculation, the government suggests a straightforward per capita approach that divides the total loss claimed by Vicky, $1,357,292.43, (in the numerator) by the total number of individuals (including Jenkins) ordered to pay restitution (in the denominator): $1,357,292.43 / 503 = $2,698.39.[1] The government then applies these two same methods to each of the remaining victims (L.S., Cindy, and Angela) in support of its request for no less than $3,000 for each victim.[2] Although both approaches present some facial appeal, neither one comports with *Paroline*, and both should be rejected for the following reason.

First, neither methodology even attempts to disaggregate the losses caused by the initial abuser(s) and image disseminator(s). This failure is most apparent with respect to the per capita approach, which simply takes the fully aggregated loss amount claimed by each victim.[3] As even

---

[1] The government overstates the amount determined by this approach, calculating the quotient as $21,418.08, when it is actually $2,698.39. The per capita amounts for the remaining victims, save Angela, are also incorrect: L.S.'s should be $12,359.33, not $17,991.80; Cindy's should be $10,846.48, not $5,035.33.

[2] Although each of the government's methods result in an award below $3,000 in the case of Vicky, it suggests revising the amount upward to the account for a $3,000 floor.

[3] As Jenkins's offense and arrest predate most, if not all, of the losses claimed by each respective victim, there appears to be no need to exclude (or disaggregate) losses that predate his conduct.

3

a conservative estimate would require disaggregating at least half (and much more)[4] of the total claimed losses to account for the harm attributable to the initial abuser(s) and image dissementator(s), this Court should reject the government's fully aggregated approaches.[5]

Second, neither of the government's approaches account for two important factors identified by the *Paroline* Court. As explained by *Paroline*, sentencing courts should place the defendant's conduct within the context of three broader population categories: (1) the number of past criminal defendants found to have contributed to the victim's general losses; (2) the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses; and (3) the broader number of unidentified offenders involved. *Paroline*, 134 S.Ct. at 1728. Both of the government's approaches account only for the number of defendants ordered to pay restitution in category (1), without even so much as attempting to incorporate the populations in categories (2) and (3).

This failure overestimates Jenkins share of the claimed losses. As explained by Chief Justice Roberts in *Paroline*, the projected total number of persons who have viewed Amy's images is at least 71,000. *Paroline*, 134 S.Ct. at 1734 (Roberts, CJ., dissenting). Because the dissemination of Amy's images appears to have occurred earlier than the dissemination of any of the images of the four victims here, it is reasonable to conclude that the total number of persons who have viewed images of the respective victims in each of these cases is less than 71,000. Nevertheless, as the government acknowledges, the images in each case, with the possible exception of the one depicting Angela, are widely-circulated, and in the case of L.S., appear to be "one of the most prolific and widely-traded images series via the Internet." Dkt. No. 183 at 10

---

[4] This is not to suggest that the initial abusers and image disseminators are only responsible for half of the fully aggregated losses. Fifty percent is offered as a convenient way to achieve an award at the lowest non-trivial amount without a hearing.
[5] Cindy even recognizes that her initial abuser is responsible for half of her losses. *See* Dkt. No. 180, Ex. 2 at 8.

(citing Dkt. No. 178, Ex. 2 at 3). Thus, while the number of unidentified persons who have viewed the respective images is likely less than 71,000 at the moment, it is reasonable to predict that the number of unidentified persons will eventually reach (and surpass) that number given the unfortunate ubiquity of the images.

Moreover, it is an unfortunate fact that additional individuals will be convicted of downloading the images at the center of this case long into the future. Accordingly, even a conservative estimate would require taking Vicky's case (the one with the most restitution orders)[6] and, at the very least, doubling the number of existing restitution orders to achieve a reasonable estimate of the number of future restitution defendants. *See*, *e.g.*, *United States v. Crisostomi*, __F.Supp.2d__, 2014 WL 3510215 at *3 (D.R.I. July 16, 2014) (doubling number of restitution orders to account for future defendants ordered to pay restitution).

