```
UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------x
UNITED STATES OF AMERICA

vs.                              5:11-CR-602

JOSEPH VINCENT JENKINS,

                         Defendant.
------------------------------------------x
```

Transcript of a Digitally-Recorded Detention Hearing held on January 5, 2012, at the James Hanley Federal Building, 100 South Clinton Street, Syracuse, New York, the HONORABLE ANDREW T. BAXTER, United States Magistrate Judge, Presiding.


A P P E A R A N C E S

```
For The Government: UNITED STATES ATTORNEY'S OFFICE
                    P.O. Box 7198
                    100 South Clinton Street
                    Syracuse, New York  13261-7198
                      BY:  TAMARA THOMSON, AUSA

For Defendant:      JEFFREY R. PARRY, ESQ.
                    Attorney at Law
                    7030 East Genesee Street
                    Fayetteville, New York  13066
```

*Jodi L. Hibbard, RPR, CSR, CRR*
*Official United States Court Reporter*
*100 South Clinton Street*
*Syracuse, New York  13261-7367*
*(315) 234-8547*

1             (Open Court, 2:31 p.m.)
2             THE CLERK:  11-CR-602, may I have the appearances
3    for the record.
4             MS. THOMSON:  Good afternoon, your Honor, Tamara
5    Thomson on behalf of the United States.
6             THE COURT:  Ms. Thomson.
7             MR. PARRY:  Good afternoon, your Honor, Jeffrey
8    Parry for Mr. Jenkins.
9             THE COURT:  Mr. Parry.  All right, we're here as a
10   result of Mr. Jenkins' motion to reopen the detention
11   hearing.  Normally the government would go first but since
12   it's Mr. Jenkins' motion, I'll let you go first, Mr. Parry,
13   and I'll let Ms. Thomson respond.
14            MR. PARRY:  Thank you very much.  Judge, in the
15   slang of the profession this is what's known as a presumption
16   case.  My argument is a purely legal one.  I think the
17   statute is clear, it requires that Mr. Jenkins, based upon
18   the presumption of innocence, is required to be controlled,
19   if you will, under the least coercive method possible.  The
20   statute goes so far as to say that if he is incarcerated, he
21   should be kept out of the general population.  That's
22   something that can be accomplished and it's my recollection
23   the statute specifically mentions house arrest.
24            Your Honor, when I, as a practical matter, when I
25   first appeared with Mr. Jenkins, I was not aware of his

1    living circumstances.  He lives in a home that is actually
2    the home of his parents in Geneva, New York where he has
3    lived, for all practical purposes, his entire life.  When I
4    met his parents, they told me that upon their return to the
5    residence after their son's arrest, that they had terminated
6    the internet service to the house.  Now, this is purely an
7    internet crime, I don't think it's contested, but also
8    presuming that the government's allegations are true, that
9    the evidence that would come before the court has all been
10   downloaded or otherwise acquired on the internet.
11           Having said that, your Honor, in the absence of
12   internet service, it is impossible for my client to reoffend.
13   Were he somehow constrained and his whereabouts known by this
14   court, obviously the court could, he would be in perfect
15   control and the court would be assured of him showing up at
16   future proceedings, and most importantly, the interest of
17   society would be maintained because he would be isolated
18   essentially.
19           Your Honor, the ability to reoffend is a
20   particularly important issue, because my client literally has
21   no criminal record whatsoever.  It's unfortunate that in
22   cases of this type, and certainly this isn't my first one, in
23   cases of this type, there is -- it is a distasteful topic,
24   but the fact of the matter is Mr. Jenkins has gotten to this
25   point in his life and never run into any legal trouble

