UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
UNITED STATES OF AMERICA

vs.                               5:11-CR-602

JOSEPH VINCENT JENKINS,

                         Defendant.
-------------------------------------------x

        Transcript of a Re-Sentencing held on

January 5, 2018, at the James Hanley Federal

Building, 100 South Clinton Street, Syracuse,

New York, the HONORABLE GLENN T. SUDDABY, Chief

Judge, Presiding.


              A P P E A R A N C E S

For The Government: UNITED STATES ATTORNEY'S OFFICE
                    P.O. Box 7198
                    100 South Clinton Street
                    Syracuse, New York  13261-7198
                      BY:  TAMARA THOMSON, ESQ.
                           Assistant U.S. Attorney

For Defendant:      FEDERAL PUBLIC DEFENDER'S OFFICE
                    NORTHERN DISTRICT OF NEW YORK
                    4 Clinton Square
                    Syracuse, New York  13202
                      BY:  LISA PEEBLES, ESQ.



            *Jodi L. Hibbard, RPR, CSR, CRR*
         *Official United States Court Reporter*
              *100 South Clinton Street*
            *Syracuse, New York  13261-7367*
                  *(315) 234-8547*

1          (Open Court, 10:55 a.m.)

2          THE CLERK:  Case number 5:11-CR-602, United States

3    of America versus Joseph Vincent Jenkins.  Counsel, please

4    note your appearance for the record.

5          MS. THOMSON:  Good morning, your Honor, Tamara

6    Thomson on behalf of the United States.

7          THE COURT:  Good morning.

8          MS. PEEBLES:  Good morning, your Honor, Lisa

9    Peebles appearing on behalf of Joe Jenkins.  Mr. Jenkins is

10   also present.

11         THE COURT:  Good morning.  We're here for

12   resentencing as result of a mandate from the Circuit and

13   there have been submissions by counsel, I've had the

14   opportunity to review them, I've reviewed everything that's

15   been submitted, and we're obviously, I'm not going to ask

16   about the presentence report because we've been through that,

17   same presentence report has been received and reviewed by all

18   parties; I take it that's the case?

19         MS. PEEBLES:  It is, your Honor.

20         MS. THOMSON:  Yes, your Honor.

21         THE COURT:  Okay, then I'll ask the government to

22   go ahead.

23         MS. THOMSON:  Your Honor, I would rely on the

24   sentencing memorandum submitted, the government's response to

25   the defendant's sentencing memorandum, and each of the

3

1   arguments that were advanced in the Exhibit A that was

2   attached to the government's sentencing memorandum, that is

3   the petition of the United States for panel rehearing.

4           THE COURT:  Okay.  And with regard to what appears

5   to be a new argument from defendant with regard to

6   restitution and the fine, the government's position?

7           MS. THOMSON:  Government's position is it's not

8   appropriate and it wasn't called for to be redetermined at

9   this stage and so for the arguments advanced in our response,

10  it's the government's position the court doesn't need to

11  address those.  If the court decided to address those, it's

12  the government's position that the original fine and original

13  restitution amount were appropriate and supported by the

14  evidence.

15          THE COURT:  Which have already been collected is my

16  understanding, they've been paid?

17          MS. THOMSON:  That's correct, yes.

18          THE COURT:  Ms. Peebles.

19          MS. PEEBLES:  Thank you, your Honor.  In my

20  sentencing submission to the court, I'm reiterating what the

21  mandate suggested by the Second Circuit and that is it echoes

22  the original sentencing memorandum that I filed back in

23  September of 2014 concerning the enhancements.  In this

24  instance, four of the enhancements that were applied raised

25  Mr. Jenkins' advisory Guideline offense level or advisory

1    range up toward the statutory maximum for the offense and
2    while the court applied those enhancements because they
3    technically would apply, in this instance, it was our
4    position that they shouldn't have been applied because they
5    are not the product of empirical research, empirical study by
6    the Commission, and that applying those enhancements in every
7    run-of-the-mill case certainly is unreasonable and I think
8    that's what the Circuit was saying in its opinion.
9            Specifically in this case, Mr. Jenkins is a
10   first-time offender, there were no allegations that he
11   distributed child pornography and there were no allegations
12   that he ever attempted to contact a child or that he was ever
13   in communication with any other individual who was promoting
14   or distributing child pornography.  Based on those factors,
15   it would seem unreasonable to apply all of those enhancements
16   that would apply in those types of cases which catapulted
17   Mr. Jenkins' Guidelines up toward the statutory maximum.
18           I think it's important for the court to note that
19   Mr. Jenkins has been in custody for six years and he has not
20   had any disciplinary infractions since he's been in BOP
21   custody which I think the court -- would be important for
22   this court to know.  He's been, in all respects, very
23   respectful to those who have had him in custody at BOP and
24   complying in all respects in that regard.  I think, your
25   Honor, that that shows and demonstrates that Mr. Jenkins is

1    somebody who could follow court order and comply with

2    conditions of supervised release.

3            So with that, your Honor, I would ask the court to

4    consider adopting the mandate by the Circuit and that is not

5    applying the four-level enhancements that were applied in

6    this instance which we've calculated even if the court does

7    add the levels for obstruction of justice and puts him at a

8    level 24, in a criminal history --

9            THE COURT:  When you say even if I do, is there

10   some argument why I shouldn't with regard to obstruction of

11   justice and perjury?

12           MS. PEEBLES:  Well, I'm not arguing against that

13   two-level enhancement, so if the court applies that, that

14   would be a level 24 and a category I which would recommend a

15   range of 51 to 63 months.  If the court were to apply the

16   minimum in this case, it would be the higher end of that

17   level which would be 60 months, and your Honor, I think that

18   that would be a reasonable sentence in light of the factors

19   that the Second Circuit outlined in its decision.

20           And I do think, your Honor, that Mr. Jenkins is not

21   the same person that he was when he initially appeared in

22   front of the court for sentencing.

23           I note that a lot of the frustration that the court

24   had with Mr. Jenkins stemmed from a lot of antics in his --

25   Mr. Jenkins' frustration with the whole process but I do

6

1   think, your Honor, he is a changed individual and I do think,

2   your Honor, that he is respectful to the court, and the

3   process, and understands what he has to do, and which brings

4   me to my next argument with regard to the supervised release.

5          In deciding the amount of time to impose with

6   regard to supervision in this case, it's our position, and I

7   outline in my sentencing submission to the court that five

8   years would be appropriate, in light of the fact that he,

9   again, is a first-time offender, and I think he's capable of

10  abiding by the terms and conditions that the court would

11  impose, some of which I think the Circuit has outlined and

12  suggested were not appropriate under the circumstances

13  without additional findings.  And in this case I think it's

14  important to know that Mr. Jenkins has never had any contact

15  with a minor, inappropriate contact with a minor, there's

16  never been any allegation or suggestion that he has, and

17  therefore adopting the recommendation of the Second Circuit,

18  I would just ask the court to maybe consider not opposing --

19  or not imposing some of those conditions, that is having

20  absolutely no contact with anyone under the age of 18, and

21  also the restrictions of his computer usage and also with

22  regard to his inability to use and access credit cards.

23          I think that Mr. Jenkins is somebody, your Honor,

24  who will and can be a productive member of the community.

25  For years he did operate his own business as an electrician,

1    I think he has great family support by his parents, and your

2    Honor, I think that Mr. Jenkins wants nothing more than to be

3    released and be able to reintegrate back into the community

4    and start over again, with the hopes that he'll never do

5    anything that would land him in this position again.