However, to fully account for the full scope of individuals bearing responsibility for each victim's harm, most of whom will never be caught, this Court should, at the very least, double that number again. This will achieve a reasonable prediction of 2,000 individuals who have and will view each victim's image, whether or not the individual has been or will be ordered to pay restitution.

Third, each of the government's two approaches fails to adequately account for Jenkins's position at or near the very low end of the culpability spectrum. Instead, the government's two methodologies treat him as being *equally* culpable as every other defendant in the per capita approach and as possessing *average* culpability among the defendants in the modified mean approach. As Jenkins had no direct connection to the production or dissemination (at any time) of

---

[6] It is reasonable to use the restitution awards in Vicky's case as a model because she has been receiving awards the longest of the four victims, and there is no reason to doubt that the other three victims will receive a similar number of awards as they continue to pursue the full amount of their respective restitution claims.

5

any image and had no role in aggravating any harm by, for example, communicating with or about any victim or exposing her real name,[7] there is no basis to conclude that Jenkins's causal role is either *equal* to the role of every other defendant or that his role is somehow *average* as compared to the entire group of traffickers and downloaders.

Although this criticism applies to both of the government's suggested methodologies, more should be said about the government's modified mean approach. While that approach benefits from discarding the highest 10 percent of the awards, which presumably include the most culpable offenders, of which Jenkins is not a member, as well as awards that fail to limit the restitution amount to a defendant's particular conduct, the government also throws away the lowest 10 percent of the awards. The government's only basis for doing so is to remove the trivial awards. However, the government never defines trivial, which leads to the next point.

Finally, the government's approaches should be rejected because, although both methods use $3,000 as a floor, the government fails to explain why a sentencing court should not award less than $3,000.[8] At best, the government asserts that $3,000 is a "reasonable floor and an award of that size would not be trivial, token, or nominal." Dkt. No. 183 at 9. It appears, then, that the government believes any amount below $3,000 would be trivial or nominal. Jenkins disagrees.

Unfortunately, the *Paroline* Court did not define what dollar amount would be deemed trivial or nominal. Ordinarily, the term "nominal" means "trifling, esp[ecially] as compared to what would be expected." *United States v. Boccagna*, 450 F.3d 107 (2d Cir. 2006) (quoting Black's Law Dictionary 1075 (8th ed.2004). This definition is not terribly illuminating. Cases discussing the terms suggest that their meaning is dependent on context and the financial situation

---

[7] Exposure of a victim's real name appears to have been done in at least the cases of Vicky and Cindy, though not by Jenkins. *See* Dkt. No. 180, Ex. 1 at 2 ("Vicky"); Dkt. No. 180, Ex. 3 at 5 ("Cindy").
[8] Indeed, the government's modified mean approach yields an amount less than $3,000 in each of the four cases.

of the defendant. Thus, in *United States v. McCarter*, 406 F.3d 460, 464 (7th Cir. 2005), the Seventh Circuit described the improper imposition of a $100 special assessment as too trivial to constitute a miscarriage of justice. In *Rosenberg v. U.S. Dept. of Immigration and Customs*, 954 F.Supp.2d 1, 11 n.7 (D.D.C. 2013), District Judge Kollar-Kotelly suggested that the dollar amount dividing trivial and non-trial is $250 in the context of fees the Executive Office for United States Attorneys charges pursuant to 5 U.S.C. § 552(a)(4)(A)(v).

In the context of restitution awards, district courts prior to *Paroline* ordered (and the government and the respective victim have not appealed) amounts as low as $50,[9] $100,[10] $200,[11] $250,[12] $300,[13] and $500.[14] Indeed, since *Paroline*, courts have awarded as low as $500 to restitution victims.[15] Moreover, as the government explains, the mode (most frequent) of the prior restitution awards for each of the instant victims is $1,000, well below the floor suggested by the government. Dkt. No. 183 at 9 ("Vicky"); 11 ("L.S."); 12 ("Cindy"); 14 ("Angela"). Therefore, this Court should reject the government's methodologies and hold that, in the circumstances of this case, a restitution award below $3,000 complies with *Paroline* and would not be trivial.