1  whatsoever.  He has never been a threat to any of the
2  children in the neighborhood, he has never been a threat to
3  any of the people that he works with, he has never so much as
4  been noted for a cross word.  Again, presuming that the
5  allegations are correct, we have a problem only with the
6  internet.  Sir, I submit to you that if there is no internet
7  service, there's no possibility of further crimes, society's
8  interests are protected.
9           Now, I concede, your Honor, that there's a Canadian
10 warrant, and even though that --
11          THE COURT:  Can I interject there only because, as
12 I recall from the detention hearing, you may have said at
13 that time that the defendant was not aware of his obligation
14 to appear at the trial, but I looked again at the exhibits
15 that were submitted by the government and it seemed fairly
16 clear that he did have an appearance on the criminal charge
17 in Canada and was obligated, for example, to notify them of
18 any change in residence, so I don't see any support in the
19 record for your suggestion that he didn't know about the
20 trial in Canada that he failed to appear at.
21          MR. PARRY:  Your Honor, actually this is one of the
22 reasons why I asked that the detention hearing be reopened
23 and I hope that the court will forgive me for that statement.
24 I have since received papers not just from Ms. Thomson but
25 also from the Canadian attorney that indicates that the

1    Canadian court gave my client what would be, in New York
2    State would be referred to as (inaudible) warrants, he knew
3    when he was supposed to show up in court, there's no question
4    about that.  Your Honor, I simply misspoke, I hope you don't
5    think I was trying to mislead the court.
6              THE COURT:  No, that's fine, I just wanted to
7    clarify that you weren't still taking that position.
8              MR. PARRY:  No, I am not taking that position, your
9    Honor, and also I am not taking the position that a Canadian
10   warrant should not be a matter concerning this court simply
11   because it's a foreign court, I don't think that argument
12   holds any water anyway.
13             THE COURT:  I'm sorry, what doesn't hold any water?
14             MR. PARRY:  Well, a warrant is a warrant, Judge,
15   and if the court were looking at --
16             THE COURT:  And failure to appear is a failure to
17   appear.  And the other issue besides whether he can reoffend
18   is whether he's going to appear as required and he's already
19   failed to answer the charges that were pending in Canada
20   which were considerably less serious than the charges he's
21   facing here.
22             MR. PARRY:  Your Honor, I raise the issue for
23   specifically that reason.  I am not trying to say that a
24   warrant by the Canadian court should be disregarded and the
25   only thing I can say along that line in terms of the Canadian

1   involvement in this matter is it's my understanding the
2   Canadians know very well where he is and they haven't made an
3   effort to extradite him.  But having said that, your Honor,
4   he's under a situation where -- well, the court is correct,
5   the charges in Canada are far less severe, and my knowledge
6   of that, I have some knowledge of the Canadian statute, comes
7   from Mr. Jenkins' Canadian attorney, it's my understanding
8   which is a -- a B misdemeanor, again, relatively minor
9   matter.  It is still breaking the law, I am not suggesting
10  that it is not and I am not suggesting that running afoul of
11  Canadian law is something that should (inaudible).
12          Having said that, your Honor, were he on house
13  arrest, he is still liable for extradition, he's still under
14  your control and we can still go, I think it's the intent of
15  the statute of the -- federal statute that he be presumed
16  innocent and that he be maintained in the least coercive
17  method possible.  Certainly he is there and under your
18  control if the Canadians wish to come and get him.  I'm not
19  going to, you know, defend in the slightest the fact that he
20  did not appear for Canadian court or any other court, I don't
21  think that would be appropriate and quite frankly I don't
22  think it would be ethical.  Having spoken to his Canadian
23  attorney, and this is only his opinion, sir, given the fact
24  that it's such a low charge in Canada, it is extremely
25  unlikely that the Canadians would pursue extradition, but