6            So with that, your Honor, I do think Mr. Jenkins is

7    somebody who has changed and he has more respect for the

8    process and the system, and I'm hopeful that the court will

9    consider my arguments and my sentencing submission and impose

10   the statutory minimum in this case.  Thank you.

11           THE COURT:  Counsel, I've received your submissions

12   and have considered them.  The -- I have a lengthy statement

13   that I'm going to read into the record as to the mandate from

14   the Circuit, my original sentence, and the sentence I'm about

15   to give today.  But before I do that, I only have one thing

16   to say to you outside of that, Counsel, and that is, you use

17   the term frustration with this court, and it was used in the

18   mandate from the Circuit.  I have no personal -- and

19   Mr. Jenkins, I'm talking to you directly, sir, no personal

20   animosity against Mr. Jenkins or any other defendant.  I have

21   no frustration with Mr. Jenkins.  His behavior is his

22   behavior, and his criminal behavior was evaluated and I

23   believe appropriately responded to by this court.  But this

24   has never been personal, never would be personal, with regard

25   to any defendant, and it certainly isn't with regard to

8

1    Mr. Jenkins.  So that should be perfectly clear, Counsel, the
2    court doesn't have any frustration with Mr. Jenkins.
3    Mr. Jenkins behaved the way he behaved, his criminal behavior
4    is his criminal behavior, and that's all there is to it.
5            Mr. Jenkins, would you like to be heard, sir,
6    before I impose sentence?
7                THE DEFENDANT:  No.
8                THE COURT:  You have nothing you'd like to say?
9                THE DEFENDANT:  (Gesturing negatively.)
10               THE COURT:  Okay, sir.  The statement that I'm
11   about to read is very lengthy, I'm going to warn you that,
12   and it's -- it will be attached to the statement of reasons
13   and go to the Circuit, and that should be clear.  Some of the
14   cites that I'm going to refer to, I'm not going to give the
15   full cite because, as I've indicated, it will be attached to
16   the statement of reasons.
17           We are here today to address the Second Circuit's
18   mandate, in which a divided panel vacated Mr. Jenkins'
19   sentence and remanded the case back to me for resentencing.
20   According to the mandate, the panel found no procedural
21   issues with the sentence; however, the majority found the
22   sentence, including the supervised release term and certain
23   special conditions, substantively unreasonable.  One judge
24   concurred with the unreasonableness of the supervised release
25   term, but disagreed with the majority's opinion relating to

1   the imprisonment portion of the sentence.  In her dissenting

2   opinion, Senior Judge Kearse indicated she dissented from "so

3   much of the majority's opinion" and explained:

4       "As is revealed in the summary order filed

5   contemporaneously in this case, the district court in

6   sentencing Jenkins did not commit any procedural error.

7   Where we have determined 'that the district court's

8   sentencing decision is procedurally sound,' we reverse on the

9   the basis of substantive unreasonableness only if the

10  sentence 'cannot be located within the range of permissible

11  decisions.'  Given this record in which Jenkins disputed any

12  justification or authority for prosecuting him, and argued

13  that instead the children who were victims of the child

14  pornography should have been prosecuted, the district court's

15  concern for the likelihood that, without a lengthy prison

16  term, Jenkins would reoffend was not unreasonable, and I

17  cannot conclude that the imposition of the prison term that

18  was no higher than midway between the top and bottom of the

19  Guidelines range 'cannot be located within the range of

20  permissible decisions.'"

21      I too disagree with the majority's opinion in many

22  ways.  To begin, I greatly take issue with the conclusions

23  that Mr. Jenkins is a run-of-the-mill case and that the

24  sentence was excessive because it fails to avoid unwarranted

25  sentencing disparities; two, the 2G2.2 Guideline yielded a

1    sentence in Mr. Jenkins' case that was derived substantially

2    from outdated enhancements related to his collecting

3    behavior; three, it was substantively unreasonable for me to

4    have applied the 2G2.2 enhancements in a way that placed

5    Jenkins at the top of the range with the very worst

6    offenders; and four, that I dramatically increased

7    Mr. Jenkins' sentence by exclusively relying on his conduct

8    at trial and during sentencing proceedings; five, that I

9    concluded his denial of acceptance of responsibility was

10   insufficient, so I added years and years on to Mr. Jenkins'

11   sentence; and that my frustration dramatically increased

12   Mr. Jenkins' sentence.  It's patently just untrue.

13            Over three years ago, I imposed a sentence that was

14   within Mr. Jenkins' applicable Guidelines range; one that

15   fell below the middle of the range of 210 to 262 months.  I

16   did not conjure up this range.  I did not personally increase

17   the range out of frustration or in any way add years and

18   years on to Mr. Jenkins' sentence.  In fact, as the panel

19   concluded in its summary order, I did not commit any

20   procedural error.  As the panel well knows, the Guidelines

21   are implemented and amended at the direction of Congress, and

22   their application is solely driven by a defendant's conduct;

23   taking into consideration both mitigating and aggravating

24   factors.  I believe it is my responsibility to take every

25   single child pornography case on its specific facts and to

1       decide in light of those facts if the Guideline range is too

2       high or too low.  We all know the Guidelines are not

3       mandatory, but I begin every sentencing by reviewing those

4       Guidelines.  I then carefully review and consider the

5       parties' arguments in the backdrop of 3553(a) factors to

6       arrive at a sentence that I believe is fair and just; one

7       that is reasonable and not greater than necessary to serve

8       the goals of sentencing.

9               The Supreme Court has clearly defined the role of

10      the sentencing judge and the appellate court.  In *Rita* and

11      *Gall*, the Supreme Court held:  A district court should begin

12      all sentencing proceedings by correctly calculating the

13      applicable Guideline range.  As a matter of administration

14      and to secure nationwide consistency, the Guidelines should

15      be the starting point and the initial benchmark."  And there

16      are cites to *Gall* and *Rita*.  The Supreme Court further held

17      in *Gall*:

18              "Regardless of whether the sentence imposed is

19      inside or outside the Guidelines range, the appellate court

20      must review the sentence under an abuse-of-discretion

21      standard.  It must first ensure that the district court

22      committed no significant procedural error, such as failing to

23      calculate (or improperly calculating) the Guidelines range,

24      treating the Guidelines as mandatory, failing to consider the

25      3553(a) factors, selecting a sentence based on clearly

1    erroneous facts, or failing to adequately explain the chosen

2    sentence -- including an explanation for any deviation from

3    the Guidelines range.  Assuming that the district court's

4    sentencing decision is procedurally sound, the appellate

5    court should then consider the substantive reasonableness of

6    the sentence imposed under an abuse-of-discretion standard.

7    When conducting this review, the court will, of course, take

8    into account the totality of the circumstances, including the

9    extent of any variance from the Guidelines range.  If the

10   sentence is within the Guidelines range, the appellate court

11   may, but is not required to, apply a presumption of

12   reasonableness."

13            "Practical considerations also underlie this legal

14   principle.  The sentencing judge is in a superior position to

15   find facts and judge their import under 3553(a) in the

16   individual case.  The judge sees and hears the evidence,

17   makes credibility determinations, has knowledge of the facts

18   and gains insights not conveyed by the record.  'The

19   sentencing judge has access to, and greater familiarity with,

20   the individual case and the individual defendant before him

21   than the Commission or the appeals court.'  Moreover,

22   '[d]istrict courts have an institutional advantage over

23   appellate courts in making these sorts of determinations,

24   especially as they see so many more Guidelines cases than

25   appellate courts do,'" and the cite is omitted.