## II. THIS COURT SHOULD ORDER JENKINS TO PAY NO MORE THAN $500 TO EACH RESTITUTION VICTIM.

Given that Jenkins's culpability vis-à-vis each respective victim's claimed loss is at or near the lowest end of the spectrum, this Court should order the lowest restitution award deemed non-

---

[9] *See United States v. Seiley*, 10-cr-192 (S.D.Ohio) ("Vicky" and "Amy").
[10] *See United States v. Church*, 09-cr-42 (W.D.Vir.) ("Amy"); *United States v. James Morris*, 09-cr-101 (N.D.Tex.) ("Vicky").
[11] *See United States v. Young*, 08-cr-218 (E.D.Cal.) ("Vicky); *United States v. Bunch*, 11-cr-121 (N.D.Ind.) ("L.S.").
[12] *See*, *e.g.*, *United States v. Jager*, 10-cr-1531 (N.M.) ("Vicky" and "Amy"); *United States v. Teran*, 13-cr-33 (W.D.Tex.) ("Cindy").
[13] *See*, *e.g.*, *United States v. Chipperfield*, 10-cr-65 (D.Wy.) ("Vicky").
[14] *See*, *e.g.*, *United States v. Sylvestre*, 09-cr-78 (Conn.) ("Amy"); *United States v.* Allen, 11-cr-1864 (D.N.M.) ("Vicky"); *United States v. Bellemare*, 12-cr-169 (D.Conn.) ("Cindy"); *United States v. Doucette*, 11-cr-88 (W.D.Vir.).
[15] *See United States v. Elvis Toledo*, 13-cr-20822 (S.D.Fl.).

trivial, which could be as low as $50, but no more than $500, for each individual victim.  As noted above, this could be accomplished by using a modified per capita approach based on the case of Vicky, which is paradigmatic.  In her case, courts have already ordered 502 restitution awards.  Because it is reasonable to conclude that future restitution awards will increase at least two-fold, this Court should double that number to comply with the *Paroline* Court's requirement to base restitution on "[r]easonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses."  *Paroline*, 134 S.Ct. at 1728.  Because even that number would be limited to known and convicted defendants, this Court should double that number again to arrive at a "reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted."  *Id*.  This would establish a denominator of approximately 2,000 individuals in each case.  The numerator in the per capita approach would be established by halving each full loss to disaggregate the respective losses caused by the initial abuser(s) and image disseminator(s).[16]

Applying a per capita approach with a denominator of 2,000 and a disaggregated numerator of half the claimed losses to account for the share caused by the initial abuser(s) and image disseminator(s) would result in a restitution award of $339.32 for Vicky,[17] $463.48 for L.S.,[18] $336.24 for Cindy,[19] $146.75 for Angela.[20]  This baseline figure should then be revised downward to the lowest amount deemed non-trivial, which could be as low as $50, to account for Jenkins's

---

[16] Again, Jenkins does not conceded that the initial abuser(s) and image disseminators share only 50 percent of the losses.  Disaggregating half the losses is merely suggested to conveniently achieve the lowest non-trivial amount without a hearing.

[17]     $1,357,292.43(fully aggregated amount) / 2 = $678,646.22 (disaggregated amount)
    $678,646.22 / 2,000 (loss-contributing individuals) = $339.32.

[18]     $1,853,900 (fully aggregated amount) /2 = $926,950 (disaggregated amount)
    $926,950 / 2,000 (loss-contributing individuals) = $463.48.

[19]     $1,344,963.70 (fully aggregated amount) / 2 = $672,481.85 (disaggregated amount)
    $672,481.85 / 2,000 (loss-contributing individuals) = $336.24.