1  nevertheless, a warrant is a warrant, and I don't want to
2  minimize that.
3          Your Honor, the reason for, and this is, I'll say
4  this in a way proposing, the reason for the presumption is to
5  protect the interest of society, and at the same time, the
6  friction of the law arises because of the presumption of
7  innocence.  Having said that, keeping Joseph Jenkins off the
8  internet perfectly, by anyone's definition, protects the
9  interests of society and as I said before, sir, the Canadians
10 can come and get him if they want him, they know exactly
11 where he is.
12         So the only thing I'm really asking the court to do
13 here, sir, is to follow that law by the letter, we'll still
14 have perfect control over him, where if he somehow reoffends
15 or if it's -- the parole people or whomever were to somehow
16 find he had access to the internet, you can certainly drag
17 him back.  That is the sum of my argument, sir.
18         THE COURT:  All right.  And so just on, so that I'm
19 clear, you're proposing that the conditions of his release
20 would include home detention?
21         MR. PARRY:  Sir, I contend that it's the most
22 reasonable approach for the court to take.  Quite frankly,
23 sir, and I explained this to my client, I can't imagine if
24 you let him out in the general public that you could somehow
25 structure a situation where he could not have access to the

1    internet.  I mean there's coffee houses and wifi at
2    McDonald's in this day and age and I think that would be, I
3    would think -- I don't want to presume but I would think that
4    would be one of the court's goals.  If he were simply
5    confined to home, he could not reoffend.  Somewhat physically
6    impossible for him to do it.  That is I think the best way
7    the court could go.
8             Now, I'm not familiar unfortunately with the amount
9    of control that the court can enforce via electronic
10   monitoring.  I mean perhaps there's some way he could
11   actually work and you could still have some sort of control
12   over him, but I think the court, again, I don't mean to
13   presume, Judge, but I think you're going to tell me that
14   that's not possible.
15             THE COURT:  Okay.
16             MR. PARRY:  That's it, sir.
17             THE COURT:  Well, I'm not telling you anything
18   right now, I'm just trying to clarify what your position is,
19   that's all.
20             MR. PARRY:  My position, sir, is, in a nutshell, is
21   if you would confine him to home, he couldn't possibly harm
22   anyone, and it would comport with the statute because he's
23   supposed to be held by the least coercive means possible.
24             THE COURT:  All right.  And I don't know, I don't
25   profess to be an expert on all the new devices that are

1   available out there, but it seems to me all you need to get
2   on the internet now is a cell phone or a pocket-sized device
3   which doesn't require internet connection or Time Warner
4   service or anything like that.
5            MR. PARRY:  I have one as we speak, your Honor.
6   Only thing that was in the Jenkins household is a standard
7   land line, that's it.  And Mr. and Mrs. Jenkins are here,
8   they are certainly willing to have the house inspected, they
9   are willing to provide phone bills as far as phone service is
10  concerned to the court so that the only thing that he would
11  have access to is a plain old dial phone which isn't going to
12  get him anything.
13           THE COURT:  Okay.  All right.  Thank you,
14  Mr. Parry.
15           MR. PARRY:  Thank you, sir.
16           THE COURT:  Ms. Thomson.
17           MS. THOMSON:  Your Honor, I think it's important
18  for us to begin at what brings us before the court.  This
19  court has already had a detention hearing on this matter, the
20  court has already considered factors that were brought forth
21  by the government and that were brought forth by the
22  defendant.  We're here today because the defendant has made a
23  motion requesting to reopen the detention hearing, indicated
24  that there's new information that the court has not already
25  considered.  The information that we're hearing today and

1   that was provided in the motion are things that I believe the
2   court has already considered.
3           When you look at the original report that was
4   prepared by probation, it already contemplated as an option
5   for this court to consider if the defendant is released,
6   electronic monitoring with probation and rules.  So it's the
7   position of the government the court's already considered
8   that as it is required to be considered, he would not be
9   allowed to be released without signing a contract.  So the
10  court has implicitly already considered that as an option,
11  has already rejected that option.
12          In looking at what other factors have been brought
13  forth by the defendants to support reopening this hearing, it
14  appears from my view of the notion that the defendant may
15  have his parents living at his home full time, that was one
16  of the items that I saw as something that may not have been
17  considered by this court.  What I'd like the court to
18  consider is that this defendant already had the support of
19  his parents, this defendant was already living in their home,
20  and I'm not sure how a 41-year-old man would -- what the
21  benefit would be to the community and to this court ensuring
22  his appearance by having his parents live with him full time
23  instead of part time.  When you also consider that his
24  parents have a residence in Canada, that was available to the
25  defendant so -- that the defendant had a place to stay for