1          "It has been uniform and constant in the federal

2     judicial tradition for the sentencing judge to consider every

3     convicted person as an individual and every case as a unique

4     study in the human failings that sometimes mitigate,

5     sometimes magnify, the crime and the punishment to ensue."

6          It was in this vein as a sentencing judge that I

7     considered the totality of Mr. Jenkins' history, his specific

8     characteristics, and his conduct, and that I sentenced him in

9     accordance with the 3553(a) factors.  I carefully weighed the

10    nature and circumstances of his offense along with his

11    history and characteristics and found a Guidelines sentence

12    of 225 months was sufficient but not greater than necessary

13    to meet the goals of sentencing.  At that time, I found not

14    one compelling reason to vary from his advisory Guidelines

15    range based on the totality of his conduct, the results of

16    his competency evaluation, and his behavior following his

17    arrest, including his failure to appear in Canada and his

18    behavior in the Northern District of New York, which all

19    demonstrated a complete disdain and lack of respect for the

20    law.  I particularly found Mr. Jenkins was very likely to

21    reoffend and a lengthy sentence was necessary to reflect the

22    seriousness of his conduct; to promote respect for the law;

23    and provide him with adequate deterrence for committing

24    further crimes; and to protect the public.

25          After reconsidering Mr. Jenkins' offense

1    conduct, including the content of his child pornography

2    collection, his long record before this court, the Second

3    Circuit's mandate, the parties' submissions on appeal, and

4    available statistics and research relating to nonproduction

5    child pornography offenders, I now find a non-Guidelines

6    sentence of 200 months is sufficient but not greater than

7    necessary in light of Mr. Jenkins' characteristics and the

8    need for the sentence to reflect the seriousness of his

9    conduct; to promote respect for the law; to provide him with

10   adequate deterrence from committing further crimes; and to

11   protect the public.

12            Three years ago, and again today, I find that

13   Mr. Jenkins is not the typical non-production offender

14   described in *Dorvee* or in the majority opinion in *Jenkins*.

15   Unlike the so-called run-of-the-mill non-production cases, it

16   was not the 2G2.2 Guideline that yielded the higher

17   Guidelines range in Mr. Jenkins' case.  What drove

18   Mr. Jenkins' Guidelines higher than the typical child

19   pornography case was his failure to accept responsibility and

20   his obstruction of justice.  It was this atypical conduct

21   that set Mr. Jenkins apart from other non-production cases,

22   and from federal offenders in general.  Unlike the

23   comparisons offered in the majority opinion in *Jenkins*, a

24   true comparison demonstrates the majority failed to compare

25   Mr. Jenkins to similarly-situated defendants and further

1    failed to adequately account for the offense level increases

2    based on Chapter Three adjustments that have nothing to do

3    with the child pornography Guidelines.  The majority further

4    failed to adequately consider Mr. Jenkins' characteristics,

5    which make him more dangerous and much more likely to

6    reoffend when compared to other child pornography offenders.

7             According to the Sentencing Commission

8    statistics for those sentenced in 2014, the year Mr. Jenkins

9    was sentenced, only 2.1 percent of all defendants obstructed

10   justice, and only 4.5 percent of all defendants did not

11   accept responsibility.  In child pornography cases, the same

12   percentage of defendants, 4.5, did not accept responsibility.

13   These sentencing statistics clearly distinguish Mr. Jenkins

14   from the vast majority of federal offenders, who receive

15   lower sentences because they accept responsibility for their

16   crimes, and do not obstruct the administration of justice.

17             The *Jenkins* majority spent a great deal of

18   time discussing *Dorvee* and relying on various statistics and

19   mathematical comparisons to illustrate that Mr. Jenkins

20   should be treated as the least culpable of non-production

21   cases.  In *Dorvee*, the Second Circuit explained, and I quote:

22             "An ordinary first-time offender is therefore

23   likely to qualify for a sentence of at least 168 to 210

24   months, rapidly approaching the statutory maximum, based

25   solely on sentencing enhancements that are all but inherent

1      to the crime of conviction.  Consequently, adherence to the

2      Guidelines results in virtually no distinction between the

3      sentences for defendants like Dorvee, and the sentences for

4      the most dangerous offenders....This result is fundamentally

5      incompatible with 3553(a).  By concentrating all offenders at

6      or near the statutory maximum, Section 2G2.2 eviscerates the

7      fundamental statutory requirement in 3553(a) that district

8      courts consider 'the nature and circumstances of the offense

9      and the history and characteristics of the defendant' and

10     violates the principle, reinforced in *Gall*, that courts must

11     guard against unwarranted similarities among sentences for

12     defendants who have been found guilty of dissimilar conduct."

13     And I cite *Gall*, affirming a sentence where "it is perfectly

14     clear that the District Judge considered the need to avoid

15     unwarranted sentencing disparities, but also considered the

16     need to avoid unwarranted similarities among other

17     co-conspirators who were not similarly situated."

18             None of the comparisons made in *Dorvee* or in

19     the majority decision in *Jenkins* involve offenders who are

20     similarly situated to Mr. Jenkins.  In fact, the mean and

21     median sentences offered as "meaningful comparisons" are

22     based on offenders who, unlike Mr. Jenkins, accepted

23     responsibility and did not obstruct justice.  Any meaningful

24     comparison would recognize that Mr. Jenkins is not the

25     typical offender and would require a more case-specific

1    comparison of the sentencing data.  I fail to understand why

2    the majority would tell me or any judge to undermine the

3    sentencing process and to create disparities by completely

4    ignoring Chapter Three adjustments that play a very important

5    role in our federal system.

6                     When the correct comparison is made,

7    Mr. Jenkins is clearly distinguished from the typical

8    first-time offender, who, according to *Dorvee*, qualifies for

9    a sentence rapidly approaching the statutory maximum based

10   solely on sentencing enhancements that are all but inherent

11   to the crime of conviction.  The first distinction in

12   Mr. Jenkins' case is that the statutory maximum sentence is

13   360 months, and the sentence I imposed was 225 months.  It is

14   not near, or exceeding, the statutory maximum.  Second, the

15   sentence I imposed was not based solely on sentencing

16   enhancements that are all but inherent to the crime of

17   conviction.  Had Mr. Jenkins been the typical non-production

18   offender which just -- with just the all-but-inherent

19   enhancements, his Guidelines range would have been 121 to 151

20   months.  However, unlike most federal offenders, Mr. Jenkins

21   took his case to trial, committed perjury, and was relentless

22   in his attempts to avoid any culpability during court

23   proceedings.  Blaming this court or anyone else for

24   Mr. Jenkins' sentencing range is sorely misplaced.  It was

25   Mr. Jenkins and Mr. Jenkins alone who caused his Guidelines

1    to jump 89 to 111 months to a range of 210 to 262.  This

2    belies the majority's opinion that this range was derived

3    substantially from outdated enhancements related to his

4    collecting behavior; that I added years and years on to

5    Mr. Jenkins' sentence in light of his persistent rudeness and

6    disrespect; and that I dramatically increased his sentence

7    out of frustration.  In short, it was Mr. Jenkins'

8    aggravating criminal conduct that generated his higher

9    Guidelines range.

10           The Second Circuit has consistently denied

11   challenges of unreasonableness based on unwarranted

12   sentencing disparities under 18 U.S.C. Section 3553(a)(6),

13   when defendants are not similarly situated.  *See* *United*

14   *States v. Serrano*.  "...Serrano has failed to demonstrate" --

15   I'm quoting, "that co-defendants who received lower sentences

16   were, in fact, similarly situated to him.  As Serrano

17   acknowledges, co-defendants receiving lower sentences pleaded

18   guilty, whereas Serrano proceeded to trial and did not accept

19   responsibility for his conduct."  *See* *United States v.*

20   *Fearon-Hales*, finding that the disparate sentences are not

21   unwarranted when the other defendants had pled guilty and

22   cooperated with the government and the defendant had not.  In

23   *Hatala*, the Second Circuit held:

24           "Insofar as Hatala argues that the district

25   court failed to avoid unwarranted disparities between his

1    sentence and lesser sentences subsequently imposed by other

2    judges in the same district on other defendants prosecuted

3    for the same crime, we have already observed that he fails to

4    demonstrate that he is similarly situated to his comparators.