[20]     $587,000 / 2,000 (loss-contributing individuals) = $293,500 (disaggregated amount)
    $293,500 / 2,000 (loss-contributing individuals) = $146.75.

minimal culpability in the production and dissemination of the images. If that amount is deemed trivial, then this Court should increase the award to the lowest amount not deemed trivial, which in no case should exceed $500.[21] Even if this Court deems $500 to be trivial when viewed in isolation, it is important to consider that imposing such an award to each victim would result in a total award of $2,000, which could hardly be considered trivial for an indigent defendant.

## II. IF THIS COURT CONTEMPLATES ORDERING MORE THAN THE LOWEST NON-TRIVIAL AMOUNT TO EACH VICTIM, JENKINS REQUESTS A HEARING.

While a hearing is not necessary to impose a restitution award at the lowest amount deemed non-trivial, Jenkins respectfully requests a hearing should this Court be inclined to order an award above that amount. Three considerations warrant a hearing to determine the total amount of losses caused by the group of traffickers.

First, a hearing is necessary to establish whether any information in the restitution requests of the respective victims has changed. Many of the claims are based on evaluations that are several years old. For example, the expert report supporting L.S.'s claim is from July 1, 2010. In the four intervening years, it is not clear whether any facts have reduced the general need for or the suggested frequency of counseling. As matters currently stand, the information supplied in the respective restitution requests has simply grown too stale to support a finding of the claimed losses by a preponderance of the evidence.

Second, a hearing is necessary to evaluate each respective victim's claim of lost wages. For example, Vicky's claim of $722,511.00 in lost wages comprises more than fifty percent (53%)

---

[21] There is nothing in *Paroline* that prevents a court from revising the restitution award upward to reach what it deems to be a non-trivial amount. Indeed, though for different reasons and with different results, that is what both parties suggest may be appropriate here. Accordingly, there is no reason to favor a method that fails to incorporate and account for each of the *Paroline* factors simply because the initial result may be viewed as trivial, as the District Court did in *United States v. Miner*, No. 14-cr-33 (MAE), 2014 WL 4816230 at *10-11 (N.D.N.Y. Sept. 25, 2014).

of the $1,357,292.43 in fully aggregated losses.  However, the vocational assessment supporting Vicky's claim for lost wages was conducted in February of 2009.  *See* Exhibit 1B to Vicky's Restitution Request at 141. Likewise, Cindy's claim of $1,185,332.00 in lost wages comprises nearly ninety percent (88%) of the $1,344,963.70 in fully aggregated losses.  Yet, the vocational assessment of Cindy was completed on June 18, 2012 and describes how Cindy's goal is to obtain "a Bachelor of Science Degree in Computer Security and Investigation where hopefully she could be employed in the future in helping to 'catch child predators.'"  *See* Vocational Assessment attached to Cindy's restitution request at 3.  The assessment also describes her plan to complete "a Master's Degree in Digital Forensics for employment purposes . . . ." *Id*.  Given the staleness of the information, together with indications therein that undermine the very claims they are meant to support, this Court should find that the government has failed to meet its burden of establishing the respective claims of lost income by a preponderance of the evidence.

Third, a hearing is required to disaggregate losses sustained as a result of the initial abuse and dissemination of the illicit images at the center of these proceedings.  *Paroline*, 124 S.Ct. at 1722.  Assuming this Court declines to conduct a hearing, the amount of losses attributable to each of the respective initial abuser(s) and image disseminator(s) should be kept as close to 100 percent as possible, because the original abuse and dissemination of the images is the *sine qua nun* of each respective victim's losses as well as the foundational harm that each new image downloader triggers.

## CONCLUSION

Based on the foregoing reasons, this Court should order Jenkins to pay no more than the lowest amount deemed non-trivial, which in the circumstances of this case would be as little as $50, but no more than $500, to each victim.  In the event this Court declines to impose the lowest


restitution award deemed non-trivial, this Court should hold a hearing to determine the current fully disaggregated amount of losses caused by the group of downloaders.

DATED: October 10, 2014                    Respectfully submitted,

*/s/*
Lisa A. Peebles
Federal Public Defender
4 Clinton Square, 3rd Floor
Syracuse, New York 13202
(315) 701-0080