1   his court appearances and still couldn't manage to get
2   himself to Canada with a home that was available to him
3   through his parents, I still am not certain how the presence
4   of his parents would change this outcome.  It doesn't seem to
5   be anything that would be gained by his parents living with
6   him full time and two important factors, risk of flight and
7   the dangerousness to the community.
8         In going back and forth between those residences,
9   one in New York that he lives in with his parents part time
10  and the Canadian residence, this defendant found it necessary
11  to carry with him his electronic media.  As this court
12  pointed out at the detention hearing, that's significant in
13  showing exactly what his frame of mind is and his dependency
14  on the collection of pornography that he had amassed, and
15  let's not forget that that was 3,881 images and 109
16  multimedia files that the defendant was traveling with and
17  transporting.  It does give the court an indication of his
18  need for these materials.  And again, I'm not certain how the
19  added influence of his parents' residence with him full time
20  in New York changes any of those two considerations, the risk
21  of flight or the dangerousness to the community.
22        The defendant also indicates that he would be able
23  to remove electronic -- or remove computer equipment, and
24  again, it's this court's practice as it is the practice of
25  the probation department to make sure that if there's any

1   electronic equipment in the home, that it is monitored or
2   given the option of removing that equipment.  So again, when
3   we consider the procedural posture we're in, this court's
4   already considered that as an option.  We would not allow the
5   defendant -- we would not allow defendant to return to a home
6   where there was unchecked electronic media.
7           As the court has pointed out during this hearing,
8   it is entirely possible for the defendant to have access to
9   the internet and have access to those areas where he's gone
10  before, without any of us knowing, that's entirely possible.
11  The best analogy is to say when a drug user has been caught
12  and their stash has been taken, well, they don't have the
13  drugs anymore, your Honor, so we know that they're not going
14  to use, they're not going to reoffend.  It's available.  And
15  this defendant has shown such a propensity and such a need
16  for it that he's not leaving it on his site, he's taking it
17  with him when he travels.
18          So, in considering the procedural posture, I would
19  indicate to the court it's the government's position that
20  we've not seen anything that is new, that hasn't been
21  considered by the court already, that this court didn't
22  already factor in when making its original decision.
23          To the extent that the court does find this
24  information is new, I'd ask the court to reconsider the fact
25  that, again, there was a warrant issued for this defendant's

1    arrest because he did not comply when ordered to be in court.
2    You have Exhibit Number 1 and Number 2 that I submitted to
3    the court that you've referenced to so I know the court has
4    seen them.  What we heard today, and I don't know the
5    accuracy of it but what we heard today is that these appear
6    to be less serious charges in Canada.  So if the defendant,
7    when facing less serious charges, is still not going to
8    appear in court, in our case, when he's facing a mandatory
9    minimum of five years, has an even greater incentive not to
10   appear.
11              With regards to the dangerousness, again, the
12   defendant is a person who has such a need that has not been
13   quelled that he has to travel with the images and take them
14   with him.
15              With regard to the legal argument that's been made
16   about searching for the least restrictive method for
17   defendant, I take issue with that.  I would, you know, tell
18   the court that what's applicable are the Adam Walsh
19   conditions which don't look for the least restrictive, you
20   look for the most appropriate and list out a number of
21   factors that have to be considered under 18 U.S.C. 3142, with
22   electronic monitoring being a minimum.
23              So I think the court procedurally does not have the
24   information before it that's anything new, that changes the
25   outcome at all.  I think that all of the information this