5    Moreover, such disparity is one factor, not the determinative

6    factor, to be considered in identifying the appropriate

7    sentence under 3553(a).  Here, the district court expressly

8    stated that it had considered all the 3553(a) factors in

9    determining Hatala's sentence.  In light of the totality of

10   the circumstances, including aggravating factors pertinent to

11   Mr. Hatala, we identify no merit in the claim that sentencing

12   disparity renders Hatala's 30-month prison sentence

13   substantively unreasonable."  And the cite follows.

14            A sentence well below Mr. Jenkins' Guidelines

15   range would have failed to adequately take into account his

16   specific offense conduct and his characteristics, and would

17   have ignored the important function of acceptance of

18   responsibility in the federal sentencing process.  As

19   reflected in the background commentary in U.S.S.G. 3E1.1, the

20   reduction for acceptance of responsibility recognizes

21   legitimate societal interests.  The commentary emphasizes:

22   "For several reasons, a defendant who clearly demonstrates

23   acceptance of responsibility for his offense by taking, in a

24   timely fashion, the actions listed in the Guidelines is

25   appropriately given a lower offense level than a defendant

who has not demonstrated acceptance of responsibility."  The
importance of crediting defendants with acceptance of
responsibility has been recognized by the Second Circuit for
decades.  In *Cruz*, the Second Circuit explained, and I quote:

"Courts have long recognized that trial judges
are entitled to encourage guilty pleas by imposing on a
defendant who pleads guilty a lesser sentence than would have
been imposed had the defendant stood trial...Though that
'discount' means, in effect, that a defendant who stands
trial receives a higher sentence than would have been imposed
if he had pled guilty, courts have accepted traditional
'discount' approach, apparently on the rationale that the
reduced sentence for a guilty plea represents a reduction
from a sentencing norm ascertained independent of the
procedure by which guilt is ascertained."

Likewise, an individual who takes his case to
trial and then commits perjury should not be given the same
sentence as someone who pleads guilty and who doesn't
obstruct justice.  Case law is replete with decisions that
recognize the importance of the obstruction enhancement.  For
example, in *Dunnigan*, the Supreme Court found the commission
of perjury is "of obvious relevance" to determining the
appropriate type and extent of punishment after the issue of
guilt has been resolved because it reflects on the
defendant's criminal history, his willingness to accept

1    commands of law and authority of court, and on his character

2    in general.  The Supreme Court indicated, and I quote:

3                    "A sentence enhancement based on perjury does

4    deter false testimony in much the same way as a separate

5    prosecution for perjury.  But the enhancement is more than a

6    mere surrogate for a perjury prosecution.  It furthers

7    legitimate sentencing goals relating to the principal crime,

8    including the goals of retribution and incapacitation.  It is

9    rational for a sentencing authority to conclude that a

10   defendant who commits a crime and then perjures himself or

11   herself in an unlawful attempt to avoid responsibility is

12   more threatening to society and less deserving of leniency

13   than a defendant who does not so defy the trial process.  The

14   perjuring defendant's willingness to frustrate judicial

15   proceedings to avoid criminal liability suggests that the

16   need for incapacitation and retribution is heightened as

17   compared with the defendant charged with the same crime who

18   allows judicial proceedings to progress without resorting to

19   perjury."  And again, I'm citing *United States v. Dunnigan*,

20   Supreme Court case.

21                   Had I imposed a sentence without regard to the

22   Chapter Three adjustments, I would have committed the very

23   violation that is alleged by the *Jenkins* majority.  I would

24   have failed to distinguish Mr. Jenkins from less culpable and

25   less dangerous offenders, who demonstrate some respect for

1    the law, who express remorse, and who don't blame others,

2    including the victims themselves.  Such a sentence would have

3    failed to avoid unwarranted sentencing disparities involving

4    offenders whose sentences fall within the 121- to 151-month

5    range because they were credited with acceptance.  *United*

6    *States v. Aumais*, and I'm quoting, "Finding a sentence of 121

7    months was substantively reasonable because the Guidelines

8    range of 121 to 151 months was well short of the statutory

9    maximum, which was 30 years had the district court chosen to

10   impose consecutive sentences, and the district court found

11   that 121 months imprisonment was 'sufficient, but not greater

12   than necessary' to comply with the purposes of 3553(a) given

13   the violent nature of the images, the number of them, and

14   other considerations."

15             In order to avoid unwarranted disparities, I

16   requested case-specific sentencing data from the Sentencing

17   Commission Office of Research and Data in order to compare

18   Mr. Jenkins to similarly-situated defendants.  As the *Jenkins*

19   majority recognized, "[i]n general, a district court need not

20   consult the Commission's statistics because there is 'no

21   assurance of comparability.'"  Nevertheless, since the

22   majority contends I failed to consider readily available

23   statistics to allow for a meaningful comparison of

24   Mr. Jenkins' behavior to that of other child pornography

25   offenders, I obtained the following sentencing data from the

1    commission relating to offenders who are like Mr. Jenkins

2    with one exception.  Of the 14 offenders found to be similar

3    to Mr. Jenkins over a five-year period, 12 of the 14

4    offenders received a two-level reduction for mere possession

5    or receipt of child pornography pursuant to U.S.S.G. Section

6    2G2.2 -- 2.2(b)(1).  As Mr. Jenkins did not receive this

7    reduction because he transported the pornography into Canada,

8    his Guideline range was two levels higher than most in the

9    comparison group.  According to the Commission, nationally

10   from fiscal years 2012 through 2016, there were only 14

11   offenders sentenced under the 2G2.2 Guideline who, like

12   Mr. Jenkins, did not receive acceptance of responsibility;

13   received an adjustment for obstruction of justice; did not

14   receive an enhancement for pattern of activity involving the

15   sexual abuse of a minor; and who did not receive an

16   enhancement for distribution; but who otherwise received the

17   same enhancements as Mr. Jenkins.  Of the 14 offenders,

18   eight, 57.2, were sentenced within the Guideline range; one,

19   which would be 7.2 percent, was sentenced below the Guideline

20   range sponsored by the government; and five, 35.7, were

21   otherwise sentenced below the Guideline range.  The average

22   sentence for these 14 offenders was 140 months.  The average

23   sentence of the eight offenders who received the Guideline

24   sentence was 170 months.  Again, Mr. Jenkins' Guidelines

25   range was two levels higher than most of this comparison

1      group because he transported the material across the border

2      into Canada and did not receive a two-level reduction under

3      U.S.S.G. Section 2G2.2 -- .2(b)(1).  However, after

4      considering the sentencing data and the majority's opinion, I

5      agree that Mr. Jenkins is "relatively less culpable" among

6      defendants convicted of transportation because it appears he

7      was bringing his collection to Canada for his own use rather

8      than to sell or to distribute to others.  We have no proof to

9      suggest that he was intending to distribute or sell to

10     others.  While I do take exception with the criticism of the

11     majority with regard to the significance of crossing an

12     international border with child pornography, it's not like

13     going from New York to Connecticut, this is an international

14     border where you're subject to search, and that search is

15     likely to happen and certainly if you've ever crossed that

16     border, you would be aware of that, which brought the

17     attention of the prosecution to mention that in their

18     sentencing memorandum.  An indication of how important this

19     pornography, child pornography material was to Mr. Jenkins.