1    court had when making its original decision, nothing's
2    changed and certainly nothing's been added to it and I ask
3    the court to keep the original detention order and keep the
4    defendant detained.
5               THE COURT:  Thank you, Ms. Thomson.  Anything else
6    you want to say, Mr. Parry?
7               MR. PARRY:  Your Honor, only one quick comment,
8    sir.  The reality of the situation is when we had our first
9    detention hearing, this is the reality in any case, that I
10   had known my client for mere minutes before we had the
11   detention hearing.  Certainly I'm not trying to pass the buck
12   here, but the fact of the matter is I didn't know anything
13   about the man's living circumstances.  Also these
14   circumstances changed, as I put in the papers, purely by
15   accident when the whole Jenkins family came home.  This is
16   not something we concocted and prepared for the court, I hope
17   I'm not making that impression.
18              THE COURT:  No, I think -- I do think because of
19   the benefit of the pretrial services investigation, we did
20   have some information about the defendant's family.  I'm not
21   suggesting that having the parents move home was a maneuver
22   on anybody's part, the question really is how much it changes
23   the equation.  I will note for the record that Mr. Jenkins'
24   parents are here, and I, you know, I appreciate the difficult
25   situation that you're in and I certainly think you're acting

1   with the best of intentions.
2           That having been said, I'm going to deny the motion
3   to reopen the detention hearing.  Because, Mr. Parry, you may
4   well intend to appeal my ruling, I'm going to issue a written
5   decision rather than read my decision in the record and I
6   will include basically the substance of my original detention
7   decision which I did read into the record last time.  I don't
8   know, if you decide to appeal it, I don't know what the
9   District Court Judge Suddaby will require in terms of
10  transcripts of the proceeding but I will at least have this
11  decision and my prior decision documented in writing to the
12  extent that will facilitate the process.  All right.
13          So the defendant is remanded to the custody of the
14  United States Marshal.  Oh, yes, there is a new indictment so
15  shall we do an arraignment?
16          MS. THOMSON:  Acceptable to the government, your
17  Honor.
18          MR. PARRY:  That would be good.
19          THE COURT:  All right.  Mr. Jenkins, you have been
20  charged in a two-count indictment.  Count 1 charges you with
21  transportation of child pornography on or about May 24, 2009;
22  Count 2 charges you with possession of child pornography on
23  the same date and there is also a forfeiture allegation.
24  Have you had an opportunity to review the indictment with
25  your client, Mr. Parry?

1            MR. PARRY:  Yes, we discussed it last evening.
2            THE COURT:  All right, you'll waive the reading of
3    it?
4            MR. PARRY:  I will.
5            THE COURT:  We'll enter a plea of not guilty on
6    your client's behalf to all charges.  Can you review just for
7    the record, please, Ms. Thomson, the applicable penalties.
8            MS. THOMSON:  Certainly, your Honor.  With regard
9    to Count 1, transportation, there is a mandatory minimum of
10   five years incarceration with a maximum of 20 years,
11   supervised release potential of five years to life, a fine of
12   $250,000, special assessment of $100 and as result of a
13   conviction in this case, the defendant would be required to
14   register as a sex offender and would be subject to
15   prosecution under 18 U.S.C. Section 2250 and endure all the
16   consequences that would be amenable to a felony conviction
17   including, but not limited to, loss of right to vote and to
18   bear arms.
19           With regard to Count 2, there is a maximum term of
20   incarceration of 10 years, again, supervised release, five
21   years to life, fine of $250,000, special assessment of $100.
22           THE COURT:  All right, thank you.  If it has not
23   already happened, we will also enter a pretrial scheduling
24   order on behalf of Judge Suddaby.  All right, is there
25   anything else, Counsel?

1             MS. THOMSON:  No, your Honor.
2             MR. PARRY:  Thank you, Judge.
3             THE COURT:  Thank you.
4                  (Proceedings Adjourned, 2:53 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                    C E R T I F I C A T I O N
 2
 3
 4            I, JODI L. HIBBARD, RPR, CRR, CSR,
 5   Official Court Reporter in and for the United States
 6   District Court, Northern District of New York, DO
 7   HEREBY CERTIFY that I have listened to and
 8   transcribed the foregoing proceedings and that the
 9   foregoing is a true and correct transcript thereof
10   to the best of my ability.
11
12
13
14
15
16
17
18                            _____
19                            JODI L. HIBBARD, RPR, CRR, CSR
                              Official U.S. Court Reporter
20
21
22
23
24
25
```