20     Although I find transportation of child pornography across

21     the border very serious, I agree, this is not the typical

22     transportation case, and accordingly, I have resentenced

23     Mr. Jenkins as if he had received the two-level reduction

24     under U.S.S.G. Section 2G2.2(b)(1) and as if his advisory

25     Guideline range had been 168 to 210 months.

1            The Commission's sentencing data shows that,

2    unlike the data relied upon in *Dorvee* and in *Jenkins*, an

3    individualized, case-specific comparison demonstrates the

4    sentence that I have reimposed is not substantively

5    unreasonable when Mr. Jenkins is compared to

6    similarly-situated individuals, and I have not failed to

7    avoid unwarranted sentencing disparities.  In fact, when

8    compared to sentences received by similar offenders, a

9    sentence of 200 months is not shockingly high, not shockingly

10   low, or otherwise unsupported as a matter of law.  As the

11   Second Circuit has held many times before, a sentence is

12   substantively unreasonable "only in exceptional cases where

13   the trial court's decision cannot be located within the range

14   of permissible decisions."

15           I must next address the majority's disagreement

16   with my conclusion that Mr. Jenkins is a high risk to

17   reoffend and that I ignored "widely available definitive

18   research demonstrating that recidivism substantially

19   decreases with age."  Again, I emphasize the importance of

20   relying on meaningful comparisons, statistics, and research.

21   There are several reasons to seriously doubt the majority's

22   proposition that the rates of recidivism for child

23   pornography offenses follow a general pattern of recidivism

24   that decreases with age.

25           First, as the Sentencing Commission statistics

1  show, among all offenders sentenced in 2016 for child

2  pornography offenses, almost half, 46 percent, were 41 years

3  of age or older, and more than half of that group were over

4  50.  The percentage for these age groups are slightly higher

5  in each of the preceding six years, see United States

6  Sentencing Commission, Sourcebook of Federal Sentencing

7  Statistics 2010 to 2016, at Table 6.  This table, which

8  provides the Age of Offenders in Each Primary Offense

9  Category, is broken down by seven age groups starting with

10 "Under 21" and ending with "Over 50."  For the category of

11 child pornography, these statistics reveal for each year,

12 from 2010 to 2016, the number of child pornography cases

13 doubled or almost doubled from the age group "36 to 40" to

14 the age group "41 to 50."  Moreover, for each of the seven

15 years, the percentage of cases were highest for ages 41 to 50

16 and for those over 50, and second, with the exception of

17 2013, which had a slight decrease, the number of cases

18 continued to increase from the age group "41 to 50" to age

19 group "over 50."  These statistics belie the majority's

20 notion that Mr. Jenkins will "age out" of this type of

21 offense when he is released from prison at the approximate

22 age of 56, as it appears child pornography offenses increase,

23 not decrease, with age.  This is the line -- this is in line

24 with one study's findings that the recidivism rate for child

25 pornography offenders increases, rather than decreases, over

1   time.   See *Examining the Criminal History and Future*
2   *Offending of Child Pornography Offenders:   An Extended*
3   *Perspective Follow Up Study*, Law and Human Behavior.   This
4   study also found that the longer that an offender is in the
5   community, the greater the likelihood that he will be caught
6   reoffending.

7           I believe recidivism research and studies relating
8   to sexually dangerous behavior by child pornography offenders
9   is relevant in light of the majority's assumption that
10  Mr. Jenkins "never contacted or attempted to contact any
11  minor" and "never spoke to, much less approached or touched,
12  a child or transmitted explicit images to anybody."   The
13  government contends these assumptions are misplaced given the
14  evidence submitted at trial, a picture found on Mr. Jenkins'
15  computer of him with an unidentified young girl sitting close
16  together, looking back at the camera.   Having sat through the
17  trial, having full knowledge of the case and firsthand
18  knowledge of Mr. Jenkins' behavior, I am unwilling to make
19  such conclusions, in part because we now -- we know very
20  little about his sex offense history.   As the Sentencing
21  Commission cautioned in its 2012 report to Congress on child
22  pornography offenses, "[i]t is well established that the
23  actual rate of offenders' criminally sexually dangerous
24  behavior is higher than the known rate," and "[i]t is widely
25  accepted among researchers that sex offenses against children

1    often go unreported and undetected."  And that's quoting

2    United States Sentencing Commission, *Report to Congress:*

3    *Federal Child Pornography Offenses*, December 2012.

4              Numerous studies have shown that the rate of

5    reporting child exploitation crimes is extremely low,

6    indicating any recidivism rates based on records of arrest or

7    conviction should be viewed as underestimates.  And I'm

8    quoting from a study from the Mayo Clinic.  As one study

9    noted:

10              "The most serious problem with estimating overall

11   recidivism rates ... is that substantial portion of sexual

12   offenses remain undetected.  Comparisons between police

13   statistics and victimization surveys indicate that most

14   sexual offenses, particularly offenses against children,

15   never come to official attention.  It is also implausible to

16   expect that the offenders themselves will provide thorough

17   accounts of their undetected sexual crimes.  Consequently,

18   any empirical estimates of sexual offenders' recidivism rates

19   should be considered underestimates."  And I'm quoting from

20   *Predictors of Sexual Offender Recidivism*.

21              Other studies have highlighted the danger of

22   relying on arrest or conviction records to assess the

23   prevalence of child sex offenses.  For example, in one recent

24   study of child pornography offenders, the authors found that

25   if arrests and convictions were the only indicator used, the

1  percentage of these offenders would have prior contact -- who

2  had prior, excuse me -- who had prior contact offenses with

3  children was low, approximately 12 percent.  Where, however,

4  studies used polygraph testing, or some other means to insure

5  honest self reporting, such as anonymity or immunity from

6  prosecution as part of a treatment program, the numbers were

7  radically different.  The studies with these types of

8  validations determined that over half such offenders admitted

9  prior sexual contact with children.

10             In its 2012 report to Congress on child pornography

11  offenses, the Sentencing Commission highlighted the

12  following:  One, all child pornography offenses, including

13  the simple possession of child pornography, are extremely

14  serious because they both result in perpetual harm to victims

15  and validate and normalize the sexual exploitation of

16  children; two, some federal offenders who commit

17  non-production child pornography offenses also have engaged

18  in sexually dangerous behavior.  Existing studies, which have

19  employed different methodologies and examined different

20  offender populations, have yielded inconsistent findings

21  concerning the prevalence rate of other sex offending by

22  non-production offenders; three, it is well established that

23  the actual rate of offenders' criminally sexually dangerous

24  behavior is higher than the known rate; polygraph testing is

25  an important part of the treatment of child pornography

1   offenders.  Polygraph testing encourages offenders in

2   treatment to be truthful, which can advance the goals of

3   treatment; researchers are beginning to develop actuarial

4   risk assessments to gauge child pornography offenders' risk

5   of sexual recidivism.  Two primary factors that appear to be

6   correlated with criminal sexually dangerous behavior are an

7   offender's antisociality and his sexual deviance; and the

8   Commission's study of 610 offenders sentenced under the

9   non-production Guidelines in fiscal years '99 and 2000 found

10  their rate of known general recidivism was 30 percent.

11  However, caution should be exercised when evaluating any

12  recidivism study, particularly involving sex offenders,

13  because the known recidivism rate is lower than the actual

14  recidivism rate.

15          I believe these highlights from the Commission's

16  report have serious implications concerning Mr. Jenkins and

17  whether this court's sentence was unreasonable in light of

18  his individual and atypical characteristics.  He has never

19  admitted any wrongdoing, he has blamed the victims, he was

20  compelled to bring his child pornography collection into

21  Canada knowing the risk of being caught, which demonstrates

22  his addiction to viewing the sexual abuse of children.

23  Without polygraph testing, we will likely never know more

24  about Mr. Jenkins' offense conduct or his sex offending

25  history.  Existing studies have yielded inconsistent findings

31

1    concerning the prevalence rate of sex offending by

2    non-production offenders and is well established that the

3    actual rate of offenders' criminally sexually dangerous

4    behavior is higher than the known rate.  This is why caution

5    should be exercised when concluding that someone has never

6    committed another sex offending behavior.  The good news is

7    that researchers are beginning to develop actuarial risk

8    assessments to gauge child pornography offenders' risk of

9    sexual recidivism.  And so far, an offender's antisociality

10   and sexual deviance are the two primary factors that appear

11   to be correlated with criminal sexually dangerous behavior.

12            The antisocial risk factor is particularly relevant

13   in my sentencing decision in Mr. Jenkins' case because, as

14   the record shows, I ordered him to undergo a psychological

15   evaluation to determine his competency and his behavior was

16   attributed to narcissistic antisocial personality traits

17   rather than a mental disease or defect.  Among other things,

18   the evaluation contained the following statements or

19   conclusions which are pertinent to Mr. Jenkins' character and

20   this court's finding that he is a danger and is likely to

21   reoffend.  I'm quoting from page 5, first of all, it's

22   quoting, "It appeared Mr. Jenkins presented himself in a

23   consistently favorable light when completing a self-report.

24   Therefore, as a result of his tendency to minimize or deny

25   problem areas, the evaluator recommended his resulting

1    profile and interpretive hypotheses be considered cautiously

2    as they may underrepresent the extent and degree of any

3    significant findings.  Furthermore, despite his defensive

4    approach to the test, Mr. Jenkins endorsed distrust;

5    interpersonal hostility; rigidity; low frustration tolerance;

6    and inflated self-esteem.  He had a strong need for control

7    and expects respect from others."

8            From page 6, "He did not meet the criteria for a

9    known mental disease or defect.  However, given his

10   presentation, he appeared to display some narcissistic and

11   antisocial personality traits.  The evaluator noted his

12   interactions with others would continue to be complicated by

13   his maladaptive personality traits.  Furthermore, his

14   demeanor and beliefs regarding the proceedings and the

15   persons involved was most likely attributable to his

16   antisocial attitude and significant irritability.

17   Mr. Jenkins doubted the charge was serious, stating 'they're

18   trying to make it out to be a big deal.'"

19           Page 7, "It is noted that Mr. Jenkins understood

20   the consequences of committing perjury; he described his

21   relationship with prior attorneys as problematic because they

22   would not follow his directives; and the evaluator concluded

23   Mr. Jenkins was not willing to consider their opinions due to

24   his narcissistic and antisocial characteristics."

25           Pages 8 and 9.  "The evaluator concluded

1    Mr. Jenkins' cynicism appeared to reflect his antisocial and

2    narcissistic attitudes, as well as his ongoing frustration

3    and irritability regarding his case; the hostile themes of

4    his writings appeared to extend from his apparent frustration

5    over the lengthy legal process and his resentment over the

6    proceedings; his hostile behavior towards the Judge was a

7    result of his frustration over legal proceedings; and he was

8    capable of managing his behavior as it was volitional."

9            Quoting again from the Sentencing Commission's

10   report in 2012:

11           "Some researchers have concluded that the single

12   most significant factor associated with criminal sexually

13   dangerous behavior committed by child pornography offenders

14   (in particular, their commission of sexual contact offenses)

15   is their degree of antisociality, as measured on the

16   antisocial behavior scale.  This recent research concerning

17   child pornography offenders is consistent with earlier

18   research that concluded that antisociality, when coupled with

19   sexual deviance, is a strong predictor of sexual recidivism

20   among sex offenders generally.  Because antisociality is

21   typically manifested during an offender's childhood and

22   further because the typical PSR does not contain extensive

23   information about criminal and other antisocial acts

24   committed by offenders before the age of majority, the

25   Commission's special coding project of child pornography

1    cases was unable to specifically examine antisociality among

2    offenders."

3           Given Mr. Jenkins' antisocial characteristics and

4    his offense conduct, I do not believe the sentence I've

5    reimposed is unreasonable in light of what we know and what

6    we do not know about him.  We know that Mr. Jenkins had a

7    large collection of child pornography that he was

8    transporting into Canada.  However, we do not know when he

9    obtained these files or when he first started viewing child

10   pornography.  We know that Mr. Jenkins stored child

11   pornography on three different devices and he possessed a

12   total of 3,811 images and 109 videos.  His collection

13   consisted mostly of prepubescent female children; some bound

14   with chains and ropes; some being forced to perform oral sex

15   on adult men; some being raped by adult men.  He had text

16   documents containing passwords to access websites offering

17   child pornography; one of which appeared to be a members-only

18   site.  He saved child pornography sites in his "favorites"

19   folder on his Toshiba laptop computer.  Child pornography

20   files that were transferred to his 4GB thumb drive were wiped

21   from his Toshiba laptop using CCleaner software, which is a

22   program used to clean and eliminate file history; internet

23   activity; and other residential data maintained by a

24   computer's operating system.  No illicit material was found

25   on his second laptop computer; however, this computer also

had the wiping software.  Mr. Jenkins denied knowing child

pornography was on his computer and he denied any knowledge

of the two thumb drives.  He has never made one single

attempt to admit his wrongdoing; and therefore, we know

nothing about his sex offending history.  Accordingly, making

conclusions without adequate information is something I am

unwilling to do when it comes to protecting the most precious

and vulnerable victims in our society.  Rather, I will be

cautious and carefully weigh the 3553 factors in order to

impose a sentence that is consistent with those factors and

is not greater than necessary; one that includes a lengthy

period of community supervision and necessary conditions of

supervision.

          So I go back where I started three years ago, to

fashion a sentence that is just, reasonable, and not greater

than necessary to achieve the goals of sentencing.  I have

carefully considered the nature and circumstances of the

offense and the history and characteristics of Mr. Jenkins

and find a sentence of 200 months is sufficient but not

greater than necessary to meet the goals of sentencing.  Such

a sentence accounts for the important difference between

those who accept responsibility for their conduct, who do not

commit perjury, and who do not obstruct justice and those

like Mr. Jenkins, who relentlessly claimed he did nothing

wrong, repeatedly blamed others, including the victims of the

1    offense.  Mr. Jenkins' behavior since his arrest and his

2    narcissistic and antisocial personality traits demonstrate he

3    is a high risk of reoffending.  Accordingly, I have imposed a

4    sentence that reflects the seriousness of his offense, that

5    promotes respect for the law, and provides adequate

6    deterrence and that protects the public.

7                    Supervised release terms and special

8    conditions.  I will now address the supervised release term

9    of 25 years and the special conditions that are addressed in

10   the mandate.  I first note that the Second Circuit has

11   consistently upheld long terms of supervised release,

12   including life terms, in non-production cases.  In *Brown*, who

13   was convicted in the Northern District of New York of

14   possession of child pornography and who appealed his lifetime

15   term of supervised release, the Second Circuit held:

16                    "In light of the specific circumstances of

17   Brown's offense, the fact that the Sentencing Guidelines

18   recommend a lifetime of supervised release, U.S. Sentencing

19   Guidelines Manual 5D1.2(b), and the fact that Congress has

20   found that the high rate of recidivism of sex offenders does

21   not decline with age, citing *United States v. Hayes*, we do

22   not find the district court abused its discretion in

23   sentencing Brown to a lifetime term of supervised release."

24                    Incorporating my findings regarding the

25   imprisonment term, I believe a lengthy period of supervised

1    release is necessary to protect the public and deter the

2    defendant from reoffending.  Statistics and studies

3    demonstrate that recidivism rate for child pornography

4    offenders increase with age and over time.  Given

5    Mr. Jenkins' lack of respect for the law, his failure to

6    accept any responsibility for his actions, and his

7    narcissistic and antisocial personality traits, a 25-year

8    term of supervised release is reasonable and is not greater

9    than necessary to comply with the 3553(a) factors; and

10   therefore, this term is reimposed today.

11            Three years ago, I imposed a special -- some

12   special conditions that were either self-evident from the

13   record or reasonably related to Mr. Jenkins' offense and his

14   characteristics.  I was, and still am, guided by the

15   statutory authority and case law when imposing special

16   conditions of supervised release.  Pursuant to 18 U.S.C.

17   Section 3583(d), the court may order any condition that it

18   considers appropriate as long as the condition is, one,

19   reasonably related to certain sentencing factors set forth in

20   18 U.S.C. Section 3553(a)(1) and (a)(2); two, involves no

21   greater deprivation of liberty than is reasonably necessary

22   to implement the statutory purposes of sentencing; and three,

23   is consistent with the pertinent Sentencing Commission policy

24   statements.

25            In accordance with 18 U.S.C. Section 3583(d),

1    United States Sentencing Guidelines provide that a district
2    court may impose conditions of supervised release to the
3    extent that such conditions are, one, reasonably related to
4    the nature and circumstances of the offense and the history
5    and characteristics of the defendant; the need for the
6    sentence imposed to afford adequate deterrence of criminal
7    conduct; the need to protect the public from further crimes
8    of the defendant; and the need to provide defendant with
9    needed educational, vocational training, medical care, or
10   other correctional treatment in the most effective manner;
11   and two, involve no greater deprivation of liberty than is
12   reasonably necessary for the purposes set forth above and are
13   consistent with any pertinent policy statements issued by the
14   Sentencing Commission.  With respect to the reasonably
15   related requirement, "a condition may be imposed if it is
16   reasonably related to any one or more of the specified
17   factors," quoting from *United States v. McLaurin*.  Conditions
18   of supervised release may restrict liberty to the extent
19   reasonably needed to achieve the above purposes.  A district
20   court retains wide latitude in imposing conditions of
21   supervised release and "we therefore review a decision to
22   impose a condition for abuse of discretion."  Nevertheless,
23   the district court's broad discretion in tailoring conditions
24   of supervised release to meet the specific circumstances of a
25   given case is not untrammeled and "we must carefully

1  scrutinize unusual and severe conditions," quoting *United*
2  *States v. Brown.*

3        In *Johnson*, the Second Circuit stated, "In
4  order to satisfy the Due Process Clause, supervised release
5  conditions need not be cast in letters six feet high, or
6  describe every possible permutation, or spell out every last,
7  self-evident detail; conditions may afford fair warning even
8  if they are not precise to the point of pedantry."  They give
9  the person of ordinary intelligence a reasonable opportunity
10 to know what is prohibited so they may act accordingly.

11       As to the role of the district court and
12 probation officers, the Seventh Circuit emphasized, "[i]n
13 reviewing contested conditions of supervised release, the
14 Court of Appeals must be mindful of the fact that the
15 sentencing judge is in a superior position to find facts, and
16 judge their import in the individual case" and "[p]robation
17 officers must be allowed a degree of discretion in performing
18 their difficult job and, at some point, Court of Appeals must
19 fairly presume defendant's probation officer will apply
20 conditions of release in a reasonable manner."

21       In light of the *Jenkins* mandate and the
22 relevant case law, I have carefully reviewed the previously
23 imposed special conditions and will reimpose some while
24 tailoring others.  These special conditions are reasonably
25 related to the defendant's history and characteristics, as

1    well as to the nature and circumstances of his offense.

2    Furthermore, they are necessary to achieve the purposes of

3    deterring further criminal activity, protecting the public,

4    and promoting defendant's rehabilitation, all while involving

5    no greater deprivation of liberty than is reasonably

6    necessary to serve these purposes.  As noted above, a

7    condition need only be reasonably related to one of the

8    specified factors.  Special conditions number 2, 3, 4, and 5,

9    as well as 6 will remain the same.  Conditions number 1 and 7

10   will be modified, and conditions 8 and 9 will not be

11   reimposed because Mr. Jenkins has paid the $40,000 fine and

12   the $12,000 restitution order has been satisfied.

13            The new special condition number 1 reads as

14   follows:  You must not have direct contact with any minor you

15   know or reasonably should know to be under the age of 18

16   without the permission of the probation officer.  If you do

17   not have any direct contact -- if you do -- excuse me.  If

18   you do have direct contact with any minor you know or

19   reasonably should know to be under the age of 18 without the

20   permission of the probation officer, you must report this

21   contact to the probation officer within 24 hours.  Direct

22   contact includes written communication, electronic

23   communication, in-person communication, or physical contact.

24   Direct contact does not include contact during ordinary daily

25   activities in a public place.  The modified language

addresses several concerns raised in the *Jenkins* mandate.
Specifically, the updated condition specifically allows for
incidental contact at a supermarket for instance; it clearly
defines the boundaries of the restriction using common sense
or ordinary intelligence standards; it allows the defendant
to seek permission to have contact with a minor; and it
involves no greater deprivation of liberty than is necessary
to afford adequate deterrence to criminal conduct and to
protect the public.  Like the *Johnson* court, I have refined
the terms of the condition to involve purposeful initiative
to have contact with a minor which allows a person of
ordinary intelligence to know what is prohibited.  Moreover,
the structure of the modified language clearly indicates that
inadvertent contact with minors does not result in violation
of the condition.  This condition is reasonably related to
Mr. Jenkins' offense and involves no greater deprivation of
liberty than is necessary.  Given the nature of his crime, it
is not unreasonable to restrict an individual who takes
pleasure in viewing the rape and sexual abuse of children
from unsupervised contact with children.

New special condition number 7 reads as
follows:  If the defendant's employment requires the use of a
computer, the defendant may use a computer in connection with
his employment provided the defendant notifies his employer
of the nature of his conviction and the fact that his offense

1    was facilitated by the use of a computer.  The probation

2    officer must confirm the defendant's compliance with this

3    notification requirement.

4                    The modification removes the requirement that

5    employment be approved by the probation officer.  This

6    condition is reasonably related to Mr. Jenkins' offense and

7    circumstances because he used a computer to facilitate his

8    crime and he attempted to blame his employees by falsely

9    claiming they had access to his computers and suggesting that

10   they must have put the child pornography on his equipment.

11   The government's evidence at trial also established he kept

12   child pornography on his laptop computer intermingled with

13   his business records and contracting estimates and he saved

14   child pornography while conducting business.  Accordingly,

15   his condition -- this condition is necessary to monitor his

16   computer use and to make sure his employer is aware of his

17   conviction, thereby minimizing any inappropriate computer

18   use.  In the *MacMillen* case, the Second Circuit upheld the

19   employer's notification condition for a defendant convicted

20   of possessing child pornography, finding it was not

21   overbroad.  The Circuit reasoned:

22                    "Moreover, MacMillen's offense of

23   conviction -- possessing computerized images of child

24   pornography that had been obtained via the internet --

25   adequately informs probation as to what circumstances might

43

present a risk of recidivism, thus warranting employer

notification.  This is underscored further by a different

special condition of supervised release which specifically

authorizes probation to monitor MacMillen's computer use and

conduct unannounced inspections of any computers he may

use -- including computers he uses at work.  The

circumstances of this case therefore make it pellucidly clear

that employers are to be notified of MacMillen's conviction

when, because of the nature of the employment, there is a

possibility that MacMillen will have access to a computer,

and thus be presented with the opportunity to obtain

computerized images of child pornography."

        Although I am not reimposing special condition

number 8, the record should reflect that I would have

reimposed the condition had Mr. Jenkins not paid his monetary

penalties in full.  The condition have remained -- would have

remained the same but with the following caveat at the end of

the condition:  "unless you are in compliance with the

payment schedule."  The modified language provides, as long

as a defendant remains in compliance with his payment

schedule, new credit charges or additional lines of credit

need not be approved.

        My justification for this condition is

important because the panel concluded that nothing in the

record suggested that restricting Mr. Jenkins from incurring

1    new debt was reasonably necessary.  By no means would this

2    condition have prevented Mr. Jenkins from buying a drink on

3    an airplane or taking an Uber ride, as suggested by the

4    panel.  Rather, in line with the Sentencing Commission's

5    Policy Statement at 5D1.3(d)(2), the condition was imposed

6    because he was ordered to pay a fine and restitution.  This

7    condition was particularly reasonable in Mr. Jenkins' case

8    because, as the record demonstrates, he attempted to hide his

9    substantial assets from the court to make himself appear to

10   be indigent and he failed to provide any financial

11   information during his presentence investigation.  The

12   condition was therefore necessary to adequately monitor his

13   financial situation and to ensure he paid his cost --

14   court-ordered monetary obligations while restricting his

15   collection of debt.

16            None of the special conditions imposed today

17   prevent Mr. Jenkins from leading a normal life.  While the

18   panel believed the conditions imposed meant Mr. Jenkins would

19   never be able to pay his debt to society, Mr. Jenkins has

20   already proven that wrong by paying his debts while

21   incarcerated.  While the panel believed the special

22   conditions would have likely prevented him from developing

23   and maintaining meaningful relationships, the record

24   demonstrates that he will likely be -- that will likely only

25   be the case as a result of his own personality

1    characteristics.  As to employment, Mr. Jenkins is college

2    educated and he operated his own business for 20 years.

3    Beyond his personality traits, I find no reason to believe he

4    will have any trouble obtaining employment should he choose

5    to do so.

6              In conclusion, I note that by the operation of

7    law, a district court may modify, reduce, or enlarge the

8    conditions of supervised release at any time prior to the

9    expiration or termination of a term of supervised release.

10   Therefore, at any time during the supervised release period,

11   Mr. Jenkins or the probation officer can certainly apply for

12   modifications or removal of a special condition, and the

13   court will entertain such applications as long as there is a

14   basis to do so for that application to go forward.  This

15   court also obviously has the authority to grant early

16   discharges from supervision should it be warranted.

17             (A discussion was held off the record between

18             The Court and the courtroom deputy.)

19        THE COURT:  The counts, I imposed a 200-month

20   sentence, Counts 1 and 2, those sentences will run concurrent

21   for a total of 200 months.

22             With regard to what appears to be the new arguments

23   submitted from the defendant, defense counsel with respect to

24   restitution and fine, the court finds that those were

25   appropriate and proper.  The government submitted their

1    arguments with regard to that and the court acknowledges

2    that, those will be maintained as already been collected and

3    will not be disturbed in this resentencing.

4              Anything from the government?

5              MS. THOMSON:  No, your Honor.

6              MS. PEEBLES:  Your Honor, I just note our objection

7    to the court's sentence, but I also want to make clear that

8    Mr. Jenkins, the fine that was imposed, the $40,000 actually

9    cost him more than $60,000 because they reached into his

10   retirement account and as a result, it cost him penalties and

11   unpaid interest, so it actually cost him more than the

12   $40,000 that this court initially imposed.  And I just want

13   the record to be clear that that in fact is how that debt had

14   been satisfied.  Thank you.

15             THE COURT:  Okay.  Anything else?

16             MS. THOMSON:  No, your Honor.

17             THE COURT:  Okay.

18                  (A discussion was held off the record between

19                   The Court and the courtroom deputy.)

20             THE COURT:  And certainly, as is always the case,

21   an appeal must be filed within 14 days of the date of the

22   judgment being filed in this case which will be refiled and,

23   as I indicated, my sentencing statement will be filed with

24   the statement of reasons.  Okay?

25             MS. PEEBLES:  Thank you.

1              THE COURT:  All right.

2              THE CLERK:  Court is adjourned.

3                   (A discussion was held off the record.)

4              MS. THOMSON:  Your Honor, just with regard to the

5    statutory maximum for the second count which would be the

6    possession, it's 120 months.  Your sentence of 200 months, I

7    heard you indicate that the two counts will be concurrent to

8    each other and I just would like to put on the record that

9    the 200 months would be for Count 1 and it would be 120

10   months for Count 2?

11             THE COURT:  Yeah, you know, I think that's clear,

12   but so it is clear on the record, that's exactly what's

13   happening, they run concurrent, it's -- Count 1 is the --

14             MS. PEEBLES:  Transport.

15             MS. THOMSON:  Transportation.

16             THE COURT:  -- transportation, and Count 2 is

17   the --

18             MS. PEEBLES:  Possession.

19             THE COURT:  -- possession and they run concurrent

20   together for a total of 200 months, okay?

21             MS. PEEBLES:  Thank you.

22             THE COURT:  All right.

23                   (Court Adjourned, 12:06 p.m.)

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4          I, JODI L. HIBBARD, RPR, CRR, CSR, Federal

5     Official Realtime Court Reporter, in and for the

6     United States District Court for the Northern

7     District of New York, DO HEREBY CERTIFY that

8     pursuant to Section 753, Title 28, United States

9     Code, that the foregoing is a true and correct

10    transcript of the stenographically reported

11    proceedings held in the above-entitled matter and

12    that the transcript page format is in conformance

13    with the regulations of the Judicial Conference of

14    the United States.

15

16                    Dated this 29th day of January, 2018.

17

18

19                    /S/ JODI L. HIBBARD
                      _____

20                    JODI L. HIBBARD, RPR, CRR, CSR
                      Official U.S. Court Reporter
21

22

23

24

25